## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

POMONA VALLEY HOSPITAL MEDICAL
CENTER,
1798 North Garey Avenue
Pomona, CA 91767,

                        Plaintiff,

            v.

ALEX M. AZAR II, Secretary,                              Case No. _____
United States Department of Health and
Human Services,
200 Independence Avenue, S.W.
Washington, D.C. 20201,

                        Defendant.

            Plaintiff Pomona Valley Hospital Medical Center ("the Hospital"), by and through its

undersigned attorneys, brings this action against defendant Alex M. Azar, II, in his official

capacity as the Secretary ("the Secretary") of the Department of Health and Human Services

("HHS"), and states as follows:

### INTRODUCTION

            1.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. §§1395

*et seq*. (the "Medicare Act"), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§551 *et*

*seq*. The Hospital seeks judicial review of the final decision (the "Final Decision") issued by the

Provider Reimbursement Review Board ("Board" or "PRRB") rejecting the Hospital's challenge

to the Supplemental Security Income ("SSI") percentages calculated by the Centers for Medicare

& Medicaid Services ("CMS") that were used to determine the Hospital's Medicare

disproportionate share hospital ("DSH") payments for the Hospital's Fiscal Years ("FYs") 2006,

2007, and 2008.  The Hospital challenged those SSI percentages as understated based on official records from the California "Medi-Cal" program (California's Medicaid program) showing that CMS undercounted the number of days during which the Hospital's inpatients were entitled to Medicare Part A and SSI benefits.  Significantly, CMS could have, but refused to, provide the data that would conclusively show whether the SSI percentages at issue were, in fact, accurate.

2.     The PRRB's Final Decision, which is the Secretary's Final Decision for purposes of judicial review, must be set aside because it is arbitrary and capricious, not based on substantial evidence, and otherwise unlawful.  For example, the PRRB failed to address the uncontroverted testimony from the Hospital's expert showing that the SSI percentages were incorrectly low and unreasonably not based on the best available data.  The evidence in the record shows that there are unexplained discrepancies in the data that CMS used to calculate the SSI percentages at issue, and that CMS unreasonably failed to consider other sources of data and, therefore, relief is warranted.

3.     The Hospital seeks an order (a) reversing or setting aside the Final Decision, (b) requiring CMS to provide the Hospital with access to the information necessary to confirm that the SSI percentages at issue were incorrectly understated, and (c) directing the Secretary to recalculate the Hospital's DSH payments for the FYs at issue using SSI percentages based on correct data.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction under 42 U.S.C. §1395oo(f) (appeal of final Medicare program agency decision) and 28 U.S.C. §§1331 (federal question) and 1361 (mandamus).

5.     Venue lies in this judicial district under 42 U.S.C. §1395oo(f) and 28 U.S.C. §1391.

## PARTIES

6.      At all times relevant to this action, the Hospital (Medicare Provider No. 05-0231) was a Medicare-participating, not-for-profit general acute-care hospital located in Pomona, California that furnished inpatient and outpatient hospital services to patients entitled to benefits under the Medicare program and others.

7.      Defendant Alex M. Azar, II, is the Secretary of HHS, the federal department which contains CMS.  The Secretary, the federal official responsible for administration of the Medicare Program, has delegated the responsibility to administer that program to CMS.  Before June 14, 2001, CMS was known as the Health Care Financing Administration ("HCFA").  In this Complaint, the Hospital generally refers to the agency as CMS.

## PROCEDURAL BACKGROUND

8.      This action arises from three consolidated PRRB appeals challenging the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008.  The PRRB held a combined hearing on these three appeals on August 17, 2017 (the "Hearing").  Following the Hearing, and extensive post-hearing briefing, the PRRB issued its Final Decision on October 1, 2018.  On November 21, 2018, the CMS Administrator gave notice that she had declined to review the PRRB's decision, making it the Secretary's Final Decision for purposes of judicial review under 42 U.S.C. §1395oo.  This action is timely-filed under 42 U.S.C. §1395oo(f).

## GENERAL BACKGROUND OF THE MEDICARE PROGRAM

9.      The Medicare Act establishes a system of health insurance for the aged, disabled, and individuals with end-stage renal disease.  42 U.S.C. §1395c.  The Medicare program is federally funded and administered by the Secretary through the CMS and its contractors.  42 U.S.C. §1395kk; 42 Fed. Reg. 13,262 (Mar. 9, 1977).

10.     CMS implements the Medicare program, in part, through the issuance of official Rulings.  *See* 42 C.F.R. §401.108.  In addition to the substantive rules published by the Secretary in the Code of Federal Regulations and the Rulings, CMS publishes numerous other interpretative rules implementing the Medicare program, which are compiled in one or more CMS Manuals.  The Secretary also issues other subregulatory documents to implement the Medicare program, which generally do not have the force and effect of law.  The Medicare Act, at 42 U.S.C. §1395hh(a), prohibits the application of any rule or policy that establishes or changes a substantive legal standard governing the payment for service unless it is promulgated by the Secretary using notice-and-comment rulemaking.

