**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

POMONA VALLEY HOSPITAL
MEDICAL CENTER,

        Plaintiff,

   v.

ALEX M. AZAR II, Secretary,
United States Department of Health and
Human Services,

        Defendant.

Civil Action No.:  18-cv-2763 (ABJ)

**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANT'S
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT</u>**

<u>**TABLE OF CONTENTS**</u>                                                      <u>**Page**</u>

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................3

    A.      The Secretary's Argument that Pomona Failed to Show That CMS Did
        Not Use the Best Available Data Does Not Withstand Scrutiny. ..........................6

        1.      The Secretary's Arguments Regarding the Lack of a Relationship
            Between Medi-Cal Aid Codes and SSI Codes Lack Factual Merit
            and Are Insubstantial. ...............................................................................10

        2.      The Secretary Has No Evidence to Support His Argument that
            Purported Flaws in Pomona's Methodology Had a Material Impact
            on Pomona's Recalculation of Its Medicare SSI Percentages. ..................13

    B.      The Secretary's Attempts to Discredit Pomona's Evidence Fail Are
        Unsupported by the Record and, Thus, Fail. .......................................................16

        1.      The Secretary Acts Unreasonably by Faulting Pomona for Failing
            to Demonstrate  the Precise Flaws in CMS's Data While
            Simultaneously Refusing to Disclose Such Data.......................................17

        2.      The Secretary's Arguments Discounting Pomona's Expert Witness
            Testimony Fail Factually and Legally. .....................................................18

        3.      Because the Final Decision Does Not Challenge Pomona's
            Calculation in Terms of the Exclusion of SSP-Only Days, the
            Secretary's *Post-Hoc* Arguments Cannot be Considered. .........................19

        4.      The Secretary's Argument that His Disclosure of MedPAR Data
            Negates the Need for Him to Disclose the Determinative SSI Data
            Fails Because MedPAR Data Does Not Include the Necessary SSI
            Data. ...........................................................................................................22

    C.      Pomona Is Entitled to the Application of an Adverse Inference Against the
        Secretary and/or Burden Shifting, and the Secretary's Arguments to the
        Contrary Lack Merit. ...........................................................................................23

        1.      The Critical Fact Here Is the Validity of CMS's Data and Not, as
            the Secretary Argues, Pomona's "Methodology and Data."......................24

        2.      The Secretary's Argument that the MAC Had a Legitimate Reason
            Not to Introduce Evidence Supporting CMS's Calculation Before
            the PRRB Does Not Withstand Scrutiny. ..................................................26

i

<u>**TABLE OF CONTENTS**</u> **(cont.)**                                    <u>**Page**</u>

3.      The Secretary Assertion that Pomona Did Not Raise CMS's
        Refusal to Provide the Underlying SSI Data Before the PRRB
        Lacks Factual Merit. ....................................................................................28

III.    CONCLUSION.................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n, et al. v. Azar*,
No. 1:18-cv-02841 (D.D.C. September 17, 2019) ...................................................30

*Appalachian Power Co. v. EPA*,
251 F.3d 1026 (D.C. Cir. 2001) .............................................................................29

*Atlanta College of Med. & Dental Careers, Inc. v. Riley*,
987 F.2d 821 (D.C. Cir. 1993) ..........................................................................14, 24

\*   *Baystate Medical Center v. Leavitt*,
545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ............................ *passim*

*Bowen v. Georgetown Univ. Hosp.*,
488 U.S. 204 (1988) ..........................................................................................16, 19

*Canadian Comm. Corp. v. Dep't of the Air Force*,
514 F.3d 37 (D.C. Cir. 2008) .................................................................................24

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984) ..................................................................................................7

\*   *County of Los Angeles v. Shalala*,
192 F.3d 1005 (D.C. Cir. 1999) ...............................................................................7

*Dist. Hosp. Partners. L.P. v. Burwell*,
786 F.3d 46 (D.D.C. 2015) .......................................................................................7

\*   *Int'l Union v. NLRB*,
459 F.2d 1329 (D.C. Cir. 1972) .................................................................23, 24, 27

*Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*,
134 F.3d 1095 (D.D.C. 1998) .................................................................................29

*Nat'l Wildlife Fed'n v. EPA*,
286 F.3d 554 (D.C. Cir. 2002) ...............................................................................29

*Nuclear Energy Inst., Inc. v. EPA*,
373 F.3d 1251 (D.C. Cir. 2004) (en banc) .............................................................28

*United States v. L.A. Tucker Truck Lines, Inc.*,
344 U.S. 33 (1952) ..................................................................................................28

\* Authorities upon which we chiefly rely are marked with an asterisk (\*).

iii

**Statutes**

5 U.S.C. §706(2)(A)............................................................................................7

5 U.S.C. §706(2)(D)............................................................................................7

5 U.S.C. §706(2)(E)............................................................................................7

**Other Authorities**

70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005)..............................................22

75 Fed. Reg. 50,042, 50,278-79 (Aug. 16, 2010) ....................................2, 5, 12, 13, 27
    p. 50,281..........................................................................................................11

## GLOSSARY OF PERTINENT ABBREVIATIONS AND ACRONYMS

| | | |
|---|---|---|
| APA | -- | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |
| A.R. | -- | Administrative Record |
| Board or PRRB | -- | Provider Reimbursement Review Board |
| CMS | -- | Centers for Medicare & Medicaid Services |
| DPP | -- | Disproportionate Patient Percentage |
| DSH | -- | Disproportionate Share Hospital |
| FFY | -- | Federal Fiscal Year |
| FFY 2011 IPPS Final Rule | -- | 75 Fed. Reg. 50,042 (Aug. 16, 2010) |
| The Final Decision | -- | PRRB Decision No. 2018-D50 (Oct. 1, 2018) |
| HHS | -- | United States Department of Health and Human Services |
| IPPS | -- | Medicare Hospital Inpatient Prospective Payment System |
| MAC | -- | Medicare Administrative Contractors |
| MCPM | -- | Medicare Claims Processing Manual |
| Medicare Act | -- | 42 U.S.C. §1395 *et seq.* |
| Medi-Cal | -- | California's Medicaid program |
| MedPAR | -- | Medicare Provider Analysis and Review |
| The Ruling | -- | CMS Ruling 1498-R (Apr. 28, 2010) |
| Secretary | -- | Secretary of HHS |
| SSA | -- | Social Security Administration |
| SSI | -- | Supplemental Security Income |
| Tr. | -- | PRRB Transcript of Aug. 17, 2017 Hearing |
| UC DSH | -- | Uncompensated Care Disproportionate Share Hospital |

## I.    <u>INTRODUCTION</u>

The issue here is whether Pomona's 2006, 2007, and 2008 Medicare Disproportionate Share Hospital ("DSH") payments were too low because the Secretary did not properly account for Medicare beneficiaries who were also entitled to Supplemental Security Income ("SSI") benefits when they received inpatient services at Pomona.  Based on a comparison of its DSH payments from previous and subsequent years, and the fact that it serves many low-income Medicare beneficiaries, Pomona suspected that the DSH payments at issue were too low because they did not properly take into account all of the Medicare/SSI inpatients treated during each fiscal year at Pomona.  Because the government has the data that would show <u>indisputably</u> whether Pomona's DSH payments were correct, Pomona asked the Secretary either to check that data or give Pomona access to do so.  The Secretary refused.

Since that refusal, Pomona has tried every legal means available to convince or force the Secretary to disclose the data, which is <u>not</u> available to the public.  But the government has steadfastly refused.  Left with no alternative, and as explained in the hearing before the Provider Reimbursement Review Board ("PRRB"), Pomona used an extensive and expensive series of actions to obtain crucial SSI data <u>indirectly</u> from other sources to which the data had been released, including Medi-Cal, which relies on Federal government SSI data when deciding whether an individual is entitled to Medicaid benefits in California.  Pomona's validation process confirmed material discrepancies between Pomona's data and the Secretary's data and, <u>at the least</u>, showed that the Secretary likely did not use the best available data to calculate Pomona's DSH payments.  In contrast, before the PRRB, the Secretary (acting through the MAC) presented no witnesses or evidence and, thus, did not show that the Secretary used the best available data when making the DSH calculations at issue or otherwise rebut Pomona's proof to the contrary.

1

The PRRB's Final Decision found that Pomona did not provide "sufficient quantifiable data" to show that the DSH payments at issue were incorrect. Pomona's Initial Memorandum explained that the PRRB's nit-picks were either incorrect or insubstantial (or both). Instead of making the modicum of effort required to resolve this dispute once and for all by allowing a small test of the SSI data at issue, the Secretary's Memorandum defends the PRRB's findings, which Pomona further addresses below.

