# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| _____ | ) | |
| POMONA VALLEY HOSPITAL | ) | |
| MEDICAL CENTER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-02763-ABJ |
| | ) | |
| ALEX M. AZAR II, Secretary | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## REPLY MEMORANDUM IN SUPPORT OF DEFENDANT'S
## CROSS-MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 2

    I.    There Is No Basis to Disturb the Board's Decision, Which Is Supported by
Substantial Evidence, and Is Not Arbitrary and Capricious .................................. 2

        A.    The Secretary is Entitled to Rely on the Revised Matching Process to
Calculate the SSI Fraction, Which is Not Arbitrary and Capricious ......... 2

        B.    Plaintiff Failed to Show that the SSI Fractions Generated by the
Secretary's Revised Matching Process Were Erroneously Understated..... 8

        C.    The Court Should Reject Plaintiff's Unsupported Request to Shift the
Burden of Proof, or to Adopt an Adverse Inference ................................ 16

        D.    The Board Adequately Explained the Reasons for its Findings and
Conclusions .............................................................................................. 23

    II.    Plaintiff Seeks Improper Relief, and the Court Should Reject Plaintiff's Last-
Minute Request for an Order Requiring Disclosure of Additional Data .............. 23

CONCLUSION .............................................................................................................. 24

## TABLE OF AUTHORITIES

**CASES**

*Am. Med. Ass'n v. Reno*,
   57 F.3d 1129 (D.C. Cir. 1995) ................................................................ 6

*Baystate Med. Ctr. v. Leavitt*,
   545 F. Supp. 2d 20 (D.D.C. 2008) ................................................ *passim*

*Baystate Med. Ctr. v. Mut. of Omaha Ins. Co.*,
   2006 WL 752453 (PRRB Mar. 17, 2006) ............................................ 5, 20

*Chevron USA, Inc. v. Nat. Resources Def. Council, Inc.*,
   467 U.S. 837 (1984) .......................................................................... 19

*In re Cheney*,
   406 F.3d 723 (D.C. Cir. 2005) ............................................................ 24

*Loumiet v. United States*,
   65 F. Supp. 3d 19 (D.D.C. 2014) .................................................... 19, 24

*Methodist Hosp. of Sacramento v. Shalala*,
   38 F.3d 1225 (D.C. Cir. 1994) ...................................................... 4, 5, 8

*Metropolitan Hosp. v. HHS*,
   712 F.3d 248 (6th Cir. 2013) ............................................................ 19

*Power v. Barnhart*,
   292 F.3d 781, 784-86 (D.C. Cir. 2002)................................................ 24

**STATUTES**

42 U.S.C. § 1395ww ...................................................................... 8, 18

Medicare Modernization Act,
   Pub. L. No. 108-173, 117 Stat. 2066 (2003)........................................ 18

**REGULATIONS**

42 C.F.R. § 405.1871 .................................................................... 7, 17

42 C.F.R. § 412.106 ........................................................................ 19

51 Fed. Reg. 31,454 (Sept. 3, 1986) .................................................... 21

70 Fed. Reg. 47,278 (Aug. 12, 2005) .......................................................................... 19, 20, 21, 24

71 Fed. Reg. 17,470-02 (Aug. 6, 2006) .......................................................................... 19, 20, 21

75 Fed. Reg. 23,852 (May 4, 2010) .......................................................................... 3, 6

75 Fed. Reg. 50,042 (Aug. 16, 2010) .......................................................................... *passim*

## INTRODUCTION

As explained in the Secretary's opening brief, the Court should reject plaintiff's challenges to the SSI fractions at issue in this case.  Plaintiff's latest brief provides no basis to conclude otherwise.  Plaintiff identifies no flaws in the matching process used to produce those fractions, which has been revised and refined by the agency after notice and comment rulemaking to ensure that the calculations are based on the best available data.  Plaintiff wrongly argues that it showed the SSI fractions were understated, but even if that were true, it would not provide a reason to set those fractions aside under the applicable standard.  To make that showing, plaintiff would have to show that in some respect, the revised matching process did not use the best available data.  Plaintiff does not attempt to identify any such flaw in the matching process.  Accordingly, summary judgment should be granted in favor of the Secretary.

In any event, plaintiff failed to show any understatement in the SSI fractions themselves. The fractions are lower than the SSI fractions plaintiff itself came up with using a different methodology and data, but the Board proceedings revealed a number of flaws in plaintiff's methodology, and plaintiff failed to show that it was otherwise reliable.  As the Board emphasized, plaintiff failed to submit a diagram or crosswalk or other comparison to show how the data on which plaintiff relied would correlate to the three SSI codes that denote patients who are properly included in the SSI fraction under the statutory formula.  Plaintiff now asserts that it could not make that showing without access to vast amounts of privacy-protected data.  But plaintiff never made that argument to the Board, and in any event, plaintiff provides no reason to doubt the Board's conclusion that plaintiff could have provided the relevant information without

access to such data.  For these and other reasons, substantial evidence supports the Board's finding that plaintiff failed to show any flaws in the challenged SSI fractions.

Finally, the Court should also reject plaintiff's request to modify the burden of proof by shifting the burden to the Secretary or by drawing an inference adverse to the Secretary.  Plaintiff waived any claim to such relief because, as plaintiff now admits, it did not request such relief in the Board proceedings.  In any event, plaintiff's belated request for this extraordinary relief is meritless for numerous additional reasons.  Contrary to plaintiff's unsupported assertions, CMS is not in "exclusive possession" of data necessary to prove plaintiff's claims, nor did it refuse to produce such evidence.  Indeed, CMS provided plaintiff with requested data underlying its calculation of the challenged SSI fractions, and in doing so, CMS fully complied with the applicable statutory obligation to make such data available.  And contrary to plaintiff's suggestion, the agency is not required to depart from its established process and conduct further *ad hoc* testing of data at the request of one hospital among thousands.  That is especially so where, as here, there is no reason to doubt the accuracy of CMS's original calculations.

For these and other reasons, the Court should grant summary judgment in favor of the Secretary.