11.     The Medicare program is divided into five parts: A, B, C, D, and E.  Part A of the Medicare program, which is the Part primarily at issue in this action, provides for coverage and payment for, among others, inpatient hospital services on a fee-for-service basis.  42 U.S.C. §§1395c *et seq*.  Individuals are automatically entitled to Part A coverage when they reach age 65 if they are entitled to Social Security benefits, or at a younger age if they become disabled and have been entitled to disability benefits for 24 calendar months.  42 U.S.C. §426.  In addition, the Medicare Program provides that certain qualifying individuals with end stage renal disease are entitled to Part A coverage.  *See* 42 U.S.C. §426-1.  Part A services are furnished to Medicare beneficiaries by "providers" of services, including the Hospital, that have entered into written provider agreements with the Secretary, under 42 U.S.C. §1395cc, to furnish hospital services to Medicare beneficiaries.

12.     CMS pays providers participating in Part A of the Medicare program for covered services rendered to Medicare beneficiaries through Medicare Administrative Contractors ("MACs"), which are agents of the Secretary.  Each Medicare-participating hospital is assigned

to a MAC. 42 U.S.C. §1395h. The amount of the Medicare Part A payment to a hospital for services furnished to Medicare beneficiaries is determined by its MAC based on instructions from CMS.

13.    Effective with cost reporting years beginning on or after October 1, 1983, Congress adopted the hospital inpatient prospective payment system ("IPPS") to reimburse hospitals, including the Hospital, for inpatient hospital operating costs. Under IPPS, Medicare payments for hospital inpatient operating costs are not based directly on the costs actually incurred by the hospitals. Rather, they are based on predetermined, nationally applicable rates based on the diagnosis of the patient determined at the time of discharge from the inpatient stay, subject to certain payment adjustments. One of these adjustments is the Medicare "disproportionate share hospital" or "DSH" payment. *See* 42 U.S.C. §1395ww(d)(5)(F).

## MEDICARE DSH PAYMENT

14.    Hospitals that treat a disproportionately large number of low-income patients are entitled by statute to a DSH payment adjustment, in addition to standard Medicare payments. 42 U.S.C. §1395ww(d)(5)(F). Congress enacted the DSH adjustment in recognition of the relatively higher costs associated with providing services to low-income patients. These higher costs have been found to result from the generally poorer health of low-income patients. The DSH adjustment provides additional Medicare reimbursement to hospitals for the increased cost of providing services to their low-income patients.

15.    There are two methods of determining qualification for a DSH adjustment: the more common "proxy method" (42 U.S.C. §1395ww(d)(5)(F)(i)(I)) and the less common "Pickle method" (42 U.S.C. §1395ww(d)(5)(F)(i)(II)). The Hospital's DSH calculations were made using the proxy method, under which entitlement to a DSH adjustment, as well as the amount of

the DSH payment, is based on the hospital's "disproportionate patient percentage" ("DPP"). 42 U.S.C. §1395ww(d)(5)(F)(v) and (vi).

16.    The DPP is the sum of two fractions, which are designed to capture the number of low-income patients a hospital serves on an inpatient basis by counting the number of days that <u>certain</u> low-income patients receive inpatient services in a given fiscal year. Thus, the two fractions serve as a "proxy" to determine low-income patients, rather than having CMS count the actual number of such patients.

17.    The focus of this action is the first fraction in the DPP equation, referred to as the "Medicare/SSI fraction," which accounts for inpatients who are entitled to both Medicare Part A benefits and benefits under SSI, a federal low-income supplemental payment focused primarily on supplementing the income of low-income individuals who are either aged, blind, or disabled. The Medicare/SSI fraction is defined by statute as follows:

> [T]he fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter.

42 U.S.C. §1395ww(d)(5)(F)(vi)(I). The Medicare/SSI fraction, therefore, is the percentage of a hospital's Medicare Part A-entitled inpatients who were also entitled to SSI benefits at the time that they were receiving inpatient services at the hospital. The terms "Medicare" and "SSI," and "ratio," "fraction," "proxy" and "percentage" are all used interchangeably throughout various sources to describe the fraction set forth in 42 U.S.C. §1395ww(d)(5)(F)(vi)(I). For consistency, the term "Medicare/SSI fraction" is used herein.

18.     There is no discussion, direction, or limitation, in either the statute or regulation, as to the particular time when the data used to calculate the Medicare/SSI fraction should be measured or when that calculation must be finalized.  *See* 42 U.S.C. §1395ww(d)(5)(F)(vi)(I); *see also* 42 C.F.R. §412.106 [2008].  There is similarly no limitation in the statute or regulation regarding review of the accuracy of the calculation of the Medicare/SSI fraction at a later date.

19.     CMS determines the numerator of the Medicare/SSI fraction for all IPPS hospitals by matching data from the Medicare Provider Analysis and Review ("MedPAR") file, which is Medicare's database of hospital inpatients, with a file created for CMS by the Social Security Administration ("SSA"), the agency that administers the SSI program, to identify SSI-recipients. CMS generally does not share with providers the underlying SSA data that CMS uses to "match" inpatients for Medicare DSH purposes and specifically refused the Hospital's request for such data for purposes of determining the accuracy of the SSI percentages at issue.

20.     Section 3-20.3 of the Medicare Claims Processing Manual ("MCPM") requires MACs to make DSH payment determinations using the Medicare/SSI fraction supplied to them by CMS.  Accordingly, IPPS hospitals, such as the Hospital, are not permitted to create their own Medicare/SSI fractions for use by CMS or their MAC.  In accordance with this duty, the Hospital's MAC made the DSH payment determinations at issue in this action using the Medicare/SSI fractions that CMS furnished to them.