Given that the Secretary has the data to show that Pomona's DSH payments were correct, one would have expected the Secretary to present that data below and to the Court, thereby ending this action in his favor. But, instead, the Secretary focuses only on the alleged insufficiency of Pomona's evidence, asking the Court to buy a "pig in a poke" — uphold the DSH payments at issue as correct without the information needed for the Court to know if it is making the right decision.

Because the Secretary has the data to show whether Pomona is wrong but refuses to produce it, Pomona is asking this Court to infer that the data shows that Pomona is right. Init. Mem., at 32. The Secretary concedes that this kind of inference is proper where "the party against whom relief is sought has exclusive access to evidence necessary to provide some critical fact." Sec.'s Mem., at 34. Here, it is undisputed that the Secretary has or has access to the SSI data[1] at issue, which is not available to Pomona.[2] Thus, the inference is warranted.

The Secretary seeks to avoid the inference through a "bait and switch," arguing that "the critical fact in this case was the reliability of plaintiff's own methodology and data," and not the

---

[1] The terms "SSI data" and "SSI entitlement data" are used interchangeably to refer to the underlying SSI entitlement data, that originates with the SSA, and that is used in CMS's DSH matching process.

[2] See, e.g., 75 Fed. Reg. 50,042, 50,278-79 (Aug. 16, 2010) (noting that summary statistics will be produced, but that the underlying "data will be used as part of [CMS's] internal data validation process, [and thus, CMS] do[es] not intend to provide them to the public."); see also Answer at ¶19.

Secretary's DSH calculation.  *Id.*, at 35.  Not so.  The "critical fact" has always been whether the DSH payments were supported by the best data available to  the Secretary and the focus on Pomona's "own methodology and data" arises <u>only because</u> the Secretary has unreasonably refused to produce the conclusive data.  Moreover, whether Pomona's "methodology and data" is the "critical fact" is irrelevant to whether the inference applies.

Thus, the Secretary's argument fails and this Court should either (a) order the Secretary to produce the determinative data or (b) find that the Secretary's failure to disclose the determinative data means that it shows the DSH payments were incorrectly low.  Also, for the reasons set forth below and in Pomona's Initial Memorandum, Pomona asks this Court to reverse the Final Decision and order the Secretary to recalculate the DSH determinations at issue using correct data.

## II.    ARGUMENT

At the PRRB, Pomona presented unrefuted evidence, including expert testimony, showing that there are unexplained discrepancies in the data that CMS used to calculate the DSH payments at issue.  Specifically, Pomona presented evidence that the Medicare/SSI days calculated by CMS were lower than the ones calculated by Pomona by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008.  *See* Provider's Post-Hearing Brief, Exs. P-40, P-41, and P-42 (Certified Administrative Record ("A.R.") 00118-00123); *see also* Provider's Ex. P-27 (A.R. 01370, 01387, 01404).  If the Medicare/SSI fractions were calculated using Pomona's data, they would have increased to 18.04% for FY 2006, 20.16% for FY 2007, and 19.12% for FY 2008, which would translate into additional estimated reimbursement of $770,837 for FY 2006, $1,291,520 for FY 2007, and $1,232,627 for FY 2008.  Provider's Post-Hearing Brief, Exs. P-40, P-41, and P-42 (A.R. 00118-00123).

Pomona's calculation of its Medicare/SSI fractions does not result in an abnormally high Medicare/SSI fraction for the relevant fiscal years.  Instead, Pomona's figures comport with the fact that Pomona is located in a rather poor municipality within eastern Los Angeles County that has a

large Medicaid population.  For example, CMS's calculated Medicare/SSI fraction for Pomona for

FY 2006 is in the 82nd percentile, whereas Pomona's calculated Medicare/SSI fraction is

approximately in the 88th percentile.  Similarly, for FYs 2007 and 2008, Pomona's calculation raises

its Medicare/SSI fraction from approximately the 82nd percentile to the 91st percentile.[3]   The

Medicare/SSI fractions that Pomona calculated are reasonable for the specific demographics and

geographic location of Pomona.

These discrepancies that Pomona's data and methodology uncovered show that "[t]here has

to be something wrong with the [CMS] data," *see* PRRB Transcript of Aug. 17, 2017 Hearing

("Tr.") at 326-327 (Testimony of S. Rosenstein) (A.R. 00420), and are sufficient to demonstrate that

there are errors in CMS's calculation and that the Secretary did not use the best available data.

Before the PRRB, the MAC did not produce any contrary evidence or testimony, and did not

produce any positive evidence supporting CMS's calculation, including the underlying SSI data.

Given that there is no evidence on the record supporting CMS's Medicare/SSI fractions, or

showing that they were based on the best available data, the Secretary's arguments in his

Memorandum largely mirror the PRRB's unsupported findings.[4]   However, the Secretary also

engages in nitpicking details that are irrelevant in the broad scheme of the evidence presented while

ignoring that, at every stage in this process, CMS could have disproved Pomona's methodology and

---

[3] CMS's SSI calculations are available at https://www.cms.gov/medicare/medicare-fee-for-service-payment/acuteinpatientpps/dsh.html. *See* IPPS SSI Calculations: FY06 MedPAR 12/31/2008 FFS Claims Run Out, 11/30/2009 MA Claims Submissions; April 2009 SSI Eligibility File; IPPS SSI Calculations: FY07 MedPAR 12/31/2009 FFS Claims Run Out, 08/31/2010 MA Claims Submissions; April 2011 SSI Eligibility File; IPPS SSI Calculations: FY08 MedPAR 12/31/2010 Claims Run Out (including MA Claims Submissions); April 2011 SSI Eligibility File.

[4] Although there are three separate entities referenced herein (the MAC, CMS, and the Secretary), in reality, all actions were taken either directly by the Secretary or through his designee or contractor. Moreover, the PRRB's Final Decision was subject to review by the Secretary, through his designee, the CMS Administrator, who declined to review the decision.  (*See* A.R. 00001).  Thus, it is the Secretary's final decision for purposes of judicial review.

data by providing the underlying SSI data, or by facilitating a review of Pomona's verified sample of 50 patient Medicare claims.[5]   The SSA even agreed to review such a limited sample *if* CMS transmitted the data on the 50 claims directly to the SSA.  *See* Email Correspondence with A. Sadre, Aide to Sen. Dianne Feinstein, Ex. P-30 (A.R. 01434-01443); *see also* Tr. at 106:25-107:15, 110:14-111:1 (Testimony of C. Le-Tran) (A.R. 00365, 00366).   However, CMS refused to cooperate and declined to transmit the sample to the SSA.  *See* Letter from C. Blackford, CMS, to U.S. Senator Dianne Feinstein (June 23, 2017), Ex. P-32 (A.R. 01451-01453); *see also* Tr. at 238:16-239:13 (Testimony of T. Hefter) (A.R. 00398) (CMS initially responding with some interest, but ultimately deciding not to pursue the sample testing due to alleged "workload" concerns).

Pomona's experience here is nothing new.  For years following this Court's decision in *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20, *amended by* 587 F. Supp. 2d 37 (D.D.C. 2008) ("*Baystate*"), and the implementation of the Secretary's revised matching process in 2010, hospitals' efforts to challenge their DSH payments have been stymied because the SSI data that CMS used to calculate the Medicare/SSI fractions is not available to the public and CMS refuses to disclose that data.  Under CMS's final rule, there is no external validation of the underlying data and no way for hospitals to review the Secretary's matching process.  *See, e.g.*, 75 Fed. Reg. at 50,278–79.  To counter the extremely prejudicial effect of its DSH underpayments, Pomona has gone above and beyond other hospitals' efforts to develop a methodology that uses State-verified data, based on data from SSA, to demonstrate the errors in CMS's calculation of Pomona's Medicare/SSI fractions.

But there obviously is a limit to what Pomona can demonstrate without access to the underlying SSI entitlement data that CMS used in its matching process, which would conclusively

---

[5]  Ms. Le-Tran testified that Pomona agreed to accept the results of an SSA and CMS review of the 50-record sample:  "We were very curious as to what's going on, as we were definitely willing to abide with the result."  *See* Tr. at 102:10-13 (A.R 00364).

prove (or disprove) Pomona's claim and demonstrate the exact amount of any discrepancies. And, because this data is within the control of the Secretary, this Court should find that this underlying data is adverse to the Secretary and would show that Pomona's recalculations of the Medicare/SSI fractions at issue are correct.