## ARGUMENT

## I.    There Is No Basis to Disturb the Board's Decision Which Is Supported by Substantial Evidence, and Is Not Arbitrary and Capricious

### A.    The Secretary is Entitled to Rely on the Revised Matching Process to Calculate the SSI Fraction, Which is Not Arbitrary and Capricious

As explained in the Secretary's opening brief, the revised matching process used to calculate the SSI fractions for this hospital (and for DSH hospitals nationwide) is entitled to

deference, and the Secretary may rely on it so long as it was reasonably calculated to produce an accurate result by using the best available data.  *See* Def. Cross-MSJ at 20-25, ECF No. 14. Plaintiff has not shown any flaw in the matching process or that it was not based on the best available data.   Accordingly, there is no basis to set aside the challenged SSI fractions.  *See Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 40-42, 49-50 (D.D.C. 2008).

Plaintiff cites nothing in the record that could support a finding that the revised matching process was not based on the best available data.  The general process, which has been in place for decades, involves matching data from Medicare Part A billing records with SSI-entitlement data provided to CMS by the Social Security Administration ("SSA") in order to identify patients that should be included in the SSI fraction under the statute.  The Secretary revised that process in response to the *Baystate* litigation, to ensure use of the best available data, formally adopting the revised process in notice and comment rulemaking.  *See* Def. Cross-MSJ at 7-12, 20-21.  The proposed and final rules describe in detail the multi-step process used by CMS to accurately identify patients who should be included in the fraction, and the final rule details additional refinements to the process that were made in response to public comments.  *See* 75 Fed. Reg. 50,042, 50,277-50,284 (Aug. 16, 2010); 75 Fed. Reg. 23,852, 24,003-24,006 (May 4, 2010). Unlike the *Baystate* plaintiffs, plaintiff here makes no effort to identify flaws in this process, or to show that it does not rely on the best available data.  Indeed, plaintiff's arguments do not focus on that process at all.

Rather than presenting a coherent argument under the best available data standard, plaintiff continues to argue merely that the SSI fractions produced by that process were "incorrectly low," because they were lower than SSI fractions plaintiff came up with later based

on data from the California Medicaid program.  Pl. Opp. at 3, 15, ECF No. 16.  These arguments

rehash plaintiff's claims, refuted in the next section, that it has shown errors in the CMS fractions

based on "unexplained discrepancies" with its own fractions.  Such arguments are irrelevant

under the applicable standard.  To set aside the challenged fractions, it is not enough to show that

they are merely inaccurate.  Rather, plaintiff must show that the process used by the Secretary

did not use the best data available at the time of the decision.  "[T]he best available data standard

leaves room for error, so long as more reliable data did not exist at the time of the agency

decision."  *Baystate*, 545 F. Supp. 2d at 49.  Having failed to identify any respect in which the

revised matching process did not use the best available data, plaintiff cannot set aside the

challenged decision.

     Plaintiff acknowledges that the best available data standard leaves room for error but

otherwise misses the point, suggesting that the standard precludes results that are more than

"slightly" inaccurate.  Pl. Opp. at 7.  Of course, as discussed *infra*, the Secretary does not agree

that plaintiff showed any inaccuracy—even a slight one.  In any case, however, it is not the

degree of accuracy (or inaccuracy) that matters, it is whether the SSI fractions were based on the

best data available to the agency at the time of the decision.  *See Baystate*, 545 F. Supp. 2d at 40-

42.  If so, then they cannot be set aside merely because they are later shown to be inaccurate

based on different data.  As the *Baystate* court emphasized, this point is "amply support[ed]" in

the caselaw.  *See id.* at 49.  The D.C. Circuit, for example, has held that the Secretary reasonably

relied on a regional wage index even though it incorporated erroneous understated wage data that

caused certain hospitals to lose over $730,000 in reimbursements.  *See Methodist Hosp. of

Sacramento v. Shalala*, 38 F.3d 1225, 1228 (D.C. Cir. 1994).  The reimbursements were upheld

because they were based on "the most reliable data available to the Secretary at the time of publication," and thus reflected the Secretary's "best approximation" of the wage index. *See id.* at 1230. *See also Baystate*, 545 F. Supp. 2d at 49-50 (citing other cases).[1]

Plaintiff also seems to assert that it should not be required to identify flaws in the matching process without access to the "underlying data" because "virtually nothing is known" about that process. *See* Pl. Opp. at 6-7, 12, 17-18. This argument is meritless. While plaintiff itself may know "virtually nothing" about the revised matching process, that is not for lack of available information. Again, the basic matching process has been in place for decades, and the adequacy of that process has been litigated extensively in other cases (most notably, of course, in *Baystate* itself), which generated published opinions that review and discuss the process in great detail. *See, e.g.*, *Baystate*, 545 F. Supp. 2d 20; *Baystate Med. Ctr. v. Mut. of Omaha Ins. Co.*, 2006 WL 752453, at *9 (PRRB Mar. 17, 2006). And of course, the *revised* matching process, which was developed specifically to ensure that the SSI fraction is based on the best available data, was formally adopted through public notice and comment rulemaking, after affording providers and other members of the public the opportunity to comment. The proposed and final

---

[1] Plaintiff does not argue that its own data is better than the data used in the revised matching process, nor could it do so given that (as discussed below) plaintiff's data was shown to be inaccurate and unreliable at the Board hearing. Moreover, it is worth noting that the Secretary does not have plaintiff's data at the time he calculates the SSI fractions for all hospitals nationwide. Thus, by definition, plaintiff's alternative data cannot be the best data "available" to the agency at the time it determines the SSI fraction. Plaintiff's alternative data is from the California Medi-Cal program, but it is unclear what data California gets from SSA and what the State does with it before transmitting it to hospitals, and it is unclear how the timing of that data relates to the timing of data the Secretary receives directly from SSA regarding entitlement to SSI. The Secretary has made clear that it is the SSI eligibility file that he receives directly from SSA, at a particular point in time, which "serves as *the system of record* for whether or not SSA made a payment of SSI benefits to an individual who applied for SSI benefits." 75 Fed. Reg. at 50,277 (emphasis added).