## PREVIOUS SCRUTINY OF CMS'S CALCULATION OF THE MEDICARE/SSI FRACTION

21.     There has previously been scrutiny of, and litigation regarding, CMS's calculation of the Medicare/SSI fraction.  In *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ("*Baystate*"), this Court determined that, given the evidence in the record, it was arbitrary and capricious for the CMS Administrator to find that

CMS had used the "best available data" in determining the Medicare/SSI fractions at issue in that action. To correct the agency's errors, the Court remanded the matter to the Secretary for the purposes of having CMS recalculate the Medicare/SSI fractions at issue based on the "best available data" as determined by the Court. The *Baystate* Court was unmoved by the Secretary's arguments that Medicare/SSI fraction recalculations would conflict with the agency's interest in "administrative finality."

22.    In response to *Baystate*, CMS issued CMS Ruling 1498-R ("the Ruling") on April 28, 2010. The Ruling required CMS to review and recalculate the Medicare/SSI fraction of Baystate Medical Center and the other *Baystate* plaintiffs. CMS also required, as part of the Ruling, that the claims for all hospitals pending at the PRRB as of the date of the Ruling—April 28, 2010—would thereafter be remanded to the hospitals' MACs for reprocessing pursuant to CMS's "improved" methodology for calculating Medicare/SSI fractions.

23.    Further, for all claims in cost reporting periods that had not been settled as of April 2010, which includes the FYs at issue here, the Ruling required the MAC to recalculate the Medicare/SSI fraction using the "suitably revised data matching process" ordered by this Court in *Baystate* or, in the alternative, using the methodology implemented under CMS's final rule published on August 16, 2010 ("FFY 2011 IPPS Final Rule"), effective October 1, 2010, depending on the year at issue and whether that Final Rule applied.

24.    More specifically, in the FFY 2011 IPPS Final Rule, CMS implemented a revised data matching process, explaining that only the following three SSA codes transmitted to CMS would be counted as confirming a patient's entitlement to SSI: C01, M01, and M02. *See* 75 Fed. Reg. 50,041, 50,281 (Aug. 16, 2010). CMS would not take into account any other SSA codes in its determination of whether a particular patient was entitled to SSI. The FFY 2011 IPPS Final

Rule did not, however, explain how CMS determined that these particular SSA codes alone "match up" to a patient's SSI entitlement or how these codes were derived. In addition to limiting the SSA codes upon which CMS would rely, in the Final Rule's preamble, CMS also attempted to limit the use of specific data to that available as of fifteen months after the end of the Federal fiscal year and to require that the data be measured only once, and never revisited. *See* 75 Fed. Reg. at 50,282. Such a limitation resulted in calculations that, almost by definition, are arbitrary and incorrect because not all of the relevant SSI entitled determinations are made and/or identified until after this time period.

25.    As a result of the Ruling, CMS calculated new Medicare/SSI fractions for the Hospital for the FYs at issue, which the MAC used to make the DSH payment determinations that the Hospital challenged because CMS's recalculations still significantly understate the Hospital's Medicare/SSI patient days, due to inaccurate and/or incomplete data, which the MAC and CMS have failed to explain and which reflect an incomplete and arbitrary process.

## THE MEDICARE APPEALS PROCESS

26.    Under the Medicare program, each hospital's MAC is required to audit the hospital's annually submitted Medicare cost report and issue a Notice of Program Reimbursement ("NPR"), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year.

27.    If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the PRRB by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. §1395oo.

28.     The decision of the PRRB constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the PRRB's decision.  42 U.S.C. §1395oo(f)(1); 42 C.F.R. §§405.1875 and 405.1877.  The Secretary has delegated his authority under the statute to review PRRB decisions to the CMS Administrator.

29.     A hospital may obtain judicial review of the PRRB's decision by filing suit within 60 days of receipt of notice of any final decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia.  42 U.S.C. §1395oo(f).  In any such action, the Secretary is the proper defendant.  *See* 42 C.F.R. §421.5(b).  Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of a hospital that prevails in an action brought under 42 U.S.C. §1395oo(f).

30.     Judicial relief is also available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a non-discretionary duty to honor that right.  *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807 (D.C. Cir. 2001).

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

31.     Under 42 U.S.C. §1395oo(f)(1), an action brought for judicial review "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the APA.  Under the APA, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §706(2)(A).  "Generally, an agency's decision is arbitrary and capricious 'if the agency . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Johnson v. U.S. Dep't of Educ.*, 580 F. Supp. 2d 154,

157 (D.D.C. 2008) (*quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co. ("Motor Vehicle")*, 463 U.S. 29, 43 (1983)) (internal citations omitted).  Furthermore, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. §706(2)(C).

32.     Additionally, a "reviewing court shall…hold unlawful and set aside agency action, findings, and conclusions found to be…without observance of procedure required by law."  5 U.S.C. §706(2)(D).  The APA dictates rulemaking procedural requirements, specifically the requirement that the agency provides notice of proposed rulemaking, that the agency affords interested parties an opportunity to comment on the proposed rulemaking, and that the agency considers the relevant matters presented.  5 U.S.C. §553.