A.  **The Secretary's Argument that Pomona Failed to Show that CMS Did Not Use the Best Available Data Does Not Withstand Scrutiny.**

The Secretary argues that the PRRB "properly found that plaintiff had failed to show that there was any flaw in the CMS fractions, and that finding is supported by substantial evidence." Sec.'s Mem., at 22; *see also id.*, at 25. The Secretary, however, presents no <u>positive</u> "substantial evidence" to support this argument. Rather, the Secretary relies on Pomona's alleged inability to determine the "cause of the discrepancy between its own calculation and that of the agency." *Id.*, at 23; *see also id.* (contending that "plaintiff does not actually attempt to identify any flaw in the process or inaccuracies with the data"). The Secretary's argument lacks merit and is contradicted by the record.

Pomona's Initial Memorandum (at 11-20) explained, in detail, Pomona's extensive efforts to identify (a) the flaws in CMS's Medicare/SSI calculations and (b) the unexplained discrepancies between CMS's calculations and the calculations that Pomona made using available SSI data. Most importantly, the results of Pomona's recalculation[6] highlight the magnitude of the discrepancies that Pomona uncovered in the data—in 2006, CMS's calculation included 4,886 days whereas Pomona's calculation included 5,841. In 2007, CMS's calculation included 4,153 days whereas Pomona's calculation included 5,553. And, in 2008, CMS's calculation included 4,238 days whereas Pomona's calculation included 5,500.

---

[6] CMS's data is taken from the MedPAR file, and Pomona's data is found at A.R. at 00118-00123. *See also* Provider's Ex. P-27, pp. 501, 518, and 535 (A.R. 01370, 01387, 01404).

Pomona's recalculation demonstrates that the Medi-Cal aid codes (which are irrefutably based on data from the SSA) identified a significant number of aged, blind, and/or disabled low-income Medicare Part A recipients who, for whatever reason, were either (a) not coded C01, M01, or M02 by SSA or (b) so coded but still not "matched" using the Secretary's methodology.  *See* Provider's Post-Hearing Brief, Exs. P-40, P-41, and P-42 (A.R. 00118-00123); Provider's Ex. P-27 (A.R. 01369-0142).  Pomona's recalculations shows that CMS's count of Medicare/SSI days for Pomona are lower than Pomona's calculated Medicare/SSI days by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008.[7]

While the Secretary (at 22) correctly asserts that the best available data standard[8] does not require "perfect accuracy," the magnitude of the discrepancies here is far more serious than the data simply being slightly less than perfect.  *See Dist. Hosp. Partners. L.P. v. Burwell,* 786 F.3d 46, 56 (D.D.C. 2015) ("[A]gencies do *not* have free rein to use inaccurate data."); *see also Baystate*, 545 F. Supp. 2d at 41, 44 (overturning CMS Administrator decision and agreeing with the PRRB that the Medicare payment determination should be set aside because it was not based on the best available data).  Moreover, the Secretary's argument that Pomona failed to make the requisite showing here

---

[7] As noted above, if the Medicare/SSI fractions were calculated using Pomona's data, they would have increased to 18.04% for FY 2006, 20.16% for FY 2007, and 19.12% for FY 2008, which would translate into additional estimated reimbursement of $770,837 for FY 2006, $1,291,520 for FY 2007, and $1,232,627 for FY 2008.  (A.R. 00118-00123).

[8] The Secretary (at 21) argues that his calculations should be afforded deference under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  However, *Chevron* deference does not apply where, as here, the action does not involve a challenge to an agency's interpretation of a statute.  *See Baystate,* 545 F. Supp. 2d at 41-42; *see also County of Los Angeles v. Shalala*, 192 F.3d 1005, 1020-22 (D.C. Cir. 1999).  Further, because the Secretary's methodology is yielding irrational and erroneous results, Pomona is challenging whether that methodology has been applied accurately and whether the Secretary's conclusions were based on the best available data.  This Court in *Baystate* made clear that, under these circumstances, the Court should conduct a record-based inquiry applying, not *Chevron*, but the traditional arbitrary and capricious and substantial evidence standards of review.  *See Baystate*, 545 F. Supp. 2d at 41-42; *see also* 5 U.S.C. §§706(2)(A), (2)(E); *see also* 5 U.S.C. §706(2)(D).

because Pomona did not determine the "cause of the discrepancy" in CMS's data rings hollow because CMS is the only party with possession of the data to show that would allow Pomona to explain the "cause of the discrepancies" but refuses to disclose that data.

The Secretary also rehashes a number of points made the PRRB.  Pomona discusses in detail two of those arguments—the need for a crosswalk between the aid codes and SSI codes and explanations for the potential variances in the data—below in sections A(1) and A(2).

The Secretary also picks several new nits regarding Pomona's methodology.  But, contrary to the Secretary's assertion (at 30-31) that "Plaintiff cites vague opinions given by witnesses who were not designated experts in the SSI program or in aid codes, stating (for example) that these codes identify Medi-Cal enrollees that are on 'on SSI and/or SSP,'" Pomona presented three fact witnesses with extensive experience, one of whom was also recognized by the PRRB as an expert witness. Init. Mem. at 9-10.  In particular, Mr. Rosenstein was the former head of the California State Medicaid (Medi-Cal) program, and before that, Medi-Cal's eligibility branch, and was the only witness put forth by either party with first-hand knowledge of the relevant areas of Medi-Cal involved in this case.  He was recognized as an "expert witness" on the topics of the Medi-Cal program generally and Medi-Cal eligibility, *see* Tr. at 294: 20-25 (A.R. 00412), and was additionally a credible fact witness given his prior experience.

Mr. Rosenstein, along with Pomona's other fact witnesses, testified how SSI and SSP entitlement data from SSA are translated into Medi-Cal aid codes 10, 20, and 60 and the origination of the data used by Medi-Cal to assign aid codes.  *See* Decl. of S. Rosenstein (A.R. 00104); Tr. at 305:2-311:6, 316-322 (Testimony of S. Rosenstein) (A.R. 00415-00419); *id.* at 216:13-217:12 (Testimony of T. Hefter) (A.R. 00392-393); *see also id.* at 314:7-12 (A.R. 00417) ("…[SSA] doesn't have the aid code, has data elements that the state is able to use that social security data element to

assign the aid code"); *id.* at 320:15-321:12 (A.R. 00418-00419) (Q: "Does the information used to create the aid codes ultimately derive from SSA?" A: "100% It comes off of what [SSA] give the state…the aid code is assigned based upon the Social Security record, and there's a data element in the Social Security record that says, you know, for this eligible person, they're aged, blind, or disabled. So it's in their data set and the state takes that data, changes the data to its data set and posts it."); Provider's Post-Hearing Brief, Exs. P-47 and P-48 (A.R. 00180-00184).  Mr. Rosenstein further confirmed that Medi-Cal assigns aid codes 10, 20, and 60 only after verification from two separate data fields from the SSA confirming the individual's aged, blind, or disabled status.  (*See* A.R. 00180-00184).  Importantly, the MAC presented no evidence contesting that the source of these particular Medi-Cal aid codes is data from the SSA and did not produce the underlying data that could have proven (or disproven) Pomona's calculation.

The Secretary (at 27) also attempts to cast doubt on Pomona's methodology based on the fact that Pomona utilizes CMS's data (while also apparently taking an inappropriate and unfair cheap shot by questioning Pomona's integrity):

> Although plaintiff claims that CMS's calculation was unreliable and flawed, it appears that plaintiff nonetheless relied on that same calculation when it was favorable to plaintiff's interests — even if it did not match up with their own aid codes 10, 20, and 60. Plaintiff's posthearing brief suggests that it claimed additional SSI days identified in CMS's calculation even when that SSI day was not assigned a Medi-Cal aid code of 10, 20, or 60.