5

rules describe the revised process in considerable detail.  *See* 75 Fed. Reg. 50,277-50,284; 75

Fed. Reg. 24,003-24,006.  Plaintiff does not identify any aspect of this process that remains

unexplained or insufficiently clear.  Nor has plaintiff ever argued that the revised matching

process should be set aside because the proposed rule provided inadequate detail to allow for

meaningful public comment on the process.  *See Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1132

(D.C. Cir. 1995) (proposed rule must contain sufficient detail "to allow for meaningful and

informed comment").

Of course, even before these public disclosures about the revised process occurred, the

*Baystate* plaintiffs themselves were able to ascertain information sufficient to challenge various

aspects of the matching process in both administrative and judicial proceedings, eventually

persuading the district court in that case that, in certain respects, the prior process did not employ

the best available data.  *See Baystate*, 545 F. Supp. 2d 20.  For example, they identified certain

types of data that were potentially omitted from the matching process, *see id.* at 44-46, potential

problems pertaining to the use of patient identifiers in that process, *see id.* at 46-49, and other

specific concerns under the best available evidence standard.  Plaintiff should not now be heard

to argue that a lack of information prevents it from raising similar challenges.

Moreover, if plaintiff truly cared to learn more about the revised matching process, it

could have asked its own witness for additional information.  One of the three witnesses plaintiff

presented in the Board proceedings, Tzvi Hefter, was a former director of a division within CMS

responsible for inpatient payment policies, including policies relating to the DSH calculation.

Tr. 205-207 [AR 390].  The witness, whom plaintiff hired as a consultant, confirmed at the

hearing that he is "familiar with the methodology that CMS used to actually calculate each

6

individual hospital's SSI percentage or fraction," and that "when the Bay State [sic] decision was finalized, it really fell into our group and our area to work with SSA to come up with a 'better file' from SSA" Tr. 211-12, 241 [AR 391, 399].  Plaintiff was perfectly free to ask its consultant any relevant questions it might have about the revised matching process and, if the answers supported plaintiff's claims, to present that testimony in the Board proceedings.

Finally, plaintiff also argues that the MAC did not introduce "positive evidence" to show that CMS's methodology is reliable.  Pl. Opp. at 12.  But again, the matching process was formally adopted by the agency after notice and comment rulemaking, so the details of the process are already a matter of public record.  Both the Board and the MAC referred to those descriptions in the Federal Register repeatedly throughout the proceedings.  Moreover, since plaintiff did not (and still does not) purport to identify any flaw in that process, there was no apparent reason to present any "positive evidence" of reliability.  Nor was there any way to discern what aspect of the process should be the focus of such a "positive" evidentiary showing. In any event, it was ultimately plaintiff's burden to prove its entitlement to relief in the Board proceedings, including by showing that the revised matching process does not meet the best available evidence standard.  *See* 42 C.F.R. § 405.1871(a)(3).  That being the case, any lack of "positive evidence" to support the methodology is irrelevant.  Of course, plaintiff now asks the Court to relieve it of that burden of proof, either through burden-shifting or an adverse inference, but as discussed below in Section C, those arguments are both waived and meritless.

Since plaintiff failed to show that the revised matching process did not rely on the best available data, there is no basis to set aside the challenged SSI fractions—even if they could be deemed "incorrectly low" based on SSI fractions plaintiff came up with later, using a different

methodology and different data.  *See Baystate*, 545 F. Supp. 2d at 49-50; *Methodist Hospital*, 38 F.3d at 1228-30.  The Court should therefore grant summary judgment for the Secretary.

### B. Plaintiff Failed to Show that the SSI Fractions Generated by the Secretary's Revised Matching Process Were Erroneously Understated

In any event, plaintiff also failed to show that the CMS fractions were incorrectly low. Plaintiff's only basis for that claim was that the CMS fractions were "lower" than the SSI fractions that plaintiff itself produced based on its own methodology and data.  As explained in the Secretary's opening brief, however, plaintiff failed to show that its own SSI fractions were accurate, much less more accurate than the fractions calculated by CMS.  To the contrary, the Board hearing showed that plaintiff's methodology and data was demonstrably unreliable in a number of respects and that there was no basis to conclude that it was otherwise sound.  *See* Def. Cross-Mot. at 25-33.

Plaintiff can hardly deny that its methodology was shown to be inaccurate.  The DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I), limits the SSI fraction numerator to Medicare patients actually entitled to receive payment of federal SSI benefits for the months in which they received inpatient services at the hospital.  *See* Board Decision [AR 9-10].  *See also* 75 Fed. Reg. at 50,280-50,281.  To identify such patients for inclusion in the SSI fraction, CMS's matching process relies on indicators based on three monthly-assigned SSI codes (C01, M01, and M02), which "accurately captures all SSI-entitled individuals, during the month(s) they are entitled to receive SSI benefits."  *See id.* at 50,281.  By contrast, plaintiff's own methodology—based on Medi-Cal aid codes assigned by the State of California—does not limit the SSI fraction to such patients.  Several examples of patients who would be improperly included came to light during the Board proceedings.  Shortly after submitting its initial claims for additional days, plaintiff

acknowledged that the calculations were vastly overstated because they include days for which Medicare beneficiaries were only entitled to receive state supplementary payments ("SSP"), not federal SSI benefit payments. *See* Def. Cross-Mot. at 26. Plaintiff later acknowledged, after questioning by Board members, that its methodology would also improperly include other kinds of unpaid patient days, including days for which patients were not entitled to federal benefit payments because they were receiving nursing home benefits, or because their application for SSI benefits had not yet taken effect. *See id.* at 27-28.