## FACTUAL BACKGROUND

### THE HOSPITAL'S ANALYSIS OF CMS'S MEDICARE/SSI FRACTIONS FOR THE FYS AT ISSUE

33.     For each FY at issue here, the Hospital filed its cost report using its best estimate of what its Medicare/SSI fraction should be based on prior experience.  At final audit, the MAC adjusted the Hospital's Medicare/SSI fraction, reducing it in each FY to the percentage determined and published by CMS, following its matching of SSA and CMS data.  CMS's Medicare/SSI fractions calculated for the Hospital for FYs 2006, 2007, and 2008, respectively, were 14.74%, 14.73%, and 14.40%.

34.     As explained in detail below, the Hospital was unable to access the underlying SSA data that CMS used in calculating the Medicare/SSI fractions at issue, either from SSA directly or through CMS.  Thus, to review the accuracy of CMS's published Medicare/SSI fractions for FYs 2006, 2007, and 2008, the Hospital used a number of other verified data

sources.  In particular, the Hospital analyzed data drawn from a database maintained by the State of California, which is directly compiled using SSA data, and compared it to data that CMS used to determine the Hospital's SSI percentages at issue.   The applicability and accuracy of Hospital's data collection and calculation methodology was confirmed by testimony given by the former Director of California's Medi-Cal program, whom the PRRB accepted as an expert, and extensive evidence submitted on the record.   A brief summary of that data collection and methodology is included here.

35.    The Hospital gathered "aid" or "aide" codes for all of its patients who were Medi-Cal beneficiaries under the California Department of Health Care Services ("DHCS"), the State Medicaid agency for California.  Specifically, the Hospital compiled a list of all patients that DHCS assigned aid codes "10", "20," and "60," since these three aid codes specifically and uniquely identify individuals who are confirmed to the State Medi-Cal program by SSA as actively receiving SSI and/or state supplementation payments ("SSP") benefits.  As confirmed by expert testimony, the assignment of these three aid codes is based completely on information that DHCS receives from SSA, which is updated weekly or monthly.

36.    The Hospital went to extraordinary lengths to confirm the aid codes assigned for particular days for each and every patient, utilizing data from the State Medi-Cal Paid Claims Summaries, the Hospital's internal patient data, including its internal financial patient database, the DSS database, a database prepared and maintained by a private contractor to DHCS, "HDX"; and the Automated Enrollment Verification System ("AEVS") operated by DHCS.

37.    During this first phase of the process, if the Hospital could not confirm that a particular patient had SSI and/or SSP benefits during the patient's inpatient stay, the Hospital would not include the inpatient days from that patient in its total count of days in the

Medicare/SSI fraction numerator. Similarly, if a patient were assigned a "10", "20," or "60" aid code for a portion of his or her inpatient stay, only those days during the period actually covered were included in the Hospital's calculation of the Medicare/SSI fraction numerator.

38. The Hospital recognized that the total number of patients (and days) associated with aid codes 10, 20, or 60, may include some patients that were receiving only SSP benefits, and thus would not be eligible to be counted in the Medicare/SSI fraction. However, DHCS records do not distinguish between a patient who receives SSI and SSP benefits, and one that receives only SSP benefits, and, as previously mentioned, the Hospital was unable to access SSA data to confirm the exact number of patients receiving only SSP benefits. To eliminate patients receiving only SSP benefits from the calculation, the Hospital reduced its "raw" total of patients (and days) by approximately 16.5%, which is the Statewide average from 2005 through 2009 of SSI/SSP patients having only SSP benefits. These calculations were confirmed through expert testimony. Further, the Hospital presented testimony at the Hearing that the Statewide average was likely <u>higher than</u> the actual percentage of SSP only beneficiaries in Southern California, where the Hospital is located.

39. Second, the Hospital obtained, through data use agreements, CMS's data, from the MedPAR file, that supported Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

40. Third, with the above two datasets—the Hospital's verified list of patients assigned aid codes 10, 20, or 60, and CMS's MedPAR file—the Hospital compared patient-by-patient, and day-by-day, the days that CMS included in the numerator of the Medicare/SSI fraction for each of the FYs at issue, and the Hospital's results, and grouped the days as either "matched" (CMS's data and Hospital's data is in agreement), "unmatched" (Hospital's data

includes verified 10, 20, or 60 aid code for all days, but CMS does not include the patient and days on its list of Part A/SSI beneficiaries), or "partial match" (a portion of the inpatient admission was "matched" but not all days of the admission).  The results of the comparison are:

| Year | CMS "SSI" Days | Hospital "SSI" Days | CMS "SSI" Patients | Hospital "SSI" Patients |
|------|----------------|---------------------|--------------------|-------------------------|
| 2006 | 4,886 | 5,841 | 748 | 1,129 |
| 2007 | 4,153 | 5,553 | 757 | 1,197 |
| 2008 | 4,238 | 5,500 | 729 | 1,148 |

41.    As evident from this chart, CMS's Medicare/SSI fraction for the Hospital is lower than the Hospital's calculated SSI fraction by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008.  In addition, CMS's count of patients receiving SSI benefits during the month(s) of admission is lower than the Hospital's count of SSI receiving patients during these years by 20.56% in 2006, by 24.09% in 2007, and by 23.79% in 2008.  The differences between CMS's data and the Hospital's data result in estimated negative reimbursement impacts of $770,837 in FY 2006, $1,291,520 in FY 2007, and $1,232,627 in FY 2008.  These differences were confirmed by expert testimony, and are <u>unexplained</u> by any theory espoused (or evidence submitted) by the MAC or CMS during the PRRB appeal process.