But Pomona used CMS's data in this way to avoid being overly-inclusive and capturing patients in the calculation who were not receiving SSI and/or SSP.[9]  Importantly, instead of including all

---

[9]  Pomona also ensured that all patient days included in its calculation had an aid code to substantiate that the patient had been entitled to SSI and/or SSP benefits, or such patient was not included in Pomona's recalculated SSI percentage numerator.  *See* Tr. at 68:12-16 (Testimony of C. Le-Tran) (A.R. 00355).  Further, where patients had a 10, 20, or 60 aid code only for a portion of their admission (a "partial" aid code approval), only those patient days during the period actually covered by one of those three aid codes were included in Pomona's calculation of the numerator of the (footnote continued)

potential Medi-Cal aid codes, Pomona focused only on codes 10, 20, and 60 because they specifically and uniquely identify individuals who are either aged, blind or disabled, and whom SSA confirmed as actively receiving SSI and/or SSP at a particular time.[10]  Importantly for purposes of addressing the Secretary's argument, there are <u>other</u> Medi-Cal aid codes that potentially include a small number of patients who also are receiving SSI and/or SSP at a particular time.  *See* Tr. at 81-83 (A.R. 00359).  Thus, in recalculating its Medicare/SSI fractions, Pomona included patient days that may not have had an aid code of 10, 20, or 60, but only when such days were specifically identified in CMS's own calculation.  *Id.*

1.    The Secretary's Arguments Regarding the Lack of a Relationship Between Medi-Cal Aid Codes and SSI Codes Lack Factual Merit and Are Insubstantial.

The Secretary (at 26) parrots the PRRB's unsupported findings,[11] stating that "plaintiff did not prove the aid codes would map onto the three SSI codes (C01, M01, M02) that reflect entitlement to SSI benefits for purposes of the statute."  But, such a crosswalk or comparison between the data sets is not relevant here.  This is because Pomona's claim focuses on whether CMS's data is flawed in that SSI codes C01, M01, and M02 do not capture all qualifying SSI and

_____

Medicare/SSI Fraction.  *See id.* at 65:20-66:4, 68:12-16 (A.R. 00355).  In addition, Pomona reduced its "raw" total of patients (and days) for each year by approximately 16.5% of the patients, which is the Statewide average of SSI/SSP patients having SSP-only benefits during State fiscal years 2006 to 2009.  *See* Provider's Post-Hearing Brief, Exs. P-51 and P-46 (A.R. 00191-00193, 00178-00179); *see also* Decl. of S. Rosenstein, ¶5 (A.R. 00105-00106).

[10]  Pomona presented evidence, including expert testimony, confirming that these three aid codes can be assigned only where a potential Medi-Cal beneficiary is aged, blind or disabled and is entitled to SSI and/or SSP benefits.  *See, e.g.*, Tr. at 311:2-6 (Testimony of S. Rosenstein) (A.R. 00416); *id.* at 320:15-321:17 (A.R. 00418-00419).  (*See also* A.R. 00180-00184).

[11]  The PRRB's unsupported findings included: (1) the "Provider's methodology assumes that all individuals with an 'aid code' of 10, 20, or 60 will map to an SSI code of C01, M01, or M02," and (2) a "crosswalk [between the Medi-Cal aid codes and CMS SSI codes] is necessary to determine if the Provider's use of 'aid codes' 10, 20, and 60 accurately identified only those individuals with an SSI code of C01, M01, and M02."  *See* Final Decision at 7, 9 (A.R. 00012, 00014).

Part A days for Pomona's inpatients during the relevant FYs. *See, e.g.*, Tr. at 219:3-7, 224:12-25, 253:4-254:11 (Testimony of T. Hefter) (A.R. 00393-00394, 00402); *id.* at 324:16-327:4 (Testimony of S. Rosenstein) (A.R. 00419-00420); Expert Report by S. Rosenstein, Ex. P-34 (A.R. 01461-01462).

More importantly, and as the Secretary knows, such a comparison is not possible without the underlying SSI data that supports the assignment of SSA/CMS "SSI benefits entitlement" codes of C01, M01 and M02, which the Secretary refuses to disclose. The Secretary (at 31-32) contends that "Plaintiff does not address this point [in its Initial Memorandum] except to say in a conclusory manner that 'such comparison of the two datasets is not possible without the underlying SSA data that supports the assignment of SSI codes of C01, M01, and M02.'" And, again, the Secretary reiterates the PRRB's unsupported finding that Pomona "could have developed this crosswalk" without the use of privacy protected information, "by obtaining definitions of the various codes, and if necessary confirming the information with the appropriate authorities." *Id.*, at 32 (citing Final Decision, A.R. 00014).

But the Secretary's argument and the PRRB's unsupported finding assume that the definitions will be comparable, which is not the case. CMS/SSA SSI entitlement codes purportedly denote all SSI-entitled individuals during the month(s) that they are entitled to received SSI benefits. *See* 75 Fed. Reg. at 50,281. But these codes do not distinguish, on their own, the underlying basis for the SSI entitlement, such as being aged, blind, or disabled and/or other qualifying attributes. The Medi-Cal aid codes, in contrast, denote individuals who are aged, blind or disabled, based on other

SSA data provided to the State.[12]  *See* Tr. at 311:2-6, 313:4-314:12 (Testimony of S. Rosenstein) (A.R. 00416-00417).  Given that the two data sets denote different things, and the only tie-in between the two is the underlying SSI data, a crosswalk is not possible without the underlying SSI entitlement data.[13]

The need for the underlying SSI data to compare the aid codes and SSI entitlement codes is reflective of the fact that, while CMS revised its methodology (pursuant to this Court's decision in *Baystate*) for matching CMS Medicare data and SSI benefit data, virtually nothing is known about CMS's underlying matching methodology.  *See, e.g.*, 75 Fed. Reg. at 50,278-79 (noting that summary statistics will be produced, but that the underlying "data will be used as part of [CMS's] internal data validation process, [and thus, it] do[es] not intend to provide them to the public.").

Pomona used the Medi-Cal aid code information to demonstrate that CMS's Medicare/SSI fractions for Pomona were lower than Pomona's recalculated Medicare/SSI fraction for each of the FYs at issue, even after the percentage of SSP-only patients was removed from Pomona's recalculated Medicare/SSI fractions in each year.  (*See* A.R. 00119, 00121, 00123).  The MAC presented no evidence supporting CMS's methodology and the Secretary offers no new insights as to why such a crosswalk is necessary, or even how one could or would be performed without the determinative, yet undisclosed, underlying SSI data.

---

[12]  Aid codes 10, 20, and 60 are assigned only after verification from two separate SSA data fields, both of which must confirm the individual's aged, blind, or disabled status.  (*See* A.R. 00180-00184).

[13]  Thus, the Secretary's attempts (at 15-16) to make something of the fact that Mr. Rosenstein testified that "he did not know whether there was a one-to-one correlation between aid codes 10, 20, and 60 and the three SSI codes," and that there "were instances in which the aid codes would not correlate exactly with the SSI codes," do not diminish the validity of Pomona's methodology.

2.      The Secretary Has No Evidence to Support His Argument that
Purported Flaws in Pomona's Methodology Had a Material Impact on
Pomona's Recalculation of Its Medicare SSI Percentages.

The Secretary argues (at 30) that "[P]laintiff's methodology…was shown to be demonstrably

unreliable in a number of respects" and that it improperly included certain days that do not belong in

the calculation. *See also id.* ("Indeed, the Board made clear that it was not just concerned with the

various flaws that came to light in the Board proceedings, but that there could be other situations in

which reliance on plaintiffs 'aid codes' would result in improper inclusion of days that do not belong

in the SSI fraction numerator."). The Secretary's straw-man argument fails factually and legally.

Pomona is not required, as the Secretary suggests, to provide precise estimates of the impact

of these variances between CMS's count of SSI days and Pomona's count of such days on its own

calculation or to proactively determine any and all potential explanations for the differences between

CMS's calculations and the data that Pomona used in its recalculations. Where Pomona has

presented "specific allegations supported by all the information available to [it]," the burden of

production shifts to the Secretary to explain why such allegations should be found not to have been

supported. *Baystate*, 545 F. Supp. 2d at 52 (internal citation omitted). As detailed in its Initial

Memorandum (at 11-20), Pomona presented evidence and testimony before the PRRB explaining its

methodology. For both the impact of nursing home residents and effective dates of eligibility, which

were specifically noted by the PRRB, Pomona demonstrated that these potential explanations for

variances would have a *de minimis* impact, if any, on its recalculation of its Medicare/SSI

fractions.[14] *Id.* at 18-21. The MAC did not present any contrary evidence and, *ipso facto*, did not

meet its burden to produce countervailing evidence or proof to explain why Pomona's overall

---

[14] The PRRB acknowledged Pomona's arguments that "these discrepancies would not reflect a large
number of days." Sec.'s Mem., at 17 (citing Final Decision (A.R. 00012-00013)).

arguments, supported by evidence, should not be accepted.  *See Atlanta College of Med. & Dental Careers, Inc. v. Riley*, 987 F.2d 821, 830-31 (D.C. Cir. 1993); *see also Baystate*, 545 F. Supp. 2d at 51-52 (burden shifts upon presentation of undisputed errors in data).