These problems are illustrative of the more fundamental problem with plaintiff's methodology, namely, that it does not accurately identify patient days that should be included under the statutory formula. Plaintiff continues to argue that it has now corrected for the improper inclusion of SSP-only days, Pl. Opp. at 19-22, and that the other identified flaws would not have a large impact, Pl. Opp. at 14-15. But this response fails to address the problem. Specifically, there was no basis to conclude that plaintiff's methodology would otherwise limit the SSI fraction to patients who were entitled to be paid SSI benefits during the month(s) they were in the hospital. That concern was amply justified. The Board emphasized, both at the hearing and in its final decision, that there are other situations (many specifically discussed in the Federal Register, *see* 75 Fed. Reg. at 50,281) in which otherwise-eligible patients might not be entitled to SSI payments in a particular month. *See*, *e.g.*, Tr. 386-406 [AR 435-39]; Board Decision [AR 8-9, 13-14]. And having already identified three instances in which plaintiff's methodology would improperly include patients who were not entitled to SSI payments at the relevant time, there was no basis to suppose that it was sound in other respects. As one Board member explained, such identified flaws reflect a difference "in definition," between the aid

codes relied on by plaintiff and the three monthly SSI codes that reflect entitlement to SSI benefits.  Tr. 346-347 [AR 425].

Having failed to demonstrate the accuracy of its own methodology and SSI fractions, plaintiff likewise failed to show there was any reason to question the accuracy of the challenged CMS fractions.  Given that plaintiff's methodology produced a fraction that was shown to be overstated under the statute, and that there was no way of quantifying the magnitude of the overstatement, it is only natural to expect that the CMS fractions would be "lower" than plaintiff's own fractions.  Contrary to plaintiff's suggestion, the problem is not merely that plaintiff failed to provide "precise estimates" of identified errors in the CMS fraction, or to "proactively determine any and all potential explanations for the differences between CMS's calculations and the data that [plaintiff] used in its recalculations."  Pl. Opp. at 13.  Rather, the problem is that plaintiff failed to make even a preliminary showing that would cast doubt on the validity of the CMS fractions.  This is especially true given plaintiff's failure to identify any potential flaw in the revised matching process.  Absent any such showing, plaintiff's entire case rested on the proposition that plaintiff's own methodology and data was "more reliable" than that of CMS.  *See* Def. Cross-MSJ at 13-14.  Unfortunately for plaintiff, the Board hearing showed that plaintiff's methodology and data were not reliable at all.

None of plaintiff's arguments address this basic deficiency.  Plaintiff rehashes irrelevant testimony about the Medi-Cal aid codes, asserting that they are based on information "derived from" SSA data, that they are assigned only after being verified twice based on separate data fields, and that the codes identify someone who is aged, blind or disabled, and who has been confirmed as receiving SSI and/or SSP "at a particular time."  Pl. Opp. at 9-10, 11-12 & n.12,

etc.  But none of it suggests that the aid codes provide a reliable means of identifying Medicare beneficiaries who were actually entitled to receive payment of federal SSI benefits for the month(s)/days they received inpatient services.  As the Board emphasized, SSI entitlement can change from month-to-month based on various factors, and a person who is, or has been, deemed eligible or entitled in one month may not be entitled to SSI payments in subsequent months. Board Decision [AR 8-9].  Unlike the three SSI codes used by CMS, which reflect entitlement to SSI payments on a month-by-month basis, *see* 75 Fed. Reg. at 50,280-50,281, plaintiff's aid codes do not reflect entitlement to federal SSI payments, and thus do not necessarily denote individuals who were entitled to receive such payments while they were in the hospital.

The Board gave plaintiff every opportunity to clarify or address this concern—even after the Board hearing—but plaintiff failed to do so.  Def. Cross-MSJ at 30-32.  In particular, the Board invited plaintiff to submit a diagram or cross-walk to show that Medi-Cal aid codes were, apart from the flaws that happened to come to light in the Board proceeding, otherwise reliable indicators of SSI-entitlement under the statute, and that they corresponded to the monthly SSI codes assigned by SSA to indicate entitlement to SSI payment benefits.  *Id.* at 30-31.  As the Board noted, however, plaintiff failed to provide such a comparison, even though one could have been developed without the use of privacy protected data.  Board Decision [AR 13-14].  Instead, plaintiff submitted with its post-hearing brief information pertaining to "indicator value codes," without any clear explanation of what those codes mean or how (if at all) they relate to the SSI codes indicative of entitlement to benefits.  *Id.* [AR 14].  As a result, the Board had no way of knowing the extent to which plaintiff's aid codes correlate with SSI codes *other* than C01, M01,

and M02, thereby resulting in improper inclusion of patients who, under the statutory formula, should have been excluded. *Id.* [AR 13-14].

Plaintiff now makes two arguments as to why it did not need to submit the requested information, neither of which were made to the Board and neither of which have merit. First, plaintiff asserts, without explanation, that the requested comparison is "not relevant here" because plaintiff's claim "focuses on whether . . . SSI codes C01, M01, and M02 do not capture all qualifying" days for the relevant periods. Pl. Opp. at 10-11. However, the Secretary has explained the basis for its determination that those three SSI codes do, in fact, "accurately capture[] all SSI-entitled individuals," for purposes of the SSI fraction, *see* 75 Fed. Reg. at 50,281, and plaintiff suggests no reason to doubt that conclusion. To the contrary, plaintiff's opening brief expressly disavowed any challenge to the Secretary's decision to treat only those three SSI codes as indicators of entitlement. Pl. MSJ at 7, ECF No. 11-1 (stating that plaintiff "does not contest" that decision). Since it is undisputed that those three SSI codes capture all SSI-entitled patients for purposes of the SSI fraction numerator, it is clearly "relevant" to determine the extent to which the aid codes used in plaintiff's methodology would correspond to those three SSI codes.[2] To the extent the aid codes correspond to SSI codes *other* than those

---

[2] Plaintiff suggests (albeit without support) that there may be instances in which SSI-entitled patients are mistakenly not assigned a code of C01, M01, or M02, or in which someone who is assigned such a code is nonetheless not properly identified using the Secretary's revised matching process. Pl. Opp. at 7. But even if that were possible, it would not make a comparison any less relevant. In assessing the reliability of plaintiff's methodology, the relevance of the comparison turns on what the codes *mean*, not on whether they are properly applied by SSA or detected in the Secretary's matching process. There is no dispute that the three SSI codes denote all persons who were entitled to receive SSI payments for the month in which the code is assigned. *See* 75 Fed. Reg. at 50,280-50,281.

three SSI code indicators (and the Board proceedings had already revealed several circumstances

in which they do), plaintiff's methodology would result in overstated SSI fractions.[3]