42.    The Hospital presented an overwhelming amount of evidence and testimony before the PRRB, including but not limited to, expert testimony at the Hearing, and then provided additional information and evidence in response to numerous PRRB questions on specific factual issues related to the methodology and data sources detailed above.  The MAC introduced no contrary evidence, brought no witnesses to offer contrary evidence at the Hearing, and based its argument on CMS's right to calculate providers' Medicare/SSI fractions essentially in any way CMS deems appropriate, despite the APA requirements to the contrary.  The Hospital met its burden of production of evidence and proof and established before the PRRB that it is

entitled to relief.  Indeed, the Hospital's expert testimony, which went completely unrefuted during the Hearing, was not addressed by the PRRB <u>at all</u> in the Final Decision.

**THE PRRB'S FINAL DECISION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE**

43.    In its Final Decision, the PRRB determined that the Medicare/SSI fractions used by the MAC were proper.  This determination was based on a number of findings that are unsupported by any evidence, let alone substantial evidence, including but not limited to the following:

    a.    The Hospital assumed all individuals with 10, 20, or 60 aid codes mapped to SSI codes of C01, M01, or M02;[1]

    b.    The Hospital did not provide a "crosswalk" between aid codes 10, 20 and 60, and the SSI codes C01, M01, or M02;

    c.    The Hospital did not explain or identify the potential reasons for differences between the Medi-Cal aid codes and SSI codes;

    d.    The Hospital could have, but did not, provide an estimate of the impact of two potential explanations for the variances between the state Medi-Cal aid codes and SSI codes; and, finally,

    e.    The Hospital did not submit sufficient quantifiable data in the record to prove that the Medicare/SSI fractions calculated by CMS, and used in Hospital's 2006, 2007, and 2008 cost reports, were flawed.

44.    The Final Decision also failed to address the extensive, uncontroverted evidence and testimony, including expert testimony by the former Director of the Medi-Cal program and Director of the Eligibility Branch of Medi-Cal, presented by the Hospital at the Hearing and in post-hearing briefing and accompanying declarations.  The expert testimony offered by the

---

[1]  To the extent that the Hospital's initial totals, calculated prior to the Hearing, of individuals with aid codes of 10, 20, or 60, potentially included individuals receiving SSP benefits only, the PRRB recognized that the Hospital corrected its totals by adjusting for SSP-only days.  The Final Decision does not challenge the Hospital's revised number of SSI patients/days on that basis. Similarly, the PRRB accepted the Hospital's use of the CMS MedPAR total of entitled (covered) days as the denominator of its request for recalculation of the SSI Fraction for FYs 2006, 2007, and 2008 as it is not questioned in the Final Decision.

Hospital covered numerous, highly relevant topics, and, in particular, confirmed Hospital's methodology for calculating its SSI patients/days through analysis of Medi-Cal records, which included accounting for SSP-only days; confirmed the insignificant effect of nursing home residents and month of eligibility on Hospital's final count of SSI patients/days; and, finally, confirmed that the difference between CMS's and Hospital's Medicare/SSI fractions is significant and unexplained by any CMS or MAC theory. Although the PRRB accepted one of the Hospital's witnesses as an expert, the PRRB failed even to comment in the Final Decision on the expert report, testimony, or additional declaration responding to specific Board inquiries.

### THE PRRB'S UNSUPPORTED FINDINGS REGARDING THE RELATIONSHIP BETWEEN AID CODES AND SSI CODES

45.    The PRRB's fundamental misunderstanding of the data issues raised by the Hospital on appeal, and the PRRB's ignoring of unrefuted expert testimony, resulted in the PRRB's unsupported (and clearly inaccurate) findings (1) that the "Provider's methodology assumes that all individuals with an 'aid code' of 10, 20, or 60 will map to an SSI code of C01, M01, or M02," and (2) that a "crosswalk [between the "Medi-Cal" aid codes and CMS SSI codes] is necessary to determine if the Provider's use of 'aid codes' 10, 20, and 60, accurately identified only those individuals with an SSI code of C01, M01, and M02."

46.    Without the underlying SSA data that support the SSI codes, a comparison of the two datasets is not possible.

47.    The futility of the comparison between Medi-Cal aid codes and CMS SSI codes, as well as the Hearing testimony and the Hospital's post-hearing brief and accompanying declarations, make it clear that merely matching the aid codes to the specific SSI/CMS codes C0I, M0I and M02 is not the focus of the Hospital's appeal. Instead, the focus of the Hospital's appeal is whether CMS's count of qualifying SSI and Part A days is correct—or, put another

way, whether CMS's matching process is flawed such that C01, M01, and M02 <u>do not capture</u> <u>all qualifying SSI and Part A days</u> for the Hospital's inpatients during FYs 2006, 2007, and 2008.