Further, specifically rehashing the two potential variances raised by the PRRB, the Secretary's arguments raise nothing new to address their lack of merit.  Regarding nursing home residents, the Secretary argues (at 27) that Pomona's "methodology would improperly include days associated with certain nursing home residents who, because of SSI restrictions applicable to such residents, were not entitled to receive SSI benefits for the days in question."  But this argument fails to account for Pomona's evidence, including unrefuted expert testimony, showing that the number of patients who both (1) were admitted to any given hospital in California from nursing homes from 2006 through 2008, and (2) had their SSI payments reduced to zero in the month of hospitalization, is quite small, and would have had a minimal, if any, impact on Pomona's recalculated Medicare/SSI Fractions.  *See* Tr. at 340:13-22 (Testimony of S. Rosenstein) (A.R. 00423); Decl. of S. Rosenstein, ¶¶6, 7, 8a and 8c (A.R. 00103-00108) (Mr. Rosenstein's explained in testimony that, even if some nursing home patients with SSI benefits are admitted to hospitals, these patients retain their SSI beneficiary status for the first three months of their stay in a nursing home, and that at least half of Medi-Cal nursing home patients stay in such nursing homes for fewer than three months); *see also* Provider's Post-Hearing Brief, Exs. P-49, P-52 (A.R. 00185-00188, 00194-00204).  There simply were not enough nursing home patients admitted to any one hospital who could have also lost their SSI benefits right at the time of the acute care admission to explain any material portion of the discrepancies in the calculations of the Medicare/SSI fractions at issue by CMS and Pomona.

Regarding differences in timing of patients' eligibility, the Secretary argues (at 28) that "plaintiff's methodology would also improperly include days of patients who technically qualified

for SSI benefits, but who were not actually entitled to receive SSI benefits for the days in question because their benefits application had not yet taken effect under the SSI statute." Here again, Pomona presented evidence, including unrefuted expert testimony, that such differences could only have an effect in the extremely rare situation where a patient is admitted at Pomona and, in that same month and for the first time, applied for both Medi-Cal and SSI benefits and was somehow granted Medi-Cal eligibility on the basis of a very quick decision by SSA to make the individual eligible for SSI benefits. *See* Decl. of S. Rosenstein, ¶4 (A.R. 00104-00105); *see also* Provider's Post-Hearing Brief, Ex. P-49 (A.R. 00185-00188).

But, receipt of SSI benefits is only one of many ways a patient can demonstrate eligibility for Medi-Cal benefits. (See A.R. 00104-00105). And, Ms. Le-Tran stated that Pomona does not assist patients "in applying for SSI benefits, nor does the hospital have a process or procedure in place to help patients use newly applied for SSI benefits to qualify for Medi-Cal benefits." *See* Decl. of C. Le-Tran, ¶7 (A.R. 00113). Mr. Rosenstein, a recognized expert in Medi-Cal eligibility, further stated that "if a hospital is not using SSI as a means for obtaining Medi-Cal enrollment for coverage of an hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the first time at the same time as seeking SSI benefits for the first time. . ." *See* Decl. of S. Rosenstein, ¶4 (A.R. 00104-00105). Thus, Pomona showed this group of patients could not cause a material discrepancy between the CMS and Pomona calculation. The MAC presented no contrary evidence or witness testimony regarding either potential variance.

In sum, Pomona went to great lengths to validate its recalculated Medicare/SSI fractions and demonstrated, through uncontroverted evidence and testimony that (a) its recalculated Medicare/SSI fractions were incorrectly low for FYs 2006-2008 and (b) there are unexplained discrepancies in the underlying data that CMS used to calculate the Medicare/SSI fractions and the SSI-entitlement data

that Pomona obtained from the State of California Medi-Cal program records.  While Pomona's methodology may not have conclusively determined the precise errors in CMS's data, it is the best Pomona reasonably could be expected to do without being given access to the underlying SSI data. Further, given the magnitude of the discrepancies that Pomona's evidence demonstrates, the resulting Medicare/SSI fractions for Pomona here cannot be considered "sufficiently 'accurate.'" *See Baystate*, 545 F. Supp. 2d at 41 ("[A]n agency must use 'the most reliable data available' to produce figures that can be considered sufficiently 'accurate.'") (quoting *Methodist Hosp. of Sacramento v. Shalala*, 38  F.3d 1225, 1230 (D.C. Cir. 1994)).  CMS should not be allowed to nitpick Pomona's attempts here, while also refusing to produce the underlying data or facilitate a review of a sample of patients.

### B.    The Secretary's Attempts to Discredit Pomona's Evidence Are Unsupported by the Record and, Thus, Fail.

The Secretary's arguments disparaging Pomona's efforts to show its Medicare/SSI fractions fail because they lack support in the record and include improper *post-hoc* attempts by the Secretary's counsel to bolster the PRRB's flawed Final Decision, which this Court cannot consider. *See Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 212 (1988) ("Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands.").[15]  Because there is no record evidence showing that CMS's calculations used the best available data, and CMS continues to refuse to produce the data that would conclusively prove, or disprove, Pomona's calculation, the Secretary resorts to parroting the PRRB's make-weight

---

[15]  The Secretary asserts (at 13, note 1) that "Plaintiff made conflicting statements as to whether the state or the SSA assigns the[ ] aid codes," but does <u>not</u> suggest that there is any ongoing confusion on this point.  And, as the Secretary concedes, the allegedly conflicting statement in Pomona's Final Position Paper was later clarified in testimony.  *See* Tr., at 309:12-17 (Testimony of S. Rosenstein) (A.R. 00416).  More importantly, because the PRRB did not rely on this point to support the Final Decision, this *post-hoc* argument cannot be considered by this Court.

findings and raising a number of unfounded criticisms regarding the minutiae of Pomona's efforts. Pomona addressed the PRRB's findings, and the Secretary's arguments thereon, in its Initial Memorandum and above, and quickly dispels of the Secretary's recycled criticisms below.

      1.   <u>The Secretary Acts Unreasonably by Faulting Pomona for Failing to Demonstrate  the Precise Flaws in CMS's Data While Simultaneously Refusing to Disclose Such Data.</u>

As noted above, the Secretary (at 23-24) criticizes Pomona for allegedly not "identify[ing] any flaw in the process or inaccuracies in the data."  Meanwhile, the Secretary further takes Pomona to task for opining on potential explanations for the possible discrepancies in CMS's data:

> The closest plaintiff comes to addressing the issue is when plaintiff briefly speculates about possible problems based on the timing of the CMS match. Plaintiff states that the "unexplained discrepancies" in its SSI fraction "may be due" to the Secretary's decision to rely on SSA data updated fifteen months after the end of the Federal fiscal year.

*Id.* at 24.[16]  The Secretary further argues (at 23-24) that Pomona has "admit[ted] that it does not know whether timing adversely affected the SSI fractions," and that "since plaintiff has not pointed to any other flaw in the CMS methodology, the Court should reject plaintiff's conclusory and unsupported claim that the revised matching process and its selected timing are arbitrary and capricious."[17]

---

[16] The Secretary also argues (at 24) that Pomona's "speculation [on the timing issue] is flatly contrary to what plaintiff told the Board in proceedings below, namely, that the timing of the match 'is not the problem,' and that there is some other unexplained problem causing the discrepancy."  However, a careful reading of the record demonstrates that Pomona never discounted timing as <u>potentially</u> playing a role in the errors in CMS's data. *See* Tr. at 36-37 (A.R. 00347-00348) (noting that focusing exclusively on timing is a "red herring").

[17] The Secretary (at 24) raises the issue of whether later data could be used given "time constraints in the cost report review process," noting that the applicable standard requires use of the best available data at the time of decision 'that is, within the cost report settlement period.'"  However, Notice of Program Reimbursements ("NPRs") are issued many years after a cost report year ends, and CMS's matching process easily could be done at the end of the cost reporting process with no (footnote continued)

The Secretary's argument that Pomona has failed to provide <u>definitive</u> data demonstrating CMS's errors is irrelevant and is apparently intended to distract the Court from the seminal question of whether CMS used the best available data to calculate the Medicare/SSI fractions at issue.  Only with the underlying SSI entitlement data would anyone, including Pomona, be able to definitively demonstrate the cause of the errors in CMS's data.  It is thus unreasonable and cynical for the Secretary to refuse to produce the underlying data and then fault Pomona for not being able to show the specific flaws in that data.