Second, plaintiff argues that such a cross-walk is "not possible" without the "underlying

SSI data."[4]  Pl. Opp. at 11-12.  But that is not what their "expert" told the Board.  Rather, he said

he "didn't go through the data on the dictionary from—for the SSA," and did not know whether

there was a one-to-one correlation between the aid codes and the SSI codes.  Tr. 334-38 [AR

422-23].  Indeed, far from suggesting that it was "not possible" to create a crosswalk, plaintiff

apparently believed that such a crosswalk must already be in existence.  Plaintiff's witness said

she sought a "crosswalk" from her contact at the state but was told that a "formal" cross walk is

not available.  [AR 114, 206-209; *see also id.* at 209] (stating that "there must be a crosswalk

that translates the SSA codes into the DHCS aid codes").  Having failed to argue that the

crosswalk was "not possible" before the Board, and having suggested the opposite, plaintiff

cannot now challenge the Board's conclusion in that regard.

In any event, plaintiff's belated assertion that it is "not possible" to develop a diagram,

crosswalk or other comparison of the two sets of codes is meritless.  The Board explained that

plaintiff could have developed this crosswalk "by obtaining the definitions of the various codes,

---

[3]  For example, in addition to SSI codes E01 and E02, the Board cited monthly SSI codes
beginning with "S"—denoting persons whose SSI payments are in a suspended status for various
reasons, *see* 75 Fed. Reg. 50,281—as denoting patients who should be excluded under the
statute, but who were not shown to be excluded under plaintiff's methodology.  Board Decision
[AR 13-14].

[4]  By referring to the "underlying SSI data," plaintiff appears to mean the SSI eligibility
file that SSA provides to CMS for purposes of conducting the revised matching process for DSH
hospitals nationwide.  Pl. Opp. at 2 n.1 & 2.  As discussed below, that file contains highly
sensitive information about millions of SSI recipients and is protected from disclosure by federal
law and applicable data use agreements.  Plaintiff has not shown a need or right to be granted
access to such information.

and if necessary confirming the information with the appropriate authorities."  Board Decision [AR 14].  Plaintiff provides no reason to doubt that conclusion.  Plaintiff now argues—for the first time in its latest brief—that the comparison was not possible because the definitions that would apply to the two sets of codes are "not comparable."  According to plaintiff, the SSI codes "denote all SSI-entitled individuals during the month(s) that they are entitled to receive benefits," while the "Medi-Cal aid codes, in contrast, denote individuals who are aged, blind or disabled, based on other SSA data provided to the State."  Pl. Opp. at 11-12.  This argument does not show that a comparison is impossible.  It only shows that such a comparison would likely undermine, rather than support, plaintiff's methodology.  Plaintiff's own description suggests that the aid codes are significantly broader than the SSI codes, because they denote aged, blind or disabled individuals, without regard to whether such individuals were actually entitled to receive SSI payments during the month of their hospital treatment.  In other words, it suggests (as the Board hearing confirmed) that the aid codes would identify individuals for inclusion in the SSI fraction even though they should be excluded under the statute.[5]

Further, it is clear from the record that plaintiff was perfectly capable of ascertaining what the aid codes mean and how they compare to SSI codes.  Plaintiff already performed some such comparisons in the course of the Board proceedings, though the results of that comparison undermined rather than supported its own methodology.  *See* Board Decision [AR 12] (noting

---

[5] Plaintiff also argues that the underlying SSI-entitlement information is needed for a comparison because "the only tie-in between the two [sets of codes] is the underlying SSI data." Pl. Opp. at 12.  It is not clear from the record, however, that the two sets of codes are based on the same SSI data.  And even if they were, that would not preclude a comparison of the two sets of codes based on other factors, such as definitions of the codes and/or discussions with the relevant authorities.

that plaintiff "recognized that" the three aid codes "include individuals who receive SSP payment but no SSI payment and therefore these individuals would not have an SSI code of C01, M01, or M02"); *see also*, *e.g.*, Provider's Post-Hearing Brief at 35 [AR 77] (stating that as plaintiff's witness "confirmed at the hearing, and as has since been re-confirmed after the hearing as well, . . . patients who lose their SSI payments completely due to receipt of nursing home benefits [*i.e.*, patients receiving an SSI code of E01, rather than C01, M01, or M02], may still be 'coded' by DHSCS for some period as 10, 20 or 60"). These examples show that it was indeed possible for plaintiff to obtain information necessary to draw comparisons between how aid codes relate to the three SSI codes indicating SSI-entitlement. If plaintiff had wanted to, it could have made similar comparisons to show whether other monthly SSI codes, whether indicative of payment or not,[6] would be assigned or retain an aid code of 10, 20, or 60.

Indeed, as the Board noted, plaintiff evidently began developing a comparison, but either did not follow through on the effort or did not report the ultimate results. Plaintiff submitted exhibits with its post-hearing brief containing "indicator value codes" used by the state in assigning the aid codes. Board Decision [AR 14]; Post-Hearing Brief, P-55 [AR 218] (e-mail from state contact providing indicator value codes and informing plaintiff that "[t]his isn't an aid code crosswalk exactly, but what we have is the criteria our system uses to determine which of the three SSI/SSP aid codes we assign to a beneficiary based on the files we receive from SSA").

---

[6] The 2010 rulemaking discusses the three SSI codes indicating entitlement (C01, M01, M02), as well as various other monthly SSI codes that denote individuals who, for various reasons, are *not* entitled to SSI payment during the month in question. *See* 75 Fed. Reg. 50,280-50,281 (discussing other SSI codes that do not indicate entitlement to payment, such as E01, E02, N06, N10, N11, N18, N35, N39, N42, N43, N46, N50, N54, S04, S05, S06, S07, S08, S09, S10, S20, S21, S90, S91, T01, T20, T22, and T31).