48.     As discussed above, this Court previously ordered CMS to modify its methodology for matching CMS Medicare data and the SSI benefits information provided by SSA.  While CMS modified its methodology, virtually nothing is known about the underlying matching process.   And, the MAC presented <u>no evidence</u> supporting CMS's methodology before, at, or following the Hearing.   On the other hand, the Hospital has shown, through extensive evidence and testimony, that aid codes 10, 20, and 60, can be assigned by State DHCS <u>only in cases where a potential Medi-Cal beneficiary is aged, blind or disabled and is entitled to</u> <u>SSI and/or SSP benefits</u>.   The Hospital also provided extensive evidence, as well as expert testimony, demonstrating how SSI and SSP entitlement data is transmitted directly from SSA to DHCS and how such data is translated into aid codes by the DHCS.  It appears that the PRRB's only issue with the Hospital's evidence in this regard is that it does not link the aid codes to the SSI codes of C01, M01, and M02.  For the reasons stated above, this is insufficient to support the PRRB's conclusion that the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008 were proper.

### THE PRRB'S UNSUPPORTED FINDINGS REGARDING POTENTIAL EXPLANATIONS FOR VARIANCES BETWEEN THE DATA

49.     The PRRB also found that the Hospital did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Hospital's FYs 2006, 2007, and 2008 cost reports, were flawed.  The PRRB appeared to base this finding on Hospital's alleged inability (1) to explain or identify the potential reasons for differences between Medi-Cal's aid codes and CMS's SSI codes; (2) to demonstrate the significance

resulting from differences in coding nursing home residents, and (3) to demonstrate the significance resulting from differences in effective dates for Medi-Cal eligibility versus SSI payments.

50.    The record demonstrates that the Hospital met its burden of producing substantial evidence that the discrepancies in CMS's data had an impact on the Hospital's Medicare/SSI fraction, and ultimately the Hospital's DSH payment.  However, CMS and SSA are in sole possession of the records necessary to conclusively prove (or disprove) the Hospital's claim and the exact adverse impact.  In that situation, the PRRB may not reject the Hospital's allegations as "insufficiently proven unless [CMS] comes forward with 'countervailing evidence or a reason, not based on the insufficiency of [Hospital's] showing, that explains why the … allegations have not been accepted." *Baystate*, 545 F. Supp. 2d at 93-94.  This is because "the burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue." *Id.* at 94.  The Final Decision does not base its findings on any countervailing evidence, nor could it because the MAC did not present any such evidence.

51.    At the Hearing, the PRRB questioned whether nursing home (residential long-term care facilities) residents could account for some or all of the difference between the Hospital's calculated Medicare/SSI fraction and CMS's calculated Medicare/SSI fraction.  When individuals enter nursing homes, the benefits received in the form of payments to the nursing home from the State or other third party payor are counted as "income" for purposes of SSI (and SSP) benefits.  Thus, if a longtime resident of a nursing facility is admitted to a hospital as a patient, that patient may no longer qualify for SSI benefits, and should not be included when determining SSI eligible days for the numerator of the Medicare/SSI fraction.

52.     The PRRB stated, incorrectly, that the Hospital only provided "some statewide statistics to backup [its] assertion" that the difference does not represent a significant number of days.  The Hospital provided testimony at the Hearing, including unrefuted expert testimony, as well as extensive documentation and analysis in its post-hearing brief and accompanying declarations, that demonstrated the number of patients who both (1) are admitted to hospitals in California from nursing homes, and (2) have had their SSI payments reduced to zero in the month of hospitalization, is quite small, and would have had minimal, if any, impact on the Hospital's SSI percentage during the relevant FYs.  Notwithstanding that substantial evidence, the PRRB indicated that the Hospital needed to provide an estimate of the impact of the difference on the additional SSI days being requested.  However, this is not what is required— the undisputed evidence of errors in CMS's data shifts the burden to the MAC to "produce countervailing evidence or a reason, not based on the insufficiency of [Hospital's] evidence, that explains why [Hospital's] allegations [should not be] accepted." *Baystate*, 545 F. Supp. 2d at 93-94.  This burden cannot be avoided merely by asserting generalized scenarios that could affect the impact of CMS's errors and omissions and that "could only be eliminated with information unavailable to [the Hospital]." *Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993).  The MAC introduced no contrary evidence and brought no witnesses to offer contrary evidence at the Hearing.

53.     Regarding the second potential explanation of the variances between the Medicare/SSI fractions, the PRRB also questioned at the Hearing whether differences in timing of patients' qualification for Medi-Cal benefits as compared to when such patient started to receive actual SSI payments may have skewed the number of "unmatched" patients and/or days. The Hospital provided testimony and evidence, including expert testimony, that this is a rare

situation that occurs only if the patient is admitted at the Hospital in that same month for the first time applied for both Medi-Cal and SSI benefits, and was somehow granted Medi-Cal eligibility on the basis of a very quick decision by the SSA to make the individual eligibly for SSI benefits, for the first time, that same month.  The MAC did not meet its burden to produce countervailing evidence or proof to explain why the Hospital's overall allegations should not be accepted.  *See Atlanta College of Med. & Dental Careers*, 987 F.2d at 830-31.

54.    A court must be satisfied that the agency "has examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle*, 463 U.S. at 43.  Here, the Final Decision does not articulate a rational connection between the overwhelming and <u>uncontroverted</u> evidence, including expert testimony, submitted by the Hospital and the PRRB's ultimate findings and decision.  For this reason, the Final Decision should be reversed.