2.    <u>The Secretary's Arguments Discounting Pomona's Expert Witness<br>Testimony Fail Factually and Legally.</u>

The Secretary makes several attempts to discredit or discount the importance of Pomona's expert witness, Mr. Rosenstein, and his testimony regarding the use of Medi-Cal aid codes 10, 20, and 60 in Pomona's validation of its Medicare/SSI fractions.  *See, e.g.*, Sec.'s Mem., at 30 ("Plaintiff cites vague opinions given by witnesses who were not designated experts in the SSI program or in aid codes…"); *see also id.*, at 15.  Mr. Rosenstein had thirty years' experience with the Medi-Cal program, including at least twenty in a supervisory role, as the former director of the Medi-Cal program, and, before that, Director of the Medi-Cal Beneficiary Eligibility Branch.  He was the only witness put forth by either party with first-hand knowledge of Medi-Cal eligibility and the aid codes relevant to this case.  *See* Tr. at 270-281 (A.R. 00406-00409).  Further, the PRRB recognized Mr. Rosenstein as an expert witness in the areas of the Medi-Cal program generally and Medi-Cal eligibility.  *See id.* at 294:20-25 (A.R. 00412).

While the PRRB may not have recognized Mr. Rosenstein as an expert specifically on the topic of Medi-Cal aid codes, this is immaterial because Medi-Cal eligibility (an area where the

---

impact on the provider or CMS.  Thus, the Secretary's contention that later data could not be used is puzzling, misleading, and lacking in factual support in the record.

PRRB recognized Mr. Rosenstein as an expert) is defined by aid codes and the two areas—eligibility and the aid codes—are inextricably intertwined. *See id.* at 308-309 (A.R. 00415-00416) (noting that aid codes are used to "tell various entities; the state, Federal Government, providers, what is the source of [Medi-Cal] eligibility…you can look at an aid code you know where this person – how this person became eligible, source of eligibility, what source of benefits they get, and how much money the state can claim from the Federal Government."); *see also* Expert Report by S. Rosenstein, Ex. P-34 (A.R. 01462) (describing the use of aid codes to meet state and federal requirements that require the state to track and report on various eligibility groups). Moreover, Mr. Rosenstein's extensive and direct prior experience in the Medi-Cal program makes him a credible fact witness, and the MAC did not introduce any facts or witnesses to challenge Mr. Rosenstein's testimony. Because of his designation as an expert witness, and position as a fact witness, the Secretary's dismissal of Mr. Rosenstein's testimony as "vague" or otherwise insufficient is make-weight and meritless.

3.    Because the Final Decision Does Not Challenge Pomona's Calculation in Terms of the Exclusion of SSP-Only Days, the Secretary's *Post-Hoc* Arguments Cannot be Considered.

The PRRB acknowledged that Pomona "eliminated the [estimated] SSP only days" from Pomona's patient (and days) totals but did not find fault with Pomona's final totals on the basis that Pomona had failed to properly account for the possible inclusion of inpatient days where the Medicare beneficiary patient was entitled only to SSP benefits. *See* Final Decision at 7 (A.R. 00012). Thus, the Secretary's arguments regarding SSP-only days are *post-hoc* and may not be considered. *See Bowen.,* 488 U.S. at 212. And, even if the Court were to consider these arguments, they are not only incorrect, but also insubstantial.

Pomona explained in its Initial Memorandum (at 15-18) that Pomona corrected the issue regarding SSP-only days raised at the PRRB Hearing and subsequently accounted for the exclusion of such days from its recalculations. *See also* Exhibit P-46 (A.R. 00178-00179); Decl. of C.Le-Tran,

¶6 (A.R. 00112-00113), and Exs. P-40, P-41 and P-42 (A.R. 00118-00123).  The Secretary asserts (at 29, n. 8) that Pomona's  "correct[ion of] its original calculations to adjust for and take account of the SSP-only days issue…[is] based more on lay opinion than on quantifiable data specifically pertaining to patients treated by [Pomona]," and that Pomona "did not attempt to calculate the actual number of SSP-only days to be excluded…[and, instead,] 'presumed' that the original calculation should be reduced by a percentage corresponding to the statewide average of SSI/SSP patients having SSP-only benefits."[18]  The Secretary also argued (at 27) that inclusion of SSP-only patients "would result in a vastly overstated number of days in the SSI fraction numerator."

Here again, the Secretary's arguments improperly discount Mr. Rosenstein's testimony, both as an expert witness (Tr. at 294:20-25 (A.R. 00412)) and as a fact witness (Tr. at 270-281 (A.R. 00406-00409)).   Pomona presented evidence and testimony supporting its use of the SSP-only statewide average to adjust the number of days in its recalculations.  Pomona agreed that it was necessary to reduce the raw total number of patients by the number of patients who received SSP-only benefits, *see* Decl. of S. Rosenstein, ¶5 (A.R. 00105-00106); Decl. of C. Le-Tran, ¶6 (A.R. 00112-00113); Tr. at 92:11-94:6 (Testimony of C. Le-Tran) (A.R. 00361-00362), but only the SSA maintains records that underline conclusively identify the patients who are receiving SSI plus SSP benefits, as opposed to those receiving SSP-only benefits.  *See* Expert Report by S. Rosenstein, Ex. P-34 at pp. 2, 3 (A.R. 01461-01462).

Because of this, and in light of Pomona's inability, despite considerable efforts, to access the SSI data, Pomona reasonably used Statewide averages of SSI/SSP patients having SSP-only benefits

---

[18]   Despite arguing that Pomona's exclusion of SSP-only days is somehow insufficient, the Secretary concedes (at 26) that Pomona "acknowledged this flaw at the hearing," and agreed that it was necessary to reduce the "raw" total number of patients by the number of patients who received SSP-only benefits.

to reduce the "raw" total of patients (and days) for each year by approximately 16.5%, which is the

Statewide average of SSI/SSP patients having SSP-only benefits during State fiscal years 2006 to

2009.  *See* Provider's Post-Hearing Brief, Exs. P-51 and P-46 (A.R. 00191-00193, 00178-00179);

*see also* Decl. of S. Rosenstein, ¶5 (A.R. 00105-00106).  Moreover, Mr. Rosenstein explained that

the use of the Statewide average SSP-only percentages here was conservative given Pomona's

geographic location in a relatively poorer section of eastern Los Angeles County.  *See* Tr. 325

(Testimony of S. Rosenstein) (A.R. 00420).  He testified that the SSP-only percentage should be

lower in Southern California, which is less wealthy than Northern California.  *See id.* (explaining

that an individual will have SSP-only benefits when they have an income above the SSI threshold,

but below the SSP threshold).

Moreover, Pomona's expert witness and others testified that the magnitude of the remaining

discrepancies between the CMS and Pomona calculations, after application of a 16.5% reduction for

SSP-only patients, cannot be explained by the number of  SSP-only days.  *See* Expert Report by S.

Rosenstein, Ex. P-34 (A.R. 01460-01467); Tr. at 324:16-327:4 (A.R. 00419-00420).  There is simply

too large a gap between CMS's and Pomona's calculations to be caused by the unaccounted for SSP-

only population:

> There has to be something wrong with the data.  It just does not – it's not in sync
> with the experience of – that the State of California has with the overall SSI, SSP
> program.  It's just so much more off than average.  And the SSI, SSP Population is a
> very consistent population.

Tr. at 326-327 (A.R. 00420); *see also id.* at 253:4-254:11 (A.R. 00402) (Mr. Hefter, a former high

ranking CMS official, testifying that the unexplained difference between Pomona's and CMS's

respective Medicare/SSI fraction calculations was too large to be explained away by attributing the

difference to a large number of SSP-only patients.).  While Pomona may not have been able to

"calculate the *actual* number of SSP-only days to be excluded," Sec.'s Mem. at 29, n. 8 (emphasis

added), this does not diminish the fact that only the Secretary has the underlying data necessary to demonstrate whether Pomona's Medicare/SSI fraction is ultimately accurate and should be required to produce that data here so that his concerns can be conclusively addressed.

4. The Secretary's Argument that His Disclosure of MedPAR Data Negates the Need for Him to Disclose the Determinative SSI Data Fails Because MedPAR Data Does Not Include the Determinative SSI Data.