15

As the Board further noted, it is unclear what the indicator value codes mean and how they relate to the SSI codes, but the state agency producing the information advised plaintiff to contact SSA for an explanation if plaintiff needed to ascertain their meaning.  *See id.* (stating "[i]f you don't know what these indicator values mean, you will need to get that information from SSA as it is their programming code").  It is not clear from the record whether plaintiff attempted to follow up with SSA to obtain such information, but plaintiff does not deny that it could have done so.  As a result, the Board found, "[t]his question remains unanswered."  *Id.* [AR 14].  Given that plaintiff has shown itself more than capable of comparing the two sets of codes, the Court should reject plaintiff's argument that such a comparison is "not possible."

In sum, plaintiff did not meet its burden to show that the SSI fractions challenged in this case were understated, much less that they were not based on the best data available at the time of the decision.  Substantial evidence supports the Board's finding that plaintiff "did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Pomona's . . . cost reports, were flawed."  *See id.*

## C.   The Court Should Reject Plaintiff's Unsupported Request to Shift the Burden of Proof, or to Adopt an Adverse Inference

Having failed to make their case before the Board, plaintiff asks the Court to relieve it of the applicable burden of proof, either by shifting that burden to the Secretary or by adopting an adverse inference against him.  As the Secretary has explained, however, plaintiff waived any claim to such relief by failing to request it in the Board proceedings, and plaintiff's burden-shifting and adverse inference arguments are in any event meritless for numerous additional reasons.  *See* Def. Cross-Mot. at 33-39.  Plaintiff's latest brief does not show otherwise.

First, as to waiver, plaintiff does not deny that it failed to request burden-shifting or an adverse inference in proceedings before the Board.  Accordingly, it would be improper to set aside the Board's decision on such grounds.  *See id.* at 33-34 (citing cases).  Plaintiff incorrectly argues that the MAC and the Board should have addressed this issue anyway because plaintiff presented "the underlying factual and legal bases" for such relief.  Pl. Opp. at 28-29.  As discussed below, however, plaintiff has *not* established any factual or legal basis for this relief.  And in any event, the statements on which plaintiff relies—pertaining to plaintiff's unsuccessful efforts to have SSA (a separate federal agency) run testing on a fifty-record sample that plaintiff created—cannot possibly be said to have put the Board or the MAC on notice that plaintiff was seeking burden-shifting or an adverse inference against the Secretary.  *See id.* at 28.  Indeed, the statements relied on were made in support of a different kind of relief—an order requiring the MAC to "work with CMS to engage SSA to review and re-match" a sample of plaintiff's records.  *See* Pl. Post-Hearing Brief at 58 [AR 100].  Plaintiff never suggested there was a reason to modify the applicable burden of proof.  To the contrary, plaintiff argued that it had demonstrated flaws in the SSI fractions through "presentation of highly qualified witnesses" and "mounds of documentary evidence and verified data."  Pl. Post-Hearing Brief at 22 [AR 64].

Given plaintiff's failure to raise burden-shifting and adverse inference below, the Court should not even consider those arguments now.  It would be particularly inappropriate to do so in this case.  First, even where (unlike here) this sort of relief is properly requested, it is purely a matter of discretion for the fact finder.  *See* Def. Cross-MSJ at 38 n.12.  Further, applying it here would mean modifying the burden of proof set forth in the agency's regulations.  *See* 42 C.F.R. §

405.1871(a)(3).   It could hardly have been an abuse of discretion by the Board not to grant such extraordinary relief when plaintiff itself never even bothered to request it.

That said, even if the Court were to consider these waived arguments, they are otherwise meritless for numerous reasons.  First, the Secretary does not have "exclusive possession" of records necessary to prove plaintiff's case.[7]  *See* Def. Cross-Mot. at 34-35.  Again, plaintiff's challenge did not focus on any purported flaws in CMS's own matching process.  Rather, it was predicated entirely on plaintiff's assertion that it had developed its own "more reliable" methodology for calculating the SSI fractions.  *See* Provider's Final Position Paper, at 7 [AR 1832].   Plaintiff is obviously better positioned than the Secretary to access information about the reliability of its own methodology.  And as the Board correctly found, and as plaintiff itself demonstrated during the Board proceedings, plaintiff was fully capable of getting information that would support (or refute) the reliability of its own methodology.  If plaintiff lacks evidence to support its claim, it is not because CMS has exclusive access to relevant data and is refusing to provide it.  It is because plaintiff's claim has no merit.

Moreover, CMS *did* furnish plaintiff with data plaintiff requested, and in so doing, fully complied with the governing statutory obligation to share data underlying the DSH calculation. *See* Def. Cross-Mot. 9-10 (discussing Section 951 of the Medicare Prescription Drug, Improvement and Modernization Act of 2003 ("MMA"), Pub. L. No. 108-173, § 951, 117 Stat. 2066, 2427 (2003) (codified at 42 U.S.C. § 1395ww Note)).  Plaintiff does not deny that the agency furnished the data, or that it complied with the governing obligation.  Rather, plaintiff

_____

[7] Contrary to plaintiff's suggestion, Pl. Opp. at 2, the Secretary did not "concede" that burden-shifting is appropriate if one party has exclusive access to some necessary evidence.  As the Secretary's filings makes clear, this is a necessary, but not sufficient, condition to such relief.

18

asserts simply that the data is "inadequate."[8]  But if plaintiff believes the statutory requirement to

share data is inadequate, then plaintiff should take up that grievance with Congress, rather than

asking this Court to expand the obligation in the course of reviewing the agency's Medicare

reimbursement decisions.[9]

In any event, the data is not inadequate.  It includes the "matched, patient-specific

Medicare Part A inpatient days/SSI eligibility data on a month-to-month basis" for the relevant

period, 70 Fed. Reg. 47,278, 47,440 (Aug. 12, 2005), and is provided for the express "purpose of

assisting the hospital to verify or challenge CMS' determination of the hospital's SSI ratio."  71