## <u>CMS'S RESISTANCE TO EFFORTS TO OBTAIN RELEVANT EVIDENCE IN THE GOVERNMENT'S SOLE POSSESSION BEARING ON FINANCIAL IMPACT OF ERRORS IN CMS'S CALCULATIONS</u>

55.    Prior to, and during the appeal process, the Hospital sought to obtain information directly from the SSA, as well as from CMS, to confirm the accuracy of the SSI/Medicare fractions at issue.  The Hospital was unsuccessful on both fronts due to CMS's resistance.  Initially, the SSA advised the Hospital that no data could be shared directly between SSA and a provider.  The Hospital then requested that CMS, instead, review a sample of fifty "unmatched" patients and days and compare that sample against official SSA records to which CMS had access.  The Hospital indicated that it would accept the results of any such CMS review of the sample claim; thus, if the review showed overwhelmingly that the "unmatched" patients were not included in official SSA records, the Hospital would have dropped its consolidated appeal.

56.    To facilitate the review, the Hospital engaged a former longtime CMS official to approach CMS.  After several months of back and forth between that individual and CMS, CMS ultimately refused to conduct the review for workload concerns, and stated that the PRRB was the proper forum for the Hospital to present its data issues.  The Hospital also sought assistance from its Congressional delegation.  Senator Dianne Feinstein's office, in particular, engaged with SSA and CMS and brokered an arrangement whereby SSA would review the Hospital's sample data if the data sample was supplied to SSA directly from CMS.  Ultimately, the review never took place because, even though SSA expressed its willingness to review the sample data, CMS refused to cooperate and transmit the Hospital's data sample to the SSA, necessitating the current action.

57.    The Final Decision "recognize[d] [the Hospital's] difficulty in proving that CMS significantly understated [the Hospital's] SSI fractions for the three fiscal years under appeal, and in demonstrating that [the Hospital's] calculations of the SSI fractions are more accurate," without the SSA data.  However, the Final Decision failed to apply the correct shifting burden, described above, given CMS's control of the data.  *See Baystate*, 545 F. Supp. 2d at 93-94.  CMS's refusal to cooperate with an alternative match approach the Hospital proposed, which and was acceptable to SSA, unlawfully and improperly denied the Hospital access to the SSI records needed to prove impact of the errors and omissions in CMS's calculation of the Hospital's Medicare/SSI fractions for the fiscal years at issue.  The Final Decision unlawfully ignored the impact of CMS's denials.

## CAUSES OF ACTION

### COUNT I

### Judicial Review Under the APA and the Medicare Act
### (The PRRB's Final Decision Affirming CMS's Improper Calculation of the Hospital's Medicare/SSI Fractions is Contrary to Law.)

58.     The Hospital hereby incorporates by reference paragraphs 1 through 57 herein.

59.     The PRRB's Final Decision finding that Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008 were "proper" is unlawful and must be reversed because it is procedurally and substantively contrary to the APA, the Medicare Act, and other authorities, including but not limited to various Medicare regulations, and is otherwise unlawful.

60.     The PRRB's Final Decision is contrary to plain meaning and legislative intent of DSH statute and regulations, which require the Secretary to compute using accurate data the number of Medicare patient days attributable to hospital inpatients who were entitled to benefits under both Medicare Part A and SSI during their inpatient stay.  For example, the Final Decision did not examine the relevant data presented by the Hospital that revealed discrepancies in CMS's data, nor did it offer any rational connection between the evidence in the record and the conclusion that the data used was accurate.

### COUNT II

### Judicial Review Under the APA and the Medicare Act
### (The PRRB's Final Decision Affirming CMS's Improper Calculation of the Hospital's Medicare/SSI Fractions is Arbitrary and Capricious.)

61.     The Hospital hereby incorporates by reference paragraphs 1 through 60 herein.

62.     Under 42 U.S.C. §1395oo(f), the PRRB's Final Decision finding that Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006, 2007, and 2008 were "proper" is final agency action that is subject to judicial review under the

applicable provisions of the APA.  Under the APA, the reviewing court shall set aside the final

agency decision if, *inter alia*, it is contrary to law, arbitrary and capricious, an abuse of

discretion, or unsupported by substantial evidence in the record.  5 U.S.C. §706.

63.     The PRRB's Final Decision is procedurally and substantively arbitrary,

capricious, and otherwise unlawful under the APA because it is inconsistent with (a) the

Medicare Act and other authorities including but not limited to, various Medicare regulations,

and (b) the previous decision of this Court in *Baystate* and the Secretary's actions in light of that

decision.  For example, the Final Decision improperly failed to examine the relevant data

presented by the Hospital that revealed discrepancies in CMS's data, nor offer any rational

connection between the evidence in the record and conclusion that the data used was

accurate.  Moreover, the PRRB's Final Decision results in the Hospital's FYs 2006, 2007, and

2008 Medicare payments being based on incorrect factual data, in violation of *St. Francis*

*Medical Center v. Azar*, 894 F. 3d 290 (D.C. Cir. 2018).

64.     The PRRB's Final Decision is thus contrary to law, arbitrary and capricious, an

abuse of discretion, or unsupported by substantial evidence in the record pursuant to 5 U.S.C.