The Secretary (at 35-37) argues that CMS has "already furnished relevant data pursuant to the applicable statutory directive," and that furnishing any further data is somehow unnecessary. This argument overstates the scope of the data provided by the Secretary under Section 951 of the Medicare Modernization Act of 2003 and ignores the inconsistencies that are present within CMS's own internal data. *See* Provider's Final Position Paper, at 2 (A.R. 01827).

The MedPAR file provided by CMS contains "matched patient-specific Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis. . . ." 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005). This file does not contain the underlying SSI-entitlement data, nor the specific SSA codes assigned to each patient. Thus, the MedPAR file lists only the Pomona inpatients included in the numerator of CMS's Medicare/SSI fraction calculations for the FYs at issue, who allegedly were the only Pomona inpatients entitled to both Medicare Part A and SSI at the time they were receiving inpatient services at Pomona. *See* Tr. at 55:18-56:1 (Testimony of C. Le-Tran) (A.R. 00352). This is the end result of the Secretary's matching process and does not contain the underlying SSI-entitlement data or SSA codes for the inpatients, to which Pomona does not have access (*see* Answer at ¶19). The MedPAR file, therefore, does not provide sufficient information to confirm either CMS's or Pomona's Medicare/SSI fraction calculations, and the Secretary should be required to "show his work" here.

In addition, while CMS and the MAC <u>claim</u> to use the MedPAR file in performing the SSI matching, *see* CMS Ruling 1498-R, the MAC ultimately applied Medicare/SSI fractions here that are lower than what is supported by CMS's own MedPAR file. *See* Tr. at 89:3-90:16 (A.R. 00361); *see also* Provider's Final Position Paper, at 2 (A.R. 01827) (noting that the MedPAR data supports an SSI percentage for Pomona of 15.09% for FY 2006, not the 14.74% SSI percentage used by the MAC and CMS). The MAC presented no contrary evidence and did not refute this evidence. Nor did the MAC or CMS ever explain why its published Medicare SSI percentage for Pomona for FY 2006 was lower than the MedPAR file indicated it would likely be.

Based on the foregoing, the MedPAR data is insufficient, by itself, to allow Pomona to conclusively determine whether the Medicare/SSI fractions at issue are correct because MedPAR does not contain the underlying SSI entitlement data or codes assigned to individual patients. Counsel's arguments that CMS allegedly met its statutory burden to produce MedPAR data do nothing to counter this insufficiency or the need for the Secretary to disclose the underlying SSI entitlement data to allow this Court to conclusively determine whether the Secretary's Medicare/SSI fractions at issue are correct.

**C.** **Pomona Is Entitled to the Application of an Adverse Inference Against the Secretary and/or Burden Shifting, and the Secretary's Arguments to the Contrary Lack Merit.**

Because the Secretary (and not Pomona) has the SSI data necessary to conclusively confirm whether CMS's Medicare/SSI fraction calculations are correct, this Court should infer from the Secretary's failure to produce the data that the data would show that Pomona's recalculations are correct and the Secretary's are incorrect. *See Int'l Union v. NLRB*, 459 F.2d 1329, 1336-37 (D.C. Cir. 1972) (listing cases applying "common sense" adverse inference rule); *see also* 2 J. Wigmore, Evidence § 285 (3d ed. 1940) ("The failure to bring before the tribunal some circumstance, document, or witness, when either the party himself or his opponent claims that the facts would

thereby be elucidated, serves to indicate, as the most natural inference, *that the party fears to do so, and this fear is some evidence that the circumstance or document or witness, if brought, would have exposed facts unfavorable to the party*." (emphasis added)).  Thus, the PRRB acted unreasonably by not shifting the burden and requiring the MAC to produce "countervailing evidence or a reason, not based on the insufficiency of [Pomona's] showing, that explains why the … allegations have not been accepted." *Baystate*, 545 F. Supp. 2d at 51 (internal citation omitted).  This is because, as the Secretary (at 34) concedes, "the burden of bringing forward evidence generally shifts when the defendant has greater access to information on a particular issue." *Id.*; *see also Canadian Comm. Corp. v. Dep't of the Air Force*, 514 F.3d 37, 42 (D.C. Cir. 2008); *Atlanta College of Med. and Dental Careers, Inc.*, 987 F.2d at 830-31.

The Secretary (at 33-39) raises several arguments to avoid this adverse inference and/or burden shift.[19]  These arguments, which Pomona addresses below, lack merit and should not "be allowed to detract from the more general, commonsense observation that in most cases a party will introduce his most favorable evidence without being compelled by legal process to do so." *Int'l Union*, 459 F. 2d at 1338.

    1.    <u>The Critical Fact Here Is the Validity of CMS's Data and Not, as the Secretary Argues, Pomona's "Methodology and Data."</u>

The Secretary (at 35) makes the "bait and switch" argument that "the critical fact in this case was the reliability of plaintiff's own methodology and data—or lack thereof," and that "plaintiff is in

---

[19]  The Secretary argues (at 33) that Pomona's position related to application of an adverse inference and burden shifting is an "acknowledge[ment] that [Pomona] could not 'conclusively prove' its claim based solely on the strength of its evidence before the Board."  But the Secretary here argues too much because, as Pomona has stated repeatedly, it is the Secretary (and not Pomona) that has the data necessary to conclusively prove (or disprove) Pomona's claim here.  However, Pomona has conclusively demonstrated that there is something wrong with CMS's data and this is sufficient to require the Secretary either to disclose the determinative data or yield to Pomona's calculation.

a better position than defendant to obtain information bearing on the reliability of plaintiffs own methodology and data." However, the only reason that Pomona's data is at issue at all here is because the Secretary refuses to provide the underlying data to conclusively demonstrate that CMS's calculation is accurate.

As explained at the PRRB and in Pomona's Initial Memorandum (at 22-23), Pomona was forced to resort to using other verified data sources to determine the accuracy of its Medicare/SSI fractions because, despite multiple attempts by Pomona to obtain the underlying SSI data, or to reach an alternative solution involving testing the data with the cooperation of both CMS and SSA, CMS did not disclose, or grant Pomona's request to test, the underlying SSI data. *See* Answer, at ¶19; *see also* Provider's Ex. P-32 (A.R. 01451-01453). And it is unrefuted that SSA and CMS are in sole possession of the underlying SSI data, which is necessary to prove (or disprove) Pomona's claim and demonstrate the exact amount of any discrepancies in CMS's data. Thus, the Secretary assertion lacks merit that Pomona is in a better position to confirm the reliability of CMS's Medicare/SSI fractions. Only the underlying SSI data will suffice and the Secretary has that data, not Pomona.

In support of its argument that Pomona's data, as opposed to CMS's, is at the heart of this case, the Secretary (at 35) points to the PRRB's suggestions of "a number of ways plaintiff might have supported its methodology without the need to use SSA's underlying source data." These suggestions were for Pomona to (a) use its "own records to quantify the number of additional days attributable to patients from a nursing home," (b) use its "own records and the State records to determine if any additional requested days were 'associated with individuals whose application for Medi-Cal/SSP was submitted in the same month that patient days of service occurred,'" and (c) "review[] definitions of aid codes and SSI codes to build a crosswalk or diagram … between the aid codes and the SSI codes." *Id.*, at 35, n. 11.

On the first two points, and as explained above at 14, the number of days attributable to nursing home patients and individuals whose application for Medi-Cal/SSP was submitted in the same month that the patient days of service occurred, are *de minimis*.  Moreover, it is impossible to determine conclusively the number of days attributable to these patients without the underlying SSI data.  And, on the third point, Pomona explained above at 10-12 why such a crosswalk is not possible without the underlying SSI data.  Thus, the Secretary's argument that the "critical fact in this case was the reliability of plaintiff's own methodology and data" fails because the reliability of Pomona's data can only be conclusively addressed by the underlying SSI data and only the Secretary can provide the "evidence necessary to prove [a] critical fact," here.  *Baystate*, 545 F. Supp. 2d at 51 (recognizing that "CMS and SSA were in sole possession of the SSI data necessary to determine the scope of the impact with any greater precision").  Thus, an adverse inference and/or shifting of the burden to CMS is entirely appropriate and necessary for a fair decision.