---

[8] Plaintiff also appears to argue—for the first time in its latest brief—that CMS does not really use the MedPAR data because CMS's SSI fraction for FY 2006 was 14.74% when, in plaintiff's view, it should have been 15.09% based on the MedPAR data.  Pl. Opp. at 23. Plaintiff's suggestion that the MedPAR data supports a 15.09% fraction rests on the mistaken belief that the denominator of the fraction is limited to "covered" Medicare patient days (i.e., days for which Medicare actually made payment for hospital services), rather than total patient days of Medicare beneficiaries.  *See* Tr. 89-91 [AR 361] (plaintiff's witness testimony, stating—erroneously—that the denominator of the SSI fraction should have included only "covered" days, and that CMS's inclusion of total days in the hospital stay increased the denominator, thereby decreasing the overall fraction from 15.09% to 14.74%).  In fact, the governing regulation requires inclusion of *all* patient days of Medicare beneficiaries, not just covered days. *See* 42 C.F.R. § 412.106(b).  *See also Metropolitan Hosp. v. HHS*, 712 F.3d 248, 252-53, 269 (6th Cir. 2013) (explaining that the current regulation interprets the statute to include all patient days of Medicare beneficiaries, including those who have exhausted their coverage, and holding that this is a permissible interpretation of the DSH statute).  To the extent plaintiff is now asking the Court to set aside the 2006 SSI fraction on the basis of this alleged .35% discrepancy, the argument is waived because plaintiff abandoned any such claim before the Board.  Plaintiff insisted that it was not challenging such small discrepancies, see, e.g., Tr. 21-22 [AR 344], and plaintiff's post-hearing brief made no mention of the "covered days" issue or raise any claim pertaining to the alleged .35% discrepancy, *see* Pl. Post-Hearing Brief [AR 34-101].  Plaintiff also waived this issue by failing to raise it in its original summary judgment motion.  *See Loumiet v. United States*, 65 F. Supp. 3d 19, 25 (D.D.C. 2014).  In any event, any such claim would fail because it rests on the witness's mistaken understanding of the law, as discussed above.

[9] Plaintiff does not challenge the Secretary's interpretation of Section 951 of the MMA, which was adopted through notice and comment rulemaking and is entitled to deference.  *See Chevron USA, Inc. v. Nat. Resources Def. Council, Inc.*, 467 U.S. 837 (1984).

Fed. Reg. 17,470-02, 17,472 (Aug. 6, 2006).  The data set provided is the same data set CMS

uses to calculate the SSI fractions for the Federal fiscal year.  *See* 70 Fed. Reg. at 47,439.  And it

serves its intended purpose.  Plaintiff itself relied on that data in developing its own SSI

fractions, using it to increase the numerator when its own methodology did not otherwise

indicate SSI-entitlement.[10]  Moreover, one of plaintiff's own witnesses, a former CMS official,

testified during the Board hearing about how other providers would review the data and in some

cases find issues pertaining to the accuracy of their SSI fraction.  *See* Tr. 229-230 [AR 396].

Plaintiff nonetheless complains that the data provided does not include the "underlying

SSI-entitlement data" or the "specific SSA codes assigned to each patient."  But CMS does not

even have the "specific SSA codes assigned to each patient" because the SSA does not provide

them in the SSI eligibility file it sends to CMS as part of the matching process.[11]  As to the

---

[10]  Plaintiff suggests that this was done because there could "potentially" be a small number of patients, other than those assigned Medi-Cal aid codes 10, 20, and 60, who "are receiving SSI and/or SSP at a particular time."  Pl. Opp. at 10.  Whatever the reason, plaintiff's own reliance on the MedPAR data to try to support its challenge to the CMS fractions shows that this data serves its intended purpose.  Moreover, plaintiff's response, if true, also underscores the extent to which there is no discernable correlation between the three aid codes plaintiff relied on as indicators of SSI-entitlement and patients who should actually be included under the DSH statute.

[11]  Although SSA provides CMS with "monthly indicators" of entitlement or non-entitlement, those indicators are not the SSI codes, but are merely *based on* assigned SSI codes.  *See Baystate*, 545 F. Supp. 2d at 29 n.17 (noting that parties stipulated that the SSI data provided by SSA contain 42 monthly indicators, described as "ones and zeros," denoting the payment or non-payment of federal SSI cash benefits); *Baystate Med. Ctr.*, 2006 WL 752453, at *8-9 (explaining that the program run by SSA to prepare the annual tape assigns a "1" – denoting payment – or a "0" – denoting non-payment – depending on whether the computational history field in SSA's permanent record shows one of the SSI codes indicating entitlement); 75 Fed. Reg. at 50,276 ("The SSI eligibility data that CMS receives from SSA contain monthly indicators to denote which month(s) each person was eligible for SSI benefits during a specific time period").  After the *Baystate* decision, the Secretary indicated that he was requesting from SSA indications of SSI entitlement related to codes C01, M01 (Forced Pay) and M02 (Forced Due).  But the Secretary still only receives monthly indicators reflecting those three SSI codes

"underlying SSI-entitlement data," plaintiff is presumably referring to the SSI eligibility file itself, which is not limited to a particular hospital or its patients, but rather contains individual records pertaining to millions of SSI recipients nationwide.  *See* 51 Fed. Reg. 31,459 (noting that, as of 1986, the SSI file combined by SSA contained over 5 million records).[12]  Plaintiff has not shown that it needs or is entitled to such a sweeping disclosure of sensitive, privacy-protected information.  The information from the file is protected under data use agreements between CMS and SSA, as well as "Federal law and regulations," and CMS is "strictly prohibited" from disclosing it.  *See* 70 Fed. Reg. at 47,440 (noting that while such disclosure is not permitted, CMS is permitted to disclose the matched data subject to proper limitations and protections).  Plaintiff cites nothing to suggest it ever even requested such information from CMS.

Rather, the record indicates plaintiff asked CMS to work with SSA to conduct additional testing outside its established process, using a sample of records chosen by plaintiff.  *See* Def. Cross-MSJ at 37.  Pl. Post-Hearing Brief at 16-20 [AR 58-62].  As the Secretary has explained, CMS is not required to provide additional testing outside of its established matching process at the whim of individual DSH hospitals.  And its unwillingness to make *ad hoc* exceptions to that process certainly could not justify an adverse inference or burden-shifting.  To hold otherwise

---

(e.g., C01 in a month is reflected as a "1").  The Secretary does not receive the SSI codes themselves, nor does the Secretary receive any information about months in which SSA assigned codes other than C01, M01, or M02, which are still reflected as a "0" on the file that CMS receives from SSA.