§706, and other laws, and must be reversed or set aside.

## COUNT III

### Judicial Review Under the APA and the Medicare Act
### (The Hospital's DSH payments are unlawful and should be set aside because the Final Decision is arbitrary and capricious and unsupported by the evidence in the record.)

65.     The Hospital hereby incorporates by reference paragraphs 1 through 64 herein.

66.     Under 42 U.S.C. §1395oo(f), the PRRB's Final Decision finding that

Medicare/SSI fractions used to calculate the Hospital's Medicare DSH payments for FYs 2006,

2007, and 2008 were "proper" is final agency action that is subject to judicial review under the

applicable provisions of the APA.  Under the APA, the reviewing court shall set aside the final

agency decision if, *inter alia*, it is contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record.  5 U.S.C. §706.

67.    The PRRB's Final Decision in this action must be aside because it is arbitrary, capricious, and unsupported by substantial evidence in the record.  The uncontroverted facts in the record before the PRRB show there are unexplained discrepancies in CMS's data.  The discrepancies are sufficient to show that CMS's data was inaccurate, not based on the best available data, and that relief is warranted.  In addition, the Final Decision neither addressed nor explained the failure to address extensive testimony, including expert testimony, that was not contradicted by the MAC and/or CMS.  Given this failure to address evidence and expert testimony, the Final Decision "entirely failed to consider an important aspect of the problem, [and] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle*, 463 U.S. at 43.

68.    The Final Decision is thus contrary to law, arbitrary and capricious, an abuse of discretion, or unsupported by substantial evidence in the record pursuant to 5 U.S.C. §706, and other laws, and must be reversed or set aside.

## COUNT IV

### Mandamus

69.    The Hospital hereby incorporates by reference paragraphs 1 through 68 herein.

70.    The Secretary has the non-discretionary duty to reimburse the Hospital fully at the amounts to which it is entitled under the law.  The Hospital is entitled to a writ of mandamus under 28 U.S.C. §1361, directing the Secretary to recalculate the Hospital's DSH payments for the FYs at issue after validating the underlying data used by CMS to calculate the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

## COUNT V

## All Writs Act

71.     The Hospital hereby incorporates by reference paragraphs 1 through 70 herein.

72.     The Secretary has violated the Medicare Act and APA by improperly calculating the Hospital's DSH payments at issue.  Under the All Writs Act, 28 U.S.C. §1651, and other authority, the Hospital is entitled to issuance of an order requiring the Secretary to recalculate Hospital's DSH payments for the FYs at issue after validating the underlying data that CMS used to calculate the Hospital's Medicare/SSI fractions for FYs 2006, 2007, and 2008.

## REQUEST FOR RELIEF

WHEREFORE, the Hospital requests:

1.     An order reversing or setting aside the Final Decision and remanding this action to the Secretary with instructions to (a) obtain correct and complete patient SSI data from SSA for the periods at issue, (b) recalculate the Hospital's Medicare/SSI fractions for the FYs at issue based on a patient by patient match to the SSA's SSI data, (c) provide the Hospital with the patient-level data, and the data specifications, systems requirements, and programs used to compute the revised fractions for the FYs at issue so that the Hospital can validate the results, and (d) pay the Hospital the additional DSH amounts due as a result of the recalculations of the Medicare/SSI fractions for the FYs at issue, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

2.     Issuance of a writ of mandamus requiring the Secretary to (a) obtain correct and complete patient SSI data from SSA for the periods at issue, (b) recalculate the Hospital's Medicare/SSI fractions for the FYs at issue based on a patient by patient match to the SSA's SSI data, (c) provide the Hospital with the patient-level data, and the data specifications, systems

requirements, and programs used to compute the revised fractions for the FYs at issue so that the Hospital can validate the results; and (d) pay the Hospital the additional DSH amounts due as a result of the recalculations of the Medicare/SSI fractions for the FYs at issue, with interest calculated in accordance with 42 U.S.C. §1395oo(f)(2);

3.      An order that the Court shall retain jurisdiction over this action for purposes of enforcement until notice, upon motion of the Hospital, of the Secretary's compliance with this Court's orders, and the PRRB's compliance with all of the remand instructions of the Secretary;

4.      Legal fees and costs of suit incurred by the Hospital; including reasonable attorneys' fees; and

5.      Such other and relief as the Court deems just and proper.

Dated:  November 27, 2018                        Respectfully submitted,

                                                 /s/ Robert L. Roth
                                                 Robert L. Roth (DC Bar No. 441803)
                                                 Kelly A. Carroll (DC Bar No. 1018485)
Laurence D. Getzoff                              HOOPER LUNDY & BOOKMAN, P.C.
Alicia W. Macklin                                401 9th Street, NW, Suite 550
HOOPER LUNDY & BOOKMAN, P.C.                     Washington, D.C.  20004
1875 Century Park East, Suite 1600               Tel.: (202) 580-7700
Los Angeles, CA  90067-2517                      Fax: (202) 580-7719
Tel:  (310) 551-8111                             E-mail:  rroth@health-law.com
Fax:  (310) 551-8181                             E-mail:  kcarroll@health-law.com
E-mail:  lgetzoff@health-law.com
E-mail:  amacklin@health-law.com


*Counsel for Plaintiff Pomona Valley Hospital Medical Center*