2.   <u>The Secretary's Argument that the MAC Had a Legitimate Reason Not to Introduce Evidence Supporting CMS's Calculation Before the PRRB Does Not Withstand Scrutiny.</u>

The Secretary argues (at 38) that the adverse inference rule does not apply here because before the PRRB Pomona "failed to substantiate its claims that the SSI fraction was erroneous or understated" and therefore "the MAC had no reason to introduce evidence to contradict that showing."  But the evidence presented by Pomona before the PRRB, including expert and fact witness testimony, raised serious questions about whether the Medicare/SSI fractions at issue were based on the best available data.  And it would have been quite easy for the MAC to disprove Pomona's claims by presenting the determinative SSI data.  *See* Tr. at 115 (Testimony of C. Le-Tran) (A.R. 00367) (estimating that a review of the sample claims would take "less than three hours").  Instead, the MAC, and CMS, choose to remain silent about the true facts and to avoid presenting evidence that may have supported Pomona's methodology.  "The only rational inference"

from the agency's "unexplained nonproduction" here is that the unproduced determinative data would have supported Pomona's claims. *Int'l Union*, 459 F.2d at 1347.[20]

Relatedly, the Secretary asserts (at 35-36) that CMS has already turned over the necessary data to confirm the discrepancies and errors that Pomona uncovered here, and that there is no obligation for the agency to provide additional data.[21]  The Secretary here is referring to MedPAR data which, as explained above at 22-23, is inadequate because it does not include the underlying SSI data, and is also internally inconsistent with CMS's own data.  The insufficiency of the MedPAR data, along with the internal inconsistencies, underscore the need for the Secretary to produce the underlying SSI entitlement data to verify Pomona's Medicare/SSI fractions.

Ultimately, the data necessary to conclusively prove (or disprove) Pomona's claim and demonstrate the exact amount of any discrepancies is within the control of CMS and SSA.  Pomona has presented extensive evidence regarding its unsuccessful efforts to obtain the SSI entitlement information directly from SSA, as well as from CMS.  Because Pomona has no ability to validate the underlying SSI data that supports the Medicare/SSI fractions at issue, the application of the adverse inference is both necessary and appropriate.  Thus, this Court should find that the underlying SSI entitlement data that CMS refused to disclose would be adverse to CMS's position and would support Pomona's recalculation of the Medicare/SSI fractions at issue.

---

[20]  Following *Baystate*, there may be good reason for CMS to prefer to remain silent — while CMS revised the process as a result of that case, CMS has never made public an external validation of the underlying data and matching process.  *See* 75 Fed. Reg. at 50,278–79 (noting that CMS will produce summary statistics, but that the underlying "data will be used as part of [CMS's] internal data validation process, [and thus, CMS] do[es] not intend to provide them to the public.").  But that supports, rater than undermines, the need for the inference.

[21]  The Secretary (at 39) notes that additional data provided by CMS here "would be subject to the strict privacy protections that apply in this context."  Pomona would, of course, agree to protective orders or other process necessary to protect that data.  Further, such privacy concerns would be not even arise if CMS reviewed the SSA's matching results for the patient sample, as Pomona requested.

3.     The Secretary's Assertion that Pomona Did Not Raise CMS's Refusal
       to Provide the Underlying SSI Data Before the PRRB Lacks Factual
       and Legal Merit.

The Secretary argues (at 33) that "it does not appear that plaintiff sought such relief [the application of an adverse inference and burden-shifting] before the Board, so these arguments are waived."   This argument fails because, as the Secretary acknowledges, Pomona raised the unavailability of the underlying SSI data numerous times before the PRRB.   *See* Sec.'s Mem., at 33-34 (noting Pomona's unsuccessful attempts to obtain the "source data from SSA").   Pomona also raised the logical conclusions that flow from CMS's refusal to produce the underlying SSI data or to facilitate a review of sample patients/days, *i.e.*, that this data is adverse to the Secretary.   *See, e.g.*, Provider's Post-Hearing Brief at 18 (A.R. 00060) ("First, it is obvious that CMS did not know if its calculations were correct or not and CMS was afraid of finding out since it did not feel it had sufficient manpower to address needed corrections if other hospitals started to look at their DSH data in the manner that Pomona has done."); *id.* at 20 (A.R. 00062) ("The fact remains, the SSA was willing to look at Pomona's data, all it would have taken was for a CMS official to 'push a button' and send it.   CMS blocked Pomona's data from being reviewed, without any compelling legal reason for doing so.   There is no other conclusion to draw here.").

This situation, where Pomona presented the underlying facts as well as the conclusions which can be drawn from those facts to the PRRB, is distinguishable from the cases that the Secretary cited to oppose application of the inference and burden-shift, none of which involve the Medicare program or the Secretary.   *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1297 (D.C. Cir. 2004) (en banc) (finding waiver of issue where party had "offered 'no hint' of th[e] argument during [agency's] rulemaking"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) (finding waiver of issue where appellee moved for leave to amend its petition to raise, for the first time, a particular contention and the underlying facts supporting that contention); *Nat'l Wildlife*

*Fed'n v. EPA*, 286 F.3d 554, 562 (D.C. Cir. 2002) (finding waiver of issue where the contentions were not raised during the administrative phase of rulemaking); *Nat'l Ass'n of Mfrs. v. U.S. Dep't of Interior*, 134 F.3d 1095, 1111 (D.D.C. 1998) (finding that "scattered references" to a particular contention in a voluminous record does not suffice to provide the agency with a "fair opportunity" to pass on the issue). Here, the MAC and CMS had a "fair opportunity to pass on a legal or factual argument," given the fact that inability to access the SSI data, and CMS's refusal to facilitate a review of Pomona's data, was central to Pomona's case at the PRRB. *See Nat'l Ass'n of Mfrs.*, 134 F.3d at 1111 ("Our cases ... require complainants, before coming to court, to give the [agency] a fair opportunity to pass on a legal or factual argument" (*quoting Wash. Ass'n for Television & Children* v. FCC, 712 F.2d 677, 681(D.C. Cir. 1983)); *see also Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) ("An objection must be made with sufficient specificity reasonably to alert the agency." (quoting *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991)). The Secretary, CMS, and the MAC could have, but did not address Pomona's arguments.[22] Thus, the Secretary did not (and cannot) show that waiver is appropriate here.

The underlying factual and legal bases for Pomona's waiver and burden-shifting arguments were presented to the PRRB, and the MAC and CMS were well aware of the need to counter Pomona's contentions regarding the unavailability of the SSA data, but chose to remain silent. While this might have been a good strategy to avoid making public the obvious (but hidden) problems with the Secretary's SSI data-matching process, this Court should not accept the accuracy of the Secretary's Medicare/SSI fraction on blind faith and should order the Secretary to disclose the determinative SSI data.

---

[22]   The Final Decision was subject to review by the Secretary, through his designee, the CMS Administrator, who declined to get involved.  (*See* A.R. 00001).

III.   **CONCLUSION**

For the foregoing reasons, this Court should grant Pomona's Motion for Summary Judgment, deny the Secretary's Cross-Motion for Summary Judgment, declare the PRRB's actions arbitrary and capricious, and set aside the Final Decision.[23]


Dated:  September 27, 2019                    Respectfully submitted,

Laurence D. Getzoff                            /s/ Robert L. Roth
Alicia W. Macklin                              Robert L. Roth (DC Bar No. 441803)
HOOPER LUNDY & BOOKMAN, P.C.                    HOOPER LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600             401 9th Street, NW, Suite 550
Los Angeles, CA  90067-2517                    Washington, D.C.  20004
Tel:  (310) 551-8111                           Tel.: (202) 580-7700
Fax:  (310) 551-8181                           Fax: (202) 580-7719
E-mail:  lgetzoff@health-law.com               E-mail:  rroth@health-law.com
E-mail:  amacklin@health-law.com

*Counsel for Plaintiff Pomona Valley Hospital Medical Center*

---

[23]  As Pomona explained (at 43-45), there are no outstanding issues to be resolved at the PRRB unless the Secretary produces the underlying SSI data.  Remand is warranted only if this Court orders the Secretary to produce the underlying data or to facilitate the review of Pomona's data. Recently, while recognizing that "when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards," this Court left open the question of whether specific instructions were necessary to mitigate the complications that may arise from an order to remand and vacate a final rule.  *See Am. Hosp. Ass'n, et al. v. Azar*, Mem. Op. at 26-27, Case 1:18-cv-02841 (D.D.C. September 17, 2019)(quoting *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005)).  Thus, the Court invited the parties to submit a joint status report to determine if additional briefing on remedies was necessary.  *Id.*, at 27.  If the Court here determines that Pomona has demonstrated that there are flaws in CMS's data, but does not order the Secretary to produce the underlying data or facilitate a review of the data, Pomona respectfully requests the opportunity to further brief the issue of the appropriate remedy here.