[12]   *See also*, *e.g.*, 51 Fed. Reg. 31,454, 31,459 (Sep. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits").  Due to privacy concerns, the information provided under Section 951 of the MMA is significantly more limited in scope.  *See* 71 Fed. Reg. at 17,473 ("Disclosure shall be limited to data concerning the total number of patient days, the number of SSI/Medicare days, if any, and the number of Medicare covered days, if any, associated with each stay at the hospital's facility . . . .").

would defeat the purpose of having such a process, which was painstakingly developed and refined to ensure the use of the best available data, vetted through notice and comment rulemaking, and formally adopted as the established means of generating SSI fractions for thousands of DSH hospitals nationwide.  For that reason, CMS "does not make exceptions" to that process "for individual hospitals."  *See* Letter from CMS to Senator Feinstein dated June, 23, 2017 [AR 1451-52].  The SSA confirmed this same point, stating that "we are unable to perform such a separate match of records, because the process by which these payments are determined is already articulated in law and regulation."  *See* Letter from SSA to Senator Feinstein dated May 30, 2017 [AR 1448].[13]  Plaintiff's own witness, a former CMS official previously involved with the matching process, likewise confirmed that he knows of no instance in the past in which "CMS has calculated an SSI fraction outside of their ordinary process," or has reviewed different data to produce an SSI fraction "outside the methodology they usually use."  Tr. 248 [AR 400].

It would be especially inappropriate to suggest that the Secretary should carve out exceptions to this process where, as here, plaintiff has provided no reason to question its reliability.  Plaintiff disagrees, insisting that it has at least demonstrated that "there is something wrong with CMS's data," and that this showing is sufficient to "require the Secretary either to disclose the determinative data or yield to [plaintiff's] calculation."  Pl. Opp. at 24 n.19.  Plaintiff is wrong.  Unlike the *Baystate* plaintiffs, plaintiff here has not shown that the revised matching process did not use the best available data, or even that there were inaccuracies in the SSI

---

[13] The SSA also explained that "we do not have legal authority under the Privacy Act to disclose the specific detailed information about affected SSI recipients," and that SSA "already provides CMS the exact data it needs to administer the DSH."  *See id.* [AR 1449].

22

calculations.  *See* Def. Cross-MSJ at 38.  And since plaintiff failed to make such a showing, there

is also no basis for an adverse inference predicated on the failure to introduce evidence that

would counter the showing.  *See id.*  Indeed, as already discussed, plaintiffs did not even show

that there is "something wrong" with CMS's data.  To make that showing, there would have to

be some reason to conclude that plaintiff's own SSI fractions were reliable.  As the Board

correctly held, however, plaintiff did not provide evidence necessary to support that conclusion.

> **D.     The Board Adequately Explained the Reasons for its Findings and Conclusions**

Plaintiff appears to have abandoned its argument that the Board did not sufficiently

explain the reasoning for its decision.   To the extent plaintiff's silence has not already conceded

this point, the Court should grant summary judgment to the Secretary for reasons set forth in the

Secretary's opening brief.  *See* Def. Cross-MSJ at 39-41.

**II.     Plaintiff Seeks Improper Relief, and the Court Should Reject Plaintiff's Last-Minute Request for an Order Requiring Disclosure of Additional Data**

Plaintiff's original summary judgment motion asked the Court to retain jurisdiction over

this action if it reversed the Board's decision.  The Secretary's opening brief explained that this

request is irrelevant because there is no basis to reverse the Board's decision, and that in any

event, plaintiff's request is contrary to well-settled principles of administrative law, which limit

relief to an order remanding to the agency for action consistent with the correct legal standards.

*See* Def. Cross-MSJ at 41-42.  Plaintiff's latest brief does not refute any of this.

However, plaintiff now requests a new form of relief that was not requested in plaintiff's

original summary judgment motion: An order requiring the Secretary to produce "the

determinative data."  Pl. Opp. at 3, 22, 27.  The request should be denied.  Plaintiff has waived

any claim to such relief by failing to seek it in the original motion.  *See*, *e.g.*, *Loumiet*, 65 F. Supp. 3d at 25.  Moreover, plaintiff provides no legal support for its belated suggestion that the Court could order the Secretary to produce data, and that is an independent reason to deny the request.  *See id.* (citing cases holding that "courts will not make arguments for the litigants" and will not entertain "asserted but unanalyzed and underdeveloped claims").

The complaint suggests that plaintiff may be seeking relief in the nature of mandamus, Compl., Request for Relief, ¶ 2, ECF No. 1, but there is no basis for such relief.  Mandamus is "drastic," and available only in "extraordinary situations," and "it is hardly ever granted."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005).  It certainly should not be granted on the basis of an unexplained, unsupported and belated request, like that of plaintiff here.  In any event, plaintiff could not demonstrate the prerequisites for such drastic relief, which requires a showing that plaintiff has a clear right, that defendant is violating a clear, non-discretionary duty, and that there is no other adequate remedy available.  *See Power v. Barnhart*, 292 F.3d 781, 784-86 (D.C. Cir. 2002).  As explained above, CMS has already complied with the applicable statutory duty to share data underlying the DSH calculation, *see supra*, at 18-20, and to the extent plaintiff seeks broader disclosure of the underlying SSI eligibility file, CMS has an affirmative duty <u>not</u> to disclose it, *see* 70 Fed. Reg. at 47,440 (stating that such disclosure is "strictly prohibited").

## CONCLUSION

Accordingly, the Secretary respectfully asks the Court to deny plaintiff's motion for summary judgment, and to grant summary judgment in favor of the Secretary.

Dated: November 26, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

MICHELLE R. BENNETT
Assistant Branch Director
Civil Division

_/s/ Peter M. Bryce_____
PETER M. BRYCE
(IL Bar No. 6244216)
Senior Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W., Rm 11106
Washington, D.C. 20005
Tel: (202) 616-8335
Fax: (202) 616-8470
E-mail: peter.bryce@usdoj.gov
Attorney for Defendant