# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

POMONA VALLEY HOSPITAL MEDICAL
CENTER

                              Plaintiff,

        v.                                            Civil Action No.: 18-cv-2763 (ABJ)

ALEX M. AZAR II, Secretary,
United States Department of Health and Human
Services,

                              Defendant.

## JOINT APPENDIX

Pursuant to Local Rule 7(n), the designations to the administrative record filed in this matter

as listed on the following table of contents have been mutually agreed to by all of the parties to this

action and are being submitted by Plaintiffs on behalf of all the parties.

Dated:  December 10, 2019

                                        Respectfully submitted,

Laurence D. Getzoff                     /s/ Robert L. Roth
Alicia W. Macklin                       Robert L. Roth (DC Bar No. 441803)
HOOPER LUNDY & BOOKMAN, P.C.            HOOPER LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600      401 9th Street, NW, Suite 550
Los Angeles, CA  90067-2517             Washington, D.C.  20004
Tel:  (310) 551-8111                    Tel.: (202) 580-7700
Fax:  (310) 551-8181                    Fax: (202) 580-7719
E-mail:  lgetzoff@health-law.com        E-mail:  rroth@health-law.com
E-mail:  amacklin@health-law.com

        *Counsel for Plaintiff Pomona Valley Hospital Medical Center*

5899582.6

## TABLE OF CONTENTS

| Document Title/Description | Administrative Record Pages Included in Appendix |
|---|---|
| **PRRB Administrative Record** | |
| PRRB Decision No. 2018-D50 (Oct. 1, 2018) | 1-26 |
| Provider's Post-Hearing Brief | 38-101 |
| Declaration of Stan Rosenstein, Expert Witness to the PRRB Hearing Dated August 17, 2017 | 102-108 |
| Declaration of Candice Le-Tran, Witness to the PRRB Hearing Dated August 17, 2017 | 109-114 |
| 2006 Summary Impact Chart, Ex. P-40 | 118-119 |
| 2007 Summary Impact Chart, Ex. P-41 | 120-121 |
| 2008 Summary Impact Chart, Ex. P-42 | 122-123 |
| 2006 Individual Appeal Request Documents, Ex. P-43 | 124-141 |
| 2007 Individual Appeal Request Documents, Ex. P-44 | 142-160 |
| 2008 Individual Appeal Request Documents, Ex. P-45 | 161-177 |
| California SSI/SSP Caseload from CDSS dated September 8, 2017, Ex. P-46 | 178-179 |
| SSI Eligibility, Ex. P-47 | 180-182 |
| Summary of SSI Eligibility Chart, Ex. P-48 | 183-184 |
| Email String from Provider's Expert Witness, Stan Rosenstein to Sharyl Shanen-Ray, DHCS dated August 25, 2017, Ex. P-49 | 185-188 |
| SSP Program Recipient Summary Report dated August 22, 2017 (California Department of Social Services), Ex. P-50 | 189-190 |
| California SSI/SSP Caseload from CDSS dated July 2005 through June 2009, Ex. P-51 | 191-193 |
| HHS Public Access, Publication: "*Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life*" published at J Am Geriatr Soc. 2010 Sep: 58(9): 1701-1706; PMCID: PMC2945440, Ex. P-52 | 194-204 |
| Email String from Provider's Witness, Candice Le-Tran to Amy Rosenkranz, DHCS dated September 7, 2017, Ex. P-53 | 205-210 |
| Listing of California GENERAL ACUTE Hospitals as of 2010, Ex. P-54 | 211-216 |
| Email from Amy Rosenkranz, DHCS, to Provider's Witness, Candice Le-Tran dated September 12, 2017, Ex. P-55 | 217-218 |
| August 17, 2017 PRRB Hearing Transcript (complete) | 339-476 |
| PVHMC SSI Data Process Flow Chart, Ex. P-20 | 1036-1037 |
| FYEs 2006, 2007 and 2008 SSI Verification Process and Supporting Data Prepared by PVHMC for Tzvi Hefter, Ex. P-24 | 1057-1059, 1061-1063 |
| Letter from U.S. Senator Dianne Feinstein to Christina Walters, SSA (May 20, 2016); Reply Letter from Patricia Raymond, SSA to U.S. Senator Dianne Feinstein (Oct. 26, 2016), Ex. P-25 | 1359-1363 |
| Letter from U.S. Senator Dianne Feinstein to Carolyn Colvin, SSA (Oct. 26, | 1364-1368 |

| | |
|---|---|
| 2016); Letter from U.S. Senator Dianne Feinstein to Seema Verma, CMS and Nancy Berryhill, SSA (May 19, 2017), Ex. P-26 | |
| PVHMC Summary of SSI Days by Aid Code, Ex. P-27 | 1369-1372, 1387-1389, 1404-1406 |
| E-Mail Correspondence with Amanda Sadra, Aide to U.S. Senator Dianne Feinstein, Ex. P-30 | 1429-1446 |
| Letter from N. Berryhill, SSA, to U.S. Senator Dianne Feinstein (May 30, 2017), Ex. P-31 | 1447-1449 |
| Letter from Carol Blackford, CMS to U.S. Senator Dianne Feinstein (June 23, 2017), Ex. P-32 | 1451-1454 |
| Expert Report by Stan Rosenstein, Ex. P-34 | 1459-1469 |
| Statewide SSI/SSP and SSP Only Data Tables prepared by Aron Smith, California DSS, Ex. P-37 | 1490-1494 |
| MAC's Final Position Paper | 1600-1617 |
| Provider's Final Position Paper | 1822-1838 |
| DSH Data Use Agreement for Cost Reporting Periods that Include December 8, 2004 and Thereafter | 1908-1915 |
| **Rulemaking Record** | |
| Public Comments | 002292, 002578, 002301 |

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



**Office of the Attorney Advisor**

**NOV 2 1 2018**

**VIA EMAIL AND
FIRST CLASS MAIL**

Laurence D. Getzoff, Esquire
Hooper, Lundy & Bookman
Watt Plaza, Suite 1600
1875 Century Park East
Los Angeles, CA 90067-2799

Re: <u>Pomona Valley Hospital Medical Center,</u> PRRB Decision No. 2018-D50

Dear Mr. Getzoff:

This is to advise that the Administrator of the Centers for Medicare & Medicaid Services (CMS)
has declined to review the decision entered by the Provider Reimbursement Review Board in the
captioned case.

If the Provider wishes to obtain judicial review of the matter, civil action must be initiated within
60 days of the date the Board's decision was received in accordance with 42 CFR 405.1877.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: Wilson Leong, CPA, Esquire, Intermediary's Representative

00001

1

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850
Telephone 410-786-3176 Facsimile 410-786-0043



Re:  *Pomona Valley Hospital Medical Center*, PRRB Dec. No. 2018-D50 (09/21/18) (FYE: Various)

I recommend that the Administrator, Centers for Medicare and Medicaid Services, decline

to review the decision entered by the Provider Reimbursement Review Board in this case.

Jacqueline R. Vaughn
Attorney Advisor

APPROVED:

Date: **NOV 2 0 2018**

Demetrios L Kouzoukas
Principal Deputy Administrator
Centers for Medicare & Medicaid Services

00002

**Gassmann, Arlene O. (CMS/OSORA)**

| | |
|---|---|
| **From:** | noreply@salesforce.com on behalf of CMS PRRB_OHCDMS |
| **Sent:** | Monday, October 1, 2018 4:35 PM |
| **To:** | lgetzoff@health-law.com; jeprrbappeals@noridian.com; board@fssappeals.com; CMS PRRB_OHCDMS· |
| **Subject:** | PRRB Case No. 13-0430, Pomona Valley Hospital Medical Center (05-0231) FYE 12/31/2006, PRRB Notification Letter |
| **Attachments:** | Oct 1 2018-D50.pdf.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Please find the attached information regarding PRRB case number 13-0430.

Regards,
**Provider Reimbursement Review Board**

1



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
1508 Woodlawn Drive, Suite 100
Baltimore, MD 21207
410-786-2671

October 1, 2018

Laurence D. Getzoff, Esq.
Hooper, Lundy & Bookman, P.C.
Watt Plaza, Suite 1600
1875 Century Park East
Los Angeles, CA  90067-2799

Wilson C. Leong, Esq.
Federal Specialized Services
PRRB Appeals
1701 S. Racine Avenue
Chicago, IL  60608-4058

RE:  PRRB Decision 2018-D50
     Pomona Valley Hospital Medical Center
     PRRB Case Numbers:  13-0430; 13-0628; 13-0680

Dear Laurence D. Getzoff and Wilson Leong:

The Provider Reimbursement Review Board issued PRRB decision 2018-D50 via the Office of Hearings Case and Document Management System (OHCDMS) on September 21, 2018. It has come to our attention that although the decision was uploaded in the system and available for view, not all parties received notification of the decision issuance.  Therefore the Board is reissuing the decision with a date of October 1, 2018.  Please reference 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877 regarding Administrator review and judicial review of this decision.

If you have any questions, please call (410) 786-2671.

Sincerely,

Lisa Ogilvie-Barr
Director, DHD

*Enclosure*

cc:  Lorraine Frewert, Noridian Healthcare Solutions

00004



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Provider Reimbursement Review Board
1508 Woodlawn Drive, Suite 100
Baltimore, MD 21207
410-786-2671

September 21, 2018

Laurence D. Getzoff, Esq.
Hooper, Lundy & Bookman, P.C.
Watt Plaza, Suite 1600
1875 Century Park East
Los Angeles, CA 90067-2799

Wilson C. Leong, Esq.
Federal Specialized Services
PRRB Appeals
1701 S. Racine Avenue
Chicago, IL 60608-4058

RE: PRRB Decision 2018-D50
Pomona Valley Hospital Medical Center
PRRB Case Numbers: 13-0430; 13-0628; 13-0680

Dear Laurence D. Getzoff and Wilson Leong:

A copy of the Provider Reimbursement Review Board's decision for the above-referenced appeal is enclosed. Please reference 42 U.S.C. § 1395oo(f) and 42 C.F.R. §§ 405.1875 and 405.1877 regarding Administrator review and judicial review of this decision.

If you have any questions, please call (410) 786-2671.

Sincerely,

Lisa Ogilvie-Barr
Director, DHD

Enclosure

cc: Lorraine Frewert, Noridian Healthcare Solutions

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

### 2018-D50

| | |
|---|---|
| **PROVIDER-**<br>Pomona Valley Hospital Medical Center | **HEARING DATE –**<br>August 17, 2017 |
| **Provider No.:** 05-0231 | **Cost Reporting Period Ended --**<br>12/31/2006, 12/31/2007, 12/31/2008 |
| **vs.** | |
| **MEDICARE CONTRACTOR –**<br>Noridian Healthcare Solutions | **CASE NOs.** – 13-0430 13-0628 13-0680 |

## INDEX

| | Page No. |
|---|---|
| Issue Statement.................................................................... | 2 |
| Decision............................................................................... | 2 |
| Introduction......................................................................... | 2 |
| Statement of the Facts........................................................... | 2 |
| Discussion, Findings of Facts, and Conclusions of Law................. | 5 |
| Decision and Order................................................................ | 9 |

Case Nos.: 13-0430, 13-0628 & 13-0680

## ISSUE STATEMENT:

Whether the Medicare Administrative Contractor properly calculated Pomona Valley Hospital Medical Center's disproportionate share hospital reimbursement with respect to the Provider's Supplemental Security Income percentage.[1]

## DECISION

After considering Medicare law and regulations, arguments presented, and the evidence admitted, the Provider Reimbursement Review Board ("Board") finds that the Supplemental Security Income ("SSI") percentages used by the Medicare Contractor for Pomona Valley Hospital Medical Center's ("Pomona" or "Provider") disproportionate share hospital ("DSH") adjustment for its 12/31/2006, 12/31/2007 and 12/31/2008 cost reports were proper.

## INTRODUCTION

Pomona is a Medicare-certified acute care hospital located in Pomona, California.  Noridian Healthcare Solutions is Pomona's Medicare Contractor.  For each of the fiscal years ("FY's") involved, 12/31/2006, 12/31/2007, and 12/31/2008, Pomona qualified for a DSH payment and the Medicare Contractor updated the SSI percentage to the percentage published by CMS for the respective year.

Pomona timely appealed the Medicare Contractor's adjustments to the Board, and met the jurisdictional requirements of 42 C.F.R. §§ 405.1835-405.1840.  The Board held a live hearing on August 17, 2017.  Laurence D. Getzoff, Esq., of Hooper, Lundy & Bookman, P.C., represented the Provider.  Jerrod Olszewski, Esq., of Federal Specialized Services, represented the Medicare Contractor.

## STATEMENT OF THE FACTS

Under Medicare's inpatient prospective payment system ("IPPS") the Medicare program pays providers of inpatient hospital services based on predetermined, standardized amounts subject to certain payment adjustments.[2]  One of these adjustments, the Medicare DSH adjustment, provides additional payments to certain qualifying hospitals that treat a disproportionate share of low income patients.[3]  The Medicare DSH adjustment is calculated using two fractions known as the Medicare fraction (also referred to as the SSI percentage or SSI fraction) and the Medicaid fraction.  The Medicare fraction is calculated by using: (a) in the numerator, the "number of such hospital's patient days…which were made up of patients who (for such days) were entitled to benefits under part A of the subchapter and were entitled to supplementary security income benefits…under subchapter XVI of this chapter…"[4]; and (b) in the denominator, the number of days of care that are furnished to patients who were entitled to Medicare Part A.

---

[1] Transcript ("Tr") at 6-7.
[2] 42 C.F.R. Part 412.
[3] 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).
[4] 42 U.S.C. 1395d(5)(F)(vi)(I); *See also* 42 C.F.R. § 412.106(b)(2)(i)(B) (copy included at Provider Exhibit P-39).

Case Nos.: 13-0430, 13-0628 and 13-0680

The SSI program is a federal cash assistance program for low-income individuals who are aged, blind, or disabled,[5] administered by the Social Security Administration ("SSA"). The SSI statute, generally, does not use the term "entitled" to SSI benefits. Rather, the SSI statute typically refers to whether an individual is "eligible for benefits."[6] In order to be eligible for SSI benefits, a person must be: (1) 65 years of age or older, blind or disabled; (2) a lawful resident of the United States; (3) have limited income and resources; (4) not be fleeing to avoid prosecution for a crime or violating a condition of parole; and (5) file an application for benefits.[7]

The Medicare program is an insurance program where an individual is automatically entitled to Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits, or becomes disabled and had been entitled to disability benefits for 24 calendar months.[8] In addition, the Medicare program provides that certain qualifying individuals with end stage renal disease are entitled to Medicare Part A.[9]

Unlike entitlement for Medicare Part A benefits, an individual who is currently eligible for SSI benefits may later become *ineligible* for SSI benefits. In this regard, SSA conducts periodic redeterminations to ensure continued eligibility[10] and may terminate,[11] suspend,[12] or stop payments to individuals who are temporarily or permanently ineligible for payment of SSI benefits.[13] In particular, SSI eligibility may be lost if a person no longer meets the basic requirements. For example, an individual may lose SSI eligibility if the individual is no longer disabled or the individual meets one of the following reasons set forth in Sections §§ 416.207-416.216:

1. The individual fails to give the SSA permission to contact financial institutions;[14]
2. The individual fails to apply for other benefits to which the individual may be entitled;[15]
3. The individual fails to participate in drug or alcohol addiction treatment;[16]
4. The individual is absent from the United States for more than 30 days;[17] or
5. The individual becomes a resident of a public institutions or prison.[18]

Under certain circumstances, the SSA may not pay benefits for administrative reasons, including removal of a representative payee, an unknown address for the beneficiary, or because of income from a previous month.[19]

---

[5] 42 U.S.C. § 1382.
[6] 42 U.S.C. §§ 1381a, 1382(a) (emphasis added).
[7] *See* 20 C.F.R. § 416.202.
[8] *See* 42 U.S.C. § 426.
[9] 42 U.S.C. § 426-1.
[10] 20 C.F.R. § 416.204.
[11] *Id.* at §§ 416.1331-1335.
[12] *Id.* at §§ 416.1320-1330.
[13] *Id.* at § 416.1320.
[14] *Id.* at § 416.207.
[15] 20 C.F.R. § 416.210.
[16] *Id.* at § 416.214.
[17] *Id.* at § 416.215.
[18] *Id.* at § 416.211.
[19] SSA Program Operations Manual ("POMS") § SI 02301.201 (describing certain SSI post-eligibility events).

After the Medicare DSH legislation was enacted in 1984, the Health Care Financing Administration ("HCFA"), the predecessor to CMS, announced that the Secretary of Health and Human Services, rather than the hospitals, would be solely responsible for computation of the Medicare fraction because the data necessary to compute the Medicare fraction is voluminous and much of the required data needed to be obtained from another agency, the SSA.[20]  HCFA noted that, as of 1986, the data sources for the computation of the Medicare fraction included approximately 11 million billing records contained in the Medicare inpatient discharge file and over 5 million records in the SSI file compiled by SSA.[21]  To compute the Medicare fraction, HCFA had to match individual Medicare billing records to individual SSI records.[22]  Considering the administrative burdens and complexity of the data matching process, HCFA concluded that the Secretary would be responsible for the data matching process, which she would conduct retrospectively for every eligible Medicare hospital on a "federal fiscal year" basis—that is, based on discharges occurring in the federal fiscal year.[23]  HCFA/CMS notifies the Medicare contractors of the SSI fractions after they are calculated.  CMS currently makes this notification by posting the resulting fractions on its website.  The Medicare contractors then use the posted SSI fraction to calculate the Medicare DSH percentage used to determine the hospital's Medicare DSH adjustment.[24]

The Medicare DSH adjustment has been the subject of much litigation and *Baystate v. Leavitt*, 545 F. Supp. 2d 20 *as amended* 587 F. Supp. 2d 37, 44 (D.D.C. 2008) ("*Baystate*"), is of particular relevance to this appeal.  In *Baystate*, the court held that the Secretary's process to identify and gather the data necessary to calculate each hospital's SSI fraction was deficient.  On April 28, 2010, CMS published Ruling 1498-R to respond to the court's order in *Baystate*.  This Ruling stated that CMS implemented the court order by recalculating the plaintiff's SSI fractions and Medicare DSH adjustments, using a revised data matching process that used "updated and refined SSI eligibility data and Medicare records, and by matching individuals' records with reference to Social Security numbers ("SSNs") as well as HICANs [Health Insurance Claim Account Numbers] and Title II numbers."[25]  The Ruling also stated that "in the FY 2011 proposed rule, CMS is proposing to adopt the same revised data matching process" for use with all hospitals and that "[i]n the forthcoming FY 2011 final rule, CMS expects to respond to public comments on the proposed new data matching process, make any changes to such matching process that seem appropriate, and adopt finally a new data matching process."[26]  CMS also stated that it would "use that new data matching process in calculating SSI fractions and DSH payments for specific claims that are found to qualify for relief under this Ruling."[27]

Consistent with Ruling 1498-R, CMS published the new data matching process in the FY 2011 proposed rule published on May 4, 2010,[28] and finalized that data matching process in the final

---

[20] 51 Fed. Reg. 31454, 31459 (Sep. 3, 1986).
[21] *Id.*
[22] *Id.*
[23] *Id.* at 31459–31460; 42 C.F.R. § 412.106(b).
[24] 42 C.F.R. § 412.106(b)(5); 42 C.F.R. § 405.1803.
[25] CMS-1498-R at 5 (copy included at Provider Exhibit P-6).
[26] *Id.*
[27] *Id.* at 5-6.
[28] 75 Fed. Reg. 23852, 24002-24007 (May 4, 2010).

rule published on August 16, 2010 ("FY 2011 Final Rule").[29]  Significantly, in the preamble to
the FY 2011 Final Rule, CMS acknowledged a public comment requesting "that CMS include
both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there
would be consistency between the numerator and denominator of the SSI fraction."[30]  This same
public comment provided examples of "several SSI codes that represent individuals who were
eligible for SSI but not eligible for SSI payments" asserting that these codes should be included
as SSI-entitled for purposes of the data match process.[31]  CMS responded in detail to this
comment and explained that CMS interprets SSI entitlement to correspond with any month for
which an individual *receives* payment of SSI benefits.[32]  CMS also stated that the three SSI
codes denoted as C01, M01, or M02 "accurately captures all SSI-entitled individuals, during the
month(s) they are entitled to receive SSI benefits."[33]

While the new data matching process established in the FY 2011 Final Rule was effective
October 1, 2010, Ruling 1498-R directed that the Medicare Contractors apply "the same, unitary
relief" consisting of SSI fractions that the Secretary had calculated using the new "suitably
revised" data matching process to: (1) any Medicare cost report that had not been settled; and (2)
all properly pending Medicare DSH appeals of the SSI fraction data matching process issue.[34]
The Ruling noted that hospitals dissatisfied with the initial or revised NPR issued using the new
SSI ratios in the Medicare DSH adjustment calculation could seek administrative and judicial
review provided they met the jurisdictional and procedural requirements of 42 U.S.C. § 1395oo,
the Medicare regulations, and other agency rules and guidelines.[35]

As a result of CMS Ruling 1498-R and these regulations, CMS calculated new SSI percentages
for Pomona for all of the fiscal years at issue in these appeals.[36]  However Pomona contends that
the new methodology CMS uses to generate the new SSI fractions, although slightly
improved, still significantly understates its Medicare/SSI patient days, due to inaccurate
and/or incomplete data[37] and therefore Pomona appealed the count of Pomona's qualifying
Part A and SSI days.

### DISCUSSION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

At the outset, Pomona notes that unlike other SSI percentage cases that have come before the
Board, this case is not about "eligible" days versus "entitled" days.  Rather, Pomona is
challenging CMS' count of Pomona's qualifying Part A and SSI days, based on an inaccurate
translation of data between agencies, human error, coding errors or other potential problems
that may have led to CMS not using the best available data to calculate Pomona's SSI
fraction for each of these years.[38]

---

[29] 75 Fed. Reg. 50041, 50280-50281 (Aug. 16, 2010) (copy included at Medicare Contractor Exhibit 1-8).
[30] *Id.* at 50280.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 50281.
[34] CMS-1498-R at 6-7.
[35] *Id.* at 28, 31.
[36] Tr. at 120-122.
[37] Provider's Final Position Paper (2006) at 3-4.
[38] Provider's Post-Hearing Brief at 3.

To prove its case Pomona sought to match CMS' Medicare Provider Analysis and Review ("MedPAR") data files and other CMS supplied data with the Provider's own patient records denoting SSI eligibility, and with the State of California's records showing specific benefit "aide codes" assigned to specific patients.[39] Pomona explains the "aide codes" are assigned by SSA and then tabulated and published by the State of California Department of Health Care Services. The Provider believes that "aide codes" 10 (aged), 20 (blind), and 60 (disabled), unambiguously reflect and correspond to a patient's SSI status since the State's Medicaid program obtains patients' SSI status in real time directly from SSA.[40] The Provider believes these records are especially reliable because California provides a State Supplement amount ("SSP") that is in addition to the benefits these patients receive from SSA. The beneficiaries receive one check from SSA that includes both the SSI benefit and the State's SSP benefit.[41]

Using its data along with the State of California's records for "aide codes" 10, 20, and 60, the Provider identified the following SSI/Medicare days and asserts that its calculation of the SSI fractions using this data is more accurate then CMS' calculations:[42]

- For 2006 Pomona identified 6965 SSI/Medicare days compared to the 4886 days identified by CMS.[43]
- For 2007 Pomona identified 6665 SSI/Medicare days compared to the 4153 days identified by CMS.[44]
- For 2008 Pomona identified 6572 SSI/Medicare days compared to the 4235 days identified by CMS.[45]

Pomona points out that it made numerous efforts to obtain the source SSA data to test a sample set of patient records and learn whether or not SSA's data would confirm or disagree with Pomona's own underlying data. Pomona agreed to abide by the result of such test. Despite enlisting former government officials and members of Congress to convince CMS to investigate what Pomona believed were discrepancies in the calculations, CMS blocked Pomona's process of testing the data, and directed the Provider to the Board for relief.[46]

The Medicare Contractor believes its SSI adjustments are correct and points out that CMS revised its process of matching Medicare and SSI eligibility data, and the Provider received SSI fractions based on that revised process for each of the three fiscal years at issue.[47] Additionally the Medicare Contractor disputes that Pomona's data is more accurate than CMS' because the Provider did not explain how the SSI status codes of C01, M01, and

---

[39] Provider's Final Position Paper (2006) at 5.
[40] *Id.* at 5-6. Provider Exhibit P-10.
[41] *Id.* at 6-7.
[42] *Id.* at 8.
[43] *Id.*
[44] Provider's Final Position Paper (2007) at 8.
[45] Provider's Final Position Paper (2008) at 9
[46] Provider's Post-Hearing Brief at 3-4.
[47] Medicare Contractor's Post-Hearing Brief at 5.

M02 used by CMS to calculate the SSI fraction interplay with the California's "aide codes" of 10, 20 and 60. The Medicare Contractor argues that the Provider has been unable to explain how its methodology is better for determining SSI entitlement.[48]

The Board is aware that Pomona sought to obtain SSI information directly from SSA through various means and that SSA advised the Provider that no SSA data could be shared directly with the Provider.[49] In addition the Board understands that Pomona created a sample and asked CMS to rematch the unmatched patient days against official SSA records but CMS declined to do so based on workload concerns.[50] Without this information the Board recognizes Pomona's difficulty in proving that CMS significantly understated Pomona's SSI fractions for the three fiscal years under appeal, and in demonstrating that Pomona's calculations of its SSI fractions are more accurate.

After reviewing Pomona's methodology and data, the Board finds that the Provider's methodology assumes that all individuals with an "aide code" of 10, 20, or 60, will map to an SSI code of C01, M01, or M02. However, in its post hearing brief Pomona recognized that "aide codes" 10, 20, and 60, include individuals who receive a SSP payment but no SSI payment and therefore these individuals would not have an SSI code of C01, M01, or M02. The Provider estimates that its original calculation of SSI days included 1,141 SSP only days for 12/31/2006; 1,112 SSP only days for 12/31/2007; and 1,095 SSP only days for 12/31/2008,[51] and agrees that these days are not SSI eligible for purposes of the Medicare DSH calculation. Pomona eliminated these SSP only days, reducing the number of additional SSI days it is requesting to 955 days for 12/31/2006; 1,400 days for 12/31/2007; and 1,262 days for 12/31/2008.[52]

During the hearing the Board pointed to other reasons of why variances may exist between the "aide codes" used by Pomona and the SSI codes. One of the reasons is the difference in coding nursing home residents. At the hearing Pomona's witness explained that a Medi-Cal eligible person who went into a nursing home would still remain Medi-Cal eligible and remain on an aide code of 10, 20, or 60, and would be counted as SSI eligible by Pomona.[53] However, in the August 16, 2010, Federal Register, CMS explains that SSI Code E01 "represents an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but has countable income of $30 or more. Such an individual is not entitled to receive SSI payment."[54] CMS does not include individuals with Code E01 when determining SSI eligible days. Pomona does not believe this difference represents a significant number of days,[55] and submitted some statewide statistics to backup this assertion.[56] However the Provider could have quantified from its own records the number of additional days being requested that were for patients that came to Pomona from a nursing home. Without Pomona providing an estimate of the impact of this

---

[48] *Id.* at 9.
[49] Provider's Post-Hearing Brief at 16.
[50] *Id.* at 16-18.
[51] Provider Exhibits P-40, P-41, and P-42.
[52] *Id.*
[53] Tr. at 339-340.
[54] 75 Fed. Reg. 50042, 50281 (Aug. 16, 2010).
[55] Provider's Post-Hearing Brief at 35.
[56] *Id.* at 36-38.

difference on the additional SSI days being requested, the Board does not and cannot know the significance of this coding difference.

Pomona's witness also testified that "Medi-Cal eligibility is month-specific... they would get eligibility the first day of the month of the application"[57] and the person would also be identified as a code 10, 20, or 60, if the person qualified for SSI/SSP.[58]  This is different than the effective date for an SSI payment as the FY 2011 Final Rule states "Code E02 is used to identify a person who is not entitled to SSI payment in a month ... pursuant to section 1611(c)(7) of the Act, which provides that an application for SSI benefits shall be effective on the later of the 1) first day of the month *following the date the application is filed*, or 2) the first day of the month following the date the individual becomes eligible for SSI based on that application. Such an individual is not entitled to SSI benefits during the month his or her application is filed or determined to be eligible for SSI, but, for, the following month."[59]  As CMS does not include days for individuals with code E02 when determining SSI eligible days, the different effective dates represents another difference between CMS' data and Pomona's data.  The Board recognizes that Pomona believes this difference would have a minimal effect on the number of SSI eligible days,[60] and explained post hearing that the Provider is not assisting patients to file for SSI benefits and uses other basis to qualify patients for Medi-Cal benefits on a first time basis.[61]  However, Pomona could have estimated the potential impact that the different effective dates had on the additional days it is requesting by reviewing its records and the State's records, to determine if any of the additional days are associated with individuals whose application for Medi-Cal/SSP was submitted in same month the patient days of service occurred.  Without this information the Board does not know the potential impact the different effective dates has on Pomona's data.

Further the Board points out that, while the Provider performed a detail comparison of its internal data, the Medi-Cal system data, the MedPAR SSI patient file, and multiple other data sources,[62] it did not explain or identify the potential reasons for differences between the data from these sources.  While the Board understand that the Medi-Cal aide code information used by Pomona is based on real time data from SSA,[63] there is no information in the record to identify what SSI codes other than C01, M01, and M02, are translated into the "aide codes" of 10, 20, and 60.[64]  As explained above the Board believes the Provider could have analyzed its data to quantify the number of patient days contained in "aide codes" 10, 20, and 60, for patients with SSI codes E01 and E02.  In addition the Provider could have determined if there were any other potential reasons for the discrepancies between the "aide codes" of 10, 20, and 60, and the SSI codes of C01, M01, and M02.  Specifically the Provider could have reviewed the definitions of both the SSI codes and "aide codes" and built a crosswalk or diagram to identify if there were other situations in which an individual would be assigned or remain on an "aide code" of 10, 20,

---

[57] Tr. at 342.
[58] Tr. at 342.
[59] 75 Fed. Reg. at 50281.
[60] Provider's Post-Hearing Brief and Declarations, Exhibit A at 2.
[61] Provider's Post-Hearing Brief at 40.
[62] Provider Exhibit P-27 contains the comparison of "aide code" days to SSI days for each year and P-20 contains the diagram of the logic and data sources used. The logic for Provider Exhibit P-20 is explained in Tr. at 54 - 80.
[63] Provider's Post-Hearing Brief at 24.
[64] Tr. at 334-338.

　　　　　　　　　　　　　　　　　　　Case Nos.: 13-0430, 13-0628 and 13-0680

or 60, but the SSI code would not be C01, M01, or M02 (e.g. SSI codes beginning with the letter "S" reflect records in a "suspended" status,[65] and the Provider did not address if individuals with "S" codes get assigned or retain a code of 10, 20, or 60). Rather Pomona's witness testified that he "didn't go through the data on the dictionary from---for the SSA." and did not know if there was a one-to-one correlation with "aide codes" 10, 20, and 60, and the SSI codes of C01, M01, and M02.[66]

At the hearing the Board specifically requested a diagram of how information from SSA is translated into "aide codes" 10, 20, and 60,[67] in order to gain insight into how these aide codes relate to C01, M01, and M02. The Provider submitted Exhibits P-47 and P-55 with its post-hearing brief containing indicator value codes used by the State in assigning the "aide codes." It is unclear what the indicator value codes mean and how they relate to the SSI codes of C01, M01, and M02. The Medi-Cal Eligibility Division advised the Provider to contact SSA for the meaning of the indicator value codes.[68] This question remains unanswered as Pomona did not submit any additional information. The Board acknowledges that building a crosswalk might have been a difficult task, but finds a crosswalk is necessary to determine if the Provider's use of "aide codes" 10, 20, and 60, accurately identified only those individuals with an SSI code of C01, M01, or M02. The Board notes the Provider could have developed this crosswalk without the use of Health Insurance Portability and Accountability Act ("HIPAA") protected information, by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities.

The Board finds that the Provider did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Pomona's FYE 12/31/2006, 12/31/2007, and 12/31/2008 cost reports, were flawed. The Board affirms the SSI percentages used by the Medicare Contractor.

## DECISION AND ORDER

After considering Medicare law and regulations, arguments presented, and the evidence admitted, the Board finds that the SSI percentages used by the Medicare Contractor for Pomona's DSH adjustment for its 12/31/2006, 12/31/2007, and 12/31/2008 cost reports were proper.

## BOARD MEMBERS PARTICIPATING:

Charlotte F. Benson, CPA
Gregory H. Zeigler, CPA, CPC-A
Robert A. Evarts, Esq.

---

[65] 75 Fed. Reg. at 50281
[66] Tr. at 334-338.
[67] Tr. at 400-411.
[68] Provider Exhibit P-55.

Page 10                                    Case Nos.: 13-0430, 13-0628 and 13-0680

**FOR THE BOARD:**

*Charlotte Benson*

Board Member

**DATE:**

SEP 2 1 2018



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

SEP 2 4 2018

Provider Reimbursement Review Board
1508 Woodlawn Drive, Suite 100
Baltimore, MD 21207
410-786-2671

**Case Nos.:**  13-0430; 13-0628; 13-0680
**Decision No.:**  2018-D50

Ms. Seema Verma
Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Mailstop:  C5-16-03
Baltimore, Maryland 21244-1850

RE:   Pomona Valley Hospital Medical Center
      Provider No.:  05-0231
      Cost Reporting Periods Ended - 12/31/2006; 12/31/2007; 12/31/2008

Dear Ms. Verma:

A copy of the Provider Reimbursement Review Board's decision on the above-referenced appeal is
enclosed.

Also, by copy hereof, the decision and the official case file containing all items listed in the index are
forwarded to the Attorney Advisor to be returned intact upon completion of the "Own Motion" review.

Additional information will be furnished upon request.

If you have any questions, please call (410) 786-2671.

Sincerely,


Lisa Ogilvie-Barr, Director
Division of Hearings and Decisions

Enclosure

cc:   Deputy Chief Counsel for Litigation
      Director, Center for Medicare
      Attorney Advisor

**FILE BOX**

| NAME & DATE | REVIEWER & DATE | BD SIGNATURE & DATE |
|---|---|---|
| Maude Shepard  9/24/18 | | |
| | | |

00016

# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

## 2018-D50

**PROVIDER-**
Pomona Valley Hospital Medical Center

**HEARING DATE –**
August 17, 2017

**Provider No.:** 05-0231

**Cost Reporting Period Ended –**
12/31/2006, 12/31/2007, 12/31/2008

**vs.**

**MEDICARE CONTRACTOR –**
Noridian Healthcare Solutions

**CASE NOs. –** 13-0430 13-0628 13-0680

## INDEX

                                                                        Page No.

Issue Statement...................................................................... 2

Decision............................................................................... 2

Introduction.......................................................................... 2

Statement of the Facts............................................................ 2

Discussion, Findings of Facts, and Conclusions of Law................. 5

Decision and Order................................................................. 9

Page 2                                                    Case Nos.: 13-0430, 13-0628 & 13-0680

## ISSUE STATEMENT:

Whether the Medicare Administrative Contractor properly calculated Pomona Valley Hospital Medical Center's disproportionate share hospital reimbursement with respect to the Provider's Supplemental Security Income percentage.[1]

## DECISION

After considering Medicare law and regulations, arguments presented, and the evidence admitted, the Provider Reimbursement Review Board ("Board") finds that the Supplemental Security Income ("SSI") percentages used by the Medicare Contractor for Pomona Valley Hospital Medical Center's ("Pomona" or "Provider") disproportionate share hospital ("DSH") adjustment for its 12/31/2006, 12/31/2007 and 12/31/2008 cost reports were proper.

## INTRODUCTION

Pomona is a Medicare-certified acute care hospital located in Pomona, California. Noridian Healthcare Solutions is Pomona's Medicare Contractor. For each of the fiscal years ("FY's") involved, 12/31/2006, 12/31/2007, and 12/31/2008, Pomona qualified for a DSH payment and the Medicare Contractor updated the SSI percentage to the percentage published by CMS for the respective year.

Pomona timely appealed the Medicare Contractor's adjustments to the Board, and met the jurisdictional requirements of 42 C.F.R. §§ 405.1835-405.1840. The Board held a live hearing on August 17, 2017. Laurence D. Getzoff, Esq., of Hooper, Lundy & Bookman, P.C., represented the Provider. Jerrod Olszewski, Esq., of Federal Specialized Services, represented the Medicare Contractor.

## STATEMENT OF THE FACTS

Under Medicare's inpatient prospective payment system ("IPPS") the Medicare program pays providers of inpatient hospital services based on predetermined, standardized amounts subject to certain payment adjustments.[2] One of these adjustments, the Medicare DSH adjustment, provides additional payments to certain qualifying hospitals that treat a disproportionate share of low income patients.[3] The Medicare DSH adjustment is calculated using two fractions known as the Medicare fraction (also referred to as the SSI percentage or SSI fraction) and the Medicaid fraction. The Medicare fraction is calculated by using: (a) in the numerator, the "number of such hospital's patient days...which were made up of patients who (for such days) were entitled to benefits under part A of the subchapter and were entitled to supplementary security income benefits...under subchapter XVI of this chapter..."[4]; and (b) in the denominator, the number of days of care that are furnished to patients who were entitled to Medicare Part A.

---

[1] Transcript ("Tr") at 6-7.
[2] 42 C.F.R. Part 412.
[3] 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).
[4] 42 U.S.C. 1395d(5)(F)(vi)(I); *See also* 42 C.F.R. § 412.106(b)(2)(i)(B) (copy included at Provider Exhibit P-39).

The SSI program is a federal cash assistance program for low-income individuals who are aged, blind, or disabled,[5] administered by the Social Security Administration ("SSA"). The SSI statute, generally, does not use the term "entitled" to SSI benefits. Rather, the SSI statute typically refers to whether an individual is "eligible for benefits."[6] In order to be eligible for SSI benefits, a person must be: (1) 65 years of age or older, blind or disabled; (2) a lawful resident of the United States; (3) have limited income and resources; (4) not be fleeing to avoid prosecution for a crime or violating a condition of parole; and (5) file an application for benefits.[7]

The Medicare program is an insurance program where an individual is automatically entitled to Medicare Part A when the person reaches age 65 and is entitled to Social Security benefits, or becomes disabled and had been entitled to disability benefits for 24 calendar months.[8] In addition, the Medicare program provides that certain qualifying individuals with end stage renal disease are entitled to Medicare Part A.[9]

Unlike entitlement for Medicare Part A benefits, an individual who is currently eligible for SSI benefits may later become *in*eligible for SSI benefits. In this regard, SSA conducts periodic redeterminations[10] to ensure continued eligibility[10] and may terminate,[11] suspend,[12] or stop payments to individuals who are temporarily or permanently ineligible for payment of SSI benefits.[13] In particular, SSI eligibility may be lost if a person no longer meets the basic requirements. For example, an individual may lose SSI eligibility if the individual is no longer disabled or the individual meets one of the following reasons set forth in Sections §§ 416.207-416.216:

1. The individual fails to give the SSA permission to contact financial institutions;[14]
2. The individual fails to apply for other benefits to which the individual may be entitled;[15]
3. The individual fails to participate in drug or alcohol addiction treatment;[16]
4. The individual is absent from the United States for more than 30 days;[17] or
5. The individual becomes a resident of a public institutions or prison.[18]

Under certain circumstances, the SSA may not pay benefits for administrative reasons, including removal of a representative payee, an unknown address for the beneficiary, or because of income from a previous month.[19]

---

[5] 42 U.S.C. § 1382.
[6] 42 U.S.C. §§ 1381a, 1382(a) (emphasis added).
[7] *See* 20 C.F.R. § 416.202.
[8] *See* 42 U.S.C. § 426.
[9] 42 U.S.C. § 426-1.
[10] 20 C.F.R. § 416.204.
[11] *Id.* at §§ 416.1331-1335.
[12] *Id.* at §§ 416.1320-1330.
[13] *Id.* at § 416.1320.
[14] *Id.* at § 416.207.
[15] 20 C.F.R. § 416.210.
[16] *Id.* at § 416.214.
[17] *Id* at § 416.215.
[18] *Id.* at § 416.211.
[19] SSA Program Operations Manual ("POMS") § SI 02301.201 (describing certain SSI post-eligibility events).

After the Medicare DSH legislation was enacted in 1984, the Health Care Financing Administration ("HCFA"), the predecessor to CMS, announced that the Secretary of Health and Human Services, rather than the hospitals, would be solely responsible for computation of the Medicare fraction because the data necessary to compute the Medicare fraction is voluminous and much of the required data needed to be obtained from another agency, the SSA.[20]  HCFA noted that, as of 1986, the data sources for the computation of the Medicare fraction included approximately 11 million billing records contained in the Medicare inpatient discharge file and over 5 million records in the SSI file compiled by SSA.[21]  To compute the Medicare fraction, HCFA had to match individual Medicare billing records to individual SSI records.[22]  Considering the administrative burdens and complexity of the data matching process, HCFA concluded that the Secretary would be responsible for the data matching process, which she would conduct retrospectively for every eligible Medicare hospital on a "federal fiscal year" basis—that is, based on discharges occurring in the federal fiscal year.[23]  HCFA/CMS notifies the Medicare contractors of the SSI fractions after they are calculated.  CMS currently makes this notification by posting the resulting fractions on its website.  The Medicare contractors then use the posted SSI fraction to calculate the Medicare DSH percentage used to determine the hospital's Medicare DSH adjustment.[24]

The Medicare DSH adjustment has been the subject of much litigation and *Baystate v. Leavitt*, 545 F. Supp. 2d 20 *as amended* 587 F. Supp. 2d 37, 44 (D.D.C. 2008) ("*Baystate*"), is of particular relevance to this appeal.  In *Baystate*, the court held that the Secretary's process to identify and gather the data necessary to calculate each hospital's SSI fraction was deficient.  On April 28, 2010, CMS published Ruling 1498-R to respond to the court's order in *Baystate*.  This Ruling stated that CMS implemented the court order by recalculating the plaintiff's SSI fractions and Medicare DSH adjustments, using a revised data matching process that used "updated and refined SSI eligibility data and Medicare records, and by matching individuals' records with reference to Social Security numbers ("SSNs") as well as HICANs [Health Insurance Claim Account Numbers] and Title II numbers."[25]  The Ruling also stated that "in the FY 2011 proposed rule, CMS is proposing to adopt the same revised data matching process" for use with all hospitals and that "[i]n the forthcoming FY 2011 final rule, CMS expects to respond to public comments on the proposed new data matching process, make any changes to such matching process that seem appropriate, and adopt finally a new data matching process."[26]  CMS also stated that it would "use that new data matching process in calculating SSI fractions and DSH payments for specific claims that are found to qualify for relief under this Ruling."[27]

Consistent with Ruling 1498-R, CMS published the new data matching process in the FY 2011 proposed rule published on May 4, 2010,[28] and finalized that data matching process in the final

---

[20] 51 Fed. Reg. 31454, 31459 (Sep. 3, 1986).
[21] *Id.*
[22] *Id.*
[23] *Id.* at 31459–31460; 42 C.F.R. § 412.106(b).
[24] 42 C.F.R. § 412.106(b)(5); 42 C.F.R. § 405.1803.
[25] CMS-1498-R at 5 (copy included at Provider Exhibit P-6).
[26] *Id.*
[27] *Id.* at 5-6.
[28] 75 Fed. Reg. 23852, 24002-24007 (May 4, 2010).

rule published on August 16, 2010 ("FY 2011 Final Rule").[29]  Significantly, in the preamble to the FY 2011 Final Rule, CMS acknowledged a public comment requesting "that CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there would be consistency between the numerator and denominator of the SSI fraction."[30]  This same public comment provided examples of "several SSI codes that represent individuals who were eligible for SSI but not eligible for SSI payments" asserting that these codes should be included as SSI-entitled for purposes of the data match process.[31]  CMS responded in detail to this comment and explained that CMS interprets SSI entitlement to correspond with any month for which an individual *receives* payment of SSI benefits.[32]  CMS also stated that the three SSI codes denoted as C01, M01, or M02 "accurately captures all SSI-entitled individuals, during the month(s) they are entitled to receive SSI benefits."[33]

While the new data matching process established in the FY 2011 Final Rule was effective October 1, 2010, Ruling 1498-R directed that the Medicare Contractors apply "the same, unitary relief" consisting of SSI fractions that the Secretary had calculated using the new "suitably revised" data matching process to: (1) any Medicare cost report that had not been settled; and (2) all properly pending Medicare DSH appeals of the SSI fraction data matching process issue.[34] The Ruling noted that hospitals dissatisfied with the initial or revised NPR issued using the new SSI ratios in the Medicare DSH adjustment calculation could seek administrative and judicial review provided they met the jurisdictional and procedural requirements of 42 U.S.C. § 1395oo, the Medicare regulations, and other agency rules and guidelines.[35]

As a result of CMS Ruling 1498-R and these regulations, CMS calculated new SSI percentages for Pomona for all of the fiscal years at issue in these appeals.[36]  However Pomona contends that the new methodology CMS uses to generate the new SSI fractions, although slightly improved, still significantly understates its Medicare/SSI patient days, due to inaccurate and/or incomplete data[37] and therefore Pomona appealed the count of Pomona's qualifying Part A and SSI days.

## DISCUSSION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

At the outset, Pomona notes that unlike other SSI percentage cases that have come before the Board, this case is not about "eligible" days versus "entitled" days.  Rather, Pomona is challenging CMS' count of Pomona's qualifying Part A and SSI days, based on an inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SSI fraction for each of these years.[38]

---

[29] 75 Fed. Reg. 50041, 50280-50281 (Aug. 16, 2010) (copy included at Medicare Contractor Exhibit I-8).
[30] *Id.* at 50280.
[31] *Id.*
[32] *Id.*
[33] *Id.* at 50281.
[34] CMS-1498-R at 6-7.
[35] *Id.* at 28, 31.
[36] Tr. at 120-122.
[37] Provider's Final Position Paper (2006) at 3-4.
[38] Provider's Post-Hearing Brief at 3.

To prove its case Pomona sought to match CMS' Medicare Provider Analysis and Review ("MedPAR") data files and other CMS supplied data with the Provider's own patient records denoting SSI eligibility, and with the State of California's records showing specific benefit "aide codes" assigned to specific patients.[39]  Pomona explains the "aide codes" are assigned by SSA and then tabulated and published by the State of California Department of Health Care Services.  The Provider believes that "aide codes" 10 (aged), 20 (blind), and 60 (disabled), unambiguously reflect and correspond to a patient's SSI status since the State's Medicaid program obtains patients' SSI status in real time directly from SSA.[40]  The Provider believes these records are especially reliable because California provides a State Supplement amount ("SSP") that is in addition to the benefits these patients receive from SSA.  The beneficiaries receive one check from SSA that includes both the SSI benefit and the State's SSP benefit.[41]

Using its data along with the State of California's records for "aide codes" 10, 20, and 60, the Provider identified the following SSI/Medicare days and asserts that its calculation of the SSI fractions using this data is more accurate then CMS' calculations:[42]

- For 2006 Pomona identified 6965 SSI/Medicare days compared to the 4886 days identified by CMS.[43]
- For 2007 Pomona identified 6665 SSI/Medicare days compared to the 4153 days identified by CMS.[44]
- For 2008 Pomona identified 6572 SSI/Medicare days compared to the 4235 days identified by CMS.[45]

Pomona points out that it made numerous efforts to obtain the source SSA data to test a sample set of patient records and learn whether or not SSA's data would confirm or disagree with Pomona's own underlying data.  Pomona agreed to abide by the result of such test.  Despite enlisting former government officials and members of Congress to convince CMS to investigate what Pomona believed were discrepancies in the calculations, CMS blocked Pomona's process of testing the data, and directed the Provider to the Board for relief.[46]

The Medicare Contractor believes its SSI adjustments are correct and points out that CMS revised its process of matching Medicare and SSI eligibility data, and the Provider received SSI fractions based on that revised process for each of the three fiscal years at issue.[47]  Additionally the Medicare Contractor disputes that Pomona's data is more accurate than CMS' because the Provider did not explain how the SSI status codes of C01, M01, and

---

[39] Provider's Final Position Paper (2006) at 5.
[40] *Id.* at 5-6.  Provider Exhibit P-10.
[41] *Id.* at 6-7.
[42] *Id.* at 8.
[43] *Id.*
[44] Provider's Final Position Paper (2007) at 8.
[45] Provider's Final Position Paper (2008) at 9
[46] Provider's Post-Hearing Brief at 3-4.
[47] Medicare Contractor's Post-Hearing Brief at 5.

M02 used by CMS to calculate the SSI fraction interplay with the California's "aide codes" of 10, 20 and 60.  The Medicare Contractor argues that the Provider has been unable to explain how its methodology is better for determining SSI entitlement.[48]

The Board is aware that Pomona sought to obtain SSI information directly from SSA through various means and that SSA advised the Provider that no SSA data could be shared directly with the Provider.[49]  In addition the Board understands that Pomona created a sample and asked CMS to rematch the unmatched patient days against official SSA records but CMS declined to do so based on workload concerns.[50]  Without this information the Board recognizes Pomona's difficulty in proving that CMS significantly understated Pomona's SSI fractions for the three fiscal years under appeal, and in demonstrating that Pomona's calculations of its SSI fractions are more accurate.

After reviewing Pomona's methodology and data, the Board finds that the Provider's methodology assumes that all individuals with an "aide code" of 10, 20, or 60, will map to an SSI code of C01, M01, or M02.  However, in its post hearing brief Pomona recognized that "aide codes" 10, 20, and 60, include individuals who receive a SSP payment but no SSI payment and therefore these individuals would not have an SSI code of C01, M01, or M02.  The Provider estimates that its original calculation of SSI days included 1,141 SSP only days for 12/31/2006; 1,112 SSP only days for 12/31/2007; and 1,095 SSP only days for 12/31/2008,[51] and agrees that these days are not SSI eligible for purposes of the Medicare DSH calculation.  Pomona eliminated these SSP only days, reducing the number of additional SSI days it is requesting to 955 days for 12/31/2006; 1,400 days for 12/31/2007; and 1,262 days for 12/31/2008.[52]

During the hearing the Board pointed to other reasons of why variances may exist between the "aide codes" used by Pomona and the SSI codes.  One of the reasons is the difference in coding nursing home residents.  At the hearing Pomona's witness explained that a Medi-Cal eligible person who went into a nursing home would still remain Medi-Cal eligible and remain on an aide code of 10, 20, or 60, and would be counted as SSI eligible by Pomona.[53]  However, in the August 16, 2010, Federal Register, CMS explains that SSI Code E01 "represents an individual who is a resident of a medical treatment facility and is subject to a $30 payment limit, but has countable income of $30 or more.  Such an individual is not entitled to receive SSI payment."[54]  CMS does not include individuals with Code E01 when determining SSI eligible days.  Pomona does not believe this difference represents a significant number of days,[55] and submitted some statewide statistics to backup this assertion.[56]  However the Provider could have quantified from its own records the number of additional days being requested that were for patients that came to Pomona from a nursing home.  Without Pomona providing an estimate of the impact of this

---

[48] *Id.* at 9.
[49] Provider's Post-Hearing Brief at 16.
[50] *Id.* at 16-18.
[51] Provider Exhibits P-40, P-41, and P-42.
[52] *Id.*
[53] Tr. at 339-340.
[54] 75 Fed. Reg. 50042, 50281 (Aug. 16, 2010).
[55] Provider's Post-Hearing Brief at 35.
[56] *Id.* at 36-38.

difference on the additional SSI days being requested, the Board does not and cannot know the significance of this coding difference.

Pomona's witness also testified that "Medi-Cal eligibility is month-specific... they would get eligibility the first day of the month of the application"[57] and the person would also be identified as a code 10, 20, or 60, if the person qualified for SSI/SSP.[58]  This is different than the effective date for an SSI payment as the FY 2011 Final Rule states "Code E02 is used to identify a person who is not entitled to SSI payment in a month ... pursuant to section 1611(c)(7) of the Act, which provides that an application for SSI benefits shall be effective on the later of the 1) first day of the month *following the date the application is filed*, or 2) the first day of the month following the date the individual becomes eligible for SSI based on that application.  Such an individual is not entitled to SSI benefits during the month his or her application is filed or determined to be eligible for SSI, but, for, the following month."[59]  As CMS does not include days for individuals with code E02 when determining SSI eligible days, the different effective dates represents another difference between CMS' data and Pomona's data.  The Board recognizes that Pomona believes this difference would have a minimal effect on the number of SSI eligible days,[60] and explained post hearing that the Provider is not assisting patients to file for SSI benefits and uses other basis to qualify patients for Medi-Cal benefits on a first time basis.[61]  However, Pomona could have estimated the potential impact that the different effective dates had on the additional days it is requesting by reviewing its records and the State's records, to determine if any of the additional days are associated with individuals whose application for Medi-Cal/SSP was submitted in same month the patient days of service occurred.  Without this information the Board does not know the potential impact the different effective dates has on Pomona's data.

Further the Board points out that, while the Provider performed a detail comparison of its internal data, the Medi-Cal system data, the MedPAR SSI patient file, and multiple other data sources,[62] it did not explain or identify the potential reasons for differences between the data from these sources.  While the Board understand that the Medi-Cal aide code information used by Pomona is based on real time data from SSA,[63] there is no information in the record to identify what SSI codes other than C01, M01, and M02, are translated into the "aide codes" of 10, 20, and 60.[64]  As explained above the Board believes the Provider could have analyzed its data to quantify the number of patient days contained in "aide codes" 10, 20, and 60, for patients with SSI codes E01 and E02.  In addition the Provider could have determined if there were any other potential reasons for the discrepancies between the "aide codes" of 10, 20, and 60, and the SSI codes of C01, M01, and M02.  Specifically the Provider could have reviewed the definitions of both the SSI codes and "aide codes" and built a crosswalk or diagram to identify if there were other situations in which an individual would be assigned or remain on an "aide code" of 10, 20,

---

[57] Tr. at 342.
[58] Tr. at 342.
[59] 75 Fed. Reg. at 50281.
[60] Provider's Post-Hearing Brief and Declarations, Exhibit A at 2.
[61] Provider's Post-Hearing Brief at 40.
[62] Provider Exhibit P-27 contains the comparison of "aide code" days to SSI days for each year and P-20 contains the diagram of the logic and data sources used. The logic for Provider Exhibit P-20 is explained in Tr. at 54 - 80.
[63] Provider's Post-Hearing Brief at 24.
[64] Tr. at 334-338.

Page 9                                         Case Nos.: 13-0430, 13-0628 and 13-0680

or 60, but the SSI code would not be C01, M01, or M02 (e.g. SSI codes beginning with the letter "S" reflect records in a "suspended" status,[65] and the Provider did not address if individuals with "S" codes get assigned or retain a code of 10, 20, or 60).  Rather Pomona's witness testified that he "didn't go through the data on the dictionary from---for the SSA." and did not know if there was a one-to-one correlation with "aide codes" 10, 20, and 60, and the SSI codes of C01, M01, and M02.[66]

At the hearing the Board specifically requested a diagram of how information from SSA is translated into "aide codes" 10, 20, and 60,[67] in order to gain insight into how these aide codes relate to C01, M01, and M02.  The Provider submitted Exhibits P-47 and P-55 with its post-hearing brief containing indicator value codes used by the State in assigning the "aide codes." It is unclear what the indicator value codes mean and how they relate to the SSI codes of C01, M01, and M02.  The Medi-Cal Eligibility Division advised the Provider to contact SSA for the meaning of the indicator value codes.[68]  This question remains unanswered as Pomona did not submit any additional information.  The Board acknowledges that building a crosswalk might have been a difficult task, but finds a crosswalk is necessary to determine if the Provider's use of "aide codes" 10, 20, and 60, accurately identified only those individuals with an SSI code of C01, M01, or M02.  The Board notes the Provider could have developed this crosswalk without the use of Health Insurance Portability and Accountability Act ("HIPAA") protected information, by obtaining the definitions of the various codes, and if necessary confirming the information with the appropriate authorities.

The Board finds that the Provider did not submit sufficient quantifiable data in the record to prove that the SSI percentages calculated by CMS, and used in Pomona's FYE 12/31/2006, 12/31/2007, and 12/31/2008 cost reports, were flawed.  The Board affirms the SSI percentages used by the Medicare Contractor.

## DECISION AND ORDER

After considering Medicare law and regulations, arguments presented, and the evidence admitted, the Board finds that the SSI percentages used by the Medicare Contractor for Pomona's DSH adjustment for its 12/31/2006, 12/31/2007, and 12/31/2008 cost reports were proper.

## BOARD MEMBERS PARTICIPATING:

Charlotte F. Benson, CPA
Gregory H. Zeigler, CPA, CPC-A
Robert A. Evarts, Esq.

---

[65] 75 Fed. Reg. at 50281
[66] Tr. at 334-338.
[67] Tr. at 400-411.
[68] Provider Exhibit P-55.

Page 10                                    Case Nos.: 13-0430, 13-0628 and 13-0680

**FOR THE BOARD:**

Board Member

**DATE:**

SEP 2 1 2018

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| **POMONA VALLEY HOSPITAL** | ) |
| **MEDICAL CENTER** | ) |
| | ) |
| Fiscal Years Ended: | ) |
| December 31, 2006 | ) |
| December 31, 2007 | ) |
| December 31, 2008 | ) |
| | ) |
| Provider No.: 05-0231 | ) |
| | ) |

CASE NOS.:  13-0430
            13-0628
            13-0680

RECEIVED

OCT **1 3** 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

**PROVIDER'S POST-HEARING BRIEF
(AND DECLARATIONS)**

*Attorneys for Provider:*
POMONA VALLEY HOSPITAL
MEDICAL CENTER

LAURENCE D. GETZOFF
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA  90067
Tel.:  (310) 551-8111
Fax:  (310) 551-8181

**TABLE OF CONTENTS**

I.      ISSUE PRESENTED...................................................................................................1

II.     INTRODUCTION. ...................................................................................................1

III.    THE PROVIDER'S METHODOLOGY. ..............................................................5

IV.     APPLICABLE LAW AND REGULATIONS.......................................................8

V.      ARGUMENT.............................................................................................................11

        A.      POMONA USED A CREDIBLE METHODOLOGY TO DERIVE AN
                ACCURATE SSI FRACTION FOR 2006, 2007 AND 2008................................11

        B.      CMS'S METHODOLOGY DOES NOT RISE TO THE SAME LEVEL
                OF CREDIBILITY. .......................................................................................14

        C.      POMONA SUBMITTED A VERIFIED SAMPLE OF ITS PATIENTS
                AND SERVICE DATES TO CMS FOR TESTING AGAINST SSA
                RECORDS, BUT DESPITE SSA AGREEMENT TO REVIEW THE
                RECORDS IF PROVIDED BY CMS, CMS REFUSED TO
                COOPERATE. ..............................................................................................16

                1.      The Sample. ...............................................................................16

                2.      Dealings with CMS and SSA................................................17

                3.      CMS's Rebuke of a United States Senator and Further Refusal to
                        Cooperate and Reasonably Resolve this Dispute........................19

        D.      CMS'S CALCULATION OF POMONA'S SSI FRACTION DOES NOT
                COMPLY WITH THE GOVERNING STATUTE. .............................................20

        E.      ARGUMENTS RAISED AND THEORIES PROPOSED TO SUGGEST
                THAT POMONA'S CALCULATIONS OR METHODOLOGY ARE
                FLAWED ARE NOT SUPPORTED BY THE BEST AVAILABLE
                DATA OR LAW..............................................................................................22

                1.      The Data Relied Upon by Pomona Also Emanated from the SSA............23

                2.      Pomona's Calculation Fully Accounts for, If Not Overstates, the
                        SSP-Only Patient Factor that Reduces the SSI Percentage. ......................27

                3.      The Number of SSP-Only Recipient Patients at Pomona Cannot
                        Explain a Majority of the Discrepancy Between the CMS and

00039

Pomona Calculations of Pomona's SSI Fraction for 2006, 2007 and 2008 .................................................................................... 32

4.   Transfers of Nursing Patients from Nursing Facilities in California to Pomona Valley Hospital Medical Center Cannot Explain the Difference Between Pomona's Calculation of the SSI Fraction and CMS's Calculation of that Fraction. ....................................... 34

5.   A Potential Difference in Timing of Patients' Receipt of New Medi-Cal Coverage Versus SSI Payments Had No Material Impact on Pomona's SSI Percentage During Its Fiscal Years 2006 Through 2008. ....................................................................... 38

6.   The Provider Consistently Has Utilized the CMS MedPAR Total of Entitled (Covered) Days as the Denominator of Its Request for Recalculation of the SSI Fraction for 2006, 2007 and 2008 ..................... 41

7.   Administrative Finality Is Not a Supportable Basis for the Medicare Program's Refusal to Review and Verify the Data Underlying Pomona's SSI Fraction Calculations for the Fiscal Years Under Appeal. ............................................................... 42

F.   CMS RULING 1498-R DOES NOT LIMIT THE PRRB'S ABILITY TO DECIDE AND/OR OTHERWISE RESOLVE THIS CASE. ............................. 47

G.   THE BOARD RETAINS FULL AUTHORITY TO DECIDE THIS CASE. ............................................................................. 49

1.   General Authority. ................................................................ 49

2.   The Preamble to the 2011 Final IPPS Rule is Inapplicable to this Fiscal Period. ........................................................................ 51

3.   The Board Is Not Bound by CMS's Preamble Language. ......................... 52

VI.   EXPEDITED JUDICIAL REVIEW:  FINDINGS OF FACT. ........................................... 54

VII.   REQUEST FOR RELIEF. ....................................................................... 57

00040

# TABLE OF AUTHORITIES

## Cases

*Autumn Bridge LLC v. Sebelius,*
  2009 WL 9073083 (W.D. Okla. 2009) ...................................................................57

*Baystate Medical Center v. Leavitt,*
  545 F.Supp.2d 20 (D.D.C. 2008) ................................................................ *passim*

*Board of Trustees of Knox Cty Hosp. v. Shalala,*
  959 F. Supp. 1026 (S.D. Ind. 1997) ........................................................................53

*Bowen v. Georgetown Univ. Hosp.,*
  488 U.S. 204 (1988) ................................................................................................52

*Christensen v. Harris Cty,*
  529 U.S. 576 (2000) ................................................................................................50

*Comm. Hosp. of Monterey Peninsula v. Thompson,*
  323 F.3d 782 (9th Cir. 2003) ..................................................................................51

*Heart to Heart Hospice, Inc. v. Leavitt,*
  2009 WL 279099 (N.D. Miss. 2009) .......................................................................57

*Loma Linda Comm. Hosp. v. Shalala,*
  907 F. Supp. 1399 (C.D. Cal. 1995) .......................................................................53

*Nat. Resources Defense Council, Inc. v. S. Coast Air Quality Mngmt Dist.,*
  651 F. 3d 1066 (9th Cir. 2011) ...............................................................................53

*Santa Cruz, CA 03-05 MSA Hosp. Wage Index Group, et al. v. Noridian*
  *Healthcare Solutions, LLC/Blue Cross & Blue Shield Assoc.,*
  2015 WL 10381779, PRRB Hearing Dec. No. 2015-D6, Case No. 04-0492G
  (April 2, 2015) ........................................................................................................55

*Select Specialty Hosp.-Akron, LLC v. Sebelius,*
  820 F.Supp.2d 13 (D.D.C. 2011) ............................................................................55

*Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.,*
  307 F.3d 1214 (9th Cir. 2002) ................................................................................53

## Statutes

42 U.S.C. 1395oo(f)(i) .................................................................................................54

42 U.S.C. 1395ww(d)(5)(F)(vi) ..................................................................1, 8, 22, 49

42 U.S.C. § 1395oo(d) .................................................................................................49

-iii-

## TABLE OF AUTHORITIES

### Other Authorities

42 C.F.R. 412.106(b) ........................................................................................... *passim*

42 C.F.R.
   § 405.1801 ...................................................................................................48
   § 405.1803 ...................................................................................................48
   § 405.1842 ...................................................................................................54
   § 405.1867 ....................................................................................49, 50, 53
   § 405.1869 ...................................................................................................49

48 Fed. Reg. 22897, 22921-22926 (May 23, 1983).........................................55, 56

69 Fed. Reg. 35715, 35730 (June 25, 2004) ...................................................55, 56

73 Fed. Reg. 30190, 30214 (May 23, 2008) .........................................................55

75 Fed. Reg. 50275 (August 16, 2010)........................................................ *passim*

CMS Ruling 1498-R .................................................................................. *passim*

PRRB Rules, Rule 42.3.............................................................................................56

00042

I.     **ISSUE PRESENTED.**

Whether the Medicare Administrative Contractor ("MAC") properly calculated Pomona Valley Hospital Medical Center's ("Pomona" or "Provider") disproportionate share hospital ("DSH") reimbursement with respect to the Provider's Supplemental Security Income ("SSI") percentage?[1]

At the hearing, held August 17, 2017, the Provider presented the consolidated appeals of three cost reporting years, fiscal years ending ("FYE") 12/31/2006, 12/31/2007 and 12/31/2008. The correctness of the SSI fraction or percentage was the sole and identical issue remaining in each of the three cases consolidated for hearing before the Provider Reimbursement Review Board ("Board" or "PRRB"). The revised, estimated reimbursement impacts in each year are provided in Exhibits P-40, P-41 and P-42, respectively (submitted herewith), and following the review of issues stated at the hearing the amounts are now calculated as $770,837 in FYE 2006, $1,291,520 in FY 2007, and $1,232,627 in FY 2008.

II.    **INTRODUCTION.**

The SSI percentage (or "fraction") consists of the number of patient days associated with treating patients who are entitled to Medicare Part A benefits and SSI benefits, divided by the number of patient days associated with the treatment of all patients entitled to Medicare Part A benefits. 42 U.S.C. 1395ww(d)(5)(F)(vi) (Exhibit P-3 attached to the Provider's Final Position Paper for each year's appeal). As demonstrated at hearing, and as will be detailed throughout this Post Hearing Brief, the CMS calculation of Pomona's SSI fraction in each of the three years in this appeal was (1) significantly understated; (2) omitted numerous days that the Provider has

---

[1] In the present case, it should be noted that all parties agree that the SSI percentage of a provider is not actually "calculated" by the MAC, but rather is applied to the provider's cost report based on a published SSI percentage prepared by CMS.

00043

demonstrated to be days involving patients who on those days were entitled to both Medicare

Part A and SSI benefits; and (3) therefore out of compliance with the statutory requirements for

calculating the SSI percentage, as well as CMS's own regulation pertaining to calculation of

DSH reimbursement – 42 C.F.R. 412.106(b).  Simply stated, Pomona is entitled to the benefits

accorded to it by statute and regulation of an accurate SSI percentage, based on the best available

data.

   In contrast to the MAC, which presented no witnesses and scant evidence in this case to

support the Medicare program's calculation of Pomona's SSI fraction in each year, the Provider

presented three highly qualified witnesses, including Candice Le-Tran, a Hospital

Reimbursement Director with thirty years' experience, who is also a Certified Public Accountant

with an M.B.A., Tzvi Hefter, a former longtime Director of the CMS Division of Acute Care,

who had issued the Medicare "IPPS" rules concerning DSH and the SSI fraction for almost thirty

years, and Stan Rosenstein, the former Director of California's Medicaid program, who was

accepted by the Board as an "expert witness" on the subjects of the Medi-Cal program and Medi-

Cal eligibility topics in light of a 30 year career  working for California's State Medicaid

Program.  Further, this individual displayed a remarkable knowledge of how Social Security

Administration ("SSA") data was and is used by the Medi-Cal program to qualify individual

patients for Medi-Cal benefits through assignment of "aid codes" based directly on SSA data.

   These witnesses, as will be summarized herein, explained how Pomona first developed

and then implemented a highly technical and comprehensive system to identify patients who

were entitled to both SSI benefits and Medicare Part A benefits at the time such patients received

their hospital services at Pomona.  As demonstrated at hearing, and throughout this Post Hearing

Brief, each of the witnesses has shown that Pomona credibly and completely rebutted any

-2-

presumption of correctness that may otherwise be attributed to CMS's calculation of Pomona's SSI fraction in each of the three years.  The data supporting Pomona's own SSI fraction calculations were not only shown to be internally consistent, but were also demonstrated to be based on data received by the State of California directly from the SSA.  Pomona, not CMS, has used the "best available data" in this case.

Importantly, when reviewing this Brief, it should be noted that unlike other SSI fraction cases that have come before this Board, Pomona is <u>not</u> challenging the CMS policy of including only days on which a patient is actually "entitled" to Medicare Part A + SSI benefits – this case is not about "eligible" days versus "entitled" days.  Rather, the Provider is challenging CMS's count of Pomona's qualifying Part A + SSI days, based on either inaccurate translation of data between agencies, human error, coding errors or other potential problems that may have led to CMS not using the best available data to calculate Pomona's SSI fraction in each of these years.  Likewise, this case is not about a "small" error.  The gap between the CMS and Pomona calculations in each year is many percentage points and has been characterized by both the former Medi-Cal program Director and former CMS official as unexplained by any CMS or MAC theory and quite significant.  See Transcript, at pp. 324-327 and pp. 253-254.

As was further testified to at hearing and as will be explained in this Brief, the Provider made numerous efforts to obtain the source SSA data to test a sample set of patient records, to learn, once and for all, whether or not the SSA's data would confirm or disagree with Pomona's own underlying data.  Pomona further agreed to abide by the result of such test.  Yet, despite enlisting former government officials and members of Congress to convince CMS to investigate the discrepancy in the calculations, and to work with the SSA to confirm or refute Pomona's

-3-

00045

calculation, CMS blocked Pomona's process of testing the data, and instead directed the Provider to this Board for relief.

Accordingly, the Provider is now summarizing its case in this Brief, and requesting the Board to consider carefully its many aspects: The Provider has used a credible methodology and has based its case on SSA data received by the State of California in the ordinary course of business. In contrast, CMS has used a somewhat opaque process for calculating providers' SSI fractions, and one that has been demonstrated to have incurred data problems in the past. Moreover, as this Brief will show, Pomona has accounted for each and every potential theory or question raised prior to or during the hearing suggesting that somehow Pomona overlooked some important process or fact. Similarly, Pomona herein completely rebuts any claim made by the MAC that "administrative finality" should somehow bar this Board from deciding in favor of the Provider. Likewise, Pomona demonstrates herein, in response to Board requests for further information, that this Board has both broad authority to act, and ample remedies from which to choose, in granting relief to Pomona. Finally, as requested by the Board, Pomona is submitting Proposed Finding of Fact and Conclusions of Law, as a part of its Proposed Decision, as well as responses to approximately 15 questions from the Board, explained in this Brief, and supported by Declarations of Stan Rosenstein and Candice Le-Tran (Appendices A and B, respectively), and new supplemental exhibits P-40 through P-72.

Pomona firmly believes that it has demonstrated an error in CMS's calculation of this hospital's SSI fraction in three fiscal periods. It is now up to this Board to review and correct that error.

-4-

III.   **THE PROVIDER'S METHODOLOGY.**

As testified to at the hearing by Candice Le-Tran, Pomona used many data sources to ensure accuracy of its SSI fraction calculations.  First, Pomona obtained, through data use agreements, CMS's basic data for Federal fiscal years (FFY) 2006 through 2009 that supported each of the three years' published SSI percentages.  CMS's published SSI percentages for FFYs 2006, 2007 and 2008, respectively, were 14.74% (2006 – See Exhibit P-40), 14.73% (2007 – See Exhibit P-41), and 14.40% (2008 – See Exhibit P-42).

Next, Pomona gathered aid codes for all of its patients who also were Medi-Cal beneficiaries with California Department of Health Care Services (DHCS) – the State Medicaid agency in California -- "aid codes" 10, 20 and 60, since these three aid codes specifically and uniquely identify individuals who are confirmed by the SSA as actively receiving SSI and/or SSP benefits.[2]  As testified to by Stan Rosenstein at the hearing:

> "Q.   And which aid codes identify a Medi-Cal enrollee on SSI and/or SSP?
>
> A.   They are identified by three aid codes; 10, 20 and 60."

Transcript, p. 311, ll. 2-6.

Mr. Rosenstein further pointed out that the assignment of aid codes 10, 20 and 60 are based completely on information received by DHCS from the SSA. *See* Transcript, p. 313, l. 4, to p. 314, l. 12; *see also* Declaration of Stan Rosenstein, Appendix A, paragraph 3, and Exhibits

---

[2]  "Aid Codes" are assigned by the DHCS to "tell various entities; the state, Federal Government, providers, what is the source of [Medi-Cal] eligibility. . . you can look at an aid code you know where this person – how this person became eligible, source of eligibility, what source of benefits they get, and how much money the state can claim from the Federal Government.  (See Testimony of Stan Rosenstein, Medi-Cal Eligibility Expert Witness, Transcript, p. 308, l. 7 to p. 309, l. 17.)  Moreover, Mr. Rosenstein testified that "aid codes" are "100% accurate" and "well tested."  Transcript, at p. 309, ll. 16-25.

P-47 and P-48; and see Section V.E. 1 of this Brief, *infra* – discussing how SSA data is received and processed by the State DHCS.

As Ms. Le-Tran represented in Exhibit P-20 and at the hearing, Pomona used several sources of data to confirm the aid code assigned covering particular days for each and every patient. As noted on Exhibit P-20, these sources included the CMS MedPAR file for each year, State Medi-Cal Paid Claims Summaries, Pomona's internal patient data, the DSS database, and a quite thorough data base prepared and maintained by a private contractor to the DHCS, "HDX." Further, as noted in Exhibit P-20 and at hearing, Pomona also sought aid code information from the Automated Enrollment Verification System ("AEVS")[3] operated by the State of California DHCS, to obtain confirmed aid codes on some patients and to verify aid codes on other patients (whose aid codes had been obtained through non-State databases):

> Q. Once your SSI identification process is complete, approximately how many sources would you say you check annually to determine a patient's SSI status throughout his or her admission?
>
> A. I would say four sources. So the first source is our internal data from the HDX, which is the state-approved system, and if we cannot find it then we would go to the Medi-Cal website which is the point of service network. And then we would do manual research, we would go look up record and go through all the pages to find out if there's an aid code somewhere that we can find and then we would use the paid claims summary. . . We do this for all patients in the hospital.

Testimony of Candice Le-Tran, Transcript, p. 78, ll. 5-7, and p. 78, l. 20 to p. 79, l. 13.

Ms. Le-Tran also confirmed that if Pomona could not locate an aid code to substantiate that a particular patient had SSI and/or SSP benefits, then Pomona did not include those patients'

---

[3] "The AEVS is a set of systems that allow providers, through a number of ways, to find out who is eligible for Medi-Cal... The AEVS system is a system that providers access Medi-Cal through its fiscal agent to get information from MEDS that tells them who is eligible this month, is your patient eligible, and then what are the conditions of eligibility. And a big part of that is what aid code does the person have on that given month." [Testimony of Stan Rosenstein, Transcript, p. 281, ll. 3-22.]

00048

days in its SSI fraction numerator.  (See Transcript, p. 68, ll. 12-16).  Likewise, Ms. Le-Tran testified that where patients only had a "10, 20 or 60" aid code for a portion of their admission (a "partial aid code approval"), only those patients' days during the period actually covered by one of those three aid codes would be included in the calculation of the numerator of the SSI fraction each year.  (See Transcript at p. 65, l. 20 to p. 66, l. 4 and comment at p. 68, ll. 12-16:  ". . . so if we cannot find an aid code to substantiate that the patient has SSI or SSP, then we do not want to put those – we did not claim those patients.")

Next, Pomona compared, on a patient by patient, and day by day, basis, the days that CMS included in the numerator of the SSI fraction for each of the three years, and Pomona's results, and grouped the days as either "matched" (CMS's data and Pomona's data is in agreement), "unmatched" (Pomona has verified a 10, 20 or 60 aid code for all days, but CMS does not include the patient and days on its list of Part A + SSI beneficiaries), or "partial match" (a portion of the admission was "matched" but not all days of the admission).  (Transcript, p. 76, l. 17 to p. 77, l. 3; *see also* Exhibit P-27-Lists of Patients).  Pomona compared its data to CMS's data for two important reasons.  First, "we want to compare because, again, we only want to capture Medicare patients.  So if a patient has SSI and did not have Medicare, then we do not want to claim that patient." (Transcript at p. 69, ll. 10-15).  Second, Pomona needed to understand the variance each year, on a percentage basis, between CMS's calculation of the SSI fraction, and Pomona's calculation, for purposes of identifying the reimbursement impact of the variance.  (See Exhibits P-40, P-41 and P-42.)

The results of these calculations and comparisons are as follows (the CMS data is from the MedPAR file, Pomona's data is from Exhibits P-27, pp. 501, 518 and 535 and Exhibits P-40,

00049

P-41 and P-42 and include a reduction to Pomona's days and patients to reflect the Statewide average of SSP only patients):[4]

| Year | CMS "SSI" Days | Pomona "SSI" Days | CMS "SSI" Patients | Pomona "SSI" Patients |
|------|----------------|-------------------|--------------------|-----------------------|
| 2006 | 4,886 | 5,841 | 748 | 1,129 |
| 2007 | 4,153 | 5,553 | 757 | 1,197 |
| 2008 | 4,238 | 5,500 | 729 | 1,148 |

Based on these results, CMS's SSI Fraction for Pomona is lower than Pomona's calculated SSI Fraction (even after subtracting the likely number of SSP only days) by 19.55% in 2006, by 25% in 2007, and by 22.95% in 2008. In addition, CMS's count of patients receiving SSI benefits during the month(s) of admission is lower than Pomona's count of SSI receiving patients during these years (even after subtracting the 16.5% of SSP only patients) by 20.56% in 2006, by 24.09% in 2007, and by 23.79% in 2008. These remaining 20 to 25 percent differences, even after subtracting out the statistically presumed number of SSP only recipient patients, is unexplained by any theory espoused by the MAC, CMS or other parties, as demonstrated in later sections of this Brief.

## IV.   APPLICABLE LAW AND REGULATIONS.

The statute governing the calculation of Pomona's SSI fractions for 2006, 2007 and 2008 is 42 U.S.C. 1395ww(d)(5)(F)(vi):

---

[4] As testified to at hearing by Candice Le-Tran and Stan Rosenstein, the "raw" totals of patients found by Pomona to have been assigned aid codes 10, 20 or 60 include both patients who are receiving SSI and SSP benefits, as well as patients who are receiving only SSP benefits. All parties agree that it is necessary to reduce the total number of patients with 10, 20 or 60 "aid codes" by the number of such patients who are receiving only SSP payments, but not SSI payments. Since State DHCS records do not identify a patient as one or the other, and in light of the Provider's inability despite considerable efforts to access the SSA database regarding which patients were which, as explained fully in Section V.E.2 of this Brief, infra, Pomona has reduced the "raw" total of patients (and days) associated with approximately 16.5% of the patients, which is the Statewide average of SSI/SSP patients having SSP benefits only. [See also, Exhibits P-51 and P-46.]

-8-

> "the fraction (expressed as a percentage), the numerator of which is the number of such hospital's patient days for such period which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter and were entitled to supplementary security income benefits (excluding any State supplementation) under subchapter XVI of this chapter, and the denominator of which is the number of such hospital's patient days for such fiscal year which were made up of patients who (for such days) were entitled to benefits under Part A of this subchapter, . . ."

See Exhibit P-3.

The construct and meaning of this statute is unambiguous. Patient days on which a patient is "entitled" to benefits under Part A and to SSI benefits on that day make up the numerator. Patient days on which a patient is "entitled" to Part A benefits make up the denominator. In light of the qualifier "for such days," relating to the numerator and the denominator, the only plausible interpretation is that a provider must be entitled to "payment" under Part A and SSI to have those days be included in the numerator (i.e., the patient cannot be merely "eligible" for such payments or benefits), and similarly, a provider must be entitled to "payment" under Part A (again, the patient cannot be merely "eligible" for Part A benefits for such days) in order for the days to be included in the denominator.

Moreover, it should be noted that nowhere in the plain language of the statute is there any mention of limitations on measuring these days, or any suggestion that a provider is not entitled to include *all* of the days in the numerator of the SSI fraction that are shown to be days for which the patient is "entitled" to both Part A Medicare payments and is receiving SSI payments. The word "entitled" cannot be interpreted differently for Part A and SSI benefits when used in the very same sentence. Accordingly, the denominator of the SSI Fraction also should include "paid" or "covered" Part A days, as Pomona has included in its calculations from the start of these appeals.

-9-

CMS then promulgated regulations to implement the governing statute. During the period from 2006 through 2008, the governing regulation, 42 C.F.R. 412.106 [2008], stated, in pertinent part:

> "*(b)(2) First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS --
>
> (i)    Determines the number of patient days that –
>
> (A)    Are associated with discharges occurring during each month; and
> (B)    Are furnished to patients who during that month were entitled to both Medicare Part A (or Medicare Advantage (Part C) and SSI, excluding those patients who received only State supplementation;
>
> (ii)    Adds the results for the whole period; and
>
> (iii)    Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of days that –
>
> (A)    Are associated with discharges that occur during that period; and
> (B)    Are furnished to patients entitled to Medicare Part A (or Medicare Part C)"

See Exhibit P-39.

As in the statute, the regulation provides for a clear, clean ratio of paid Part A plus SSI days in the numerator, and paid Part A days in the denominator. The remainder of the regulation does not place any limits on measuring these days or the ratio, nor suggest that a provider is not entitled to include all of the proven days in the SSI Fraction. Likewise, there is no suggestion in these provisions that the Provider Reimbursement Review Board has no authority to ensure the proper calculation pursuant to statute and regulation of the SSI Fraction for a hospital.

-10-

00052

V.   **ARGUMENT**.

   A.   **POMONA USED A CREDIBLE METHODOLOGY TO DERIVE AN ACCURATE SSI FRACTION FOR 2006, 2007 AND 2008.**

   Pomona's re-calculation of its SSI fraction for each of the three years under appeal was the product of a highly credible methodology, and one that in many ways includes more reliable data than the data used by CMS. First, as presented above, in Section III., and as discussed more specifically in Section V.E.1, below, Pomona compiled its list of SSI + Part A patients (the numerator of the SSI fraction) from several sources, including but not limited to Federal agency records, State DHCS databases, various private databases and information collected at the hospital level from patients. Importantly, the "aid codes" on which Pomona's list of SSI/SSP beneficiaries is based ("10", "20" and "60") were assigned by a State governmental agency, DHCS, and are based entirely on data received directly from the SSA.

   Q.   Does the information used to create the aid codes ultimately derive from the Social Security Administration?

   A.   100 percent. It comes off of what Social Security Administration gives the state, and all the – 10, 20 and 60, all is define whether aged, blind, or disabled.

   Q.   And how is then assigned to individuals?

   A.   Well, it's assigned – the aid code is assigned based upon the Social Security record, and there's a data element in the Social Security record that says, you know, for this eligible person, they're aged, blind or disabled. So it's in their data set and the State takes that data, changes the number to one of the – you know, changes the data to its data set and posts it.

   Q.   In your opinion, do these records verify that Pomona's methods of identifying SSI and SSP patients was accurate?

   A.   Yes.

-11-

00053

Testimony of Stan Rosenstein, Transcript, p. 320, l. 15 to p. 321, l. 17; see also, more complete discussion in Section III, above, Section V.E.1, below, and Exhibits P-47 and P-48, and Declaration of Stan Rosenstein, paragraph 3.

The credibility of such data, especially the DHCS aid codes assigned based on SSA data that transfers directly to the State, also is enhanced by the fact that the State relies on such data, and assigns aid codes that form the basis of the State's obligation to make payments to Medi-Cal beneficiaries, as well as to SSP recipients.  As Stan Rosenstein testified:

> "Well, the people, you know, people who are enrolled by the Social Security Administration in both programs they come over electronically to the state, the state will then pay for their health care, become – the state becomes responsible and and pays the state's share of 50 percent, draws down federal funds from CMS paying the federal matching rates in California, which is 50 percent.  So the state is accountable for making sure its payments are correct both to the state and its taxpayers, as well as the Federal Government, CMS and the federal taxpayers."  [Transcript, p. 303, l. 22 to p. 304, l. 13]

In addition, Pomona has reduced its raw total of patients' days covered by aid codes 10, 20 and 60 by a credible, and possibly even overstated, percentage of SSP only recipients in California, approximately 16.5% each year.  Further, Pomona accounted for admissions wherein patients were covered by aid codes 10, 20 and 60 for only a portion of their admission, rather than including all of the days of such an admission.  Pomona also chose not to include in its SSI fraction numerator any days that did not have aid codes 10, 20 and 60, unless such days were specifically identified as SSI days by CMS in CMS's own calculation.

As discussed in more detail in the next section, Pomona also created a sample of 50 patients spanning the three fiscal years at issue to assure that aid codes were being accounted for accurately.  Pomona then had the first part of the sample verified by the State of California DHCS, and the results of such verification showed that Pomona's assignment of State aid codes was 100% accurate.  (See Exhibit P-24, p. 222, see also Transcript, at p. 99, l. 23 to p. 100, l. 8.)

-12-

00054

Ms. Le-Tran also testified that Pomona only included "unmatched" or "partial match" days in the SSI Fraction numerator if a positive match with an aid code 10, 20 or 60 could be made for each day included. Pomona's SSI fraction was not inflated by potential matches; there had to be a positive aid code match for each day included.

Stan Rosenstein, the former Director of California's Medi-Cal program, and expert witness, testified:

> "A.     I was asked to do a number of things. To verify that their processes, their ideas to determine what – who was on SSI on Medi-Cal were accurate to validate their processes, to make sure they had interpreted Medi-Cal right. . .
>
> Q.     Did you review Ms. Le-Tran's and Pomona's methodology for obtaining data?
>
> A.     Yes, I did.
>
> Q.     In your opinion, were Ms. Le-Tran's methods for assigning aid codes sound?
>
> A.     Yes.
>
> Q.     Do you believe the data she compiled is accurate for purposes of demonstrating SSI and SSP status?
>
> A.     Yes. She's accurately gone through her records and found people who are either 10, 20 or 30 [sic] [60] aid code, SSI, SSP.
>
> Q.     Was there any important data source of which you are aware that Ms. Le-Tran did not seek to access in her patient data compilation?
>
> A.     No. Again, from an SSI, SSP, Medi-Cal perspective, it's the eligibility verification process I described."

Transcript at p. 314, l. 22 to p. 315, l. 3; p. 316, l. 1 to p. 317, l. 4.

Tzvi Hefter, the longtime former Director of the Division of Acute Care at CMS, agreed that Pomona used the best information it had available, and that Pomona did its due diligence. Further, Mr. Hefter indicated that Pomona has a very good basis for assuming that these patients

-13-

truly are SSI patients.  (See Transcript at p. 229, ll. 4-11, and p. 233, l. 19 to p. 234, l. 14.)  In contrast, CMS's methodology is not fully transparent and has been shown to be replete with prior problems and errors.

**B.    CMS'S METHODOLOGY DOES NOT RISE TO THE SAME LEVEL OF CREDIBILITY.**

CMS's methodology is frankly somewhat opaque.  After being ordered by a Court in *Baystate Medical Center v. Leavitt*, 545 F. Supp. 2d 20 (D.D.C. 2008) to modify the methodology for matching CMS Medicare data and the SSI benefits information provided by the SSA, CMS published its new, "revised" methodology for conducting the data matching as part of the Preamble to the 2011 Final IPPS Rule in August 2010.  See 75 Fed. Reg. 157, at 50275, *et seq.* (Exhibit I-9).  CMS explained in that Preamble some of the various problems with the data matching in the past and how they would be fixed going forward.  In addition, CMS explained in the Preamble that only a few codes transmitted to CMS would be counted as confirming a patient's SSI entitlement:  C01, M01 and M02.  All other codes from the SSA would not translate to CMS finding that a patient is entitled to SSI benefits.

But unlike what we know now regarding the "matching" of SSA codes and California aid codes based on a relatively direct translation (see Exhibits P-47 and P-48), virtually nothing is stated in the 2011 Final Rule Preamble regarding how the CMS matching takes place.  No "crosswalk" methodology was provided.  Providers are not given an opportunity to review the data from the SSA that underlies the CMS calculation.  Moreover, unlike California's aid codes, which are updated based on weekly or monthly updated data from the SSA, CMS has decided that it would only review the SSA data once, about 15 months after the end of a Federal fiscal year.  As discussed below in Section V.E.6 of this Brief, CMS based its decision to review the SSA data only once on the need for administrative finality, but as demonstrated in Section V.E.6,

-14-

all CMS's decision accomplished with respect to Pomona's case was to make final a provider's SSI fraction calculation that appears not to be based on the best available data. Unfortunately, about ten to fifteen years earlier, CMS faced similar questions regarding possible mistakes leading to understatement of providers' SSI fractions. The *Baystate* Court looked at the inconsistencies in CMS's numbers as raised by providers and ruled that CMS was required to modify and improve its methodology for calculating providers' SSI fractions.

At a minimum, this Board should seek to impose a remedy that would require some basic testing of and comparison between Pomona's calculation and CMS's calculation. Pomona has proposed and explained how such a sample could easily be tested. Such a result would be completely consistent with the holding in *Baystate*, wherein the Court addressed the last time providers argued that CMS's calculation of the SSI percentage. The *Baystate* Court emphasized that "administrative finality" was not an important or overriding consideration where DSH calculations are involved. *Baystate*, at Exhibit P-14, p. 126, 545 F. Supp. 2d 20 at 52 [126]. In addition, the Court stated:

> ". . . the denial of relief here would have the perverse effect of rewarding CMS for ignoring the best available data and also allowing CMS to continue that practice indefinitely."

Id. at 54 [127].

In the present case, the evidence suggests that CMS has not used the best available data in calculating Pomona's SSI fractions for the three years under appeal. Tzvi Hefter, a longtime CMS Division Director, and Stan Rosenstein, the former Director of California's Medicaid program both testified that there appears to be something wrong with CMS's data. The MAC introduced no evidence supporting CMS's methodology.

-15-

C.    **POMONA SUBMITTED A VERIFIED SAMPLE OF ITS PATIENTS AND
SERVICE DATES TO CMS FOR TESTING AGAINST SSA RECORDS,
BUT DESPITE SSA AGREEMENT TO REVIEW THE RECORDS IF
PROVIDED BY CMS, CMS REFUSED TO COOPERATE.**

Pomona sought to obtain information directly from the SSA in various ways, all to no
avail. Early on in the appeal, the SSA advised Pomona that no SSA data could be shared directly
between SSA and a Provider. Thereafter, Pomona sought to avoid the entire hearing process by
preparing and submitting a credible and verified sample of "unmatched" patient admissions (that
is, where CMS records state that the patient was receiving no SSI benefits for a given admission,
but where Pomona's records clearly showed a verified aid code of 10, 20 or 60 -- many of which
were specifically verified by the DHCS) to CMS for review and submission to the SSA.

1.    ***The Sample.***

Pomona created a 50 record sample. The sample included a twenty (20) record "random"
sample from 2006, and then the ten longest unmatched admissions from each FFY year 2006,
2007 and 2008. (See p. 193 of Exhibits, Exhibit P-24, letter from Candice Le-Tran to Tzvi
Hefter and Transcript, at p. 98, l. 9 to p. 99, l. 19.) As Ms. Le-Tran testified, the sample was
based on existing data, was "not hand-picked" and reflected a cross section of the claims for the
three years. Transcript at p. 98, l. 9 to p. 99, l. 19.

Pomona then engaged Tzvi Hefter, a former longtime CMS official, to approach CMS
and seek their help in re-matching Pomona's 50 record sample by submitting it to the SSA for
specific matching of just the "unmatched" patients and days included by Pomona against official
SSA records. Such matching would have, once and for all, identified without any doubt, whether
Pomona's "unmatched" SSI days actually were or were not days in months in which the relevant
patients verifiably were receiving SSI benefits from the SSA. Mr. Hefter did not immediately
agree to take on the project, but after review of Pomona's sample and methodology, Mr. Hefter

-16-

agreed to approach CMS with the sample. See Transcript, at p. 101, ll. 7-15, p. 217, l. 20 to p. 219, l. 7.

Pomona indicated from the start that it would abide by the results of an SSA and CMS review of the hospital's 50 record sample: "We were very curious as to what's going on, as we were definitely willing to abide with the result." (Transcript, p. 102, ll. 10-13). In other words, if the review showed an overwhelming result of no matches, Pomona would have dropped the challenge. Likewise, if an overwhelming majority of claims were matched, Pomona was advised that CMS was willing to review this matter outside of the PRRB process. If the results were split half and half, Pomona was presuming that there would be some further review and possibly a negotiation. Pomona continues to be willing to abide by the results of such a sample review, and seeks only what it is entitled to under the statutory SSI fraction and DSH formula.

Prior to submitting the sample to CMS, however, Pomona also engaged Stan Rosenstein, the former Director of the Medi-Cal program, to authenticate Pomona's use of Medi-Cal aid code information and to assess the sampling methodology overall. Mr. Rosenstein noted that 10 of the records had been specifically verified by officials of the Medi-Cal program's Eligibility Division. (See, Transcript, p. 317, ll. 9-14; see also, Letter from Stan Rosenstein to Marc Hartstein (then of CMS), Exhibit P-24, p. 196.). Mr. Rosenstein testified, as noted above, that he found Pomona's records to be accurate and compelling.

### 2.    *Dealings with CMS and SSA.*

Initially, Mr. Hefter met with the CMS Division of Acute Care's then current Director and a staff analyst early in 2016, and submitted Pomona's 50 record sample along with the letter from Stan Rosenstein to Marc Hartstein. Mr. Hefter noted regarding the sample he submitted: ". . . it certainly was a valid basis of going to the SSA and seeing if we can get to the bottom of this." (Transcript at p. 237, ll. 3-5.). Mr. Hefter then asked CMS to consider the sample and

-17-

then to try to engage the SSA to review it and either match or reject as unmatched the fifty records, once and for all.  Mr. Hefter then followed up with CMS over the next several months.  CMS at times indicated interest in the process, and at times questioned it.  Mr. Hefter noted that at first, CMS was "sympathetic to the hospital" and that they would "see what they can do."  Transcript at p. 238, ll. 8-16.  But as the months passed in 2016, CMS pulled back, essentially telling Mr. Hefter that because of "workload" concerns, CMS did not want to pursue the issue.  Transcript at p. 238, l. 16 to p. 239, l. 13.  In the words of Mr. Hefter, CMS refused, basically out of fear of the unknown:

> "At the end, the last person I spoke to there at CMS, the impression I got was that we can't – we really can't pursue this the way I would have liked them to do, and it's basically a workload issue, meaning that they felt that DSH issues are not a rare issue, meaning hospitals all over the country, there are well over 1,000 DSH hospitals, -- over 2,000, and they always have issues with their numbers, and if CMS would start a -- of saying that, well, if you come in to me, we'll go in to SSA and start looking at – pulling data, your specific data, they just felt that would be an issue that they just couldn't deal with from a workload and manpower perspective.  So their answer really was that, look, we can't do that, we're sorry, their proper avenue for appeal is to go through the Board [the PRRB]."

Testimony of Tzvi Hefter, Transcript, at p. 238, l. 16 to p. 239, l. 13.

The takeaways and logical conclusions from CMS's response to Mr. Hefter are inescapable.  First, it is obvious that CMS did not know if its calculations were correct or not, and CMS was afraid of finding out since it did not feel it had sufficient manpower to address needed corrections if other hospitals started to look at their DSH data in the manner that Pomona has done.  Second, CMS was clearly of the opinion, at high administrative levels, that the PRRB is the appropriate tribunal to review this matter and to make a decision.  Third, CMS is brazenly ignoring the governing statute and regulation in this instance, each of which by its plain language

-18-

00060

indicates that a provider's SSI fraction is required to include specific days. If these days exist, they must be included in the SSI fraction.

### 3. CMS's Rebuke of a United States Senator and Further Refusal to Cooperate and Reasonably Resolve this Dispute.

Once it became clear that CMS was not going to exert much energy trying to have the SSA review Pomona's data, Pomona sought assistance from its elected Congressional representatives, two U. S. Senators and its U. S. Representative. Of the three, Senator Dianne Feinstein became most interested and involved. Sen. Feinstein sent an initial letter to the SSA on May 16, 2016 (See Exhibit P-25), expressing her concern about Pomona's SSI fraction calculation and asking the SSA to work with CMS. After hearing nothing for about six months, Sen. Feinstein wrote again on October 26, 2016. (Exhibit P-26, pp. 497-498). Meanwhile, Representative Norma Torres wrote to CMS, asking for assistance and again requesting cooperation between CMS and the SSA on Pomona's behalf. (See Exhibit P-29).

The SSA's initial response to Sen. Feinstein was also dated October 26, 2016 and suggested that Pomona direct its questions to CMS. (Exhibit P-25, p. 496). But, even before SSA's initial response, Sen. Feinstein directed her staff to escalate their efforts to bring about a resolution. As testified to by Ms. Le-Tran, and as demonstrated in emails between Ms. Le-Tran and the Senator's staff person, Amanda Sadra, Sen. Feinstein almost succeeded in getting the SSA to finally review Pomona's sample.

First, through the efforts of Ms. Sadra, Sen. Feinstein's office thought that they had brokered an arrangement whereby the SSA would agree to review Pomona's data *if* the data sample from Pomona was supplied to the SSA directly from CMS. An email was sent to a contact at CMS explaining the need for an indirect transfer of a sample of 30 records

-19-

00061

from Pomona to CMS to the SSA.  See, E-mail strings, Exhibit P-30, pp. 562-571.  As Ms. Le-

Tran testified:

> ". . . so this is around October [2016], and at that time we decided it's best
> to reach out to the CMS office in San Francisco. . .  So we – Feinstein's office
> spoke to Lisa Leon [sic] and somebody else at SSA and they have agreed to
> look at the data.  But they specified that the data has to come from CMS.
> Pomona cannot view the [SSA] data directly.  So we worked with Senator
> Feinstein's office and we gave the 30 account through their office so they
> [CMS] can pass it on to SSA. . .  [Transcript at p. 106, l. 25 to p. 107, l. 15].

> . . . And we waited a month, and I followed up monthly to find out what's
> going on, and not much was happening.  And at the same time, Senator
> Feinstein's staff would tell me that she's working on it, she's in
> communication with them, SSA has agreed to look at it, and so were still very
> hopeful by the end of 2016, . . ."  [Transcript at p. 110, l. 14 to p. 111, l. 1].

Ultimately, however, CMS simply refused to cooperate and transmit Pomona's data

sample to the SSA.  CMS's final, formal response was sent June 23, 2017, and basically referred

Pomona to this Board (again demonstrating CMS's belief that this issue should be decided by the

PRRB.) (See Exhibit P-32).  The fact remains, the SSA was willing to look at Pomona's data, all

it would have taken was for a CMS official to "push a button" and send it.  CMS blocked

Pomona's data from being reviewed, without any compelling legal reason for doing so.  There is

no other conclusion to draw here.

**D.     CMS'S CALCULATION OF POMONA'S SSI FRACTION DOES NOT COMPLY WITH THE GOVERNING STATUTE.**

Based on the great if not compelling preponderance of the evidence submitted in this

case, CMS appears to have significantly understated Pomona's SSI fraction (and thus DSH

adjustment as applied by the MAC) for each of Pomona's fiscal years 2006, 2007 and 2008.

Without a review of at least a sample of Pomona's data by the SSA, it is difficult to state with

precision the exact SSI fraction to which Pomona should have been entitled to in each year.  But

regardless of that final percentage, it seems clear that Pomona's SSI fraction was decidedly understated in CMS's calculation by factors of between 22% and 35%, and each year would have resulted in a "final" DSH SSI percentage that would have been four to six percentage points higher than the published number. (*See* Exhibits P-40, P-41 and P-42.)

In contrast, as stated earlier in this brief, and as will be explained in following Sections V. E. 1 through V. E. 6, the MAC introduced no contrary evidence, brought no witnesses to offer contrary evidence at the hearing, and bases its argument in this case on CMS's right to calculate providers' SSI fractions essentially in any way CMS sees fit, even if CMS's methods have been fraught with errors in the past, are not fully transparent, cannot be tested and do not appear to be based on the best available data overall. Instead, CMS seeks to hide behind a methodology that is unnecessarily and unjustifiably limited with respect to when the matching of CMS's data on providers' services with SSA data, and one that has been proven to have had serious errors in the past. Moreover, when offered one clear opportunity to test this Provider's data against the SSA's database, CMS blocked Pomona's ability to have its records tested against SSA data, and in the process, CMS simply ignored the repeated requests of a United States Senator to work with the SSA to determine once and for all whether Pomona's calculations were, indeed, accurate.

CMS does not operate in a vacuum. The agency and its methodologies and interpretations must comply with the laws enacted by Congress. As noted earlier in Section IV of this Brief, and as shown in Exhibit P-3, the Medicare Act unambiguously states that the SSI fraction, the "first" computation of the DSH adjustment, measures the number of a provider's days where its patients both receive (is "entitled to") Part A benefits and receives (is "entitled to") SSI benefits, divided by the number of a provider's days on which its patients were entitled to Part A benefits. Congress did not state in its explanation of how the SSI fraction is calculated

00063

that the fraction is as limited by CMS, or as reasonably measured by CMS, nor did Congress indicate anywhere that the Provider was not entitled to receive the benefit of a fully and accurately calculated SSI fraction.

In the present case, Pomona has demonstrated, through presentation of highly qualified witnesses, mounds of documentary evidence and verified data from State of California Medi-Cal program and Department of Social Services records, glaring gaps in CMS's calculation of Pomona's SSI fraction for three years, 2006, 2007, and 2008. Pomona asks only that its SSI fraction be calculated according to the statutory requirement in 42 U.S.C. 1395ww(d)(5)(F)(vi), and the plain language of CMS's own regulation at 42 C.F.R. 412.106(b). CMS's own calculation for each of the three years has been more than rebutted. Yet CMS's only action in this case has been to affirmatively block Pomona's and others' requests to test the data against SSA records. CMS's calculation is not in compliance with the statutory or regulatory dictate, and must therefore be corrected.

E.   **ARGUMENTS RAISED AND THEORIES PROPOSED TO SUGGEST THAT POMONA'S CALCULATIONS OR METHODOLOGY ARE FLAWED ARE NOT SUPPORTED BY THE BEST AVAILABLE DATA OR LAW.**

The MAC, as well as others, have suggested various potential reasons why Pomona's methodology and/or calculations may be flawed. In each case, however, the data as well as the law compel a finding that Pomona's calculations and methodology are credible, and call into serious question the accuracy of CMS's calculation of this hospital's SSI fraction for 2006, 2007 and 2008. In summary, Pomona has demonstrated that the data it relies upon comes from the SSA, and that such data is presented in both a more accountable and updated form. In addition, Pomona has demonstrated that it has fully and correctly accounted for (if not overstated) the likely number of "SSP-only" patients, and reduced its calculated SSI fraction accordingly for

-22-

each year.  Pomona, through the Declarations of Stan Rosenstein (See Appendix A) and Candice

Le-Tran (See Appendix B), and through exhibits and this brief, also demonstrates that neither a

large number of transfers from nursing facilities, nor potential timing differences in when

patients commenced receiving SSI benefits could have been a likely reason for a significant

portion of the discrepancy between CMS's calculation of Pomona's SSI fraction in the three

years and Pomona's updated calculation of the SSI fractions for those years.  Moreover, Pomona

demonstrates herein that the MAC cannot rely on CMS's purported need for "administrative

finality" to explain the discrepancy between CMS's calculation of the SSI fraction and Pomona's

calculation of that fraction, or to avoid participating in a review of CMS's own calculation and

the SSA's data.

          1.        ***The Data Relied Upon by Pomona Also Emanated from the SSA.***

One of the MAC's principal arguments in this case has been that unlike CMS's

calculation – which is based on a complex and not completely transparent matching between

CMS Medicare program data and SSA SSI payments data -- Pomona did not obtain its data from

the SSA.  In fact, Pomona's calculations are directly based on three California State Medicaid

program "aid codes" that are assigned by the California Department of Health Care Services

(DHCS) following receipt of data directly from the SSA.  In many ways, Pomona's calculations

are based on more and more direct data points from the SSA than are CMS's calculations.

      Pomona's Director of Reimbursement and Analytics testified at the hearing, outlined her

entire data collection and analysis methodology in a flow chart (Exhibit P-20), and has submitted

a Declaration that discusses refinements in the results following Board Member questions.  In

addition, Pomona's Medi-Cal and Medi-Cal Eligibility Expert, Stan Rosenstein, the former

Director of the Medi-Cal program, testified and has submitted a Declaration following Board

Member questions to show how completely the State Medi-Cal "aid code" information is based

-23-

on real time and highly credible data obtained directly from the SSA.  Each of these sources

demonstrate how closely Pomona's calculations are tied to SSA data.

     As stated earlier, in Section III of this Brief, Pomona utilized a multi-source database as

the foundation for its SSI fraction calculations.  As shown in Exhibit P-20, for purposes of its

calculations, Pomona includes only those patient days in the numerator of its SSI fraction where

the hospital can confirm that a patient has been assigned aid codes 10, 20 or 60 for the month in

which those days of the admission occurred.  Each of these aid codes were assigned by the State

DHCS based on data obtained directly from the SSA.  At the hearing, Stan Rosenstein explained:

> Q.     Can you summarize then how data travels from the Social Security
> Administration to a Provider, such as Pomona, and what information would be
> available through these Medi-Cal systems?
>
> A.     Right.  So somebody who is determined eligible [for SSI, SSP]
> from the Social Security Administration is posted, of course through the
> Social Security Administration's files.  The Social Security Administration,
> through the state data exchange, sends the data to the Department of
> Healthcare Services.  The Department of Healthcare Services takes that data,
> posts it to the MEDS system.  It then sits and resides on the MEDS system.
> When a Provider sees a patient and they want to know are they eligible, the
> Provider accesses through the AEVS system, is my patient eligible.  The
> AEVS system goes to MEDS, grabs the record, doesn't do any interpretation
> or changing, and basically ships that information back to the Provider.  It
> includes basic demographic information, what the person is eligible, what
> scope of benefits, and again, the aid code.  So that is an aid code coming
> directly off of MEDS, unchanged, and the state is taking the aid code from
> Social – you know, from Social Security information – Social Security
> Administration doesn't have the aid code, has data elements that the state is
> able to use that social security data element to assign the aid code.

Transcript at p. 312, l. 23 to p. 314, l. 12.

> Q.     Which agency assigns the aid codes to individual patients? . . .
>
> A.     The Department of Healthcare Services assigns them.
>
> Q.     How accurate in general are the aid codes in the MEDS system
> with respect to identifying a beneficiary's source of [Medi-Cal] eligibility?

<div align="center">-24-</div>

    A.     They're 100 percent accurate.  They've been well tested.  We cannot bring somebody in eligibility without having the aid code be correct. . . And, the three aid codes for SSI, SSP [10, 20 and 60], as I said, have been in existence and used in the MEDS system since the 1980s.

Transcript at p. 309, l. 12 to p. 310, l. 8.

Tzvi Hefter, the former longtime Director of the Division of Acute Care within CMS, confirmed that the State was receiving SSI/SSP entitlement data directly from the SSA and testified that ". . . the State had a very invested interest in making sure that the information it was getting from SSA was consistent with its information, because it was paying money to the Social Security Administration to supplement those SSI payments.  So the data that the state was getting, it was getting from SSA. ..." (Transcript, at p. 216, l. 24 to p. 217, l. 9.)  Mr. Hefter added: "and it seems to be a reliable basis for determining whether or not those patients truly were getting SSI or not." (Transcript at p. 217, ll. 9-12.)

Mr. Rosenstein added that the Federal Government, in addition to the State, provided oversight over the aid codes used by the Medi-Cal program to assure accuracy.  (Transcript, p. 310, l. 10 to p. 311, l. 6.)  Mr. Rosenstein also confirmed that a provider such as Pomona can access the State DHCS database to confirm, in real time, a patient's Medi-Cal status, and accompanying aid code, by accessing the AEVS system, on its own, or through a service (such as HDX).  (Transcript, p. 311, l. 7 to p. 312, l. 22.)

In response to questions from at least three of the Board Members for more detailed information, Stan Rosenstein prepared verbal and flow chart explanations detailing how data regarding SSI and SSP entitlement is transmitted from the SSA to the State DHCS and how such data then is used and translated into aid codes by the DHCS.  These verbal and pictorial representations (See Exhibits P-47 and P-48, and Declaration of Stan Rosenstein, paragraph 3)

-25-

also, show how providers such as Pomona can access the SSA based information directly through State databases.

The representations, prepared by a highly qualified expert in Medi-Cal eligibility, who also demonstrated to the Board great proficiency in understanding how SSA data is used in the process of establishing Medi-Cal eligibility, show in detail how the SSA first establishes SSI eligibility and payment level for SSI beneficiaries and then sends (on a weekly basis) such eligibility/entitlement information directly to California's State Data Exchange (SDX) from where the file goes to the DHCS. Thereafter, DHCS processes the information based on the SSI/SSP effective date provided by the SSA. (See Exhibits P-47 and P-48.)

Importantly, DHCS then takes two separate SSA data fields (a "multi-category indicator" and a "recipient type") and translates the SSA provided value for each indicator into a State aid code. As noted in the two exhibits, P-47 and P-48, aid codes 10, 20 and 60 can be assigned by the State DHCS **only in cases where both of the SSA provided values identify a potential Medi-Cal beneficiary as aged, blind or disabled and as being entitled to SSI and/or SSP benefits.** Aid codes are not haphazardly assigned.

The flow chart and verbal representations then further explain how providers access the eligibility and aid code information through the AEVS, which accesses the MEDS system for that information.

In light of Candice Le-Tran's explanation at the hearing (and in her Declaration, as discussed above in Section III of this Brief) of Pomona's methodology for deriving its SSI fraction calculation each year, and the 100% verification of the accuracy of the aid codes attached to patients in Pomona's 2006 sample by the State DHCS, it is clear that Pomona's SSI fraction calculation is based on information emanating directly from the SSA. Moreover, unlike

-26-

00068

the somewhat opaque data matching conducted by CMS to match its database with information from the SSA, Mr. Rosenstein has now illustrated precisely how the State Medi-Cal program uses a two factor confirmation process based entirely on SSA data before assigning aid codes 10, 20 or 60 to individual patients in individual months for purposes of demonstrating the basis of such individuals' Medi-Cal eligibility.

### 2. *Pomona's Calculation Fully Accounts for, If Not Overstates, the SSP-Only Patient Factor that Reduces the SSI Percentage.*

Contrary to the MAC's contentions before and at the hearing, and in response to Board Members' questions, Pomona's SSI fraction calculations for fiscal years 2006, 2007 and 2008 unquestionably take into account, if not overstate, the effect of "SSP-only" patients. Patients can qualify for SSP payments, but not SSI benefits, when their incomes are above the maximum income level for receiving SSI payments, but are still below the maximum income level for receiving additional supplemental payments funded by the State. (See Rosenstein testimony at Transcript, p. 296, ll. 12-22, and p. 297, ll. 1-16; *see also* Rosenstein Expert Report Exhibit P-34, at p. 5 [588].) Since for Medicare purposes, the SSI fraction counts in the numerator only those Part A patients who are also actually receiving SSI payments (in the month of services), Pomona fully agrees that when patients receive SSP benefits, but not SSI payments, these patients' "SSP-only" days cannot be included in the numerator of the SSI fraction.

Pomona's most recent and final calculations, Exhibits P-40 (2006), P-41 (2007) and P-42 (2008) now fully take into account (if not overstate) the number of SSP-only patients and days to be omitted from the numerator of Pomona's calculated SSI fraction. At the hearing, Pomona presented indisputable evidence that it had identified a high percentage (about 35% in 2006, 37% in 2007, and about 39% in 2008) of "unmatched" patients who had been assigned SSI/SSP benefits indicating aid codes "10, 20 and 60" but who were not matched (or included) on CMS's

00069

list of SSI plus Part A patients for purposes of the numerator of the SSI percentage.  See Exhibit P-27, pp. 501, 518 and 535, now updated as Exhibits P-40, P-41 and P-42; *see also* Stan Rosenstein Expert Report, Exhibit P-34, at pp. 6, 7.

The "unmatched" patients with aid codes 10, 20 and 60, however, include both patients who are receiving both SSI and SSP benefits in the month of services, as well as patients who are receiving only SSP benefits in a particular month.  Only the SSA has records (which as the Provider describes in Section V.C. of this Brief, it has tried to access in every way conceivable, but to no avail) that conclusively show when an individual is receiving SSI+SSP benefits as opposed to only SSP benefits by month.  (See Rosenstein Expert Report at pp. 2, 3).  Pomona, therefore, had to devise a credible methodology to calculate by what percentage to reduce its raw SSI fraction number (including all matched and unmatched patients with aid codes 10, 20 and 60 in the numerator of the SSI fraction calculation) to account for the number of Medicare patients with only SSP benefits, but no SSI benefits.

In the absence of SSA records or summaries thereof, the most accurate option is to look at the Statewide numbers of SSP only recipients compared to the number of SSI+SSP recipients during the relevant years October 2005 through September 2008.  These statistics were obtained from the California Department of Social Services by Stan Rosenstein.  See Exhibit P-37, email from Aron Smith to Stan Rosenstein, and statistics, at pp. 612 to 615 of Exhibits; *see also* Transcript, p. 298, ll. 8-13:  "And in this case, Mr. Smith provided me with data for the period in question of the SSI caseload and the SSP-specific caseload, and that's attached to the email…" Mr. Rosenstein explained in his Expert Report, Exhibit P-34, that it appeared based on the statistics supplied by Aron Smith that the "Total SSI Caseload" (left column of the table on pages 614-615 of Exhibits) from 2005 through 2009 was 58,936,800 patient months, whereas the

-28-

"Caseload – SSP Only (No SSI)" (right column of the table at 614-615) was 9,699,795 patient months. From these totals, Mr. Rosenstein reasoned that the total caseload (adding total SSI caseload to total SSP only caseload) was 68,636,595. Mr. Rosenstein then determined that the percentage of SSP only patients to total SSI and SSP only patients was about 14%. Exhibit P-34, p. 6 [589]. Mr. Rosenstein added that: "In reviewing this data on a monthly basis, it consistently averages about 14 percent enrolled only in SSP. Consistently, 86 percent of the people with an SSI/SSP designation had SSI." Exhibit P-34, page 6 [589].

Mr. Rosenstein then testified regarding this percentage at the hearing:

> A.    ... I looked at it and made a determination as to what percentage of the total universe of caseload, and by – just to be clear on that, it's the total of people who are SSI and SSP only, because that's what the Department would have. So you have these two columns together. I analyzed to determine what percentage of the total population was SSP only, and while it varied very, very slightly month to month, it was on the average about 14 percent.

Transcript at p. 300, ll. 9-22.

Ms. Le-Tran testified that she agreed that a 14% reduction to her raw calculation of Pomona's SSI percentage for each year under appeal was appropriate and needed, and Pomona agreed to submit corrected schedules following the hearing:

> "So the proper treatment, which I agree, is to remove all of the state-only SSI or state-only SSP days. . ."

Transcript at p. 93, ll. 6-9.

It should be noted by the Board that Pomona has exhausted every conceivable other basis for determining the precise number of SSP only patients it treated. Pomona does not maintain these records, since it does not ask patients whether they are on SSI or SSP or any other social benefits program. Pomona concerns itself with a patient's eligibility for Medi-Cal at the time of admission. The State of California does not apply different aid codes to SSI+SSP beneficiaries as compared to SSP only beneficiaries since, again, the State DHCS is using the aid codes to

-29-

00071

qualify patients for Medi-Cal, and having either SSI or SSP will so qualify them. Pomona and its representatives have conducted numerous data searches, without finding any more detailed information than was made available through the Department of Social Services and has been submitted to the Board in Exhibits to this hearing. The one source, above all, that has a person by person breakdown of SSI compared to SSP only beneficiaries, by month, is the SSA, since as was noted at the hearing, SSA actually pays out its own SSI benefits, as well as California's State SSP benefits through a "1634 Agreement". See Testimony of Stan Rosenstein, Transcript, p. 303, l. 13 to p. 305, l. 1. But, as has been chronicled before, during and after the hearing, the SSA, whether due to its own or CMS's restrictions, has been unwilling to share its SSI/SSP eligibility data directly with the Provider. The Statewide average SSP only data remains the most credible, and best available data.

The Statewide average SSP-only statistics represent the most credible count of SSP-only percentage for another reason too. If anything, the average *overstates* Pomona's SSP only numbers and results in a larger than actual reduction to the provider's SSI fraction. As Mr. Rosenstein testified:

> Q.    Would you expect the percentage of SSP only beneficiaries to vary greatly compared to statewide averages in any particular large . . .or county of the state?
>
> A.    No, . . . If anywhere, there would be a higher SSP-only population in northern California, and southern California would have a lower percentage, but I would consider it pretty consistent.

Transcript, p. 302, ll. 7-18.

Tzvi Hefter further testified: "It's so unlikely that for some reason Pomona happens to be located in an area where they – where there's three times the statewide average of those kinds of patients." Transcript at p. 254, ll. 2-7.

-30-

00072

At the hearing, multiple Board Members requested additional detail regarding Mr. Rosenstein's conclusion that about 14% of the combined SSI/SSP caseload were comprised of SSP-only recipients. As stated in Mr. Rosenstein's post hearing Declaration, he obtained "source documents" from the Department of Social Services to trace how the caseload was being tabulated for purposes of the table introduced in Exhibit P-37. See sample of source documentation introduced as post hearing Exhibit P-50. Further, Mr. Rosenstein conferred with contacts within the DHCS. See Declaration of Stan Rosenstein, Appendix A, paragraph 5. Mr. Rosenstein then made an important discovery:

> "Based on my review of the source documentation, I can now conclude that the original document submitted as Exhibit P-37 was potentially ambiguous in one respect, and therefore led to an incorrect estimate. The left column in P-37 labeled "Total SSI Caseload" actually included all SSI/SSP recipients, the aggregate total of all such recipients of SSI and/or SSP Benefits, and thus it included those who were SSP only during a particular month. Accordingly, the 14% estimate submitted at the hearing is not technically accurate. I have prepared a "modified" version of the State document (P-37) as new Exhibit P-51. The modified version now "corrects" the heading on the left column and recalculates the Statewide average for each month. The aggregate percentage of SSI only patients for the same studied 2005-2009 period was 16.46% (not 14%)."

Declaration of Stan Rosenstein, Appendix A, paragraph 5.

Following review of this new information, Candice Le-Tran then isolated the specific SSP-only average percentage for each fiscal year at issue, and prepared new Exhibit P-46, which breaks down the average SSP-only percentage, month by month, and year by year. See Exhibit P-46 and Declaration of Candice Le-Tran, Appendix B, paragraph 6. Ms. Le-Tran then prepared new SSI fraction calculations for each year, with revised reimbursement impacts, using the previous totals of matched and unmatched days with aid codes of 10, 20 and 60, and then reducing the total by 16.34% (for 2006), 16.69% (for 2007) and by 16.61% (for 2008), to

00073

account for the reduction to the raw SSI fraction calculation by the Statewide average of SSP

only recipients for each specific federal fiscal year period. Ms. Le-Tran stated:

> As noted in the Declaration of Stan Rosenstein, the California Department
> of Social Services mis-labeled one of its sub-headings on the report that was
> submitted prior to the hearing as Exhibit P-37. As such, the report was
> misinterpreted. A corrected version of the report has been submitted by Mr.
> Rosenstein (as Exhibit P-51), which increases the percentage of SSP only
> beneficiaries in California to just over 16%. Accordingly, Pomona is now
> reducing its claimed SSI percentage to reflect a slightly higher number of SSP
> only beneficiary patients. The revised calculations are included in Exhibits P-
> 40 (2006), P-41 (2007) and P-42 (2008). In addition, Pomona is submitting
> new Exhibit P-46 which demonstrates more specifically and isolates by each
> individual year, the basis (Statewide average of SSP-only recipients) for
> adopting 16.34% (for 2006), 16.69% (for 2007) and 16.61% (for 2008) as the
> "reduction" in SSI percentage to reflect the percentage of the Provider's
> patients who were "SSP only."

Declaration of Candice Le-Tran, Appendix B, paragraph 6.

Based on the detailed study of the Statewide average, by month, of SSP only recipients in

California, and the corrected schedules submitted as P-40, P-41 and P-42, it cannot be

successfully contended that Pomona has failed to include a credible reduction of its SSI fraction

to take into account the number of SSP only recipients among its patients.

> **3.  *The Number of SSP-Only Recipient Patients at Pomona Cannot Explain
>        a Majority of the Discrepancy Between the CMS and Pomona
>        Calculations of Pomona's SSI Fraction for 2006, 2007 and 2008.***

Despite the small increase post hearing in the percentage of SSI only patients (and days)

that are being offset from Pomona's raw calculation of its SSI percentage, the roughly 16.5%

reductions to Pomona's calculated SSI fractions (as shown in Exhibits P-46, P-40, P-41 and P-

42) cannot even begin to explain the still remaining vast discrepancy between CMS's calculation

of Pomona's SSI fraction and Pomona's calculation using State aid codes based on SSA data.

As stated in Stan Rosenstein's Expert Report (Exhibit P-34), at p. 6 [589] and

summarized at the hearing, based on a review of the total of "matched" and "unmatched"

00074

patients for each of the years with aid codes 10, 20 or 60, shown in Exhibit P-27, pp. 501 (for

2006), 518 (for 2007) and 535 (for 2008), the ratio of "unmatched" (defined as patients with 10,

20 or 60 aid codes but not shown on CMS's list of patients receiving SSI benefits) patients in

each fiscal period was 35% in 2006, 37% in 2007, and 39% in 2008.

     In contrast, the percentage of Pomona's patients with aid codes of 10, 20 or 60 who also

had only SSP benefits, but no SSI benefits, as shown in Sections III. and V.E.2, above, would be

expected to be about 16.5% in any given month over the three year period from October 2005

through September 2008. As such, it is not only a profound stretch, but almost inconceivable

that these 35% to 39% discrepancies between CMS's and Pomona's calculations can be

explained by the approximately 16.5% of patients who have SSP but not SSI benefits. Mr.

Rosenstein concluded in his Expert Report (Exhibit P-34):

> "... the analysis shows that the percentage of people shown on Medi-Cal
> as having SSI/SSP status who do not have SSI benefits pursuant to the CMS
> database (and who therefore were "SSP" only) is much larger (by between
> 200% and 300%) than the data the State has on how many people during this
> time period had SSP only. Based on the data available to me, there appears to
> be a problem with the CMS data."

Mr. Rosenstein also testified at hearing:

> Q.    If the CMS data concerning SSI days and percentages were
> accurate, what would these results mean in terms of Pomona's percentage of
> SSP-only patients?

> A.    Well, this would – for the first year it would mean they would have
> to have 35 percent of the people who were SSP only, 37 percent and 39
> percent the subsequent years who were SSP only, compared to a statewide
> average of 14 [now 16.5] percent.

> Q.    Is there anything that you are aware of in the circumstances of
> Pomona Valley Hospital Medical Center that would suggest that it would be
> likely that 35 to 39 percent of its patients were SSP only?

> A.    I cannot think of thing. . . .

00075

Q.      So if the CMS information were accurate, would Pomona's SSP only population have to be approximately 250 percent of the statewide average?

A.      Yes.  I mean I can't account for how that would ever occur.

Q.      Given the information and records you reviewed, what do you conclude regarding the accuracy of CMS's data with Respect to Pomona's SSI percentage for cost years '06, '07 and '08?

A.      There has to be something wrong with the data.  It just does not – it's not in sync with the experience of -- that the State of California has with the overall SSI, SSP program.  It's just so much more off than the average. And the SSI, SSP Population is a very consistent population.

Transcript, p. 324, l. 16 to p. 327, l. 4.

Tzvi Hefter, Director of the Division of Acute Care at CMS for 23 years, stated at the hearing:

A.      That's why I said before, the number that I heard from the state was the statewide the SSP, state-only payment is about 14 percent of the total number of folks that are getting SSI.  So it's possible, I can't say -- I will not say it's impossible that the variance is totally due to that, but it's so unlikely that we're talking about that many tend to fall into Pomona's hospital, it just doesn't make sense.  It really – that means like we were saying before, again, these are patients whose income falls just between the federal max for getting SSI.  I think maybe $1,000 or $2,000 difference between the two.

Transcript, at p. 253, l. 4 to p. 254, l. 2.

SSP only patients are not a plausible explanation for the vast remaining difference between Pomona's calculated SSI fraction (even after revision to include a 16.5% SSP only component) and CMS's calculation of Pomona's SSI fraction.

    4.    *Transfers of Nursing Patients from Nursing Facilities in California to Pomona Valley Hospital Medical Center Cannot Explain the Difference Between Pomona's Calculation of the SSI Fraction and CMS's Calculation of that Fraction.*

At the hearing, one or more Board Members questioned whether nursing home (residential long term care facilities) residents could account for some or all of the difference

-34-

00076

between Pomona's calculated SSI fraction and CMS's calculated SSI fraction for Pomona. Following the hearing, Pomona and its consultants carefully analyzed this issue and conclude that nursing home residents cannot explain the discrepancy between the calculations.

The issue was raised because when individuals go into nursing homes, the benefits received in the form of payments to the nursing home from the State or other third party payor are counted as "income" for purposes of SSI (and SSP) benefits. Accordingly, if a longtime resident of a nursing facility is admitted to a hospital as a patient, that patient – who may have previously qualified for SSI benefits – may no longer qualify for SSI payments at the time of hospitalization. The issue was raised, in addition, because Mr. Rosenstein confirmed at the hearing, and as has since been re-confirmed after the hearing as well, that patients who lose their SSI payments completely due to receipt of nursing home benefits, may still be "coded" by DHCS for some period as 10, 20 or 60 for Medi-Cal eligibility. (See Transcript at p. 340, ll. 13-22, and Declaration of Stan Rosenstein).

However, upon close inspection and analysis, it is clear that the number of hospital patients who both (1) are admitted to hospitals in California from nursing homes, **and** (2) have had their SSI payments reduced to zero in the month of hospitalization, is quite small, and would have had minimal, if any, impact on the Provider's SSI percentage during any of the three years on appeal.

First, Candice Le-Tran conferred with Amy Rosenkranz of the Program Integrity Unit of the State DHCS. Ms. Rosenkranz confirmed that an SSI/SSP recipient who goes into long term care (including a nursing facility) would remain in aid codes 10, 20 and 60 for the first three months of the long term care placement. (See Email string between Candice Le-Tran and Amy Rosenkranz, Exhibit P-53; see also, Declaration of Candice Le-Tran, Appendix B, paragraph 8.)

-35-

00077

In addition, Stan Rosenstein conferred with Sharyl Shanen-Raya, an eligibility expert within the Department of Health Care Services.  Ms. Shanen-Raya confirmed that patients with SSI benefits actually **retain their full SSI payment benefits for the first three months of residence in a nursing facility** (which corresponds with Ms. Rosenkranz's statement that these patients retain their 10, 20 or 60 aid code for those first three months).  (See Email string between Sharyl Shanen-Raya and Stan Rosenstein, Exhibit P-49, page 3 [690]; *see also* Declaration of Stan Rosenstein, Appendix A, paragraph 6.  It follows that any hospital patient that is an SSI recipient, who is admitted to a hospital during the first three months of his or her nursing facility residence, would still be receiving their SSI payments as of that time.

Second, Stan Rosenstein confirmed that based on his many years of experience working for and ultimately running the Medi-Cal program, roughly fifty percent (50%) of the people in nursing facilities remain there for less than three months.  (See Declaration of Stan Rosenstein, Appendix A, paragraph 6; *see also* Sharyl Shanen-Raya email at Exhibit P-49, page 2 [689]); *see also,* article obtained by Mr. Rosenstein and submitted with his Declaration:  "Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life" as published in the Journal of American Geriatric Society, September 2010 (9): 1701-1706 (online version submitted as Exhibit P-52)).  It follows, therefore, that any *potential* impact on the number of SSI patients from patients possibly losing their SSI benefits prior to or during a hospitalization should be reduced by about fifty percent (50%), since it is likely that at any given hospital, about 50% of the patients admitted from nursing homes with SSI benefits will still be receiving those SSI benefits.

Third, Mr. Rosenstein reports, consistent with his testimony at the hearing, that the total number of Medi-Cal beneficiary nursing home resident patients in California during the relevant

00078

period from 2005 through 2010 or so ranged from about 60,000 to 65,000 individuals. This was confirmed by Ms. Shanen-Raya (see Email string with Stan Rosenstein, Exhibit P-49, page 2 [689]). During the same relevant period, there were approximately 360 general acute care hospitals operating in California. (See Declaration of Stan Rosenstein, paragraph 7, Appendix A, and Exhibit P-54.) Dividing roughly 63,000 patients by about 360 hospitals suggests that at most, on average, a California hospital would potentially service only about 175 Medi-Cal patients from nursing homes each year. But not every nursing home resident will require hospitalization each year; in fact, many do not. Being conservative, and assuming that about half of the Medi-Cal nursing facility population requires hospitalization in a given year would reduce the potential nursing home patient caseload by about half, to roughly 88 patients. See Declaration of Stan Rosenstein, paragraph 7, Appendix A; and references cited therein to support conclusion that only about half of nursing home patients will require hospitalization.

As noted earlier, however, those potential 88 or so patients would be reduced by half, to about 44 patients on average, to take into account the fact that only half of the nursing patients who had SSI benefits would have remained in that nursing home for at least three months, and who, therefore, could or would have lost those benefits. (See Declaration of Stan Rosenstein, paragraph 8.a, Appendix A).

Moreover, even for those nursing home residents with SSI benefits who may have stayed longer than an initial three month period, not all such patients would have had their SSI benefits reduced all the way to zero. Some unknown number of these patients would likely still be receiving some level of SSI payments. This would further reduce the number of nursing home patients who may have lost their SSI benefits in Pomona's hospital.

-37-

But, even beyond the remaining number, now already well <u>below</u> an average of 44, the number of Medi-Cal nursing facility patients who lose their SSI benefits prior to or during hospitalization must be further and significantly reduced by the number of Medi-Cal nursing facility patients who obtain their eligibility from non-SSI related Medi-Cal programs. According to Mr. Rosenstein and data from the State DHCS budget for State fiscal year 2005-2006, there were 63,100 average monthly Medi-Cal eligibles in nursing facilities with Medi-Cal coverage granted by counties, 62,300 in fiscal year 2007 (see Exhibit P-56 and Declaration of Stan Rosenstein, paragraph 8.c, Appendix A), and 62,400 of such non-SSI related eligibles in nursing facilities in fiscal year 2008 (see Exhibit P-57, and Declaration of Stan Rosenstein, paragraph 8.c., Appendix A).

These data demonstrate that SSI benefits would not have been the basis by which at least most of the nursing home population qualified for their Medi-Cal benefits, and a majority of such nursing home patients on Medi-Cal were not receiving SSI aid codes that the time. (Declaration of Stan Rosenstein, paragraph 8.c.)

These facts compel the conclusion that the number of nursing facility patients hospitalized at a hospital such as Pomona, who were assigned aid codes 10, 20 or 60, but who were no longer actually receiving SSI payments, would be only a small fraction of the potential 88 or so Medi-Cal nursing home patients who might need hospitalization within Pomona's service area in any given year. Such a small number of people (probably fewer than 10) would have minimal if any impact on Pomona's SSI percentage in that given year.

   5.   ***A Potential Difference in Timing of Patients' Receipt of New Medi-Cal Coverage Versus SSI Payments Had No Material Impact on Pomona's SSI Percentage During Its Fiscal Years 2006 Through 2008.***

Board Members questioned at the hearing whether the difference in timing of patients' qualification for Medi-Cal benefits as compared to when such patient may have started to receive

-38-

00080

actual SSI *payments* may have played a role in skewing the number of "unmatched" patients and/or days as between Pomona's and CMS's respective SSI fraction calculations. A review of Pomona's process and results indicates that it is extremely unlikely that such a difference in timing inflated the hospital's SSI fraction on any more than a *de minimus* basis.

The issue was raised since for "first time" Medi-Cal and SSI beneficiaries, whereas an individual can become qualified for Medi-Cal payments in the month of application (for example by showing that he or she is "eligible" for SSI or SSP benefits), the SSA does not actually start paying SSI (or SSP) benefits until the month *after* approval. So, theoretically, it is possible for a patient to apply or be applied for both Medi-Cal and SSI benefits for the first time in the same month, but for the patient to receive Medi-Cal benefits that month, be approved for SSI benefits that month (and thus be coded by DHCS based on SSA data as a 10, 20 or 60), but not actually start receiving SSI payments until the following month. Pursuant to CMS's 2011 Final IPPS Rule language, CMS has indicated that it would start counting the patient as SSI entitled only after payment of the benefits in the second month, not during the month of application. (See 75 Fed. Reg. 157, August 16, 2010, at p. 50280.) [Exhibit I-9]. However, despite the difference in start of benefit timing between the two programs, this is really a "red herring" in that there simply are very few of these patients, if any, in each given fiscal year. The situation could only arise if the patient coming into Pomona **in that same month for the first time applied for both Medi-Cal and SSI benefits, and was somehow granted Medi-Cal eligibility on the basis of a very quick decision by the SSA to make the individual eligible for SSI benefits, for the first time, that same month.** The odds against such a fact pattern happening in ten or twenty percent of Pomona's Medi-Cal cases are staggering.

In response to Board questions on this point, Candice Le-Tran states in her Declaration:

-39-

> "Pomona Valley Hospital and Medical Center does not (and did not in 2006, 2007 and 2008) assist our patients in applying for SSI benefits, nor does the hospital have a process or procedure in place to help patients use newly applied for SSI benefits to qualify for Medi-Cal benefits."

Declaration of Candice Le-Tran, Appendix B, paragraph 7.

Moreover, Stan Rosenstein, the former Director of the Medi-Cal Program, and expert in Medi-Cal Eligibility, states in response to the same series of Board questions:

> "It is my opinion based on my many years of experience working in the Medi-Cal eligibility area that any effect of such a difference would be minimal. From my vantage point as a former Director of Medi-Cal, we know that most of the enrollment on SSI is fairly stable in California, and that if a hospital is not using SSI as a means for obtaining Medi-Cal enrollment for coverage of an hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the first time at the same time as seeking SSI payment benefits for the first time. . . My understanding in this case (to be confirmed by Ms. Le-Tran) is that Pomona does not assist individual patients in seeking SSI (or SSP) payments, but rather uses other methods to help such patients qualify for Medi-Cal benefits if needed."

Declaration of Stan Rosenstein, Appendix A, paragraph 4.

Where a hospital, such as Pomona, is not assisting patients to file for SSI benefits, and that hospital is using other bases to qualify for Medi-Cal benefits on a first time basis, it is a real longshot to assume that the patient, simultaneously with being hospitalized and being granted Medi-Cal benefits for the first time, also is filing for SSI benefits for the first time, getting approved quickly enough to be coded a 10, 20 or 60 in that same month, but nonetheless receiving Medi-Cal benefits on some other basis. That is simply not a plausible explanation for more than a tiny portion (if any) of the remaining twenty to thirty-five percent difference between the Provider's and CMS's respective SSI fraction calculations. The scenario is made even less plausible in light of the fact that the SSI population in California is fairly stable – in other words, not that many people each year are moving onto or off of the SSI program benefits in the aged, blind and disabled categories.

-40-

00082

6.    ***The Provider Consistently Has Utilized the CMS MedPAR Total of Entitled (Covered) Days as the Denominator of Its Request for Recalculation of the SSI Fraction for 2006, 2007 and 2008.***

In response to multiple Board Members' questions regarding the extent to which Pomona has used consistent data ranges throughout the appeal process for these three years, and further whether or not Pomona has placed the correctness of the denominator of each year's SSI fraction at issue in the appeals, the Provider reviewed its records and has determined that, in fact, Pomona has consistently utilized values from the CMS MedPAR file in this appeal, which correspond to "paid" or "covered" Medicare days as opposed to patients' total days (which include some days on which the patients were not entitled to Medicare payments for those days). Pomona's calculations are consistent with the required construct of the SSI fraction as described in statute and regulations.  (See earlier discussion in Section IV., above.)

As noted by Pomona's Director of Reimbursement, "the CMS MedPAR file includes listings of both Medicare Covered Day[s] and Medicare Total Days.  In preparing the SSI analysis I have used to support Pomona's SSI percentage for each year, 2006, 2007 and 2008, PVHMC used the MedPAR file to identify the Medicare population and used the CMS covered days calculation as reflected in Pomona's SSI percentage denominator."  (Declaration of Candice Le-Tran, Appendix B, paragraph 3.)  Ms. Le-Tran stated, in addition:

> "Exhibits submitted herewith to update the hospital's calculations, P-40 (for 2006), P-41 (for 2007) and P-42 (for 2008) were prepared by me and I used the CMS MedPAR value in each so that "paid" or "covered" days would appear in the denominator, which is consistent with my understanding of how the SSI percentage is required to be calculated by statute and regulation.  My Department at Pomona also analyzed for additional SSI days using the same Medicare population in the MedPAR SSI file, and therefore our calculation of Medicare covered (or "paid") days would be the same as the MedPAR files "covered Medicare days")."

See Declaration of Le-Tran, Appendix B, Paragraph 3.

-41-

00083

Further, Ms. Le-Tran stated that she has identified all of the "unmatched" days claimed by Pomona, and stated that they correspond to "paid" or "covered" days as identified in the CMS MedPAR SSI file, and do not correspond to unpaid days that were included by CMS in its calculation of "total Part A days" (which include days on which Medicare Part A patients for whatever reason were *not* "entitled" to payment for services). (See Declaration of Le-Tran, Appendix B, Paragraph 4; *see also* Exhibits P-40, P-41 and P-42.)

Ms. Le-Tran also confirmed that Pomona has, indeed, since the commencement of each of the three appeals, objected to CMS's use of "total Medicare Part A days" (instead of "paid" or "covered" days) as the denominator of the SSI fraction calculation:

> "Pomona has consistently used "paid" or "covered" days in the denominator of its SSI percentage calculations for each of the years 2006, 2007 and 2008, from the start of its appeal of each of the three fiscal years, thereby placing the use of the MedPAR file's listing "paid" days at issue, in lieu of the slightly higher number of "total" days by CMS in the final published calculation of the Provider's SSI percentage in each of fiscal years 2006, 2007 and 2008. It is evident from Pomona's original hearing request and position papers for each of the three years that Pomona has consistently contended that "covered" days should be calculated from the SSI (paid or covered) days denominator as reported in the Medicare P, S & R. Pomona is re-submitting its original appeal documentation, including the original reimbursement calculation for each year, to demonstrate that it has consistently used "covered" not "total" days in the denominator. The new Exhibits are P-43 (2006), P-44 (2007) and P-45 (2008)."

See Declaration of Le-Tran, Appendix B, Paragraph 5; *see also* Exhibits P-43, P-44 and P-45.

Accordingly, the CMS MedPAR SSI file value for "covered" days should be used in calculating the denominator of the Provider's SSI fraction for each of the years on appeal herein.

7. ***Administrative Finality Is Not a Supportable Basis for the Medicare Program's Refusal to Review and Verify the Data Underlying Pomona's SSI Fraction Calculations for the Fiscal Years Under Appeal.***

The MAC's contention that the need for "administrative finality" within the Medicare program outweighs Pomona's right to have its SSI fraction calculated in accordance with the

00084

governing statute and regulation is neither supported by law or fact. As stated earlier in this

Brief, and as has been presented by the Provider in earlier filings and at hearing, the Medicare

Act provides that a hospital's SSI fraction is to be calculated using a simple formula of Part A

entitled days on which a patient was also entitled to SSI benefits divided by the hospital's

number of Part A covered days in a given year. The statute does not provide any wiggle room or

otherwise suggest that a measurement of these days taken 15 months after the close of a cost

reporting year will be deemed correct and final, even if it is factually wrong.

Likewise, as discussed in Section IV, above, the Medicare Program regulations governing

the calculation of a hospital's SSI fraction mirror the statutory definition of the SSI fraction, and

while providing slightly more detail in terms of process, the regulation makes no mention

whatsoever of any time frame for nor places limits of any kind on the measurement of the SSI

fraction. (See 42 C.F.R. Section 412.106). Moreover, the regulation does not limit CMS's or

any other agency's or tribunal's ability to correct a hospital's SSI fraction if it is shown, as in this

case, to be simply wrong, for whatever reason.

In fact, the only purported "limitation" placed on CMS to revisit a hospital's SSI fraction

beyond a single measurement approximately 15 months after the close of a federal fiscal year is a

completely self-imposed limitation stated in the Preamble to the 2011 Final IPPS Rule (August

6, 2010) wherein CMS states that it is important to have "administrative finality" on the question

of DSH adjustments so as not to hold up Notices of Program Reimbursement for Providers.[5] But

such a "self-imposed" limitation, found only in a Preamble to a rule, and not the regulation,

itself, as is discussed more fully in the later sections of this Brief, does not have the force and

---

[5] It is somewhat ironic that CMS argues for the need to insist on administrative finality
on DSH calculations, given that following the *Baystate* decision in 2008, cost reports nationwide

effect of law or regulation, and importantly, does not bind this Board's decision-making authority.

Pomona has credibly demonstrated throughout this case that there is an unexplained and serious problem impacting CMS's calculation of Pomona's SSI fractions for the three years in this appeal. CMS's expressed "preference" for administrative finality does not override the need to comply with the requirements of the Medicare Act and Medicare regulations.

First, Pomona, as discussed earlier, presented a comprehensive description of its process of gathering and analyzing millions of bits of data and organizing such data into a credible analysis regarding which of its patients' days with SSI benefits were not being counted.

Next, Tzvi Hefter, a 30 year veteran of CMS, and the single individual responsible for issuing Proposed and Final Update Rules for 23 of those years at CMS as the Director of the Division of Acute Care, has testified that it "bothered me that there was such a big difference and that there needs to be an answer why are the numbers so different." (Transcript at p. 219, ll. 3-7.) Mr. Hefter added: "it made me think that there's some kind of systemic problem. It just – to me it's huge. It's really huge . . . I have no clue what it is, and that's what intrigues me. I have no clue what the problem is. But to me it's just pointing to that there is a real problem." (Transcript at p. 224, ll. 12-25). Mr. Hefter, as he testified, tried, for months, to enlist CMS's help, to convince CMS to go back to the SSA to take another look at the SSA data, but CMS ultimately refused, stating that it did not want to pursue the inquiry due to potential workload issues, and that the provider should take its case to the PRRB. (Transcript, pp. 237, l. 20 to p. 240.)

---

were held and no NPRs issued for several years, for hundreds or thousands of hospitals while CMS undertook to examine how to revise its SSI fraction data matching process.

-44-

Subsequently, Stan Rosenstein, a Medi-Cal eligibility expert and the former Director of

the Medi-Cal program, testified regarding the accuracy of CMS's data:

> "There has to be something wrong with the data.  It just does not – it's not
> in sync with the experience of the State of California has with the overall SSI,
> SSP program.  It's just so much more than the average. . ."

Transcript, p. 326, l. 21 to p. 327, l. 2.

Neither Congress nor the Secretary of Health and Human Services has, through statute or

regulation, placed any limits on CMS's ability or duty to make certain that providers' SSI

fractions are computed correctly, and based upon the best available data.  Clearly, in this case,

CMS's data from its matching process with SSS regarding Pomona seems flawed or faulty, and

is quite likely not the best available data.  In contrast, Pomona has demonstrated its

comprehensive analysis and calculation process and has opened up its process to demonstrate the

reliability of the underlying data from the State of California and the SSA.

The *Baystate* Court, in 2008, was faced with largely similar concerns regarding the

accuracy of CMS's data matching process with respect to the SSI fraction.  CMS and the

Secretary of HHS in that case argued that providers' SSI fractions should not be re-calculated,

and that the agency's interest in "administrative finality" was of paramount importance.  The

Court, while recognizing that administrative finality has some importance, disagreed:

> "The Administrator also relied on the importance of administrative finality
> and certainty in the prospective payment system to support his denial of
> retrospective relief. . .  However, the interest in administrative finality carries
> far less weight for DSH payments than other PPS payments.  The case in
> which courts have denied retrospective relief involved components of the PPS
> system that were truly prospective . . . In contrast, the DSH adjustment is
> entirely retrospective..."

See *Baystate, supra,* at 545 F. Supp. 2d 20, 52 (2008).

The *Baystate* Court also went further, explaining why it was important to require action

by CMS despite its claim, as in the present case, of an administrative burden: "The Court finally

-45-

considers whether the administrative burden of retrospective correction supports denial of

retrospective relief. There is, however, nothing in the administrative record to support the

Administrator's conclusion that the administrative burden is great, other than his conclusory

statements." *Baystate,* at 53.

> The Court added:

> > "Moreover, the denial of relief here would have the perverse effect of
> > rewarding CMS for ignoring the best available data and also allowing CMS to
> > continue that practice indefinitely."

*Baystate,* at 54.

In the present case, there is no basis for CMS to argue that there is any administrative

burden or the need for administrative finality. There is one hospital in this case. This is a fully

retrospective DSH issue. At the hearing, Ms. Le-Tran testified that to have its sample reviewed

by SSA or a combination of SSA and CMS would probably take only about three hours.

(Transcript, at p. 114, l. 19 to p. 115, l. 10). Moreover, Ms. Le-Tran testified at the hearing that

Pomona has been willing throughout this process to abide by the results of a test of Pomona's

random sample of from 30 to 50 records against Social Security Administration data.

(Transcript, p. 102, ll. 7-21).

The MAC introduced no witnesses or evidence to rebut any of the provider witnesses'

statements or present CMS's contrary arguments. CMS essentially told Mr. Hefter that it just did

not want to get involved and re-visit Pomona's calculation. CMS more formally suggests by

letter the need for administrative finality, yet by doing so, CMS's would be continuing its

practice of ignoring the best available data indefinitely. And, most importantly, CMS's ongoing

practice has led to a result in this situation where Pomona has, from every indication to date, not

received the benefit of an accurate calculation of its SSI fraction, contrary to both the governing

Medicare statute and the governing Medicare regulation, each of which unambiguously define what providers' SSI fractions are to include.

**F.      CMS RULING 1498-R DOES NOT LIMIT THE PRRB'S ABILITY TO DECIDE AND/OR OTHERWISE RESOLVE THIS CASE.**

CMS Ruling 1498-R (Exhibit P-6) was published April 28, 2010 and addressed three substantive issues, one of which was CMS's response to the court's ruling in *Baystate (*Exhibit P-14) requiring CMS to review and recalculate the SSI percentage of *Baystate Medical Center* and other plaintiffs challenging the accuracy of the SSI percentage published by CMS for each of the hospital plaintiffs. In summary, CMS indicated in the Ruling that it would recalculate providers' SSI percentages, generally, over a lengthy period, using an improved methodology that was designed to correct for alleged errors noted in the *Baystate* case relating to flaws in the matching of SSA and CMS data sets. As a part of the Ruling, CMS noted that all claims pending at the PRRB as of the date of the Ruling (April 28, 2010) would thereafter be remanded to the MACs for re-processing pursuant to CMS's improved methodology for calculating the SSI percentage. Further, the Ruling stated that the PRRB would no longer have jurisdiction over such pending claims and thus could not decide such cases.

None of Pomona's 2006 through 2008 cases were pending as of 2010. Indeed, as a result of a "hold" on calculating DSH adjustments for many hospitals following the *Baystate* decision, Pomona's 2006 through 2008 cost reports were not audited fully and the SSI percentages adjusted and applied until 2012. (*See* Pomona Appeal Letters and Attachments at Exhibits P-43, P-44 and P-45). Pomona's appeals for these three years were not filed until federal fiscal year 2013. Accordingly, CMS Ruling 1498-R imposed no jurisdictional bar on the PRRB's ability to decide Pomona's appeals of the 2006, 2007 and 2008 NPRs.

-47-

CMS Ruling 1498-R also addressed claims in cost reporting periods that had not been settled as of April 2010 (such as the three cost reporting periods herein).  For these non-settled cost years, CMS indicated in its Ruling that if the years were covered by the changes announced in the Final IPPS Rule for fiscal year 2011, the new methodology announced therein would be utilized in calculating the provider's SSI percentage.  Since Pomona's 2006 through 2008 years are not specifically governed under the language of the FY 2011 Final IPPS Rule with respect to SSI percentage changes (see full discussion in following Section V.G. of this post-hearing brief), the Ruling then specified an alternative treatment whereby CMS would utilize the "suitably revised data matching process" established in response to the *Baystate* decision.  In practice, this "suitably revised data matching process" was the methodology announced in the FY 2011 Final Rule, but CMS Ruling 1498-R did not describe the methodology, nor did the Ruling suggest in any way, shape or form, that the results of such methodology could not be challenged by a provider through a PRRB appeal or other tribunal.  In fact, CMS stated:

> Furthermore, in order to avoid, or at least minimize, the filing of new administrative appeals on the SSI fraction data matching process issue, CMS and the Medicare contractors will apply the same suitably revised data matching process in determining the SSI fraction, and calculating the DSH payment adjustment, for each "open" hospital cost reporting period where the contractor has not yet settled finally the provider's Medicare cost report through the issuance of an initial notice of program reimbursement (NPR), see 42 C.F.R. §§ 405.1801(a), 405.1803.  [Emphasis added.]

*See* CMS Ruling 1498-R, Exhibit P-6, page 7.

Clearly, CMS contemplated within the four corners of CMS Ruling 1498-R that there could still be provider appeals to the PRRB regarding the calculation of the SSI percentage and the matching of SSA and CMS data.  CMS Ruling 1498-R placed no restrictions whatsoever on a provider's ability to ask the PRRB to review and decide an appeal challenging the accuracy of the provider's SSI percentage for fiscal years that were neither (1) specifically covered under the

-48-

00090

language of the FY 2011 Final IPPS Rule (which the provider's 2006 through 2008 years were not); nor (2) years that had been settled initially by April 28, 2010 (which these three years also were not).  Accordingly, under CMS Ruling 1498-R, this Board both has jurisdiction over and the authority to decide this case.

### G.      THE BOARD RETAINS FULL AUTHORITY TO DECIDE THIS CASE.

#### 1.     *General Authority.*

In response to the Board's request for clarification as to its authority, see Transcript, p. 437, lines 1-2; p. 441, lines 7-11, there is statutory and regulatory support for the Board's authority to resolve all of the factual, as well as legal, issues presented here.

Under 42 U.S.C. § 1395oo(d) and the implementing regulations, the Board has broad statutory authority "to affirm, modify, or reverse a final determination of the fiscal intermediary with respect to a cost report <u>and to make any other revisions on matters covered by such cost report</u> (including revisions adverse to the provider of services) even though such matters were not considered by the intermediary in making such final determination." 42 U.S.C. § 1395oo(d) [Exhibit P-58]; *see also* 42 C.F.R. § 405.1869(b)(1)(i) [Exhibit P-59].  Herein, Pomona is seeking a revision to a matter identified on its cost report (the SSI fraction) and the MAC's adjustments thereto.  Pomona is not seeking in this case to strike, modify, invalidate or even avoid the plain language of a statute, regulation or CMS Ruling, each of which the Board would not have authority to decide or do.  See 42 C.F.R. § 405.1867 [Exhibit P-59].  Instead, Pomona is asserting that CMS, and the MAC, failed (by incorrectly identifying the Provider's Medicare Part A + SSI days) to give effect to particular statutory and regulatory authorities; thus, the Board has clear authority to decide the matter and to provide a remedy.

As outlined in detail in Section III, above, the statute and regulations set forth a simple formula to determine DSH reimbursement, and, specifically, the SSI percentage. See 42 U.S.C.

-49-

00091

1395ww(d)(5)(F)(vi) [Exhibit P-3] and 42 C.F.R. 412.106(b) [Exhibit P-39].  There is no discussion or direction in the regulation as to the particular time when the data underlying the percentages should be measured, or when that calculation must be finalized.  There is similarly no limitation in the regulation regarding review of the calculation at a later date.  Moreover, the statute simply commands that certain days be included or excluded in the calculation of the SSI percentage.  If a provider demonstrates that it has logged certain qualifying SSI + Part A days, and these appeal years remain "open," the correct number of Part A + SSI days must be included pursuant to statute and regulations.  CMS's interpretation (as noted in the preamble to the 2011 Final IPPS Rule) attempts to limit the use of specific data to that available as of fifteen months after the end of the Federal fiscal year and then purports to require that the data be measured only once, and never revisited.  See 75 Fed. Reg. 50275, 50281, 50282 [Exhibit I-9]; see also Transcript, pp. 41-43.  But, such an interpretation does not bind this Board, and it cannot override what both the statute and the regulation unambiguously require by their plain language.

Pomona is not requesting that the Board weigh in on the validity of the statute or regulations here, but instead to enforce the statute and regulation by deciding whether CMS's extra-regulatory and purely self-limiting interpretation of the statute and regulation fairly gives effect to the statutory and regulatory language.  While the Board's regulations dictate that the Board shall afford "great weight to interpretive rules, general statements of policy, and rules of agency organization, procedure, or practice established by CMS,"  42 C.F.R. § 405.1867 [Exhibit P-59], as explained in Sections V.G.2 and V.G.3, below, such interpretations,[6] including

---

[6]  Courts also afford less deference to interpretative materials such as the Provider Reimbursement Manual.  See Christensen v. Harris Cty, 529 U.S. 576, 587 (2000) [Exhibit P-60] ("Interpretations such as those in opinion letters–like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law–do not warrant Chevron-style deference.  Instead, interpretations contained in formats such as

00092

language from a regulatory preamble, do not bind the Board when they clearly are inconsistent with the plain language of the regulation.  Thus, the Board has the requisite authority here to find that Pomona has offered credible evidence demonstrating that the statute and regulations have not been given effect by the MAC and CMS, in that days which clearly must be included in the SSI fraction numerator have not been so included.  And, with that requisite authority, the Board can direct the MAC to review the data underlying Provider's SSI percentage calculation and re-evaluate such data using a preliminary test sample, as offered by Pomona [at the Hearing.]

Further, there has been no evidence presented that appropriate data sharing agreements between the Provider and CMS on one hand, and CMS and SSA on the other, fail to exist. Clearly such agreements do exist.  Thus, there is no legal barrier to the remedy that Pomona seeks here.

    2.     ***The Preamble to the 2011 Final IPPS Rule is Inapplicable to this Fiscal Period.***

Beyond the Board's own complete authority to decide the issues presented in this case, the very authority that CMS and the MAC seek to apply here is not applicable to these cases:  the 2011 Final IPPS Rule and any such limitations set forth in that Preamble apply only to Fiscal Year ("FY") 2011 and beyond.  See 75 Fed. Reg. at 50284-50285 [Exhibit 1-9].  CMS Ruling 1498-R, on the other hand, provides for application of its data matching process to properly pending appeals and open cost reports for cost reporting periods beginning prior to October 1, 2010 (that is, those preceding the effective date of the FY 2011 IPPS Final Rule).  The Ruling

---

opinion letters are entitled to respect under our decision in *Skidmore v. Swift,* but only to the extent that those interpretations have the power to persuade." (citation omitted)); *Comm. Hosp. of Monterey Peninsula v. Thompson,* 323 F.3d 782, 791 (9th Cir. 2003) [Exhibit P-61] ("Pronouncements in manuals like the PRM [CMS's Provider Reimbursement Manual], which do not have the force of law, are entitled to less deference than an interpretation arrived at after a formal adjudication or notice-and-comment rulemaking.")).

also provides that "[i]f the FY 2011 IPPS final rule results in a new data matching process, then CMS will use that new data matching process in calculating SSI fractions and DSH payments for specific claims that are found to qualify for relief under this Ruling." CMS Ruling 1498-R, at pp. 5-6 [Exhibit P-6].

As the Board recognized at the Hearing, there is an interplay between the Final Rule and CMS Ruling 1498-R. (See Transcript, p. 440-441, lines 25, 1.) This interplay, however, does not bind the Board to following the specific process laid out in the preamble given the FY years at issue here: 2006-2008. In general, CMS cannot retroactively apply its rule. See *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988) [Exhibit P-62]. Instead, the Board is only bound by the specific requirements of the CMS Ruling and the plain language of the regulation, which do not limit CMS's ability to review and correct an erroneously calculated SSI fraction. And, as explained in Section V.F., above, CMS Ruling 1498-R actually permits Pomona's efforts to arrive at the correct, and thus best available, data.

### 3. *The Board Is Not Bound by CMS's Preamble Language.*

Notwithstanding that the perambulatory statement of the 2011 Final IPPS Rule does not apply to the 2006 to 2008 fiscal years at issue here, the Board also is not bound by CMS's interpretation of the process to calculate the SSI percentage if such interpretation is at odds with the plain language of the governing statute and regulation.

CMS's language from the Preamble to the 2011 Final IPPS Rule announcing changes to the SSI percentage process, and specifically, CMS's self-imposed limitations on the timing of the particular data to be used and the time period in which it will be reviewed, is the only thing supporting the CMS's and the MAC's process here. See MAC Final Position Paper, pp. 10-11; Transcript, pp. 41-43; *see also* 75 Fed. Reg. 50275 [Exhibit I-9]. The Board, however, is not bound by CMS's self-imposed limitations in trying to assess whether CMS and the MAC gave

-52-

effect to the statute and regulation. *See, e.g., Board of Trustees of Knox Cty Hosp. v. Shalala*, 959 F. Supp. 1026 (S.D. Ind. 1997) [Exhibit P-63] ("The Board also noted that the preamble language relied upon by the Agency lacks the force and effect of law."); *Loma Linda Comm. Hosp. v. Shalala*, 907 F. Supp. 1399 (C.D. Cal. 1995) [Exhibit P-13] ("The Secretary concedes that a preamble may not have the same authority as a regulation, but argues that preambles can be used to interpret statutes, as many court decisions have done."); *see also* 42 C.F.R. § 405.1867 [Exhibit P-59] (only requiring the Board to give "great weight" to interpretive rules established by CMS, but not binding the Board).

    In addition to not being bound by the regulations to follow CMS's interpretative language in a preamble, case law demonstrates that courts similarly do not afford the same weight to preamble language as they do to the unambiguous plain language of the statute and regulation itself. See *Nat. Resources Defense Council, Inc. v. S. Coast Air Quality Mngmt Dist.*, 651 F. 3d 1066 (9th Cir. 2011) [Exhibit P-64] ("We have explained that the preamble of an EPA rule approving a SIP has 'little legal traction' and 'should not be considered unless the regulation itself is ambiguous.'" (citing *El Comite Para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1070 (9th Cir. 2008)). There is no question that the plain language of the regulation in this case is absolutely clear. Further, the Court in *Baystate* stated: [Exhibit P-14] ("[I]solated preamble language is of no moment, for 'the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'" (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)); *Wards Cove Packing Corp. v. Nat'l Marine Fisheries Serv.*, 307 F.3d 1214, 1219 (9th Cir. 2002) [Exhibit P-65] ("[T]he plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted only when the regulation's language is ambiguous." (citation omitted)).)

-53-

00095

In the case at hand, CMS and the MAC rely on perambulatory interpretative language to support enforcement of flawed, self-limiting language on the regulatory process. This Board is not bound by that language and its limitations. Herein, both the governing statute and regulation are unambiguous and set forth a clear mathematical calculation; there is no room for CMS to place additional limitations and restrictions on the calculation, especially concerning the validity of the underlying data. And, where the underlying data from CMS has been shown to contain discrepancies, and the Provider has furnished a more than credible calculation based on SSA and State data, the Board has authority to determine that the best available data must be used to give effect to the statute and implementing regulation.

## VI.   **EXPEDITED JUDICIAL REVIEW:  FINDINGS OF FACT**.

In response to Board Members' questions, Pomona has demonstrated that the Board has authority here to decide the case at hand and to provide a remedy. However, if the Board ultimately determines that it does not have sufficient authority to decide the legal issue present in this case--whether CMS's calculations gave effect to the statute and regulation setting forth the SSI percentage--the Board nonetheless has the authority, and duty, to rule on the factual issues presented by the provider and to make factual findings[7] prior to considering expedited judicial review ("EJR"), either on the Board's own motion or on provider's motion.

The Medicare statute, at 42 U.S.C. 1395oo(f)(i) [see Exhibit P-58], and the implementing regulations, give the Provider (or the Board) the right to pursue EJR of a "legal question relevant to a specific matter at issue in the Board appeal if there is Board jurisdiction to conduct a hearing on the matter... and the Board determines it lacks the authority to decide the legal question." 42

---

[7] The Provider has included a list of factual findings as requested by the Board in its Proposed Decision submitted herewith.

00096

C.F.R. § 405.1842.  [See Exhibit P-58].  Under this authority, the Board retains its own authority

to request EJR on its own motion, again provided, the Board first resolves all questions of fact.

Importantly, it should be noted that prior to August 2008, the regulations expressly noted

that EJR is not appropriate "[i]f there are factual or legal issues in dispute on an issue within the

authority of the Board to decide."  48 Fed. Reg. 22897, 22925 (May 23, 1983).  [Exhibit P-66].

When the regulations were modified in the 2008 Final Rule, that specific language was

eliminated.  See 73 Fed. Reg. 30190, 30214 (May 23, 2008) [Exhibit P-67], yet the policy

remained ingrained in the EJR process.  While the implementing regulations no longer list "no

factual issues in dispute" as a criteria for EJR, there is nothing in the Proposed or Final Rules

suggesting that this requirement is no longer relevant (See Proposed Rule, 69 Fed. Reg. 35715,

35730 (June 25, 2004) [Exhibit P-68]; Final Rule, 73 Fed. Reg. 30190, 30214) [Exhibit P-67].  In

fact, the PRRB and courts that have examined this issue after 2008 continue to enforce this

requirement.  See *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F.Supp.2d 13, 16-17

(D.D.C. 2011) [Exhibit P-69].  ("A provider may seek expedited judicial review. . .if the

following three requirements are satisfied:  First, the provider must be eligible for a PRRB

hearing, meaning that the provider meets the applicable amount-in-controversy and timeliness

requirements. Second, there must be no factual issues in dispute.  Third, the case must turn on an

issue that the PRRB lacks authority to decide, such as an interpretation of CMS policy."); *see*

*also, Santa Cruz, CA 03-05 MSA Hosp. Wage Index Group, et al. v. Noridian Healthcare*

*Solutions, LLC/Blue Cross & Blue Shield Assoc.*, 2015 WL 10381779, at *4, PRRB Hearing

Dec. No. 2015-D6, Case No. 04-0492G (April 2, 2015) [Exhibit P-70] ("Because there remains

disputed facts surrounding whether the Watsonville wage data was incorrect, the case is not

appropriate for expedited judicial review.  Although it creates an anomalous result, the Board,

-55-

therefore, must resolve the fact issue even though it has no authority to grant a remedy."). In the present case, the PRRB would be required to assess the Provider's data and methodology at a minimum.

Moreover, the current PRRB Rules now expressly require that a provider demonstrate in any written request for EJR that "there are no factual issues in dispute." PRRB Rules, Rule 42.3 (July 1, 2015), available at https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/ Downloads/ PRRBRULES_07_01_2015.pdf. [Exhibit P-71].

In addition to current interpretations of the EJR requirements and the PRRB Rules, CMS has previously stated:

> "the law does not provide for a Board hearing and an expedited administrative review determination on separate facets of the same matter in dispute, nor does it provide for the Board hearing to be bypassed on disputed matters that are within the authority of the Board to decide. For such cases, there is the need to establish an administrative record before the Board when factual or legal matters are in dispute before the case is appropriate for judicial review. Thus, when there are factual matters in dispute with respect to the particular matter for which a provider requests an expedited review, we believe the law intends that these matters be resolved by the Board ...."

48 Fed. Reg. 22897, 22922 (Emphasis added). [Exhibit P-66].

Further, in response to comments regarding an opportunity to compile a factual record before the PRRB prior to EJR, CMS clarified that:

> "when there are factual or legal issues in dispute within the authority of the Board to decide on the particular issue, the Board will not issue an expedited review determination and will proceed with a hearing. [This will] give providers ample opportunity to establish a record at the Board hearing, while at the same time providing for the orderly conduct of the determination process and the fulfillment of the intent of the statute."

*Id.* at 22923 (Emphasis added) [Exhibit P-66]; *see also* 69 Fed. Reg. 35715, 35730, where CMS stated:

> "[I]n situations in which a provider asserts that audit adjustments are improper and also argues that a statute, regulation, or CMS Ruling bearing on

-56-

> those adjustments is invalid, a Board hearing should be held before the matter
> proceeds to court. We believe that although an assertion that a statute,
> regulation, or Ruling is invalid is a matter that the Board cannot decide, the
> Board should accept the case and rule on those other issues relating to the
> same adjustments over which it has jurisdiction and does have authority to
> decide."

(Emphasis added.) [Exhibit P-68].

As there are numerous disputed factual issues in this case, EJR would not be appropriate unless the Provider has had an opportunity to establish a record (as it has sought to do through this hearing process) and then the Board subsequently issues findings of fact. Without such an opportunity and findings of fact, a federal court will likely first remand the matter back to the Board to make factual findings before issuing a decision on the legal issue. *See, e.g., Heart to Heart Hospice, Inc. v. Leavitt*, 2009 WL 279099, at *6 (N.D. Miss. 2009) ("While this court is thus not prepared to grant the relief sought by plaintiff, it does conclude that plaintiff has raised sufficiently valid concerns that defendant's motion for summary judgment should not be granted. The court concludes that the proper course of action at this juncture is to remand this case to the PRRB so that plaintiff may, if it so chooses, develop a factual record regarding its allegations in this case."); *Autumn Bridge LLC v. Sebelius*, 2009 WL 9073083, at *7 (W.D. Okla. 2009) (remanding to the PRRB for fact findings related to standing). [Exhibit P-72].

Accordingly, in the event this Board decides to move on its own for EJR, it is vitally important to present the court with a factually resolved case and a sufficient record so that the court can exercise its legal judgment and issue any appropriate orders and/or remedies.

## VII.   **REQUEST FOR RELIEF.**

Based on the foregoing summary of facts, evidence and argument, the Provider requests the Board to grant relief in this case according to the following priorities:

-57-

1)      The Provider has demonstrated a consistent, credible methodology for supporting its correct SSI percentage.  As noted above, the Board has authority to find that Pomona's calculated SSI percentage in each of the three years appears to be more credible than CMS's calculation of the Provider's SSI percentage in each of the three years, 2006, 2007 and 2008.

Accordingly, the Board should rule in the alternative regarding how the Provider's SSI percentage should be calculated.  The Board should rule and order that the MAC be directed to utilize the calculations presented in Exhibits P-40, P-41 and P-42, subject to the MAC's ability to verify Pomona's calculations on a patient by patient basis.  Such a decision would accept use of the California statewide average of "SSP-only" patients for each of Federal fiscal years 2006, 2007 and 2008 and offset such percentage against the Provider's patient days with DHCS "aid codes" of 10, 20 and 60, as illustrated in Exhibits P-40, P-41 and P-42.

2)      In the alternative, the Board should order that the MAC work with CMS to engage the SSA to review and re-match Pomona's 50 record sample, or a new statistically valid random sample, and then present the results to all parties.  All parties will be bound by the results of such re-matching process.

All calculations finally settling this matter under paragraphs VII.1 and 2, above, should use for purposes of the denominator of the SSI fraction:  the total number of days at Pomona on which patients are "entitled" to Part A benefits in accordance with the plain language of the Medicare Act and regulations.

3)      In the event the Board decides that it does not have the requisite authority to finally decide this case and order relief, the Board, based on the overwhelming weight of authorities, is required to make complete findings of fact, and further conclusions of law and fact

-58-

00100

to the extent the Board determines it has authority to do so, and then to request expedited judicial review on its own motion.

DATED: October 12, 2017                     Respectfully submitted,

                                            By: _____
                                                LAURENCE D. GETZOFF
                                            HOOPER, LUNDY & BOOKMAN, P.C.
                                            Attorneys/Representatives for Provider,
                                            **POMONA VALLEY HOSPITAL
                                            MEDICAL CENTER**

-59-

#1236976.3

00101

A

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| In the Matter(s) of: | Case No's.:   13-0430 |
| | 13-0628 |
| POMONA VALLEY HOSPITAL MEDICAL CENTER | 13-0680 |
| Fiscal Years Ended: | |
| December 31, 2006 | |
| December 31, 2007 | |
| December 31, 2008 | |
| Provider No.:  05-0231 | |

**DECLARATION OF STAN ROSENSTEIN, EXPERT WITNESS TO THE PRRB HEARING DATED AUGUST 17, 2017**

1236274.4

## DECLARATION OF STAN ROSENSTEIN

I, STAN ROSENSTEIN, declare as follows:

1.       I am a former Director of the California Medicaid Program known as "Medi-Cal" and I make this declaration in support of my testimony submitted to the Provider Reimbursement Review Board Hearing conducted on August 17, 2017, to respond to questions posed by various Board Members.  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.       Candice Le-Tran was asked by a Board Member (pp. 195-196 of Transcript) whether SSP payment benefits start simultaneously with SSI benefits (as of the month following demonstration of qualification), as opposed to Medi-Cal benefits which can start during the month of application.  My understanding based on my experience directing the Medi-Cal program and subprograms, and after re-checking with sources currently within the program, is that SSP payment benefits and SSI payment benefits have the same start dates.  The same processes are used to set up payments for both.  A Board member questioned whether SSP benefits could be paid earlier, however, I have never heard of that or understood that to be the case.

3.       Board Members requested me (see pp. 321, 377-386, 388-389, and 407-412 of Transcript) to clarify how data from the SSA physically is transmitted and ultimately assigned in the form of "aid codes" to Medi-Cal patient at the Department of Health Care Services in California, and how such information then reaches or is accessed by a provider.  To clarify this matter, I prepared two documents:  1) a verbal "flow sheet" demonstrating in some detail how data from the SSA flows to the State of California, and then how such data is matched within the Department of Health Care Services to DHCS "aid codes" to be used for qualifying beneficiaries for Medi-Cal benefits (this is attached as Exhibit P-47), and 2) a pictorial representation of the same process (albeit with slightly less detail) (this is attached as Exhibit P-48).

4.       Board Members questioned  (see pp. 341-354 of Transcript) whether the difference in timing of patients' qualification for Medi-Cal benefits versus SSI benefits would have a meaningful impact on the number of a hospital's SSI beneficiary patients.  It is my

opinion based on my many years of experience working in the Medi-Cal eligibility area that any effect of such a difference would be minimal. From my vantage point as a former Director of Medi-Cal, we know that most of the enrollment on SSI is fairly stable in California, and that if a hospital is not using SSI as the means for obtaining Medi-Cal enrollment for coverage of an hospitalization, then it is quite uncommon for a patient to be seeking Medi-Cal enrollment for the first time at the same time as seeking SSI payment benefits for the first time. This is also confirmed by another and current employee of the Department of Health Care Services, Sharyl Shanen-Raya (see email string with Sharyl Shanen-Raya, new Exhibit P-49, pgs. 1-2). My understanding in this case (to be confirmed by Ms. Le-Tran) is that Pomona does not assist individual patients in seeking SSI (or SSP) payments, but rather uses other methods to help such patients qualify for Medi-Cal benefits if needed. As SSI coverage is relativity stable, and since the hospital does not assist patients in enrolling in SSI as a means of obtaining Medi-Cal coverage for hospital care, there likely would be few hospital stays that would occur in the person's first month of eligibility, the potential period where the person would be SSI eligible but not receive a SSI payment.

5.      Board Members requested additional information from me regarding the derivation of the "14%" estimate of "SSP only" beneficiaries Statewide in California during the 2006 through 2008 period (see pp. 396-401 of Transcript). To "drill down" somewhat on the data reported at the hearing in Exhibit P-37, I reviewed California Department of Social Services "source documentation" regarding current year's expenditures and caseloads relating to SSI and SSP beneficiaries in California. The "source documentation" is attached as Exhibit P-50). Further, I conferred with contacts within the State Department of Health Care Services and the Department of Social Services. Based on my review of the source documentation, I can now conclude that the original document submitted as Exhibit P-37 was potentially ambiguous in one respect, and therefore led to an incorrect estimate. The left column in P-37 labeled "Total SSI Caseload" actually included all SSI/SSP recipients, the aggregate total of all such recipients of SSI and/or SSP benefits, and thus it included those who were SSP only during a particular month. Accordingly, the 14% estimate submitted at the hearing is not technically accurate. I

1236274.4                                              2

have prepared a "modified" version of the State document [P-37] as new Exhibit P-51. The modified version (P-51) now "corrects" the heading on the left column and recalculates the Statewide average for each month. The aggregate percentage of SSP only patients for the same studied 2005-2009 period was 16.46 % (not 14%).

6.     Board Members questioned whether patients who are admitted to the hospital from nursing homes could have skewed Pomona's count of SSI beneficiary Part A patients in that California aid codes 10, 20 and 60 may reflect continued Medi-Cal benefits, but not necessarily continued receiving SSI payments (see pp. 338-340, and 415-416 of Transcript). For various reasons (as explained herein, and in paragraphs 7 through 9, below), it is extremely unlikely that a large number of nursing home resident patients could have significantly inflated Pomona's count of SSI beneficiary patients above the number of patients actually still receiving SSI benefits. First, I confirmed with an eligibility expert at the Department of Health Care Services, Sharyl Shanen-Raya, that patients with SSI benefits retain their full SSI benefits for the first three months of residence in a nursing facility. (See email string with Sharyl Shanen-Raya, new Exhibit P-49, page 3.) This fact was also independently confirmed with another employee of the California Department of Health Services, Amy Rosenkranz, as stated in the Declaration of Candice Le-Tran.) Second, from my experience working with the Medi-Cal population, an average of fifty percent (50%) of the people in nursing facilities remain there for less than three (3) months. (Exhibit P-49, page 2). This statistic is supported further by an article entitled "Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life" as published in the Journal of American Geriatric Society, September 2010, 58 (9):1701-1706 (online version attached as Exhibit P-52). As such, any *potential* impact from nursing home patients should be reduced initially by fifty percent (50%) as 50 percent of all Medi-Cal nursing home days occur during the period where SSI benefits have not been reduced.

7.     The total number of Medi-Cal beneficiary nursing home patients in California during the relevant period from 2005 through 2010 or so ranged between 60,000 and 65,000 individuals. (See email string with Sharyl Shanen-Raya, Exhibit P-49, page 2.) During the relevant period, there were approximately 360 general acute care hospitals operating in

California.  (See Exhibit P-54.)  Dividing the roughly 63,000 patients by 360 hospitals suggests that, on average, each hospital would potentially service only about 175 Medi-Cal patients from nursing homes each year.  But, not all nursing home patients would require hospital care in the first place each year.  In fact, many do not.  But assuming that up to fifty percent would require hospital services[1], that would mean that an average hospital would see only about 88 Medi-Cal patients potentially with SSI benefits admitted each year from nursing homes.

        8.      The number of nursing facility patients coming to the hospital would have to be further reduced for the following reasons:

        a.      The number of SSI linked Medi-Cal patients in a nursing facility coming to Pomona must be reduced by another fifty percent, as stated in paragraph 6, to take into account the fact that only half of the nursing patients likely would remain in a nursing facility for up to three months, and thus, these patients would continue to receive SSI payments in those three months.

        b.      Individuals receiving SSI benefits in nursing facilities only would receive a zero payment amount when their income exceeds the remaining SSI maintenance need grant amount for people in a nursing facility.  It is unknown, what percentage of people on SSI in a nursing facility meet this circumstance, but for those people who still receive a reduced SSI grant amount, they would still be counted as SSI recipients for purposes of the SSI percentage.

        c.      The already and substantially reduced number of potential nursing home patients who had SSI benefits but then are reduced to  a zero payment amount prior to or during hospitalization must then be further and significantly reduced by the number of Medi-Cal nursing facility patients who obtain their eligibility from non-SSI related Medi-Cal programs.  According to data from the Department of Health Care Services budget, in State fiscal year 2005-2006, there were 63,100 average monthly eligibles in nursing facilities with

---

[1] 53.3 percent of residents at the end-of-life had at least one hospitalization.  "Hospitalizations Among Nursing Home Residents in the Last Year of Life:  Nursing Home Characteristics and Variation in Potentially Avoidable Hospitalizations", Journal of American Geriatric Society, November 5, 2013, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3827689/table/T2/

Medi-Cal coverage granted by the counties.  Likewise, in 2006-2007, there were about 62,300 monthly eligibles in nursing facilities with Medi-Cal coverage (Statewide) granted by the counties on the basis of other non-SSI programs (See Exhibit P-56),[2] and 62,400 non-SSI related nursing facility patients in 2007-2008 (See Exhibit P-57).[3]  SSI benefits would not have been the basis by which at least most of these individuals qualified for their Medi-Cal benefits.  The State data shows that the majority of individuals on Medi-Cal in nursing facilities were not on SSI or SSI aid codes at the time, but gained their Medi-Cal eligibility through other programs.

       9.      Given the above factors, one has to conclude that the number of nursing facility patients hospitalized at a hospital such as Pomona, who were assigned aid codes 10, 20 or 60, but who were no longer receiving SSI payments, would only be a very small fraction of the potential 88 nursing home patients per year that might go to Pomona for care.  This small number of people could explain only a mere fraction of the 18% to 26% difference between CMS's count of SSI beneficiaries and the hospital's count of SSI beneficiaries.

       I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

       Executed September 14, 2017, at Davis, California.

STAN ROSENSTEIN

---

[2]  May 2006 Medi-Cal Estimate, Department of Health Care Services, http://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2006_may_estimate/04_csld/est06M_csld_1.pdf

[3]  May 2007 Medi-Cal Estimate, Department of Health Care Services, http://www.dhcs.ca.gov/dataandstats/reports/mcestimates/Documents/2007_May_Estimate/04_Caseload/Pages_0A_May_2007_Caseload.pdf

00108

B

**BEFORE THE**

**PROVIDER REIMBURSEMENT REVIEW BOARD**

| | |
|---|---|
| In the Matter(s) of: | Case No's.:   13-0430 |
| | 13-0628 |
| **POMONA VALLEY HOSPITAL MEDICAL CENTER** | 13-0680 |
| **Fiscal Years Ended:** | |
| December 31, 2006 | |
| December 31, 2007 | |
| December 31, 2008 | |
| Provider No.:  05-0231 | |

**DECLARATION OF CANDICE LE-TRAN, WITNESS
TO THE PRRB HEARING DATED AUGUST 17, 2017**

1236325.2

00110

## DECLARATION OF CANDICE LE-TRAN

I, CANDICE LE-TRAN, declare as follows:

1.     I am the Director of Reimbursement and Analytics at Pomona Valley Hospital Medical Center and am submitting this Declaration in response to questions from Members of the Provider Reimbursement Review Board, in support of my testimony submitted to the Provider Reimbursement Review Board Hearing conducted on August 17, 2017.  The facts set forth herein are true of my own personal knowledge, and if called upon to testify thereto, I could and would competently do so under oath.

2.     I was asked by a Board Member (pp. 124-138 of the Transcript) to clarify whether or not Pomona Valley Hospital Medical Center used consistent data ranges to calculate the hospital's "SSI percentage" for each of fiscal years 2006, 2007 and 2008.  I have reviewed my work for each of these three years and conclude that I did use consistent data ranges so as to make an "apples to apples" comparison as noted in paragraphs 3 and 4, below.

3.     The CMS MedPAR SSI file includes listings of both Medicare Covered Day and Medicare Total Days.  In preparing the SSI analysis I have used  to support Pomona's SSI percentage for each year, 2006, 2007 and 2008, PVHMC used the MedPAR file to identify the Medicare population and used  the CMS covered days calculation as reflected in Pomona's SSI percentage denominator.  Exhibits submitted herewith to update the hospital's calculations, P-40 (for 2006), P-41 (for 2007) and P-42 (for 2008) were prepared by me, and I used the CMS MedPAR value in each so that "paid" or "covered" days would appear in the denominator, which is consistent with my understanding of how the SSI percentage is required to be calculated by statute and  regulation.  My Department at Pomona also analyzed for additional SSI days using the same Medicare population in the MedPAR SSI file, and therefore our calculation of Medicare covered (or "paid") days would be the same as the MedPAR file's "covered Medicare days."

4.     In each year, the numerator of Pomona's calculated SSI percentage for each of the three years also included only days that would have been included in the "paid" or "covered" days summary shown in the CMS MedPAR SSI file.. All of the "unmatched" days claimed by Pomona are "paid" or "covered" days and do not correspond to days deemed to be unpaid days and thus included by CMS in its calculation of "total Part A days". Please see Exhibits P-40, P-41, and P-42, which reflect the revised calculations taking into account items discovered post-hearing (small increase in number of SSP-only days, and corresponding small reduction in reimbursement claimed by Pomona at the hearing, which was based on a reduction for only 14% SSP-only days).

5.     I was asked by a Board Member (pp. 197-203 of the Transcript) whether Pomona has appealed CMS's calculation of the denominator of Pomona's SSI percentage in each of the fiscal years 2006, 2007 and 2008.  CMS's calculation each year used "total" Part A days in the denominator of each year's percentage, instead of "paid" or "covered" days, as the Provider contends is required by law.  Pomona  has consistently used "paid" or "covered" days in the denominator of its SSI percentage calculations for each of the years 2006, 2007 and 2008, from the start of its appeal of each of the three fiscal years, thereby placing the use of the MedPAR file's listing "paid" days at issue, in lieu of the slightly higher number of "total" days used by CMS in the final published calculation of the Provider's SSI percentage in each of fiscal years 2006, 2007 and 2008.   It is evident from Pomona's original hearing request and position papers for each of the three years that Pomona has consistently contended that "covered" days should be calculated from the SSI (paid or covered days) denominator as reported in the Medicare P, S & R. Pomona is re-submitting its original appeal documentation, including the original reimbursement calculation for each year, to demonstrate that it has consistently used "covered" not "total" days in its denominator.  The new exhibits are P-43 (2006), P-44 (2007) and P-45 (2008).

6.     Board Members requested Pomona to provide additional clarity regarding the derivation of the "14%" SSP-only population in California and how that number was derived (pp. 396-401 of Transcript).  As noted in the Declaration submitted by Stan Rosenstein, the

California Department of Social Services mis-labeled one of its subheadings on the report that was submitted prior to the hearing as Exhibit P-37. As such, the report was misinterpreted. A corrected version of the report has been submitted by Mr. Rosenstein (as Exhibit P-51), which increased the percentage of SSP only beneficiaries in California to just over 16%. Accordingly, Pomona is now reducing its claimed SSI percentage to reflect a slightly higher number of SSP only beneficiary patients. The revised calculations are included in Exhibits P-40 (2006), P-41 (2007) and P-42 (2008). In addition, Pomona is submitting new Exhibit P-46 which demonstrates more specifically and isolates by each individual year, the basis (Statewide average of SSP-only recipients) for adopting 16.34% (for 2006), 16.69% (for 2007), and 16.61% (for 2008) as the "reduction" in SSI percentage to reflect the percentage of the Provider's patients who were "SSP only."

7.     In response to Board Members' questions regarding the potential difference in timing of qualification for Medi-Cal benefits and SSI benefits (pp. 341-354 of Transcript), Pomona Valley Hospital Medical Center does not (and did not in 2006, 2007 and 2008) assist our patients in applying for SSI benefits, nor does the hospital have a process or procedure in place to help patients use newly applied for SSI benefits to qualify patients for Medi-Cal benefits.

8.     In response to Board Members' questions regarding whether patients being admitted to our hospital from nursing homes could have skewed Pomona's count of SSI beneficiary Part A patients (in that California aid codes 10, 20 and 60 may reflect continued Medi-Cal benefits, but not necessarily continued receipt of SSI payments) (see pp. 338-340, and pp. 415-416 of Transcript), I conferred with Amy Rosenkranz of the Program Integrity Unit of the California Department of Health Care Services. Ms. Rosenkranz confirmed that an SSI/SSP recipient who goes into long term care (including a nursing facility) would stay in aid codes 10, 20, and 60 for the first three months of the long term care placement. Thereafter, the counties will be required to evaluate which benefits the individuals qualify for. (Please see email string between Candice Le-Tran and Amy Rosenkranz, Exhibit P-53.)

1236325.2                                3

9.      In response to Board Members' requests to clarify how data from the SSA physically is transmitted and ultimately assigned to Medi-Cal beneficiary patients in the form of "aid codes" in California (Transcript, pp. 321, 377-386, 388-389 and 407-412), I asked my contact at the Department of Health Care Services, Amy Rosenkranz of the Program Integrity Division, to furnish me with a "crosswalk" showing how codes from the SSA are translated into aid codes used by the State Medi-Cal program.  Although a formal table or "crosswalk" is not available, Ms. Rosenkranz did provide the translation instruction by email.  This is submitted as Exhibit P-55.  This information also was used as a basis for Stan Rosenstein's process flow charts in Exhibits P-47 and P-48.


I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed September 14, 2017, at Pomona, California.


CANDICE LE-TRAN

00114

P-40

PVHMC
FYE: 2006

## SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Days

Note for Medicare Days Denominator:

The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below. In preparing the SSI data analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the PVHMC Medicare denominator below. We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and therefore our covered Medicare days would be the same as the Medpar's covered Medicare days. Note that in our original hearing request and position papers, we consistently used covered days in the SSI Denominator as reported in the Medicare PS&R.

### Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One

| | C | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published Data | SSI Days Diff | % Diff |
|---|---|---|---|---|---|---|
| SSI and Medicare Days per PVHMC Listing - Part A (1) | | 6,803 | 4,886 | 4,886 | | |
| SSI and Medicare Days per PVHMC Listing - Part C (1) | | 179 | | | | |
| Less: Estimate of State SSP only days & Note B below | 16.34% | (1,141) | | | | |
| **Total Federal Medicare SSI days** | | 5,841 | 4,886 | 4,886 | 955 | 20% |
| Total Medicare Days Part A & C per CMS MedPar data (2) | | 32,371 | 32,371 | 33,149 | | |
| SSI Percentage per PVHMC | | 18.04% | 15.09% | 14.740% | | |
| Published SSI % per CMS | | 14.740% | 14.740% | 14.740% | | |
| SSI Percent Difference | | 3.30% | 0.35% | 0.00% | | |
| DSH Formula's Multiplier | | 82.50% | 82.50% | 82.50% | | |
| SSI Incremental Difference | | 2.73% | 0.29% | 0.00% | | |
| PVHMC 2006 Federal specific Payment per Audited PS&R dated 11/29/2010 | | 28,271,965 | 28,271,965 | 28,271,965 | | |
| **Increase in SSI Reimbursement** | | $   770,837 | $   82,626 | $   - | | |

(1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details

(2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in SSI factor is already in a separate appeal issue

Note B: Per CDSS data for 2006-2008 SSI/SSP Case load

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | | | |
| 2 | FYE: 2007 (SSI = FFY 2007) | | | | | | | |
| 3 | | SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Days | | | | | | |
| 4 | | | | | | | | |
| 5 | Note for Medicare Days Denominator: | | | | | | | |
| 6/7/8/9 | The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below. In preparing the SSI data analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the PVHMC Medicare denominator below. We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and therefore our covered Medicare days would be the same as the Medpar's covered Medicare days. Note that in our original hearing request and position papers, we consistently used covered days in the SSI Denominator as reported in the Medicare PS&R. | | | | | | | |
| 10 | | | | | | | | |
| 11 | | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | | |
| 12 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published (3/19/2012) Data - FFY 2007 | SSI Days Diff between PVHMC and CMS | SSI % Diff between PVHMC and CMS |
| 13 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,320 | 4,153 | 4,153 | | |
| 14 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 345 | | | | |
| 15 | Less: Estimate of State SSP only days  & Note B below | | 16.69% | (1,112) | | | | |
| 16 | **Total Federal Medicare SSI days** | | | 5,553 | 4,153 | 4153 | 1,400 | 25% |
| 17 | Total Medicare  Days Part A & C per CMS MedPar data (2) | | | 27,538 | 27,538 | 28,188 | | |
| 18 | SSI Percentage per PVHMC | | | 20.16% | 15.08% | 14.733% | | |
| 19 | Published SSI % per CMS | | | 14.733% | 14.733% | 14.733% | | |
| 20 | SSI Percent Difference | | | 5.43% | 0.35% | 0.00% | | |
| 21 | DSH Formula's Multiplier | | | 82.50% | 82.50% | 82.50% | | |
| 22 | SSI Incremental Difference | | | 4.48% | 0.29% | 0.00% | | |
| 23 | PVHMC Federal specific Payment per Audited PS&R dated 7/28/11 for  FYE 2007 | | | 28,828,953 | 28,828,953 | 28,828,953 | | |
| 24 | **Increase in SSI Reimbursement** | | | $       1,291,520 | $      82,763 | $           - | | |
| 25 | | | | 1282269 | | | | |
| 26 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | | | |
| 27/28 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in SSI factor is already in a separate appeal issue | | | | | | | |
| 29 | | | | | | | | |
| 30 | Note B: Per CDSS data for 2006-2008 SSI/SSP Case load | | | | | | | |
| 31 | | | | | | | | |
| 32 | | | | | | | | |

9/11/2017  12:49 PM

N:\SSI Data\2007\FFY 2007 PVHMC SSI  WP:S_Summary for Post hearing

P-42

PVHMC

FYE: 2008 (SSI = FFY 2008)

### SUMMARY IMPACT FOR PRRB POST-HEARING with reduction for estimated SSP Only Day...

Note for Medicare Days Denominator:

The CMS Medpar SSI file has Medicare Covered Days and Medicare Total Days (used in published SSI%) as reflected below.  In pr... analysis, PVHMC used the Medpar SSI file to identify the Medicare population and used the CMS covered days as reflected in the... denominator below.  We analyzed for additional SSI days using the same Medicare population in the Medpar SSI file, and theref... days would be the same as the Medpar's covered Medicare days.  Note that in our original hearing request and position papers, ... covered days in the SSI Denominator as reported in the Medicare PS&R.

| | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare | CMS Published (3/19/2012)Data - FFY 2008 |
|---|---|---|---|---|---|
| SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,167 | 4,238 | 4,235 |
| SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 428 | | |
| Less: Estimate of State SSP only days  & Note B below | | 16.61% | (1,095) | | |
| **Total Federal Medicare SSI days** | | | **5,500** | **4,238** | **4,235** |
| Total Medicare  Days Part A & C per CMS MedPar data (2) | | | 28,768 | 28,768 | 29,404 |
| SSI Percentage per PVHMC | | | 19.12% | 14.73% | 14.403% |
| Published SSI % per CMS | | | 14.403% | 14.403% | 14.403% |
| SSI Percent Difference | | | 4.71% | 0.33% | 0.00% |
| DSH Formula's Multiplier | | | 82.50% | 82.50% | 82.50% |
| SSI Incremental Difference | | | 3.89% | 0.27% | 0.00% |
| PVHMC Federal specific Payment per Audited PS&R dated 2/23/12 (FYE 2008) | | | 31,693,675 | 31,693,675 | 31,693,675 |
| **Increase in SSI Reimbursement** | | | $ 1,232,627 | $ 85,932 | $    - |

(1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details

(2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in

SSI factor is already in a separate appeal issue

Note B: Per CDSS data for 2006-2008 SSI/SSP Case load

00123

0632

P-43



POMONA VALLEY HOSPITAL
M E D I C A L   C E N T E R

January 15, 2013

**Via Federal Express**

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re: Pomona Valley Hospital Medical Center
    Medicare Provider No.: 05-0231/55-5502
    Fiscal Year Ended: December 31, 2006
    Date of NPR: August 20, 2012

Dear Chairman Harty:

In accordance with 42 C.F.R. § 405.1835 – 405.1890, the Provider hereby requests a hearing before the Provider Reimbursement Review Board (the "Board") for the above-referenced fiscal year end Notice of Program Reimbursement ("NPR"). Enclosed are the following documents:

1. PRRB Model Form A
2. The required Certifications
3. The NPR and final adjustments (Tab 1)
4. A signed letter appointing Hooper, Ludy & Bookman and Laurence Getzoff, Esq. as Provider representative (Tab 2)
5. A description of the issues (Tab 3)
6. Exhibit A, which summarizes the calculation of the reimbursement impacts of the issues in dispute.

Thank you for your attention to this matter. If you have any questions or need any additional information, please contact me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Director of Reimbursement and Capitated Systems

cc:  Larry Getzoff, Hooper, Lundy & Bookman
     Darwin San Luis, First Coast Services Option, Inc.
     Eric Swanson, Blue Cross Blue Shield Assn.

100 ONE HUNDRED TOP HOSPITALS
1994, 1998, 1999 & 2000

N:\Appeal\2006\06 Appeal Letter_PRRB.doc

0633

00125

---

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
*2520 Lord Baltimore Drive, Suite L*
*Baltimore, MD 21244-2670*
**Phone: 410-786-2671**

---

**MODEL FORM A – INDIVIDUAL APPEAL REQUEST**

---

Date of Request: <u>January 15, 2013</u>

Provider Name: <u>Pomona Valley Hospital Medical Center</u>

Provider Number: <u>05-0231/55-5502</u>

Fiscal Year Ended: <u>12/31/2006</u>

Intermediary/MAC: <u>Palmetto GBA, c/o First Coast Service Option, Inc.</u>

Notice of Final Determination Dated: <u>August 20, 2012</u>

YOU MUST ATTACH THE FINAL DETERMINATION UNDER A <u>**TAB LABELED 1.**</u>
**\*If claiming intermediary/MAC failed to issue a timely Final Determination, state date cost report was sent to intermediary:** _____
(Include copy of the cost report certification page and any other evidence to support the date the cost report was filed.)

**Does this Request for Hearing include a request for Expedited Judicial Review?**
_____YES __X__NO (Note: A request for EJR must be submitted in a separate document and "EJR Request" must be marked on the outside of the envelope.)

**Is the Provider requesting Mediation?** (If yes, a request must be submitted in a separate document.)
__YES __X_ NO

**Provider Information:**
Provider Name: <u>Pomona Valley Hospital Medical Center</u>

Provider Contact/Title: <u>Candice Le-Tran, Director of Reimbursement & Capitated System</u>

Provider Address:    <u>1798 N. Garey Avenue</u>
                     <u>Pomona, CA 91767</u>

Provider Telephone Number: <u>(909) 865-9844</u>

Provider FAX Number: <u>(909) 469-9433</u>

E-mail address: <u>Candice.Letran@PVHMC.org</u>

1

**Is this Provider commonly owned or controlled? ____YES __X__NO**
If YES, identify the name of the corporation, name of the contact person at the corporation, the address and telephone number:

**Intermediary/MAC Information:**

Intermediary/MAC Name: Palmetto GBA
         Address:   Brenda Merriweather
                  c/o First Coast Services Option, Inc.
                  4880 Santa Rosa Road, Suite 170
                  Camarillo, CA 93012-0951

Intermediary/MAC Code:
(From NPR, if known)

**Representative Information (if applicable):**

Representative's Name:      Laurence D. Getzoff, Esq.
Company Name and Address:  Hooper, Lundy & Bookman
                          1875 Century Park East, Suite 1600
                          Los Angeles, CA 90067
Phone Number: (310) 551-8190
Fax Number: (310) 551-8181
E-mail Address: lgetzoff@health-law.com

If you are filing as a representative, UNDER A **TAB LABELED 2** YOU MUST ATTACH A
LETTER SIGNED BY THE PROVIDER AUTHORIZING REPRESENTATION

**Issue(s) Appealed:**

UNDER A **TAB LABELED 3** YOU MUST SUBMIT A STATEMENT OF THE ISSUE. The
statement of the issue must conform to the requirements of the regulations found at 42 C.F.R. §
405.1835 et seq. and the Board's Rules and include: (1.) Description of the issue; (2.) The audit
adjustment number(s); if applicable or other evidence required by 42 C.F.R. § 405.1835 (a)(1)(ii);
(3.) The amount in controversy; and (4.) A statement identifying the legal basis for the appeal (Cite
statutes, regulations and/or manual provisions.).

**Total Amount in Controversy for all issues:** _____$3,742,769_____

2

0635

00127

## CERTIFICATIONS

A.   I certify that none of the issues filed in this appeal are pending in any other appeal for the same period and provider, nor have they been adjudicated, withdrawn, or dismissed from any other PRRB appeal.

Printed Name: <u>Candice Le-Tran</u>

Title: <u>Director of Reimbursement and Capitated Systems</u>

Signature: <u>Candice Le-Tran</u>
             (Provider Owner/Officer/Director or Representative)

Date: <u>January 15, 2013</u>

B.   I certify to the best of my knowledge that there are no other providers to which this provider is related by common ownership or control that have a pending request for a Board hearing on any of the same issues for a cost reporting period that ends in the same calendar year covered in this request. See 42 C.F.R. § 405.1835 (b)(4)(i).

Signature: <u>Candice Le-Tran</u>
             (Provider Owner/Officer/Director or Representative)

Date: <u>January 15, 2013</u>

C.   I certify that a copy of this Request (and any supporting documentation) was sent by **(Check one)**

        _____United States Postal Service

        <u>✓</u> Nationally recognized courier. Specify name: <u>Federal Express</u>

to the intermediary/MAC on this <u>16th</u> day of <u>January</u> , 2<u>013</u> .

Certified Mail or Tracking Number: <u>7945 2963 9160</u>

Signature: <u>Candice Le-Tran</u>      Date: <u>1/16/2013</u>
(Provider Owner/Officer/Director or Representative

3

0636

00128

# Pomona Valley Hospital Medical Center

## Attachment to Model Form A

## Tab 1



**Palmetto GBA.**
PARTNERS IN EXCELLENCE.

**A/B MAC Jurisdiction 1**
**Provider Audit and Reimbursement**
**Department**

California, Nevada, Hawaii,
Guam, American Samoa,
Northern Mariana Islands

08/20/2012

NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT

Mr. MICHAEL NELSON
EVP, Finance
Pomona Valley Hospital Medical Center
1798 NORTH GAREY AVENUE
POMONA CA 91767

RE: Provider: Pomona Valley Hospital Medical Center
Provider Number: 050231
Fiscal Year End: 12/31/2006
NPI: 1407813660

Dear Mr. NELSON:

In accordance with Regulation Section 405.1803, this is your Notice of Program Reimbursement (NPR) for the above referenced period shows an amount due the program as follows:

| | | PART II - SETTLEMENT SUMMARY | | | |
| --- | --- | --- | --- | --- | --- |
| | | TITLE V | | TITLE XVIII | |
| | | 1 | | A 2 | B 3 |
| 1 | HOSPITAL | | 0 | -1,873,857 | 241,218 |
| 5 | HOSPITAL-BASED SNF | | 0 | 0 | -26 |
| 100 | TOTAL | | 0 | -1,873,857 | 241,192 |

(1,632,665)

Enclosed are schedules relating this determination to your originally claimed reimbursement.

Payment will follow this notice within the next few days, and will include more specific instructions regarding interest assessments. If this notice indicates a balance due the provider, our payment must be postmarked within 30 days of the date of this notice, otherwise we are required to pay you interest on the unpaid balance.

Revision 2/25/2011                    1-6.7.05
Offices:
832 Riverside Avenue ROC-16T, Jacksonville, FL 32202-4916
4350 W. Cypress Street – 9th Floor, Tampa, FL 33607-4164
4550 Santa Rosa Road, Suite 170, Camarillo, CA 93012-0951
www.palmettogba.com/J1              ISO 9001:2000



A CMS-Contracted Medicare Administrative Contractor

0638

Pomona Valley Hospital Medical Center
050231 12/31/2006

Enclosed for your files is a copy of your adjusted cost report that is the basis of this NPR. Also enclosed is the Adjustment Report that reflects individual adjustments made, and includes reference to and citations of applicable law, regulations, or general instructions used as a basis of these adjustments.

This NPR is the Medicare Administrative Contractor's (MAC) determination for the purposes of appeal rights for the items of cost changed by it. We encourage you to discuss with us any disagreement you may have with the new adjustments contained herein. If the dispute cannot be resolved to your satisfaction, you may file an appeal of the determined items of cost with either the intermediary/MAC or the Provider Reimbursement Review Board (PRRB) depending on the amount in controversy. Appeal requests must be in writing and be filed within 180 days from the date of this NPR. Filing requirements are summarized below.

This settlement is subject to future Center for Medicare and Medicaid Services clarifications and regulations which may retroactively affect it, and it may be revised at any time within the three-year period from the date of this notification.

| | **MAC Appeals** | **PRRB Appeals** |
|---|---|---|
| References: | 42CFR 405.1885 | 42CFR 405.1835 –405.1889 |
| Amount in Controversy: | | |
| Individual Providers | $1,000 - $10,000 | Over $10,000 |
| Group (Common Issues) | No provision for group appeals of unrelated providers | $50,000 or more, in aggregate; no minimum for individual providers |
| Groups | $1,000 - $10,000 for individual providers; less than $50,000 in the aggregate | Same as above |
| Send Request to: | Mike Harty Director, Appeals Strategic Government Initiatives Blue Cross Blue Shield Assn. 225 North Michigan Ave Chicago, IL 60601. | Chairman Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L Baltimore, MD 21244-2670 |
| Copy: | Darwin San Luis, FCSO 4880 Santa Rosa Road, Suite 170 Camarillo, CA 93012-0951 | Darwin San Luis, FCSO and Mike Harty, BCBSA |
| For Information on filing call: | Mike Harty Blue Cross Blue Shield Assn. 312.297.5876 | PRRB 410.786.2671 |

0639

00131

Pomona Valley Hospital Medical Center
050231 12/31/2006

The appeal requests for either an Intermediary/MAC or PRRB appeal must include the following:

1. Identification of items in dispute by adjustment number, amount and description,
2. Reasons for disagreement with the MAC's determination on these items, and
3. One (1) copy of the NPR, or determination disputed and adjustment report (pertinent portion).

MAC requests must include, in addition to the items listed above, an estimate of the reimbursement in controversy for each item appealed.  All position papers should be submitted electronically to FCSO by submitting via email to "J1CostReportAppeals@fcso.com."

Should you have any questions, regarding the payment and the amount of settlement, please contact the audit branch that is handling the audit.

| J1 Camarillo | | | | |
|---|---|---|---|---|
| Brenda | Merriweather | 805 | 504-3550 | J1 Camarillo |
| Ellen | Corwin | 805 | 504-3553 | J1 Camarillo |
| Marilyn | George | 805 | 504-3554 | J1 Camarillo |
| J1 Georgia | | | | |
| Donna | Wright | 706 | 478-1740 | J1 Georgia |
| J1 Jacksonville | | | | |
| Jacquoline | Burke | 904 | 791-8432 | J1 Jacksonville |
| Lewis | Cantrell | 904 | 791-8023 | J1 Jacksonville |
| Aryn | Linnane | 904 | 791-8500 | J1 Jacksonville |
| J1 Tampa | | | | |
| Ronald | Kaufman | 813 | 448-0452 | J1 Tampa |
| Kelvin | Dell | 813 | 448-0448 | J1 Tampa |

The manager is available to respond to any inquiries concerning disputed adjustments and to make a determination regarding the merits of reopening this cost report.  Please note that your right to appeal any adjustment is not jeopardized by such contact with the Intermediary/MAC.

Sincerely,

Martin Lothes
Director
Provider Audit and Reimbursement Department

Attachments

Audit Adjustment Report  
Date Prepared: 8/8/2012  
Data File:    C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca  
Fiscal Year:   01/01/2006  To  12/31/2006  
Provider Name: POMONA VALLEY HOSPITAL MED CTR  
Provider No:   050231

CMS-2552-96  
Page 12

Health Financial Systems  
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

WPR: B15A-1.19  
To adjust the DSH SSI % to the latest publication from CMS dated 3/16/2012.  
42 CFR 412.106  
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 23.21 | -8.47 | 14.74 | Replace |

WPR: B15A-1.19  
To adjust the DSH Patient Percentage to the MAC's computation based on revised Medicaid Days, SSI Percentage date 3/16/2012 and DRG Payments.  
42 CFR 412.106  
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 52.12 | -7.38 | 44.74 | Replace |

WPR: B15-2.13  
To adjust OP Hospital data to our reconciliation with the 11/29/2010 PS&R.  
Outpatient - OPPS Ref: 42CFR 412.110/413.20  
CMS PUB. 15-1 Sec. 2408.4

E, Part B, Title XVIII, Hospital, Line 1.02 PPS payments received including outliers.

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 9,020,056 | 155,396 | 9,175,452 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.00 Deductibles and coinsurance (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 66,545 | -55,024 | 11,521 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.01 Deductibles and coinsurance relating to line 17.01 (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 2,610,612 | 41,452 | 2,652,064 | Replace |

E, Part B, Title XVIII, Hospital, Line 24.00 Primary payer payments

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 5,222 | 85 | 5,307 | Replace |

E, Part B, Title XVIII, Hospital, Line 30.99 OTHER ADJUSTMENTS (SPECIFY)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 0 | -207 | -207 | Replace |

WPR: B14-1  
To adjust OP Bad Debts to the provider's submitted bad debt logs considering the patients 2% SOC.  
42 CFR Section 413.80  
CMS 15-1 Section 300

E, Part B, Title XVIII, Hospital, Line 27.00 Bad debts (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 853,849 | -39,475 | 814,374 | Replace |

E, Part B, Title XVIII, Hospital, Line 27.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 853,849 | -39,824 | 814,025 | Replace |

0641

Audit Adjustment Report                                                                                          CMS-2552-96
Date Prepared: 8/8/2012                                                                                           Page 11
Data File:    C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca
Fiscal Year:    01/01/2006   To   12/31/2006
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                                         Health Financial Systems
Provider No:    050231                                                                                            MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

**WPR: B13-6**
*To adjust the Prior Year Intern & Resident to Bed Ratio to the MAC's computation based on the Prior Year Finalized Cost Report.*
*PRM-II, Section 3630.1*

E, Part A, Title XVIII, Hospital, Line 3.19 Prior year resident to bed ratio (see instructions)
| 1.00 | 0.047342 | -0.000719 | 0.046623 | Replace |

**WPR: B15-1**
To properly eliminate the as filed IP Protested Amount.
Inpatient Part A Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11
| 1.00 | 596,732 | -596,732 | 0 | Replace |

**WPR: B14-1**
To adjust IP Bad Debts to the provider's submitted bad debt logs considering the patients 2% SOC.
42 CFR Section 413.80
CMS 15-1 Section 300

E, Part A, Title XVIII, Hospital, Line 21.00 Reimbursable bad debts (see instructions)
| 1.00 | 1,106,683 | 20,762 | 1,127,445 | Replace |

E, Part A, Title XVIII, Hospital, Line 21.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)
| 1.00 | 1,106,683 | 19,850 | 1,126,533 | Replace |

**WPR: B15-4.8**
To adjust ESRD days and discharges to the providers revised listings based on the results of our audit.
42CFR 412.104

E, Part A, Title XVIII, Hospital, Line 5.00 Total Medicare discharges on Worksheet S-3, Part I excluding discharges for DRGs 302, 316, 317 M
| 1.00 | 3,270 | 28 | 3,298 | Replace |

E, Part A, Title XVIII, Hospital, Line 5.01 Total ESRD Medicare discharges excluding DRGs 302, 316, 317, MS-DRGs 683 and 684 (see instruc
| 1.00 | 363 | -2 | 361 | Replace |

E, Part A, Title XVIII, Hospital, Line 5.03 Total Medicare ESRD inpatient days excluding DRGs 302, 316, 317, MS-DRGs 683 and 684 (see inst
| 1.00 | 3,063 | 42 | 3,105 | Replace |

00134

Audit Adjustment Report                                                             CMS-2552-96
Date Prepared: 8/8/2012                                                             Page 16
Data File:     C:\mcrif32\DATA\Settle\050231 12312006\WA050231.mca
Fiscal Year:   01/01/2006  To  12/31/2006
Provider Name: POMONA VALLEY HOSPITAL MED CTR                                       Health Financial Systems
Provider No:   050231                                                               MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

WPR: B13-1
To properly include the locality-adjusted national average per resident amount.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 96,606.04 | 96,606.04 | Replace |

WPR: B15-2.13
To adjust Capital DRG and Outliers to our reconciliation with the 11/29/2010 PS&R.
Inpatient Part A Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 2,537,783 | 28,977 | 2,566,760 | Replace |

L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 103,345 | 659 | 104,004 | Replace |

WPR: B15A-1.19
To adjust the Capital DSH SSI % to the latest publication from CMS dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 23.21 | -8.47 | 14.74 | Replace |

0643

00135

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 2

0644



December 28, 2012

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:     Pomona Valley Hospital Medical Center
        Provider No.: 05-0231/55-5502
        FYE: December 31, 2006
        PRRB Case No.: To Be Determined

Dear Mr. Chairman:

By this letter, Pomona Valley Hospital Medical Center ("Provider") designates Laurence
D. Getzoff of Hooper, Lundy and Bookman as its provider representative in the above-
referenced case to:

        Laurence D. Getzoff
        Hooper, Lundy and Bookman
        1875 Century Park East, Suite 1600
        Los Angeles, CA 90067

        Tel:    (310) 551-8190
        Fax:    (310) 551-8181
        E-mail:  Lgetzoff@health-law.com

If you have any questions, please call me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Director of Reimbursement & Capitated Systems

Cc:     Laurence D. Getzoff, Esq. Hooper, Lundy & Bookman
        Darwin San Luis, First Coat Services Option, Inc.
        Eric Swanson, Blue Cross Blue Shield Assn.

N:\Appeal\2006\04PRRB_Representative .doc



# Pomona Valley Hospital Medical Center

## Attachment to Model Form A

### Tab 3

0646

00138

Pomona Valley Hospital Medical Center
FYE: 12/31/2006

## STATEMENT OF THE ISSUES

**Issue One:  DSH Adjustment – Data Integrity in SSI Percentage calculation**
**Adjustment Numbers: 22, 23, 39**
**Reimbursement Impact: $1,552,507**

In calculating the Disproportionate Share Hospital ("DSH") adjustment, the Intermediary used a Supplemental Security Income ("SSI") ratio of 22.23%, which was furnished by CMS and amended in the Provider's cost report. However, the Intermediary was unable to provide the detailed underlying data to support the calculation of the SSI percentage. The Provider disputes the accuracy of the SSI percentage used by the Intermediary and seeks to analyze and challenge *the underlying data used by CMS in generating the SSI percentage. Based on the Provider's* recent SSI internal analysis for 2005, the Provider believes that the SSI percentage computed by CMS was understated by 6.61%. The regulation supporting the Provider's position appears at 42 C.F.R. § 412.106(b)(2).

**Issue Two:  DSH Adjustment – Inclusion of Medicare Part C in SSI Percentage**
**Adjustment Number 22, 23, 39**
**Reimbursement Impact: $2,155,262**

In calculating the DSH adjustment, the Intermediary used a SSI ratio of 14.74%, which included Medicare Part C days. The Provider contends that Medicare Part C days should not be included in either the numerator or denominator of the SSI fraction. In accordance with 42 U.S.C. § 1395ww(d)(5)F)(vi)(I), hospital inpatients who are "entitled to benefits under Part A" are to be included in the SSI fraction, with all such patients in the denominator and those who are also *entitled to SSI in the numerator*. The Provider maintains that patients who have enrolled in Medicare HMOs under Medicare Part C may be "eligible" for Part A, but are not "entitled" to Part A during the months when they have given up their Part A entitlement to enroll in Part C.

The Provider asserts that the Centers for Medicare & Medicaid Services ("CMS") has violated the statutory directive for computing the DSH SSI percent. Specifically, the Provider asserts that CMS has improperly included Part C and other days not covered or not paid under Medicare Part A in the DSH SSI percent. The inclusion of days not covered or paid under Medicare Part A violates the Medicare DSH statute. Further, CMS failed to follow the federal Administrative Procedure Act when attempting to promulgate a regulation that suggests Part C days will be (or should be) in the DSH SSI percent. Thus, the inclusion of Part C days (and other days not paid for or covered by Medicare Part A) in the DSH SSI percent is both procedurally and substantively invalid.

0647

00139

**Issue Three:  Unbilled Medicare Crossover Bad Debts**
**Adjustment Number: 20, 25**
**Reimbursement Impact:  $35,500**

In determining Medicare crossover bad debts, the Intermediary has allowed only the deductibles and copayments that were billed to Medi-Cal.  The Provider contends that it is *entitled to receive reimbursement as well for the unbilled crossover bad debts in accordance with 42 C.F.R. § 413.80 and CMS publication 15, Provider Reimbursement Manual Part I, Section 312.*  The estimated reimbursement impact for the unbilled crossover deductibles and copayments is approximately $35,000.

**Total Reimbursement Impact for all Controversy Issues:  $3,742,769**

\*     \*     \*     \*

N:\Appeal\2006\06 Appeal_Statement of Issues_after HLB review.doc

0648

00140

**POMONA VALLEY HOSPITAL MEDICAL CENTER**
Appeal Impact for Hearing Request
FISCAL YEAR ENDED: 12/31/2006

Prepared: 12/24/2012

## EXHIBIT A

| | Impact Calculation | | Impact Total | CMS Adj | Comments & Notes |
|---|---|---|---|---|---|
| **Issue One: DSH Adjustment  - SSI Data Integrity** | | | | | |
| | SSI Days | SSI % | | 22,23,39 | |
| Estimated SSI days per PVHMC - Part A only | 6,187 | 31.42% | | | Per internal estimate using 2005 detailed data S-1; Proxy of 31.42 |
| SSI Days per CMS - published 3/19/12 (include Part A & C) | 4,886 | 24.81% | | | |
| Difference | 1,301 | 6.61% | | | SSI/Mcare Part A days (w/o Part C) = 6,762 |
| Medicare Part A Days per  PSR 11/29/2010 | 19,694 | | | | |
| Estimated SSI% Reimbursement Impact | | 1,552,507 | 1,552,507 | | |
| **Issue Two: DSH Adjustment  - SSI Inclusion of Medicare Part C** | | | | | |
| | SSI Days | SSI % | | 22,23,39 | |
| SSI Days Part A & C per CMS | 4,886 | 14.74% | | | % in audited cost report |
| Medicare Part A & C Days per SSI Publication 3/19/12 | 33,149 | | | | |
| Estimated SSI Days Part A per CMS (2008 publication) | 4,709 | 23.91% | | | |
| Medicare Part A Days per  PSR 4/02/07 | 19,694 | | | | |
| Difference | | 9.17% | | | |
| Estimated SSI% Reimbursement Impact | | 2,155,262 | 2,155,262 | | |
| **Issue Three Unbilled Crossover Bad Debts** | | | | | |
| Estimated unbilled IP & OP Medicare Crossover Bad Debts | 50,000 | | | 20,25 | |
| BBA Reduction @        30% | (15,000) | | | | |
| Reimbursement Impact | 35,000 | | 35,000 | | |
| **Grand Total of Controversy Issues:** | | | 3,742,769 | | |

00141

0649

P-44



February 8, 2013

**Via Federal Express**

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

           Re: Pomona Valley Hospital Medical Center
               Medicare Provider No.: 05-0231/55-5502
               Fiscal Year Ended:  December 31, 2007
               Date of NPR:  August 20, 2012

Dear Chairman Harty:

       In accordance with 42 C.F.R. § 405.1835 – 405.1890, the Provider hereby requests a hearing before the Provider Reimbursement Review Board (the "Board") for the above-referenced fiscal year end Notice of Program Reimbursement ("NPR").  Enclosed are the following documents:

1. PRRB Model Form A
2. The required Certifications
3. The NPR and final adjustments (Tab 1)
4. A signed letter appointing Hooper, Ludy & Bookman and Laurence Getzoff, Esq. as Provider representative (Tab 2)
5. A description of the issues (Tab 3)
6. Exhibit A, which summarizes the calculation of the reimbursement impacts of the issues in dispute.

       Thank you for your attention to this matter.  If you have any questions or need any additional information, please contact me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Candice Le-Tran
Director of Reimbursement and Capitated Systems

cc:    Larry Getzoff, Hooper, Lundy & Bookman
       Darwin San Luis, First Coast Services Option, Inc.
       Eric Swanson, Blue Cross Blue Shield Assn.

N:\REIMB\Appeal\2007\07Appeal Letter_PRRB.doc

**0650**

00143

<div style="text-align:center">

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
**2520 Lord Baltimore Drive, Suite L**
**Baltimore, MD 21244-2670**
**Phone: 410-786-2671**

</div>

<div style="text-align:center">

**MODEL FORM A – INDIVIDUAL APPEAL REQUEST**

</div>

**Date of Request:** February 8, 2013

**Provider Name:** Pomona Valley Hospital Medical Center

**Provider Number:** 05-0231/55-5502

**Fiscal Year Ended:** 12/31/2007

**Intermediary/MAC:** Palmetto GBA, c/o First Coast Service Option, Inc.

**Notice of Final Determination Dated:** August 20, 2012

YOU MUST ATTACH THE FINAL DETERMINATION UNDER A **TAB LABELED 1**.
***If claiming intermediary/MAC failed to issue a timely Final Determination, state date cost
report was sent to intermediary:** _____
(Include copy of the cost report certification page and any other evidence to support the date the cost
report was filed.)

**Does this Request for Hearing include a request for Expedited Judicial Review?**
_____YES __**X**__NO (Note: A request for EJR must be submitted in a separate document and "EJR
Request" must be marked on the outside of the envelope.)

**Is the Provider requesting Mediation?** (If yes, a request must be submitted in a separate
document.)
__YES __X_ NO

**Provider Information:**
Provider Name: Pomona Valley Hospital Medical Center

Provider Contact/Title: Candice Le-Tran, Director of Reimbursement & Capitated System

Provider Address:     1798 N. Garey Avenue
                      Pomona, CA 91767

Provider Telephone Number: (909) 865-9844

Provider FAX Number: (909) 469-9433

E-mail address: Candice.Letran@PVHMC.org

<div style="text-align:center">1</div>

**Is this Provider commonly owned or controlled? _____ YES __X__ NO**
If **YES**, identify the name of the corporation, name of the contact person at the corporation, the address and telephone number:

**Intermediary/MAC Information:**

Intermediary/MAC Name: <u>Palmetto GBA</u>
                    Address:   Brenda Merriweather
                               c/o First Coast Services Option, Inc.
                               4880 Santa Rosa Road, Suite 170
                               Camarillo, CA 93012-0951

Intermediary/MAC Code:
(From NPR, if known)

**Representative Information (if applicable):**

Representative's Name:            Laurence D. Getzoff, Esq.
Company Name and Address:  Hooper, Lundy & Bookman
                                       1875 Century Park East, Suite 1600
                                       Los Angeles, CA 90067
Phone Number: (310) 551-8190
Fax Number: (310) 551-8181
E-mail Address: lgetzoff@health-law.com

If you are filing as a representative, UNDER A **TAB LABELED 2** YOU MUST ATTACH A LETTER SIGNED BY THE PROVIDER AUTHORIZING REPRESENTATION

**Issue(s) Appealed:**

UNDER A **TAB LABELED 3** YOU MUST SUBMIT A STATEMENT OF THE ISSUE. The statement of the issue must conform to the requirements of the regulations found at 42 C.F.R. § 405.1835 <u>et seq.</u> and the Board's Rules and include: (1.) Description of the issue; (2.) The audit adjustment number(s); if applicable or other evidence required by 42 C.F.R. § 405.1835 (a)(1)(ii); (3.) The amount in controversy; and (4.) A statement identifying the legal basis for the appeal (Cite statutes, regulations and/or manual provisions.).

**Total Amount in Controversy for all issues: ___ $2,246,181 _____**

2

0652

00145

## CERTIFICATIONS

A.    I certify that none of the issues filed in this appeal are pending in any other appeal for the same period and provider, nor have they been adjudicated, withdrawn, or dismissed from any other PRRB appeal.

Printed Name: <u>Candice Le-Tran</u>

Title: <u>Director of Reimbursement and Capitated Systems</u>

Signature: _____
             (Provider Owner/Officer/Director or Representative)

Date: <u>2|8|2013</u>

B.    I certify to the best of my knowledge that there are no other providers to which this provider is related by common ownership or control that have a pending request for a Board hearing on any of the same issues for a cost reporting period that ends in the same calendar year covered in this request. See 42 C.F.R. § 405.1835 (b)(4)(i).

Signature: _____
             (Provider Owner/Officer/Director or Representative)

Date: <u>2|8|2013</u>

C.    I certify that a copy of this Request (and any supporting documentation) was sent by **(Check one)**

_____United States Postal Service

  ✓  Nationally recognized courier. Specify name: <u>Federal Express</u>

to the intermediary/MAC on this ___8___ day of <u>February</u>, 2013.

Certified Mail or Tracking Number: <u>7947 1259 2515</u>

Signature: _____ Date: <u>2|8|2013</u>
        (Provider Owner/Officer/Director or Representative

3

00146

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 1

0654



**Palmetto GBA.**

PARTNERS IN EXCELLENCE.

**A/B MAC Jurisdiction 1**
**Provider Audit and Reimbursement**
**Department**

California, Nevada, Hawaii,
Guam, American Samoa,
Northern Mariana Islands

08/20/2012

NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT

Mr. MICHAEL NELSON
EVP, Finance
Pomona Valley Hospital Medical Center
1798 NORTH GAREY AVENUE
POMONA CA 91767

RE: Provider: Pomona Valley Hospital Medical Center
Provider Number: 050231
Fiscal Year End: 12/31/2007
NPI: 1407813660

Dear Mr. NELSON:

In accordance with Regulation Section 405.1803, this is your Notice of Program Reimbursement (NPR) for the above referenced period shows an amount due the program as follows:

|  |  | TITLE V | TITLE XVIII A | B |
|---|---|---|---|---|
|  |  | 1 | 2 | 3 |
| 1 | HOSPITAL | 0 | -1,190,362 | -485,140 |
| 5 | HOSPITAL-BASED SNF | 0 | -3,013 | -207 |
| 100 | TOTAL | 0 | -1,193,375 | -485,347 |

PART II - SETTLEMENT SUMMARY

(1,678,722)

Enclosed are schedules relating this determination to your originally claimed reimbursement.

Payment will follow this notice within the next few days, and will include more specific instructions regarding interest assessments. If this notice indicates a balance due the provider, our payment must be postmarked within 30 days of the date of this notice, otherwise we are required to pay you interest on the unpaid balance.

Revision 2/25/2011                    1-6.7.05
Offices:
632 Riverside Avenue ROC-16T, Jacksonville, FL 32202-4918
4350 W. Cypress Street – 9ᵗʰ Floor, Tampa, FL 33607-4164
4880 Santa Rosa Road, Suite 170, Camarillo, CA  93012-0951
www.palmettogba.com/J1            ISO 9001:2000



A CMS-Contracted Medicare Administrative Contractor

0655

00148

Pomona Valley Hospital Medical Center
050231 12/31/2007

Enclosed for your files is a copy of your adjusted cost report that is the basis of this NPR. Also enclosed is the Adjustment Report that reflects individual adjustments made, and includes reference to and citations of applicable law, regulations, or general instructions used as a basis of these adjustments.

This NPR is the Medicare Administrative Contractor's (MAC) determination for the purposes of appeal rights for the items of cost changed by it. We encourage you to discuss with us any disagreement you may have with the new adjustments contained herein. If the dispute cannot be resolved to your satisfaction, you may file an appeal of the determined items of cost with either the intermediary/MAC or the Provider Reimbursement Review Board (PRRB) depending on the amount in controversy. Appeal requests must be in writing and be filed within 180 days from the date of this NPR. Filing requirements are summarized below.

This settlement is subject to future Center for Medicare and Medicaid Services clarifications and regulations which may retroactively affect it, and it may be revised at any time within the three-year period from the date of this notification.

| | **MAC Appeals** | **PRRB Appeals** |
| --- | --- | --- |
| References: | 42CFR 405.1885 | 42CFR 405.1835 –405.1889 |
| Amount in Controversy: | | |
| Individual Providers | $1,000 - $10,000 | Over $10,000 |
| Group (Common Issues) | No provision for group appeals of unrelated providers | $50,000 or more, in aggregate; no minimum for individual providers |
| Groups | $1,000 - $10,000 for individual providers; less than $50,000 in the aggregate | Same as above |
| Send Request to: | Mike Harty Director, Appeals Strategic Government Initiatives Blue Cross Blue Shield Assn. 225 North Michigan Ave Chicago, IL 60601. | Chairman Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L Baltimore, MD 21244-2670 |
| Copy: | Darwin San Luis, FCSO 4880 Santa Rosa Road, Suite 170 Camarillo, CA 93012-0951 | Darwin San Luis, FCSO and Mike Harty, BCBSA |
| For Information on filing call: | Mike Harty Blue Cross Blue Shield Assn. 312.297.5876 | PRRB 410.786.2671 |

0656

00149

Pomona Valley Hospital Medical Center
050231 12/31/2007

The appeal requests for either an Intermediary/MAC or PRRB appeal must include the following:

1. Identification of items in dispute by adjustment number, amount and description,
2. Reasons for disagreement with the MAC's determination on these items, and
3. One (1) copy of the NPR, or determination disputed and adjustment report (pertinent portion).

MAC requests must include, in addition to the items listed above, an estimate of the reimbursement in controversy for each item appealed.  All position papers should be submitted electronically to FCSO by submitting via email to "J1CostReportAppeals@fcso.com."

Should you have any questions, regarding the payment and the amount of settlement, please contact the audit branch that is handling the audit.

| J1 Camarillo | | | | |
|---|---|---|---|---|
| Brenda | Merriweather | 805 | 504-3550 | J1 Camarillo |
| Ellen | Corwin | 805 | 504-3553 | J1 Camarillo |
| Marilyn | George | 805 | 504-3554 | J1 Camarillo |
| J1 Georgia | | | | |
| Donna | Wright | 706 | 478-1740 | J1 Georgia |
| J1 Jacksonville | | | | |
| Jacquoline | Burke | 904 | 791-8432 | J1 Jacksonville |
| Lewis | Cantrell | 904 | 791-8023 | J1 Jacksonville |
| Aryn | Linnane | 904 | 791-8500 | J1 Jacksonville |
| J1 Tampa | | | | |
| Ronald | Kaufman | 813 | 448-0452 | J1 Tampa |
| Kelvin | Dell | 813 | 448-0448 | J1 Tampa |

The manager is available to respond to any inquiries concerning disputed adjustments and to make a determination regarding the merits of reopening this cost report.  Please note that your right to appeal any adjustment is not jeopardized by such contact with the intermediary/MAC.

Sincerely,

Martin Lothes
Director
Provider Audit and Reimbursement Department

Attachments

Audit Adjustment Report                                                    CMS-2552-96
Date Prepared: 8/9/2012                                                    Page 11
Data File:     C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:   01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR                              Health Financial Systems
Provider No:   050231                                                     MCRIF32

|  | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 17   Ref: 27

WPR:  B14.1
To adjust Bad debts to the provider's revised listing submitted during the desk review.
42 CFR 413.80
CMS Pub 15-1 Sec. 300

E, Part A, Title XVIII, Hospital, Line 21.00 Reimbursable bad debts (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 1,290,899 | -97,620 | 1,193,279 | Replace |

E, Part A, Title XVIII, Hospital, Line 21.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)

| | | | | |
|---|---|---|---|---|
| 1.00 | 1,156,931 | -18,646 | 1,138,285 | Replace |

### Adjustment No. 18   Ref: 29

WPR:  B15.6
To removed the Part A protested amount.
42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11

| | | | | |
|---|---|---|---|---|
| 1.00 | 540,081 | -540,081 | 0 | Replace |

### Adjustment No. 19   Ref: 32

WPR:  B13.5
To adjust the allowable CY and Penultimate Year FTE count to the MAC's record's for the proper computation of the IME rolling average.
42 CFR 413.79
42 CFR 412.105

E, Part A, Title XVIII, Hospital, Line 3.08 FTE count for allopathic and osteopathic programs in the current year from your records

| | | | | |
|---|---|---|---|---|
| 1.00 | 18.06 | -0.03 | 18.03 | Replace |

E, Part A, Title XVIII, Hospital, Line 3.16 Total allowable FTE count for the penultimate year if that year ended on or after September 30, 199

| | | | | |
|---|---|---|---|---|
| 1.00 | 17.78 | 0.03 | 17.81 | Replace |

### Adjustment No. 20   Ref: 34

WPR:  B15.5.16
To adjust the DSH Patient Percentage to the MAC's computation based on revised Medicaid Days, revised SSI Percentage dated 3/16/2012 and DRG Payments.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | | | | |
|---|---|---|---|---|
| 1.00 | 54.10 | -6.99 | 47.11 | Replace |

Audit Adjustment Report           CMS-2552-96
Date Prepared: 8/9/2012          Page 12
Data File:     C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:     01/01/2007   To   12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR       Health Financial Systems
Provider No:    050231                    MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

**Adjustment No. 21 , Ref: 35**

WPR:  B15.16
To adjust the SSI percentage to the revised CMS publication dated 3/16/2012.
42 CFR 412.106
CMS Pub 15-1 Sec. 2807.2

E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 22.82 | -8.09 | 14.73 | Replace |

**Adjustment No. 22 , Ref: 14**

WPR:  B15.2.2
*To adjust OP Hospital PPS data to our reconciliation to the 7/28/11 PS&R.*
Outpatient - OPPS Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

E, Part B, Title XVIII, Hospital, Line 1.02 PPS payments received including outliers.

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 10,360,467 | 165,001 | 10,525,468 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.00 Deductibles and coinsurance (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 9,936 | 55 | 9,991 | Replace |

E, Part B, Title XVIII, Hospital, Line 18.01 Deductibles and coinsurance relating to line 17.01 (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 2,917,811 | 46,054 | 2,963,865 | Replace |

E, Part B, Title XVIII, Hospital, Line 24.00 Primary payer payments

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 5,571 | 0 | 5,571 | Replace |

E, Part B, Title XVIII, Hospital, Line 30.99 OTHER ADJUSTMENTS (SPECIFY)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | -165 | 0 | -165 | Replace |

**Adjustment No. 23 , Ref: 27**

WPR:  B14.1
*To adjust Bad debts to the provider's revised listing submitted during the desk review.*
42 CFR 413.80
CMS Pub 15-1 Sec. 300

E, Part B, Title XVIII, Hospital, Line 27.00 Bad debts (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 1,287,382 | -90,495 | 1,196,887 | Replace |

E, Part B, Title XVIII, Hospital, Line 27.02 Reimbursable bad debts for dual eligible beneficiaries (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 774,157 | 309,992 | 1,084,149 | Replace |

Audit Adjustment Report
Date Prepared: 8/9/2012
Data File:   C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:   01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:   050231

CMS-2552-96
Page 15

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 29   Ref: 22

WPR:  B15.3.2
To adjust Part A SNF PPS data to our reconciliation to the 7/28/11 PS&R.
SNF Inpatient Part A Ref:-42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| | | | | |
|---|---|---|---|---|
| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 24.00 Other than outlier payments | | | | |
| 2.00 | 2,117,036 | 20,602 | 2,137,638 | Replace |
| | | | | |
| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 36.00 Coinsurance | | | | |
| 2.00 | 113,708 | 3,100 | 116,808 | Replace |

### Adjustment No. 30   Ref: 27

WPR:  B14.1
To adjust Bad debts to the provider's revised listing submitted during the desk review.
42 CFR 413.80
CMS Pub 15-1 Sec. 300

| | | | | |
|---|---|---|---|---|
| E-3, Part III, Title XVIII, Skilled Nursing Facility, Line 38.00 Reimbursable bad debts (see instructions) | | | | |
| 2.00 | 8,774 | -4,304 | 4,470 | Replace |

### Adjustment No. 31   Ref: 11

WPR:  B15.1.4
To adjust IP Hospital managed care days to our reconciliation to the 7/28/11 PS&R.
Ref: 42CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4

| | | | | |
|---|---|---|---|---|
| E-3, Part IV, Title XVIII, Hospital, Line 6.02 Program managed care days occuring on or after January 1 of this cost reporting period (see inst | | | | |
| 1.00 DIRECT GME & ESRD OUTPATIENT DIRECT ME | 9,146 | 24 | 9,170 | Replace |

### Adjustment No. 32   Ref: 30

WPR:  B13.1
To adjust the Primary Care PRA to the Mac's record's.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

| | | | | |
|---|---|---|---|---|
| E-3, Part IV, Title XVIII, Hospital, Line 3.23 See instructions depending on the cost reporting periods beginning prior to 10/01/2001 or on or | | | | |
| 1.00 DIRECT GME & ESRD OUTPATIENT DIRECT ME | 102,107.54 | -169.03 | 101,938.51 | Replace |

### Adjustment No. 33   Ref: 31

WPR:  B13.1
To properly include the locality-adjusted national average per resident amount.
42 CFR 413.77
PM A-01-38
PRM-II, Section 3633.4

| | | | | |
|---|---|---|---|---|
| E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions) | | | | |
| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 99,040.51 | 99,040.51 | Replace |

Audit Adjustment Report
Date Prepared: 8/9/2012
Data File:      C:\mcrif32\DATA\Settle\050231 12312007\A.050231.1207.mca
Fiscal Year:    01/01/2007  To  12/31/2007
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:    050231

CMS-2552-96
Page 16

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| **Adjustment No: 34   Ref: 6** | | | | |
| WPR: B15.1.4 | | | | |
| To adjust Hospital Capital PPS data to our reconciliation to the 7/28/11 PS&R. | | | | |
| Inpatient Part A Ref: 42CFR 412.110/413.20 | | | | |
| CMS PUB. 15-1 Sec. 2408.4 | | | | |
| | | | | |
| L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier | | | | |
| 1.00 CAPITAL PAYMENT | 2,510,038 | 42,870 | 2,552,908 | Replace |
| | | | | |
| L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997 | | | | |
| 1.00 CAPITAL PAYMENT | 67,220 | 995 | 68,215 | Replace |
| **Adjustment No: 35   Ref: 35** | | | | |
| WPR: B15.16 | | | | |
| To adjust the SSI percentage to the revised CMS publication dated 3/16/2012. | | | | |
| 42 CFR 412.106 | | | | |
| CMS Pub 15-1 Sec. 2807.2 | | | | |
| | | | | |
| L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions) | | | | |
| 1.00 CAPITAL PAYMENT | 22.82 | -8.09 | 14.73 | Replace |

0661

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 2

0662



January 31, 2013

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive,  Suite L
Baltimore, MD 21244-2670

Re:    Pomona Valley Hospital Medical Center
        Provider No.: 05-0231/55-5502
        FYE: December 31, 2007
        PRRB Case No.:  To Be Determined

Dear Mr. Chairman:

By this letter, Pomona Valley Hospital Medical Center ("Provider") designates Laurence
D. Getzoff of Hooper, Lundy and Bookman as its provider representative in the above-
referenced case to:

        Laurence D. Getzoff
        Hooper, Lundy and Bookman
        1875 Century Park East, Suite 1600
        Los Angeles, CA 90067

        Tel:    (310) 551-8190
        Fax:    (310) 551-8181
        E-mail:  Lgetzoff@health-law.com

If you have any questions, please call me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Director of Reimbursement & Capitated Systems

Cc:    Laurence D. Getzoff, Esq. Hooper, Lundy & Bookman
        Darwin San Luis,  First Coat Services Option, Inc.
        Eric Swanson, Blue Cross Blue Shield Assn.

N:\REIMB\Appeal\2007\07PRRB_Representative.doc

ONE HUNDRED TOP HOSPITALS

PVHMC— A Recipient of
HEALTHGRADES
2009/2010 Outstanding Patient Experience Award™

(909) 865-9500  •  1798 North Garey Avenue, Pomona, CA  91767  •  www.pvhmc.org

0663

00156

# Pomona Valley Hospital Medical Center

## Attachment to Model Form A

### Tab 3

0664

Pomona Valley Hospital Medical Center
FYE: 12/31/2007

STATEMENT OF THE ISSUES

## ISSUES FOR INDIVIDUAL APPEAL:

**Issue One:  DSH Adjustment – Data Integrity in SSI Fraction calculation**
**Adjustment Numbers:  20, 21, 35**
**Reimbursement Impact:  $2,015,144**

In calculating the Disproportionate Share Hospital ("DSH") adjustment, the Intermediary was unable to provide a patient listing to support the calculation of the Supplemental Security Income ("SSI") ratio furnished by CMS.   The published SSI ratio with no supporting data was 14.73%, which included Part C days.  The Provider recalculated  CMS SSI ratio to exclude Part C days for purposes of demonstrating the reimbursement impact for Issue One, based on the language of the governing statute, which does not permit inclusion of Part C Days in the SSI ratio for DSH Adjustment purposes.  Without Part C, The Provider contends that the SSI ratio would be at 22.95%.  The Provider disputes the accuracy of the SSI percentage used by the Intermediary and seeks to analyze and challenge the underlying data used by CMS in generating the SSI percentage.  Based on the Provider's recent SSI internal analysis for 2005, the Provider believes that the SSI percentage computed by CMS for Part A should be at 31.42% and was understated by 6.99%.  The regulation supporting the Provider's position appears at 42 C.F.R. § 412.106(b)(2).

**Issue Two:  DSH Adjustment – Part C Dual Days in Medicaid Fraction**
**Adjustment Numbers:  20, 21, 35**
**Reimbursement Impact:  $196,036**

In calculating the Disproportionate Share Hospital ("DSH") adjustment, by including all Part C days in the SSI ratio, the Intermediary also neglected to include qualifying Medi-Cal (and Medicare Part C) "dual eligible" Part C days in the Medicaid fraction or ratio of the DSH Adjustment.  The Intermediary used a Medicaid ratio of 55.45%, which was based on the Medi-Cal eligible days submitted by the Provider in conjunction with the eligibility verification process performed by the Department of Heathcare Services (DHCS).  Due to an apparent program error, the DHCS eligibility verification process did not distinguish between Part A patients and Part C patients for purposes of identifying DHCS Medi-Cal eligibility.  Therefore, the Provider was required to exclude these patient days as dual days in the Medicaid ratio, even though the Medi-Cal eligible Part C patient days should have been included in the Provider's Medicaid fraction.  The Provider contends that under the plain language of the governing Medicare statute, the Medicare Part C with Medicaid coverage patients are not entitled to

0665

00158

benefits nor were these days paid under Medicare Part A.   These Medicare Part C patients are paid through the Provider's contracted plan partners under the Risk-Adjusted Medicare Advantage (MA) rates, a per diem, or case rate, and the Provider's hospital-specific DSH components are not part of these contracted rates.  The Provider did not receive the usual Medicare Part A DRG payment on these contracted Medicare Part C patients.   The Provider has identified 986 days associated with these patients.  These days are not part of the Medicare Part A dual exclusion requirements and should be included as Medicaid days in the Medicaid ratio.  The regulation supporting the Provider's position appears at 42 C.F.R. § 412.106(b)(2).

**Issue Three:  Unbilled Medicare Crossover Bad Debts**
**Adjustment Number: 17, 23, 30**
**Reimbursement Impact:  $35,000**

In determining Medicare crossover bad debts, the Intermediary has allowed only the deductibles and copayments that were billed to Medi-Cal.  The Provider contends that it is entitled to receive reimbursement as well for the unbilled crossover bad debts in accordance with 42 C.F.R. § 413.80 and CMS publication 15, Provider Reimbursement Manual Part I, Section 312.  The estimated reimbursement impact for the unbilled crossover deductibles and copayments is approximately $35,000.

**Total Reimbursement Impact for all Controversy Issues:  $2,246,181**

\*     \*     \*     \*

# OTHER ISSUE SEPARATELY UNDER APPEAL FOR THIS COST REPORTING YEAR:

The Provider also appealed the DSH Adjustment SSI Part C days issue as a group appeal. The appeal was requested on December 20, 2012 by Hooper, Lundy & Bookman, P.C. as part of the HLB Independent Hospitals 2007 DSH SSI Part C Days, Case No. 13-0368G.

N:\REIMB\Appeal\2007\07 Appeal_Statement of Issues.doc

**POMONA VALLEY HOSPITAL MEDICAL CENTER**
Appeal Impact for Hearing Request
FISCAL YEAR ENDED: 12/31/2007

Prepared: 2/8/2013 12:14

# EXHIBIT A

| | Impact Calculations | | | Impact Total | CMS Audit | Comments & Notes |
|---|---|---|---|---|---|---|
| **Issue One: DSH Adjustment - SSI Data Integrity** | | | | | | |
| | Per PVHMC | Per CMS | Diff | | | |
| SSI days - Estimated Part A only | 5,685 | 4,153 | | | 20,21,35 | Per internal estimate using 2005 detailed data S-1. Proxy of 31.42%. |
| 2007 Medicare Part A Days per PS&R dtd 7/28/11 | 18,097 | 18,097 | | | | CMS SSI Days assumed to be all Part A since no patient detail available |
| Estimated SSI% Part A Only | 31.416% | 22.949% | | | | |
| Medicaid % | 55.45% | 55.45% | | | | Used PVHMC's FYE - Should be on FFY - immaterial |
| Estimated SSI% Part A Only | 31.42% | 22.95% | | | | |
| Disproportionate Patient% | 86.87% | 78.40% | | | | |
| Maximum Adj | 20.20% | 20.20% | | | | |
| Amount Over Max | 66.67% | 58.20% | | | | |
| DSH Factor - Amount Over Max * 0.825 +.0588 | 60.88% | 53.89% | 6.99% | | | |
| PVHMC Federal Specific Pymt per PS&R dtd 7/28/11 | | | $ 28,828,953 | | | |
| Reimbursement Impact | | | 2,015,144 | 2,015,144 | | |
| **Issue Two: DSH Adjustment - Part C Dual** | | | | | | |
| | Per PVHMC | Per CMS | Diff | | | |
| Allowed Medicaid Eligible Days per 8/20/12 NPR | 66,213 | 66,213 | | | | |
| Part C Dual per Internal DSH listing | 986 | | | | | |
| | 67,199 | 66,213 | | | | |
| Total Hospital Days per 8/20/12 NPR | 119,404 | 119,404 | | | | |
| Medicaid % | 56.28% | 55.46% | | | 20,21,35 | |
| SSI% per Audit | 14.73% | 14.73% | | | | |
| Disproportionate Patient% | 71.01% | 70.18% | | | | |
| Maximum Adj | 20.20% | 20.20% | | | | |
| Amount Over Max | 50.81% | 49.98% | | | | Used PVHMC's FYE - Should be on FFY - immaterial |
| DSH Factor - Amount Over Max * 0.825 +.0588 | 47.80% | 47.12% | 0.68% | | | |
| PVHMC Federal Specific Pymt per PS&R dtd 7/28/11 | | | 28,828,953 | | | |
| Reimbursement Impact | | | 196,036.88 | 196,037 | | |
| **Issue Three: Unbilled Crossover Bad Debts** | | | | | | |
| Estimated unbilled IP & OP Medicare Crossover Bad Debts | 50,000 | | | | 17,23,30 | |
| BBA Reduction @           30% | (15,000) | | | | | |
| Reimbursement Impact | 35,000 | | | 35,000 | | |
| **Grand Total of Controversy Issues:** | | | | 2,246,181 | | |

00160

0667

Printed:2/8/2013 File:N\REIMB\Appeal\2007\07Appeal_PP Impact\07Appeal_PP Impact

P-45

00161



**POMONA VALLEY HOSPITAL**
MEDICAL CENTER

February 11, 2013

**Via Federal Express**

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re: Pomona Valley Hospital Medical Center
Medicare Provider No.: 05-0231/55-5502
Fiscal Year Ended: December 31, 2008
Date of NPR: August 29, 2012

Dear Chairman Harty:

In accordance with 42 C.F.R. § 405.1835 – 405.1890, the Provider hereby requests a
hearing before the Provider Reimbursement Review Board (the "Board") for the above-
referenced fiscal year end Notice of Program Reimbursement ("NPR"). Enclosed are the
following documents:

1. PRRB Model Form A
2. The required Certifications
3. The NPR and final adjustments (Tab 1)
4. A signed letter appointing Hooper, Ludy & Bookman and Laurence Getzoff, Esq.
   as Provider representative (Tab 2)
5. A description of the issues (Tab 3)
6. Exhibit A, which summarizes the calculation of the reimbursement impacts of the
   issues in dispute.

Thank you for your attention to this matter. If you have any questions or need any
additional information, please contact me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Director of Reimbursement and Capitated Systems

cc:    Larry Getzoff, Hooper, Lundy & Bookman
       Darwin San Luis, First Coast Services Option, Inc.
       Eric Swanson, Blue Cross Blue Shield Assn.


HEALTHGRADES
2009/2010 Outstanding Patient Experience Award™

N:\REIMBVRS\6--b\2008\08\Appeal Letter_PRRB.doc

0668

(909) 865-9500 • 1798 North Garey Avenue, Pomona, CA 91767 • www.pvhmc.org

00162

---

**DEPARTMENT OF HEALTH & HUMAN SERVICES**
**PROVIDER REIMBURSEMENT REVIEW BOARD**
**2520 Lord Baltimore Drive, Suite L**
**Baltimore, MD 21244-2670**
**Phone: 410-786-2671**

---

**MODEL FORM A – INDIVIDUAL APPEAL REQUEST**

---

Date of Request: <u>February 12, 2013</u>

Provider Name: <u>Pomona Valley Hospital Medical Center</u>

Provider Number: <u>05-0231/55-5502</u>

Fiscal Year Ended: <u>12/31/2008</u>

Intermediary/MAC: <u>Palmetto GBA, c/o First Coast Service Option, Inc.</u>

Notice of Final Determination Dated: <u>August 29, 2012</u>

YOU MUST ATTACH THE FINAL DETERMINATION UNDER A <u>**TAB LABELED 1**</u>.
\*If claiming intermediary/MAC failed to issue a timely Final Determination, state date cost report was sent to intermediary: _____
(Include copy of the cost report certification page and any other evidence to support the date the cost report was filed.)

Does this Request for Hearing include a request for Expedited Judicial Review?
_____YES __X__ NO (Note: A request for EJR must be submitted in a separate document and "EJR Request" must be marked on the outside of the envelope.)

Is the Provider requesting Mediation? (If yes, a request must be submitted in a separate document.)
__YES __X_ NO

<u>**Provider Information:**</u>
Provider Name: <u>Pomona Valley Hospital Medical Center</u>

Provider Contact/Title: <u>Candice Le-Tran, Director of Reimbursement & Capitated System</u>

Provider Address:    <u>1798 N. Garey Avenue</u>
                     <u>Pomona, CA 91767</u>

Provider Telephone Number: <u>(909) 865-9844</u>

Provider FAX Number: <u>(909) 469-9433</u>

E-mail address: <u>Candice.Letran@PVHMC.org</u>

0669

00163

**Is this Provider commonly owned or controlled?** ____YES __X__NO
If **YES**, identify the name of the corporation, name of the contact person at the corporation, the address and telephone number:

**Intermediary/MAC Information:**

Intermediary/MAC Name: <u>Palmetto GBA</u>
               Address:  Brenda Merriweather
                           c/o First Coast Services Option, Inc.
                           4880 Santa Rosa Road, Suite 170
                           Camarillo, CA 93012-0951

Intermediary/MAC Code:
(From NPR, if known)

**Representative Information (if applicable):**

Representative's Name:      Laurence D. Getzoff, Esq.
Company Name and Address: Hooper, Lundy & Bookman
                            1875 Century Park East, Suite 1600
                            Los Angeles, CA 90067
Phone Number: (310) 551-8190
Fax Number: (310) 551-8181
E-mail Address: lgetzoff@health-law.com

If you are filing as a representative, UNDER A **TAB LABELED 2** YOU MUST ATTACH A LETTER SIGNED BY THE PROVIDER AUTHORIZING REPRESENTATION

**Issue(s) Appealed:**

UNDER A **TAB LABELED 3** YOU MUST SUBMIT A STATEMENT OF THE ISSUE. The statement of the issue must conform to the requirements of the regulations found at 42 C.F.R. § 405.1835 <u>et seq.</u> and the Board's Rules and include: (1.) Description of the issue; (2.) The audit adjustment number(s); if applicable or other evidence required by 42 C.F.R. § 405.1835 (a)(1)(ii); (3.) The amount in controversy; and (4.) A statement identifying the legal basis for the appeal (Cite statutes, regulations and/or manual provisions.).

**Total Amount in Controversy for all issues: __$4,741,511_____**

2

0670

00164

## CERTIFICATIONS

A.  I certify that none of the issues filed in this appeal are pending in any other appeal for the same period and provider, nor have they been adjudicated, withdrawn, or dismissed from any other PRRB appeal.

Printed Name: <u>Candice Le-Tran</u>

Title: <u>Director of Reimbursement and Capitated Systems</u>

Signature: <u>Candice LeTran</u>
              (Provider Owner/Officer/Director or Representative)

Date: <u>2|12|2013</u>

B.  I certify to the best of my knowledge that there are no other providers to which this provider is related by common ownership or control that have a pending request for a Board hearing on any of the same issues for a cost reporting period that ends in the same calendar year covered in this request. See 42 C.F.R. § 405.1835 (b)(4)(i).

Signature: <u>Candice LeTran</u>
              (Provider Owner/Officer/Director or Representative)

Date: <u>2|12|2013</u>

C.  I certify that a copy of this Request (and any supporting documentation) was sent by **(Check one)**

_____ United States Postal Service

__✓__ Nationally recognized courier. Specify name: <u>Fed Ex</u>

to the intermediary/MAC on this <u>12</u> day of <u>February</u>, 2<u>013</u>.

Certified Mail or Tracking Number: <u>7947 3105 7802</u>

Signature: <u>Candice LeTran</u>                    Date: <u>2/12 2013</u>
              (Provider Owner/Officer/Director or Representative

3

0671

00165

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 1

0672





*handwritten: GBS Scanned 9/11/1*

**A/B MAC Jurisdiction 1**
**Provider Audit and Reimbursement**
**Department**

California, Nevada, Hawaii,
Guam, American Samoa,
Northern Mariana Islands

08/29/2012

NOTICE OF AMOUNT OF PROGRAM REIMBURSEMENT

Mr. MICHAEL NELSON
Pomona Valley Hospital Medical Center
1798 NORTH GAREY AVENUE
POMONA, CA 91767

RE:  Provider: Pomona Valley Hospital Medical Center
Provider Number: 050231
Fiscal Year End: 12/31/2008
NPI: 1407813660

Dear MICHAEL NELSON:

In accordance with Regulation Section 405.1803, this is your Notice of Program Reimbursement (NPR) for the above referenced period shows an amount due the program as follows:

PART II - SETTLEMENT SUMMARY

| | | TITLE V | TITLE XVIII | |
| | | | A | B |
| | | 1 | 2 | 3 |
| 1 | HOSPITAL | 0 | -2,115,497 | 183,010 |
| 5 | HOSPITAL-BASED SNF | 0 | 3,012 | 74 |
| 100 | TOTAL | 0 | -2,112,485 | 183,084 |

*handwritten: 1,929,401*

Enclosed are schedules relating this determination to your originally claimed reimbursement.

Payment will follow this notice within the next few days, and will include more specific instructions regarding interest assessments.  If this notice indicates a balance due the provider, our payment must be postmarked within 30 days of the date of this notice, otherwise we are required to pay you interest on the unpaid balance.

Revision 2/25/2011                     1-6.7.05
Offices:
632 Riverside Avenue ROC-16T, Jacksonville, FL 32202-4918
4350 W. Cypress Street – 9ᵗʰ Floor, Tampa, FL 33607-4164
4880 Santa Rosa Road, Suite 170, Camarillo, CA 93012-0951
www.palmettogba.com/J1                 ISO 9001:2000

**CMS**

*A CMS Contracted Medicare Administrative Contractor*

Pomona Valley Hospital Medical Center
050231 12/31/2008

Enclosed for your files is a copy of your adjusted cost report that is the basis of this NPR. Also enclosed is the Adjustment Report that reflects individual adjustments made, and includes reference to and citations of applicable law, regulations, or general instructions used as a basis of these adjustments.

This NPR is the Medicare Administrative Contractor's (MAC) determination for the purposes of appeal rights for the items of cost changed by it. We encourage you to discuss with us any disagreement you may have with the new adjustments contained herein. If the dispute cannot be resolved to your satisfaction, you may file an appeal of the determined items of cost with either the intermediary/MAC or the Provider Reimbursement Review Board (PRRB) depending on the amount in controversy. Appeal requests must be in writing and be filed within 180 days from the date of this NPR. Filing requirements are summarized below.

This settlement is subject to future Center for Medicare and Medicaid Services clarifications and regulations which may retroactively affect it, and it may be revised at any time within the three-year period from the date of this notification.

| | **MAC Appeals** | **PRRB Appeals** |
|---|---|---|
| References: | 42CFR 405.1885 | 42CFR 405.1835 –405.1889 |
| Amount in Controversy: | | |
| Individual Providers | $1,000 - $10,000 | Over $10,000 |
| Group (Common Issues) | No provision for group appeals of unrelated providers | $50,000 or more, in aggregate; no minimum for individual providers |
| Groups | $1,000 - $10,000 for individual providers; less than $50,000 in the aggregate | Same as above |
| Send Request to: | Mike Harty Director, Appeals Strategic Government Initiatives Blue Cross Blue Shield Assn. 225 North Michigan Ave Chicago, IL 60601. | Chairman Provider Reimbursement Review Board 2520 Lord Baltimore Drive, Suite L Baltimore, MD 21244-2670 |
| Copy: | Darwin San Luis, FCSO 4880 Santa Rosa Road, Suite 170 Camarillo, CA 93012-0951 | Darwin San Luis, FCSO and Mike Harty, BCBSA |
| For Information on filing call: | Mike Harty Blue Cross Blue Shield Assn. 312.297.5876 | PRRB 410.786.2671 |

00168

Pomona Valley Hospital Medical Center
050231 12/31/2008

The appeal requests for either an Intermediary/MAC or PRRB appeal must include the following:

1. Identification of items in dispute by adjustment number, amount and description,
2. Reasons for disagreement with the MAC's determination on these items, and
3. One (1) copy of the NPR, or determination disputed and adjustment report (pertinent portion).

MAC requests must include, in addition to the items listed above, an estimate of the reimbursement in controversy for each item appealed.  All position papers should be submitted electronically to FCSO by submitting via email to "J1CostReportAppeals@fcso.com."

Should you have any questions, regarding the payment and the amount of settlement, please contact the audit branch that is handling the audit.

| J1 Camarillo | | | | |
|---|---|---|---|---|
| Brenda | Merriweather | 805 | 504-3550 | J1 Camarillo |
| Ellen | Corwin | 805 | 504-3553 | J1 Camarillo |
| Marilyn | George | 805 | 504-3554 | J1 Camarillo |
| J1 Georgia | | | | |
| Donna | Wright | 706 | 478-1740 | J1 Georgia |
| J1 Jacksonville | | | | |
| Jacquoline | Burke | 904 | 791-8432 | J1 Jacksonville |
| Lewis | Cantrell | 904 | 791-8023 | J1 Jacksonville |
| Aryn | Linnane | 904 | 791-8500 | J1 Jacksonville |
| J1 Tampa | | | | |
| Ronald | Kaufman | 813 | 448-0452 | J1 Tampa |
| Kelvin | Dell | 813 | 448-0448 | J1 Tampa |

The manager is available to respond to any inquiries concerning disputed adjustments and to make a determination regarding the merits of reopening this cost report.  Please note that your right to appeal any adjustment is not jeopardized by such contact with the intermediary/MAC.

Sincerely,

Martin Lothes
Director
Provider Audit and Reimbursement Department

Attachments

Audit Adjustment Report
Date Prepared: 8/16/2012
Data File:     C:\HFS 2012 (AS)\050231.1208\F.050231.1208.mca
Fiscal Year:   01/01/2008   To   12/31/2008
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:   050231

CMS-2552-96
Page 11

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 16    Ref: 25

WPR: B.30.1
E, Part A, Title XVIII, Disproportionate Share Hospital
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage and SSI%, based on our CY audit findings.

E, Part A, Title XVIII, Hospital, Line 4.00 Percentage of SSI recipient patient days to Medicare Part A patient days. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 22.82 | -8.42 | 14.40 | Replace |

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 52.78 | -6.65 | 46.13 | Replace |

See Also Ref.# 30

### Adjustment No. 17    Ref: 26

WPR: B.53.1
Protested Amount - Title XVIII
Ref: 42CFR 413.24
CMS PUB. 15-2 Sec. 3630.1
To eliminate protested amounts identified on the amended OCR, in accordance to our CMS guidelies.

E, Part A, Title XVIII, Hospital, Line 30.00 Protested amounts (nonallowable cost report items) in accordance with CMS Pub. 15-II, section 11

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 3,786,857 | -3,786,857 | 0 | Replace |

### Adjustment No. 18    Ref: 27

WPR: B.12.2
E, Part A, Title XVIII, IME Rolling Average
Ref: 42CFR 413.79
CMS PUB. 15-1 Sec. 3630.1
To adjust the CY IME FTE count to be used for the Rolling Average calculation.

E, Part A, Title XVIII, Hospital, Line 3.08 FTE count for allopathic and osteopathic programs in the current year from your records

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 18.23 | -0.07 | 18.16 | Replace |

### Adjustment No. 19    Ref: 30

WPR: B.30.2
E, Part A, Title XVIII, Disproportionate Share Hospital Percentage
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage, based on provider submitted listing.

E, Part A, Title XVIII, Hospital, Line 4.03 Allowable disproportionate share percentage. (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 | 46.13 | -0.27 | 45.86 | Add |

See Also Ref.# 25

0676

Audit Adjustment Report
Date Prepared: 8/16/2012
Data File:      C:\HFS 2012 (AS)\050231.1208\F.050231.1208.mca
Fiscal Year:    01/01/2008   To   12/31/2008
Provider Name: POMONA VALLEY HOSPITAL MED CTR
Provider No:    050231

CMS-2552-96
Page 15

Health Financial Systems
MCRIF32

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|

### Adjustment No. 30   Ref: 24

WPR: 8.9.1
E-3, Part IV, Per-Resident-Amount
Ref: 42 CFR 413.77
CMS PUB.-15-2 Sec. 3633.4
To adjust the updated per-resident amount (PRA) for the primary care residents, and include the Locality-adjusted national average per resident amount on the RCR.

E-3, Part VI, Title XVIII, Hospital, Line 8.00 Enter the locality adjustment national average per resident amount (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 DIRECT GME & IME PAYMENTS FOR REDISTRI | 0.00 | 104,299.56 | 104,299.56 | Replace |

### Adjustment No. 31   Ref: 8

WPR: B.51.1A
L, Part I, Inpatient Part A
Ref: 42 CFR 412.110/413.20
CMS PUB. 15-1 Sec. 2408.4
To reconcile updated PS&R data dated 02/23/2012. to CY amended OCR data.

L, Part I, Title XVIII, Hospital, Line 2.00 Capital DRG other than outlier

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 2,688,052 | -16,380 | 2,671,672 | Replace |

L, Part I, Title XVIII, Hospital, Line 3.01 Capital DRG outlier payments for services rendered on or after to October 1, 1997

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 93,961 | 4,783 | 98,744 | Replace |

### Adjustment No. 32   Ref: 25

WPR: B.30.1
E, Part A, Title XVIII, Disproportionate Share Hospital
Ref: 42CFR 412.106
CMS PUB. 15-1 Sec. 2807.2
To adjust the Allowable DSH percentage and SSI%, based on our CY audit findings.

L, Part I, Title XVIII, Hospital, Line 5.00 Percentage of SSI recipient patient days to Medicare Part A patient days (see instructions)

| | Previous Value | Difference | New Value | Action |
|---|---|---|---|---|
| 1.00 CAPITAL PAYMENT | 22.82 | -8.42 | 14.40 | Replace |

0677

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 2

0678



# POMONA VALLEY HOSPITAL
## MEDICAL CENTER

January 31, 2013

Chairman Michael Harty
Provider Reimbursement Review Board
Department of Health and Human Services
2520 Lord Baltimore Drive, Suite L
Baltimore, MD 21244-2670

Re:    Pomona Valley Hospital Medical Center
        Provider No.: 05-0231/55-5502
        FYE: December 31, 2008
        PRRB Case No.: To Be Determined

Dear Mr. Chairman:

By this letter, Pomona Valley Hospital Medical Center ("Provider") designates Laurence D. Getzoff of Hooper, Lundy and Bookman as its provider representative in the above-referenced case to:

        Laurence D. Getzoff
        Hooper, Lundy and Bookman
        1875 Century Park East, Suite 1600
        Los Angeles, CA 90067

        Tel:    (310) 551-8190
        Fax:    (310) 551-8181
        E-mail: Lgetzoff@health-law.com

If you have any questions, please call me at (909) 865-9844.

Sincerely,

Candice Le-Tran
Director of Reimbursement & Capitated Systems

Cc:    Laurence D. Getzoff, Esq. Hooper, Lundy & Bookman
        Darwin San Luis, First Coat Services Option, Inc.
        Eric Swanson, Blue Cross Blue Shield Assn.

N:\REIMB\Appeal\2008\08PRRB_Representative.doc

ONE HUNDRED TOP HOSPITALS

*PVHMC—A Recipient of*
HEALTHGRADES
*2009/2010 Outstanding Patient Experience Award™*

0679

(909) 865-9500 • 1798 North Garey Avenue, Pomona, CA 91767 • www.pvhmc.org

00173

Pomona Valley Hospital Medical Center

Attachment to Model Form A

Tab 3

0680

00174

Pomona Valley Hospital Medical Center
FYE: 12/31/2008

## STATEMENT OF THE ISSUES

**Issue One:  DSH Adjustment – Data Integrity in SSI Fraction calculation**
**Adjustment Numbers:  16, 19, 32**
**Reimbursement Impact:  $2,392,872**

In calculating the Disproportionate Share Hospital ("DSH") adjustment, the Intermediary was unable to provide a patient listing to support the calculation of the Supplemental Security Income ("SSI") ratio furnished by CMS.   The published SSI ratio with no supporting data was 14.40%, which included Part C days.  The Provider recalculated  CMS SSI ratio to exclude Part C days for purposes of demonstrating the reimbursement impact for Issue One, based on the language of the governing statute, which does not permit inclusion of Part C Days in the SSI ratio for DSH Adjustment purposes.  Without Part C, The Provider contends that the SSI ratio would be at 22.26%.  The Provider disputes the accuracy of the SSI percentage used by the Intermediary and seeks to analyze and challenge the underlying data used by CMS in generating the SSI percentage.  Based on the Provider's recent SSI internal analysis for 2005, the Provider believes that the SSI percentage computed by CMS was understated by 7.55%.  The regulation supporting the Provider's position appears at 42 C.F.R. § 412.106(b)(2).

**Issue Two:  DSH Adjustment – Inclusion of Medicare Part C in SSI Percentage**
**Adjustment Number 16, 19, 32**
**Reimbursement Impact:  $2,056,920**

In calculating the DSH adjustment, the Intermediary used a SSI ratio of 14.40%, which included Medicare Part C days.  The Provider contends that Medicare Part C days should not be included in either the numerator or denominator of the SSI fraction.  In accordance with 42 U.S.C. § 1395ww(d)(5)F)(vi)(I), hospital inpatients who are "entitled to benefits under Part A" are to be included in the SSI fraction, with all such patients in the denominator and those who are also entitled to SSI in the numerator.   The Provider maintains that patients who have enrolled in Medicare HMOs under Medicare Part C may be "eligible" for Part A, but are not "entitled" to Part A during the months when they have given up their Part A entitlement to enroll in Part C.

The Provider asserts that the Centers for Medicare & Medicaid Services ("CMS") has violated the statutory directive for computing the DSH SSI percent.  Specifically, the Provider asserts that CMS has improperly included Part C and other days not covered or not paid under Medicare Part A in the DSH SSI percent.  The inclusion of days not covered or paid under Medicare Part A violates the Medicare DSH statute.  Further, CMS failed to follow the federal Administrative Procedure Act when attempting to promulgate a regulation that suggests Part C days will be (or should be) in the DSH SSI percent.  Thus, the inclusion of Part C days (and other days not paid for or covered by Medicare Part A) in the DSH SSI percent is both procedurally and substantively invalid.  The Provider asserts that the SSI percentage without Medicare Part C days in the numerator and denominator would be at 22.26% and was understated by 6.49%.

0681

**Issue Three:  DSH Adjustment – Part C Dual Days in Medicaid Fraction**
**Adjustment Numbers:  16, 19, 32**
**Reimbursement Impact:  $256,719**

In calculating the Disproportionate Share Hospital ("DSH") adjustment, by including all Part C days in the SSI ratio, the Intermediary also neglected to include qualifying Medi-Cal (and Medicare Part C) "dual eligible" Part C days in the Medicaid fraction or ratio of the DSH Adjustment. The Intermediary used a Medicaid ratio of 54.26%, which was based on the Medi-Cal eligible days submitted by the Provider in conjunction with the eligibility verification process performed by the Department of Heath Care Services (DHCS). Due to an apparent program error, the DHCS eligibility verification process did not distinguish between Part A patients and Part C patients for purposes of identifying DHCS Medi-Cal eligibility. Therefore, the Provider was required to exclude these patient days as dual days in the Medicaid ratio, even though the Medi-Cal eligible Part C patient days should have been included in the Provider's Medicaid fraction. The Provider contends that under the plain language of the governing Medicare statute, the Medicare Part C with Medicaid coverage patients are not entitled to benefits nor were these days paid under Medicare Part A.  These Medicare Part C patients are paid through the Provider's contracted plan partners under the Risk-Adjusted Medicare Advantage (MA) rates, a per diem, or case rate, and the Provider's hospital-specific DSH components are not part of these contracted rates. The Provider did not receive the usual Medicare Part A DRG payment on these contracted Medicare Part C patients.  The Provider has identified 1,216 days associated with these patients.  These days are not part of the Medicare Part A dual exclusion requirements and should be included as Medicaid days in the Medicaid ratio. The regulation supporting the Provider's position appears at 42 C.F.R. § 412.106(b)(2).

**Issue Four:  Unbilled Medicare Crossover Bad Debts**
**Adjustment Number: 17**
**Reimbursement Impact:  $35,000**

In determining Medicare crossover bad debts, the Intermediary has allowed only the deductibles and copayments that were billed to Medi-Cal. The Provider contends that it is entitled to receive reimbursement as well for the unbilled crossover bad debts in accordance with 42 C.F.R. § 413.80 and CMS publication 15, Provider Reimbursement Manual Part I, Section 312. The estimated reimbursement impact for the unbilled crossover deductibles and copayments is approximately $35,000.


**Total Reimbursement Impact for all Controversy Issues:  $4,741,511**


\*       \*       \*       \*


N:\REIMB\Appeal\2008\08 Appeal_Statement of Issues.doc


0682

00176

POMONA VALLEY HOSPITAL MEDICAL CENTER
Appeal Impact for Hearing Request
FISCAL YEAR ENDED: 12/31/2008

Prepared:   2/12/2013 12:05

## EXHIBIT A

| | Impact By Calculation | | | Impact Total | CMS Adj | Comments & Notes |
|---|---|---|---|---|---|---|
| **Issue One: DSH Adjustment - SSI Data Integrity** | Per PVHMC | Per CMS | Diff | | | |
| SSI days - Estimated Part A only | 5,976 | 4,235 | | | 16,19,32 | Per internal estimate using 2005 detailed data S-1; Proxy of 31.42%. CMS SSI Days assumed to be all Part A since no patient detail available |
| 2008 Medicare Part A Days per PS&R dtd 2/23/12 | 19,023 | 19,023 | | | | |
| Estimated SSI% Part A Only | 31.416% | 22.263% | | | | |
| | | | | | | |
| Medicaid % | 54.28% | 54.28% | | | | Used PVHMC's FYE - Should be on FFY - immaterial |
| Estimated SSI% Part A Only | 31.42% | 22.26% | | | | |
| Disproportionate Patient% | 85.68% | 76.52% | | | | |
| Maximum Adj | 20.20% | 20.20% | | | | |
| Amount Over Max | 65.48% | 56.32% | | | | |
| DSH Factor - Amount Over Max * 0.825 +.0588 | 59.90% | 52.35% | 7.55% | | | |
| PVHMC Federal Specific Pymt per PS&R dtd 2/23/12 | | | $ 31,693,675 | | | |
| Reimbursement Impact | | | 2,392,872 | 2,392,872 | | |
| **Issue Two: DSH Adjustment - SSI Inclusion of Medicare Part C** | Part A Per PVHMC | Part A & C Per CMS | Diff | | | |
| SSI days | 4,235 | 4,235 | | | 16,19,32 | CMS SSI Days assumed to be all Part A since no patient detail available |
| 2008 Medicare Days per PS&R dtd 2/23/12 | 19,023 | 29,404 | | | | |
| Estimated SSI% | 22.263% | 14.403% | | | | |
| | | | | | | |
| Medicaid % | 54.28% | 54.28% | | | | Used PVHMC's FYE - Should be on FFY - immaterial |
| Estimated SSI% | 22.26% | 14.40% | | | | |
| Disproportionate Patient% | 76.52% | 68.66% | | | | |
| Maximum Adj | 20.20% | 20.20% | | | | |
| Amount Over Max | 56.32% | 48.48% | | | | |
| DSH Factor - Amount Over Max * 0.825 +.0588 | 52.35% | 45.86% | 6.49% | | | |
| PVHMC Federal Specific Pymt per PS&R dtd 2/23/12 | | | $ 31,693,675 | | | |
| Reimbursement Impact | | | 2,056,920 | 2,056,920 | | |
| **Issue Three: DSH Adjustment - Part C Dual** | Per PVHMC | Per CMS | Diff | | | |
| Allowed Medicaid Eligible Days per 8/29/12 NPR | 66,919 | 66,919 | | | 16,19,32 | |
| Part C Dual per Internal DSH listing | 1,216 | | | | | |
| | 68,135 | 66,919 | | | | |
| Total Hospital Days per 8/20/12 NPR | 123,332 | 123,332 | | | | |
| Medicaid % | 55.25% | 54.26% | | | | |
| SSI% per Audit | 14.40% | 14.40% | | | | |
| Disproportionate Patient% | 69.65% | 68.66% | | | | |
| Maximum Adj | 20.20% | 20.20% | | | | |
| Amount Over Max | 49.45% | 48.46% | | | | |
| DSH Factor - Amount Over Max * 0.825 +.0588 | 46.67% | 45.86% | 0.81% | | | Used PVHMC's FYE - Should be on FFY - immaterial |
| PVHMC Federal Specific Pymt per PS&R dtd 2/23/12 | | | 31,693,675 | | | |
| Reimbursement Impact | | | 256,719 | 256,719 | | |
| **Issue Four: Unbilled Crossover Bad Debts** | | | | | 17 | |
| Estimated unbilled IP & OP Medicare Crossover Bad Debts | 50,000 | | | | | |
| BBA Reduction @        30% | (15,000) | | | | | |
| Reimbursement Impact | 35,000 | | | 35,000 | | |
| **Grand Total of Controversy Issues:** | | | | 4,741,511 | | |

00177

0683

Printed:2/12/2013 File:N:\REIMB\Appeal\2008\08Appeal_PP Impact\08Appeal_PP Impact

P-46

## California SSI/SSP Caseload from CDSS

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|---|---|---|---|
| Federal Fiscal Year 2006: Oct 1, 2005 to Sept 30, 2006 | | | |
| Oct-05 | 1,203,912 | 199,399 | 16.56% |
| Nov-05 | 1,209,061 | 200,163 | 16.56% |
| Dec-05 | 1,203,954 | 200,535 | 16.66% |
| Jan-06 | 1,180,468 | 187,387 | 15.87% |
| Feb-06 | 1,182,214 | 187,571 | 15.87% |
| Mar-06 | 1,196,088 | 190,377 | 15.92% |
| Apr-06 | 1,207,087 | 198,651 | 16.46% |
| May-06 | 1,209,340 | 199,120 | 16.47% |
| Jun-06 | 1,209,410 | 199,936 | 16.53% |
| Jul-06 | 1,163,141 | 190,204 | 16.35% |
| Aug-06 | 1,173,146 | 192,004 | 16.37% |
| Sep-06 | 1,175,737 | 193,470 | 16.46% |
| FFY 2006 Total | 14,313,558 | 2,338,817 | 16.34% |
| | | | |
| Federal Fiscal Year 2007: Oct 1, 2006 to Sept 30, 2007 | | | |
| Oct-06 | 1,222,746 | 203,814 | 16.67% |
| Nov-06 | 1,223,216 | 204,693 | 16.73% |
| Dec-06 | 1,221,100 | 205,347 | 16.82% |
| Jan-07 | 1,224,647 | 202,549 | 16.54% |
| Feb-07 | 1,225,847 | 202,881 | 16.55% |
| Mar-07 | 1,226,262 | 203,062 | 16.56% |
| Apr-07 | 1,230,427 | 203,978 | 16.58% |
| May-07 | 1,230,532 | 204,176 | 16.59% |
| Jun-07 | 1,232,539 | 204,942 | 16.63% |
| Jul-07 | 1,214,181 | 204,939 | 16.88% |
| Aug-07 | 1,216,117 | 205,349 | 16.89% |
| Sep-07 | 1,220,536 | 206,286 | 16.90% |
| FFY 2007 Total | 14,688,150 | 2,452,016 | 16.69% |
| | | | |
| | | | |
| Federal Fiscal Year 2008: Oct 1, 2007 to Sept 30, 2008 | | | |
| Oct-07 | 1,244,689 | 207,203 | 16.65% |
| Nov-07 | 1,244,211 | 207,894 | 16.71% |
| Dec-07 | 1,225,029 | 203,512 | 16.61% |
| Jan-08 | 1,226,334 | 202,092 | 16.48% |
| Feb-08 | 1,244,310 | 206,091 | 16.56% |
| Mar-08 | 1,245,627 | 206,777 | 16.60% |
| Apr-08 | 1,248,737 | 206,969 | 16.57% |
| May-08 | 1,247,780 | 206,956 | 16.59% |
| Jun-08 | 1,253,629 | 208,221 | 16.61% |
| Jul-08 | 1,254,039 | 208,359 | 16.62% |
| Aug-08 | 1,257,422 | 209,052 | 16.63% |
| Sep-08 | 1,262,530 | 210,177 | 16.65% |
| FFY 2008 Total | 14,954,337 | 2,483,303 | 16.61% |

9/8/2017

00179

P-47

### SSI Eligibility

SSA determines SSI/SSP eligibility
- Sets effective date of eligibility
- Sets grant amount
- Establishes eligibility for SSI/SSP or SSP only

### *SSA Sends Data to State*

Weekly SSA sends eligibility information to State of California
- Information on State Data Exchange (SDX)
- Information in SSA format
- File goes to state Department of Health Care Services (DHCS)

### State Processes Data

DHCS processes SDX information
- Sets eligibility effective date based on SSI/SSP effective date
  - o   Full month eligibility
  - o   Eligibility is monthly
- Sets Medi-Cal aid code based on SSA data
- Uses two SSA SDX data fields
  - o   First use SDX field "Multi Category Indicator" field 1529.
    - ▪ Values '2', '3', '6', '7', 'F', 'G', '0', 'P', 'S', 'T', 'Y' or 'Z' are set as blind, aid code 20.
    - ▪ Values '4', 'D', 'M', 'Q' or 'W' are set as disabled, aid code 60.
    - ▪ Value '1', '5', 'E', 'N', 'R' or 'X' are set as aged, aid code 10.
  - o   Secondary use SDX field "Recipient Type", Field 6465.
    - ▪ AI     Aged Individual= Aid Code 10, aged
    - ▪ AS     Aged Spouse= Aid Code 10, aged
    - ▪ BI     Blind Individual= Aid Code 20, blind
    - ▪ BS     Blind Spouse= Aid Code 20, blind
    - ▪ BC     Blind Child= Aid Code 20, blind
    - ▪ DC     Disabled Child= Aid Code 60, disabled
    - ▪ DI     *Disabled Individual= Aid Code 60, disabled*
    - ▪ DS     Disabled Spouse= Aid Code 60, disabled
- Post Medi-Cal eligibility and information on Medi-Cal Eligibility Data System (MEDS)
- Issue Medi-Cal Benefits Identification Card (BIC) to all new eligibles
  - o   BIC only provides basic demographic information, no specific eligibility information for each month

### State Operates Automated Eligibility Verification System (AEVS)

- Since eligibility in Medi-Cal is monthly and the BIC does not provide information that the patient is eligible this month, the state created this system.
- Similar to a credit card verification system used in retail
- Providers access system by computer, swipe card reader or other methods to obtain information on eligibility for the service being provided including aid code

0685

00181

- AVES does not store eligibility information, rather it accesses MEDS for that information

**Provider/Hospital Provides Services**

- Patient presents BIC to provider
- Provider needs to know if patient is eligible for the month of service and for what scope of benefits-full scope or limited benefits
- Provider must access AEVS to obtain this information

**Medi-Cal Eligibility Verification**

- Provider accesses AEVS for eligibility information
- AEVS verifies providers eligibility for information
- AEVS accesses MEDS for the most current eligibility information
- MEDS returns the information to AEVS
- AVES sends the MEDS eligibility information to the provider
  - There is no processing or interpretation of the data, it is passed on to the provider as it exists on MEDS
- This includes information on the patient's eligibility status for the month, any restrictions in eligibility, and the patient's aid code

***Provider Now has Patient's Eligibility Information***

2

0686

00182

P-48

00183

Summary of SSI Eligibility Process between SSA and California Department of Health Care Services (DHCS)
Source:  Summary SSI Flow-process write-up from Stan Rosenstein
Amy Rosenkranz, Medi-Cal Eligibility Division of DHCS (email 9/07/17 and 9/12/17)



Burgundy: SSA process          Blue: California DHCS process          Yellow: Providers

SSA determines SSI/SSP eligibility
* Sets effective date of eligibility
* Sets grant amount
* Establishes eligibility for SSI/SSP or SSP only

SSA sends weekly SSI/SSP eligibility data to CA DHCS
* Information on State Data Exchange (SDX)
* Information in SSA format

DHCS operates Automated Eligibility Verification system (AEVS)
* AEVS accesses date from MEDS
* Provide eligibility data including aid code by computer, swipe card reader or other methods
* Similar to a credit card verification system used in retail
* Available to providers

DHCS Posts Medi-Cal eligibility information on Medi-Cal Eligibility Data System (MEDS)
* Central depository of all Medi-Cal eligibility data
* Eligibility is by month
* Aid code by month
* Full scope or limited benefits by month

DHCS processes SSA SDX information
* Uses SSI/SSP eligibility effective date for each month
* Sets Medi-Cal SSI/SSP aid code 10, 20, 60 based on SSA data
* DHCS uses two SSA SDX data fields for SSI/SSP

Primary SSA SDX Field "Multi Category Indicator":
* Value '1', '5', 'E', 'N', 'R' or 'X' = Aged, aid code 10
* Values '2', '6', 'G', '7', 'F', 'G', 'O', 'P', 'S', 'T', 'V' or 'Z' = Blind, aid code 20
* Values '4', 'D', 'M', 'Q' or 'W' = Disabled, aid code 60.

Secondary SSA SDX field "Recipient Type"
AI    Aged Individual= Aid Code 10, aged
AS    Aged Spouse= Aid Code 10, aged
BI    Blind Individual= Aid Code 20, blind
BS    Blind Spouse= Aid Code 20, blind
BC    Blind Child= Aid Code 20, blind
DC    Disabled Child= Aid Code 60, disabled
DI    Disabled Individual= Aid Code 60, disabled

Providers access AEVS for eligibility information
* On-line verification, or
* Through State-approved vendors such as HDX

09/13/2017   Prepared by: C. Le-Tran

00184

0687

P:\My Documents\Reimb\Appeals\06_08 SSI Appeals\SSI to DHCS process summary_flow chart_final

P-49

**Stan Rosenstein** **&lt;stan.rosenstein@gmail.com&gt;**    Aug 25 (13 days ago)

to Sharyl, bcc: srosenstein

Hope you don't mind me asking for a little more information.
I remember years ago you had information that I would love to get now if you still have it.
1.  You had a report that showed the current number of Medi-Cal enrollees in nursing facilities.  If I remember correctly it was consistently about 60,000.  Do you still have this data and can you send it to me?
2.  You also did a review of the number of people on Medi-Cal and how they derived their eligibility.  We were trying to see if they came in ineligible for Medi-Cal, sheltered their assets and got eligible.  If I recall correctly you found that the majority of people came into the nursing facility already being on Medi-Cal because they were on SSI.  Do you still have this study and can you also send that to me?
Much appreciated.  Thanks Stan

**Shanen-Raya, Sharyl (HCP-MED)@DHCS** **Sharyl.Shanen-Raya@dhcs.ca.gov** via **cadhcs.onmicrosoft.com**    Aug 25 (13 days ago)

to me

I do have it somewhere and I will find it for you!  If I can't today, I will try for early next week.  Have a good weekend either way!  Sharyl

**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Friday, August 25, 2017 3:00 PM
**To:** Shanen-Raya, Sharyl (HCP-MED)@DHCS <Sharyl.Shanen-Raya@dhcs.ca.gov>
**Subject:** Nursing Home patients

**Stan Rosenstein** **&lt;stan.rosenstein@gmail.com&gt;**    Aug 25 (13 days ago)

to Sharyl.Shanen-.

Thank you.  Stan

**Shanen-Raya, Sharyl (HCP-MED)@DHCS** **Sharyl.Shanen-Raya@dhcs.ca.gov** via **cadhcs.onmicrosoft.com**    Aug 29 (9 days ago)

to me

Hi Stan!
This is a write up about the reseach that we did.  I will keep looking for more.  Sharyl

A review of the numbers indicates that only 1.2 percent (783 in 2/2009) of those receiving LTC on Medi-Cal (63,452 in 2/2009) were new to Medi-Cal each month and were not moving from programs such as SSI, AFDC, Medi-Cal in the community, or DDS immediately prior to entry into LTC.  Therefore, the vast majority of individuals in LTC would not have had excess resources prior to entry.  Assuming only 8

0688

percent had spouses, the spousal impoverishment resource provisions would apply to a very small number (63 individuals in 2/2009).  (Please note: using 2009 numbers allows time for appeals to be settled and claims to be submitted.)  A very small number, less than 1 percent of the cases reviewed a number of years ago of individuals owned houses while in LTC.  This is because of the natural course of events that occur as individuals age and find they can't care for homes any longer, move to apartments, then to board and care facilities and then to LTC.  The few who move from home to LTC facilities, find that they can't afford to keep their homes on the meager $35 personal needs allowance they are permitted to retain.  Even those individuals who are certified by their doctors as reasonably expected to return home in 6 months find that they cannot keep their homes on the small upkeep and repair allowance of $209 per month.

At any given point in time, the number of people in LTC changes up and down by a few thousand a year.  According to information gathered from the financial statements of LTC facilities in California by the Office of Statewide Health Planning and Development, back in 1983, at any given point in time there were approximately 66,000 people in LTC on Medi-Cal.  The latest information for the month of 2/2009 that staff received was that that figure had dropped by approximately 3,000 to 63,452 in 2/2009, while the number of beds has increased from 101,000 in 1983 to approximately 120,000. The LTC population is one of the most stable populations on Medi-Cal and changes in resource limits do not affect the numbers.  Prior to implementation of the Medicaid spousal impoverishment provisions on 1/1/90 community property rules applied, meaning the spouse in the home retained all of his/her separate and ½ of the community property.  Under the spousal impoverishment provisions all of a couple's combined community and separate property is compared against the Community Spouse Resource Allowance, plus $2,000 for the institutionalized spouse.  That amount started at $64,580 in 1990 and is currently $111,560.  Even though the amount a couple is allowed to retain has increased that much, the number of people in LTC at any given point in time has remained stable.  It appears that medical necessity for skilled nursing care services and the increased number of more desirable Continuing Care Residential Communities are effective gate keepers for delaying entry into LTC on Medi-Cal.


**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Friday, August 25, 2017 3:10 PM
**To:** Shanen-Raya, Sharyl (HCP-MED)@DHCS <Sharyl.Shanen-Raya@dhcs.ca.gov>
**Subject:** Re: Nursing Home patients


**Stan Rosenstein <stan.rosenstein@gmail.com>**                    Aug 29 (9 days ago)

to Sharyl.Shanen-.

Thank you. This is great information.
Do you know what percentage of people going to a nursing home are on SSI specifically.
Much appreciated.
Stan

Sent from my IPhone


**Shanen-Raya, Sharyl (HCP-MED)@DHCS Sharyl.Shanen-Raya@dhcs.ca.gov via cadhcs.onmicrosoft.com**                    Aug 29 (9 days ago)

to me

No, I don't.  That gets a little trickier since SSI individuals are only in aid codes 10, 20 or 60.  We would have to do a run to look at living arrangement codes or claims paid data and some Medi-Cal Manage Care plans are at risk for LTC now, so some may be hidden.  There is also the possibility of attacking it by looking at the amount of SSI received (up to only $50 per month for those who have no other income); however SSI keeps folks at their regular community payment level for the 1st 3 months of LTC as "temporarily absent" from the home, before they reduce their payment level or discontinue them from SSI.  Any suggestions?

**From:** Stan Rosenstein [mailto:stan.rosenstein@gmail.com]
**Sent:** Tuesday, August 29, 2017 1:43 PM

**Stan Rosenstein <stan.rosenstein@gmail.com>**          Aug 29 (9 days
                                                                                ago)

to Sharyl.Shanen-.

No suggestions but one more question.
When someone on Medi-Cal on SSI goes into a NF long term do they stay in aid code 10, 20 or 60?
Thanks Stan

Sent from my iPhone

**Shanen-Raya, Sharyl (HCP-MED)@DHCS Sharyl.Shanen-**          Aug 29 (9 days
**Raya@dhcs.ca.gov via cadhcs.onmicrosoft.com**                         ago)

to me

Yes, they do stay in aid codes 10, 20, and 60.  It may be pretty tricky to study this issue.  I would have to think about the most reliable way to catch everybody you want; whether you want to include those who are temporarily absent or exclude them, whether to use living arrangement information or claims data or payment levels.  Do you still want to pursue it?  Perhaps SSI would have better data on this issue.  Remember at one  point you called a phone number of a systems guru at SSI and you were able to get exactly what you wanted?  The phone number was on some document or table that I sent to you.  I can't remember what that was about.

00188

P-50

00189

PROGRAM SSP107

STATE OF CALIFORNIA
DEPARTMENT OF SOCIAL SERVICES
STATE SUPPLEMENTARY PROGRAM
RECIPIENT SUMMARY REPORT
FOR THE MONTH OF AUGUST   2017

RUN DATE: 08/22/2017

| | TOTAL CASELOAD | TOTAL EXPENDITURES | | CASELOAD SSP ONLY (NO SSI) | EXPENDITURES SSP ONLY (NO SSI) |
|---|---|---|---|---|---|
| | | SSI | SSP | | |
| TOTAL.................. | 1,261,439 | $598,440,908 | $211,657,734 | 141,047 | $ 16,193,416 |
| AGED................. | 359,064 | $128,761,657 | $ 60,281,492 | 48,739 | $ 5,397,372 |
| BLIND................ | 17,770 | $ 8,336,558 | $ 3,808,411 | 2,542 | $ 356,453 |
| DISABLED............. | 884,605 | $461,342,692 | $147,567,829 | 89,766 | $ 10,439,590 |
| AGED INDIVIDUAL......... | 227,327 | $ 89,120,458 | $ 35,679,313 | 26,985 | $ 2,823,787 |
| COUPLE MEMBER......... | 131,737 | $ 39,641,198 | $ 24,602,179 | 21,754 | $ 2,573,584 |
| BLIND INDIVIDUAL........ | 15,978 | $ 7,660,732 | $ 3,390,655 | 2,254 | $ 315,033 |
| COUPLE MEMBER......... | 1,792 | $ 675,825 | $ 417,756 | 288 | $ 41,420 |
| DISABLED INDIVIDUAL..... | 630,942 | $317,623,560 | $112,376,868 | 77,415 | $ 9,034,755 |
| CHILDREN............. | 168,825 | $110,421,996 | $ 19,038,057 | 2,034 | $ 233,202 |
| COUPLE MEMBER......... | 84,838 | $ 33,297,136 | $ 16,152,903 | 10,317 | $ 1,171,632 |
| UNKNOWN AID TYPE........ | 0 | $ 0 | $ 0 | 0 | $ 0 |
| OWN HOUSEHOLD........... | 973,523 | $450,730,680 | $161,326,250 | 116,120 | $ 11,777,101 |
| HOUSEHOLD OF ANOTHER.... | 78,855 | $ 31,776,220 | $ 13,718,788 | 8,234 | $ 803,842 |
| RESTAURANT MEALS........ | 44,348 | $ 25,567,093 | $ 11,175,394 | 4,487 | $ 719,804 |
| NON-MEDICAL BOARD....... | 44,990 | $ 18,787,511 | $ 17,522,085 | 11,543 | $ 2,841,596 |
| TITLE XIX FACILITIES.... | 14,615 | $ 912,684 | $ 510,354 | N/A | N/A |
| DISABLED CHILDREN- LIVING WITH RELATIVE.. | 102,448 | $ 69,386,123 | $ 7,058,537 | 364 | $ 13,357 |
| ARRANGEMENT........... | 2,660 | $ 1,280,594 | $ 346,322 | 133 | $ 16,210 |

0169

P-51

California SSI/SSP Caseload

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|---|---|---|---|
| Jul-05 | 1,196,567 | 196,567 | 0.164275799 |
| Aug-05 | 1,201,958 | 197,436 | 0.164261979 |
| Sep-05 | 1,203,998 | 197,896 | 0.164365722 |
| Oct-05 | 1,203,912 | 199,399 | 0.165625893 |
| Nov-05 | 1,209,061 | 200,163 | 0.165552441 |
| Dec-05 | 1,203,954 | 200,535 | 0.166563673 |
| Jan-06 | 1,180,468 | 187,387 | 0.158739585 |
| Feb-06 | 1,182,214 | 187,571 | 0.158660784 |
| Mar-06 | 1,196,088 | 190,377 | 0.159166382 |
| Apr-06 | 1,207,087 | 198,651 | 0.164570574 |
| May-06 | 1,209,340 | 199,120 | 0.164651794 |
| Jun-06 | 1,209,410 | 199,936 | 0.165316973 |
|  |  |  |  |
| Jul-06 | 1,163,141 | 190,204 | 0.163526176 |
| Aug-06 | 1,173,146 | 192,004 | 0.163665903 |
| Sep-06 | 1,175,737 | 193,470 | 0.164552106 |
| Oct-06 | 1,222,746 | 203,814 | 0.166685477 |
| Nov-06 | 1,223,216 | 204,693 | 0.167340028 |
| Dec-06 | 1,221,100 | 205,347 | 0.168165588 |
| Jan-07 | 1,224,647 | 202,549 | 0.165393783 |
| Feb-07 | 1,225,847 | 202,881 | 0.16550271 |
| Mar-07 | 1,226,262 | 203,062 | 0.165594302 |
| Apr-07 | 1,230,427 | 203,978 | 0.165778222 |
| May-07 | 1,230,532 | 204,176 | 0.165924982 |
| Jun-07 | 1,232,539 | 204,942 | 0.16627628 |
|  |  |  |  |
| Jul-07 | 1,214,181 | 204,939 | 0.16878785 |
| Aug-07 | 1,216,117 | 205,349 | 0.168856286 |
| Sep-07 | 1,220,536 | 206,286 | 0.169012631 |
| Oct-07 | 1,244,689 | 207,203 | 0.166469696 |
| Nov-07 | 1,244,211 | 207,894 | 0.167089023 |
| Dec-07 | 1,225,029 | 203,512 | 0.166128312 |
| Jan-08 | 1,226,334 | 202,092 | 0.164793604 |
| Feb-08 | 1,244,310 | 206,091 | 0.165626733 |
| Mar-08 | 1,245,627 | 206,777 | 0.166002343 |
| Apr-08 | 1,248,737 | 206,969 | 0.165742666 |
| May-08 | 1,247,780 | 206,956 | 0.165859366 |
| Jun-08 | 1,253,629 | 208,221 | 0.166094594 |
|  |  |  |  |
| Jul-08 | 1,254,039 | 208,359 | 0.166150335 |
| Aug-08 | 1,257,422 | 209,052 | 0.166254448 |
| Sep-08 | 1,262,530 | 210,177 | 0.166472876 |

00192

| Month | Total SSI and SSP Caseload | Total SSP Only Caseload | Percent SSP only |
|-------|---------------------------|-------------------------|------------------|
| Oct-08 | 1,262,985 | 210,174 | 0.166410527 |
| Nov-08 | 1,267,145 | 212,100 | 0.167384159 |
| Dec-08 | 1,266,221 | 211,238 | 0.166825538 |
| Jan-09 | 1,263,666 | 205,594 | 0.162696472 |
| Feb-09 | 1,268,020 | 205,956 | 0.162423306 |
| Mar-09 | 1,268,371 | 205,983 | 0.162399645 |
| Apr-09 | 1,270,831 | 206,306 | 0.162339446 |
| May-09 | 1,253,793 | 188,190 | 0.150096547 |
| Jun-09 | 1,257,200 | 188,219 | 0.149712854 |

|  | 58,936,800 | 9,699,795 | 0.164579601 |

0693

00193

P-52



J Am Geriatr Soc. Author manuscript; available in PMC 2011 Sep 1.                    PMCID: PMC2945440
Published in final edited form as:                                                   NIHMSID: NIHMS216108
    J Am Geriatr Soc. 2010 Sep; 58(9): 1701–1706.
    Published online 2010 Aug 24. doi: 10.1111/j.1532-5415.2010.03005.x

# Lengths of Stay for Older Adults Residing in Nursing Homes at the End of Life

Anne Kelly, MSW,[1] Jessamyn Conell-Price, BA,[2] Kenneth Covinsky, MD, MPH,[1,2] Irena Stijacic Cenzer, MA,[1,2] Anna Chang, MD,[1,2] W. John Boscardin, PhD,[1,2] and Alexander K. Smith, MD, MS, MPH[1,2]

[1]Veterans Affairs Medical Center, San Francisco, CA
[2]Division of Geriatrics, Department of Medicine, University of California, San Francisco, San Francisco, CA
Address correspondence requests to: Alexander K. Smith, MD, MS, MPH, Division of Geriatrics, UCSF, 4150 Clement St (181G), San Francisco, CA 94121, Voice: 415-221-4810 x 4684, Fax: 415-750-6641, aksmith@ucsf.edu

Copyright notice and Disclaimer

The publisher's final edited version of this article is available at J Am Geriatr Soc
See other articles in PMC that cite the published article.

## Abstract                                                                    Go to:

### OBJECTIVES

To describe lengths of stay among nursing home decedents.

### DESIGN

Retrospective cohort study.

### SETTING

The Health and Retirement Study (HRS), a nationally representative survey of U.S. adults aged 50 and older.

### PARTICIPANTS

1,817 nursing home residents who died between 1992 and 2006.

### MEASUREMENTS

Our primary outcome was length of stay, defined as the number of months between the nursing home admission and the date of death. Covariates included demographic, social, and clinical factors drawn from the HRS interview conducted closest to the date of nursing home admission.

00195

## RESULTS

The mean age of decedents was 83.3 (SD 9.0) and the majority were female (59.12%), and White (81.5%). Median and mean length of stay prior to death were 5 months (IQR 1-20) and 13.7 months (SD 18.4), respectively. Fifty-three percent died within 6 months of placement. Large differences in median length of stay were observed by gender (men, 3 months vs. women, 8 months) and net worth (highest quartile, 3 months vs. lowest quartile, 9 months) (all p<.001). These differences persisted after adjustment for age, sex, marital status, net worth, geographic region, and diagnosed chronic conditions (cancer, hypertension, diabetes, lung disease, heart disease, and stroke).

## CONCLUSION

Nursing home lengths of stay are brief for the majority of decedents. Lengths of stay varied markedly by factors related to social support.

**Keywords:** Nursing Home, End of Life, Length of Stay, Palliative Care, Advance Care Planning

## INTRODUCTION                                                                                                        Go to:

Death has become institutionalized over the last 100 years.[1] Today, 25% of all deaths in the nation occur in nursing homes and the proportion of all deaths that occur in these settings continues to rise.[2] By the year 2020, an estimated 40% of Americans will die in a nursing home.[3]

While the proportion of overall deaths located in nursing homes has been well described, lengths of stay in nursing homes at the end of life have received little attention. The duration of time residents spend in a nursing home prior to death has important clinical and policy implications. If nursing home lengths of stay tend to be long, then systems and policy directives may improve overall care by prioritizing maintenance and improvement of functional status. If lengths of stay are generally brief at the end of life, then policy ensuring nursing home residents' access to quality palliative and end-of-life care must be systematized.

We used the Health and Retirement Study (HRS), a nationally representative cohort of older adults, to describe lengths of stay among older adult decedents who resided in nursing homes at the end of life.

## MATERIALS AND METHODS                                                                                  Go to:

### Study Population

We examined a consecutive sample of HRS subjects who died between 1992 and 2006. HRS subjects are a representative sample of Americans over the age of 50 who were living in the community at the time of their initial interview. The HRS is conducted by the Institute for Social Research at the University of Michigan and is sponsored by the National Institute on Aging. The HRS is designed to study transitions in health and wealth among older adults. More information about HRS sampling, data collection procedures and measures can be found on the HRS website (www.hrsonline.isr.umich.edu/).

Subjects were interviewed every two years between 1992 and 2006. Following their death, exit interviews were conducted with family caregivers. Decedents' primary residence at the end of life was

obtained from exit interviews with family caregivers. A nursing home was defined as a facility that provides the following services: dispensing of medication, 24-hour nursing assistance and supervision, personal assistance, and room & meals. A separate question asked about the location of death (nursing home, hospital, home, hospice, or elsewhere), and interviewers were instructed to clarify that residence in a nursing home at the end of life may be distinct from the location of death. Time between the exit interview with the family caregiver and the death of the subject ranged from zero months (i.e., the interview took place during the same month that the subject died) to 59 months. The mean time was one year and 93.4% of family caregivers were interviewed within two years of the subject's death.

Two thousand three hundred and one subjects primarily resided in a nursing home at the end of life. We excluded subjects with missing information regarding their exact year of placement in nursing home (n=68), age at time of placement in nursing home (n=27), not having completed a core interview within two years of their placement in nursing home (n=203), not having the exact date of death (n=71), having reported nursing home placement after the date of death (n=54) and having an irreconcilable nursing home admission date (i.e. subjects reported as being interviewed in the community after the nursing home admission date) (n=67). Our final sample was comprised of 1,817 decedents. We performed sensitivity analysis to determine how the excluded subjects differ from the subjects in the final sample with regards to demographic characteristics and length of stay in nursing home before death.

## Primary Outcome: Length of Stay

In exit interviews, decedents' caregivers were asked to identify the month and year decedents relocated to the nursing home. The HRS gathers month and year of decedents' death through proxy interviews and National Death Index records. We used the date of admission to the nursing home and the date of death to calculate length of stay in months. Lengths of stay were considered brief if they were less than 6 months, the prognostic requirement for the Medicare hospice benefit.

## Potential Predictors

In the absence of previous studies identifying variables related to lengths of stay in nursing homes at the end of life, we looked at existing literature to identify factors associated with nursing home admission for older adults.[2-8] Of those, we selected variables that were available for examination in HRS in order to identify variables that may influence nursing home lengths of stay. Demographic variables include the age at which decedents moved to a nursing home (categorized as <84 and 85 or older in bivariate analysis), sex, and race/ethnicity (categorized as Non-Hispanic White, Non-Hispanic Black, Hispanic, and Non-Hispanic Other.) Data on social and clinical factors are drawn from the last HRS interview before decedents entered a nursing home. The social factors are respondents' marital status (categorized as Married/Partnered, Not Married/Partnered) and participants' household net worth (in quartiles). Respondents were asked if they had any of the following diagnosed chronic conditions at the time of nursing home admission: hypertension, diabetes, heart disease, stroke, cancer (except skin cancer), or chronic lung disease (except asthma). Geographical region in which decedents died are drawn from exit interviews with caregivers (categorized as Northeast, Midwest, Southeast, and West).

## Analyses

We described lengths of stay in nursing homes at the end of life using a plot of the data and descriptive statistics. Length of stay data had a skewed distribution and, therefore, median length of stay represents the best clinical summary. We performed bivariate analysis using non-parametric methods (Wilcoxon Rank test and Kruskal Wallis test, as appropriate). Multivariate linear regression analysis was used to examine the adjusted associations of demographic, social and clinical factors in relation to lengths of stay in a nursing home at the end of life. Age at time of admission to nursing home, chronic conditions and any other factors significant at a p<.05 level in bivariate analysis were included in the multivariable model. Since the sample size is large, the results of the multiple linear regression are valid even though the normality assumption was not met.[9] Additionally, we computed bootstrap estimates of the regression coefficients and their distributions. All statistical analyses were performed using Stata/MP 10.1 and SAS 9.1.3. The institutional review board at the University of California, San Francisco considered this study exempt.

## RESULTS

Go to:

### Study population

Over the years 1992 to 2006, 8,433 HRS participants died, and 27.3% of these decedents resided in a *nursing home at the time of death. While subjects resided in a nursing home at the end of life, their physical location of death was distinct for many.* Of the 1,817 subjects in our study sample who resided in a nursing home at the end of life, next-of-kin stated that the physical location of death was the nursing home for 70.4% of subjects, the hospital for 22.6%, in-inpatient hospice facilities for 3.5%, home for 0.4%, and 3.1% died elsewhere. The majority of decedents were Non-Hispanic White (81.5%), female (59.1%), and had a mean age of 83.3 (SD 9.0) years at the time of admission to a nursing home (Table 1).



Table 1
Characteristics of study sample (N=1,817)

Analysis of the 484 subjects excluded from our analysis due to missing data revealed that those subjects were similar to the subjects included in the sample in age at the time of placement in nursing *home, household net worth and length of stay in nursing home before death.* They were, however, more likely to be female (64.3% vs. 59.1%, p=0.040) and Hispanic (5.6% vs. 2.9%, p=0.004).

### Length of stay in nursing homes at the end of life

Decedents' lengths of stay in nursing homes at the end of life are illustrated in the Figure. The mean length of stay among decedents was 13.7 months; however, this was explained by a relatively small number of subjects with long lengths of stay. The median length of stay was only 5 months (IQR 1-20). The majority of residents had short lengths of stay, 65% percent of decedents had lengths of stay of less than one year, and over 53% died within 6 months of admission.

Bivariate analysis identified statistically significant associations between lengths of stay and gender, marital status, household net worth, region of death, all chronic conditions but hypertension, and the

number of chronic conditions (Table 2). Men spent fewer months (median of 3 months) in a long-term care setting prior to death than women (median of 8 months) (p<.0001). Those who were married at the time of placement had median lengths of stay 4 months shorter than those who were unmarried (p<.0001). Decedents in the highest quartile of net worth (household net worth > $150,000) had median lengths of stay 6 months shorter than the median stays of the lowest quartile (household net worth < $3,000) (p <.0001). There was regional variation in average length of stay; decedents in the West had median nursing home lengths of stays that were 2 months shorter than decedents in the Midwest and 3 months shorter than decedents in the South or Northeast (p=0.015). Having a chronic illness was associated with statistically significant differences in lengths of stay. Lengths of stay were shortest for patients suffering from cancer or lung disease (median of 3 months). There were no statistically significant associations between lengths of stay and decedents' race or ethnicity.



Table 2
Factors associated with length of stay among residents who resided in a nursing home near death: bivariate analysis

Multivariate linear regression analysis revealed that male gender, high household net worth, and diagnoses of cancer, hypertension, diabetes, lung disease, or heart disease were associated with shorter lengths of stay after adjusting for all other potential predictors (Table 3). Residents with a history of stroke had longer lengths of stay than those without a history of stroke. Bootstrap estimates and corresponding p-values were very similar and therefore are not reported here.



Table 3
Independent factors associated with length of stay among residents who resided in a nursing home near death: multivariate linear regression analysis

## DISCUSSION
Go to:

In this sample of 1,817 older adults who were living in nursing homes at the end of life, we found that lengths of stay for the majority of decedents were brief: less than six months. We also found that decedents' lengths of stay differed according to a number of demographic, social, and clinical factors and some of these differences were dramatic. Demographic and social indicators often related to having increased access to paid and informal caregiver support include being male, married, and having a higher net worth.[10] These indicators revealed significantly shorter nursing home lengths of stay at the end of life. Additionally, those who were diagnosed with a chronic illness often associated with rapid functional decline, such as cancer, had shorter median lengths of stay at the end of life than those diagnosed with an illness generally associated with more progressive functional decline, such as stroke or heart disease.

Brief lengths of stay at the end of life coupled with the variability that exists among subgroups highlights the importance of addressing advance care planning needs with residents and families, as there may be shorter periods of time to address important end-of-life tasks with some residents than with others. There is growing support for the notion that advance care planning conversations,

00199

including hospice and palliative care options, ought to occur shortly after admission and be readdressed periodically with nursing home residents and their families.[11, 12] Currently, many nursing home residents do not have any documentation of advance directives. In 2004 only 44% of nursing home residents had any advance directive recorded at admission and only 63% of residents had any advance directive orders after 12 months in the nursing home.[13] Yet, lengths of stay (and life) were within the window of hospice eligibility for most patients among this sample of decedents at the time of nursing home admission.

While the rates of hospice use in our sample are unknown, hospice care appears to be underutilized in long-term care settings.[11, 12, 14] Currently, estimates of the proportion of nursing home decedents in the United States who received hospice or palliative care range from less than 10% to 30%.[15, 16] Research suggests that hospice care improves the quality of life at the end-of-life in long term care settings. A 2002 study by Miller and colleagues found that 51% of dying nursing home residents who were enrolled in hospice (n=2,644) received analgesics for daily pain, compared to 33% of non-hospice residents (n=7,929)[17]. Family satisfaction with symptom care has been shown to be superior for long-term care residents enrolled in hospice compared to non-hospice residents.[18] Evidence suggests that non-hospice palliative care teams and palliative care education for nursing home staff improves patient care[19]. Unlike hospice care, which is bound by criteria related to prognosis and goals of care, non-hospice palliative care may be offered in conjunction with curative treatments for chronically or terminally ill residents despite their expected prognosis, code status, or treatment plan. Unfortunately, while many nursing homes have some affiliation with a hospice, few nursing home providers have received any training in palliative care.[11, 14, 20]

These findings may have important implications for nursing home care, as it now often focuses on rehabilitation.[11, 12] A 1991 survey of North Carolina nursing homes reported 8 percent of patients were in daily specialized rehabilitation.[21] By 2006, however, rehabilitation accounted for 86 percent of all Medicare reimbursement days in skilled nursing facilities nationwide[22]. Many of these changes are due to financial policy rather than clinical factors.[23] Rehabilitation is an important goal for many, but some patients may benefit more from a palliative approach[24-26].

Though over half of decedents resided in a long-term care setting for less than six months before death, the range in lengths of stay within this study population was large (ranging from less than one month to more than 10 years). Eligibility for the Medicare hospice benefit is prognosis based: patients must have a physician estimated prognosis of less than six months to live. While we do not have data in our study on the expected prognosis of subjects at the time of admission, in general, prognosis for nursing home residents can be difficult to determine.[27-29] The Medicare hospice benefit may more appropriately and effectively serve older adults at the end of life if eligibility criteria were redefined by symptom and psychosocial needs, rather than prognosis.

Unlike our study, previous studies have been limited to describing nursing home residents whose physical location of death was the nursing home, excluding those who resided in a nursing home near the end of life but were transferred to the hospital in the hours or days prior to death.[2, 30-32] For these patients, however, the optimal time and place to address palliative needs is likely the nursing home setting where they spend the last weeks or months of life, not the hospital where they spend the final

00200

moments prior to death[33].

Limitations of this study are noted. The HRS enrolls community dwelling older adults and tracks them over time as they age and enter nursing homes. Additionally, the few residents of nursing homes admitted at a younger age would not be captured in this study, biasing our findings toward shorter lengths of stay. We relied on after death interviews with next-of-kin to determine the admission date to the nursing home. In addition to the issue of recall bias, lengths of stays for nursing home residents who were transferred to the hospital due to acute illness and then later readmitted may not be accurately presented in this study. However, subjects' next-of-kin are unlikely to have counted readmission to the nursing home after hospitalization as a new start date. In this way our data may be superior to administrative data that count only the length of stay for the final admission prior to death. We do not know the reason for admission to the nursing home, and some patients may have been admitted specifically for end-of-life care. We excluded patients admitted to residential hospice facilities, although some residential hospice facilities may have been located within nursing homes. Given the complexities of the study design, we were unable to track time trends in nursing home use in the HRS. The prognoses for patients in our study were not known at the time of admission. Retrospective studies of end-of-life care have been criticized as identifying patients who are dying can be challenging for clinicians;[34] thus, studies of the dying differ from studies of decedents.[35] However, studies of decedents may offer utility in identifying patterns that add incrementally to our understanding of how to care for patients at the end of life.[36]

Future prospective studies in this area are needed to further examine trends in nursing home lengths of stay at the end of life over time, and identify additional clinical and social indicators that may be significantly associated, such as functional status, expected prognosis at admission, and the number of hospital readmissions that take place prior to death. Authors of this study are in the process of linking HRS data to Medicare claim data to identify those patients who utilize hospice benefits or acute care services at the end of life. Given that median lengths of stay in a nursing home were less than a year, studies are also needed to examine the possible fiscal implications nursing home lengths of may have for individuals interested in purchasing long term care insurance.

In conclusion, brief nursing home lengths of stay among older adult decedents highlight the importance for health care providers to discuss and address advance care planning needs with patients and families, including palliative and hospice care options, soon after admission to the nursing home.

---



Figure 1
Lengths of stay among subjects who resided in a nursing home at death

## Acknowledgments                                                                                      Go to:

**Funding Sources**: Dr. Smith is supported by a Research Supplement to Promote Diversity in Health Related Research from the National Institute on Aging (R01AG028481), the University of California San Francisco Clinical and Translational Science Institute (UL1 RR024131), and the National

00201

Palliative Care Research Center.

**Sponsor's Role**: The National Institute of Health and the National Palliative Care Research Center had no role in the design, methods, subject recruitment, data collections, analysis, or preparation of the paper.

## Footnotes

Go to:

**Author Contributions**: All authors were involved in the study concept and design, Drs. Smith and Covinsky were responsible for the acquisition of data, and all authors were involved in the analysis and interpretation of data and preparation of the manuscript.

**Conflict of Interest**: The editor in chief has reviewed the conflict of interest checklist provided by the authors and has determined that the authors have no financial or any other kind of personal conflicts with this paper.

## References

Go to:

1. Katz BP, Zdeb MS, Therriault GD. Where people die. Public Health Rep. 1979;94:522–527. [PMC free article] [PubMed]

2. Gruneir A, Mor V, Weitzen S, et al. Where people die: A multilevel approach to understanding influences on site of death in America. Med Care Res Rev. 2007;64:351–378. [PubMed]

3. Weitzen S, Teno JM, Fennell M, et al. Factors associated with site of death: A national study of where people die. Med Care. 2003;41:323–335. [PubMed]

4. Bharucha AJ, Pandav R, Shen C, et al. Predictors of nursing facility admission: A 12-year epidemiological study in the United States. J Am Geriatr Soc. 2004;52:434–439. [PubMed]

5. Yaffe K, Fox P, Newcomer R, et al. Patient and caregiver characteristics and nursing home placement in patients with dementia. JAM. 2002;287:2090–2097. [PubMed]

6. Brock DB, Foley DJ, Salive ME. Hospital and nursing home use in the last three months of life. J Aging Healt. 1996;8:307–319. [PubMed]

7. Andel R, Hyer K, Slack A. Risk factors for nursing home placement in older adults with and without dementia. J Aging Healt. 2007;19:213–228. [PubMed]

8. Mitchell SL, Teno JM, Miller SC, et al. A national study of the location of death for older persons with dementia. J Am Geriatr Soc. 2005;53:299–305. [PubMed]

9. Lumley T, Diehr P, Emerson S, et al. The importance of the normality assumption in large public health data sets. Annu Rev Public Health. 2002;23:151–169. [PubMed]

10. Katz SJ, Kabeto M, Langa KM. Gender disparities in the receipt of home care for elderly people with disability in the United States. JAMA. 2000;284:3022–3027. [PubMed]

11. Meier DE, Lim B, Carlson MD. Raising the standard: palliative care in nursing homes. Health Aff (Millwood) 29:136–140. [PubMed]

12. Hirschman K, Kapo J, Straton JB, et al. Hospice in Long-Term Care. Ann Long-Term Care. 2005;13:25–29.

13. McAuley WJ, Buchanan RJ, Travis SS, et al. Recent trends in advance directives at nursing home admission and one year after admission. Gerontologist. 2006;46:377–381. [PubMed]

14. Zerzan J, Stearns S, Hanson L. Access to palliative care and hospice in nursing homes. JAMA. 2000;284:2489–2494. [PubMed]

15. Bercovitz A, Decker FH, Jones A, et al. End-of-life care in nursing homes: 2004 National Nursing Home Survey. Natl Health Stat Report. 2008:1–23. [PubMed]

16. Miller SC, Han B. End-of-life care in U.S. nursing homes: Nursing homes with special programs and trained staff for hospice or palliative/end-of-life care. J Palliat Med. 2008;11:866–877. [PubMed]

17. Miller SC, Mor V, Wu N, et al. Does receipt of hospice care in nursing homes improve the management of pain at the end of life? J Am Geriatr Soc. 2002;50:507–515. [PubMed]

18. Baer WM, Hanson LC. Families' perception of the added value of hospice in the nursing home. J Am Geriatr Soc. 2000;48:879–882. [PubMed]

19. Hanson LC, Reynolds KS, Henderson M, et al. A quality improvement intervention to increase palliative care in nursing homes. J Palliat Med. 2005;8:576–584. [PubMed]

20. Chang A, Walter L. Recognizing dementia is a terminal illness in nursing home residents. Arch Intern Med. In Press. [PubMed]

21. Kochersberger G, Hielema F, Westlund R. Rehabilitation in the nursing home: How much, why, and with what results. Public Health Rep. 1994;109:372–376. [PMC free article] [PubMed]

22. MEDPAC. A Data Book: Healthcare spending and the Medicare program. Commission MPA, ed 2008 June;

23. Buntin MB. Access to postacute rehabilitation. Arch Phys Med Rehabil. 2007;88:1488–1493. [PubMed]

24. Boyd CM, Landefeld CS, Counsell SR, et al. Recovery of activities of daily living in older adults after hospitalization for acute medical illness. J Am Geriatr Soc. 2008;56:2171–2179. [PMC free article] [PubMed]

25. Kurella Tamura M, Covinsky KE, Chertow GM, et al. Functional Status of Elderly Adults before and after Initiation of Dialysis. N Engl J Med. 2009;361:1539–1547. [PMC free article] [PubMed]

26. Arnold RM, Zeidel ML. Dialysis in frail elders--a role for palliative care. N Engl J Med. 2009;361:1597–1598. [PubMed]

27. Murray SA, Kendall M, Boyd K, et al. Illness trajectories and palliative care. BMJ. 2005;330:1007–1011. [PMC free article] [PubMed]

28. Flacker JM, Kiely DK. Mortality-related factors and 1-year survival in nursing home residents. J Am Geriatr Soc. 2003;51:213–221. [PubMed]

29. Mitchell SL, Teno JM, Kiely DK, et al. The clinical course of advanced dementia. N Engl J Med. 2009;361:1529–1538. [PMC free article] [PubMed]

00203

30. Hanson LC, Eckert JK, Dobbs D, et al. Symptom experience of dying long-term care residents. J Am Geriatr Soc. 2008;56:91–98. [PubMed]

31. Teno JM, Clarridge BR, Casey V, et al. Family perspectives on end-of-life care at the last place of care. JAMA. 2004;291:88–93. [PubMed]

32. Miller SC, Gozalo P, Mor V. Hospice enrollment and hospitalization of dying nursing home patients. Am J Med. 2001;111:38–44. [PubMed]

33. Miller SC, Teno JM, Mor V. Hospice and palliative care in nursing homes. Clin Geriatr Med. 2004;20:717–734. vii. [PubMed]

34. Christakis NA, Lamont EB. Extent and determinants of error in doctors' prognoses in terminally ill patients: Prospective cohort study. BMJ. 2000;320:469–472. [PMC free article] [PubMed]

35. Bach PB, Schrag D, Begg CB. Resurrecting treatment histories of dead patients: A study design that should be laid to rest. JAMA. 2004;292:2765–2770. [PubMed]

36. Earle CC, Ayanian JZ. Looking back from death: The value of retrospective studies of end-of-life care. J Clin Oncol. 2006;24:838–840. [PubMed]

0703

00204

P-5?

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, September 07, 2017 4:58 PM
**To:** Laurence D. Getzoff
**Subject:** FW: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Thursday, September 07, 2017 1:09 PM
**To:** Candice LeTran
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

I'm told the beneficiary is eligible in Month 1.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
*This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients. If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.*

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, September 07, 2017 1:03 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Cc:** 'lgetzoff@health-law.com' <lgetzoff@health-law.com>
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Amy,
Thank you for your explanations below, and for continuing to look into the SSA-DHCS aid code cross walk. On answer (A) below, would you please clarify for me what is considered as "first month"? In my question, I indicated that the Board said someone may qualify for SSI (month 1), but is not eligible until the following month (month 2). So, in your "first month" below, is that the actual month that the member is eligible for payment (month 2)? Thank you.

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Thursday, September 07, 2017 9:53 AM

0704

**To:** Candice LeTran
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Candice –

I have a response to your two questions.

A) The SSI recipient would get the aid code 10, 20, or 60 for the first month. It would post to our system once we received the file from SSA and will show as eligible in the first month.

B) The SSI/SSP recipient going into long term care would stay in aid codes 10, 20, or 60 for three months and then revert to aid codes 1E, 2E, or 6E. That will trigger the counties to evaluate the case and decide what program the person qualifies for. If the beneficiary has an income of less than $50 per month, that person can stay in 10, 20, or 60. Most beneficiaries have more income than that, and many of them will qualify for our medically needy long term care aid codes, which are 13, 23, or 63. There are also cases where the person will qualify for a MAGI aid code, such as M1, except for those in aid code 10 because MAGI only covers up to age 64. Basically, if a beneficiary goes into long term care, the county eligibility worker will review the person's case and determine which program best meets their needs on an individual basis.

I am still waiting on an answer regarding the aid code crosswalk.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients. If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Thursday, August 24, 2017 3:36 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Subject:** Re: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Thank you Amy for your prompt reply. The PRRB Board was the one requesting the information so everyone can better understand the mapping from the Federal SSA system to the State DHCS system.

Also, the Board also posed 2 system sample questions which we don't know the answers:
A) SSI recipient qualifies in month 1 for both SSI and Medi-Cal but do not get the actual SSI cash grant until the subsequent month (month 2). Month 2 is the actual eligible SSI month. In this case, would aid codes 10/20/60 be assign in month 2 (the correct assignment) and not month

1? If so, what code would the recipient get in month 1 for the Medi-Cal only since recipient was not yet eligible for SSI?

B) Recipient qualified for both Medi-Cal and SSI but was sent to a nursing home permanently. Recipient will lose SSI benefits since they now reside at the nursing home. Recipient was a code 10 but after the nursing home admit month, what aid code would recipient get?

Thank you.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics
Pomona Valley Hospital Medical Center
909-865-9844


On Aug 24, 2017, at 2:42 PM, Rosenkranz, Amy (HCP-MED)@DHCS
<Amy.Rosenkranz@dhcs.ca.gov> wrote:

Hi Candice –

I spoke with one of the managers here, and she has reached out to someone in our IT department to see if there's anything we can give you.

The way this works is that SSA determines eligibility, and then they include the new client information in a periodic file of updates.  No one at the state visually sees the file contents – it consists entirely of computer code.  The file is then uploaded to our computer system, our computer system reads the file, determines the aid code here based on programming (aged is 10, blind is 20, and disabled is 60), and it is posted.  Our computer system is programmed to select the appropriate aid code based on specific SSA computer code in the file.

The only location that we are aware of where the conversion of SSA codes to our aid codes is found is embedded in our computer code, and we don't think we can give that to you.  However, she is checking to see if there's anything we can do for you.  I will let you know when we have an answer.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
The information contained in this e-mail document is confidential and is intended only to be viewed by the recipient(s) listed above.  If you are not the intended recipient(s), you are hereby notified that any distribution or copying of this document is strictly prohibited.  If you have received this document in error, please contact the sender listed above, and destroy the document(s).

00208

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Tuesday, August 22, 2017 5:11 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS <Amy.Rosenkranz@dhcs.ca.gov>
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients
**Importance:** High

Hi Amy,
Thank you for the update below on the DSH system.  I am writing to enlist your help again on the DHCS SSI/SSP aid codes (10, 20, 60…).  We just got back from Baltimore for our PRRB Hearing last week and the PRRB Board is requesting additional information.  You informed me around 2015/2016 that the SSI/SSP aid codes are handled by the SSA office.  At the Board hearing, we were informed that SSA uses codes Cxx, Mxx, etc. to classify their SSI/SSP patients.  Since DHCS is using more of a numeric classifications (10,20,60), there must be a crosswalk that translates the SSA codes into the DHCS aid codes.

This crosswalk will be very valuable to our continued quest of getting to the bottom of the SSI days discrepancy from the SSA, and we need to submit it back to the Board.    Would you please look into this and direct me to the right person at DHCS, perhaps the department that handles the data translation received from SSA before it is loaded into DHCS MEDS??

Thank you for your assistance on our appeal with CMS.

Candice Le-Tran
Office: 909-865-9844

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Tuesday, August 22, 2017 2:27 PM
**To:** Rosenkranz, Amy (HCP-MED)@DHCS
**Subject:** DSH System Issues

Hello –

The DSH system is currently not operational.  I do not know how long it will take to bring the system back up, but I will let everyone know when it is back online.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
The information contained in this e-mail document is confidential and is intended only to be viewed by the recipient(s) listed above.  If you are not the intended recipient(s), you are hereby notified that any distribution or copying of this document is strictly prohibited.  If you have received this document in error, please contact the sender listed above, and destroy the document(s).

PVHMC Email Confidentiality Notice

PVHMC Email Confidentiality Notice

PVHMC Email Confidentiality Notice

P-54

## Listing of  2010 California GENERAL ACUTE Hospitals

Source: Annual Financial Disclosure Reports filed with the Office of Statewide Health Planning and
Development for FY periods ending in calendar year 2010, as reported by OSHPD June 6, 2013

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 1 | 106301098 | 50226 | AHMC ANAHEIM REGIONAL MEDICAL CENTER | General Acute | - |
| 2 | 106010846 | 50320 | ALAMEDA COUNTY MEDICAL CENTER | General Acute | - |
| 3 | 106010735 | 50211 | ALAMEDA HOSPITAL | General Acute | - |
| 4 | 106190017 | 50281 | ALHAMBRA HOSPITAL | General Acute | - |
| 5 | 106010739 | 50305 | ALTA BATES SUMMIT MED CTR-ALTA BATES CAMPUS | General Acute | - |
| 6 | 106010937 | 50043 | ALTA BATES SUMMIT MED CTR-SUMMIT CAMPUS-HAWTHORNE | General Acute | - |
| 7 | 106370652 | 50757 | ALVARADO HOSPITAL | General Acute | - |
| 8 | 106301097 | 50768 | ANAHEIM GENERAL HOSPITAL | General Acute | - |
| 9 | 106190034 | 50056 | ANTELOPE VALLEY HOSPITAL | General Acute | - |
| 10 | 106364231 | 50245 | ARROWHEAD REGIONAL MEDICAL CENTER | General Acute | - |
| 11 | 106400466 | 50016 | ARROYO GRANDE COMMUNITY HOSPITAL | General Acute | - |
| 12 | 106150722 | 50036 | BAKERSFIELD MEMORIAL HOSPITAL | General Acute | - |
| 13 | 106184008 | 51320 | BANNER LASSEN MEDICAL CENTER | General Acute | Small/Rural |
| 14 | 106361105 | 50298 | BARSTOW COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 15 | 106090793 | 50352 | BARTON MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 16 | 106361110 | 50618 | BEAR VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 17 | 106190066 | 50531 | BELLFLOWER MEDICAL CENTER | General Acute | - |
| 18 | 106190081 | 50350 | BEVERLY HOSPITAL | General Acute | - |
| 19 | 106040802 | 51311 | BIGGS-GRIDLEY MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 20 | 106190110 | 50752 | BROTMAN MEDICAL CENTER | General Acute | - |
| 21 | 106190125 | 50149 | CALIFORNIA HOSPITAL MEDICAL CENTER | General Acute | - |
| 22 | 106380929 | 50047 | CALIFORNIA PACIFIC MEDICAL CENTER | General Acute | - |
| 23 | 106380964 | 50055 | CALIFORNIA PACIFIC MEDICAL CTN-ST. LUKE'S CAMPUS | General Acute | - |
| 24 | 106190045 | 51307 | CATALINA ISLAND MEDICAL CENTER | General Acute | Small/Rural |
| 25 | 106190555 | 50625 | CEDARS-SINAI MEDICAL CENTER | General Acute | - |
| 26 | 106190148 | 50739 | CENTINELA HOSPITAL MEDICAL CENTER | General Acute | - |
| 27 | 106160787 | 50196 | CENTRAL VALLEY GENERAL HOSPITAL | General Acute | - |
| 28 | 106301140 | 50745 | CHAPMAN MEDICAL CENTER | General Acute | - |
| 29 | 106010776 | 53301 | CHILDRENS HOSPITAL & RESEARCH CENTER AT OAKLAND | General Acute | - |
| 30 | 106304113 | 53306 | CHILDREN'S HOSPITAL AT MISSION | General Acute | - |
| 31 | 106204019 | 53300 | CHILDREN'S HOSPITAL CENTRAL CALIFORNIA | General Acute | - |
| 32 | 106190170 | 53302 | CHILDREN'S HOSPITAL OF LOS ANGELES | General Acute | - |
| 33 | 106300032 | 53304 | CHILDREN'S HOSPITAL OF ORANGE COUNTY | General Acute | - |
| 34 | 106434051 | #N/A | CHILDRENS RECOVERY CENTER OF NORTHERN CALIFORNIA | General Acute | - |
| 35 | 106382715 | 50407 | CHINESE HOSPITAL | General Acute | - |
| 36 | 106361144 | 50586 | CHINO VALLEY MEDICAL CENTER | General Acute | - |
| 37 | 106190636 | 50382 | CITRUS VALLEY MEDICAL CENTER - QV CAMPUS | General Acute | - |
| 38 | 106190176 | 50146 | CITY OF HOPE HELFORD CLINICAL RESEARCH HOSPITAL | General Acute | - |
| 39 | 106100005 | 50492 | CLOVIS COMMUNITY MEDICAL CENTER | General Acute | - |
| 40 | 106100697 | 50397 | COALINGA REGIONAL MEDICAL CENTER | General Acute | Small/Rural |
| 41 | 106190766 | 50219 | COAST PLAZA DOCTORS HOSPITAL | General Acute | - |
| 42 | 106301258 | 50747 | COASTAL COMMUNITIES HOSPITAL | General Acute | - |
| 43 | 106301155 | 50543 | COLLEGE HOSPITAL COSTA MESA | General Acute | - |
| 44 | 106361458 | 51323 | COLORADO RIVER MEDICAL CENTER | General Acute | Small/Rural |
| 45 | 106060870 | 50434 | COLUSA REGIONAL MEDICAL CENTER | General Acute | Small/Rural |
| 46 | 106190197 | 50091 | COMMUNITY & MISSION HOSPITALS OF HUNTINGTON PARK | General Acute | - |
| 47 | 106190475 | 50727 | COMMUNITY HOSPITAL OF LONG BEACH | General Acute | - |
| 48 | 106430743 | 50188 | COMMUNITY HOSPITAL OF LOS GATOS | General Acute | 1 |
| 49 | 106361323 | 50089 | COMMUNITY HOSPITAL OF SAN BERNARDINO | General Acute | - |
| 50 | 106270744 | 50145 | COMMUNITY HOSPITAL OF THE MONTEREY PENINSULA | General Acute | - |
| 51 | 106560473 | 50394 | COMMUNITY MEMORIAL HOSPITAL - SAN BUENAVENTURA | General Acute | - |
| 52 | 106100717 | 50060 | COMMUNITY REGIONAL MEDICAL CENTER | General Acute | - |
| 53 | 106070924 | 50276 | CONTRA COSTA REGIONAL MEDICAL CENTER | General Acute | - |
| 54 | 106160702 | 50349 | CORCORAN DISTRICT HOSPITAL | General Acute | Small/Rural |
| 55 | 106331152 | 50329 | CORONA REGIONAL MEDICAL CENTER - MAIN | General Acute | - |
| 56 | 106390846 | 50122 | DAMERON HOSPITAL | General Acute | - |
| 57 | 106150706 | 50608 | DELANO REGIONAL MEDICAL CENTER | General Acute | - |
| 58 | 106331164 | 50243 | DESERT REGIONAL MEDICAL CENTER | General Acute | - |
| 59 | 106364144 | 50709 | DESERT VALLEY HOSPITAL | General Acute | - |
| 60 | 106392287 | 50118 | DOCTORS HOSPITAL OF MANTECA | General Acute | - |
| 61 | 106190857 | 50096 | DOCTORS HOSPITAL OF WEST COVINA | General Acute | - |
| 62 | 106500852 | 50464 | DOCTORS MEDICAL CENTER | General Acute | - |
| 63 | 106070904 | 50079 | DOCTORS MEDICAL CENTER - SAN PABLO | General Acute | - |
| 64 | 106440755 | 50242 | DOMINICAN SANTA CRUZ HOSPITAL - SOQUEL | General Acute | - |
| 65 | 106190243 | 50393 | DOWNEY REGIONAL MEDICAL CENTER | General Acute | - |
| 66 | 106196168 | 53309 | EARL & LORRAINE MILLER CHILDRENS HOSPITAL | General Acute | - |
| 67 | 106190256 | 50541 | EAST LOS ANGELES DOCTOR'S HOSPITAL | General Acute | - |
| 68 | 106190328 | 50205 | EAST VALLEY HOSPITAL MEDICAL CENTER | General Acute | - |
| 69 | 106320859 | 51300 | EASTERN PLUMAS HEALTH CARE | General Acute | Small/Rural |
| 70 | 106010805 | 50488 | EDEN MEDICAL CENTER | General Acute | - |
| 71 | 106331168 | 50573 | EISENHOWER MEDICAL CENTER | General Acute | - |
| 72 | 106430763 | 50308 | EL CAMINO HOSPITAL | General Acute | - |
| 73 | 106130699 | 50045 | EL CENTRO REGIONAL MEDICAL CENTER | General Acute | - |

0709

00212

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 74 | 106500867 | 50179 | EMANUEL MEDICAL CENTER | General Acute | - |
| 75 | 106190280 | 50158 | ENCINO HOSPITAL MEDICAL CENTER | General Acute | - |
| 76 | 106040962 | 50039 | ENLOE MEDICAL CENTER - ESPLANADE CAMPUS | General Acute | - |
| 77 | 106474007 | 51316 | FAIRCHILD MEDICAL CENTER | General Acute | Small/Rural |
| 78 | 106370705 | 50435 | FALLBROOK HOSPITAL DISTRICT | General Acute | Small/Rural |
| 79 | 106040875 | 50225 | FEATHER RIVER HOSPITAL | General Acute | - |
| 80 | 106190298 | 50597 | FOOTHILL PRESBYTERIAN HOSPITAL | General Acute | - |
| 81 | 106301175 | 50570 | FOUNTAIN VALLEY REGIONAL HOSPITAL& MEDICAL CENTER- EUCLID | General Acute | - |
| 82 | 106230949 | 51310 | FRANK R HOWARD MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 83 | 106400480 | 50232 | FRENCH HOSPITAL MEDICAL CENTER | General Acute | - |
| 84 | 106105029 | 50732 | FRESNO HEART & SURGICAL HOSPITAL | General Acute | - |
| 85 | 106301283 | 50230 | GARDEN GROVE HOSPITAL & MEDICAL CENTER | General Acute | - |
| 86 | 106190315 | 50737 | GARFIELD MEDICAL CENTER | General Acute | - |
| 87 | 106270777 | 50189 | GEORGE L. MEE MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 88 | 106190323 | 50239 | GLENDALE ADVENTIST MEDICAL CENTER | General Acute | - |
| 89 | 106190522 | 5005B | GLENDALE MEMORIAL HOSPITAL AND HEALTH CENTER | General Acute | - |
| 90 | 106110889 | 51306 | GLENN MEDICAL CENTER | General Acute | Small/Rural |
| 91 | 106420483 | 50357 | GOLETA VALLEY COTTAGE HOSPITAL | General Acute | - |
| 92 | 106150775 | 50257 | GOOD SAMARITAN HOSPITAL | General Acute | - |
| 93 | 106190392 | 50471 | GOOD SAMARITAN HOSPITAL- LA | General Acute | - |
| 94 | 106430779 | 50380 | GOOD SAMARITAN HOSPITAL- SAN JOSE | General Acute | - |
| 95 | 106190352 | 50738 | GREATER EL MONTE COMMUNITY HOSPITAL | General Acute | - |
| 96 | 106160725 | 50121 | HANFORD COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 97 | 106350784 | 50296 | HAZEL HAWKINS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 98 | 106490964 | 51321 | HEALDSBURG DISTRICT HOSPITAL | General Acute | Small/Rural |
| 99 | 106304159 | 53308 | HEALTHBRIDGE CHILDREN'S HOSPITAL-ORANGE | General Acute | - |
| 100 | 106331194 | 50390 | HEMET VALLEY MEDICAL CENTER | General Acute | - |
| 101 | 106190949 | 50624 | HENRY MAYO NEWHALL MEMORIAL HOSPITAL | General Acute | - |
| 102 | 106362041 | 50279 | HI-DESERT MEDICAL CENTER | General Acute | Small/Rural |
| 103 | 106301205 | 50224 | HOAG MEMORIAL HOSPITAL PRESBYTERIAN | General Acute | - |
| 104 | 106190380 | 50135 | HOLLYWOOD COMMUNITY HOSPITAL OF HOLLYWOOD | General Acute | - |
| 105 | 106190382 | 50063 | HOLLYWOOD PRESBYTERIAN MEDICAL CENTER | General Acute | - |
| 106 | 106301209 | 50526 | HUNTINGTON BEACH HOSPITAL | General Acute | - |
| 107 | 106190400 | 50438 | HUNTINGTON MEMORIAL HOSPITAL | General Acute | - |
| 108 | 106121031 | 51309 | JEROLD PHELPS COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 109 | 106220733 | 51304 | JOHN C FREMONT HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 110 | 106331216 | 50534 | JOHN F. KENNEDY MEMORIAL HOSPITAL | General Acute | - |
| 111 | 106071018 | 50496 | JOHN MUIR MEDICAL CENTER-CONCORD CAMPUS | General Acute | - |
| 112 | 106070988 | 50180 | JOHN MUIR MEDICAL CENTER-WALNUT CREEK CAMPUS | General Acute | - |
| 113 | 106190430 | 50139 | KAISER FDN HOSP - BELLFLOWER | General Acute | - |
| 114 | 106301132 | 50609 | KAISER FOUNDATION HOSPITAL - ANAHEIM | General Acute | - |
| 115 | 106074097 | 50760 | KAISER FOUNDATION HOSPITAL - ANTIOCH | General Acute | - |
| 116 | 106196035 | 50723 | KAISER FOUNDATION HOSPITAL - BALDWIN PARK | General Acute | - |
| 117 | 106196403 | #N/A | KAISER FOUNDATION HOSPITAL - DOWNEY | General Acute | - |
| 118 | 106361223 | 50140 | KAISER FOUNDATION HOSPITAL - FONTANA | General Acute | - |
| 119 | 106104082 | 50710 | KAISER FOUNDATION HOSPITAL - FRESNO | General Acute | - |
| 120 | 106380857 | 50076 | KAISER FOUNDATION HOSPITAL - GEARY (S.F.) | General Acute | - |
| 121 | 106190431 | 50411 | KAISER FOUNDATION HOSPITAL - HARBOR CITY | General Acute | - |
| 122 | 106010858 | 50512 | KAISER FOUNDATION HOSPITAL - HAYWARD | General Acute | - |
| 123 | 106394009 | 50748 | KAISER FOUNDATION HOSPITAL - MANTECA | General Acute | - |
| 124 | 106334048 | 50694 | KAISER FOUNDATION HOSPITAL - MORENO VALLEY | General Acute | - |
| 125 | 106010856 | 50075 | KAISER FOUNDATION HOSPITAL - OAKLAND CAMPUS | General Acute | - |
| 126 | 106190432 | 50137 | KAISER FOUNDATION HOSPITAL - PANORAMA CITY | General Acute | - |
| 127 | 106410804 | 50541 | KAISER FOUNDATION HOSPITAL - REDWOOD CITY | General Acute | - |
| 128 | 106340025 | 50686 | KAISER FOUNDATION HOSPITAL - RIVERSIDE | General Acute | - |
| 129 | 106340913 | 50425 | KAISER FOUNDATION HOSPITAL - SACRAMENTO/ROSEVILLE | General Acute | - |
| 130 | 106370730 | 50515 | KAISER FOUNDATION HOSPITAL - SAN DIEGO | General Acute | - |
| 131 | 106431506 | 50604 | KAISER FOUNDATION HOSPITAL - SAN JOSE | General Acute | - |
| 132 | 106210992 | 50510 | KAISER FOUNDATION HOSPITAL - SAN RAFAEL | General Acute | - |
| 133 | 106434153 | 50071 | KAISER FOUNDATION HOSPITAL - SANTA CLARA | General Acute | - |
| 134 | 106494019 | 50690 | KAISER FOUNDATION HOSPITAL - SANTA ROSA | General Acute | - |
| 135 | 106342344 | 50674 | KAISER FOUNDATION HOSPITAL - SOUTH SACRAMENTO | General Acute | - |
| 136 | 106410806 | 50070 | KAISER FOUNDATION HOSPITAL - SOUTH SAN FRANCISCO | General Acute | - |
| 137 | 106190429 | 50138 | KAISER FOUNDATION HOSPITAL - SUNSET | General Acute | - |
| 138 | 106484044 | 50767 | KAISER FOUNDATION HOSPITAL - VACAVILLE | General Acute | - |
| 139 | 106070990 | 50072 | KAISER FOUNDATION HOSPITAL - WALNUT CREEK | General Acute | - |
| 140 | 106190434 | 50561 | KAISER FOUNDATION HOSPITAL - WEST LA | General Acute | - |
| 141 | 106191450 | 50677 | KAISER FOUNDATION HOSPITAL - WOODLAND HILLS | General Acute | - |
| 142 | 106480989 | 50073 | KAISER FOUNDATION HOSPITAL AND REHABILITATION CENTER - VALLEJ | General Acute | - |
| 143 | 106015000 | #N/A | KAISER FOUNDATION NORTHERN REGION | General Acute | - |
| 144 | 106191300 | #N/A | KAISER FOUNDATION SOUTHERN REGION | General Acute | - |
| 145 | 106540734 | 50057 | KAWEAH DELTA MEDICAL CENTER | General Acute | - |
| 146 | 106150736 | 50315 | KERN MEDICAL CENTER | General Acute | - |
| 147 | 106150737 | 51314 | KERN VALLEY HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 148 | 106301127 | 52039 | KINDRED HOSPITAL - BREA | General Acute | - |
| 149 | 106190449 | 52038 | KINDRED HOSPITAL - LA MIRADA | General Acute | - |
| 150 | 106190305 | 52032 | KINDRED HOSPITAL - LOS ANGELES | General Acute | - |

Page 2 of 5

0710

00213

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 151 | 106361274 | 52037 | KINDRED HOSPITAL - ONTARIO | General Acute | - |
| 152 | 106344035 | 52033 | KINDRED HOSPITAL - SACRAMENTO | General Acute | - |
| 153 | 106370721 | 52036 | KINDRED HOSPITAL - SAN DIEGO | General Acute | - |
| 154 | 106010887 | 52034 | KINDRED HOSPITAL - SAN FRANCISCO BAY AREA | General Acute | - |
| 155 | 106301380 | 52035 | KINDRED HOSPITAL - WESTMINSTER | General Acute | - |
| 156 | 106100745 | 50682 | KINGSBURG MEDICAL HOSPITAL | General Acute | Small/Rural |
| 157 | 106194981 | #N/A | LA CASA PSYCHIATRIC HEALTH FACILITY | General Acute | - |
| 158 | 106301234 | 50580 | LA PALMA INTERCOMMUNITY HOSPITAL | General Acute | - |
| 159 | 106191227 | 50376 | LAC/HARBOR-UCLA MEDICAL CENTER | General Acute | - |
| 160 | 106191231 | 50040 | LAC/OLIVE VIEW-UCLA MEDICAL CENTER | General Acute | - |
| 161 | 106191306 | 50717 | LAC/RANCHO LOS AMIGOS NATIONAL REHABILITATION CTR | General Acute | - |
| 162 | 106191228 | 50373 | LAC/USC MEDICAL CENTER | General Acute | - |
| 163 | 106380865 | 50668 | LAGUNA HONDA HOSP & REHAB CENTER | General Acute | - |
| 164 | 106190240 | 50581 | LAKEWOOD REGIONAL MEDICAL CENTER | General Acute | - |
| 165 | 106190455 | 50204 | LANCASTER COMMUNITY HOSPITAL | General Acute | - |
| 166 | 106390923 | 50336 | LODI MEMORIAL HOSPITAL | General Acute | - |
| 167 | 106361246 | 50327 | LOMA LINDA UNIVERSITY MEDICAL CENTER | General Acute | - |
| 168 | 106420491 | 50110 | LOMPOC VALLEY MEDICAL CENTER | General Acute | Small/Rural |
| 169 | 106190525 | 50485 | LONG BEACH MEMORIAL MEDICAL CENTER | General Acute | - |
| 170 | 106301248 | 50551 | LOS ALAMITOS MEDICAL CENTER | General Acute | - |
| 171 | 106190198 | 50663 | LOS ANGELES COMMUNITY HOSPITAL | General Acute | - |
| 172 | 106190854 | 50644 | LOS ANGELES METROPOLITAN MEDICAL CENTER | General Acute | - |
| 173 | 106560492 | 50549 | LOS ROBLES HOSPITAL & MEDICAL CENTER | General Acute | - |
| 174 | 106434040 | 53305 | LUCILE SALTER PACKARD CHILDREN'S HOSPITAL AT STANFORD | General Acute | - |
| 175 | 106121002 | 50028 | MAD RIVER COMMUNITY HOSPITAL | General Acute | - |
| 176 | 106201281 | 50568 | MADERA COMMUNITY HOSPITAL | General Acute | - |
| 177 | 106260011 | 51303 | MAMMOTH HOSPITAL | General Acute | Small/Rural |
| 178 | 106420493 | 50107 | MARIAN MEDICAL CENTER | General Acute | - |
| 179 | 106211006 | 50360 | MARIN GENERAL HOSPITAL | General Acute | - |
| 180 | 106190500 | 50740 | MARINA DEL REY HOSPITAL | General Acute | - |
| 181 | 106050932 | 50366 | MARK TWAIN ST. JOSEPH'S HOSPITAL | General Acute | Small/Rural |
| 182 | 106090933 | 50254 | MARSHALL MEDICAL CENTER | General Acute | Small/Rural |
| 183 | 106450936 | 51305 | MAYERS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 184 | 106240924 | 50528 | MEMORIAL HOSPITAL LOS BANOS | General Acute | Small/Rural |
| 185 | 106500939 | 50557 | MEMORIAL HOSPITAL MODESTO | General Acute | - |
| 186 | 106190521 | 50468 | MEMORIAL HOSPITAL OF GARDENA | General Acute | - |
| 187 | 106231013 | 50569 | MENDOCINO COAST DISTRICT HOSPTIAL | General Acute | - |
| 188 | 106334018 | 50684 | MENIFEE VALLEY MEDICAL CENTER | General Acute | - |
| 189 | 106414018 | 50754 | MENLO PARK SURGICAL HOSPITAL | General Acute | - |
| 190 | 106340947 | 50017 | MERCY GENERAL HOSPITAL | General Acute | - |
| 191 | 106150761 | 50295 | MERCY HOSPITAL - BAKERSFIELD | General Acute | - |
| 192 | 106344029 | 50414 | MERCY HOSPITAL - FOLSOM | General Acute | - |
| 193 | 106470871 | 51319 | MERCY HOSPITAL OF MT. SHASTA | General Acute | Small/Rural |
| 194 | 106450949 | 50280 | MERCY MEDICAL CENTER | General Acute | - |
| 195 | 106240942 | 50444 | MERCY MEDICAL CENTER MERCED - COMMUNITY CAMPUS | General Acute | - |
| 196 | 106340950 | 50516 | MERCY SAN JUAN HOSPITAL | General Acute | - |
| 197 | 106340951 | 50590 | METHODIST HOSPITAL OF SACRAMENTO | General Acute | - |
| 198 | 106190529 | 50238 | METHODIST HOSPITAL OF SOUTHERN CALIFORNIA | General Acute | - |
| 199 | 106190681 | 50751 | MIRACLE MILE MEDICAL CENTER | General Acute | - |
| 200 | 106190524 | 50704 | MISSION COMMUNITY HOSPITAL - PANORAMA CAMPUS | General Acute | - |
| 201 | 106301262 | 50567 | MISSION HOSPITAL REGIONAL MEDICAL CENTER | General Acute | - |
| 202 | 106250956 | 50430 | MODOC MEDICAL CENTER | General Acute | Small/Rural |
| 203 | 106190541 | 52054 | MONROVIA MEMORIAL HOSPITAL | General Acute | - |
| 204 | 106361166 | 50758 | MONTCLAIR HOSPITAL MEDICAL CENTER | General Acute | - |
| 205 | 106190547 | 50736 | MONTEREY PARK HOSPITAL | General Acute | - |
| 206 | 106190552 | #N/A | MOTION PICTURE & TELEVISION HOSPITAL | General Acute | - |
| 207 | 106361266 | 51312 | MOUNTAINS COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 208 | 106274043 | 50248 | NATIVIDAD MEDICAL CENTER | General Acute | - |
| 209 | 106301357 | 52053 | NEWPORT SPECIALTY HOSPITAL | General Acute | - |
| 210 | 106481357 | 50367 | NORTH BAY MEDICAL CENTER | General Acute | - |
| 211 | 106141273 | 51324 | NORTHERN INYO HOSPITAL | General Acute | Small/Rural |
| 212 | 106190568 | 50116 | NORTHRIDGE HOSPITAL MEDICAL CENTER | General Acute | - |
| 213 | 106214034 | 50131 | NOVATO COMMUNITY HOSPITAL | General Acute | - |
| 214 | 106500967 | 50067 | OAK VALLEY DISTRICT HOSPITAL | General Acute | Small/Rural |
| 215 | 106430837 | 50153 | O'CONNOR HOSPITAL | General Acute | - |
| 216 | 106560501 | 50046 | OJAI VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 217 | 106190534 | 50742 | OLYMPIA MEDICAL CENTER | General Acute | - |
| 218 | 106300225 | 50678 | ORANGE COAST MEMORIAL MEDICAL CENTER | General Acute | - |
| 219 | 106040937 | 50030 | OROVILLE HOSPITAL | General Acute | - |
| 220 | 106190307 | 50018 | PACIFIC ALLIANCE MEDICAL CENTER | General Acute | - |
| 221 | 106190587 | 50277 | PACIFIC HOSPITAL OF LONG BEACH | General Acute | - |
| 222 | 106190696 | 50378 | PACIFICA HOSPITAL OF THE VALLEY | General Acute | - |
| 223 | 106491338 | 50385 | PALM DRIVE HOSPITAL | General Acute | Small/Rural |
| 224 | 106331288 | 50423 | PALO VERDE HOSPITAL | General Acute | Small/Rural |
| 225 | 106370755 | 50115 | PALOMAR MEDICAL CENTER | General Acute | - |
| 226 | 106370759 | 50024 | PARADISE VALLEY HOSPITAL | General Acute | - |
| 227 | 106331293 | 50102 | PARKVIEW COMMUNITY HOSPITAL | General Acute | - |

0711

00214

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 228 | 106410852 | 50007 | PENINSULA MEDICAL CENTER | General Acute | - |
| 229 | 106491001 | 50136 | PETALUMA VALLEY HOSPITAL | General Acute | - |
| 230 | 106130760 | 50342 | PIONEERS MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 231 | 106301297 | 50589 | PLACENTIA-LINDA COMMUNITY HOSPITAL | General Acute | - |
| 232 | 106320986 | 51326 | PLUMAS DISTRICT HOSPITAL | General Acute | Small/Rural |
| 233 | 106370977 | 50636 | POMERADO HOSPITAL | General Acute | - |
| 234 | 106190630 | 50231 | POMONA VALLEY HOSPITAL MEDICAL CENTER | General Acute | - |
| 235 | 106190631 | 50169 | PRESBYTERIAN INTERCOMMUNITY HOSPITAL | General Acute | - |
| 236 | 106190599 | 52046 | PROMISE HOSPITAL OF EAST LOS ANGELES | General Acute | - |
| 237 | 106190385 | 50278 | PROVIDENCE HOLY CROSS MEDICAL CENTER | General Acute | - |
| 238 | 106190680 | 50078 | PROVIDENCE LITTLE CO OF MARY-SAN PEDRO | General Acute | - |
| 239 | 106190470 | 50353 | PROVIDENCE LITTLE CO OF MARY-TORRANCE | General Acute | - |
| 240 | 106190758 | 50235 | PROVIDENCE SAINT JOSEPH MEDICAL CENTER | General Acute | - |
| 241 | 106190517 | 50761 | PROVIDENCE TARZANA MEDICAL CENTER | General Acute | - |
| 242 | 106281047 | 50009 | QUEEN OF THE VALLEY HOSPITAL | General Acute | - |
| 243 | 106370673 | 53303 | RADY CHILDREN'S HOSPITAL - SAN DIEGO | General Acute | - |
| 244 | 106364188 | 52049 | RANCHO SPECIALTY HOSPITAL | General Acute | - |
| 245 | 106361308 | 50272 | REDLANDS COMMUNITY HOSPITAL | General Acute | - |
| 246 | 106121051 | 51318 | REDWOOD MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 247 | 106430705 | 50125 | REGIONAL MEDICAL CENTER OF SAN JOSE | General Acute | - |
| 248 | 106580996 | 50133 | RIDEOUT MEMORIAL HOSPITAL | General Acute | - |
| 249 | 106150782 | 50448 | RIDGECREST REGIONAL HOSPITAL | General Acute | Small/Rural |
| 250 | 106331312 | 50022 | RIVERSIDE COMMUNITY HOSPITAL | General Acute | - |
| 251 | 106334487 | 50292 | RIVERSIDE COUNTY REGIONAL MEDICAL CENTER | General Acute | - |
| 252 | 106190796 | 50262 | RONALD REAGAN UCLA MEDICAL CENTER | General Acute | - |
| 253 | 106301317 | 50603 | SADDLEBACK MEMORIAL MEDICAL CENTER | General Acute | - |
| 254 | 106270875 | 50334 | SALINAS VALLEY MEMORIAL HOSPITAL | General Acute | - |
| 255 | 106361318 | 50099 | SAN ANTONIO COMMUNITY HOSPITAL | General Acute | - |
| 256 | 106190673 | 50588 | SAN DIMAS COMMUNITY HOSPITAL | General Acute | - |
| 257 | 106380939 | 50228 | SAN FRANCISCO GENERAL HOSPITAL MEDICAL CENTER | General Acute | - |
| 258 | 106190200 | 50132 | SAN GABRIEL VALLEY MEDICAL CENTER | General Acute | - |
| 259 | 106331326 | 50054 | SAN GORGONIO MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 260 | 106150788 | 50455 | SAN JOAQUIN COMMUNITY HOSPITAL | General Acute | - |
| 261 | 106391010 | 50167 | SAN JOAQUIN GENERAL HOSPITAL | General Acute | - |
| 262 | 106410782 | 50113 | SAN MATEO MEDICAL CENTER | General Acute | - |
| 263 | 106074017 | 50689 | SAN RAMON REGIONAL MEDICAL CENTER | General Acute | - |
| 264 | 106420514 | 50396 | SANTA BARBARA COTTAGE HOSPITAL | General Acute | - |
| 265 | 106430883 | 50038 | SANTA CLARA VALLEY MEDICAL CENTER | General Acute | - |
| 266 | 106190687 | 50112 | SANTA MONICA-UCLA MEDICAL CENTER & ORTHOPAEDIC HOSPITAL | General Acute | - |
| 267 | 106491064 | 50174 | SANTA ROSA MEMORIAL HOSPITAL | General Acute | - |
| 268 | 106420522 | 50478 | SANTA YNEZ VALLEY COTTAGE HOSPITAL | General Acute | Small/Rural |
| 269 | 106371256 | 50424 | SCRIPPS GREEN HOSPITAL | General Acute | - |
| 270 | 106371394 | 50503 | SCRIPPS MEMORIAL HOSPITAL - ENCINITAS | General Acute | - |
| 271 | 106370744 | 50077 | SCRIPPS MERCY HOSPITAL | General Acute | - |
| 272 | 106321016 | 50333 | SENECA HEALTHCARE DISTRICT | General Acute | Small/Rural |
| 273 | 106410891 | 50197 | SEQUOIA HOSPITAL | General Acute | - |
| 274 | 106410817 | 50289 | SETON MEDICAL CENTER | General Acute | - |
| 275 | 106370875 | 50222 | SHARP CHULA VISTA MEDICAL CENTER | General Acute | - |
| 276 | 106370689 | 50234 | SHARP CORONADO HOSPITAL & HEALTHCARE CENTER | General Acute | - |
| 277 | 106370714 | 50026 | SHARP GROSSMONT HOSPITAL | General Acute | - |
| 278 | 106370695 | 50722 | SHARP MARY BIRCH HOSPITAL FOR WOMEN | General Acute | - |
| 279 | 106370694 | 50100 | SHARP MEMORIAL HOSPITAL | General Acute | - |
| 280 | 106450940 | 50764 | SHASTA REGIONAL MEDICAL CENTER | General Acute | - |
| 281 | 106190708 | 50755 | SHERMAN OAKS HOSPITAL & HEALTH CENTER | General Acute | - |
| 282 | 106190712 | #N/A | SHRINERS HOSPITAL FOR CHILDREN- LOS ANGELES | General Acute | - |
| 283 | 106344114 | #N/A | SHRINERS HOSPITALS FOR CHILDREN NORTHERN CALIFORNIA | General Acute | - |
| 284 | 106100797 | 50192 | SIERRA KINGS DISTRICT HOSPITAL | General Acute | Small/Rural |
| 285 | 106291023 | 50150 | SIERRA NEVADA MEMORIAL HOSPITAL | General Acute | Small/Rural |
| 286 | 106540798 | 50261 | SIERRA VIEW DISTRICT HOSPITAL | General Acute | - |
| 287 | 106400524 | 50506 | SIERRA VISTA REGIONAL MEDICAL CENTER | General Acute | - |
| 288 | 106190661 | 50763 | SILVER LAKE MEDICAL CENTER | General Acute | - |
| 289 | 106560525 | 50236 | SIMI VALLEY HOSPITAL & HEALTH CARE SERVICES - SYCAMORE | General Acute | - |
| 290 | 106491076 | 50090 | SONOMA VALLEY HOSPITAL | General Acute | - |
| 291 | 106540411 | 50335 | SONORA REGIONAL MEDICAL CENTER-GREENLEY | General Acute | Small/Rural |
| 292 | 106301337 | 50193 | SOUTH COAST MEDICAL CENTER | General Acute | - |
| 293 | 106141338 | 51302 | SOUTHERN INYO HOSPITAL | General Acute | Small/Rural |
| 294 | 106334068 | 50701 | SOUTHWEST HEALTHCARE SYSTEM - MURRIETA | General Acute | - |
| 295 | 106100899 | 50093 | ST. AGNES MEDICAL CENTER | General Acute | - |
| 296 | 106361339 | 50129 | ST. BERNARDINE MEDICAL CENTER | General Acute | - |
| 297 | 106521041 | 50042 | ST. ELIZABETH COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 298 | 106190754 | 50104 | ST. FRANCIS MEDICAL CENTER | General Acute | - |
| 299 | 106380960 | 50152 | ST. FRANCIS MEMORIAL HOSPITAL | General Acute | - |
| 300 | 106281078 | 50013 | ST. HELENA HOSPITAL | General Acute | - |
| 301 | 106171049 | 51317 | ST. HELENA HOSPITAL - CLEARLAKE | General Acute | Small/Rural |
| 302 | 106190756 | 50290 | ST. JOHN'S HEALTH CENTER | General Acute | - |
| 303 | 106560508 | 50616 | ST. JOHN'S PLEASANT VALLEY HOSPITAL | General Acute | - |
| 304 | 106560529 | 50082 | ST. JOHN'S REGIONAL MEDICAL CENTER | General Acute | - |

Page 4 of 5

0712

00215

| Count | FAC_NO | Medicare | FAC_NAME | TYPE_CARE | Small/Rural |
|---|---|---|---|---|---|
| 305 | 106121080 | 50006 | ST. JOSEPH HOSPITAL - EUREKA | General Acute | - |
| 306 | 106301340 | 50069 | ST. JOSEPH HOSPITAL - ORANGE | General Acute | - |
| 307 | 106391042 | 50084 | ST. JOSEPH'S MEDICAL CENTER OF STOCKTON | General Acute | - |
| 308 | 106301342 | 50168 | ST. JUDE MEDICAL CENTER | General Acute | - |
| 309 | 106434138 | 50688 | ST. LOUISE REGIONAL HOSPITAL | General Acute | - |
| 310 | 106361343 | 50300 | ST. MARY MEDICAL CENTER - APPLE VALLEY | General Acute | Small/Rural |
| 311 | 106190053 | 50191 | ST. MARY MEDICAL CENTER - LOS ANGELES | General Acute | - |
| 312 | 106380965 | 50457 | ST. MARY'S MEDICAL CENTER-SAN FRANCISCO | General Acute | - |
| 313 | 106010967 | 50002 | ST. ROSE HOSPITAL | General Acute | - |
| 314 | 106190762 | 50502 | ST. VINCENT MEDICAL CENTER | General Acute | - |
| 315 | 106430905 | 50441 | STANFORD UNIVERSITY HOSPITAL | General Acute | - |
| 316 | 106250955 | 51308 | SURPRISE VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 317 | 106034002 | 50014 | SUTTER AMADOR HOSPITAL | General Acute | Small/Rural |
| 318 | 106310791 | 50498 | SUTTER AUBURN FAITH HOSPITAL | General Acute | - |
| 319 | 106084001 | 50417 | SUTTER COAST HOSPITAL | General Acute | Small/Rural |
| 320 | 106574010 | 50537 | SUTTER DAVIS HOSPITAL | General Acute | - |
| 321 | 106070934 | 50523 | SUTTER DELTA MEDICAL CENTER | General Acute | - |
| 322 | 106171395 | 51329 | SUTTER LAKESIDE HOSPITAL | General Acute | Small/Rural |
| 323 | 106444012 | 50714 | SUTTER MATERNITY & SURGERY CENTER OF SANTA CRUZ | General Acute | - |
| 324 | 106341051 | 50108 | SUTTER MEDICAL CENTER - SACRAMENTO | General Acute | - |
| 325 | 106490919 | 50291 | SUTTER MEDICAL CENTER OF SANTA ROSA | General Acute | - |
| 326 | 106311000 | 50309 | SUTTER ROSEVILLE MEDICAL CENTER | General Acute | - |
| 327 | 106481094 | 50101 | SUTTER SOLANO MEDICAL CENTER | General Acute | - |
| 328 | 106391056 | 50313 | SUTTER TRACY COMMUNITY HOSPITAL | General Acute | - |
| 329 | 106291053 | 50494 | TAHOE FOREST HOSPITAL | General Acute | Small/Rural |
| 330 | 106150808 | 51301 | TEHACHAPI HOSPITAL | General Acute | Small/Rural |
| 331 | 106190784 | 50111 | TEMPLE COMMUNITY HOSPITAL | General Acute | - |
| 332 | 106190422 | 50351 | TORRANCE MEMORIAL MEDICAL CENTER | General Acute | - |
| 333 | 106370780 | 50128 | TRI-CITY MEDICAL CENTER | General Acute | - |
| 334 | 106190159 | 50575 | TRI-CITY REGIONAL MEDICAL CENTER | General Acute | - |
| 335 | 106531059 | 51315 | TRINITY HOSPITAL | General Acute | Small/Rural |
| 336 | 106540816 | 50359 | TULARE DISTRICT HOSPITAL | General Acute | - |
| 337 | 106551061 | #N/A | TUOLUMNE GENERAL MEDICAL FACILITY | General Acute | Small/Rural |
| 338 | 106400548 | 50633 | TWIN CITIES COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 339 | 106381154 | 50454 | UCSF MEDICAL CENTER | General Acute | - |
| 340 | 106231396 | 50301 | UKIAH VALLEY MEDICAL CENTER - HOSPITAL DRIVE | General Acute | Small/Rural |
| 341 | 106370782 | 50025 | UNIVERSITY OF CALIF - SAN DIEGO MEDICAL CENTER | General Acute | - |
| 342 | 106341006 | 50599 | UNIVERSITY OF CALIFORNIA DAVIS MEDICAL CENTER | General Acute | - |
| 343 | 106301279 | 50348 | UNIVERSITY OF CALIFORNIA IRVINE MEDICAL CENTER | General Acute | - |
| 344 | 106194219 | 50696 | USC UNIVERSITY HOSPITAL | General Acute | - |
| 345 | 106484001 | 50680 | VACA VALLEY HOSPITAL | General Acute | - |
| 346 | 106190812 | 50126 | VALLEY PRESBYTERIAN HOSPITAL | General Acute | - |
| 347 | 106014050 | 50283 | VALLEYCARE MEDICAL CENTER | General Acute | - |
| 348 | 106560481 | 50159 | VENTURA COUNTY MEDICAL CENTER | General Acute | - |
| 349 | 106190818 | 50124 | VERDUGO HILLS HOSPITAL | General Acute | - |
| 350 | 106361370 | 50517 | VICTOR VALLEY COMMUNITY HOSPITAL | General Acute | Small/Rural |
| 351 | 106190049 | 52045 | VISTA HOSPITAL OF SAN GABRIEL VALLEY | General Acute | - |
| 352 | 106010987 | 50195 | WASHINGTON HOSPITAL - FREMONT | General Acute | - |
| 353 | 106444013 | 50194 | WATSONVILLE COMMUNITY HOSPITAL | General Acute | - |
| 354 | 106301379 | 50426 | WEST ANAHEIM MEDICAL CENTER | General Acute | - |
| 355 | 106190859 | 50481 | WEST HILLS HOSPITAL & MEDICAL CENTER | General Acute | - |
| 356 | 106301188 | 50744 | WESTERN MEDICAL CENTER-ANAHEIM | General Acute | - |
| 357 | 106301566 | 50746 | WESTERN MEDICAL CENTER-SANTA ANA | General Acute | - |
| 358 | 106190878 | 50103 | WHITE MEMORIAL MEDICAL CENTER | General Acute | - |
| 359 | 106190883 | 50735 | WHITTIER HOSPITAL MEDICAL CENTER | General Acute | - |
| 360 | 106571086 | 50127 | WOODLAND MEMORIAL HOSPITAL | General Acute | - |

0713

00216

P-55

00217

**Laurence D. Getzoff**

**Subject:**                FW: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

**From:** Rosenkranz, Amy (HCP-MED)@DHCS [mailto:Amy.Rosenkranz@dhcs.ca.gov]
**Sent:** Tuesday, September 12, 2017 9:10 AM
**To:** Candice LeTran
**Cc:** Laurence D. Getzoff
**Subject:** RE: DHCS Aid Codes assignment and crosswalk from SSA on SSI/SSP recipients

Hi Candice –

This isn't an aid code crosswalk exactly, but what we have is the criteria our system uses to determine which of the three SSI/SSP aid codes we assign to a beneficiary based on the files we receive from SSA:

If the **multi-category indicator** value is '1', '5', 'E', 'N', 'R' or 'X', then aid code '10' is used.  (Aged)
If the **multi-category indicator** value is '2', '3', '6', '7', 'F', 'G', 'O', 'P', 'S', 'T', 'Y' or 'Z', then aid code '20' is used.  (Blind)
If the **multi-category indicator** value is '4', 'D', 'M', 'Q' or 'W', then aid code '60' is used. (Disabled)

If you don't know what these indicator values mean, you will need to get that information from SSA as it is their programming code.

I hope this helps.

Amy Rosenkranz
Program Integrity Unit
Medi-Cal Eligibility Division
Department of Health Care Services
(916) 322-4356

Confidentiality Notice:
This e-mail and any attachments may contain information which is confidential, sensitive, privileged, proprietary or otherwise protected by law. The information is solely intended for the named recipients, other authorized individuals, or a person responsible for delivering it to the authorized recipients.  If you are not an authorized recipient of this message, you are not permitted to read, print, retain, copy or disseminate this message or any part of it. If you have received this e-mail in error, please notify the sender immediately by return e-mail and delete it from your e-mail inbox, including your deleted items folder.

0714

00218

2

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES

RECEIVED

PROVIDER REIMBURSEMENT REVIEW BOARD

AUG 3 0 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

IN THE MATTER OF:

POMONA VALLEY HOSPITAL MEDICAL CENTER

CASE NO.   13-0430
            13-0628
            13-0680

VS.

NORIDIAN HEALTHCARE SOLUTIONS, LLC,
CAHABA SAFEGUARD ADMINISTRATORS, LLC

TRANSCRIPT OF PROCEEDINGS

AUGUST 17, 2017
8:50 A.M.
1508 WOODLAWN DRIVE
SUITE 100
BALTIMORE, MARYLAND

APPEARANCES

MEMBERS OF THE BOARD:
CLAYTON J. NIX, ACTING CHAIRMAN
CHARLOTTE F. BENSON, CPA
JACK AHERN, MBA, CHFP
GREGORY H. ZIEGLER

BOARD ADVISOR:
BECKY SHIREY

FOR THE PROVIDER:
LAURENCE D. GETZOFF, ESQUIRE

FOR THE INTERMEDIARY:
JERROD OLSZEWSKI, ESQUIRE

3

CONTENTS

|                      | DIRECT | CROSS | BOARD |
|----------------------|--------|-------|-------|
| FOR THE PROVIDER:    |        |       |       |
| Candice LeTran       | 45     | 117   | 119   |
| Tzvi Hefter          | 205    | 243   | 245   |
| Stan Rosenstein      | 270    | 285   | 334   |
|                      |        | 330   |       |
| FOR THE INTERMEDIARY:|        |       |       |
| [None]               |        |       |       |

***
EXHIBITS

|                                       | MARKED | ADMITTED |
|---------------------------------------|--------|----------|
| FOR THE PROVIDER:                     |        |          |
| 13-0430:                              |        |          |
| Final position paper                  | 8      | 15       |
| with Exhibits P1-P19                  |        |          |
| 13-0628:                              |        |          |
| Final position paper                  | 8      | 15       |
| with Exhibits P1-P19                  |        |          |
| 13-0680:                              |        |          |
| Final position paper                  | 8      | 15       |
| with Exhibits P1-P19                  |        |          |

4

13-0430, 13-0628, 13-0680:
Consolidated Exhibits   8      15
P20-P39

|                                       | MARKED | ADMITTED |
|---------------------------------------|--------|----------|
| FOR THE INTERMEDIARY:                 |        |          |
| 13-0430:                              |        |          |
| Final position paper                  | 15     | 16       |
| with Exhibits I1-I10                  |        |          |
| 13-0628:                              |        |          |
| Final position paper                  | 15     | 16       |
| with Exhibits I1-I9                   |        |          |
| 13-0680:                              |        |          |
| Final position paper                  | 15     | 16       |
| with Exhibits I1-I10                  |        |          |

00339

PROCEEDINGS

August 17, 2017

THE CHAIRMAN:

I call to order PRRB case numbers 13-0430, 13-0628, and 13-0680, between Pomona Valley Hospital Medical Center, the Provider, and Noridian Healthcare Solutions, the Medicare Administrative Contractor.  This hearing -- this consolidated hearing has been scheduled to resolve the dispute between the Provider and the Intermediary.  The authority for this hearing is found in 1878 of Title XVIII of the Social Security Act, and the regulations at 42 C.F.R. Sections 405.1801 through 1889.  Statutory and regulatory provisions regarding the disclosure of information apply to the Board hearing process, and to

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

persons participating in the process.  The hearing record is disclosable to the public unless there has been a duly authorized claim of privilege or confidentiality approved by the Board.  Although Board hearings are in the form of adversary proceedings, they are not restricted by formal rules of evidence.  Board procedures are intended to allow the full presentation of facts which underlie disputes.  The order in which evidence and argument shall be presented, the admissibility of the evidence, and the conduct of this hearing shall be at the sole discretion of the Board.  The parties have stated that the issue that the Board will be considering today is as follows:  whether the Medicare Administrative

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

Contractor properly calculated Pomona Valley Hospital Medical Center's disproportionate share hospital reimbursement with respect to Pomona's supplemental security income percentage.  Mr. Getzoff, does that properly state the issue?

MR. GETZOFF:

Yes, it properly states the issue, with the exception that, as the hearing will show, the Medicare Contractor merely takes a number from the -- CMS, but for formality purposes, yes, that states the issue.

THE CHAIRMAN:

This is the issue statement -- the issue statement that I read is what the parties agreed to...

MR. GETZOFF:

And that's...

THE CHAIRMAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

...for the...

MR. GETZOFF:

That's fine.  I mean that's -- I mean...

THE CHAIRMAN:

I mean I'm asking you to confirm...

MR. GETZOFF:

Yeah.

THE CHAIRMAN:

...that that's what the parties...

MR. GETZOFF:

That...

THE CHAIRMAN:

...agreed to.

MR. GETZOFF:

That's correct, yes.

THE CHAIRMAN:

Okay.  Mr. Olszewski, does that properly state the issue?

MR. OLSZEWSKI:

Yes, it does.

THE CHAIRMAN:

The parties have submitted

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

9

```
 1   documentation to the Board for
 2   this hearing, which I'll
 3   review briefly.  For the
 4   Provider, for 13-0430,
 5   pertaining to fiscal year
 6   2006, we have a final position
 7   paper with Exhibits P1 to P19.
 8   For the Provider for 13-0628,
 9   pertaining to fiscal year
10   2007, we have a final position
11   paper also with Exhibits P1 to
12   P19, where P19 is left
13   intentionally blank.  For the
14   Provider for 13-0680,
15   pertaining to fiscal year
16   2008, we have a final position
17   paper with Exhibits P1 to P19.
18   And then for all three cases
19   we have for the Provider
20   consolidated exhibits marked
21   P20 to P39.  Mr. Getzoff, is
22   that correct?
23   MR. GETZOFF:
24        That is correct.
25   THE CHAIRMAN:
```

10

```
 1        And, Mr. Olszewski, do you
 2   have any objections to these
 3   documents being made part of
 4   the record?
 5   MR. OLSZEWSKI:
 6        Yes.  The MAC objects to
 7   Exhibits 25, 26, 27, 29, 30,
 8   31, 32, and 37.  These
 9   exhibits, they're five
10   letters, an e-mail, a summary,
11   and a data table, purportedly
12   from individuals who are not
13   being called here today as
14   witnesses.  So the Provider is
15   not going to be able to build
16   a foundation for these
17   documents.  Had these
18   individuals been here to
19   testify, the MAC would be able
20   to cross examine these
21   witnesses on the exhibits, but
22   since they're not here, the
23   MAC is prejudiced and,
24   therefore, objects to having
25   these entered into the record.
```

11

```
 1   THE CHAIRMAN:
 2        Well, let's breakdown your
 3   objections first as to the
 4   documents.  You said P26 and
 5   P27, those first two documents
 6   are letters from Congress,
 7   rather than tables, and
 8   presumably those aren't
 9   individuals that would have
10   been here to testify to begin
11   with.  So the objection
12   relative to those documents
13   is, I take it, different than
14   the others?
15   MR. OLSZEWSKI:
16        Yes, the first exhibit was 25
17   and 26.  I have no way to
18   prove if this is actually a
19   letter from the United States
20   Senate, from Senator
21   Feinstein.  If she's not being
22   called as a witness...
23   THE CHAIRMAN:
24        And relative to the -- it was
25   27 and 28 were...
```

12

```
 1   MR. OLSZEWSKI:
 2        The data tables.
 3   THE CHAIRMAN:
 4        Data tables?  And 29.
 5   MR. OLSZEWSKI:
 6        Twenty-nine is another,
 7   purportedly, letter from
 8   Congress, the House of
 9   Representatives.
10   THE CHAIRMAN:
11        And then 31 was the...
12   MR. OLSZEWSKI:
13        Thirty-one...
14   THE CHAIRMAN:
15        ...31, 32, and 33 were the
16   other objections?
17   MR. OLSZEWSKI:
18        Yes.
19   THE CHAIRMAN:
20        And that's it?
21   MR. OLSZEWSKI:
22        Yes.
23   MR. GETZOFF:
24        Thirty-three is a curriculum
25   vitae of a witness.
```

13

MR. OLSZEWSKI:

That's right.  I did not say 33, it...

THE CHAIRMAN:

Sorry.

MR. OLSZEWSKI:

...was 37, after 32.

THE CHAIRMAN:

Thirty-seven.  Okay.

MR. GETZOFF:

May I address...

THE CHAIRMAN:

Sure.  Please.

MR. GETZOFF:

Let's start in reverse order. Thirty-seven is supported by e-mails -- transmittal e-mails, and will be testified to by a witness who is present.  He was the recipient of the e-mail and a former director of the Medi-Cal program.  And there's, you know, a clear foundation there for that information.  And he

14

will testify as to the authenticity of the information; that he received it personally.  The other numbers were, in terms of the Senator's letters and the House of Representative letters, our first witness, Candice LeTran, arranged for those letters and received those letters from -- actually directly from Senator Feinstein's office, and she can testify to that effect.  I do not believe that a Member of Congress -- we were told explicitly that Members of Congress would not be testifying at this hearing and could not be called.  So I think it's appropriate to show the Provider's efforts in attempting to obtain information from the Social Security Administration to

15

introduce such items when they're supported by our witness.  In terms of the letters from the CMS Administrator, or Acting Administrator, or the Social Security Commissioner, once again, those letters were sent in reply to Senator Feinstein's letters, and they were obtained directly from Senator Feinstein's office by Candice LeTran, who is here to testify, and can explain when she received them, how she received them, of whom she received them.  And I think each of these items is instructive, again, as to the efforts the Provider went through to obtain the cooperation of the Social Security Administration and CMS.

THE CHAIRMAN:

16

The objections are duly noted, and we'll enter them into the record and give them the weight that they're due based on the testimony presented. And for the MAC for 13-0430, pertaining to fiscal year 2006, we have a final position paper with Exhibits I1 to I10. And then for the MAC for case number 13-0628, pertaining to fiscal year 2007, we have a final position paper with Exhibits P -- I1 to I9.  And then finally, for the MAC for case number 13-0680, pertaining to fiscal year 2008, we have a final position paper with Exhibits I1 to I10. Mr. Olszewski, is that correct?

MR. OLSZEWSKI:

Yes.

THE CHAIRMAN:

And, Mr. Getzoff, do you have

17

1  any objections to those being
2  part of the record?
3  MR. GETZOFF:
4      No.
5  THE CHAIRMAN:
6      Thank you.  At this time,
7      we'll now -- and just to be
8      clear, we do not have
9      stipulations by the parties,
10     is that correct?
11 MR. OLSZEWSKI:
12     Yes.
13 MR. GETZOFF:
14     That's correct.
15 THE CHAIRMAN:
16     Thank you.  At this time we
17     will permit both parties to
18     make an opening statement, and
19     we'll start with you, Mr.
20     Getzoff, if you'd like to make
21     one.
22 MR. GETZOFF:
23     Thank you.  We are here to
24     present the Provider, Pomona
25     Valley Hospital Medical

18

1  Center's, case to you
2  contesting the Medicare
3  program's calculation of the
4  SSI fraction of the
5  disproportionate share, or
6  DSH, adjustment for Pomona's
7  cost years ending 12/31 of
8  '06, '07, and '08.  As many of
9  you are undoubtedly familiar
10 with that issue, you may
11 nonetheless have been
12 surprised that this case was
13 not appropriate for the
14 general remand by this Board
15 of this issue that affected
16 similar years of other
17 Providers.  But due to the
18 timing of the original NPRs in
19 these cost years for Pomona,
20 these cases were judged by the
21 Board several years ago not to
22 be appropriate for remand;
23 thus, here we are.  Before
24 getting into the substance of
25 these appeals, I want to make

19

1  certain that the Board is
2  aware of what we are not here
3  to do.  We are not here to
4  challenge the other half of
5  the DSH adjustment; the
6  Medicaid fraction, we are not
7  here to challenge whether Part
8  C days should or should not be
9  counted in the SSI fraction or
10 percentage.  All those issues
11 that were in these appeals
12 have been transferred out of
13 these appeals to groups that
14 are awaiting disposition.
15 Also, both the Medicare
16 Contractor's and Pomona are
17 using numbers for purposes of
18 this appeal regarding the SSI
19 fraction that are calculated
20 without taking into account
21 the possible impact of the
22 resolution of any of those
23 other issues.  Likewise, we
24 are not here to criticize the
25 MAC's calculation or handling

20

1  of this matter.  While Pomona
2  may disagree with some finer
3  factual points raised by the
4  MAC, as well as objections,
5  the MAC is not at fault here.
6  They were given a number to
7  apply by CMS and merely
8  applied it.  Further, unlike
9  in the Board's recent decision
10 in the Hall Render Optional
11 and CIRP DSH Dual SSI Eligible
12 appeals, Pomona is not
13 contesting whether eligible
14 SSI days or anything other
15 than entitled paid days should
16 be included in the numerator
17 of the SSI fraction.  So,
18 quite reasonably, you may all
19 ask why is the Provider here.
20 We are here for two principle
21 reasons.  First, we are here
22 because following years of
23 analysis of the hospital's
24 data, the input from a number
25 of private data sources, a

21

deliberate process of
verifying the hospital's data
against an extremely credible
database maintained by the
state of California, which is,
as you will find out from our
witnesses, is compiled using
actual Social Security
Administration data, and
finally, after a comparison
between the hospital's heavily
scrubbed and verified data,
and data furnished pursuant to
rule by the Medicare program,
our inescapable conclusion is
that CMS' data run for this
one hospital is seriously
flawed and grossly understates
Pomona's SSI percentage or
fraction for each of the years
2006, 2007, and 2008. We are
not talking about CMS' data
being a few days or one or two
percentage points off, or even
five percentage points off.

22

If that were the case, we
would not be here. We are
talking about the hospital's
verified data showing 35
percent to 45 percent more SSI
and SSP days than CMS' data,
depending on the year, and CMS
is unable and has been
unwilling to provide any
credible reason for this
discrepancy. As you know, the
SSI fraction of the DSH
percentage measures the
percentage of Medicare Part A
patient days on which the
patient was entitled to SSI
benefits, divided by the
hospital's total number of
Medicare Part A days
registered by the hospital in
that year. The DSH adjustment
and the formula for
calculating the SSI fraction
of that adjustment are fully a
statutory construct and appear

23

in the SSI Act, included in
Pomona's Exhibits P3 for each
year at page 17. The
Secretary of Health and Human
Services then adopted
regulations to give effect to
the statutory requirement in
which the SSI fraction is
calculated in the same manner,
and this is show in in Exhibit
P39, pages 619 and 620.
Importantly, as we will
explain in a moment, neither
the statute nor the regulation
fix a particular time when
this fraction should be
measured or becomes final.
Thus, the Provider is entitled
to receive the full benefit if
an accurate measure of its SSI
fraction and overall DSH
adjustment for any given year.
This is an important issue for
Pomona as it is a large,
nonprofit hospital on the east

24

part of Los Angeles County.
Pomona, therefore, has a
healthy share of lower-income
patients. Whereas the DSH
adjustment was added to
Medicare by Congress to help
hospitals that treat large
numbers of lower-income
patients, an understatement of
Pomona's SSI fraction of the
size we are talking about
deprives Pomona of several
millions of dollars to which
it is lawfully entitled,
pursuant to the Medicare
statute and the governing
Medicare regulations. This
issue has real impact on the
hospital and the many
thousands of patients it
treats each year. The second
reason we are here is because
CMS and to Social Security
Administration, but primarily
CMS, has precluded Pomona's

1  ability to have a small sample
2  of patient claims from each
3  year reviewed by Social
4  Security Administration to
5  verify once and for all
6  whether Pomona's data or CMS'
7  data are the correct or more
8  correct data.  Eighteen months
9  ago Pomona selected a sample
10  of roughly 10 patient claims
11  from each year, and an
12  additional 20 separately
13  selected random claims from
14  each -- from 2006, which were
15  deemed by CMS to be unmatched.
16  And by unmatched we mean that
17  the patient does not have SSI
18  benefits at the time of
19  receiving Part A services.
20  But these patients were deemed
21  by Pomona through its own data
22  analysis, following a rigorous
23  verification process, as being
24  days on which the patient
25  matched; that is, they both

1  received Part A benefits and
2  were actually receiving SSI
3  benefits on those days.
4  Pomona first had its
5  methodology for verifying SSI
6  benefits reviewed by the
7  former director of the
8  Medi-Cal program, who also
9  served Medi-Cal previous to
10  that as the director of its
11  eligibility systems area, to
12  corroborate that the correct
13  data was being reviewed, and
14  to vouch for the verification
15  work performed by -- using
16  state Medi-Cal records.  Next,
17  Pomona engaged the former
18  longtime director of the
19  Division of Acute Care at CMS,
20  an individual with 30 years'
21  experience at CMS, 23 as the
22  director of the Division of
23  Acute Care, to review the
24  sample to see whether there
25  was some easy explanation of

1  the large discrepancy between
2  the hospital's state SSI data
3  -- sorry, SSA data and CMS'
4  data for the same patients and
5  days.  Both the former
6  Medi-Cal director and the
7  former CMS official, each of
8  whom will testify here today,
9  concluded that there appeared
10  to be an unexplained problem
11  with the CMS data for this
12  hospital, but that Pomona's
13  methodology appeared sound.
14  Subsequently, as Tzvi Hefter's
15  testimony will show, Mr.
16  Hefter approached CMS to try
17  to get them to work with the
18  Social Security Administration
19  to have Pomona's sample
20  reviewed once and for all.  I
21  will let Mr. Hefter explain
22  this effort, but despite
23  numerous approaches, CMS
24  refused the opportunity to get
25  to the bottom of the

1  discrepancy.  The Provider
2  then sought congressional
3  help.  As the exhibits and
4  evidence will show, a U.S.
5  Senator tried, through staff
6  and personally, to have the
7  two agencies cooperate on this
8  to get Pomona's sample
9  reviewed, to either verify
10  Pomona's results or to
11  contravene them.  Either
12  result would have avoided this
13  hearing as Pomona had agreed
14  in advance to live with the
15  results.  But after getting
16  SSA onboard to -- and they
17  actually agreed at one point
18  to look at the data, CMS
19  rejected the plan and refused
20  to act as a conduit for the
21  data which had been requested
22  by SSA.  This, despite that
23  SSA and Pomona each had data
24  use agreements with CMS for
25  SSI benefits sharing -- data

29

sharing.  So once again, this issue is left to the Board to review and decide.  In support of the -- in support of its position, Pomona will prevent -- present three witnesses; Candice LeTran, a very experienced and sophisticated hospital reimbursement director, who is also the director of analytics at Pomona, will discuss her methodology on aid codes for matching Part A patient days to patients with active SSI benefits, literally using a patient day by patient day analysis for assessing qualification of each patient day as an SSI day.  Ms. LeTran will also testify about Pomona's exhaustive efforts to convince CMS to participate in a small sample review.  Tzvi Hefter, the former long-time

30

director of the Division of Acute Care at CMS, will testify about his review of the Provider's methodology, past SSI percentage database problems at CMS, his conclusions regarding the credibility of the Provider's versus CMS' data, and about his own efforts to convince CMS to participate in a small sample review process. Finally, Stan Rosenstein, the former director of California's Medicaid program; Medi-Cal, will testify as an expert regarding his review of the Provider's methodology, his conclusions regarding the credibility of the state data used to verify Pomona's patients' SSI status, the state Medi-Cal database, his knowledge of the typical percentage of SSP patients

31

within the overall populations of patients with SSI/SSP benefits in California, and his own efforts to convince CMS to participate in the review of Pomona's sample.  Although the MAC does not plan to call witnesses, the MAC representatives have raised three principle arguments in opposition.  First, the MAC contends that Pomona did not obtain its data from the SSA. Pomona disagrees.  As the evidence will show, the state data relied upon by Pomona to verify its results absolutely included data obtained directly by the state from the Social Security Administration, just as CMS' data is obtained from that source.  The state data, moreover, actually has been vetted.  There is no count

32

anywhere that I had ever -- have ever seen showing precisely how CMS validates data it receives from the SSA. Indeed, that was one of the things that they have raised three principle arguments in opposition.  First, the MAC contends that Pomona did not obtain its data from the SSA. Pomona disagrees.  As the evidence will show, the state data relied upon by Pomona to verify its results absolutely included data obtained directly by the state from the Social Security Administration, just as CMS' data is obtained from that source.  The state data, moreover, actually has been vetted.  There is no count anywhere that I had ever -- have ever seen showing precisely how CMS validates

00346

33

data it receives from the SSA.
Indeed, that was one of the
things that the Bay State
Medical Center v. Leavitt case
was all about. CMS claims to
have improved its matching
system, and it may well have
done so, but the system is,
frankly, mysterious and has
never been fully explained to
Providers, and even now, has
what appear to be apparent and
serious data errors for at
least this hospital. These
errors could be the result of
human error, of incorrect
computer coding, or maybe tied
to some data deficiency. The
Provider has no way to know at
this point. As the evidence
will also show, Pomona begged
and pleaded CMS and enlisted
other well-connected people to
convince CMS to work with SSA
to review a small but credible

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

34

sample of SSI benefits
verification data based on
state records. SSI actually
agreed at one point, and then
CMS decided that it did not
wish to participate. Second,
the MAC contends that Pomona
did not take into account
SSP-only patients. When
patients receive SSP benefits
but not SSI benefits, their
SSP-only days must be removed
from the numerator of the SSI
fraction. The MAC is right
about that. It is also true
that Pomona did not have
developed and reliable
statistics when it started
this case to include in its
position papers that would
explain precisely how many
SSP-only patients there were.
So it did not address the
specific percentage of
SSP-only patients in its

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

35

position paper that was filed
in -- at this point it's
almost a couple of years ago.
But Pomona has now included
such information in its
supplemental exhibits, and
there will be testimony on
that point from Candice LeTran
and from Pomona's expert
witness, Stan Rosenstein. The
bottom line is that Pomona
will show that CMS' apparent
count of SSP-only patients
would have to be 250 percent
to 300 percent higher than the
state averages for hospitals
like Pomona over a four-to-
five-year period, including
the years 2006 to 2008. CMS'
argument that SSP-only days
account for most or all of the
understated SSI fraction is
neither credible nor supported
by available data. To
reiterate, we are not seeking

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

36

inclusion of mere SSI-eligible
days. Pomona is seeking
inclusion of only those days
on which Part A patients
actually were receiving, being
paid SSI benefits. Finally,
the MAC contends that CMS'
calculations must be given
effect because they represent
the best available data at the
time. As we mentioned
earlier, neither the plain
language of the statute nor
the regulation mentions any
time limit for measuring the
SSI fraction. But regardless,
it's a classic red herring.
When -- whether measured 15
months after the close of the
fiscal year or 5 years after,
the numbers really don't
change very much. Certainly,
not enough to warrant a
hearing on Pomona's part, in
any event. The real issue is

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

37

1    whether CMS actually used the
2    best available data for this
3    Provider.  Pomona submits that
4    if SSI days are being
5    understated by 35 percent to
6    45 percent per year using CMS
7    data, and SSP days are being
8    overstated by 250 percent to
9    300 percent per year, timing
10   is not the problem.  Rather,
11   the problem remains
12   unexplained by CMS.  But
13   whatever the cause, when data
14   is that flawed and off by that
15   much, under any definition,
16   the data cannot be considered
17   the best available to CMS or
18   anyone else.  Administrative
19   finality cannot be asserted
20   successfully where all other
21   tenets of Medicare's
22   requirement to use the best
23   available data are violated.
24   Administrative finality as an
25   excuse for using inaccurate

38

1    and grossly inaccurate data
2    was squarely rejected by the
3    court in Bay State on the same
4    issue as is before the Board
5    today.  That court expressly
6    stated that administrative
7    finality was less important in
8    the context of issuing a
9    correct DSH adjustment.
10   Various other federal courts
11   have agreed and held CMS
12   accountable for using flawed
13   data in cases where much
14   better and more accurate data
15   was available at a different
16   time.  Courts have not
17   hesitated to hold CMS to its
18   best available data
19   requirement.  We ask this
20   Board to reach this same
21   judgment in these consolidated
22   appeals, and to require an
23   adjustment of payment to this
24   Provider, a review of the
25   data, and/or a finding

39

1    regarding the Medicare
2    program's use or non-use of
3    the best available data in
4    this instance.  Thank you.
5    THE CHAIRMAN:
6        Thank you.  Mr. Olszewski, do
7        you have an opening statement?
8    MR. OLSZEWSKI:
9        Yes.
10   THE CHAIRMAN:
11       Thank you.
12   MR. OLSZEWSKI:
13       Good morning, Board Members,
14       and thank you for permitting
15       me to have a brief opening
16       statement.  It is the
17       Provider's position that the
18       California state records and
19       coding of specific patient
20       case are a reliable indicator
21       of patients' SSI status and
22       eligibility.  The MAC
23       disagrees with this
24       assumption.  Through data use
25       agreements, the Provider has

40

1    obtained CMS' MedPAR data for
2    the fiscal years at issue,
3    which support the number of
4    SSI days used in CMS'
5    calculation of the SSI
6    percentage.  However, the
7    Provider assert that it has
8    its own its own methodology to
9    determine the SSI days that it
10   believes should be used to
11   calculate the SSI percentage.
12   Further, the Provider asserts
13   that California state's
14   records show a considerably
15   higher number of SSI
16   recipients than do CMS' data
17   files, including the MedPAR
18   file, and the Provider asserts
19   that the California records
20   are reliable.  It's the MAC's
21   position that the source data
22   used to determine the number
23   of SSI days should be from the
24   databases maintained by the
25   Social Security Administration

41

1  and CMS, and that it is
2  inappropriate to use data from
3  California's Medi-Cal system
4  because it's a secondary
5  source.  CMS revised its
6  process for matching Medicare
7  and SSI eligibility data, and
8  published it in the August 16,
9  2010, Federal Register.  In
10 the Federal Register, CMS
11 responded to comments
12 regarding the revised process
13 and stated "SSI entitlement
14 can change from time to time,
15 and we believe that including
16 SSI codes of C01, M01, and M02
17 accurately captures all SSI-
18 entitled individuals during
19 the month or months that they
20 are entitled to receive SSI
21 benefits."  CMS also published
22 its comments on the timing of
23 the data match, stating "We
24 believe that administrative
25 finality with respect to the

42

1  calculation of a hospital's
2  SSI fraction is important.  We
3  continue to believe that it is
4  important to find an
5  appropriate balance between
6  administrative finality and
7  the inclusion of retroactive
8  SSI eligibility
9  determinations, and the
10 lifting of SSI payment
11 suspensions by using the best
12 and latest available SSI
13 eligibility data at the time
14 of the cost report
15 settlement."  CMS further
16 commented that they believe by
17 calculating the SSI fractions
18 of the basis of SSI
19 eligibility data and MedPAR
20 claims that are updated 15
21 months after the end of the
22 federal fiscal year, that CMS
23 would be using the best data
24 available to them, given the
25 deadlines for submission in

43

1  final settlement of Medicare
2  cost reports.  Now, it's the
3  MAC's position that CMS'
4  processes facilitates
5  administrative finality and
6  certainty, which is imperative
7  to the entire Medicare
8  reimbursement process, and it
9  ensures predictability in the
10 process by preventing
11 unexpected shifts in the
12 payment rates based on later
13 data.  In conclusion, the
14 plain language of the
15 regulation does not provide
16 for recalculation based on
17 later data.  CMS' data-
18 matching process is much more
19 detailed, accurate, and
20 specific than the Provider's
21 proposed calculation, and
22 further and most important, it
23 is that CMS' data-matching
24 process provides finality and
25 certainty, which allows it to

44

1  administer the entire Medicare
2  reimbursement process.  It
3  would be administratively
4  impossible to recalculate
5  every hospital's DSH SSI
6  percentage based upon later or
7  corrected data.  There must be
8  a point in time where the data
9  is processed and a percentage
10 is obtained.  This cannot be a
11 moving target.  The MAC
12 respectfully requests that the
13 Board affirms its adjustments
14 to the SSI percentage as
15 calculated by CMS.  Thank you.
16 THE CHAIRMAN:
17     Thank you.  Mr. Getzoff, you
18 can call your first witness.
19 MR. GETZOFF:
20     Yes, the Provider calls Ms.
21 Candice LeTran.
22 THE CHAIRMAN:
23     And...
24 MS. LETRAN:
25     Do I sit here?

00349

45

```
 1   THE CHAIRMAN:
 2        Yes.  And before you seat, I
 3        will swear you in.  If you
 4        could please raise your right
 5        hand.
 6              ***
 7   [Witness sworn]
 8              ***
 9   THE CHAIRMAN:
10        Thank you.  Please be seated.
11        Please proceed, Mr. Getzoff.
12   MR. GETZOFF:
13        Thank you.
14              ***
15          CANDICE LETRAN,
16   having been first duly sworn, was
17   called as a witness herein and was
18   examined and testified as follows:
19              ***
20        DIRECT EXAMINATION
21   BY MR. GETZOFF:
22        Q.  Good morning, Ms. LeTran.
23        A.  Good morning.  Let me raise
24   the chair up.  Good morning.
25        Q.  Okay.
```

46

```
 1        A.  Good morning, Board
 2   Members.
 3              ***
 4   MS. BENSON:
 5        Good morning.
 6   THE CHAIRMAN:
 7        Good morning.
 8   MR. ZIEGLER:
 9        Good morning.
10              ***
11   BY MR. GETZOFF:
12        Q.  Before I start with the
13   questions, just to let you know, I
14   put copies of the exhibits up there,
15   since we may be referring to them
16   at...
17        A.  Yes.
18        Q.  ...various times.  What is
19   your current position with Pomona
20   Valley Hospital Medical Center?
21        A.  My current position is
22   director of regulatory reimbursement
23   and analytics.
24        Q.  For how long have you
25   worked at Pomona?
```

47

```
 1        A.  I've been with the hospital
 2   for 28 years.
 3        Q.  And in what capacities or
 4   positions?
 5        A.  My primary responsibility
 6   is in providing leadership,
 7   operational and technical advisory to
 8   the hospital operations, and the
 9   focus is in the reimbursement area.
10   And I'm overseeing the reimbursement
11   are for Medicare fee for service,
12   Medicare Advantage, Medicaid, HMO,
13   PPO, and also self-insured medical
14   group health.
15        Q.  Have your responsibilities
16   changed over time?
17        A.  Yes, we never, for 28
18   years, changed them prior to that.  I
19   started out as the manager of
20   financial planning, and at that time
21   my responsibility was in day-to-day
22   operations and preparing the cost
23   report, and working very closely with
24   the admitting office and the billing
25   office, and that is why I'm able to
```

48

```
 1   understand the patient details very
 2   well.  And then I was promoted to the
 3   director, and at that time I became
 4   more involved in the leadership and
 5   the operational and supervising the
 6   cost report preparation.  And now my
 7   role is more in the advisory role for
 8   the hospital.
 9        Q.  Approximately how many cost
10   reports have you prepared while at
11   Pomona?
12        A.  I would say about 60.
13        Q.  Medicare cost reports.
14        A.  About 30 Medicare cost
15   reports and...
16        Q.  Okay.
17        A.  ...and 30 Medi-Cal cost
18   reports.
19        Q.  Okay.
20        A.  Yeah.
21        Q.  Prior to working at Pomona,
22   did you have other experience working
23   on Medicare cost reporting and
24   auditing issues?
25        A.  Yes, I have always had an
```

49

interest in the reimbursement area.
I started out as a Medicare auditor
for -- so I'm familiar with the
auditing process.  And then I worked
for a healthcare firm for five years,
and they specialize in Medicare cost
report consulting and preparation,
and we also do auditing for private
industries, so I'm very familiar in
that area.
    Q.  Are you a certified public
accountant?
    A.  Yes, I am.
    Q.  And what degrees and
certificates do you hold?
    A.  I have a Bachelor Degree in
accounting, and also an MBA in
finance.
    Q.  For approximately how many
years has your work involved review
and appeal of DSH issues?
    A.  Twenty-eight years, since I
started with Pomona.
    Q.  Are you familiar with the
Medicare regulation at 42 C.F.R.

50

412.106, and it's Exhibit P39, which
is...
    A.  That's the DSH -- that's
the...
    Q.  The DSH...
    A.  ...the DSH regulation.
    Q.  Yeah.
    A.  Yes, I'm very familiar with
that.
    Q.  Please briefly describe for
the Board that regulation in terms of
what a DSH calculation is.
    A.  Yes.  So a DSH
reimbursement is an add-on funding
for hospitals that serve a higher
proportion of low-income patients.
And we look at our DSH reimbursement
very carefully because we get about
-- back during those years, about $18
million a year.
    Q.  Okay.  What does that
Medicare regulation state with
respect to how a Provider's DSH
percentage is calculated?
    A.  Well, it's based on a

51

formula, and in the formula there are
two components, as you are aware,
it's the SSI component and the
Medicaid fraction component.
    Q.  When you prepare Pomona's
annual cost report, and I'm speaking
more generically now, where do you
find the information needed to
calculate the hospital's SSI
percentage?
    A.  As part of the
Intermediary's requirement, I would
use the latest available published
SSI on the web -- on the internet.
So it could -- you know, it is a
couple of years behind.  So, for
example, when we filed the 2016 cost
report just a couple of months ago,
the latest available was the SSI
ratio from 2014, and we would use
that for the cost report filing.
    Q.  So at the time of filing
the hospital's cost report, is that
percentage actually based on a number
that CMS publishes?

52

    A.  Yes.
    Q.  Okay.  Once the hospital
files its cost report, is the
hospital's claimed SSI percentage
then adjusted by the Medicare
Contractor?
    A.  Yes.  It would be adjusted
when the Medicare contractor comes
out a couple of years down the road
to review the cost report.
    Q.  And how does the adjusted
SSI percentage get communicated to
you by the Medicare Contractor?
    A.  Through an adjustment
report and we would validate that by
confirming it on the website -- on
the CMS website.
    Q.  If you disagree with the
contractor's adjustment, do you
appeal the specific adjustments to
the hospital's SSI percentage in an
appeal filed with this Board?
    A.  Yes, we would appeal based
on the NPR, yeah.
    Q.  And on what do you base

53

1  your decision whether or not to
2  appeal that adjustment every year?
3      A. We -- by that time we would
4  look at our internal data, we have
5  established a process in trying to
6  validate the SSI, since it's always
7  been a large number for the hospital,
8  so we would look at our internal data
9  and, you know, and see that looks
10 like the ratio is understated by
11 about three to six percent, and we
12 would use that as our appeal.
13     Q. Okay.  Is that the process
14 you followed for each of the years
15 2006, 2007, and 2008?
16     A. Yes.  Yeah.
17     Q. Okay.  Now, focusing more
18 specifically on the 2006 through 2008
19 cost years, let's focus first on
20 2006.
21     A. Okay.
22     Q. Did you follow your own
23 individualized methodology for
24 isolating patients' SSI days and
25 calculating the hospital's SSI

54

1  percentage in that year?
2      A. Yes, we developed our own
3  logics and database to try to
4  determine the internal SSI number, if
5  you will.
6      Q. Okay.  If I could direct
7  you in the large book to Exhibit P20,
8  which is -- it's...
9      A. Yes.
10     Q. ...colored -- in color, and
11 it's the flowchart.
12     A. Yes, I have it.
13     Q. Okay.  I'd like to take you
14 through that methodology for
15 determining Pomona's SSI percentage
16 in 2006.  Did you use the methodology
17 shown in Exhibit P20 for 2006?
18     A. Yes.  This is a high-level
19 recap of our process.
20     Q. Okay.  Starting at the left
21 top of the page, there are three
22 small circles or ovals.  What
23 information did you start with?
24     A. So these three small
25 circles on the left are basically the

55

1  raw data sources that we would use to
2  prepare our SSI analysis.
3      Q. And why did you look at
4  each of the three sources?
5      A. Because, as we -- as our
6  Counsel mentioned earlier, the SSI
7  data is not readily available
8  anywhere, so I have to search for
9  various data sources in order to
10 capture this data.  And I need to
11 look at several of them.
12     Q. From where do you obtain
13 the CMS MedPAR SSI patient file?
14     A. That is blue circle, and I
15 get that from CMS.
16     Q. Okay.  And what does the
17 MedPAR SSI file tell you?
18     A. It tells me all the people
19 that was on the published SSI
20 percentage, on the website, and it's
21 patient by patient.  So when we
22 requested the MedPAR file, it would
23 come in a disc or in an e-mail, and
24 it had patient information it, and it
25 would show how many SSI days there

56

1  were for each patient on that file.
2      Q. Did you also look at the
3  hospital's patient data?
4      A. Yes.  That was our initial
5  starting data in the red box on the
6  left.
7      Q. Okay, and what aspects of
8  the hospital's patient data did you
9  look at?
10     A. We would look at all of the
11 financial and building and
12 demographic data.  So we basically,
13 you know, we know when the patient
14 came in and they registered at the
15 hospital, we know a lot about the
16 patient.  So those are very important
17 in this analysis.
18     Q. And did you look at the DSS
19 database?
20     A. Yes.
21     Q. What is the DSS database?
22     A. That is our internal
23 financial patient database.
24     Q. What would this information
25 show?

57

A. It would give me all the patient detail, you know, including financial, diagnosis, the doctor that treated the patient, how long the patient stayed, and their demographic.

Q. What is the HDX database?

A. This is a state-approved verification system to verify insurance coverages for all the payers that participated in this HDX company.

Q. Would such a database cover all the patients treated at the hospital?

A. It would cover all the patients that came in that we believe that they were insured. So if they were uninsured we would not be using this HDX database to verify coverage.

Q. Okay. Looking at Exhibit P23, which starts at 184 -- page 184.

A. Okay.

Q. Is Exhibit P23, pages 184 through about 191, it looks like, is

58

that an example of the type of report one would find in the HDX database?

A. Yes, this is our printout record of a particular patient that we ran the HDX on this patient so we can find out if he's covered. So, for example, in this case the patient had Medicare, and it will tell you when the coverage started, the deductible, the coinsurance, the lifetime days, and it will tell you if the patient had Medi-Cal, and what kind of an age the patient would have.

***

MR. GETZOFF:

Okay. Just to clarify for the Board, and for Mr. Olszewski, we are using all redacted records for the hearing, so that's why some of the information is not on the sheet. But...

THE CHAIRMAN:

And on that note, would ask if

59

you could just re-review the records at a certain point for -- make sure that the patient identifiable information has been excluded. I know that there's, on 187, at least one Medi-Cal ID.

MR. GETZOFF:

Really?

THE CHAIRMAN:

Yeah.

MR. GETZOFF:

Okay, we'll have to -- we'll send in another...

THE CHAIRMAN:

It...

MR. GETZOFF:

...thing at the end. It's...

THE CHAIRMAN:

It's a lot of...

MS. LETRAN:

Yes.

THE CHAIRMAN:

Yeah. It's a lot of information that's the...

60

MR. GETZOFF:

Okay.

THE CHAIRMAN:

Go ahead.

***

BY MR. GETZOFF:

Q. So from where does HDX obtain aid code information?

A. As I mentioned, HDX is a state-approved program, and it gets its information from the state of California, from the Department of Healthcare Services.

Q. So looking at this exhibit, starting on 184, from where does HDX -- well, back up. What does this example show in terms of information that would be meaningful to your SSI inquiry?

A. So this example shows the -- all the insurance coverages that this patient has, and in this particular example, if we go to page 187, you will see that this patient is also qualified for Medi-Cal, and

61

1  in the middle of the page the patient
2  was in County 19, which is from Los
3  Angeles, and then the primary aid
4  code for this patient is 60, so we
5  know that the patient qualified for
6  Medi-Cal under SSI, SSP, disabled aid
7  code.
8      Q. Okay.  Now, going back to
9  Exhibit P20, which is the color
10  flowchart, in looking at the middle
11  small circle at the upper left, which
12  would be a green color...
13      A. Yes.
14      Q. ...did you also review paid
15  claims?
16      A. Yes, we also reviewed the
17  Medicaid paid claims data.
18      Q. Okay, and what did this
19  review consist of?
20      A. This data would also give
21  us the aid code of the patient that
22  Medi-Cal paid on our behalf.
23      Q. And what is the PCL file?
24      A. That's the abbreviation for
25  paid claim summary.  That's the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

62

1  abbreviation that the state of
2  California uses.
3      Q. Okay.  What is the PS&R
4  file?
5      A. That is the Medicare paid
6  claim summary.  It stands for
7  Provider statistic and reporting
8  file.
9      Q. Okay, and what about the
10  PS&R file would be relevant to your
11  SSI inquiry?
12      A. We use the PS&R file to
13  ensure that the patient is a Medicare
14  patient, because we know under the
15  regulation that we can only count
16  Medicare Part A patient and SSI
17  patient.
18      Q. Okay.
19      A. So we use that to validate
20  that we are capturing the correct
21  Medicare patients.
22      Q. What is the PFC DSH
23  database?
24      A. This is another database
25  that we have because in the DSH

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

63

1  component we have the Medicaid
2  fraction, and we get audited for the
3  Medicaid fraction annually.  So we
4  also put together a different
5  database to defend our DSH days, and
6  in that database we have many, many
7  valuable information.  So we wanted
8  to use that database to help assist
9  with this analysis.
10      Q. Just so the Board members
11  understand your process, do you
12  capture this information, if
13  available, on all patients who are
14  inpatient at Pomona in a given year,
15  such as 2006?
16      A. Yes.  We started out with
17  our work on all patients in the
18  hospital.  So every -- for every --
19  you know, for a particular year we
20  have about 30,000 patient records
21  that we look at.
22      Q. Now, moving to the larger
23  blue circle at the top center of
24  Exhibit P20, once you have compiled
25  your master patient list, what is the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

64

1  next step?
2      A. So this is when the data
3  scrubbing begins, if you will.  So
4  now that we have all of the fields
5  that we need we start to look at the
6  data and we will bill logics to
7  ensure that we would meet the
8  requirement in the regulation.
9      Q. Why would some of the
10  patients not have aid codes?
11      A. Because they were not
12  Medi-Cal, because the aid code is an
13  indicator that Medi-Cal -- assigned
14  to Medi-Cal patient.  And so either
15  they were not Medi-Cal or either the
16  aid code was not input into our
17  system.  So that is not a required
18  field that has to be in our billing
19  system for billing, so there are
20  times when it's not there.
21      Q. Would you then seek to
22  assign aid codes where an individual
23  had not been assigned one?
24      A. Right.  So our first step
25  is to get a download of our internal

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

00354

65

data, and to see how many aid codes
are in our own internal data, and we
would see a, you know, a big portion
of the aid codes that are missing.
And that was done -- we would look at
the HDX data to bring more aid codes
in, and then we would look at the
Medi-Cal paid plan summary to bring
any missing aid codes into our master
database so we can start the process.
Q. The white box to the right
of the blue circle on Exhibit P20,
does this show various sources of aid
codes?
A. Yes, right. So this is
where we can find aid codes.
Q. If Pomona is only able to
verify a partial aid code approval,
what does this signify?
A. The partial aid code
approval means for partial month. A
patient who has stayed for three,
months and they may only qualify for
SSI or SSP for the first month, and
then they would lose their benefit

66

for the second month. So we want to
be aware of that and look at the case
a little bit closer to determine that
we're not over-capturing days.
Q. Okay. Do you seek to
identify and quantify changes within
a given patient's admission?
A. I'm sorry, can you...
Q. Do you...
A. ...please...
Q. Changes to aid codes within
a given patient's admission.
A. We do. So when we do this
analysis, we look for all the aid
codes that were available for that
patient, and the patient may have
multiple aid codes for one month.
And when the patient is staying for
three months, and now we're looking
at a minimum of three aid codes for
that particular stay, and if a
patient has multiple aid codes, it
could be five or six, or -- yeah, so
it gets very complicated.
Q. Okay. Do you try to

67

analyze these items by the day?
A. We analyze them by the
month because the Medi-Cal
eligibility is based on the month.
And then we will translate that into
the number of days that the patient
was in the hospital for that month.
Q. Okay. After you complete
the process of finding all of the aid
codes that you can find in a given
year, what is the next step?
A. So after we found all the
aid codes, then we would look at the
whole database and then we would look
for all the patients that have
Medicare Part A and Medi-Cal, and
with the SSI aid code, we would
identify the SSI aid code.
Q. Okay. From all the
information collected to this point
in the process, were you able to
identify all of the days that you
believe were SSI days?
A. Not all of them, but a
majority of them, because in the end

68

we still have patients that we know
Medicare -- has Medicare, Medi-Cal,
but we did not have an aid code, and
after our manual research we still
couldn't find the aid code, so we
just gave up on those accounts.
Q. So those are not included
in your request for inclusion in the
SSI -- numerator of the SSI...
A. No.
Q. ...DSH percentage.
A. No, so if we cannot find an
aid code to substantiate that the
patient has SSI or SSP then we do not
want to put those -- we did not claim
those patients.
Q. Okay. Reading down the
blue circle, again, at the top of
Exhibit P20, it says that you linked
in CMS MedPAR SSI patients. Why
would you do this?
A. We -- this is a very
important step because the CMS MedPAR
file is the file that produced the
SSI percentage, and we're appealing

69

that number so we want to make sure
that after we're done with our
initial look, that we would match
each patient that we have to the CMS
file, because if CMS has those
patients then we know we're in good
shape, you know, but if CMS doesn't
have them then we have to go one more
step to find out why is there a
discrepancy.  And want to compare
because, again, we only want to
capture Medicare patients.  So if a
patient has SSI and did not have
Medicare, then we do not want to
claim that patient.
       Q.  Okay.  What is the
difference -- actually, let's move to
the red rectangle just under the
larger blue circle.
       A.  Okay.
       Q.  Moving down that chart,
what did you next do with the listing
of all patients in SSI status?
       A.  Right, so by -- so when
we're done with the blue circle, you

70

-- that the majority of the data
scrubbing is done, so now we want to
do a final look and see what is the
results here.  So we would start to
group all of our patients by the aid
codes, and only a few aid codes
qualify for SSI, so we know that from
the state's description.  So we would
group the SSI aid codes versus the
non-SSI aid codes so that we can only
claim the SSI patients.
       Q.  Okay.  Looking at the white
box to the right of the red triangle,
so it's the second white box down on
the page, what do the items all CMS
SSI accounts and FVHMC SSI 10, 20, 60
mean?
       A.  So in this process in which
we will see indicated in one of the
exhibits.  So in the end we have a
comparison that show all of the days
that CMS gave to us as SSI.  So those
are in the MedPAR file, patient by
patient, showing all the SSI days.
And we're accepting those.  And then

71

we also have another column that
showed the patient that we identified
as SSI, using the state's aid code of
10, 20 and 60.
       Q.  Turning to Exhibit P27, and
I think if we look at page 502...
       A.  Okay.
       Q.  ...is this what you mean by
aid codes?
       A.  Exhibit 502 is the
description of the aid codes, yes.
       Q.  Okay.
       A.  These descriptions came
from the state of California.
       Q.  Okay.  From where does the
state get that information, if you
know?
       A.  The state would get the aid
codes from the Social Security
Administration office.
       Q.  Okay.  If we could turn to
-- and we'll use the 2006 volume,
Exhibit P11, 11B.
       A.  Okay.
       Q.  Okay.  Who is -- this is an

72

e-mail -- or purporting to be an
e-mail from Amy Rosenkranz to you.
       A.  Right.  Yes.
       Q.  Did you receive this
e-mail?
       A.  Yes, I did.
       Q.  Yeah.
       A.  This was part of my
communication with her.
       Q.  Okay.  Who is Amy
Rosenkranz?
       A.  Amy Rosenkranz is my main
contact at the Medi-Cal eligibility
division when I have questions about
Medi-Cal eligibility.
       Q.  Did Ms. Rosenkranz confirm
where the aid codes are obtained?
       A.  Yes.  So in these strings
of e-mail she told me that it came
from the SSA office, because I was
asking her to do some validation for
me and she said she couldn't because
it came from the SSA.
       Q.  Okay.  What is significant
about aid codes 10, 20, and 60?

00356

73

```
 1        A. As I mentioned, 10, 20, and
 2   60 is the aid code for people that
 3   receive the cash grant from SSI or
 4   SSP. And they are either aged, which
 5   is number 10, 20 is blind, and 60 is
 6   disabled. So that's the distinction.
 7        Q. Okay. How did you obtain
 8   the CMS SSI account list for 2006,
 9   2007, and 2008?
10        A. Through the -- through CMS
11   MedPAR SSI file.
12        Q. Okay. Going back to
13   Exhibit P20, and looking back at the
14   -- that second-from-the-top white box
15   on the right...
16               ***
17   UNIDENTIFIED SPEAKER:
18        It's tabbed 8.
19   MS. LETRAN:
20        Yes.
21               ***
22   BY MR. GETZOFF:
23        Q. ...the box includes an item
24   regarding sending accounts to the
25   state for verification. Was this
```

74

```
 1   done for 2006?
 2        A. Yes, this was done for
 3   2006, '07, and '08, and this was our
 4   attempt in validating our data before
 5   we proceed to this Board.
 6        Q. What information do you try
 7   to obtain from the state?
 8        A. So when we were done with
 9   these analyses, and we knew this for
10   many years, not just these three
11   years, we've always known that's a
12   big discrepancy, so we wanted to find
13   out why, was there some flaw in our
14   math. This is a home-cooked process,
15   so we're saying that maybe we're
16   missing something, so we would like
17   for the SSA to look at 10 accounts
18   for each year to see if we're
19   correct, we're on the right track, or
20   if this information, if whatever
21   we're doing is all wrong, we wanted
22   to find out why.
23        Q. Okay. If we could now turn
24   to, again, the 2006 booklet...
25        A. Okay.
```

75

```
 1        Q. ...Exhibit 11A on page 107,
 2   and continues 108 and nothing really
 3   on 109, but 107 and 108.
 4        A. Yes.
 5        Q. What was this
 6   communication?
 7        A. Okay, give me a minute. So
 8   this communication is a string of
 9   e-mails between me and Amy Rosenkranz
10   around October 2015, and I wanted to
11   confirm with Amy one more time about
12   this aid code because we know -- I
13   know from the description that 10,
14   20, 60 -- for aged, disabled, and
15   blind for SSI and SSP, and I know
16   that from the regulation we cannot
17   include the state SSP. So I wanted
18   to clarify where the information came
19   from, and I was told from one of the
20   previous contacts that I had that it
21   is -- whatever days that I have aid
22   codes 10, 20, 60, they were all
23   federal SSI. So I was very excited
24   to hear that because I'm saying that
25   based on what I'm doing this is all
```

76

```
 1   now federal SSI, and I did not have
 2   to exclude the state SSP. So this is
 3   what this communication is doing, and
 4   Amy confirmed with me that they were
 5   all federal SSI. So we -- again, we
 6   were very happy with that news, but
 7   in the...
 8        Q. Okay. Moving back to the
 9   red rectangle in the center of
10   Exhibit P20, which is our flowchart,
11   once you had grouped the SSI and the
12   non-SSI days as determined through
13   the hospital's process, and obtained
14   the CMS listing of SSI days, what is
15   meant by the terms matched and
16   unmatched SSI days?
17        A. So matched, all the
18   individual patient accounts that we
19   were able to compare to the CMS
20   MedPAR file and we were able to match
21   with all the data across. So we are
22   in complete agreement with CMS MedPAR
23   file on that particular account. And
24   the unmatched, those accounts where
25   we matched to the SSI MedPAR file but
```

77

1 we could not find a patient with the
2 same episode to match up to our
3 analysis.
4          Q.  At the bottom of Exhibit
5 P20 there is an orange box.  The
6 language in the orange box talks
7 about removing accounts.  What do you
8 mean by removing accounts?
9          A.  Right.  Yes, as I said in
10 the beginning, when we did this we
11 looked at all patients, all inpatient
12 in the hospital for a particular
13 year.  So, of course, we have non-
14 Medicare patients, we have commercial
15 insurance, you have non -- many,
16 many.  So by the time we're done
17 we wanted to exclude all those
18 accounts that do not meet the
19 requirement, so we would remove
20 patients that did not have the SSI
21 aid code and patients that were not
22 met from our analysis.
23          Q.  Were all of the steps that
24 you just mentioned taken for all
25 patient accounts in 2006, 2007, and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

78

1 2008?
2          A.  Yes, we do the same steps.
3          Q.  It wasn't just for the
4 sample?
5          A.  No, we -- right.  We do
6 this for the -- all patients in the
7 hospital.
8          Q.  Okay.  Looking at Exhibit
9 P21, starting on page 176...
10          A.  Yes.
11          Q.  ...does this table
12 summarize what you presented from
13 Exhibit P20 in a more technical form?
14          A.  Yes.  So this is a high-
15 level, detailed summary of the
16 process.
17          Q.  Which we will not go
18 through.
19          A.  Right.
20          Q.  Once your SSI
21 identification process is complete,
22 approximately how many sources would
23 you say you check annually to
24 determine a patient's SSI status
25 throughout his or her admission?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

79

1          A.  I would say four sources.
2 So the first source is our internal
3 data from the HDX, which is the
4 state-approved system, and if we
5 cannot find it then we would go to
6 the Medi-Cal website, which is the
7 point of service network.  And then
8 we would do manual research, we would
9 go look up record and go through all
10 the pages to find out if there's an
11 aid code somewhere that we can find,
12 and then we would use the paid claim
13 summary.  Those are our main sources.
14          Q.  Okay.  Looking at Exhibit
15 P22, starting on 179...
16          A.  Yes.
17          Q.  ...where is this
18 information from?
19          A.  This is a printout from the
20 California Department of Healthcare
21 Services for our eligibility
22 verification.
23          Q.  Okay, what is the Medi-Cal
24 recipient eligibility page or site?
25          A.  That's the site where

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

80

1 hospitals can -- or Providers can go
2 in and check for eligibility for
3 Medi-Cal.
4          Q.  Okay, now that we have
5 reviewed your methodology, let's take
6 you through the results of your
7 inquiry for each of the three years
8 at issue today.
9          A.  Yes.
10          Q.  First, for 2006.
11          A.  Okay.
12          Q.  Looking at Exhibit P27,
13 page 501, which is the first page of
14 that exhibit...
15          A.  Okay.
16          Q.  ...what does this table
17 show?
18          A.  This is our summary
19 analysis of our final results, after
20 we went through all of the steps and
21 backing out things that done qualify,
22 accounts that don't qualify, this is
23 the final...
24          Q.  And you spoke earlier about
25 matched and unmatched...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

00358

81

A. Correct.

Q. ...days and patients, do you separate them on this chart?

A. Yes. So if you look on the left-hand side of this exhibit you will see that I have a column labeled match, and I have a category CMS matched, CMS partial matched, and then CMS unmatched.

Q. Okay. In addition to the predominant totals in the codes 10, 20, and 60 on this table, several other aid codes are listed. Why are these additional aid codes shown on the table?

A. So you can see the additional aid codes I've listed all fell under the category CMS matched. So when we get the MedPAR SSI file from CMS there was no aid code in that file. And by using all the data in there and matching up to our internal data, we were able to obtain the aid code. And this summary here proves again to me that our analysis

82

is correct because the majority under the CMS matched fell under aid code 10, 20, and 60, and that was our premise in saying that, okay, if people have 10, 20, 60, and they have Medicare Part A, then they would qualify for SSI. However, we also found a handful of patients with aid code 14, 1E, 64, and, and some that we couldn't find that CMS gave to us as SSI patients.

Q. Okay.

A. So we're keeping those and count them because those are on the SSI listing.

Q. At the bottom of each of the columns there are matched and unmatched totals...

A. Yes.

Q. ...on this chart. What do these totals represent?

A. So the -- if you look at the grand total on line 27, we were looking at, in the end, 1,129 patients that we want to claim as SSI

83

patients. And of that, we were able to match with the CMS file on line 19 of 748 patients. So again, our system is working because we were able to match, and then we have about 380-some patients that we couldn't match by using our own internal analysis.

Q. Ultimately, which totals are being compared to determine what SSI days Pomona -- and, therefore, increased SSI percentage, Pomona claimed in 2006?

A. So that would be the last column, because in the last column we show total PVHMC SSI days, and we are asking for 6,982 SSI days for our DSH reimbursement, and in the CMS MedPAR file we saw 4,886 days.

Q. Was a similar table prepared for each of the years 2007 and 2008 as well?

A. Yes.

Q. Okay, and I just want to direct your attention briefly, we

84

won't go through all the detail, but page 518 of the same exhibit for 2007.

A. Yes, I'm there.

Q. I just want you to confirm if this is the same type of table.

A. This is the same format, yes.

Q. Okay.

A. So in this case we are asking for 6,665 days in the last column, but CMS showed 4,153 days. Again, we're looking at a huge difference.

Q. Okay. And for 2008, page 535.

A. Yes, same format. And we're asking for 6,595 days, and CMS showed 4,231.

Q. For some aid codes, the CMS total count and the hospital's total are the same. What does this mean?

A. Well, they're the same because we were able to match up the patient with the CMS file. So we're

85

keeping it in a separate category so
we know that these are the accounts
that we have both satisfied with
the...

Q. Did you obtain the CMS data
through a data use agreement with
CMS?

A. Yes, we started with the
data use agreement and it was signed.

Q. Looking at Exhibit P27,
which is a lengthy -- the lengthy
exhibit that we've been in...

A. Okay.

Q. ...comprised largely of
redacted patient lists...

A. Correct.

Q. ...what are the redacted
patient tables in this exhibit?  And
for the Board's reference, they're --
2006 is at 504 to 517, 2007 is 521 to
534, and 2008 is 538 to 553.

A. Yes, I have it.  So, for
example, if we look at 2007,
beginning on 522, so these are the
detailed patient listings.  So if you

86

-- when we get audited, if this gets,
you know, approved, I can pull up the
patient account for each of these
lines on here.  So these have patient
detail that we have and the grand
total on the last page of this 2007
year, which is on page 534, the grand
total would tie into my summary slide
that we looked at earlier.  So I was
saying that we were asking for 6,665
days, and if you look on page 534
that's the grand total of patient
medication.

Q. And do you follow this
process for each of the years?

A. Yes.

Q. Okay.

A. Yes, I do.

Q. Okay, looking at page 538,
the tab pertaining to year 2008,
please briefly explain the data on
this page.

A. So this is similar to what
I just pointed out.  So this is a
detailed patient listing of all of

87

our SSI days that we are asking for
fiscal year 2008, and it would -- you
know, for example, on the first it
will show the admit date, the date
the patient was admitted, patient was
discharged, how many days they
stayed, how many Medicare days, and
how many SSI days that CMS showed,
and how many SSI days that we would
want to have.

Q. Okay.

A. So those are the typical
columns in our final result.

Q. Now, pleases look at page
547.  Below the partial match entries
there are several admissions that
continue on the next page, labeled
unmatched.  What does this mean in
this context?

A. Right, so unmatched, so
this would be a patient that we were
able to find the aid codes 10, 20, or
60 with Medicare, and we are claiming
them as SSI but in the CMS file we
could not find the -- record.

88

Q. And we're not going to go
through all the thousands of entries
here, but was the same type of table
prepared for each of the three years
2006 through 2008?

A. Yes.

Q. Turning to Exhibit P27,
page 503, and again, this is for
2006, what is this table?

A. This is our final summary
with the reimbursement impacts.  So
after we showed how many SSI days we
would like to have, we ran it through
this formula to look at our
additional reimbursement impact.

Q. Does your calculation
distil the data from the previous
summary pages that you testified
about, 501, for this year, down to
this calculation?

A. Yes, it took the data from
501, because on 501 the last column
shows 6,982 days, and you will see
that in the page 503 on line 9.

Q. Okay, where do the Pomona

89

SSI day totals come from?

A. From 501 -- from page 501.

Q. Where do the CMS SSI data totals come from?

A. Came from the MedPAR file.

Q. Okay. Looking at line 10 of the table on page 503, why are there two different CMS totals for Medicare days?

A. Right, so we've seen this consistently with almost all the years. So in the actual CMS website under the published data, we would see 4,886 out of the website for all the hospitals in the nation. You know, so for us it was 4.886. And for the denominator the number of Medicare days were at 33,149, and that was our final SSI for 2006 of 14.74 percent. However, when we got the MedPAR file we don't see the same number. So we saw 4,886 for SSI days, which agreed with the published website, but for the denominator we only saw 32,371 days, and those came

90

from Medicare covered days column. So after tracing through, then I -- we noticed that the 33,149 is actually the total length of stay for the patient. So we're not sure what CMS is doing here because, for 2006, you know, we -- and per those regulations that the denominator should be based on entitled Medicare Part A, and in this case it did not show entitled Medicare Part A, it showed total length of stay of 33,149. So that actually hurt us even more because now our SSI ratio is lower than what was in the MedPAR file.

Q. So...

A. So that's another anomaly that we see with data. You know, when you deal with data that's also the issues that are going on.

Q. Does the regulation require the use of covered days in the -- Part A days in the denominator?

A. It's the entitled, so it

91

would be paid or covered days, so it should be the denominator, so that should be 32,371. So if anything, our SSI ratio using purely CMS data should have been at 15.09 percent, and not even 14.74 percent.

Q. Okay. How do you calculate the requested increase in reimbursement?

A. So based on our analysis we are asking for 6,982 SSI days, and we're using the denominator of 32,371, which is covered days from the MedPAR file, and that gave us 21 percent -- 21.57 percent for SSI, and the published SSI was 14.7, so we have a differential of 6.8, and we would run it through the formula in the regulation, which reduce it by 17 1/2 percent. And going through the formula, and we're looking at an anticipated reimbursement increase of almost $1.6 million for 2006.

Q. Okay. Once again, we have the same type of exhibits for the

92

other two years on page 519 and 536. We won't go through all the numbers on that page, but, Ms. LeTran, if you would just confirm for the Board that pages 519 and 536 are, in fact, those same calculations for 2007 and 2008 respectfully?

A. Yes, they are the same method -- the same type of calculation.

Q. Okay. Putting that exhibit aside for the moment, the Medicare Contractor contended in its final position paper that it believed the hospital's reimbursement impact calculation was "too simplistic", in that it ignores the fact that there may be state supplemental payment, or SSP, beneficiaries who do not also qualify for SSI payments.

A. Yes.

Q. Are you aware of that contention?

A. Yes, I am.

Q. What is the proper

93

treatment of patient days that are deemed SSP-only days, and in other words, these days do not involve patients who qualify at that time for SSI benefits as well?

A. So the proper treatment, which I agree, is to remove all the state-only SSI or state-only SSP days.

Q. And why did Pomona not eliminate such days from your initial calculations for 2006, 2007, and 2008?

A. So if you can see -- again, I'm on page 503, on line 8 I have a line in there to back-out the state-only SSP days, and I put zero percent. At the time that we did this, we were getting conflicting information, we did not have any reliable information as to how much was the state-only SSP days. And then I got that conversation going with Amy Rosenkranz, which I put notes on there that she told me that

94

everything that I thought was all federal SSI. So our understanding, which was incorrect at that time, was that I didn't need to back-out anything for the state. But I did leave a line in there.

Q. Subsequent to filing the original exhibits, have you been able to find reliable statistics regarding SSP-only patient populations in California?

A. Yes, we have.

Q. From what source?

A. We got it from the California Department of Social Services through our consultant, the former Medi-Cal director, and he will testify later.

Q. Have you read Mr. Rosenstein's expert report, which is included in the documentation, Exhibit P34?

A. Yes, I have.

Q. All right. What does that report conclude about the SSP-only

95

percentage in California during the years 2006 through 2008?

A. So Mr. Rosenstein was able to obtain a monthly -- a report that lists the monthly SSI beneficiaries and SSP-only beneficiaries for the years in question, and on average they came out to be about 14 percent, consistently, month by month, when you look at the data.

Q. Okay. Looking at Exhibit P27, and back to page 503...

A. Okay, I'm there.

Q. ...for 2006, approximately what percentage lower than the hospital's calculation of total SSI days was CMS' count of total SSI days for that year?

A. So in here we are asking for 6,982, and CMS was showing 4,886, so this is about 40 percent different -- lower.

Q. Okay. Looking at page 519 of that same exhibit for 2007, what percentage lower does CMS' total

96

appear as based on your work?

A. So I don't have the actual percentage here, but it's running about 40, 45 percent on my line 9.

Q. And did you reach the -- roughly the same conclusion for 2008...

A. Yes.

Q. ...and that'll be page 536.

A. Yes, the difference here in terms of days was -- is over 2,200 days, but yeah, it's around that 45 percent.

Q. Okay. Based on your analysis of all the data, can a 14 percent reduction in the hospital's SSI days due to recognition of SSP-only days explain the 40 to 45 percent difference between total SSI days shown by CMS versus the hospital in each of the three years?

A. No, it cannot explain that. The gap is too wide.

Q. Has Pomona attempted to verify its identification of SSI days

97

against the SSA database?

A. Yes, we have put in a tremendous amount of effort to -- in order to verify the data, because we were -- again, we were hoping to avoid all of this hearing and get to a resolution.

Q. Did Pomona use CMS' SSI day information as input into its own SSI day identification process?

A. I'm sorry?

Q. Did you use CMS information as part of the process...

A. Yes.

Q. ...of...

A. Yes, we started out with CMS information.

Q. In what ways did Pomona attempt to obtain SSI data directly or through a consultant?

A. We started in early January 2006 by reaching out to a former center director, Mr. Tzvi Hefter, and, you know, hoping that he can coordinate some effort between CMS

98

and SSA, so that SSA would be willing to look at our sample of 30 records, you know, to validate the information.

Q. Let's get into the sample a bit since I don't think we've really touched on that.

A. Okay.

Q. Did Pomona create a sample of patient claims to be matched against SSA data?

A. Yes, we did. But I want to clarify here that we created a sample based on existing data, we did not handpick any of the data.

Q. What did this sample consist of?

A. We sorted the SSI days, a count high to low each year, and then we picked the top 10 accounts of each individual year. So it's consistently the top 10 accounts.

Q. And did you include any other patient records in this...

A. Yes, for...

99

Q. ...sample?

A. For 2006 we also did a random sample. So after the top 10 accounts, we randomly picked every fifth account, and we picked 20 additional every fifth account. And we were hoping that SSA can look at 30 accounts for 2006 and then 10 accounts each for 2007 and 2008.

Q. Did each of the claims in the sample go through the full process of internal verification that you described?

A. Right. So each of the claims, including the remaining of the claims, went through the same process. Again, we didn't handpick any of these sample, it's just part of the process.

Q. Did you submit the sample of claims to the State Department of Healthcare Services for verification?

A. Yes, I also submitted 30 accounts to the Department of Healthcare Services to validate the

100

aid codes.

Q. And what was the result of such verification effort?

A. They did not have resources, and they could only do one year for me, and that was 2006, and the result came back consistent with what I show as the aid codes.

Q. How did Pomona first attempt to have the SSA review the hospital's sample of, we'll call it 30 to 50 claims?

A. Our first attempt was through Mr. Hefter.

Q. And approximately when did you contact Mr. Hefter?

A. We contacted him in -- early in January of 2016.

Q. Why did you select him in particular?

A. He was a former top CMS official and he was in charge of the division of the acute care, so he was an expert in the IPPS ruling and the DSH, and we felt very comfortable and

1  we were hoping that with his
2  connection with CMS that we can find
3  -- he can find the right person to
4  resolve this matter.
5      Q. What did Mr. Hefter agree
6  to do on behalf of Pomona?
7      A. After several lengthy
8  conversations, so that we can go
9  through the detail with Mr. Hefter,
10 he agreed to take on the case and he
11 agreed to go to CMS and discuss the
12 issue with CMS.
13     Q. Did he actually submit your
14 sample of claims to CMS?
15     A. Yes, he did.
16     Q. For approximately how long
17 did Mr. Hefter attempt to work with
18 CMS to convince them to send your
19 sample to the SSA for verification?
20     A. He met with CMS, I think
21 early in February, and the process
22 went on until October of 2016, with
23 several follow-ups, but, yeah, with
24 some progress.
25     Q. Mr. Hefter will be

1  testifying himself shortly, but was
2  his efforts successful?
3      A. Not, it was not.  But,
4  yeah, by May we started to get
5  nervous, and by October, yes, it was
6  not successful.
7      Q. Was Pomona willing to abide
8  by the results of the review of the
9  sample?
10     A. Yes, we were.  We were very
11 curious as to what's going on, as we
12 were definitely willing to abide with
13 the result.
14     Q. Would Pomona had been
15 willing to resolve this appeal based
16 upon the sample?
17     A. Definitely.
18     Q. Would Pomona still be
19 willing to abide by the results of a
20 review of the sample by the SSA?
21     A. Yes.
22     Q. Once you saw that Mr.
23 Hefter's efforts were not resulting
24 in a quick review by the SSA of
25 Pomona's sample, did Pomona make

1  further efforts?
2      A. Yes, we did.
3      Q. Did Pomona contact its
4  legislative representatives?
5      A. Yes.  By around May, we --
6  May of 2016, the process was not
7  going and Mr. Hefter was getting
8  nervous, and he said we needed to
9  reach out to congressional help, and
10 we did that.  I personally contacted
11 a government relations firm here in
12 D.C. to reach out to our senators.
13 And we reached out to Senator
14 Feinstein, Senator -- ex-Senator
15 Boxer, and now District Congresswoman
16 Norma Torres.  And I was involved in
17 all those process, every step of the
18 way.  And I even met with the staff.
19     Q. Did any of the legislative
20 offices offer to assist Pomona?
21     A. Yes, they all offered to
22 help.
23     Q. Looking at Exhibit P25,
24 were you aware of this letter to the
25 SSA from Senator Feinstein?

1      A. Yes, I am.
2      Q. What happened after that
3  letter was sent?  Was there any
4  movement?
5      A. No.  This letter was
6  written when we first approached
7  Senator Feinstein's office in May,
8  and she did it right away in May of
9  2016, and nothing was happening until
10 October 2016.
11     Q. Okay.  Looking at Exhibit
12 P29, is Representative Torres the
13 representative from the district that
14 Pomona is located in?
15     A. Yes.
16     Q. Were you made aware of the
17 letter from Representative Torres?
18     A. Yes, I am aware of this
19 letter, and before this letter was
20 written I met with Representative
21 Torres' director or deputy director
22 here in D.C., and we talked about
23 this and so I have personal
24 knowledge.
25     Q. Looking at Exhibit P25, and

105

1  page 496, do you recall the Social
2  Security Administration's response to
3  Senator Feinstein?
4      A. Yes, I recall this letter
5  clearly.
6      Q. Was this letter -- well,
7  who gave you this letter?
8      A. This letter would come from
9  Senator's Feinstein's staff, Amanda
10 Sagra [ph].  And...
11     Q. Okay, what does the letter say?
12 You don't have to read it, but just
13 summarize.
14     A. Right.  So this came from
15 the SSA office and it said that --
16 and in the middle paragraph it said
17 that the SSA provided the requested
18 information to CMS.  We're not sure
19 what was provided.  And it says that
20 they found no evidence that they
21 agreed to do anything at SSA, and
22 they refer us back to Emily Lipkin
23 [ph] at the bottom, and Lisa Leon
24 [ph] in the San Francisco office.
25 And Emily Lipkin was the one that

106

1  Tzvi Hefter met with in February to
2  give the packet of the sample, so
3  that Emily Lipkin can go to SSA.  So
4  now they're referring us back to her.
5      Q. Okay, is there any
6  indication that Pomona's claim sample
7  was ever reviewed by the SSA?
8      A. No.
9      Q. After the SSA's response to
10 Senator Feinstein's May 8, 2016,
11 letter, did you make additional
12 efforts to get your claim sample
13 reviewed by the SSA?
14     A. Yes.  So after we saw this
15 letter we were very perplexed and
16 confused and upset about how this
17 thing is going in circles and
18 circles, and we met back with Senator
19 Feinstein's staff and discussed the
20 process, and she volunteered to
21 continue to help.
22     Q. Okay.  Did Senator
23 Feinstein's office provide additional
24 assistance?
25     A. Yes.  Yes, they did.  So at

107

1  that time -- so this is around
2  October, and at that time we decided
3  that it's best to reach out to the
4  CMS office in San Francisco instead
5  of the D.C. office.  So we -- so
6  Senator Feinstein's office spoke to
7  Lisa Leon and somebody else at SSA
8  and they have agreed to look at the
9  data.  But they specified that the
10 data has to come through CMS.  Pomona
11 cannot view the data directly.  So we
12 worked with Senator Feinstein's
13 office and we gave the 30 account
14 through their office so that they can
15 pass it on to SSA.
16     Q. Okay.  Did -- if you'd look
17 at page 497 and 498, it's Exhibit
18 P26.
19     A. Yes.
20     Q. Are you familiar with this
21 letter?
22     A. Yes, this is a follow-up
23 letter from Senator Feinstein to her
24 May letter, that nothing was
25 happening until October.

108

1      Q. And from where did you
2  obtain this document?
3      A. This letter was forwarded
4  to me from Senator Feinstein's
5  office, from Amanda Sagra.
6      Q. Okay, and who is Amanda
7  Sagra?
8      A. She's the staff that's in
9  charge of this coordination project.
10     Q. Okay, looking at Exhibit
11 P30, page 558 through -- it goes on
12 for several pages to about 574, and
13 appears to be a string of e-mails.
14 What are these e-mails?
15     A. These are communications to
16 and from me and from our counsel, and
17 I am included pretty much all of
18 these e-mails here, as a
19 communication of our effort to try to
20 re-coordinate the effort to have the
21 CMS office in San Francisco to work
22 with SSA to look at the 30 records.
23     Q. Okay.  Did the Social
24 Security Administration ever agree to
25 review Pomona's claim sample?

109

1  A. Based on the e-mails that I
2  received from Amanda Sagra, yes, they
3  agreed to initially look at the
4  sample.
5  Q. Did Ms. Sagra, or Sagra,
6  tell you that she also communicated
7  with CMS?
8  A. Yes, she had an e-mail and
9  said she was in constant
10 communication with them, and she said
11 she assured me that it would be
12 looked at, and she was working with
13 the top people at CMS and SSA.  She
14 didn't specify names.
15 Q. Did Ms. Sagra tell you why
16 she needed to involve CMS?
17 A. Because we have to transmit
18 the data through CMS, since SSA
19 cannot receive the data directly from
20 the Provider.
21 Q. Was the, again, 30 to 50
22 claim sample provided to CMS for
23 purposes of sending them to the SSA
24 for review?
25 A. I'm sorry?

110

1  Q. Was the sample, the 30-
2  record sample, provided to CMS...
3  A. Yes.  Yes...
4  Q. ...for purposes...
5  A. ...they were provided.
6  Q. ...of transmitting it to
7  the Social Security Administration?
8  A. Yes, they were provided in
9  these strings of e-mails in Exhibit
10 P30.
11 Q. Okay.  And what happened
12 following the submission of the
13 claims sample to CMS?
14 A. Right.  So this was late in
15 October and the holidays were coming,
16 you know, so we knew it was going to
17 take a while.  And we waited a month,
18 and I followed up monthly to find out
19 what's going on, and not much was
20 happening.  And at the same time,
21 Senator Feinstein's staff would tell
22 me that she's working on it, she's in
23 communication with them, SSA has
24 agreed to look at it, and so we were
25 still very hopeful -- we're still

111

1  very hopeful by the end of 2016,
2  because the request was not shut
3  down.
4  Q. Okay.  Looking at Exhibit
5  P26, pages 499 and 500.
6  A. P26, okay.
7  Q. Are you familiar with this
8  document?
9  A. Yes.
10 Q. And from where did you
11 obtain this document?
12 A. From Amanda Sagra...
13 Q. Okay.
14 A. ...of Senator Feinstein's
15 staff.
16 Q. And what does this letter
17 state?
18 A. This is -- again, this is
19 the follow-up letter to the one that
20 Senator Feinstein wrote in May 2016.
21 And she put in here that they have
22 made several effort and made many
23 attempts, and they have not heard
24 back from the SSA office.
25 Q. Okay.  Looking at Exhibit

112

1  P31, it's 575 and 576, with a
2  transmittal from 577, are you
3  familiar with this -- these two
4  documents?
5  A. Yes.  Yes.
6  Q. What are they?
7  A. Okay, so this is the final
8  letter, and this is dated May 3,
9  2017, final letter from the SSA
10 office to Senator Feinstein saying
11 that they cannot help us with the
12 matching record, because the
13 initial letter from Senator Feinstein
14 was to help us with the 30 records.
15 And they cited the Bush regulation
16 and they are deferring to CMS.
17 Q. And who sent that letter to
18 you?
19 A. This letter, by this time
20 Amanda Sagra had left Senator
21 Feinstein's office, and this came
22 from the new person, which was
23 Kristin Woodruff [ph], on page 577.
24 Q. Okay.  Looking at Exhibit
25 P32, are you familiar with this

113

document?

A. Yes.

Q. And from where did you obtain this document?

A. This is the final letter from CMS dated June 23, 2017. Basically, this is in response to Senator Feinstein's request of helping us to review the 30 records. This letter says that there's nothing CMS can do, and the process for us is to go through the PRRB to have this heard.

Q. And...

A. And that was the -- you know, in the beginning we were trying to avoid the PRRB, and we said so -- Senator Feinstein said so in her letter, and in the end, after they promised to help and now they're saying that just go through the PRRB and get it resolved.

Q. Okay. So we're here. The -- did Ms. Woodruff or Mr. Miller make additional efforts to get

114

representatives of both CMS and SSA to meet them in Washington, D.C.?

A. Yes. They were at -- they were very -- they were great. They were excellent in trying to help Pomona. They offered to set up a meeting, and counsel -- my counsel and I were planning on flying over here to D.C. to meet with them, you know, in June to get this resolved. And that was in the works, but it didn't work out.

Q. Finally, just out of curiosity, how long would you say it would take one person to verify the status of 30 patients who name and identification, dates of service, and all other information is provided?

A. Based on my years of professional experience in reviewing records and looking at records online, if we have an indicator, which we do, the HIC number or the social security number, we just go online, look up the number, look

115

through some of the pages, it should take about three to five minutes per account. So I'm going to give it five minutes. And we're asking for 30 accounts, so I'm asking of the SSA office to give us less than three hours to look at the 30 samples to see if we're on the right track or we're on the wrong track so we know what to do. And that was not answered.

***

MR. GETZOFF:

That's all I have for this witness.

THE CHAIRMAN:

Okay. Before we go to cross examination, I will take a 10-minute break. So we're off the record.

***

[Off the record]

[On the record]

***

THE CHAIRMAN:

116

Let's go back on the record. Mr. Getzoff, you've completed your direct examination...

MR. GETZOFF:

Yes.

THE CHAIRMAN:

...of the witness?

MR. GETZOFF:

Yes, I have.

THE CHAIRMAN:

Okay, thank you. Mr. Olszewski, do you have cross examination?

MR. OLSZEWSKI:

I do.

THE CHAIRMAN:

Please proceed. Thank you.

MR. OLSZEWSKI:

Thank you.

***

CROSS EXAMINATION

BY MR. OLSZEWSKI:

Q. Ms. LeTran, if I could direct your attention to Provider's Exhibit 27, page 503.

117

A. 27. Yes, 503. Yes, I'm
there.
Q. Okay. And I -- Mr. Getzoff
had asked you some questions about
this and I just wanted to clarify one
point just so I understand this
table. So the -- what is the number
of days that Pomona Valley was
seeking, the number of SSI days? Is
it 6,982?
A. Yes.
Q. And the number of SSI days
that CMS had down for Pomona was
4,886?
A. Correct.
Q. And I think the question
was asked what percentage difference
is that between the number of days
Pomona wants, and the number of days
that CMS was giving. And I -- did
you say 40 percent -- about 40
percent?
A. Yes.
                    ***
MR. OLSZEWSKI:

118

I have no further questions.
THE CHAIRMAN:
Okay. Do you have any
redirect based on Mr.
Olszewski's questions?
                    ***
REDIRECT EXAMINATION
BY MR. GETZOFF:
Q. In -- just one question.
In terms of the number of days that
you are seeking -- Pomona is seeking,
would some number of SSP-only days
then be subtracted from that total?
A. Yes, it would be, now that
we know we have 14 percent so I would
reduce it by 14 percent, and it's not
on this schedule.
                    ***
MR. GETZOFF:
Thank you.
THE CHAIRMAN:
Okay. We'll move to Board
questions. Ms. Benson?
MS. BENSON:
Good morning. Thank you for

119

your testimony.
MS. LETRAN:
Good morning, Ms. Benson.
MS. BENSON:
I just want to ask one basic
question to make sure I have
the right understanding. All
the NPRs that, you know, for
these three years, they all
used -- or they all were
settled with the newly
published SSI ratio that CMS
calculated based on the
revised methodology that was
in the rule and the ruling?
MS. LETRAN:
The Bay State ruling? The...
MS. BENSON:
Yes, the 1498...
MS. LETRAN:
Dash...
MS. BENSON:
...R...
MS. LETRAN:
1498-R2.

120

MS. BENSON:
Yes.
MS. LETRAN:
Right.
MS. BENSON:
Is that a true statement?
MS. LETRAN:
No, that's not, because the
1498-R2 from the Bay State
ruling was republished around
April of 2015, and that was
only through fiscal year 2005.
MS. BENSON:
Well, not R2, but 1498-R.
MS. LETRAN:
1498-R.
MS. BENSON:
Yes.
THE CHAIRMAN:
In the 2010 rulemaking.
MS. LETRAN:
Right. So that was -- I think
that was...
MS. BENSON:
So what I'm trying to get at

121

1     is the SSI fractions that are
2     used in these three cost
3     reports, the agency published
4     SSI fractions up until, you
5     know, the Bay State hearing...
6  MS. LETRAN:
7     Right.
8  MS. BENSON:
9     ...and they were settling cost
10    reports, and at a point in
11    time the agency, because of
12    the Bay State case, stopped
13    settling cost reports...
14  MS. LETRAN:
15    Right.
16  MS. BENSON:
17    ...because of the decision in
18    Bay State.  They developed a
19    new methodology which was
20    proposed -- which was put in
21    the proposed rule for fiscal
22    year...
23  THE CHAIRMAN:
24    It was...
25  MS. BENSON:

122

1     ...'11, I thought it was.
2  THE CHAIRMAN:
3    For fiscal year 2011,
4    published in 2010.
5  MS. BENSON:
6    Yes.  So for fiscal year '11,
7    and they also issued a ruling,
8    1498-R.
9  MS. LETRAN:
10    Right.
11  MS. BENSON:
12    In that ruling and in the
13    final rule it said that any
14    cost report that had not been
15    settled for any year would use
16    the newly published SSI
17    ratios.  So what I'm trying to
18    find out, based on the
19    methodology that was proposed
20    and then finalized in the
21    final rule, what I'm trying to
22    find out is do these three
23    cost reports have CMS' SSI
24    ratio based on the revised
25    methodology, based on Bay

123

1    State?
2  MS. LETRAN:
3    Got it.  Yes.  Yes, they do.
4    And I know that because in one
5    of these exhibits here, I'm
6    not sure which page, we have a
7    data use agreement and an
8    e-mail from CMS staff giving
9    us the file, and that e-mail
10    was around 2013.
11  MS. BENSON:
12    Okay.
13  MS. LETRAN:
14    And then I also received
15    another file from another CMS
16    staffer, you know, in 2015,
17    and the data was the same.
18    So, yes, it is after the Bay
19    State 1498-R republished data.
20  MS. BENSON:
21    Okay.  I just wanted to make
22    sure the record was clear that
23    these are the newly published
24    SSI ratios using the new
25    methodology.

124

1  MS. LETRAN:
2    Yes, they are.
3  MS. BENSON:
4    If you can turn to P20.  I
5    think that was the exhibit
6    that had all that nice
7    flowcharting in it.
8  MS. LETRAN:
9    Yes.
10  MS. BENSON:
11    And specifically, in the left-
12    hand column, kind of the
13    greenish-yellow bubble...
14  MS. LETRAN:
15    Yes.
16  MS. BENSON:
17    ...that talks about, I guess,
18    where the data comes from that
19    you begin to use in your
20    process.  And it comes from
21    several different data
22    sources; paid claims, the PCL
23    file, the PS&R file, the PFC
24    DSH database.  My question is,
25    the actual claims that you are

00369

125

```
 1        using; the patient days, the
 2        patients and the days, why
 3        would you use like a state-
 4        paid claim file in addition to
 5        the PS&R file?  Why aren't you
 6        just using the PS&R file to
 7        bring in the claims?
 8   MS. LETRAN:
 9        Sure.  So in the process, our
10        original data is actually from
11        the hospital internal data.
12        So that's in the red box.  I'm
13        going to go into a little bit
14        of detail.
15   MS. BENSON:
16        Okay.
17   MS. LETRAN:
18        So we want to capture all of
19        our basis, foundation for that
20        particular year, so we capture
21        that from the hospital's
22        internal data.  And we're
23        using the state-paid claims
24        data so that we can look for
25        the aid code...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

126

```
 1   MS. BENSON:
 2        Okay.
 3   MS. LETRAN:
 4        ...because the aid code is the
 5        missing element here.  So
 6        that's why I used the state-
 7        paid claim summary for the aid
 8        code.  And then we use the
 9        PS&R to assure ourselves that
10        we are only claiming Medicare
11        paid patients.  So we're using
12        them for different validation
13        process.
14   MS. BENSON:
15        Okay, so if you have somebody
16        on your file, the -- and I
17        guess your inpatient database
18        file that -- of all your
19        patients, that was not paid by
20        Medicare...
21   MS. LETRAN:
22        Right.
23   MS. BENSON:
24        ...maybe it had a Medicare
25        claim on it because at intake
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

127

```
 1        you believed that patient
 2        should be paid by Medicare
 3        but, in fact, it wasn't for
 4        one of numerous reasons.
 5   MS. LETRAN:
 6        Exactly.
 7   MS. BENSON:
 8        The claim could be denied, the
 9        Medicare number could be
10        wrong, you know, I won't go
11        and name other possible
12        reasons, but would that claim
13        be in your file and be picked
14        up here and matched?
15   MS. LETRAN:
16        No.  That claim would be
17        dropped off at the end.  So
18        that was in the orange box.
19        So after we're going through
20        everything, and if we cannot
21        validate that that patient was
22        a truly paid Medicare claim,
23        then we will not claim that.
24   MS. BENSON:
25        Okay, so they would be dropped
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

128

```
 1        off by the orange box.  Okay,
 2        thank you.  So do you know
 3        what the denominator of your
 4        file was?  For instance, we
 5        just talked about page 503, I
 6        think it was 503 or...
 7   MS. LETRAN:
 8        In P27, right.
 9   MS. BENSON:
10        Yeah, I think it was 503.
11        Yes, 503, where the -- looks
12        like the denominator that
13        Medicare used, you initially
14        said that they used 33,149,
15        but you believe it should be
16        32,371.  And I believe you
17        said the difference between
18        those two numbers was that the
19        larger number included total
20        length of stay, whereas the
21        smaller number included the
22        paid days.
23   MS. LETRAN:
24        The covered, right.  The...
25   MS. BENSON:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

1     The covered days.
2  MS. LETRAN:
3        ...covered days, right.
4  MS. BENSON:
5        Okay.  And can you explain to
6        me, when you say covered as
7        opposed to paid, what is the
8        difference?
9  MS. LETRAN:
10       Well, I'm using the...
11 MS. BENSON:
12       In your mind.
13 MS. LETRAN:
14       All right.  I'm using the
15       exact language in the file.
16       So if you were to pull up the
17       MedPAR file, the file would
18       have a header -- which you
19       don't have it here, the file
20       would have a header that say
21       Medicare-covered days.  So
22       you're right, covered days
23       should be paid days, but
24       that's what the file
25       indicates.  So the 32,371 came

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

1        from CMS MedPAR SSI file.  It
2        wasn't my number.
3  MS. BENSON:
4        And it said -- okay, so what
5        was your number?
6  MS. LETRAN:
7        I'm going with that number.
8        So my number that I'm putting
9        here is 32,371.
10 MS. BENSON:
11       Right, I understand that,
12       but...
13 MS. LETRAN:
14       Um-hum.
15 MS. BENSON:
16       ...when you -- you have a
17       group of days that you're
18       looking at...
19 MS. LETRAN:
20       Right.
21 MS. BENSON:
22       ...and you're looking at those
23       days to see if they, and I'll
24       say are SSI-eligible based on
25       the aid codes that you have...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

1  MS. LETRAN:
2        Yes.
3  MS. BENSON:
4        ...what was the denominator of
5        -- what was the total number
6        of days in that file for 2006?
7  MS. LETRAN:
8        Okay.  So I do not have that
9        information there, but I can
10       look it up.  It would be
11       different because the total
12       days that I have for my
13       internal -- from our internal
14       database would be the total
15       length of stay.  And we would
16       have issues in there, for
17       example, denial and untimely
18       billing and all sort of issues
19       that were not paid.  So in our
20       internal database, we don't
21       track -- we don't breakout an
22       account for the actual paid
23       days, I have to rely on an
24       external source to get the
25       paid days.  So, for example, a

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

1        patient came in and stayed 30
2        days and we bill, and in our
3        billing process somehow we've
4        forgotten, we billed
5        incorrectly and we only billed
6        for 28 days, so we would only
7        be paid for 28 days.  So the
8        28 days is the covered days,
9        but in my database I would
10       show 30 days because that's
11       the total length of stay.
12 MS. BENSON:
13       Right.
14 MS. LETRAN:
15       And so that's why I'm using
16       the covered days from the CMS
17       file.
18 MS. BENSON:
19       But I guess what I'm thinking
20       of is, that becomes your
21       denominator, but in your
22       numerator were you basing it
23       on something that had more
24       than the 32,371 days?
25 MS. LETRAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

133

```
 1          No, it would be less than that
 2       because I'm only looking for
 3       Medicare-covered or paid days
 4       in my population.  So in the
 5       final population I'm looking
 6       for Medicare Part A paid with
 7       SSI benefit.
 8   MS. BENSON:
 9          Right.  Right.  I understand
10       what you're looking for.  I
11       guess what I'm a little bit
12       concerned about is that you
13       take a database that's very
14       big...
15   MS. LETRAN:
16          Right.
17   MS. BENSON:
18          ...and then you parse it
19       down...
20   MS. LETRAN:
21          Um-hum.
22   MS. BENSON:
23          ...doing many different
24       things...
25   MS. LETRAN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

134

```
 1          Exactly.
 2   MS. BENSON:
 3          ...and you pull out a number
 4       of days, but then you take
 5       that number of days and you
 6       apply it to an unrelated
 7       denominator, because you're
 8       applying it to a denominator
 9       that's coming out of the
10       Medicare system, but your
11       inputs didn't come out of the
12       Medicare system.  The inputs
13       came out of numerous different
14       systems.
15   MS. LETRAN:
16          Right.
17   MS. BENSON:
18          And so I'm wondering if you're
19       comparing apples to apples.
20   MS. LETRAN:
21          Apples to apples.
22   MS. BENSON:
23          That's...
24   MS. LETRAN:
25          Right, I...
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

135

```
 1   MS. BENSON:
 2          That's my question.
 3   MS. LETRAN:
 4          I understand your question,
 5       and I -- may I look at some of
 6       the...
 7   MS. BENSON:
 8          Sure.
 9   MS. LETRAN:
10          ...schedules in here to...
11   MS. BENSON:
12          And I don't want to put you on
13       the spot...
14   MS. LETRAN:
15          I understand.  Yeah.
16   MS. BENSON:
17          ...so it may be something
18       that...
19   MS. LETRAN:
20          I...
21   MS. BENSON:
22          ...you may have to get to me
23       post-hearing on.
24   MS. LETRAN:
25          If I could do that, that would
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

136

```
 1       be great because I have -- I
 2       do have that information, you
 3       know, in...
 4   MS. BENSON:
 5          Yes.
 6   MS. LETRAN:
 7          ...on my computer, but I'm --
 8       I just want to validate -- and
 9       I was hoping that I can answer
10       that question right here with
11       the exhibits that are here.
12   MS. BENSON:
13          I mean what my concern is, is
14       that, you know, when I go back
15       to P20, and I know that you're
16       removing days and I know that
17       you're removing them maybe
18       after a matching process...
19   MS. LETRAN:
20          Yes.
21   MS. BENSON:
22          ...if they weren't paid, but
23       it's -- you know, if you start
24       with a very big number, and as
25       you say, there's denials,
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

137

there's maybe days that
weren't timely billed, there's
lots of other reasons, and
some of those days get into
the total that have been
identified as SSI days...

MS. LETRAN:
        Um-hum.
MS. BENSON:
        ...based on your
        methodology...
MS. LETRAN:
        Yes.
MS. BENSON:
        ...and then that's compared to
        a denominator that comes from
        something else, that's a
        concern.
MS. LETRAN:
        Right, because it's not
        apples-to-apples.  But I --
        like I say, I'm pretty certain
        that it's the correct number.
        If I can bring your attention
        to page 517 within Exhibit

138

P27, see if we can -- I'm
trying to find a good example
to show to you.  Are you -- so
if we look at page 517, at the
last line, the last
subtotal...

MS. BENSON:
        Yes.
MS. LETRAN:
        ...you can see that the days
        stay that we show -- that I
        show is 1,204, so those are
        the total length of stay in
        our system.  And the CMS
        Medicare days is 1,146.  And
        you know what, I don't have
        enough information here to --
        so let me get back to you with
        the post-hearing -- in the
        post-hearing Brief on that.
MS. BENSON:
        All right.  I would appreciate
        it.
MS. LETRAN:
        But I -- I'm -- I understand

139

your concern that we need to
be consistent with the
denominator.

MS. BENSON:
        Yes.  And just because I want
        to -- again, I'm thinking of
        consistency, in your
        calculations, and I'm not sure
        if the fiscal year ended this
        Provider, it's December 31, so
        are you looking at the federal
        fiscal year or are you looking
        at the -- in your data, or are
        you looking at the Provider's
        fiscal year, which is the
        calendar year?
MS. LETRAN:
        Right.  I'm looking at the
        federal fiscal year, because
        we never asked for a
        realignment so we always go
        with the federal fiscal year
        SSI.  And if you look at any
        of these particular year, you
        will see that it will start

140

out in October and it will end
in September.

MS. BENSON:
        Okay.  That was...
MS. LETRAN:
        And...
MS. BENSON:
        That was one of my questions.
MS. LETRAN:
        Yes.
MS. BENSON:
        I wanted to make sure that, in
        the data analysis that you
        were doing, you were looking
        at the federal fiscal year...
MS. LETRAN:
        Federal fiscal year, right.
MS. BENSON:
        ...and that's what was on your
        cost report.
MS. LETRAN:
        Right.  And it -- and it's
        labeled on each of the
        exhibits.
MS. BENSON:

141

```
 1        I saw that, and I just wanted
 2        to make sure that it wasn't
 3        that way, just because that's
 4        how the SSI is done.
 5   MS. LETRAN:
 6        Right.
 7   MS. BENSON:
 8        Okay.  I guess my other -- my
 9        only other question is, and
10        you may not be the right
11        person to ask this to, and if
12        not, just say that you're not
13        the right person, I know you
14        picked up aid codes 10, 20,
15        and 60, and I know in the
16        final rule CMS talked about
17        codes C01, M01, and M02.  Is
18        there a direct correlation
19        between 10, 20, and 60 and
20        C01, M01, and M02?
21   MS. LETRAN:
22        I'm not the person to answer
23        that.
24   MS. BENSON:
25        Okay.
```

142

```
 1   MS. LETRAN:
 2        I'm not familiar with the SSA
 3        coding system at all.
 4   MS. BENSON:
 5        Okay.
 6   MS. LETRAN:
 7        No, I'm only familiar with the
 8        state system.
 9   MS. BENSON:
10        Then I won't ask you.
11   MS. LETRAN:
12        Okay.  Yeah, that should be --
13        but I -- yeah.
14   MS. BENSON:
15        I think that's all the
16        questions that I have.  Thank
17        you.
18   MS. LETRAN:
19        Yeah.  Thank you.
20   THE CHAIRMAN:
21        Mr. Ahern?
22   MR. AHERN:
23        Yes.  Thank you for your
24        testimony.
25   MS. LETRAN:
```

143

```
 1        Thank you.
 2   MR. AHERN:
 3        It's painful to hear how much
 4        work has been put into this...
 5   MS. LETRAN:
 6        Thank you.  I appreciate that.
 7   MR. AHERN:
 8        ...I can only imagine, from
 9        the beginning to the end.
10   MS. LETRAN:
11        Right.
12   MR. AHERN:
13        And I'm going to look at this
14        just a little bit bigger
15        picture to get some
16        clarification, and not get
17        into the minutiae of some of
18        these counts.  Essentially, if
19        I am correct, and tell me if
20        I'm wrong, you set out to have
21        a more accurate count because
22        you realized the SSI percent
23        was substantially lower than
24        it should be.  Is that
25        correct?
```

144

```
 1   MS. LETRAN:
 2        Right.
 3   MR. AHERN:
 4        What got you on this path, so
 5        to speak?  It's -- it is quite
 6        a path...
 7   MS. LETRAN:
 8        Right.
 9   MR. AHERN:
10        ...what started you on this
11        path?
12   MS. LETRAN:
13        Thank you.  Thank you for
14        asking that question.  So when
15        I first came to Pomona, the
16        SSI number was a number that
17        attracted me right away
18        because in the cost report, if
19        you will, basically every item
20        in the cost report is
21        traceable down to the detail
22        level.  If you look at
23        payroll, you can trace down to
24        my paycheck, you can see how
25        much I make an hour.  You
```

145

know, if we have invoices, you
can trace it down, and
everything is supportable.
But when it comes to the SSI
back then, nothing was
available.  The only thing
that was available was the
numerator and the denominator.
Not even a patient detail.
You know, we always call it,
in the Provider community, as
a black box, you know, and we
just live with it.  So it was
very -- it's a mystery to me,
and it was a big number
because, as I mentioned, we
were getting about 16, $17
million of DSH reimbursement,
and the SSI component was
about 3, $4 million back then.
And so that was a big interest
for me.  And then also, if you
look at the trend, every year
around July, August, we have
to anticipate it's going to be

146

published and what it is, and
it would go up and down and it
would fluctuate.  And we know
that in the Pomona area, the
population is pretty much
consistent so why would our
SSI go up and down?  So that
was another interest.  And we
got consultants approaching us
telling us that it's not
right, so that when we got
onto that question, we wanted
to validate, and it was years
in the making to validate all
this process.
MR. AHERN:
     So from what I'm hearing, the
key element that might have
told you you had to do
something is that there was no
fluctuation from your point of
view, but there's fluctuation
on the number that's being
published in terms of the SSI
percent.  So you're seeing a

147

fluctuating percentage that
doesn't track to what you're
experiencing at your hospital.
MS. LETRAN:
     Right, a fluctuating
percentage, and no detail to
support such a big
reimbursable number.
MR. AHERN:
     Can you recall roughly how big
the fluctuations you were
seeing that got you on this
track?  Just in rough terms.
MS. LETRAN:
     Yeah.  I think in the
beginning it was, I would say
9, 10, 12 percent, and then
one year it would jump to 23
percent, and then one year
would go back to 18 percent.
And when it jump up by 23
percent, we would have a
pickup of like $800,000 in our
books and we were very happy
with that, you know, and then

148

we were hoping that, okay,
next year maybe it will stay
at 23 percent, and it would
drop down to 18 and we would
have to take a hit of several
hundred thousand dollars on
our books.
MR. AHERN:
     So you said let's give this a
better look, and you developed
this process over the years.
And you're trying to get it
validated, if possible, and
use it going forward...
MS. LETRAN:
     Right.
MR. AHERN:
     ...is the essence of...
MS. LETRAN:
     Right.  Right.  And then I
want to -- as it is a very
difficult process because, as
far as the billing office is
concerned, they don't need to
know the aid code to bill

1  Medi-Cal, they just need to
2  know that the patient is
3  eligible, and if the patient
4  is full scope or limited
5  scope, whatever the aid code
6  is really not important. So
7  that is not an indicator that
8  we tracked in our system, and
9  that was why it makes this
10  whole process so difficult.
11 MR. AHERN:
12  So moving through the process,
13  and I'm not going to revisit
14  that, we've gone into great
15  detail, and I thought very
16  orderly, very nicely done, at
17  one point you said you
18  contacted your
19  Representatives, and I
20  understand that. In fact, in
21  the past, in your state I've
22  recommended that for people I
23  worked with. But I didn't go
24  to a government relations
25  firm, and I was wondering why

1  and how you got to that point
2  before getting to Senator
3  Feinstein.
4  MS. LETRAN:
5   Yeah.
6  MR. AHERN:
7   What is that and what did it
8   cost you? Or did it cost you
9   anything?
10 MS. LETRAN:
11  Yes, it cost us. So this was
12  my -- this has been a great
13  experience for me, you know,
14  working with the government
15  legislative branches. This
16  was my first time. So when we
17  heard that we needed to reach
18  out to congressional help, I
19  went to my boss and I said we
20  need to do this, and we were
21  very closely involved with an
22  organization in California,
23  it's called Peach. I'm not
24  sure if you've heard of them.
25  It's a private -- a central

1  organization that helped us
2  with our Medi-Cal DSH. And we
3  have government relations
4  consultant on site already for
5  that, so we reached out to
6  them and we asked them to
7  help, and they were very nice.
8  They charged us a nominal fee
9  to do that. Do you want me --
10  do you want to know how much?
11 MR. AHERN:
12  Five, 10,000?
13 MS. LETRAN:
14  4,000.
15 MR. AHERN:
16  Very nominal.
17 MS. LETRAN:
18  Yeah, 4,000. And they were
19  very -- yeah.
20 MR. AHERN:
21  Virtually...
22 MS. LETRAN:
23  And it...
24 MR. AHERN:
25  ...nothing in the world of

1  what is and government
2  consultants, that's nothing.
3  MS. LETRAN:
4   I think it's nominal.
5  MR. AHERN:
6   Virtually nothing.
7  MS. LETRAN:
8   I think it's -- and they did a
9   lot of work. They drafted the
10  letter, they met with me. We
11  talked about the issue. I
12  explained to them about DSH
13  and the reimbursement impact,
14  because they needed to be
15  onboard. So -- yes.
16 MR. AHERN:
17  And they connected you with
18  Senator Feinstein, et cetera,
19  or contacted their staffers
20  and got the -- provided the
21  factual backdrop that the
22  senator would want before she
23  gets involved.
24 MS. LETRAN:
25  Exactly.

153

```
 1   MR. AHERN:
 2        Like bring her up-to-speed...
 3   MS. LETRAN:
 4        Right.  Right.
 5   MR. AHERN:
 6        ...and make sure she's solid
 7        in what she's putting her name
 8        to.
 9   MS. LETRAN:
10        Right.
11   MR. AHERN:
12        So that said, I don't have any
13        other question.  I mean I
14        think what we see here is a
15        process that you believe is
16        valid, but you'd like it
17        validated.
18   MS. LETRAN:
19        Right.
20   MR. AHERN:
21        And you're willing to risk it
22        being invalidated.
23   MS. LETRAN:
24        Correct.
25   MR. AHERN:
```

154

```
 1        But you're going in
 2        legislative and bureaucratic
 3        circles, and getting finally
 4        to us.
 5   MS. LETRAN:
 6        Thank you.  Right, yes.
 7   MR. AHERN:
 8        Okay, so that's all I have.
 9   THE CHAIRMAN:
10        Mr. Ziegler?
11   MR. ZIEGLER:
12        Okay.  Yeah, again, thank you
13        for your testimony.  And I do
14        appreciate the work you've
15        done here...
16   MS. LETRAN:
17        Thank you.
18   MR. ZIEGLER:
19        ...because I actually come
20        from the Provider's side...
21   MS. LETRAN:
22        Thank you.
23   MR. ZIEGLER:
24        ...so I know this SSI issue
25        has been an issue everybody
```

155

```
 1        has been trying to figure out
 2        for some time now.  So it's a
 3        big, big issue.  If you could
 4        turn to P20, your diagram
 5        here, the key factor, if I
 6        were to summarize this is, in
 7        order for you to get to the
 8        proper SSI percentage,
 9        basically, the key factor here
10        is the aid codes.  Without the
11        aid codes you'd have no way of
12        getting to that SSI
13        percentage.
14   MS. LETRAN:
15        Correct.
16   MR. ZIEGLER:
17        Correct?  Okay.
18   MS. LETRAN:
19        Yes.
20   MR. ZIEGLER:
21        Now, you referred to, and
22        correct me, I may have
23        misunderstood you, but you did
24        a lot of reference to the
25        MedPAR file...
```

156

```
 1   MS. LETRAN:
 2        Yes.
 3   MR. ZIEGLER:
 4        ...which is different from the
 5        PS&R.  That's your more
 6        detailed file, has more info.
 7        Correct?
 8   MS. LETRAN:
 9        Correct.
10   MR. ZIEGLER:
11        Okay, so you actually get that
12        MedPAR file, you actually --
13        from CMS?  It's not the PS&R
14        detailed file, you're getting
15        another file called MedPAR.
16   MS. LETRAN:
17        Right.  So...
18   MR. ZIEGLER:
19        Okay, go ahead.
20   MS. LETRAN:
21        The MedPAR -- I mean the PS&R
22        I think is coming from the
23        MedPAR file.
24   MR. ZIEGLER:
25        Right.  It...
```

157

MS. LETRAN:
    Right.
MR. ZIEGLER:
    ...ultimately does, yes.
MS. LETRAN:
    Right.  And then for the PS&R
    nowadays we can go online and
    request...
MR. ZIEGLER:
    Correct.
MS. LETRAN:
    ...that information easily,
    and it comes back real-time.
    And to get the detail, we just
    simply request the detail on
    line and it will come in a
    diskette.  But with the CMS
    MedPAR SSI file, we have to
    wait for the right timing when
    it's released.  And when it's
    released we have to reach out
    to a different division --
    division of operational...
MR. ZIEGLER:
    Right.

158

MS. LETRAN:
    ...IT...
MR. ZIEGLER:
    Okay.
MS. LETRAN:
    ...or something.  And then we
    have to ask for that file.
MR. ZIEGLER:
    Um-hum.
MS. LETRAN:
    And the people there were very
    responsive.  When we asked,
    they would give it to us.
MR. ZIEGLER:
    Okay.  So basically, when you
    referred to MedPAR, you --
    it's called a DUA.
MS. LETRAN:
    Right.
MR. ZIEGLER:
    Right?  You filled out your
    DUA and then they sent you the
    data.  And I've gotten that
    data too.
MS. LETRAN:

159

    Right.
MR. ZIEGLER:
    Is that what you're referring
    to is MedPAR, in essence?
MS. LETRAN:
    Well, yes.  Yes, but because
    the name -- the actual name --
    the actual official name is
    also called the CMS MedPAR SSI
    file.  That's...
MR. ZIEGLER:
    Okay.
MS. LETRAN:
    That's the name of it.  So
    that when we request, the
    other side doesn't get
    confused as to what we're
    asking for.
MR. ZIEGLER:
    Okay.  Okay.
MS. LETRAN:
    Yeah.
MR. ZIEGLER:
    So on that file, did you say
    that it had the aid codes or

160

    anything like that?
MS. LETRAN:
    No...
MR. ZIEGLER:
    No.
MS. LETRAN:
    ...it does not have the...
MR. ZIEGLER:
    The -- okay.
MS. LETRAN:
    ...aid code.
MR. ZIEGLER:
    The only way you have the aid
    code is based upon your own
    internal records.
MS. LETRAN:
    Exactly.
MR. ZIEGLER:
    Okay.
MS. LETRAN:
    Right.
MR. ZIEGLER:
    All right.
MS. LETRAN:
    So in that -- to add onto

161

```
 1        that, in that file, there is a
 2        file format somewhere in these
 3        exhibits, I don't remember
 4        which one.  We can look at the
 5        index and it will tell you the
 6        fields that were available in
 7        the MedPAR file.  Maybe like
 8        eight fields in there.
 9   MR. ZIEGLER:
10        Yeah.  It wasn't much, if
11        it's...
12   MS. LETRAN:
13        Yeah.
14   MR. ZIEGLER:
15        ...the same file I'm thinking
16        of.
17   MS. LETRAN:
18        Okay.
19   MR. ZIEGLER:
20        Okay.  So you also said the
21        process is -- basically, I
22        assume you have an upfront
23        admissions process to capture
24        that aid code...
25   MS. LETRAN:
```

162

```
 1        Yes.
 2   MR. ZIEGLER:
 3        ...correct?
 4   MS. LETRAN:
 5        Right.
 6   MR. ZIEGLER:
 7        Okay.  And that's more -- I
 8        guess your staff is very aware
 9        of the importance of that aid
10        code...
11   MS. LETRAN:
12        They...
13   MR. ZIEGLER:
14        ...so...
15   MS. LETRAN:
16        I'm sorry.
17   MR. ZIEGLER:
18        Go ahead.
19   MS. LETRAN:
20        They are -- the admitting
21        people are aware of my
22        department's needs for it, and
23        how high is my needs in the
24        whole scheme of things is not
25        very high...
```

163

```
 1   MR. ZIEGLER:
 2        Okay.
 3   MS. LETRAN:
 4        ...because the admitting
 5        people have to worry about
 6        admitting patient quickly,
 7        getting the financial...
 8   MR. ZIEGLER:
 9        Right.
10   MS. LETRAN:
11        ...information, you know, so
12        getting the extra aid code for
13        the reimbursement department
14        is not that important, if you
15        will.  And that's just a...
16   MR. ZIEGLER:
17        Right.
18   MS. LETRAN:
19        ...fact of life, you know.
20        So...
21   MR. ZIEGLER:
22        But they must be maintaining
23        it for...
24   MS. LETRAN:
25        They are.  They...
```

164

```
 1   MR. ZIEGLER:
 2        ...you to be able to -- for
 3        you to get -- do this analysis
 4        and to come up with a higher
 5        SSI percentage, evidently,
 6        they're pretty much almost all
 7        the time getting that code.
 8   MS. LETRAN:
 9        Right.  I would say 80 percent
10        of the time, or not all the
11        time.  They do maintain it,
12        and that's why I have to use
13        this HDX database to capture
14        the data because it's
15        maintained in this different
16        database.
17   MR. ZIEGLER:
18        Okay, I see.  Okay.
19   MS. LETRAN:
20        Yes.
21   MR. ZIEGLER:
22        Got you.  I missed that piece.
23        So you're really the HDX,
24        which is the state database,
25        is why you're pulling that in.
```

165

MS. LETRAN:

   Yes.

MR. ZIEGLER:

   Okay.  So that's really your
   key reference to getting that
   aid code.

MS. LETRAN:

   Exactly.

MR. ZIEGLER:

   Okay.

MS. LETRAN:

   Right.

MR. ZIEGLER:

   Now, I know the key to coming
   up with the SSI percentage,
   and you can help me out here,
   is really -- it's the
   application, and you know
   this, for instance, when
   someone applies to admission
   and you're trying to get them
   Medicaid certified, and you
   can tell me if you -- if I'm,
   you know, overreaching here,
   but one is your Medicaid

166

   application, which is a page
   -- two-page application, the
   other application is an SSI
   application, or SSDI.

MS. LETRAN:

   Okay.

MR. ZIEGLER:

   So that's a more extensive
   application.  So a lot of
   times what they'll do is
   they'll file the Medicaid
   application -- I don't know --
   do -- is -- do you have your
   staff, is it contracted at
   your facility or is it...

MS. LETRAN:

   I'm not familiar with the
   application process.

MR. ZIEGLER:

   Okay.  You're not, okay.

MS. LETRAN:

   Right.

MR. ZIEGLER:

   That's fine.

MS. LETRAN:

167

   Right.

MR. ZIEGLER:

   I guess the key point I'm
   getting at is, in order for
   someone to get SSI, SSDI, if
   it's either done at the
   facility, which generally it
   isn't, by the way, because --
   especially if you're paying
   for people to get this -- get
   patients Medicaid certified,
   they'll always go for that
   shorter application, but in
   order for them to get SSI and
   be identified for SSDI it's
   basically done somehow by the
   state.  So the state
   ultimately has the information
   because they're the ones who
   are submitting the information
   on behalf of, you know, people
   who qualify within the state.

MS. LETRAN:

   Right.  Right.

MR. ZIEGLER:

168

   So basically, what I'm trying
   to get at is, so we know the
   state ultimately is the one
   who is filing these
   applications, and I'm not
   familiar with exactly how that
   occurs or -- you know, I -- it
   seems to me it's more -- the
   patient would actually have to
   be aware that that's
   available, and then they would
   apply somehow or another
   through the state.  Are you
   familiar with the process,
   or...

MS. LETRAN:

   I'm a bit familiar with that.
   So I know at our hospital we
   have a department that is
   called Medi-Cal eligibility or
   something to that extent, that
   we would apply for Medi-Cal...

MR. ZIEGLER:

   Okay.

MS. LETRAN:

00380

169

```
 1              ...when a low-income patient,
 2         uninsured patient showed up
 3         and...
 4    MR. ZIEGLER:
 5         Right.
 6    MS. LETRAN:
 7              ...did not have insurance.
 8         And we look at their financial
 9         and we feel like they may
10         quality, we would work with
11         the social service office...
12    MR. ZIEGLER:
13         Yeah.
14    MS. LETRAN:
15              ...and apply for Medi-Cal
16         only, because as far as the
17         hospital is concerned, we want
18         that claim to be paid so we
19         would apply for Medi-Cal...
20    MR. ZIEGLER:
21         Right.
22    MS. LETRAN:
23              ...but not SSI.  And that's
24         why I'm not familiar with the
25         SSI...
```

170

```
 1    MR. ZIEGLER:
 2         Yeah, well, they...
 3    MS. LETRAN:
 4              ...process.
 5    MR. ZIEGLER:
 6              ...so...
 7    MS. LETRAN:
 8         Right.
 9    MR. ZIEGLER:
10              ...you may want to look into
11         that, but...
12    MS. LETRAN:
13         Right.
14    MR. ZIEGLER:
15              ...then they don't...
16    MS. LETRAN:
17         Right.  But then -- but on the
18         SSI, I do, from my contact and
19         talking with the state, I know
20         that -- and you are correct
21         that the process would start
22         with the state...
23    MR. ZIEGLER:
24         Yeah.
25    MS. LETRAN:
```

171

```
 1              ...but then from my
 2         understanding, the Federal
 3         Government will take over to
 4         manage the federal SSI.  And
 5         it may have to do...
 6    MR. ZIEGLER:
 7         Okay.
 8    MS. LETRAN:
 9              ...with Section 1638 agreement
10         where...
11    MR. ZIEGLER:
12         Okay.
13    MS. LETRAN:
14              ...you know, where the federal
15         will take over and manage this
16         whole thing, and the state
17         will be out of the picture
18         after the initial application
19         is filed.
20    MR. ZIEGLER:
21         Okay.  So here's sort of where
22         I'm driving at.  We're relying
23         on the 10 -- I forget, the 20,
24         60 codes.
25    MS. LETRAN:
```

172

```
 1         Sixty.
 2    MR. ZIEGLER:
 3         And the question, I guess,
 4         that anybody's going to want
 5         to understand is, those are
 6         codes that Medi-Cal is
 7         assigning, correct?  Is it
 8         Medi-Cal?
 9    MS. LETRAN:
10         No, Medi-Cal...
11    MR. ZIEGLER:
12         Or Medicaid or California,
13         or...
14    MS. LETRAN:
15         Medicaid -- Medi-Cal, but...
16    MR. ZIEGLER:
17         Medicaid.
18    MS. LETRAN:
19         But they told me that it was
20         -- it's coming from SSA.
21    MR. ZIEGLER:
22         Right, that's what they said.
23         So -- yeah.  So how exactly
24         does that process work?
25         That's what I'm trying to
```

00381

173

```
understand.  Is SSA -- because
they're providing a
supplemental payment, they're
attaching it to the SSI,
according to what I read in
the paper -- the appeal paper.
So they're attaching that
supplemental payment to the
SSI, and then they're paying
an administrative fee, if I'm
understanding it, for SSA to
then -- to pay the individual
patients who qualify for SSI,
whatever that program is.  So
they're -- so how are they
becoming -- how is the state
becoming aware of the patients
that they have to provide this
supplemental payment for?
MS. LETRAN:
    So those were some of the
questions that I actually
asked the state myself, and
again, they could not help me
and they -- in one of the
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

174

```
e-mails they actually say that
the SSA office maintain all of
that information and they
don't own.  So, therefore, I'm
-- I don't know.
MR. GETZOFF:
    May I?
MR. ZIEGLER:
    Yeah, go ahead.
MR. GETZOFF:
    Sorry to interrupt.
MR. ZIEGLER:
    No, that's fine.  That's fine.
MR. GETZOFF:
    We do have the former director
of the Medi-Cal program
sitting back there, and he
will be testifying, and I
suspect he will be able to
answer those questions...
MR. ZIEGLER:
    Okay, that's fine.
MR. GETZOFF:
    ...pretty easily.
MR. ZIEGLER:
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

175

```
    Okay, that's fine.  That's
fine.  Yeah, because I'm just
looking for the process,
how...
MS. LETRAN:
    Right.
MR. ZIEGLER:
    ...do they send a file, or
what is the process.
MS. LETRAN:
    Right.  I understand.  That
was what I asked them because
I say -- I asked the state
could you tell me if this
patient qualified for cash
state grant, can you look into
your record and let me know...
MR. ZIEGLER:
    Right.
MS. LETRAN:
    ...that the cash grant came
from the state and not the
federal, and they told me they
couldn't help me at all
because...
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

176

```
MR. ZIEGLER:
    Okay.
MS. LETRAN:
    ...it was maintained by SSA.
MR. ZIEGLER:
    Okay.  We talked about the SSP
a little bit, and I think you
said Amy, I forget it,
Rosenkrantz, or whatever...
MS. LETRAN:
    Rosenkranz, yes.
MR. ZIEGLER:
    Okay.  She basically said all
your 10, 20, and 60 were --
was all SSI, no...
MS. LETRAN:
    All federal, right.
MR. ZIEGLER:
    ...no SSP.  I think you had
said also that there was a way
to -- that you know now to
validate the SSP?
MS. LETRAN:
    Yes.
MR. ZIEGLER:
```
York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

177

```
 1        Okay.  And...
 2  MS. LETRAN:
 3        And that...
 4  MR. ZIEGLER:
 5        ...what is that -- how is
 6        that?
 7  MS. LETRAN:
 8        That way will be through our
 9        next witness, Mr. Stan
10        Rosenstein, who was the former
11        director at the Medi-Cal
12        department.  He contacted the
13        California Department of
14        Social Services and were able
15        to obtain a listing -- a
16        general state average listing
17        of all the people that have
18        SSI, and then the people that
19        have SSP only.  And based on
20        that listing, I think that's
21        in Exhibit P35 or P36...
22  MR. ZIEGLER:
23        Okay.
24  MS. LETRAN:
25        ...in that listing it shows
```

178

```
 1        that on average it's -- on a
 2        monthly average it's about 14
 3        percent...
 4  MR. ZIEGLER:
 5        Okay.
 6  MS. LETRAN:
 7        ...for the state-only SSP.
 8  MR. ZIEGLER:
 9        Okay.  But you haven't figured
10        out a way yet to do it per
11        patient.  It's...
12  MS. LETRAN:
13        No.  I...
14  MR. ZIEGLER:
15        No, okay.
16  MS. LETRAN:
17        And that was -- right.  Right.
18  MR. ZIEGLER:
19        Okay.  Yeah.
20  MS. LETRAN:
21        Right.  Right.  Yes, that's --
22        that is my dilemma.  I --
23        yeah, I don't have...
24  MR. ZIEGLER:
25        Right, okay.
```

179

```
 1  MS. LETRAN:
 2        ...the information to figure
 3        it out down to the patient
 4        level for the state-only.  So
 5        we were hoping to come to a
 6        settlement and say we will
 7        reduce whatever we're asking
 8        by 14 percent, because that's
 9        the state average...
10  MR. ZIEGLER:
11        Got you.
12  MS. LETRAN:
13        ...you know, and we believe
14        that the state average is
15        representative of Pomona and
16        Los Angeles County.
17  MR. ZIEGLER:
18        Now, I don't know if you
19        tracked this, but as a result
20        of the Bay State you had a
21        previous SSI percentage...
22  MS. LETRAN:
23        I do track that.
24  MR. ZIEGLER:
25        Right.  And then you have it
```

180

```
 1        as a result of the revised Bay
 2        State.  How much did that
 3        vary, just out of curiosity?
 4        Very -- as what I saw, very
 5        insignificant.
 6  MS. LETRAN:
 7        Right.  When did you -- what
 8        have you seen?
 9  MR. ZIEGLER:
10        For the hospital I worked at,
11        it -- there wasn't much of a
12        difference once they reran the
13        data.
14  MS. LETRAN:
15        Correct.  And that's what I've
16        seen.  I've tracked it and
17        actually have a chart, I
18        tracked it from 1987 on
19        through...
20  MR. ZIEGLER:
21        Right.
22  MS. LETRAN:
23        ...present, and with the
24        reissuance of the 1498-R2, the
25        numbers changed little.  And
```

181

```
 1          in many of the years...
 2  MR. ZIEGLER:
 3          Very little.
 4  MS. LETRAN:
 5          ...it went the wrong way.
 6  MR. ZIEGLER:
 7          Yeah.  Um-hum.
 8  MS. LETRAN:
 9          So I know that for 1990 I
10          would have to pay CMS back
11          $250,000...
12  MR. ZIEGLER:
13          Right.  Yeah.
14  MS. LETRAN:
15          ...because the number went
16          completely the wrong way.
17  MR. ZIEGLER:
18          Yeah.
19  MS. LETRAN:
20          My denominator increased by
21          several thousand days, which
22          I'm not sure how...
23  MR. ZIEGLER:
24          Right.
25  MS. LETRAN:
```

182

```
 1          ...and then my numerator went
 2          down.
 3  MR. ZIEGLER:
 4          Um-hum.  So...
 5  MS. LETRAN:
 6          So...
 7  MR. ZIEGLER:
 8          ...that raises a question...
 9  MS. LETRAN:
10          Right.  So that's why I...
11  MR. ZIEGLER:
12          ...right?  Yeah, I was...
13  MS. LETRAN:
14          ...I still...
15  MR. ZIEGLER:
16          ...expecting a big change when
17          I was sitting on...
18  MS. LETRAN:
19          Exactly, because...
20  MR. ZIEGLER:
21          ...the hospital's side.
22  MS. LETRAN:
23          ...in the Bay State it talked
24          about all the admission
25          duplicate record, forgetting
```

183

```
 1          to use an ID, and this is the
 2          revision, and after the
 3          revision...
 4  MR. ZIEGLER:
 5          Um-hum.
 6  MS. LETRAN:
 7          ...I -- my numbers went the
 8          wrong way.  So...
 9  MR. ZIEGLER:
10          Let's see, if we could go to
11          P27 real quick.
12  MS. LETRAN:
13          Yes, I'm there.
14  MR. ZIEGLER:
15          Go to 0503.  And this ties
16          back into Ms. Benson's
17          question.  And this -- when
18          the -- the covered days, you
19          said again, you referenced the
20          MedPAR.
21  MS. LETRAN:
22          The MedPAR SSI file.
23  MR. ZIEGLER:
24          Is it -- SSI.  Did you tie
25          that also to the PS&R, the
```

184

```
 1          32...
 2  MS. LETRAN:
 3          No, I didn't, because the PS&R
 4          that we have is on a calendar
 5          year, and not that I couldn't
 6          order it by the federal fiscal
 7          year, but I didn't want to...
 8  MR. ZIEGLER:
 9          I see.
10  MS. LETRAN:
11          ...I -- yeah, I didn't want to
12          go there...
13  MR. ZIEGLER:
14          Okay.
15  MS. LETRAN:
16          ...I wanted to stay with one
17          source from CMS.
18  MR. ZIEGLER:
19          Okay.
20  MS. LETRAN:
21          You know.  Yes.
22  MR. ZIEGLER:
23          Okay.  All right, let me see,
24          I think I had another
25          question.  Yeah, when you did
```

00384

185

```
 1        your matching and you came up
 2        with your other codes, right.
 3  MS. LETRAN:
 4        The 1E, 6E from CMS.
 5  MR. ZIEGLER:
 6        Yeah.  Yeah.  Yeah.
 7  MS. LETRAN:
 8        Yes.  Yes.
 9  MR. ZIEGLER:
10        So help me understand, so
11        you're going through your
12        whole process on P20, and it's
13        a very extensive process.
14        I've got to commend you for
15        it.  It's very, very detailed.
16  MS. LETRAN:
17        Thank you.
18  MR. ZIEGLER:
19        A very good process.  You ran
20        through that process and then
21        you did your matching.  Now,
22        where did you get -- I know
23        where you got it from, you got
24        it from the DUA, the -- what
25        you call the MedPAR file
```

186

```
 1        returned with...
 2  MS. LETRAN:
 3        Right.
 4  MR. ZIEGLER:
 5        ...the SSI data.
 6  MS. LETRAN:
 7        Right.
 8  MR. ZIEGLER:
 9        Or did they have that 1E stuff
10        on it?
11  MS. LETRAN:
12        No.
13  MR. ZIEGLER:
14        I can't remember.
15  MS. LETRAN:
16        They don't.
17  MR. ZIEGLER:
18        They don't.
19  MS. LETRAN:
20        They don't.  Right.
21  MR. ZIEGLER:
22        Yeah, I don't recall they do.
23        So you got it from the MedPAR
24        file -- what you call the
25        MedPAR?
```

187

```
 1  MS. LETRAN:
 2        No, so I would get the aid
 3        code from our own internal
 4        database, either through HDX
 5        or the Medi-Cal Point of
 6        Service...
 7  MR. ZIEGLER:
 8        Okay, right.
 9  MS. LETRAN:
10        ...Network, or the paid claims
11        summary.
12  MR. ZIEGLER:
13        Okay.  And then you're
14        matching -- I got you.  I got
15        you.
16  MS. LETRAN:
17        Right.
18  MR. ZIEGLER:
19        So you're getting that code,
20        and then you're seeing it's a
21        14 in -- whatever that file
22        was from the state, and then
23        you match against the file --
24        the return from -- with your
25        SSI.
```

188

```
 1  MS. LETRAN:
 2        Right.
 3  MR. ZIEGLER:
 4        Okay.  I got you.
 5  MS. LETRAN:
 6        Right.
 7  MR. ZIEGLER:
 8        I know exactly what you're
 9        doing.  So any idea why some
10        of those had like 14 on it and
11        not your 10...
12  MS. LETRAN:
13        Yes, I have...
14  MR. ZIEGLER:
15        ...20, 60.
16  MS. LETRAN:
17        I have some ideas.  If you
18        look on page 502...
19  MR. ZIEGLER:
20        Um-hum.
21  MS. LETRAN:
22        ...the descriptions of the
23        miscellaneous aid codes, if
24        you look at 14, 1E, or 6E...
25  MR. ZIEGLER:
```

189

```
 1        Um-hum.
 2   MS. LETRAN:
 3        ...they all had a cash grant
 4        previously, but for whatever
 5        reason they fell off.  So they
 6        could have perhaps made more
 7        income for that month, or
 8        maybe they were in the
 9        hospital and they could not
10        fill out the paperwork.  I
11        don't know how often they have
12        to go back and submit the
13        paperwork...
14   MR. ZIEGLER:
15        Yeah.
16   MS. LETRAN:
17        ...because I know with SSI you
18        have to prove that your income
19        is at a certain level...
20   MR. ZIEGLER:
21        Right.
22   MS. LETRAN:
23        ...and if -- every month -- if
24        you're suddenly -- if you make
25        too much then you would lose
```

190

```
 1        out on that benefit.  So
 2        perhaps they were sick and
 3        nobody was taking care of
 4        them, and they didn't do the
 5        paperwork...
 6   MR. ZIEGLER:
 7        Right.
 8   MS. LETRAN:
 9        ...so somehow they fell off,
10        but CMS knew that and CMS
11        still gave those days to me...
12   MR. ZIEGLER:
13        Right.
14   MS. LETRAN:
15        ...as an SSI patient.
16   MR. ZIEGLER:
17        But you would think, because
18        your starting point there is
19        the SSI, SSI says these
20        patients qualify...
21   MS. LETRAN:
22        Right.
23   MR. ZIEGLER:
24        ...right?  That's your key
25        starting point.  And then
```

191

```
 1        you're going to your state
 2        data and it's giving you
 3        different codes...
 4   MS. LETRAN:
 5        Right.
 6   MR. ZIEGLER:
 7        ...than what you would expect.
 8   MS. LETRAN:
 9        Right.
10   MR. ZIEGLER:
11        So your starting point is your
12        SSI, so you would expect this
13        is -- in theory, you would
14        expect it all to be 10, 20, or
15        60.  You would expect.
16   MS. LETRAN:
17        Right.  Right.
18   MR. ZIEGLER:
19        But for...
20   MS. LETRAN:
21        And...
22   MR. ZIEGLER:
23        ...whatever reason, it wasn't.
24        And -- so...
25   MS. LETRAN:
```

192

```
 1        And -- right.  And it's very
 2        small.  Right?  We're looking
 3        at 28 days...
 4   MR. ZIEGLER:
 5        Yeah, we're not looking at big
 6        numbers here.
 7   MS. LETRAN:
 8        Yeah.  We're looking at, I
 9        think, less than 100 days.
10   MR. ZIEGLER:
11        Okay.
12   MS. LETRAN:
13        Yes.
14   MR. ZIEGLER:
15        I think that's all my
16        questions.  And, you know --
17        and I understand and you've
18        done great work here.  I know
19        this is something...
20   MS. LETRAN:
21        Thank you.
22   MR. ZIEGLER:
23        ...the hospital side has been
24        trying to get at forever,
25        and...
```

193

MS. LETRAN:

Thank you.

MR. ZIEGLER:

...been, you know, suspicious of some of the numbers, but -- so I thank you for your testimony.

MS. LETRAN:

Thank you.

THE CHAIRMAN:

I just have two things that I wanted to touch upon, and one of them was sort of a follow-up by Mr. Ziegler that you may not be able to address, and that concerned the SSP. Wanted to see if you knew when SSP-only days might arise, as opposed to it actually being sort of a supplemental payment on top of an SSI payment.

MS. LETRAN:

Okay, I can answer that question.

THE CHAIRMAN:

194

Okay.

MS. LETRAN:

So we know that in California the SSP is an augmentation to the federal SSI.  So, for example, for -- if you qualify for SSI, the normal cash grant would be $600 a month, just as an example.  And for California, because of the cost of living and the higher ceiling, the number is $800. So if I qualify for SSI, I would automatically qualify for SSP and I would get a check for $800 a month.  And if I was retired and I got a pension income of $700, so now I'm only getting a cash grant of $100.  So now I'm an SSP-only patient because my supplemental income or my retired income is higher than the federal level.

THE CHAIRMAN:

195

Okay.  Another example would -- that was -- I'm not sure about was, I know that, for instance, there's a gap period between when you become SSI eligible and when actual payments begin.  So like if you become eligible like the 15th of a month, you actually don't begin receiving payments until the 1st of the following month, I think it is.

MS. LETRAN:

Okay.

THE CHAIRMAN:

And so would there be SSP for those initial 15 days of unpaid SSI, for example?

MS. LETRAN:

I'm not -- I don't know...

THE CHAIRMAN:

Okay.

MS. LETRAN:

...the answer.  So perhaps Mr. Rosenstein can talk about it.

196

THE CHAIRMAN:

Okay.

MS. LETRAN:

Yes.

THE CHAIRMAN:

So I know you're not challenging as part of your appeal that sort of short window where they're eligible but not receiving an SSI payment, but didn't know if part of the confusion about SSP-only was SSP-only occurring during that window...

MS. LETRAN:

That -- I see.  I see.  And could be a possibility, and that was why we were very willing to have SSA look at our record and say, hey, this is...

THE CHAIRMAN:

Sure.

MS. LETRAN:

197

...wrong because of this, and
this is wrong because of that,
and we would say, okay, the
whole thing is wrong.  So, you
know, so...
THE CHAIRMAN:
      Very understandable.
MS. LETRAN:
      ...which -- yeah.  Thank you.
THE CHAIRMAN:
      The other question was, I know
that in your charts you had --
I think it was in P27, you had
denoted that there were two
different denominator numbers;
one from MedPAR and one that
was published...
MS. LETRAN:
      Yes.
THE CHAIRMAN:
      ...and that that had a
reimbursement impact.  Is that
denominator issue -- is it
your position that it's part
of this appeal?

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

198

MS. LETRAN:
      We didn't specify it in our
position paper, so I'm not
sure if it can be, but I would
love for it to be part of the
settlement, you know.  So --
and I would like to hear from
CMS are we -- am I wrong,
should the information be
based on total length of stay
or total covered days...
THE CHAIRMAN:
      Right.
MS. LETRAN:
      ...because both of these
columns were provided in the
MedPAR SSI file.  It was
there.  It was there for me to
pick it out.  So I'm -- yeah,
I'm not sure how we want to
proceed with that, but -- so
that does have a reimbursement
impact.  This is like a
quarter of a percent, so
maybe, I don't know, less than

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

199

      $100,000 per year.
THE CHAIRMAN:
      Okay.
MS. LETRAN:
      So...
THE CHAIRMAN:
      It'd be -- I'd ask Counsel to
confirm whether or not that is
part of this appeal, because
that may -- if it is then I
guess one of the things the
Board would have to, you know,
review would be whether or not
there's a, you know,
potential, you know, we'd want
to make sure that we have
jurisdiction to hear it in
terms of that it was sort of
properly part of the appeal.
MR. GETZOFF:
      The claimed percentage
includes the paid days, which
is -- my understanding has
always been that the statute
and the regulations go by paid

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

200

      Part A days in the
denominator.  So we're asking
for the slightly lower
denominator to be consistent
with the regulation and the
statute.  In that sense, I
think the Board has
jurisdiction, unless you're
aware of something...
THE CHAIRMAN:
      Well, it would be whether...
MR. GETZOFF:
      ...else that...
THE CHAIRMAN:
      ...or not it's a properly
preserved issue; meaning
whether or not, you know, the
Provider's appeal included,
from general -- generally
speaking, in terms of
jurisdiction...
MR. GETZOFF:
      It's not a huge issue, I'll
put it that way, to be
honest...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

201

THE CHAIRMAN:
    All right.
MR. GETZOFF:
    ...but on the other hand, it
    is -- I think the Provider has
    consistently asked for the
    slightly higher number in
    their appeal.
THE CHAIRMAN:
    Okay.
MR. GETZOFF:
    I think even as back -- far
    back as the appeal letter
    probably used that...
MS. LETRAN:
    Right.
MR. GETZOFF:
    Yeah.  So...
MS. LETRAN:
    And I'm sorry, and I agree
    with my Counsel, it's not a
    huge issue, but I wanted to
    bring it up here just to point
    out that when you deal with
    data, there are all sorts of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

202

misunderstanding...
THE CHAIRMAN:
    Sure.
MS. LETRAN:
    ...all sort of -- you pick up
    the wrong column it messes
    everything up...
THE CHAIRMAN:
    That's right.
MS. LETRAN:
    ...and this is an example of
    it, you know.  So...
THE CHAIRMAN:
    Right.  And I know that you
    all had had a lot of breaking
    out of issues and some split
    off into other groups, and so
    that was another reason why I
    wanted to be able to confirm
    that for the record and then
    have the parties sort of
    address that on a -- I guess
    the post-hearing basis then.
    That's all the questions that
    I had.  So that being said,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

203

    would ask Mr. Getzoff if you
    had any additional questions
    or redirect based on the
    Board's questions?
MR. GETZOFF:
    I do not.
THE CHAIRMAN:
    Mr. Olszewski?
MR. OLSZEWSKI:
    I just have one.
        ***
    RECROSS EXAMINATION
BY MR. OLSZEWSKI:
    Q.  Ms. LeTran, when Board
Member Ziegler was asking you a
question I heard you say you received
codes 10, 20, and 60 from CMS.  I was
wondering if that was a misstatement
on your behalf.
    A.  No, that would be a mistake
if I said that.
    Q.  Okay.
    A.  Right, because I do not...
    Q.  Because CMS never gives...
    A.  ...get aid codes from

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

204

CMS...
    Q.  Okay.
    A.  ...so I probably say HDX,
but I'm not sure, but that would have
been a mistake.  Yeah.
        ***
MR. OLSZEWSKI:
    Thank you.  That was it
THE CHAIRMAN:
    Mr. Getzoff, any additional...
MR. GETZOFF:
    No, sir.
THE CHAIRMAN:
    Okay, great.  Then this
    concludes your testimony, Ms.
    LeTran.
MS. LETRAN:
    Thank you, Mr. Nix.
THE CHAIRMAN:
    Thank you.  And, Mr. Getzoff,
    you can call your -- let's go
    off the record.
        ***
[Off the record]
[On the record]

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

205

```
***
THE CHAIRMAN:
     Okay, let's go back on the
     record.  Mr. Hefter, can you
     please raise your right hand?
MR. HEFTER:
     Sure.
               ***
[Witness sworn]
               ***
THE CHAIRMAN:
     Thank you.  Mr. Getzoff, you
     can proceed with your direct.
MR. GETZOFF:
     Thank you.
               ***
          TZVI HEFTER,
having been first duly sworn, was
called as a witness herein and was
examined and testified as follows:
               ***
     DIRECT EXAMINATION
BY MR. GETZOFF:
     Q.  Mr. Hefter, good morning,
and thank you for joining us from
```

206

```
afar.
     A.  Good morning.  Good morning
to you.
     Q.  What is your current
occupation?
     A.  I'm currently a consultant.
I'm the president of TMA Health
Policy Consultants, which provides
consulting services to hospitals,
lawyers, and people who are
interested in the Medicare program.
     Q.  Okay.  Prior to your work
as a consultant, where did you work?
     A.  Nearly my entire career was
at HCFA and CMS, the last 22 years of
which, which ended in 2014, I was the
director of the Division of Acute
Care which is a division in CMS which
is responsible for inpatient hospital
payment policies, including the
subject we're dealing with today;
DSH.
     Q.  Okay.  Did your
responsibilities include working with
regulatory rules and regulations
```

207

```
relating to how hospitals' DSH
reimbursements were calculated?
     A.  Well, the way the process
works is really, annually -- at least
annually, CMS publishes a proposed
and then a final rule, and in that
proposed and final rule all policies
affecting Medicare payments to
hospitals for inpatients are
proposed, including whether there are
statutory changes that need to be
implemented, whether there are policy
changes that need to be proposed and
finalized.  So every year, besides
updating the rates, which means
recalibrating the DRG rate and such,
I was responsible for issuing those
proposed and final rules.  And
certainly, many of those years there
were DSH issues that were related to
hospital data polices that were
finalized as well.
               ***
THE CHAIRMAN:
     Mr. Hefter, can you please --
```

208

```
are you on speaker or are you
speaking directly into the
telephone?
MR. HEFTER:
     I am on speaker.  Is it better
     if I spoke on the phone
     directly?
THE CHAIRMAN:
     Yes.  The transcriptionist is
     having problems hearing your
     testimony.
MR. HEFTER:
     Okay, let me try this.  Are
     you there?
MR. HEFTER:
     Does this work better?  If
     not, I may have to call back
     in.  Does this work better?
THE CHAIRMAN:
     No, that's not better.  That's
     actually a little bit worse.
MR. HEFTER:
     I can hang up and call you
     back with the regular phone.
     Okay?
```

00390

209

THE CHAIRMAN:

Okay. We'll go off the record.

***

[Off the record]

[On the record]

***

THE CHAIRMAN:

Okay, we'll go back on the record. Please proceed, Mr. Getzoff.

MR. GETZOFF:

Okay, thank you.

***

BY MR. GETZOFF:

Q. Mr. Hefter, I think probably -- it may have to do with movement or your motion, or whatever, sometimes. But, you know, I guess, just try to be as deliberate as possible with the answers, and we'll do the best we can. Are you familiar -- if you'd look at the 2006 book -- actually, any of them, Exhibit #3, which is the statute at 42 U.S.C.

210

Section 1395ww(d)(5)(f)?

A. Yeah.

Q. Does that section address what a Provider's SSI percentage or Medicare fraction is?

A. Yeah, that's the section of the statute that deals with the DSH adjustment, and it details everything -- including the two parts of the formula, meaning the SSI percentage and the Medicaid percentage.

Q. Okay. And how is the SSI percentage measured and derived pursuant to statute?

A. Well, the SSI Medicare percentage is a ratio of the Medicare patients who receiving SSI over the total number of Medicare patients that are being treated by the hospital.

Q. Okay.

A. That's patient days for both.

THE CHAIRMAN:

211

Mr. Hefter, if you could just speak a little bit more slowly, I think that will help with the transcriptionist.

MR. HEFTER:

Okay, I will try my best.

THE CHAIRMAN:

Okay.

***

BY MR. GETZOFF:

Q. Do the Medicare program regulations address how hospitals' SSI percentage or fractions are to be calculated?

A. Certainly, the regulations do implement all the statutory provisions. In the case of the percentages that we're talking about, the regulations do mimic the -- they definitely -- it's almost a cut-and-paste as to what the percentages are for the Medicaid percent and for the SSI percentage.

Q. Okay. Aside from the changes to the regulations, are you

212

familiar with the methodology that CMS used to actually calculate each individual hospital's SSI percentage or fraction?

A. Yes, at least to the point that I'm not a computer programmer, so there is a data function to it, meaning that CMS has its data; the MedPAR data, that it compares to data that it gets from the Social Security Administration; the SSI data, and based on running those two sets of data, CMS puts together the data file that shows the Medicare SSI percentages for each hospital.

Q. Was some type of matching, therefore, required to derive each hospital's SSI percentage?

A. Certainly.

Q. And...

A. Certainly.

Q. And who conducted the matching?

A. I believe that match is done by staff at CMS.

213

Q. During your tenure at CMS, were problems ever brought to the agency's attention regarding the extent to which the matching of a hospital's inpatient Part A days and SSI benefit days was accurate?

A. Yes. In fact, that's probably something that we hear about a lot. There are always different issues that hospitals have brought up questioning CMS' percentages, and there are always questions both on the Medicaid side, which is really not the percentage that we're talking about as far as how to count Medicaid days, but even the SSI days which was the subject of litigation, there was questions of whether or not the numbers that CMS was determining really accurately reflected all the days that should have been as far as the number of patients who were really getting SSI or not. The hospitals felt that maybe the files that CMS was receiving from the

214

Social Security Administration, maybe they were not asking for the information correctly so that they weren't really getting a complete list of all the SSI patients.

Q. Okay. Are you aware of any reason to why the SSA data regarding the SSI list and the CMS data on Part A days failed to match completely in the past?

A. Yeah, I mean there were -- some of the litigation involved with whether patients who were deceased, whether they were wiped off of the SSA list, and, therefore, when CMS queried the data from SSA, at that point it was no longer on the SSA list, whether or not there was a question of how Medicare was comparing social security numbers for Medicare patients and the SSI social security numbers. They didn't necessarily match, maybe there was limitation in the number of fields that was originally used for how many

215

social security numbers could be matched, and maybe those weren't showing up. There could have been a question of retroactive eligibility for SSI. So there could be a number of reasons, and were, in fact, a number of reasons that the SSA data it was argued was not accurate as far as calculating the SSI percentage.

Q. Okay. Are you familiar with the Bay State Medical Center v. Leavitt case?

A. Yeah, I guess so.

Q. Were you with CMS at the time this -- that decision was announced?

A. Yeah, definitely.

Q. And what was that CMS required to do under that decision?

A. CMS -- although I don't think CMS ever admitted that CMS did anything wrong, but CMS did agree based on that decision to go back and really work with SSA to make that SSA list as accurate as possible, and

216

accounting for all these situations that we just talked about. Different things were done, in fact, to address each one of these issues, whether it was -- had to do with social security numbers, not enough fields being matched, whether it was that there was more recent data that CMS had that it wasn't using, there were -- all the issues that were raised were addressed by CMS in the post-Bay State era.

Q. Okay. Are you familiar with the process by which the California Medi-Cal program received information regarding the SSI status of its beneficiaries?

A. Well, what I understand, and I'm not a Medi-Cal expert, but from the information that I was given by the hospital it seems to me that the -- because of the fact, and this is what intrigued me in the first place, that the state had a very invested interest in making sure that

217

the information it was getting from
SSA was consistent with its
information, because it was paying
money to the Social Security
Administration to supplement those
SSI payments, and I think maybe to
administer them.  So the data that
the state was getting, it was getting
from SSA, and it seems to be a
reliable basis for determining
whether or not those patients truly
were getting SSI or not.
     Q.  Approximately when were you
first contacted by a representative
on behalf of Pomona with respect to
its SSI percentage issue appeals for
these years, 2006 through 2008?
     A.  I believe I was first
contacted in January of 2016.
     Q.  Okay.  And what were you
initially asked to do?
     A.  Well, the first question
was could I look at the information
and get a feel whether I felt that
there was something that the hospital

218

had a legitimate question of whether
or not its data submitted as
furnished to it by CMS, whether there
were any questions of the data, and I
agreed that I would look at it, and
there was a lot of stuff to look at
but based on what I looked at, it
certainly seems like the numbers were
two off; meaning that sometimes --
even in the Bay State case, if I
remember correctly, when Providers
were complaining about this and that,
and whatever, CMS' argument then was
-- and I don't think anybody really
took issue, was that argument, that
the differences were not huge; in
other words, each one of these
changes could affect by a little bit,
a couple percent maybe, but the
numbers that they were talking about
here as of -- as the data in the
exhibit shows, that we're talking
between 40 and 50 percent of a
difference in the number of days.
And that just struck me as something

219

that needs to be resolved.  It has --
obviously has a real solid impact on
the hospital, but as a policy kind of
guy, it bothered me that there was
such a big difference, and there
needs to be an answer why are the
numbers so different.
     Q.  Okay.  If you could look at
Exhibit P24.
     A.  Sure.  Okay, it's hard to
do onehanded, but I will try.
     Q.  Right.
     A.  Okay, I got it.
     Q.  Okay.  Turning first to
your review of Pomona's methodology,
what documentation did you review to
determine whether and to what extent
you could assist Pomona with efforts
to contact CMS and ultimately Social
Security Administration?
     A.  So really, the -- P24 I
believe probably consists of most of
the information that I received.  It
looks very similar, I didn't go
through each page, but it certainly

220

looks very similar, at least in
format, to the type of information I
was looking at which, again, it
boiled down to these three codes; the
10, the 20, and the 60, which -- and
this is data that -- it's not the
hospital generates, it's the
hospital's data that the hospital
gets, which is showing these aid
codes as being for patient -- for all
these patients, and it shows whether
or not they're entitled to SSI.  And
it seems to flow, if you look at this
-- the printout, which -- I forget
the name of the company, HDX, or
whatever it -- whatever these
printouts are are, which the hospital
routinely get -- and I assume it's every
hospital in California does, they
routinely get for every patient who
comes into the hospital, they get a
printout of exactly what their status
is, are they Medicare patients, how
many days they have left, and all
that kind of information is all on

221

1  this printout.  And one of the items
2  on this printout is that aid code.
3  Again, it's not something that the
4  hospital itself generates, it's
5  information that is given to the
6  hospital, and I understand that the
7  source for this information is either
8  the state or in some cases it's CMS
9  itself.  So all this input data that
10  is -- that the hospital gets, and
11  this is what the hospital used to
12  determine whether or not these
13  patients are both Medicare and SSI
14  eligible.
15      Q. Okay.  Did you review a --
16  an explanatory letter from Candice
17  LeTran, page 192, 193?
18      A. Yes.
19      Q. Did you review Medi-Cal aid
20  code information and descriptions of
21  patients who might qualify for the
22  SSI benefits...
23      A. Yes.
24      Q. ...and -- now, if we go to
25  Exhibit P27.

222

1      A. Okay, I have it.
2      Q. Did the data show for each
3  of the cost years 2006 through 2008
4  that Pomona believed that many more
5  of its Medicare Part A patients
6  qualified for SSI benefits than was
7  shown by the CMS data?  You can start
8  at page 501, which is 2006.
9      A. I'm looking at 501, which
10  is 2006.  And there you can see that
11  it shows on line 19 it shows what the
12  CMS match number is, the number of
13  patients, the number days, this is
14  4,821, and then this is a -- there's
15  a partial match, I guess, which shows
16  that maybe CMS is showing for some
17  reason only some of the days, which
18  that there may be explanations for,
19  I'm not sure.  And then there's the
20  unmatched which are totally unmatched
21  for each one of these codes 10, 20,
22  and 60, again, which is over 2,000
23  days.  In this case it's a little bit
24  less than half, I think some of the
25  other years it was closer to half,

223

1  that where these days are SSI-
2  eligible patients which CMS' MedPAR
3  SSI data does not show these folks as
4  being eligible for Medicare and SSI.
5      Q. Okay.  Did you review a
6  similar chart for each of the other
7  two years?
8      A. I did.
9      Q. Okay.  For each of the
10  years, what was the discrepancy
11  between Pomona's count of these Part
12  A patients with SSI benefits as
13  opposed to the number of such
14  patients that were counted by CMS?
15      A. Again, I think they were at
16  least 40 percent, sometimes even
17  higher.
18      Q. Okay, if you want to look
19  at -- well, we looked at 501, maybe
20  if you want to take a look at...
21      A. I'm looking at...
22      Q. ...page 518 is another...
23      A. I'm looking at 518.  518
24  you see it's even higher.  518 it's
25  showing CMS' match total as 4,000,

224

1  and CMS' unmatched total at 2,400,
2  which is over 50 percent increase.
3      Q. Okay.
4      A. So, yes, the problem maybe
5  between '06 and '07 got even worse.
6      Q. What struck you regarding
7  the size of the discrepancy between
8  the number of SSI plus Part A
9  patients identified CMS, versus the
10  number of such days identified by
11  Pomona?
12      A. I just -- it made me think
13  that there's some kind of a systemic
14  problem.  It just -- to me it's huge.
15  It's really huge.  It's not like we
16  happened to come across a certain
17  number of patients who became
18  eligible on the last day of their
19  stay, or something, I don't know.  So
20  it just seemed that it was a huge
21  difference that -- and I have no clue
22  what it is, and that's what intrigues
23  me.  I have no clue what the problem
24  is.  But to me it's just pointing to
25  that there is a real problem.  Maybe

225

it's a programming problem somehow
that's dropping -- I mean I'm making
this up, maybe everybody who has a
certain letter of the last name is an
S is dropped.  I don't know, but the
point is that this is a huge number
of cases that aren't showing up.  And
it's not the fringes, it's not like
we're talking about the fringes.
And, in fact, again, in the Bay State
case the -- each letter -- each one
is issued separately, really was
nothing in magnitude compared to this
one.
     Q.  Okay.  Based on your review
of the data obtained and organized by
Pomona, which Medi-Cal aid codes did
Pomona use to identify patients and
claims that would likely be
associated with individuals having
SSI benefits?
     A.  So clearly, Pomona took a
conservative approach and -- at least
as far as I could figure, they only
looked at the 10 to 20s and the 60s.

226

Even though it's interesting that
when Pomona matched, in other words
when they looked at the cases that
CMS actually did match, there were
14s and 64s, et cetera, that matched
as well, but Pomona felt that there
they weren't as comfortable that they
were both getting SSI and SSP, so
they didn't include them -- they
might be, but they didn't include
them, so taking a conservative
approach they only included the 10s,
20s, and 60s.
     Q.  Based on your experience
with Medicare generally, and the SSI
percentage calculation specifically,
would you expect most individuals
with aid codes 10, 20, or 60 to also
qualify for SSI benefits?
     A.  So I have to tell you, I --
before this case I knew nothing about
10s, 20s, and 60s.  Those numbers
were a new concept to me.  It's only
based on the description of what 10,
20, and 60 is that I also came to the

227

conclusion that those are patients
who are SSI-eligible, and, therefore,
if they show up in the MedPAR file as
being as receiving Medicare services
during this period, they should be on
the list.  But I can't say I knew
that a 10, 20, and 60 before this
case, that I knew that it meant
anything.
     Q.  Okay.  Going back to
Exhibit P24, the first couple of
pages, which is the letter from
Candice LeTran dated January 21,
2016, does that letter explain how
aid codes were matched to Pomona's
patients?
     A.  I believe it did.
     Q.  And referring to that
letter once again, and based on any
discussions you may have had with Ms.
LeTran, did you come to understand
the methodology that Pomona used to
seek verification by the state of
California to assure that the
appropriate aid codes had been

228

assigned?
     A.  Yes, when I understood the
size, the size of the HDX inquiries
that we see here in the attachment
here, which look like computer
printouts, Pomona went back to the
state separately and with a list of
social security numbers, I guess, for
specific patients to ask the state,
forget about all this other stuff, go
to your records and see whether
according to your records these
patients are really getting SSI, and
for each one of them, each one that
they asked for, the state confirmed,
in fact, that they were getting SSI.
I think Pomona did try to get, not
only for 2006, they tried to get for
2007 and '08, and maybe more for
2006, and at that point the state
said that oh my gosh, this is too
much work for us so we really can't
do this for you anymore.
     Q.  Based on your experience,
did Pomona use a credible methodology

229

for identifying blind, aged, and/or
disabled patients, and then coding
them as potential SSI beneficiaries?

A. Yeah.  I mean I think
Pomona used whatever they could,
meaning they -- the only thing they
wanted to use, which they obviously
weren't able to use, would be direct
input from SSA, but other than that,
anything they used was the best they
could other than that.

Q. Okay.  What types of issues
did you typically see create
discrepancies between state Medicaid
program aid code data and the CMS
database based on matching between
SSI and CMS patient data?  I'm
speaking of when you were at CMS.

A. So again, I have to tell
you again, when I was at CMS I knew
nothing about aid codes.  It was a
new concept that I learned from this
case.  And so when I was at CMS we --
all we knew at CMS was what SSA told
us, meaning that if they told us,

230

look, this is what we're giving you,
we're giving you our list of SSI
patients, then you can take this list
and crossmatch your MedPAR days and
you can do whatever you want with it.
It was only when Providers raised
certain issues, for example, well,
wait a minute, we know this patient,
and they gave the social security
number, we know that they had SSI and
they're not showing up in your list.
Well, what was determined was that
that patient had died, and since that
patient had died and the way SSA was
generating a list, any SSI recipient
who was deceased no longer was on --
showing on that list.  So after Bay
State they revised the way they were
giving CMS the data to make sure that
those type of patients didn't drop.
But as far as aid codes and -- I'm
sorry, I can't really speak to -- at
all as to how CMS thought about --
really I don't think we knew about
aid codes now.  I didn't, and

231

certainly the policy of people that I
was responsible for, we didn't.  I
can only speak for the data -- again,
the computer programming people who
were crunching this data and doing
the matches.  Maybe they did know
about aid codes.  There, I can't
speak for them.

Q. Okay.  Are you familiar
with what SSP-only patients are?

A. From what I understand they
are patients who the state is paying
-- instead of -- like we said before,
instead of the state supplementing
what the Federal Government pays them
for SSI, these patients are getting
only the supplement.  And from what I
understood, excuse me, from what I
understood, the reason why that could
be is because there could be some
patients -- excuse me, some
recipients who exceeded the federal
level of income and, therefore, no
longer qualified for the federal SSI
payment, but still fell below the

232

state, which is a higher threshold,
that the state threshold for getting
SSP and, therefore, would receive
just the SSP benefit.

Q. Okay.  What in your opinion
is the likelihood that SSP-only
patients explains the entire, you
know, 40 or 50 percent difference in
CMS' count of SSI plus Part A
patients and Pomona's count of such
patients?

A. Okay.  So that was
something I definitely did discuss
with the hospital, and I think at one
point I was given a data point which
was that, at least as far as
statewide, the percentage of SSI
recipients who were getting SSP only
is somewhere between 14 to 15
percent.  That being the case, to
assume that the -- Pomona just
happened, happened year after year,
to have the treating patients who are
three times, whatever, maybe more,
the statewide average of SSP-only, it

233

defies logic.  It -- I mean I can't
say it's impossible, but certainly
it's not something I would expect to
find, unless, again, you know, SSA
really went through their records and
pulled all the records that they're
talking about, each one of the ones
you told us, they're not getting SSI,
they're getting SSP only.  Okay,
then, you know, sloopier [sic] things
happen.  And data, maybe it's true,
if I had to -- from an analysis
perspective, from a policy analysis
perspective, to say, well, I assume
that the problem really is all these
probably non-matched patients are
SSP-only, it's so unlikely.  It's so,
so unlikely.
      Q.  What conclusions did you
reach regarding the accuracy of the
CMS count following your review of
Pomona's methodology, and the
discrepancy between -- I'll just
leave it at that.  What conclusions
did you reach regarding the accuracy

234

of the CMS count following your
review of Pomona's methodology?
      A.  The conclusion I came to
was that there's a problem here, or
at least a question here, and it's a
question that begs for an answer,
meaning that the state seems to have
done -- I mean, excuse me, the
hospital seems to have done its due
diligence by speaking to this case,
and seems to have a very good basis
for assuming -- they're assuming that
these patients truly are SSI
patients.  Now, ultimately, it needs
work.  Somebody needs to be able to
go to SSA and get SSA to pull the
specific records that we're talking
about, these -- for these specific
patients, to see what it is that the
SSA's records are showing maybe
before the fact, after the fact,
something, to find out why is it that
the state records, which is what
Pomona is using, is showing them as
being SSI and Medicare's are not.

235

Now, I think I even made the point
when I spoke to CMS staff, and that
was that really from my discussions
with Pomona's folks, I was very
impressed with them in that they want
an answer.  Is the answer proves to
be, in fact, that your -- CMS'
numbers are correct and here's why
they're correct, they'll live with
that, that's fine.  But right now,
it's a very big question that begs
for an answer.
      Q.  Did you represent Pomona in
submitting a data sample to CMS?
      A.  I did.
      Q.  What documentation did you
submit to CMS?
      A.  I think all the same
documentation that Pomona gave to me.
I shared with them with CMS staff and
showed them the same things that
Pomona showed me really as to where
they were getting their information
from, and a list really of the social
security numbers of the, I'll call it

236

random sample.  This is definitely a
sample, a sample of SSA -- of social
security numbers of the patients that
it believes are SSI-eligible, which
CMS' data did not show, and asked CMS
could they pursue with Social
Security Administration to get to the
bottom of this problem.
      Q.  Okay.  Were you satisfied
that this was a representative sample
of the patients Pomona claimed as
having SSI benefits, but which CMS
has not shown as SSI beneficiaries?
      A.  I'm not a statistician, and
I know when statisticians through any
examples they have like these charts
of random numbers or whatever, but to
me, what they did was they just
randomly went, and I think they
picked every fifth so, or tenth, I
forget which, number on the list and
used them.  And to me, that was
certainly an unbiased way of just
picking random numbers.  Now, whether
statistically that would prove in a

00397

237

court as a statistically valid random
sample, I don't know about that, but
it certainly was a valid basis of
going to SSA and seeing if we can get
to the bottom of this.
        Q.  Okay.  Are you familiar
with a letter, it appears in Exhibit
24, it's page 195 through 197, from
Stan Rosenstein to Mark Hardstein
[ph]?
        A.  I -- yes, I believe I --
I've got a copy of it.
        Q.  Okay.  Did Mr. Rosenstein
make any representations in that
letter which supported the
authenticity of the records that
Pomona was asking CMS and SSA to
review?
        A.  Correct, yes, he did.
        Q.  All right.  Did you
ultimately meet with CMS
representatives?
        A.  I did, I believe a few
times, and the first few times -- I
think the first time I went I -- it

238

was with a little bit of -- a little
bit skeptical, but they did agree
that it was something they would look
at, or at least look into, and -- but
I subsequently met with them a couple
of times and each time I came away
with a feeling that although they --
at least at first, at first they
certainly were really sympathetic to the
hospital saying that, gee whiz, it
seems like they are really stuck in a
-- you're at a quagmire between SSA
and CMS, and certainly a horrible
feeling but they could sympathize
with that and they would see what
they could do.  At the end, the last
person I spoke to there at CMS, the
impression I got was that we can't --
we really can't pursue this the way I
would have liked them to do, and it's
basically a workload issue, meaning
they felt that DSH issues are not a
rare issue, meaning hospitals all
over the country, there are well over
1,000 DSH hospitals -- over 2,000,

239

and they always have issues with
their numbers, and if CMS would start
a -- of saying that, well, if you
come in to me, we'll go in to SSA and
start looking at -- pulling data,
your specific data, they just felt
that that would be an issue that they
just couldn't deal with from a
workload and a manpower perspective.
So their answer really was that,
look, we can't do that, we're sorry,
their proper avenue for appeal is to
go through the Board.
        Q.  So CMS recommended that we
proceed through the appeal process.
        A.  Correct.  I mean originally
when I came to CMS I -- my argument
-- my question to them was that when
I was at CMS I always felt that if we
could resolve administratively to get
to the bottom of an issue, it saves
everybody, everybody.  I mean the
Provider, the agency, everybody, a
lot of time and effort, so let's see
if we can resolve this issue and that

240

you -- and the Provider -- the
hospital would not have to go to the
Board or to court.  And they seemed
sympathetic.  They seemed to
understand, yes, that really is in
everybody's best interest.  But that
definitely changed over time.
        Q.  Okay.  What -- at what
level of, you know, manager or
director were you dealing with at
CMS?
        A.  Well, first I dealt with
really the person who replaced me as
the director of -- care, and later
when that person was, I guess,
promoted there was an acting director
of the division, I dealt with that
person.
        Q.  So...
        A.  And also, of course, the
analysts who worked on DSH
themselves.  It was always both of
them together.
        Q.  So did you feel that you
were speaking to officials who had

00398

241

1   the authority to proceed with this if
2   they chose to?
3        A. Yeah, the reason for that
4   is, in fact, when the Bay State
5   decision was finalized, it really
6   fell into our group and our area to
7   work with SSA to come up with a
8   "better file" from SSA. It really --
9   at that time it was the -- I think
10  the SPD or I forget, either the
11  deputy group director or the acting
12  group director, whatever, who was the
13  negotiator with SSA. So that person
14  was no longer with the agency so I
15  couldn't deal with him, but there
16  were other people who could have, I
17  guess, said, well, since that person
18  -- maybe we could follow up and do
19  more of the same, working with SSA.
20  But it proved to be much harder than
21  anybody thought it would be getting
22  SSA to work with them.
23       Q. Okay. Did representatives
24  of Pomona discuss with you additional
25  efforts to get CMS to transmit a 30-

242

1   record sample to SSA for review?
2        A. Yeah, in fact, I think at
3   one point I recommended that they get
4   congressional involvement, whether
5   it's at the Senate level or at the
6   House level, because usually, usually
7   the agency, both SSA, I thought, and
8   CMS, responds much more quickly and
9   effectively when there is
10  congressional interest. And, in
11  fact, I think they got Senator
12  Feinstein's office involved and maybe
13  another congressperson involved, and
14  even with their involvement it didn't
15  seem to work.
16              ***
17  MR. GETZOFF:
18       I have no further questions.
19  THE CHAIRMAN:
20       Thank you. Mr. Olszewski, do
21  you have cross examination?
22  MR. OLSZEWSKI:
23       I do, very, very brief.
24  THE CHAIRMAN:
25       Please proceed.

243

1              ***
2          CROSS EXAMINATION
3   BY MR. OLSZEWSKI:
4        Q. Mr. Hefter, I don't want to
5   misquote you in your testimony, but I
6   believe you might have made a
7   misstatement. Regarding the aid
8   codes 10, 20, and 60, I believe you
9   testified the Provider gets these
10  codes from the state or maybe CMS.
11  Did...
12       A. No, no, no, no, no. HDX.
13       Q. HDX?
14       A. Yes.
15       Q. Thank you. Did you enter
16  into an agreement with the Provider
17  to review all the documents and
18  testify today?
19       A. Sure.
20       Q. Was that agreement a
21  written agreement?
22       A. I believe it was, yes.
23       Q. Okay.
24       A. I mean I -- at the time, I
25  don't know if the original agreement

244

1   talked about testimony, but it
2   definitely -- I definitely had an
3   agreement that we went into where I
4   agreed to review and get involved in
5   this issue.
6        Q. And in return for your
7   review and getting involved with the
8   issue, was the Provider paying you?
9        A. Yes.
10       Q. And that agreement that you
11  had with the Provider, is it -- is
12  there any contingency in there based
13  on the outcome of this case?
14       A. No.
15       Q. And do you have any -- did
16  -- strike that. Did anybody ask you
17  for a copy of that agreement so they
18  could offer it as an exhibit today?
19       A. Not that I recall.
20              ***
21  MR. OLSZEWSKI:
22       That's all I have. Thank you.
23  THE CHAIRMAN:
24       Okay. Any redirect, Mr.
25  Getzoff?

245

MR. GETZOFF:

No.

THE CHAIRMAN:

We'll move to Board questions.
Ms. Benson?

MS. BENSON:

Yes.  Thank you for your
testimony, Mr. Hefter.  You
stated that you were working
with, I'll say people at CMS
who I believe you said
actually initially tried to
work with SSA to get
information, and that proved
difficult, and then they --
and I'm trying to figure out
-- I mean it sounds like you
said they tried to, it became
difficult, and then you said
earlier that CMS really didn't
want to pursue it because it
would be too costly because of
the number of providers that
could come in, you know, this
wouldn't be the only Provider

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

246

that might have this type of
situation.  So like did SSA
refuse to give the information
or was there like a change in
the minds of CMS partway
through the process?  I'm just
trying to figure out if it was
SSA who said, no, we're just
not doing this, it's too
costly, or if it was CMS that
said, well, we started this
process but we now don't think
it's a good idea anymore.

MR. HEFTER:

So I believe it's more of the
latter, meaning the -- at
first it was definitely a
problem even finding somebody
at SSA, I believe -- this is
the impression I got, there
was a problem finding somebody
at SSA who would be willing to
work with CMS to address this
issue.  And I think at the
staff level that was proving

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

247

to be very difficult.  And --
but I'm saying over time there
were different people
involved.  At one point I
think maybe SSA said, okay,
but, you know, we'd only deal
with CMS, and I think there's
probably a data use agreement
that CMS has with SSA, and if
you want -- I'm guessing -- I
may be guessing -- maybe more
than -- maybe less than a
guess, I'm not sure, but they
probably would want more money
from CMS to do extra runs, so
that could have been an issue
as well.  But ultimately,
ultimately, the last
impression I had clearly from
different people that were
involved at the CMS position
level was that we really can't
do this, we can't because of
the workload and the manpower
issue.  We just can't.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

248

MS. BENSON:

Okay, thank you.  Do you know
any other time in the past
when CMS has calculated an SSI
fraction outside of their
ordinary process, going and
looking at different data and
actually coming up with, I'll
say a different SSI fraction
outside the methodology they
usually use?

MR. HEFTER:

No.  So here what's really
unique, really, really, unique
about this situation here, CMS
published a rule which
basically says, look, this is
how we're going to come up
with the data which -- and it
was very clear as far as, I
guess -- how we were going to
do this, meaning they -- for
example, prior to the court
case, there were really two
data runs that CMS was getting

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

249

from SSA, and CMS was only
using the first data and not
the second data, where the
second data really was more
accurate.  So CMS said, look,
we're going to propose a
finalized -- a rule, I think
it was in 2010, 2011, which
was going to say this is the
data we're going to use.  And
CMS feels, and still feels,
that we have a proposed a
final rule and it says that
this is what we're going to
use.  Really, right, wrong, or
indifferent, that's the best
data that we have available at
the time, and this is the data
we're going to use.  And,
therefore, they don't feel
that there's any need to
address this issue.  Now, what
CMS is not addressing is that,
okay, but there could be a
data problem here and all

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

250

we're doing now is
perpetuating it forever by not
looking into it.  And that
part isn't being addressed by
CMS.
MS. BENSON:
    Okay, thank you very much.  I
    don't have any further
    questions.
THE CHAIRMAN:
    Mr. Ahern?
MR. AHERN:
    Yes.  Thank you for your
    testimony.  I've read some of
    the things you've written, so
    now I've heard you through the
    phone, and someday I might
    even get to meet you face-to-
    face.  So...
MR. HEFTER:
    My pleasure.
MR. AHERN:
    ...I certainly appreciate your
    input over the years,
    especially in the GME world.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

251

So in terms of this morning,
did you hear Ms. LeTran's
testimony?
MR. HEFTER:
    I heard much of it -- I should
    say parts of it.  I don't know
    how much I missed, so I
    definitely heard parts of it.
MR. AHERN:
    Well, I'm going to represent
    to you, and tell me if you
    heard this, that she said what
    got her into chasing the SSI
    percent were unexplained
    variances of up to 12 percent,
    and I took that as not 12
    percent of the SSI percent,
    but a variance within the SSI
    percent of 12 percent, and
    significant variances.  Did
    you hear that testimony?
MR. HEFTER:
    I think I did.  I heard that
    -- but I didn't really
    memorize the number she used,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

252

but I do remember her saying
that what intrigued her was --
made her think that something
weird is she saw significant
changes from year to year in
the DSH percentage.
MR. AHERN:
    Okay.  So that said, we're
    talking about significant
    financial impact and
    significant variance in the
    SSI percent which did not
    track to her payer mix
    experience, which was
    relatively stable from year to
    year.  So with that background
    and accepting that to be more
    or less accurate, you
    mentioned the SSI-only percent
    state average, do you think
    that could account for the
    variance from year to year...
MR. HEFTER:
    So...
MR. AHERN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

253

...given what knowledge you
have of that issue?

MR. HEFTER:

That's why I said before, the
number that I heard from the
state was that statewide the
SSP, the state-only payment,
is about 14 percent of the
total number of the folks that
are getting SSI.  So it's
possible, I can't say -- I
will not say it's impossible
that the variance is totally
due to that, but it's so
unlikely that we're talking
about that many tend to fall
into Pomona's hospital, it
just doesn't make sense.  It
really -- that means like we
were saying before, again,
these are patients whose
income falls just between the
federal max for getting SSI
and the state max for getting
SSI.  I think maybe 1,000 or

254

$2,000 difference between the
two.  It's so unlikely that
for some reason Pomona happens
to be located in an area where
they -- where there's three
times the statewide average of
those kinds of patients.  I
won't say it's impossible,
it's -- no, it's not
impossible.  Is it likely?
Not very likely at all.

MR. AHERN:

So that said, we've heard the
14 percent number, and it's
being used in a calculation,
and this is a question to you
but maybe Counsel can respond
if perhaps that's more
appropriate, but is there a
solid source for that number?
You said you've heard and you
talked to, and those are all,
you know, perfectly legitimate
ways to get information, but
when you're using it in a

255

calculation it seems you might
want to have a solid source or
a documented source.  Is --
can you give us some sense of
your source for that number?

MR. HEFTER:

So my source for this number
was I think one of your
witnesses today, Mr., is it
Rosenstein, who used to work
for the state.  I think he was
the person in charge of this
area.  So if he tells me that
statewide it's 14 percent or
so, I mean I took that as a
pretty good number.

MR. AHERN:

And, fortunately, we have Mr.
Rosenstein here, and we will
have the pleasure of hearing
his direct testimony, so we
will talk to him about that.
And I have no more questions.

MR. HEFTER:

Thank you.

256

THE CHAIRMAN:

Mr. Ziegler?

MR. ZIEGLER:

Okay.  Thank you, Mr. Hefter,
for your testimony.  You
probably don't remember me but
I know -- I've had contact
with you when I had worked at
a hospital before, but that
was quite some time ago.

MR. HEFTER:

I hope I was fair.  I hope I
was fair.

MR. ZIEGLER:

Yeah.  Question for you.  I
guess, what is your
understanding of SSP?

MR. HEFTER:

To me, from what I understand,
SSP is the state of
California, in this case,
contributes money to
supplement -- in most cases,
to supplement the amount of
money that the Federal

00402

257

Government normally pays for SSI. In fact, in that case, I think the recipient gets one check, one check from Social Security Administration, which includes both the federal SSI amount and the state supplement amount, and I think the state, in fact, pays an additional administrative fee for doing that. And obviously, that's something that the state will want specific information from the Social Security Administration before it pays it money. It wants to make sure that it's going to folks who are getting SSI. In addition...

MR. ZIEGLER:
Okay.

MR. HEFTER:
In addition, there are also, as we said before, there are some recipients in the state

258

who are only getting the state supplement, and for some reason they're not entitled, and I'm assuming the reason why they're not entitled is because they're over the federal max -- income max, they don't get the federal SSI payment.

MR. ZIEGLER:
Okay. Here's where my confusion comes in, and I don't know if you can answer this or not, but the SSP and the SSI in theory should be synonymous because they're attaching this SSP payment to the SSI payment. And evidently, that's being administered through SSA somehow. Is that your understanding?

MR. HEFTER:
When -- certainly, when there -- when they are administered

259

-- when the patient is getting both, when the patient is getting both SSI and SSP, certainly, I understood that it's being administered by -- being paid by -- I mean the check is being cut by SSA. I don't know -- I just don't know whether that's true as far as who cuts the check when it's SSP-only. I don't know.

MR. ZIEGLER:
But they're pretty much synonymous, is that how you understand it, SSP and SSI? If they're getting SSI payment, they should be getting an SSP payment.

MR. HEFTER:
If you're getting SSI, you should be getting SSP, correct.

MR. ZIEGLER:
Okay.

MR. HEFTER:

260

If you're getting SSP, you might not be getting SSI, but yes, if you're getting SSI, you should be getting SSP.

MR. ZIEGLER:
Okay, you said you could be getting SSP but not SSI.

MR. HEFTER:
Correct.

MR. ZIEGLER:
Okay, so they're not synonymous. Okay. So evidently, whatever the threshold is for SSP, it's a lower threshold...

MR. HEFTER:
Higher. Higher.

MR. ZIEGLER:
...to qualify?

MR. HEFTER:
Higher. Higher. Higher. You can make more...

MR. ZIEGLER:
Higher, okay.

MR. HEFTER:

261

...money.

MR. ZIEGLER:

Okay.

MR. HEFTER:

You can be making more money
and still qualify under the
state's SSP, but still -- but
then at that point you're
making too much for the
federal threshold.

MR. ZIEGLER:

Okay.  And this is another
clarification, I think you did
respond to this, but the codes
-- the 10, 20, and 60 codes,
the -- are they coming from
the government, or are they
coming from SSA, how does
Medi-Cal get those codes?

MR. HEFTER:

So I don't know -- I really
don't know.  I don't know
whether -- in fact, I suspect
the answer is no, but I don't
know whether SSA also uses the

262

same code, meaning 10, 20, 60,
those number, whether they
actually use those numbers, or
they use some other kind of a
code, some other kind of
number, which the state
converts to 10, 20, 60.  I
don't know.

MR. ZIEGLER:

Okay.

MR. HEFTER:

But whatever it is, it -- the
10 definitely identifies SSI
patients who are over 65, the
20 who are, I think blind, and
the 60 who are disabled.

MR. ZIEGLER:

Okay.  And I guess Mr.
Rosenstein will probably know
that.  So you were with CMS
after the Bay State case, so I
guess the question -- well,
let me ask you this.  During
your time at CMS, did you used
to get any questions related

263

to large variances in the SSI
from one year to the next?

MR. HEFTER:

I don't remember.

MR. ZIEGLER:

Okay.

MR. HEFTER:

Let's see, did we get
questions of high variances?
We had -- I think it was more
tied to issues than to
numbers, meaning...

MR. ZIEGLER:

Okay.

MR. HEFTER:

...people would come to us and
say we looked at the list of
patients who -- from CMS'
data, or who are both getting
SSI and showing up on our
MedPAR file, and we believe
you're not including a certain
kind of a patient.  And they
would come to us and say that
we believe, let's say for

264

example, the reason why you're
not showing this patient is
because they're really
qualifying for Medicare under
their second husband's social
security number, and they're
getting SSI under their own
social security number,
therefore, it's not showing
up, or something like that.
So it wasn't so much that the
numbers we -- I used to deal
more with the issues
themselves.  And how they came
about to identify them,
whether or not there were a
lot of patients that showed up
with, you know, with that
problem or not, I don't
remember that I was aware of
the numbers.

MR. ZIEGLER:

Okay.  That's all my
questions.

THE CHAIRMAN:

265

Okay.  Thank you again, Mr.
Hefter, for your testimony.
Have had the pleasure of
seeing your name come across a
number of different times in
different Board hearings from
correspondence and rulings, et
cetera, so pleasure to have
you here testifying by
telephone.  I just had this
quick sort of follow-up
question on the 14 percent
from the state.  Do you know
how that number is calculated
or what that's sort of based
on?  I think you had indicated
it was sort of like a
percentage of patients or -- I
say patients, a percentage
of...

MR. HEFTER:
    Recipients.

THE CHAIRMAN:
    ...recipients, just -- so it's
    just a simple raw number of

266

state-only recipients versus
recipients who were receiving
some combination of SSI and
SSP.

MR. HEFTER:
    Correct.  That's the
    impression that I'm under
    that's where the data came
    from.

THE CHAIRMAN:
    Okay.  Do you know if that
    number is actually in the
    record?

MR. HEFTER:
    I mean I don't think the
    derivation of it is.

THE CHAIRMAN:
    Okay.

MR. HEFTER:
    There may be a mention of the
    14 somewhere in the record,
    but how...

MR. GETZOFF:
    It is.

MR. HEFTER:

267

    ...how...

MR. GETZOFF:
    Yeah.

MR. HEFTER:
    But how the 14 came -- was
    determined, I'm not sure
    that's in the record.  Might
    be.

THE CHAIRMAN:
    Okay.  I guess that's -- Mr.
    Rosenstein will...

MR. GETZOFF:
    Yeah, it's P37 is...

MR. HEFTER:
    Correct.

THE CHAIRMAN:
    Okay.

MR. GETZOFF:
    Yeah.

THE CHAIRMAN:
    Great.  That's all the
    questions I had.  I guess
    based on the Board's
    questions, is there any
    redirect, Mr. Getzoff?

268

MR. GETZOFF:
    No.  No, there's not.

THE CHAIRMAN:
    And, Mr. Olszewski, do you
    have any additional questions
    based on the Board questions?

MR. OLSZEWSKI:
    No, other than based on
    Counsel representing that P37
    represents the 14 percent that
    you were asking about, I don't
    see that in the record, but
    no, no questions.

THE CHAIRMAN:
    Okay.  I understand that Mr.
    Rosenstein will be addressing
    that.  I guess at this point
    that concludes your testimony,
    Mr. Hefter.  And we'll go off
    the record.
                ***
[Off the record]
[On the record]
                ***
THE CHAIRMAN:

269

```
1           Let's go on the record.  Mr.
2      Getzoff, you can call your
3      next witness.
4  MR. GETZOFF:
5           Okay.  The Provider calls Stan
6      Rosenstein to the stand.
7  THE CHAIRMAN:
8           And before you are seated,
9      I'll have you raise your right
10     hand.
11                  ***
12 [Witness sworn]
13                  ***
14 THE CHAIRMAN:
15          Thank you, please be seated.
16     And please proceed with your
17     direct examination, Mr.
18     Getzoff.
19                  ***
20          STAN ROSENSTEIN,
21 having been first duly sworn, was
22 called as a witness herein and was
23 examined and testified as follows:
24                  ***
25          DIRECT EXAMINATION
```

270

```
1  BY MR. GETZOFF:
2           Q.  Good afternoon, Mr.
3  Rosenstein.  What is your current
4  occupation?
5           A.  Good afternoon.  I am
6  currently a healthcare consultant
7  specializing predominantly in
8  Medicaid issues.
9           Q.  Pursuant to your resume,
10 which is included as Exhibit P33,
11 starting on page 581, you indicate
12 that you have worked at the
13 California Department of Healthcare
14 Services, or its predecessor, since
15 about 1977.
16          A.  That's correct, about 31
17 years.
18          Q.  Is the California
19 Department of Healthcare Services the
20 state agency responsible for
21 administering California's Medi-Cal
22 program?
23          A.  Yes, it's a single state
24 agency responsible for Medicaid in
25 California, called Medi-Cal.
```

271

```
1           Q.  Looking at your CV, it
2  indicates that you were a section
3  chief for various sections from
4  November 1983 to April 1986.  Can you
5  describe your positions and duties
6  during that time?
7           A.  Yes, I was responsible for
8  various components of the design and
9  implementation and operation of
10 what's called the California Medicaid
11 Management Information System.  The
12 Medicaid Management Information
13 System is a federally required system
14 that's got six subsystems and it
15 operates both computer programs as
16 well as the manual processes around
17 predominantly to pay claims, but it
18 does -- among its subsystems is
19 what's called the recipient subsystem
20 who -- which is responsible for
21 maintaining information on everybody
22 enrolled in the Medicaid program,
23 Medi-Cal in California, and providing
24 Providers with that information.  And
25 I was actually the manager in charge
```

272

```
1  of the design of the recipient
2  component of that subsystem.
3           Q.  Your CV then indicates that
4  from April 1986 to July 1993, you
5  were the executive project director
6  for the Medi-Cal procurement project.
7  Can you describe your position and
8  duties during that time?
9           A.  Yeah, there were two
10 predominant responsibilities I had.
11 One was I managed the rebid of the
12 fiscal agent who operates the claims
13 processing system, the Medicaid
14 Management Information System.  Part
15 of that was also the implementation
16 of a large number, 54, enhancements.
17 And the enhancement that's relevant
18 to this case is I was the manager
19 responsible for implementation of
20 what's called the Automated
21 Eligibility Verification System,
22 which is the system that provides
23 information to Providers on who is
24 eligible for Medi-Cal.
25          Q.  Okay.  The CV goes on, from
```

273

February 1993 to October 1996 you
were the division chief of the
payment systems division.  Can you
describe your position and duties
during that time?
     A.  Yes, that was the -- I was
the manager of the overall division;
one of four divisions in the Medicaid
program.  And I was responsible for
all of the systems operations for the
Medi-Cal program related to claims
processing, eligibility,
verification, providing eligibility
information, so everything related to
Providers getting paid, Providers
getting eligibility reported to me.
I also had a few other programs that
are not really relevant to this case
that I was responsible for.
     Q.  And from October 1996 to
June 2007 you held various titles,
appearing as acting deputy director,
assistant deputy director, and deputy
director of medical care services.
Can you describe your positions and

274

duties during that time?
     A.  Yeah.  Over a course of 13
years, I was either the deputy
Medicaid director or the Medicaid
director California, and the Medicaid
director is the person responsible
for the administration of the entire
Medicaid program in California, Medi-
Cal.  So I was either during that
time the Medicaid director or the
number two person.
     Q.  From July '07 to December
'08 you were the chief deputy
director of healthcare programs.  Was
this different than your prior
Medicaid director duties?
     A.  Slightly different.  The
department reorganized.  We split
from -- into a separate department,
so I changed job titles and remained
the Medicaid director.  I also picked
up some responsibility for some other
healthcare programs that are not
Medicaid, and really unrelated to
this case, but predominantly I was

275

still the Medicaid director.
     Q.  Okay.  Did you serve as
Medicaid director during the fiscal
years at issue in these appeals: 2006
through 2008?
     A.  Yes, I did.
     Q.  Did you have supervisory
responsibility over the policies of
the Medi-Cal eligibility system?
     A.  Yes, I was a -- the Medi-
Cal eligibility division reported to
me, and I was responsible for
establishing policies on who was
eligible for Medi-Cal, who -- you
know, what was the criteria for
eligibility, creation of new
programs, the establishment of what's
aid codes which are basically
categories of eligibility under the
Medi-Cal program.
     Q.  For how long did you have,
we'll call it operational authority
over the eligibility system?
     A.  Thirteen years.
     Q.  Okay.  Can you describe

276

your experience and leadership with
Medicaid on the national level?
     A.  Yes, I had a two-measure
involvement in Medicaid.  You know, I
was Medicaid director, you know, I
was heavily involved with, you know,
all aspects of the Federal
Government.  And then the last four
years of my tenure I was an officer
with what's called the National
Association of State Medicaid
Directors.  I ended up being the vice
chair of that Association, and that's
the arm of the state Medicaid
directors that work with CMS, work
with Congress on establishing Medi-
Cal -- or Medicaid policy, Medicaid
rules, just the overall involvement
of the creation of the -- how the
Medicaid program worked.  I did such
things as I headed up the state's
effort to work with CMS on system
problems they were having on the
implementation of the Medicare Part D
program, for example.  I worked

00407

277

closely at that time with Secretary
Leavitt on that issue, and I was
involved in virtually every major
Medicaid policy issue for, you know,
the last 13 years of my state tenure
at a national level.

Q. And what is your
educational background?

A. I have a -- other -- I'm
sorry, let me finish one...

Q. Sorry.

A. ...more part of that. I
forgot to mention the second part of
my responsibility for when I was the
division chief over payment systems
division, I was running what was
known as the system development TAG,
technical advisor group. And that
was a group of people who provided
advice to CMS on various issues, and
my area was the computer systems, the
Medicaid Management Information
System. So I provided them with
background recommendations on how the
computer systems and -- systems were

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

278

on and should work on Medicaid. As
for my educational background, I have
a Master of Public Administration
from the University of Southern
California, and a Bachelor's from the
University of Iowa.

Q. Okay. During your tenure
at Medi-Cal were you involved in the
state process for obtaining SSI and
SSP data from the Social Security
Administration?

A. Yes, I was. California
has, among a number of states, a
contract agreement with the Social
Security Administration to provide
automatic Medicaid eligibility to
anybody on the SSI program. And part
of that is to have the Social
Security Administration administer
for the state the eligibility and
payment for the SSP program, the
Supplemental State program. So I was
involved in that process. The
program was established years before
I actually started working for state

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

279

government, it was probably back in
the '70, before 1977, but I was
involved in that program, worked
closely with both CMS and Social
Security Administration during my
tenure with the state.

Q. Okay. What is the
California Medicaid Management
Information Systems, MMIS?

A. It's a set of computer
programs and manual processes that
constitute the system to manage the
program to pay providers, pay claims,
manage who becomes eligible for the
program, reciprocal of who becomes an
enrollee, and it provides information
to providers who -- on who is
eligible. It also has four other
subsystems, a couple of reporting
subsystems, management of who
providers are, and management of
various reference files like, for
example, what drugs that the program
covers. So it's all of the
management of the computers and

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

280

programs that make the program work,
including eligibility verification,
maintenance of eligibility.

Q. Okay. And what is the
Medi-Cal Eligibility Data System,
MEDS?

A. The Medi-Cal Eligibility
Data System, called MEDS, is the
statewide database that receives all
information on eligibility for the
Medi-Cal program. Medi-Cal has a
number of entities who determine
eligibility for who's eligible for
Medi-Cal. Social Security
Administration determines it for
people on SSI and SSP. The carriers
in California determine it for most
of the people. And there's some
eligibility state determination. All
of those entities determine
eligibility and they send the state
computerized files, and the state
maintains the system -- the
information on the MEDS system.

Q. Okay. What is the Medi-Cal

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

281

1   Automated Eligibility Verification
2   System, AEVS, that you've mentioned?
3       A.  The AEVS is a set of
4   systems that allow providers, through
5   a number of ways, to find out who is
6   eligible for Medi-Cal.  Medi-Cal
7   issues a lifetime plastic card to its
8   members; everybody, including people
9   on SSI.  And that card has got some
10  really basic demographic information,
11  but it doesn't tell you who -- is the
12  person eligible this month and under
13  what conditions.  The AEVS system is
14  a system that providers access Medi-
15  Cal through its fiscal agent to get
16  information from MEDS that tells them
17  who is eligible this month, is your
18  patient eligible, and then what are
19  the conditions of eligibility.  And a
20  big part of that is what aid code
21  does the person have on that given
22  month.
23      Q.  Okay.  Were these systems;
24  MMIS, MEDS, AEVS, in operation during
25  the fiscal years at issue; 2006

282

1   through 2008?
2       A.  Yes, they were.  They were
3   -- they've been in operation for
4   decades now, and they were in
5   operation during that period.
6               ***
7   MR. GETZOFF:
8           Okay.  At this point, Mr.
9       Chairman, I would like to ask
10      the Board to accept Mr.
11      Rosenstein, whose expert
12      report is at P34, to be
13      accepted as an expert witness
14      on certain points, which
15      I'm...
16  THE CHAIRMAN:
17          What are those points?
18  MR. GETZOFF:
19          The Medi-Cal program, the
20      Medi-Cal eligibility systems,
21      the interface with and use of
22      SSI and SSP data by Medi-Cal
23      for determining eligibility,
24      how California obtains SSI and
25      SSP information from the

283

1           Social Security
2       Administration, and the Medi-
3       Cal aid code system.
4   MR. OLSZEWSKI:
5           The MAC objects.
6   THE CHAIRMAN:
7           To all or any portions?
8   MR. OLSZEWSKI:
9           To all, especially offering
10      this witness as an expert.
11      I'd like the opportunity to
12      cross examine before the Board
13      makes a determination.
14  THE CHAIRMAN:
15          Okay.  Mr. Getzoff, do you
16      have objection to the cross
17      examination, or...
18  MR. GETZOFF:
19          I think it's, you know -- Mr.
20      Olszewski has had the expert
21      report for a month and has
22      never -- I offered to discuss
23      any issues such as this prior
24      to the hearing, he made no
25      effort whatsoever to bring

284

1           this up.  I would have happily
2       started that process at the
3       beginning of Mr. Rosenstein's
4       testimony, but I think it
5       seemed appropriate to allow
6       Mr. Rosenstein to continue
7       with his direct testimony, and
8       if Mr. Olszewski wishes to
9       cross examine, he's certainly
10      welcome to.
11  THE CHAIRMAN:
12          Okay.  We'll allow you to
13      cross examine to determine the
14      nature of your objections.
15  MR. OLSZEWSKI:
16          Thank you.
17              ***
18          CROSS EXAMINATION
19  BY MR. OLSZEWSKI:
20      Q.  Mr. Rosenstein, have you
21  ever testified as an expert before?
22      A.  Yes, I have.  I've been an
23  expert witness a number of times now.
24      Q.  In what type of forums or
25  venues?  Court systems, Board

285

1   hearings, where have you been an
2   expert?
3       A.  I've been an expert in
4   Board hearings.  I've been an expert
5   in court actions, although at this
6   date none of those have actually gone
7   to court, but I served as an expert
8   on a number of court cases but I
9   haven't actually testified in court
10  yet...
11      Q.  Okay.
12      A.  ...on those, but on Board
13  actions.
14      Q.  So you've not actually
15  testified in any court cases as an
16  expert, but you have in Board cases?
17      A.  That's correct.
18      Q.  Okay.  And what type of
19  Boards were those, if there was more
20  than one?
21      A.  There were -- it varied.
22  Some of them were employer-employee
23  cases, some of them were disputes
24  between health plans and providers.
25  The cases I did with the Federal

286

1   Government, I served as an expert for
2   the U.S. Department of Justice on the
3   entire Medicaid program.
4       Q.  So did you actually testify
5   in those Board hearings?  What was
6   the name of the Board?
7       A.  I'm not sure -- I don't
8   have them in front of me.  One was
9   Employment Relations Board a few
10  years back.  I don't have the names
11  right in front of me, I didn't bring
12  that.  I'm sorry.
13      Q.  Do you happen to have any
14  of the case numbers...
15      A.  Not...
16      Q.  ...with you?
17      A.  Not here.  I mean I have
18  them back in my office, but...
19              ***
20  MR. GETZOFF:
21      I fail to see the relevance of
22      the case numbers that Mr.
23      Rosenstein has testified in.
24      He's -- as a former director
25      for a long time of the

287

1       Medicaid program, the issues
2       that we have asked he be
3       accepted as are very narrowly
4       drawn, and they're drawn
5       completely within his
6       expertise is probably greater
7       than anyone else in the
8       country right now on those
9       particular topics.
10  MR. OLSZEWSKI:
11      In response to that, the MAC
12      would not object to this
13      witness as being offered as a
14      witness.  The label expert is
15      what the objection is for, and
16      that's where my cross
17      examining -- examination is
18      going.  He's never testified
19      in court -- and I've only
20      asked two questions so far.
21      He's testified before one
22      Board that he can name, has no
23      case numbers, has not
24      testified in court yet, but
25      has worked as an expert on

288

1       some cases that might lead up
2       to court.  So I have a string
3       of questions to go through,
4       but if he wants to be -- I'll
5       accept him as an opinion
6       witness, but not an expert
7       witness -- or, I'm sorry, a
8       lay witness, not an expert
9       witness.
10  THE CHAIRMAN:
11      Okay.  In -- and I wanted to
12      sort of pause for a second
13      just to get some history here.
14      Did -- was -- I know that as
15      part of the Board procedures,
16      a witness list is supposed to
17      be submitted in advance to the
18      Board in advance of the
19      hearing, and that includes
20      identification of witnesses
21      that are proposed to be expert
22      witnesses.
23  MR. GETZOFF:
24      Yes.
25  THE CHAIRMAN:

289

1    And I didn't know if that
2    witness list designated...
3  MR. GETZOFF:
4    It did.
5  THE CHAIRMAN:
6    Okay.
7  MR. GETZOFF:
8    And we submitted the expert
9    report 30 days ahead of time,
10   as required.
11 THE CHAIRMAN:
12   Okay.  And the points of -- I
13   guess the four -- I think you
14   had listed four different...
15 MR. GETZOFF:
16   Five.  I guess you could say
17   two are related, but -- do you
18   want me to go through them
19   again?
20 THE CHAIRMAN:
21   Yes, please.
22 MR. GETZOFF:
23   Okay.  The Medi-Cal program,
24   the Medi-Cal eligibility
25   systems, the interface with

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

290

1    and use of SSI and SSP data by
2    Medi-Cal for determining Medi-
3    Cal eligibility, how...
4  THE CHAIRMAN:
5    Could you state that one again
6    please?
7  MR. GETZOFF:
8    The interface with and use of
9    SSI and SSP data from the
10   Social Security Administration
11   by the Medi-Cal program for
12   determining Medi-Cal
13   eligibility.  The fourth one
14   is how California obtains SSI
15   and SSP information from the
16   Social Security
17   Administration.  And the last
18   one is the Medi-Cal aid code
19   system, all areas that he has
20   indicated he worked on for
21   many years, and supervised
22   each one of those.
23 THE CHAIRMAN:
24   Okay.  Mr. Olszewski, as to
25   the first two bullet points,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

291

1    are you objecting as to his
2    being an expert as to the
3    first two bullet points?
4  MR. OLSZEWSKI:
5    Yes.
6  THE CHAIRMAN:
7    And what would be the basis of
8    his expertise in Medi-Cal and
9    Medi-Cal eligibility?
10 MR. OLSZEWSKI:
11   Thus far, he's -- he needs to
12   be shown to be an expert.
13   He's never testified -- well,
14   he's testified in one Board
15   hearing that he's been able to
16   recall right now.  He needs to
17   be an expert in order to be --
18   testify as an expert.
19 MR. GETZOFF:
20   Okay.  If I may react to that,
21   I mean...
22 THE CHAIRMAN:
23   Sure.
24 MR. GETZOFF:
25   ...honestly, I've never heard

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

292

1    of such a silly argument.  You
2    know, he was in government his
3    whole life and he became a
4    consultant somewhat recently.
5    And the fact that he's done
6    depositions but not appeared
7    in court doesn't make him any
8    less than an -- less of an
9    expert.  He's, frankly, more
10   knowledgeable about the Medi-
11   Cal system than any other
12   living human being, I imagine.
13 THE CHAIRMAN:
14   Duly...
15 MR. OLSZEWSKI:
16   For such a...
17 THE CHAIRMAN:
18   ...noted.
19 MR. OLSZEWSKI:
20   For such a silly argument,
21   it's called the Daubert
22   standard, practiced in every
23   federal court around here.
24 THE CHAIRMAN:
25   Okay.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

293

```
 1   MR. GETZOFF:
 2        Well, this is not a federal
 3        court, the last time I
 4        checked.
 5   THE CHAIRMAN:
 6        An expert does have to have
 7        their first testimony before a
 8        court as an expert, so I hear
 9        your objection but I -- that
10        in and of itself, particularly
11        with his expertise having
12        served as an administrator of
13        Medi-Cal, doesn't seem like a
14        sufficient basis for an
15        objection relative to the
16        first two points.  And is that
17        the -- relative to the first
18        two points, is that your sole
19        objection or concern?
20   MR. OLSZEWSKI:
21        Yes, for all four points.
22   THE CHAIRMAN:
23        For all four points.
24   MR. OLSZEWSKI:
25        Yes.
```

294

```
 1   THE CHAIRMAN:
 2        Relative to the other three
 3        points, I'd like to take a
 4        recess, if that's the full
 5        nature of your objections.
 6   MR. OLSZEWSKI:
 7        That is my full nature of the
 8        objection.
 9   THE CHAIRMAN:
10        We'll take a recess, and I'd
11        like to confer with the other
12        Board Members regarding the
13        other three bullet points.
14               ***
15   [Off the record]
16   [On the record]
17               ***
18   THE CHAIRMAN:
19        And we'll go back on the
20        record.  And after a
21        conference, the Board has
22        decided at this time to accept
23        Mr. Rosenstein as an expert
24        relative to Medi-Cal and Medi-
25        Cal eligibility.  As to the
```

295

```
 1        remaining three points, the
 2        Board at this time declines to
 3        recognize him as an expert as
 4        to those three points, as the
 5        Board feels that there hasn't
 6        been yet a sufficient
 7        foundation laid for his
 8        expertise in those areas.
 9        Those are rather technical
10        areas, and this is -- so at
11        this point in time, don't feel
12        like there's a sufficient
13        foundation.  If, Mr. Getzoff,
14        you wish us to revisit that at
15        a later point during the
16        hearing, you may do so.
17   MR. GETZOFF:
18        Okay, thank you.
19               ***
20   BY MR. GETZOFF:
21        Q.  Welcome back.  Mr.
22   Rosenstein, can you briefly explain
23   the SSI program and its basic
24   eligibility requirements?  Not --
25   just briefly.
```

296

```
 1        A.  Yes.  The SSI program is a
 2   cash grant program to people who are
 3   disabled and unable to work.  There
 4   are a wide variety of categories of
 5   people -- of eligibility criteria,
 6   and a wide variety of income levels.
 7   So people have to be below to be
 8   eligible.
 9        Q.  Can you briefly explain the
10   SSP program and its basic eligibility
11   requirements?
12        A.  Yeah.  The SSP program is a
13   state program administered by the
14   Social Security Administration that
15   provides a supplemental grant to
16   everybody who is SSI eligible, and
17   because it has a different income
18   level, it does provide a grant to
19   some people who are not SSI income
20   level eligible, but who are still
21   below the income standard for the SSP
22   program.
23        Q.  Okay.  Are all individuals
24   who are eligible for SSI also
25   eligible for SSP?
```

297

1    A. Yes, everybody on SSI gets
2 SSP.
3    Q. And why are there some
4 individuals who qualify for SSP but
5 not SSI?
6    A. SSI has its own income
7 standard based upon the size of its
8 cash grant.  SSP has a higher income
9 standard.  So anybody who falls below
10 the income standard for SSI, by
11 definition falls below the income
12 standard for SSP and gets both
13 programs.  There is a segment of the
14 population whose income falls above
15 the SSI level, but below the SSP
16 level, and they get SSP only.
17    Q. Okay.  If you could turn to
18 Exhibit P30, at page 612.  Okay?  The
19 first two pages of the exhibit
20 appears to be a short e-mail string.
21 Could you describe those
22 communications to and from you?
23    A. Yes.  Well, this starts off
24 as an e-mail from me to you, but more
25 importantly is an e-mail I received

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

298

1 from Harrold Smith [ph] from the
2 California Department of Social
3 Services, and they are the department
4 responsible for running the SSP
5 program.  They don't administer it
6 but they have the responsibility for
7 establishment as to the cash grant.
8 And in this case, Mr. Smith provided
9 me with data for the period in
10 question of the SSI caseload and the
11 SSP-specific caseload, and that's
12 attached to the e-mail, it's an
13 attachment of a two-page chart.
14    Q. Okay.  Why is the State
15 Department of Social Services the
16 best source of such information?
17    A. Okay, the California
18 Department of Health Services
19 administers Medi-Cal, and the only
20 information they have is people who
21 are in -- on the SSI, SSP program.
22 The Department does not have --
23 healthcare services Medi-Cal program
24 does not know who is SSP only.  The
25 California Department of Social

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

299

1 Services has the state responsibility
2 for the SSP program, and they were
3 the entity who knows who's SSI -- who
4 has SSI, and by definition, anybody
5 who has SSI has SSP, and those people
6 who are SSP only.  So they were the
7 only source that I could get this
8 information from from the state, and
9 they were kind enough to provide it.
10    Q. Looking at the chart,
11 starting on page 614 of Exhibit P37,
12 is this the chart that was provided
13 to you by the Department of Social
14 Services?
15    A. Yes.
16    Q. And what do the numbers in
17 the middle column represent?
18    A. Okay, the middle column is
19 the caseload that -- on a monthly
20 basis of people who the state got who
21 were on SSI, SSI-eligible.
22    Q. Okay.  And what do the
23 numbers in the right column
24 represent?
25    A. This is the number of

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

300

1 people who are SSP-only eligible.
2 They have SSP, but as it says, no
3 SSI.
4    Q. Okay.  Looking at your
5 expert report, which is included at
6 Exhibit P34, did you analyze the data
7 provided to you from the Department
8 of Social Services?
9    A. Yes, I did.  I looked at it
10 and made a determination as to what
11 percentage of the total universe of
12 caseload, and by -- just to be clear
13 on that, it's the total of people who
14 are SSI and SSP only, because that's
15 what the Department would have.  So
16 you have those two columns together.
17 I analyzed to determine what
18 percentage of the total population
19 was SSP-only, and while it varied
20 very, very slightly month to month,
21 it was on the average about 14
22 percent.  A few fractions one way or
23 another every month, but it was
24 pretty consistently 14 percent
25 throughout, and 40 percent total.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

301

Q. So the numbers that you list in, you know, the 68 million, 59 million, 9 million, those numbers that appear in your report, how did you arrive at those numbers?

A. Well, I totaled the total eligibility months, and one is the total of all eligibility months for SSI and SSP, and the other is the total of all eligibility months for just SSP only.

Q. Okay.

A. And those are the -- you know, if you run a total of these charts, which is what I did, that's what you get.

Q. Okay. And were the percentages that you mentioned, you said about 14 percent, consistent on a month-to-month basis?

A. Yes. Slight fractional variations, but it was consistently just about 14 percent every month.

Q. Was there any significant difference from year to year, and

302

we're referring to the 2006 to 2008...

A. No.

Q. ...period?

A. No, it was consistent month to month, year to year.

Q. Okay. Would you expect the percentage of SSP-only beneficiaries to vary greatly compared to statewide averages in any particular large city or county of the state?

A. No, I think it would be very common. If anywhere, there would be a higher SSP-only population in northern California, and southern California would have a lower percentage, but I would consider it to be pretty consistent. Northern California has a higher income level on average than southern California, so if anything, northern California is going to be slightly greater percentage of SSP only, but I would expect it to run pretty consistently.

Q. And what...

303

A. And the data on these programs has been very consistent year to year for a long time.

Q. What does that suggest about Pomona's SSP percentage?

A. Well, Pomona is in a poor area of town. They see a lot of poor people. So I would expect them to be at the 14 percent average or possibly below it.

Q. Do SSI and SSP eligibility relate to Medi-Cal eligibility?

A. Yes. by contract, California is one of the states that adopted a contract to grant automatic eligibility to -- Medi-Cal eligibility to anybody on SSI, SSP.

Q. Why were the SSI, SSP status of Medi-Cal beneficiaries important to the Department of Healthcare Services?

A. Well, the people -- you know, people who are enrolled by the Social Security Administration in both programs they come over

304

electronically to the state, the state will then pay for their health care, become -- the state becomes responsible and pays the state's share of 50 percent, draws down federal funds from CMS paying the federal matching rates in California, which is 50 percent. So the state is accountable for making sure its payments are correct both to the state and its taxpayers, as well as the Federal Government, CMS, and the federal taxpayers. So there's a tremendous amount of oversight on who Medi-Cal covers, so that it has to be done right.

Q. Okay. What is a 1634 agreement?

A. A 1634 is the federal law that provides for the contract for states to contract for the Social Security Administration to manage the eligibility for SSI and for the SSP program, and part of that provision grants automatic Medicaid

305

eligibility.

Q. How does the Social Security Administration send eligibility information to Medi-Cal?

A. Social Security Administration sends it electronically in what's called a state data exchange. So they will determine eligibility and they will send an electronic computer file to the state, which the state then processes and posts to the MEDS, the Medi-Cal Eligibility Database.

Q. How frequently does the Social Security Administration update such information to the State Department of Healthcare Services?

A. It's done on a fairly routine basis. Once monthly you get the full file, and then you get updates.

Q. And what does Medi-Cal do with the SSI, SSP data provided through the SDX?

A. It takes the data, runs it,

306

it adds the aid code based upon the data that's on the Social Security Administration file, and it posts it to the MEDS file, Medi-Cal Eligibility Database. The first time that a person comes in, the person is also issued a plastic Medi-Cal card. It's a permanent lifetime card. So the person gets it. And then that person is eligible for Medi-Cal and goes through the traditional Medi-Cal program.

Q. In addition to the information provided by the Social Security Administration via the SDX, what other sources were used during the 2006 to 2008 period to provide eligibility information in the MEDS system?

A. Well, the state receives eligibility from the Social Security Administration. That's the only source for SSI, SSP. It gets eligibility from counties and the state from other eligibility

307

programs, but for those -- only those three programs are -- for SSI, SSP, it's only from the Social Security Administration, posts it to MEDS, assigns one of those three aid codes that have been in place before I started, they came in place before 1979 when I started. And then it provides providers with the information so that they can render services to the individuals.

Q. How reliable is the information provided by the MEDS system?

A. 100 percent reliable. It is a program -- it's a system that's been in place since the 1980s. It has been tested time and time again. It's been reviewed by the State Department of Healthcare Services, State Control Agency, State Oversight Agency, by the Federal Government. It's a federally certified system. It has to be accurate, and it's been proven accurate, because there are

308

literally billions of dollars dependent on the accuracy of that system.

Q. Are you familiar with the system of aid codes that Medi-Cal uses?

A. Yes, I am. California established what's called aid codes to tell various entities; the state, Federal Government, providers, what is the source of eligibility. You know, Medicaid is a -- it's sometimes a mindboggling, complex program. It's just not one program, there are multiple sources of people got eligibility. You could be SSI, SSP, you could be CalWORKS, or TANF on the federal level. You can be a breast and cervical cancer, on and on and on. So there's multiple programs, each of those programs have to be identified. Each of those programs could have a different scope of benefits, you might have a full scope; you might have a limited

309

1  scope.  Each of those might have a
2  different federal matching rate.  The
3  aid code is the singular indicator
4  that drives all of that information.
5  So when you -- you can look at an aid
6  code you know where this person --
7  how this person became eligible,
8  source of eligibility, what source of
9  benefits they get, how much money
10 the state can claim from the Federal
11 Government.
12     Q.  Which agency assigns the
13 aid codes to individual patients?
14     A.  Which -- I'm sorry?
15     Q.  Which agency?
16     A.  The Department of
17 Healthcare Services assigns them.
18     Q.  How accurate in general are
19 the aid codes in the MEDS system with
20 respect to identifying a
21 beneficiary's source of eligibility?
22     A.  They're 100 percent
23 accurate.  They've been well-tested.
24 We cannot bring up somebody in
25 eligibility without having the aid

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

310

1  code be correct, so that's -- every
2  new aid code is tested, as well as we
3  test whether any program has changes
4  for new aid code change -- changes
5  the old aid codes.  And the three aid
6  codes for SSI, SSP, as I said, have
7  been in existence and used in the
8  MEDS system since the 1980s.  They've
9  been proven the test of time.
10     Q.  Is there federal oversight
11 over the accuracy of these aid codes
12 as used by the Medi-Cal program?
13     A.  Yes, there's federal
14 computer reviews, there are -- I mean
15 this is what drives the federal
16 claim.  So the aid code drives how
17 much money and what matching rate.
18 So every quarter CMS reviews the
19 state's claim to make sure it's
20 proper, and that would include from
21 time to time aid codes, they would
22 want to make sure that if somebody's
23 eligible for 50 percent federal
24 matching rate, the state's not
25 claiming 95 percent match because the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

311

1  aid code is wrong.
2      Q.  And which aid codes
3  identify a Medi-Cal enrollee on SSI
4  and/or SSP?
5      A.  They are identified by
6  three aid codes; 10, 20, and 60.
7      Q.  Okay.  Could a Provider,
8  such as Pomona Valley, during the
9  2006 to 2008 period, verify that a
10 patient is eligible for Medi-Cal
11 benefits?
12     A.  Yes.  They -- again,
13 there's a plastic card that's issue.
14 It doesn't tell you are they eligible
15 this month.  A Provider needs to know
16 are you eligible this month, so they
17 go through what's called the AEVS
18 system to determine what is your
19 eligibility status.  And they have to
20 do it month to month.  There's
21 multiple ways to access that system,
22 most are computerized now, and they
23 access the system based on the
24 information the patient has, and
25 Medi-Cal returns the patient through

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

312

1  the AEVS system eligibility
2  information; are they eligible, what
3  scope of benefits that they're
4  eligible for, are there any
5  restrictions, and what the aid code
6  is.  That all is returned to the
7  Provider.
8      Q.  How...
9      A.  And that information is all
10 taken directly off of MEDS with
11 really no interpretation by the AEVS
12 system.
13     Q.  Okay.  How frequently is
14 the AEVS system updated?
15     A.  It's updated real-time.  So
16 any time an eligibility worker adds
17 somebody, it's updated.  So
18 literally, you could be found
19 eligible at noon and walk down to the
20 doctor's office at 12:30 and you'd be
21 on the eligibility verification
22 system.
23     Q.  Can you summarize then how
24 data travels from the Social Security
25 Administration to a Provider, such as

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

313

1  Pomona, and what information would be
2  available through these Medi-Cal
3  systems?
4      A.  Right.  So somebody who is
5  determined eligible from the Social
6  Security Administration is posted, of
7  course, through the Social Security
8  Administration's files.  The Social
9  Security Administration, through the
10 state data exchange, sends the data
11 to Department of Healthcare Services.
12 The Department of Healthcare Services
13 takes that data, posts it to the MEDS
14 system.  It then sits and resides on
15 the MEDS system.  When a Provider
16 sees a patient and they want to know
17 are they eligible, the Provider
18 accesses through the AEVS system, is
19 my patient eligible.  The AEVS system
20 goes to MEDS, grabs the record,
21 doesn't do any data interpretation or
22 changing, and basically ships that
23 information back to the Provider.  It
24 includes basic demographic
25 information, what the person is

314

1      eligible, what scope of benefits, and
2  again, the aid code.  So that is an
3  aid code that is coming directly off
4  of MEDS, unchanged, and the state is
5  taking the aid code from Social --
6  you know, from Social Security
7  information -- Social Security
8  Administration doesn't have the aid
9  code, has data elements that the
10 state is able to use that social
11 security data element to assign the
12 aid code.
13     Q.  Approximately when were you
14 first contacted by a representative
15 of Pomona with respect to its SSI
16 percentage issue appeals for these
17 three cost years?
18     A.  About a year and a half
19 ago.
20     Q.  And what were you asked to
21 do?
22     A.  I was asked to do a number
23 of things.  To verify that their
24 processes, their ideas to determine
25 what -- who was SSI on Medi-Cal were

315

1  accurate to validate their process,
2  to make sure they had interpreted
3  Medi-Cal right, and then to assist
4  them in trying to resolve the
5  question of why did they have such a
6  high -- or such a -- you know, I
7  guess a high percentage of people who
8  would be showing as SSI -- or, excuse
9  me, high percentage of people showing
10 as SSP only, and try to resolve that
11 and get to the bottom of it from the
12 Medi-Cal data's perspective.
13     Q.  Do you recall what
14 documents you were asked to review?
15     A.  I was asked to review
16 various reports from the hospital,
17 that are exhibits here, on the
18 analysis that they had done, and
19 reviewed what work the hospital did.
20 And then I also reviewed the samples
21 -- the information with the
22 Department of Healthcare Services on
23 their sample.  And then I collected
24 data from the Department -- State
25 Department of Social Services.

316

1      Q.  Did you review Ms. LeTran's
2  and Pomona's methodology for
3  obtaining data?
4      A.  Yes, I did.
5      Q.  In your opinion, were Ms.
6  LeTran's methods for assigning aid
7  codes sound?
8      A.  Yes, it was very simple.
9  She looked on her files, which were
10 actually files that she got from the
11 state Medi-Cal program, for 10, 20,
12 or 60.  It was no more complicated
13 than that.
14     Q.  Do you believe the data she
15 compiled is accurate for purposes of
16 demonstrating SSI and SSP status?
17     A.  Yes.  She's accurately gone
18 through her records and found people
19 who are either a 10, 20, or 30 [sic]
20 aid code, SSI, SSP.
21     Q.  Was there any important
22 data source of which you are aware
23 that Ms. LeTran did not seek to
24 access in her patient data
25 compilation?

A. No. Again, from an SSI, SSP, Medi-Cal perspective, it's the eligibility verification process I described.

Q. Okay. Are you aware whether the state of California verified part of a sample of Pomona's SSI and SSP patient list?

A. Yes. The State Department of Health Services' eligibility division was asked to verify a sample for three years. They verified it for one year, and they found 100 percent accuracy with the sample...

Q. Okay.

A. ...that the sample accurately reflected people who were SSI, SSP on Medi-Cal.

Q. Did Pomona also seek to submit patient claim samples for 2007 and 2008 to the Department of Healthcare Services?

A. They did, and the Department of Healthcare Services wasn't able to accommodate due to

staffing concerns.

Q. In your opinion, does this list from the Medi-Cal program verify that Ms. LeTran's methods of identifying aid codes and SSI/SSP patients were accurate?

A. Yes. I mean they were 100 percent accurate one year. There really wasn't any reason to do the other two years because, you know, they -- she was doing it right.

Q. Okay. If I could ask you to look at Exhibit P24, and starting on page 235, there is a very large group of these items at the top called eligibility response reports. All three years are in here, but we're only going to ask the questions on the first set. How would a Provider such as Pomona obtain these reports?

A. Well, these are reports largely generated by their vendor. The first parts of these reports are from Medicare data, and then later on

in the data, on pages -- you get to the Medi-Cal data. On page, for example, 541 is the Medi-Cal data. And if I might add, if you look at page 541 you can see...

Q. 541 or 241?

A. Should be -- I'm sorry, page 237...

Q. 237.

A. ...would be -- the number 541 is on the top of it.

Q. Okay.

A. My apologies. Yeah. So page 237 of this document you'll see a -- my apologies, I looked at the wrong page number. So on page 237 if you look at the top you'll see Medi-Cal name redacted, county code 36, and you see the 60 primary aid code, that shows you that it's SSI, SSP status, because what -- it's either a 10, 30, or 60. And you can go through page after page after page and see that is the primary aid code.

Q. Okay. And did you review

this set of eligibility reports?

A. I reviewed the set and summaries, and everything I saw was either a 10, 20, or 60 aid code. I mean there are -- just so you know and are not surprised, there could be secondary aid codes in Medi-Cal, because they might be eligible for two different programs, but what's important is the primary aid codes, SSI and SSP. They might be eligible on some other program too. There's -- so you can have multiple sources of eligibility.

Q. Okay. Does the information used to create the aid codes ultimately derive from the Social Security Administration?

A. 100 percent. It comes off of what Social Security Administration gives the state, and all the -- the 10, 20, and 60, all it does is define whether aged, blind, or disabled.

Q. And how is then assigned to

321

1 individuals?
2 A. Well, it's assigned -- the
3 aid code is assigned based upon the
4 Social Security record, and there's a
5 data element in the Social Security
6 record that says, you know, for this
7 eligible person, they're aged, blind,
8 or disabled.  So it's in their data
9 set and the state takes that data,
10 changes the number to one of the --
11 you know, changes the data to its
12 data set and posts it.
13 Q. In your opinion, do these
14 records verify that Pomona's methods
15 of identifying SSI and SSP patients
16 were accurate?
17 A. Yes.
18 Q. Okay.  If I could ask you
19 to turn to Exhibit 27, and start with
20 pages -- there's a series of them,
21 but 504 to 517 is the first set for
22 2006.
23 A. Yes, if you look at that on
24 page 504 you can see on the second to
25 right-hand side it says aid code, if

322

1 you look straight down that column
2 you see 10, 10, 10, 10, 10, 10, 10,
3 10, 10, 10, that's the SSI, SSP aid
4 code.  And you can go page after page
5 and, you know, easily see that these
6 are SSI, SSP individuals.
7 Q. In your opinion, do these
8 lists appear to be compiled using
9 accurate information?
10 A. Yes, I mean it's actually
11 very simple information.  Aid code
12 off of the eligibility verification
13 and she basically ran the aid codes
14 and -- that are on there, and you can
15 just go page after page and see that
16 they're one of the three aid codes.
17 Q. And what does it mean for a
18 patient to be matched or unmatched
19 with the CMS data in terms of SSI
20 status?
21 A. It's -- my understanding is
22 that the matched are the people who
23 Medicare shows SSI, SSP, and CMS
24 system confirmed they were SSI.  And
25 the unmatched are those people that

323

1 the state said was SSI, SSP, and CMS
2 said they were not SSI.
3 Q. Okay.  Now, if I could ask
4 you to turn back to your expert
5 report, which is starting at 584, and
6 specifically, if you could look at
7 page 589.
8 A. Yeah.
9 Q. For fiscal year 2006, how
10 many patients were matched and how
11 many patients were unmatched?
12 A. In 2006, I looked at
13 eligibles.  And to be clear, it's
14 eligibles, not days, and I found that
15 of the eligibles 716 were matched,
16 381 were unmatched, which made it 35
17 percent unmatched.
18 Q. When you mentioned the term
19 eligible, does that refer -- what
20 does that refer to?
21 A. Individual enrollees,
22 eligible months.  So a person...
23 Q. Okay.
24 A. Because my 14 percent from
25 Social Security -- from the

324

1 Department of Social Services were
2 people.  To get an apple-to-apple
3 comparison I had to look people to
4 people.  I couldn't look -- I could
5 not look claims to claims.  You know,
6 that's more the people we're talking
7 about 50 percent of claims are days,
8 for me to compare to the 14 percent
9 to give you an accurate apples-to-
10 applies comparison, I had to look at
11 people.  So the 35 percent is 35
12 percent of the people were unmatched,
13 which would equate to 35 percent SSP
14 only, whereas we had statewide 14
15 percent.
16 Q. If the CMS data concerning
17 SSI days and percentages were
18 accurate, what would these results
19 mean in terms of Pomona's percentage
20 of SSP-only patients?
21 A. Well, this would -- for the
22 first year it would mean they would
23 have to have 35 percent of the people
24 who were SSP only, 37 percent and 39
25 percent the subsequent years who were

00419

325

SSP only, as compared to a statewide
average of 14 percent.
    Q.  Is there anything that you
are aware of in the circumstances of
Pomona Valley Hospital Medical Center
that would suggest that it would be
likely that 35 to 39 percent of its
patients were SSP only?
    A.  I cannot think of thing.
The only thing that causes someone to
be SSP-only is they have an income
that's above the SSI level, but below
SSP.  So they have relatively a
higher income -- literal income.
There's nothing in the Pomona
community that would ever leave one
to think that would be a highly --
represent all the people that have
more income in Pomona.  If anything,
I would think they'd have less income
than the statewide averages.  So you
know the dynamics of California,
northern California is far more
wealthy than southern California.
You know, California has a tremendous

326

level of poverty, and poverty is
greater in southern California than
it is in northern California.  So I
can't explain why they would be so
much higher than the statewide
average.
    Q.  So if the CMS information
were accurate, would Pomona's SSP-
only population have to be
approximately 250 percent of the
statewide average?
    A.  Yes.  I mean I can't
account for how that would ever
occur.
    Q.  Given the information and
records you have reviewed, what do
you conclude regarding the accuracy
of CMS' data with respect to Pomona's
SSI percentage for cost years '06,
'07, and '08?
    A.  There has to be something
wrong with the data.  It just does
not -- it's not in sync with the
experience of -- that the state of
California has with the overall SSI,

327

SSP program.  It's just so much more
off than the average.  And the SSI,
SSP population is a very consistent
population.  You know, much of Medi-
Cal churns, but the SSI, SSP
population doesn't, it's pretty
consistent, and consistent year to
year.
    Q.  Do you believe that the CMS
data understates the number of SSI-
qualifying patients treated at Pomona
during each of the three years?
    A.  Yes, it has to.  There's
something wrong with the data.  There
has to be a data error somewhere.
And, you know, I sought to find out
what the problem was, but was not
successful.  That would have been the
better way to resolve this is to find
out, you know, what was the data --
what's the problem with this data.
    Q.  Were you asked by Pomona to
provide your analysis to CMS?
    A.  Yes, and I did send CMS a
letter.

328

    Q.  If you want to take a look
at Exhibit P35, starting at 594.
    A.  Yeah, on January 21, 2016,
I sent CMS a letter describing who I
was and what I had found, and asking
them to help resolve this by going
through the sample of data and trying
to get to, you know, what was going
on here so we could get to some sort
of resolution.  Regretfully, I never
received a response from CMS on this.
CMS didn't do the sample and, you
know, I -- they were not willing to
help resolve this issue.  Rather
unfortunate.
    Q.  Had CMS acted on your
letter, do you believe that CMS would
have largely validated Pomona's data?
            ***
MR. OLSZEWSKI:
    I'm going to object to that as
    speculating as to what CMS
    would or would not have done.
MR. GETZOFF:
    If he knows, I...

```
 1   THE CHAIRMAN:
 2        Can you restate your question
 3        again please?
 4   MR. GETZOFF:
 5        Had CMS acted on your letter,
 6        do you believe that CMS would
 7        have largely validated
 8        Pomona's data?
 9   THE CHAIRMAN:
10        It is -- calls for, I guess,
11        speculation.
12   MR. GETZOFF:
13        Okay.
14              ***
15   BY MR. GETZOFF:
16        Q. Did CMS ever act on your
17   letter?
18        A. They did not.
19        Q. Did CMS ever agree to
20   request the Social Security
21   Administration to review the small
22   sample of claims submitted?
23        A. Not that I'm aware of.
24              ***
25   MR. GETZOFF:
```

```
 1        Okay. I have no further
 2        questions.
 3   THE CHAIRMAN:
 4        Thank you. Cross examination?
 5   MR. OLSZEWSKI:
 6        Yes, thank you.
 7              ***
 8        CROSS EXAMINATION
 9   BY MR. OLSZEWSKI:
10        Q. Mr. Rosenstein, in your
11   review of the documents to prepare
12   your report, could you look at page
13   503 for me please? It is Exhibit 27,
14   page 503.
15        A. Yes.
16        Q. Thank you, and if you could
17   keep your thumb on that page and then
18   look at your expert report on page
19   589. So that's Exhibit 34, page 589.
20        A. Yes.
21        Q. Okay, so on your expert
22   report, I believe I heard you testify
23   that down here on the bottom of the
24   page for fiscal year 2006 there was
25   35 percent unmatched, and you
```

```
 1   specified, I believe, unmatched
 2   people as opposed to days. Is that
 3   correct?
 4        A. That's correct.
 5        Q. In -- now, looking --
 6   keeping your thumb on that, and going
 7   back to page 503, is there anywhere
 8   in this document that you're able to
 9   confirm that your estimate of 35
10   percent?
11        A. On page 503? No. I took
12   the data from the hospital on patient
13   count. So if you look at page 501, I
14   went to the -- if you look you see a
15   patient count number, I excluded any
16   patients who were not 10, 20, or 60,
17   and I did the count based upon that
18   data field. So that's the source of
19   my data.
20        Q. So did you actually review
21   the unmatched days that Pomona Valley
22   is claiming?
23        A. I'm not sure what you mean
24   by review. I went through all of
25   their records and reviewed their
```

```
 1   records. Did I independently
 2   calculate the days? No, but I went
 3   through and validated that they used
 4   -- selected using the proper aid
 5   codes. And then as I said before, I
 6   -- to give you an apples-to-apples
 7   comparison of the 14 percent, I had
 8   to deal with people, not days. And
 9   that's how I dealt with people.
10        Q. Back -- I think you
11   testified, about a year and a half
12   ago Pomona Valley contacted you to
13   have you look at their documents and
14   make a determination. Was there an
15   agreement that you entered into with
16   Pomona Valley?
17        A. Yes. I operated under a
18   company called Health Management
19   Associates, who I subcontract with.
20   So Health Management Associates
21   entered into a consulting contract
22   with Pomona Valley.
23        Q. And in that contract, would
24   it state how much you were going to
25   be getting paid for your work?
```

333

A. How much Health Management Associates would be paid for my work, yes.

Q. And then, in turn, you would be getting paid from Health Management Associates?

A. That's correct.

Q. Do you own any part of Health Management Associates?

A. I do not.

Q. Did you happen to bring a copy of that written contract with you today?

A. I did not.

Q. Have you ever read that written contract?

A. I did.

Q. Based on your memory, do you remember if there is a -- if it's contingent based on -- if there's any pay contingent based on the outcome of this case?

A. No contingency. It's strictly a time and materials, hourly reimbursement, plus -- an hourly rate

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

334

plus reimbursement for expenses.

Q. Did anybody ever contact you for the purposes of this -- these proceedings to get a copy of that agreement to offer it into the record as evidence?

A. No.

***

MR. OLSZEWSKI:

That's all I have.  Thank you.

THE CHAIRMAN:

Any redirect?

MR. GETZOFF:

No.

THE CHAIRMAN:

Okay.  We'll move to Board questions.  Ms. Benson?

MS. BENSON:

Thank you.  Thank you for your testimony.  I have some questions.  I guess my first one is, the aid codes that are being talked about here are 10, 20, and 60.  Do you know how they correlate to the SSI

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

335

codes C01, M01, and M02?

MR. ROSENSTEIN:

I knew you were going to ask that.  Not specifically, because I didn't go through the data on the dictionary from -- for the SSA.  If those are aid -- if those are codes that designate this person as aged, blind, or disabled, which I don't know, then it probably is the correlation, but I don't know the data dictionary for...

MS. BENSON:

Yeah.  You don't really know if it is or isn't.

MR. ROSENSTEIN:

Well, I don't know that the data...

MS. BENSON:

That there's a one-to-one correlation between...

MR. ROSENSTEIN:

Whether -- yeah, I don't.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

336

MS. BENSON:

...C01, M01, and M02.

MR. ROSENSTEIN:

Yeah, I don't...

MS. BENSON:

Okay.

MR. ROSENSTEIN:

I don't have -- know the...

MS. BENSON:

That's fine.

MR. ROSENSTEIN:

I don't know the data dictionary.  It's...

MS. BENSON:

I just asked that -- go ahead.

THE CHAIRMAN:

So the aid code goes to their -- more of the nature of their eligibility, it doesn't go to, for instance, like SSA may suspend or -- SSI payments, and that's sort of -- there's a whole different types of codes that go through that in -- on the SSA side of things.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

337

MR. ROSENSTEIN:

Yeah, and those codes pass to the state too.  I mean if...

THE CHAIRMAN:

But that doesn't...

MR. ROSENSTEIN:

They -- there not easy aid codes.  I mean the people who, for example, who receive Medi-Cal eligibility due to SSI, if they lose their SSI status, Medi-Cal then has to do an independent eligibility determination before they're taken off of Medi-Cal.  So all of that other data passes to the state too, and the state knows when the person's SSI eligibility either pended or ended, or they die, and all that information -- but it's not...

MS. BENSON:

What...

MR. ROSENSTEIN:

338

...it's not generated in the aid code.

MS. BENSON:

What happens if it's not -- their eligibility gets changed, but -- it's my understanding C02, M01, M02, and then there's a whole series of other codes that were explained in the Federal Register, and some of those explanations talk about not the person being ineligible or -- based on their income, but they may be in a nursing home, they may be -- they didn't get a check that month for some reason, not necessarily that their income went up or went down, but they didn't get a check that month for a reason, would that change code 10, 20, or 60?

MR. ROSENSTEIN:

It would not.  For example, if

339

they went in a nursing home their SSI could drop, was typically what would happen, but they would still remain Medi-Cal eligible on one of those SSI aid codes.  It wouldn't change the aid code, it would change, in that case, the grant amount.

MS. BENSON:

Yeah.  I'm just asking because that could be one of the reasons for the differences.  If you read the Federal Register, that was one of the explanations of the codes that CMS doesn't pick up is when a person is in a nursing home, if they get, and I'm not going to quote the Federal Register, but sometimes they get a nominal payment, sometimes they get no payment.  When they get no payment, they don't pick up, you know, that

340

patient because -- and Medicare explains it in the Federal Register, they say they did not get any SSI benefits that month.  So I'm just looking for if that 10, 20, or 60 didn't change, and if the person was in a nursing home, that could be some of the reason for the difference.  Would you agree with that?

MR. ROSENSTEIN:

Yeah, I -- you know, nursing home -- someone who went into a nursing home, and there are not a whole lot of them; 65,000 on Medi-Cal statewide, yeah, they would still have a 10, 20, or 60, and they would have a reduced grant amount, but they would still show a 10, 20, 60.

MS. BENSON:

Okay.  So that's just a potential reason for a

00423

341

difference.  So let me ask
another question.  I assume
some people come to the
hospital and they don't have
Medi-Cal the day they walk in,
they don't have SSI, they
don't have anything, they get
qualified when they're in the
hospital.  So let's, as an
example, say they went in the
hospital on, you know, August
10...
MR. ROSENSTEIN:
    Um-hum.
MS. BENSON:
    ...and they got -- filed all
their paperwork, they got
qualified August 10 when, you
know, the date they filed
their paper, would you get a
code for that person that said
they were a 10, a 20, or a 60
beginning either August 1 or
August 10?
MR. ROSENSTEIN:

342

Well, Medi-Cal eligibility
month-specific.  So if -- they
would get eligibility the
first day of the month of the
application.
MS. BENSON:
    Okay, so in that case, so
August 1 would be their
eligibility date...
MR. ROSENSTEIN:
    That's correct.
MS. BENSON:
    ...and the code would be
either a 10, a 20, or a 60.
MR. ROSENSTEIN:
    If it was an SSI, SSP, that's
correct.
MS. BENSON:
    Okay.  So I just want to point
out another difference in the
Federal -- the Federal
Register talks about that they
make payment not the first
month that you qualify for
SSI, but the first of the

343

following month.  So in the
example that I just gave, the
SSI payment would not be in
the month of August, it would
be for the month of September.
And according to what I read
in the Federal Register, and
probably some other cases that
we've maybe heard, the days
before the month -- the first
month of payment are not
counted in the SSI fraction
calculation.  So that would be
another difference.  I just
want to point that out that
if, you know, if the state is
receiving a code 10, 20, or 60
for the first of the month in
which they actually filed the
application, the SSI rules say
your benefits are paid the
first of the following month.
And CMS said in its rule it
looks at the first time you
were paid a benefit.  So those

344

days in the month prior to you
actually receiving your first
SSI payment wouldn't be
calculated in the DSH
calculation.  So that would be
potentially another group of
days...
MR. ROSENSTEIN:
    Well, Medi-Cal is using the
start date that Social
Security Administration gives
us.
MS. BENSON:
    Right, but I -- I guess what
I'm saying is I'm not --
there's potentially a
difference between the start
date of...
THE CHAIRMAN:
    Eligibility.
MS. BENSON:
    ...when -- of eligibility and
the first benefit check that's
issued to the beneficiary for
SSI.  And the final rule

345

```
 1      explains that, at least for
 2      the DSH calculation, the CMS
 3      said that they were using the
 4      month that -- the month that
 5      you get a benefit check is,
 6      you know, the days -- how many
 7      days in that month where the
 8      patient was in an inpatient
 9      stay they counted.  If, for
10      some reason, you didn't get a
11      benefit check because maybe
12      you hadn't reached the first
13      of the month after you
14      applied, those days would not
15      be counted.  That was how it
16      was explained in the Federal
17      Register.  So it may be --
18      that could be a reason for
19      some of these days.  So I'm
20      just trying to point out that,
21      you know, if -- I was curious
22      if the 10, 20, or 60 was
23      assigned from the date -- the
24      first of the month of when the
25      application was filed, and if
```

346

```
 1      it is...
 2  MR. ROSENSTEIN:
 3      It would be the...
 4  MS. BENSON:
 5      ...then...
 6  MR. ROSENSTEIN:
 7      ...first of the -- the start
 8      date that Social Security
 9      Administration...
10  MS. BENSON:
11      Right.
12  MR. ROSENSTEIN:
13      ...gives Medi-Cal...
14  MS. BENSON:
15      Right.
16  MR. ROSENSTEIN:
17      ...it's all driven by Social
18      Security.
19  MS. BENSON:
20      So that's just, I'll say maybe
21      a difference in definition,
22      you know, the state uses one
23      for paying the Medi-Cal claim,
24      which is probably the exact
25      right one to use...
```

347

```
 1  MR. ROSENSTEIN:
 2      Um-hum.
 3  MS. BENSON:
 4      ...but CMS uses a different
 5      one maybe for counting the
 6      number of days that are
 7      eligible for SSI payment,
 8      because if you're not eligible
 9      until the month of September,
10      because it's the first of the
11      following month after you
12      apply, there's some -- there's
13      obviously a discrepancy there,
14      and one for Medicaid is
15      counted the prior month and
16      the other is counted
17      subsequent, and that could be
18      a significant number of days.
19  THE CHAIRMAN:
20      And I guess to sort of sum up
21      that, it sounds like what Ms.
22      Benson is suggesting is that
23      the first day of Medi-Cal
24      coverage equals the first day
         of state supplemental
```

348

```
 1      payments, but may not equal
 2      the first day of Social
 3      Security Income payments.  It
 4      may equal the first day of
 5      Social Security Income
 6      eligibility.
 7  MR. ROSENSTEIN:
 8      I had understood that SSI and
 9      SSP payments start at the same
10      time.  Perhaps I'm wrong, but
11      I...
12  MR. ZIEGLER:
13      Can I ask a...
14  MR. ROSENSTEIN:
15      ...thought they had the same
16      start date.
17  MS. BENSON:
18      But the payment maybe -- and I
19      don't know when the SSP is
20      paid, it may be actually the
21      same month...
22  MR. ROSENSTEIN:
23      Yeah.
24  MS. BENSON:
25      ...that the SSI is paid, but
```

1     the Medi-Cal payment may be
2     earlier, the actual, you know,
3     paying for the medical
4     services in the hospital, and
5     if that's the date that the
6     code is assigned, the first
7     month of the month that the
8     person applied, that is
9     different than the definition
10    of when your SSI payment
11    begins.
12 MR. ROSENSTEIN:
13    Could...
14 MS. BENSON:
15    And I think that could be part
16    of the discrepancy.
17 THE CHAIRMAN:
18    So maybe that the first day of
19    Medi-Cal coverage always
20    equals the first day of SSP
21    and SSI eligibility, and the
22    date of the first SSI payment
23    or SSP payment may be later or
24    may be the same.
25 MR. ZIEGLER:

1    What may add some clarity to
2    this, and I -- you know, is
3    when you receive the file from
4    SSA there is a translation
5    occurs, right, to your 10,
6    your 20, your 60. We're not
7    sure what's on that SSA file.
8    But if -- because it's
9    translating -- you asked about
10   C01, M01, M02, so the question
11   is what were the codes on the
12   SSA file when it came over,
13   because those codes are being
14   translated in the Medi-Cal
15   system, correct?
16 MR. ROSENSTEIN:
17   Well, I don't know if I'd call
18   it -- transferred, more than
19   translating.
20 MR. ZIEGLER:
21   Transferred?
22 MR. ROSENSTEIN:
23   Well, there's an -- there's
24   multiple indicators on the
25   Social Security file. It's a

1    pretty massive -- you know, a
2    lot of files. One of them
3    says -- tells us if they're
4    aged, blind, or disabled, so
5    the difference between 10, 20,
6    and 60 -- I mean the
7    eligibility 10, 20, and 60 are
8    the same, so it just
9    categorizes the person.
10   There's other file dates such
11   as the effective date of
12   eligibility, which is what
13   you're speaking to, and Social
14   Security Administration will
15   give the state here is when
16   the person's eligibility is
17   effective, and the state, you
18   know, the state has agreed to
19   follow everything the Social
20   Security Administration...
21 MR. ZIEGLER:
22   So that can't...
23 MR. ROSENSTEIN:
24   ...supplies because they're --
     they determine eligibility.

1 MS. BENSON:
2    But there is a difference
3    between the effective date of
4    eligibility and the date the
5    first SSI benefit payment is
6    made. By definition, if you
7    read the SSI rules, it says,
8    you know, the first of the
9    following month. So it's just
10   the potential for where some
11   of these differences are.
12 MR. ROSENSTEIN:
13   Yeah. I don't know if that
14   would explain in my analysis
15   about a 20 percent difference.
16 MS. BENSON:
17   Yeah. I certainly don't know.
18 MR. ROSENSTEIN:
19   Yeah.
20 MS. BENSON:
21   I'm just...
22 MR. ROSENSTEIN:
23   Yeah. Yeah.
24 MS. BENSON:
25   I'm trying to like look at the

353

```
1          process...
2   MR. ROSENSTEIN:
3          Yeah.
4   MS. BENSON:
5          ...and listen to, you know...
6   MR. ROSENSTEIN:
7          Yeah, ideally...
8   MS. BENSON:
9          ...the various testimony
10         and...
11  MR. ROSENSTEIN:
12         Ideally, where I expected this
13         to have ended up was CMS would
14         have reviewed the data, and
15         they would have come back to
16         us, and maybe with some
17         answers like that we would
18         have gotten to the bottom of
19         this, is what we expected.  I
20         -- you know, I never
21         personally expected to be
22         here, I expected that CMS...
23  MS. BENSON:
24         Yeah.
25  MR. ROSENSTEIN:
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

354

```
1          ...would have responded to the
2          letter and...
3   MS. BENSON:
4          But that's a whole...
5   MR. ROSENSTEIN:
6          ...we would have gotten to the
7          bottom of this, but...
8   MS. BENSON:
9          ...other story.  I was just
10         trying to go through this and
11         listening to what you said
12         when you said you got the code
13         right away, and looking at
14         actually the information in
15         the record, I could see that,
16         you know, maybe the day -- the date
17         of service might have been,
18         you know, August 24, the date
19         of eligibility was August 1,
20         and it looked like just what
21         you said, that Medicaid
22         eligibility was the first of
23         the month that they applied...
24  MR. ROSENSTEIN:
25         Um-hum.
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

355

```
1   MS. BENSON:
2          ...and that's what seems like
3          it's true, and that's what
4          made me think, well, if that's
5          true, the SSI payment is not
6          the first of the month that
7          you apply.  And so that just,
8          you know, is definitely a
9          discrepancy that I wanted to
10         point out.  Do you know if
11         there's any backlog in -- like
12         sounds like the state of
13         California does the initial
14         review of the SSI, SSDI
15         applications.
16  MR. ROSENSTEIN:
17         No, it -- we do not.
18  MS. BENSON:
19         You don't do that.
20  MR. ROSENSTEIN:
21         Someone said that, but that is
22         not accurate.  If you want SSI
23         you have to apply at Social
24         Security Administration.  The
25         state of California has no
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

356

```
1          involvement under its
2          contract.  People who are
3          aged, blind, disabled can
4          apply at the county social
5          services department and they
6          will get only Medi-Cal, but
7          they will not enter the stream
8          for SSI, SSP.  They have to go
9          to Social Security directly.
10  MS. BENSON:
11         Okay.  Thank you.  Thanks for
12         clearing that up because,
13         actually, I thought you had to
14         go to Social Security, but...
15  MR. ROSENSTEIN:
16         Yeah.
17  MS. BENSON:
18         I had one other question.  You
19         get a lot of information from
20         the Social Security
21         Administration, but it sounds
22         like you don't get the, and
23         I'll call it their payment
24         codes, like the C01, the M01,
25         the M02 codes, because I
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

357

```
 1        imagine if you got them, you
 2        would -- we all wouldn't be
 3        here today.  Is that a true
 4        statement?
 5   MR. ROSENSTEIN:
 6        Well, I'm not -- there are
 7        lots of other information the
 8        state gets that could trigger
 9        a number of actions that are
10        not related to the aid code.
11        So, for example, if they get a
12        code they went to a nursing
13        home, the state gets that
14        information and knows that the
15        cash grant is going to drop.
16        If they got a hold status,
17        that affects the Medi-Cal
18        eligibility.  If they get a
19        status that the person died,
20        you know, the person is
21        removed.  If they get a status
22        that says the person has
23        eligibility that's terminated,
24        there's a reason code.  So
25        there's a whole lot of
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

358

```
 1        different data that comes
 2        over.
 3   MS. BENSON:
 4        I'm just wondering if...
 5   MR. ROSENSTEIN:
 6        But it's not -- doesn't affect
 7        the aid code.
 8   MS. BENSON:
 9        If you take a look at -- and
10        it's in I9, and it's page
11        5280, this is the CMS final
12        rule for -- well, I think this
13        is actually the proposed rule
14        there.  I -- the final rule is
15        the same.  I think we could
16        probably look at either one.
17   MR. GETZOFF:
18        Excuse me, he doesn't have
19        that up there.  So...
20   MS. BENSON:
21        You don't -- sure, if you want
22        to give it to him.  In the
23        second column on page 5280
24        there's a list of codes that
25        were submitted in comments to
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

359

```
 1        the proposed rule, and I guess
 2        the submitter was stating that
 3        they would like these other
 4        codes used, and it's E01, E02,
 5        N06, N10, N11, and it keeps on
 6        going.  And I'm just assuming
 7        that you don't get all those
 8        -- these specific codes in
 9        your -- in the file that you
10        get.
11   MR. ROSENSTEIN:
12        We may or may not.  I don't --
13        it wasn't part of the analysis
14        here.
15   MS. BENSON:
16        Okay.  So you don't really
17        know if you get those codes.
18   MR. ROSENSTEIN:
19        Yeah.  We...
20   MS. BENSON:
21        I would just suggest that if
22        you did, you know, then you
23        would have the information
24        with C01, CO -- you know, M01
25        and M02, which, you know,
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

360

```
 1        would be what I think you were
 2        trying to get from the agency.
 3        So...
 4   THE CHAIRMAN:
 5        Are there similar code --
 6        payment codes that the state
 7        uses that might shed light on
 8        the state-only payment
 9        situations?
10   MR. ROSENSTEIN:
11        There isn't, and the challenge
12        here is the Department of
13        Healthcare Services gets all
14        sorts of data from the Social
15        Security Administration that
16        are not even posted to the aid
17        systems that we talked about.
18        By federal law, the State
19        Department of Healthcare
20        Services is charged with the
21        administration of the Medicaid
22        program, and must maintain
23        confidentiality and only use
24        the data they receive from the
25        Social Security Administration
```

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

361

1    for the administration of the
2    Medicaid program.  This is not
3    about the administration of
4    the Medicaid program.  So had
5    we even asked the Department
6    of Healthcare Services to help
7    us analyze their data from
8    Social Security Administration
9    for a Medicare appeal, they
10   would have rightly told us
11   it's not even allowed by the
12   Social Security
13   Administration.  They can't
14   use that data for Medicare,
15   they can only use it for
16   Medicaid.  So even if we had
17   asked for this, they couldn't
18   legally do this work for us.
19   MS. BENSON:
20       Okay.  So I just wanted...
21   MR. ROSENSTEIN:
22       Only the CMS and Social
23   Security Administration can do
24   this analysis, I'm afraid.
25   MS. BENSON:

362

1    So I just wanted to point out
2    specifically where I was
3    talking before about if you
4    turn to the next page, the
5    5281, it's where it explains
6    code E2 is used to identify a
7    person who is not eligible --
8    who is not entitled to SSI
9    payment in the month in which
10   that code is used, pursuant to
11   Section 1611(c)(7) of the Act,
12   which provides that an
13   application for SSI benefits
14   shall be effective on the
15   latter of the first day of the
16   month following the date the
17   application is filed, or, two,
18   the first day of the month
19   following the date the
20   individual becomes eligible
21   for SSI based on that
22   application.  So that's where
23   I was getting the information
24   that I was talking about
25   before, so I just wanted to

363

1    point that out.
2    MR. ROSENSTEIN:
3        Yeah.  And again, the state
4    would rely upon the data that
5    the Social Security
6    Administration sent them in
7    terms of the effective date of
8    enrollment.
9    MS. BENSON:
10       Enrollment, right, but not --
11   it's not necessarily the --
12   when they're going to get the
13   benefit paid.  And I think
14   that's, you know, probably
15   where some of these
16   differences come in.  That's
17   all the questions I have.
18   THE CHAIRMAN:
19       Mr. Ahern?
20   MR. AHERN:
21       Yes.  First, thank you for
22   your testimony.  Late
23   afternoon.  Hopefully, you're
24   still awake and interested, so
25   that...

364

1    MR. ROSENSTEIN:
2        Good.
3    MR. AHERN:
4        ...that by itself should be
5    grounds for some kind of an
6    approval.  So I'm interested
7    in your level of expertise,
8    not because I question it, but
9    because I want to understand
10   it and get it on the record.
11   MR. ROSENSTEIN:
12       Um-hum.
13   MR. AHERN:
14       Okay.  You've been at the top
15   of the Medi-Cal system...
16   MR. ROSENSTEIN:
17       And at the bottom.
18   MR. ROSENSTEIN:
19       Yeah, and you talk about
20   various systems and what's on
21   the Social Security file that
22   you receive in terms of
23   indicators.  And the genre of
24   my questions are just to
25   understand your personal

00429

365

```
 1       experience and your
 2       professional life, because I
 3       know myself, I've worked with
 4       things on the field-by-field
 5       basis matching financial
 6       systems, which is quite
 7       different than understanding
 8       on a diagrammatic...
 9   MR. ROSENSTEIN:
10       Um-hum.
11   MR. AHERN:
12       ...or a decision-making level
13       where we're looking at what
14       information is available, we
15       ask somebody else who is an IT
16       person.  So if we were to look
17       at the MEDS program, okay, can
18       you give us some in-depth
19       understanding of your personal
20       experience with the technical
21       -- because we get it, you --
22       you've made the -- you
23       understand the system and what
24       it does, and how it
25       interacts...
```

366

```
 1   MR. ROSENSTEIN:
 2       Um-hum.
 3   MR. AHERN:
 4       ...but on the technical level,
 5       the type of things that you
 6       did or you had to get your
 7       hands involved with in terms
 8       of the data and how it's
 9       transferred and how it's used.
10   MR. ROSENSTEIN:
11       Okay.
12   MR. AHERN:
13       With an emphasis on how it's
14       transferred and the -- we're
15       getting this -- how it's used
16       has more or less been covered,
17       you know.
18   MR. ROSENSTEIN:
19       Right.  Well, first of all, I
20       want to be clear I'm not a
21       computer programmer.
22   MR. AHERN:
23       Okay.
24   MR. ROSENSTEIN:
25       My background when I started
```

367

```
 1       off in the Medi-Cal program
 2       was in the system design area,
 3       defining the functional
 4       requirements for the state
 5       MMIS, including MEDS.  I did
 6       not work on the MEDS project
 7       when it was developed.  I was
 8       in the same room as the people
 9       who worked on it, and my
10       responsibility was taking the
11       MEDS data into the system
12       design that brought it to the
13       claims processing system, and
14       then brought it to eligibility
15       verification for providers.
16       So I had to know MEDS well, I
17       wasn't part of the design of
18       it but I knew the
19       functionality of what it did,
20       because I had to take that
21       data and move it to the claims
22       processing system so that, you
23       know, you got a claim from a
24       doctor or a hospital and you
25       want to make sure the person
```

368

```
 1       is eligible, are they eligible
 2       full scope, all those things
 3       again.  So we had to know the
 4       functionality of the system.
 5       And the same thing for
 6       providing to the AEVS, I was
 7       the design manager for that
 8       program.  So I got it down to,
 9       I wouldn't say the bits and
10       bytes level because I'm not a
11       programmer, but from a
12       functionality standpoint,
13       pretty deep into the weeds.
14   MR. AHERN:
15       Right.  So you'd be looking at
16       systems, design schematic
17       diagrams, you'd be look at
18       algorithm diagrams, flow of
19       data.  I mean it's maybe not
20       at the lowest level of -- I
21       mean in other words, most --
22       you're working with a
23       programmer but he's -- people
24       are talking to you about the
25       system and you're saying on a
```

369

very technical level what
information flows from...

MR. ROSENSTEIN:

Yeah.

MR. AHERN:

...where to where, and making
sure it all gets there.

MR. ROSENSTEIN:

Yeah. We would define, here
are the programmatic
requirements, they would come
back to us with the flow
diagrams. We would approve
that it meets the programmatic
requirements from the flow
diagrams. They would go off
and code it, and then we would
put in test cases to test it.
So we were involved in the
testing of it. I did the
testing, review meetings, and
I was literally first-level
supervisor over the, you know,
four staff, and we were doing
all the work on the current

370

MMIS, you know, recommend team
7980, doing all the design
work. And then subsequently,
I was involved in lots of
these various exchanges. All
the SSI, SSP stuff was done
back then. It's been around
forever. But...

MR. AHERN:

So it sounds like...

MR. ROSENSTEIN:

...I was known to get into the
weeds...

MR. AHERN:

Yeah.

MR. ROSENSTEIN:

...partially because I started
at the working level in the
state and worked my way up.

MR. AHERN:

So it sounds like you have
what I would call the
technical background to talk
about the transfer of data in
terms of the one step up from

371

the programmer, the one
abstracted level that's still
very, very technical, very
hands-on, especially when you
get to testing...

MR. ROSENSTEIN:

Um-hum.

MR. AHERN:

...you really have to
understand the system to test
it. And if -- and that's part
of what I want to get on the
record here, because there is
an issue of to what degree you
are a technical expert, and
maybe we know more now than we
did when we made that
decision.

MR. ROSENSTEIN:

Yeah. Yeah, at a certain
point I was on the technical
advisory group for CMS...

MR. AHERN:

Right.

MR. ROSENSTEIN:

372

...and when I was the Medicaid
director, each Medicaid --
each leadership Medicaid
director who's on the council
is a vice chair had an
assignment of overseeing a
technical group. My technical
group was the recipient group.
So even when I was a Medicaid
director I got -- you know, if
you ever want to see people
get in the weeds, get some
type of Medicaid eligibility,
that is really in the weeds.
So I was known to get in the
weeds.

MR. AHERN:

Well, if we were to move to
the MAEVS system, can you give
us an equivalent overview of
how you -- if you -- what your
connection on a technical
level or an operational level
was with that system?

MR. ROSENSTEIN:

```
 1        With the -- which system?
 2  MR. AHERN:
 3        The Medicaid, was it
 4        Eligibility Verification
 5        System?
 6  MR. ROSENSTEIN:
 7        The Eligibility Verification
 8        System?
 9  MR. AHERN:
10        Yeah.
11  MR. ROSENSTEIN:
12        I was the project manager.  I
13        had probably 10 staff working
14        for me, and we -- literally,
15        we came up with the concept of
16        what to do, and then we laid
17        out, you know, what were the
18        access points, what were the
19        flow, is it going to be real-
20        time data or is it going to
21        be, you know, batch files.
22        Are we going to let our
23        vendor, who's running the
24        systems, it was run by our
25        fiscal agent, are we going to
```

```
 1        have them maintain a file or
 2        -- where, you know -- and they
 3        translate it, or do we have
 4        them direct access MEDS.  It
 5        was my decision no way in the
 6        world are we going to let them
 7        translate data, they didn't
 8        have a direct access.  So I
 9        was involved in all the major
10        design decisions.  Then at the
11        higher level I didn't do test
12        data, but I had my staff do
13        test data.  I certainly
14        reviewed the test outcome
15        because, you know, this whole
16        program turned, you know,
17        eligibility change
18        dramatically.  We had a,
19        believe it or not, a paper
20        card every month with sticky
21        labels on it.
22  MR. AHERN:
23        I believe it.
24  MR. ROSENSTEIN:
25        And then we went to a plastic
```

```
 1        card.  So it was a dramatic
 2        change.  And we had to be
 3        right.  So, you know, I
 4        oversaw the testing of the
 5        program and -- but I didn't do
 6        actual test cases.
 7  MR. AHERN:
 8        So in another world, you would
 9        be considered an IT person in
10        those roles, in, say, a
11        corporate entity that was
12        developing a financial system,
13        that would certainly be an IT
14        role...
15  MR. ROSENSTEIN:
16        Yes.
17  MR. AHERN:
18        ...project manager of an IT
19        project.
20  MR. ROSENSTEIN:
21        And the people who are doing
22        the job today are IT staff.
23        They may not have any
24        different expertise than me,
25        but yeah, they are IT roles
```

```
 1        now.  It wasn't back then.
 2  MR. AHERN:
 3        So it sounds like you do have
 4        a lot of expertise on the --
 5        not just the managerial,
 6        operational, and goalsetting
 7        objectives, but on the IT...
 8  MR. ROSENSTEIN:
 9        Yes.
10  MR. AHERN:
11        ...hard part -- the hard part,
12        is what I...
13  MR. ROSENSTEIN:
14        Yeah.
15  MR. AHERN:
16        Making it work.
17  MR. ROSENSTEIN:
18        Yeah.  You had to make it
19        work.  And I've stayed, even
20        though, you know, I've moved
21        up, very IT-involved.  As I
22        mentioned, I was involved with
23        the Federal Government on the
24        Part D system, the Part D
25        system implementation.  I was
```

377

```
1      the state Medicaid lead on
2      that, because Medicaid had a
3      big role.  So I've stayed
4      involved in the system my
5      entire career, because I can't
6      help but do it, that's what I
7      know.
8  MR. AHERN:
9      Thank you very much.  I have
10     no more questions.
11 THE CHAIRMAN:
12     Mr. Ziegler, do you have
13     questions?
14 MR. AHERN:
15     Yeah, just one.  Sort of
16     trying to summarize and trying
17     to figure out possibly a way
18     to figure this out, and it
19     goes back to Ms. Benson's
20     question, I would love to see
21     what's on the SSA file sent
22     over.  I'm going to assume the
23     10, 20, and 60, they're Medi-
24     Cal codes...
25 MR. ROSENSTEIN:
```

378

```
1      Um-hum.
2  MR. ZIEGLER:
3      ...so I'm just questioning, on
4      that file coming over, is it a
5      C01, an M01, an M02 coming,
6      and then you say this means
7      10, 20, and 60 for us?
8  MR. ROSENSTEIN:
9      Some sort of indicator, yeah.
10     There's some -- there's a data
11     field in the SSA file that
12     says what's their type, are
13     they aged, blind, or disabled,
14     there's some code in their
15     file that...
16 MR. ZIEGLER:
17     Yeah.
18 MR. ROSENSTEIN:
19     ...translates one-to-one.
20     So...
21 MR. ZIEGLER:
22     Right, and it could just say
23     aged, blind, or disabled, but
24     then what does -- I don't know
25     what C01 means or M02 or M --
```

379

```
1      you know, it could mean aged,
2      blind, or disabled, and that's
3      how you translate.  But to me,
4      what's coming over on that
5      file could be the key to this
6      whole case really.  It could
7      tell us exactly -- because SSA
8      is providing the codes, and it
9      could tell us what SSA said;
10     whether it was SSI or not.  So
11     that's sort of key.  The other
12     thing is, I now we've had
13     discussion about SSP and we
14     threw out like the 14 percent
15     number, but based upon that
16     file, that's -- SSA is
17     potentially saying to you this
18     is SSI percentage, and then
19     I'm assuming that you're
20     determining who qualifies for
21     SSP...
22 MR. ROSENSTEIN:
23     So...
24 MR. ZIEGLER:
25     ...is that true?
```

380

```
1  MR. ROSENSTEIN:
2      So Social Security
3      Administration makes that
4      determination.
5  MR. ZIEGLER:
6      They do that too?
7  MR. ROSENSTEIN:
8      Yeah, and they...
9  MR. ZIEGLER:
10     And they -- and that's on that
11     file they send over also?
12 MR. ROSENSTEIN:
13     Yes.
14 MR. ZIEGLER:
15     So the question is would they
16     have other indicators on there
17     to identify -- so to me,
18     what's key is, I would love to
19     see that file coming over.
20 MR. ROSENSTEIN:
21     Okay.
22 MR. ZIEGLER:
23     That could be this whole case,
24     potentially...
25 MR. ROSENSTEIN:
```

00433

381

1      Yeah.  And had we been able to
2      access it...
3  MR. ZIEGLER:
4      ...understanding what's in
5      that file.
6  MR. ROSENSTEIN:
7      ...that file, we probably
8      could have answered this
9      question.  Unfortunately, you
10     know, the hospital doesn't
11     have access to the Social
12     Security Administration file.
13     The Department of Healthcare
14     Services can't legally share
15     it with us.
16  MR. ZIEGLER:
17     Yeah, but it did come over,
18     right?  There's a translation.
19     I think you said Social
20     Security sends over the file,
21     and then there's the
22     assignment of the codes by the
23     Department of Healthcare
24     Services.  That gets posted to
25     the MEDS system, which...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

382

1  MR. ROSENSTEIN:
2      Okay.
3  MR. ZIEGLER:
4      ...gets accessed by ADS.  So
5      that file is there if it was
6      electronically sent by SSA.
7  MR. ROSENSTEIN:
8      Yeah, the Department of
9      Healthcare Services has that
10     file.
11  MR. ZIEGLER:
12     But it is sent in the
13     translation occurs within your
14     system...
15  MR. ROSENSTEIN:
16     Well, I don't know...
17  MR. ZIEGLER:
18     ...correct?
19  MR. ROSENSTEIN:
20     ...if I would call it a
21     translation, it's more of a,
22     you take one data element on
23     the file, read it, and it says
24     this person is blind, and post
25     a -- the proper aid code,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

383

1      versus -- but, you know,
2      they're all SSI, SSP eligible.
3      Whether aged, blind, or
4      disabled probably is
5      immaterial for this
6      discussion, but the Department
7      does interpret somehow the
8      data off a data element,
9      probably a direct transfer.
10  MR. ZIEGLER:
11     And the question is what is on
12     that file that they're
13     translating?
14  MR. ROSENSTEIN:
15     I'm sorry, say...
16  MR. ZIEGLER:
17     What is on that file that's
18     being translated?
19  MR. ROSENSTEIN:
20     Yeah, and I don't have the
21     specific data element...
22  MR. ZIEGLER:
23     See, that's where I...
24  MR. ROSENSTEIN:
25     ...in the data dictionary,

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

384

1      but...
2  MR. ZIEGLER:
3      That's...
4  MR. ROSENSTEIN:
5      ...it -- you know, I'm
6      assuming they read the file
7      and it says this is a 1, and 1
8      equals 10, 2 equals...
9  MR. ZIEGLER:
10     Well, that -- yeah, I think
11     that would be important.  I
12     would like to understand what
13     that is...
14  MR. ROSENSTEIN:
15     Yeah.
16  MR. ZIEGLER:
17     ...to see -- and it may not be
18     helpful and it may be
19     extremely helpful, but I think
20     that could be, you know, key.
21  MR. ROSENSTEIN:
22     Yeah, the translation of the
23     data and the existence of
24     whether they're SSI, SSP
25     eligible, that's been going on

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

385

for 40 years probably, and
nobody has questioned what the
accuracy -- I mean this is,
you know, fairly claimed every
quarter and, you know...

MR. ZIEGLER:

Yeah.

MR. ROSENSTEIN:

...use every federal
disallowance and it's never
been an issue Federal
Government review, they never
brought into question that
it's a 10, 20, or 60 is
inaccurate.  I think that's
pretty well proven that...

MR. ZIEGLER:

Yeah.

MR. ROSENSTEIN:

...those are accurate.

MR. ZIEGLER:

And I'm not really questioning
from that standpoint, I'm
questioning it from what SSA
is sending over that gets

386

translated, and what exactly
that data is.

MR. ROSENSTEIN:

Yeah.  And I am sorry I don't
have that data...

MR. ZIEGLER:

Well, that's what I'd like to
know.  That's it.

THE CHAIRMAN:

Okay.  I guess sort of along
the same lines, one of the
things that could be helpful
is to -- what Ms. Benson was
asking about, the -- like the
CO2 code and other codes that
are in -- described in the
Federal Register, those are
payment codes by SSI or -- and
some of those payment codes
are actually suspension of
payments, and they're sort of,
I guess you'd say, nonpayment
codes.  But it's dealing with
do we disburse, and when we
disburse, what code do we

387

assign to it, which sort of
gives a picture of what's
going on overall with the
patient once -- or the
recipient once they qualify
for SSI.

MR. ROSENSTEIN:

Um-hum.

THE CHAIRMAN:

And we know that with SSP,
there is an interaction with
SSI every time there's a code
over here for a payment or
nonpayment that affects what
goes on over here with SSP.

MR. ROSENSTEIN:

Um-hum.

THE CHAIRMAN:

And so it could very well be
helpful, because as I
understand that with the 10,
60, and 20, that's just
dealing with overall large
picture of eligibility, it
doesn't necessarily say what

388

type of payment they'll
receive from SSP or how much
that is.  It could be that
maybe they receive no payment.
I'm not necessarily sure...

MR. ROSENSTEIN:

Um-hum.

THE CHAIRMAN:

...but it could be helpful to
know what some of those codes
are to get some sense of the
interaction between SSP and
SSI.  For instance, on the
chart that you have listing
SSP-only recipients versus, I
guess, a mixture of SSI and
SSP, it'd be helpful to know
what it means by "SSP-only",
what's included in that
bucket, and maybe how that
breaks out, for instance, 10
percent in institution.  For
example, I know that there's a
code for -- I think for an
institution or -- on the SSI

389

```
 1      side of things, how does that
 2      sort of flow down to the
 3      SSP...
 4  MR. ROSENSTEIN:
 5      Um-hum.
 6  THE CHAIRMAN:
 7      ...if they're in a
 8      correctional institution, how
 9      does that code sort of flow
10      down.  I'm thinking of ways
11      how -- that might necessarily
12      help, and I don't know if you
13      have additional information
14      that...
15  MR. ROSENSTEIN:
16      I don't know if...
17  THE CHAIRMAN:
18      ...in response.
19  MR. ROSENSTEIN:
20      SSP will follow SSI's rules.
21      So if their payment is stopped
22      for SSI, SSP follows.  I mean
23      the Social Security
24      Administration varies -- Medi-
25      Cal treats SSI and SSP the
```

390

```
 1      same.  So using your example
 2      of the correctional
 3      institution, their Medi-Cal
 4      coverage would be cut off.
 5      Medi-Cal doesn't cover people
 6      in a correctional institution,
 7      so their -- that would trigger
 8      eligibility to end.
 9  THE CHAIRMAN:
10      But with someone in a nursing
11      home, for example...
12  MR. ROSENSTEIN:
13      Eligibility...
14  THE CHAIRMAN:
15      ...there may not necessarily
16      be -- there may -- there would
17      be continued eligibility for
18      SSI...
19  MR. ROSENSTEIN:
20      Um-hum.
21  THE CHAIRMAN:
22      ...but there may be no SSI
23      payment.
24  MR. ROSENSTEIN:
25      Or a reduced payment.
```

391

```
 1  THE CHAIRMAN:
 2      Or reduced.  But as I
 3      understand, more likely than
 4      not, it's actually no payment,
 5      of if there is a payment it's
 6      a very miniscule...
 7  MR. ROSENSTEIN:
 8      The latter, I think.
 9  THE CHAIRMAN:
10      So in those instances, as I
11      understand, where there is no
12      SSI payment because they're in
13      a skilled nursing facility,
14      there would be an SSP payment
15      though.
16  MR. ROSENSTEIN:
17      No, the SSP payment is reduced
18      also.
19  THE CHAIRMAN:
20      But there would be an SSP
21      payment.
22  MR. ROSENSTEIN:
23      Well, you know, if they're in
24      a nursing home, they no longer
25      need the payment to pay for
```

392

```
 1      rent, so both the SSI and SSP
 2      is reduced when they go in a
 3      nursing home.  And yet they
 4      still -- they're still
 5      Medicaid eligible, Medi-Cal
 6      eligible.  And they still may
 7      go into the hospital...
 8  MS. BENSON:
 9      And...
10  MR. ROSENSTEIN:
11      ...just because they're in a
12      nursing home doesn't mean they
13      don't go to the hospital.
14  MS. BENSON:
15      And your code 10, 20, or 60
16      would remain the same, is that
17      correct?
18  MR. ROSENSTEIN:
19      That's correct.
20  MS. BENSON:
21      And just from, again, the
22      Federal Register, on page
23      5281, the -- I'll say the SSI
24      codes change when the person
25      goes into the nursing home.
```

393

If the person goes into the
nursing home and gets a -- and
doesn't get any payment at
all, then it's an E01, and an
E02 is used to identify a
person who is not entitled to
SSI payments in the month in
which that code is used,
pursuant to Section whatever
of the Act, and provides that
the application for the SSI --
so when a person goes -- I'm
sorry, I was reading the
eligibility for E02, but E01
actually represents an
individual who is a resident
of a medical treatment
facility and subject to a $30
payment limit, but has
countable income of $30 or
more, and that individual is
not entitled to receive SSI
payments.  So in CMS'
calculation of the SSI
fraction, they do not count

394

anybody that's coded E01, per
the Federal Register.
However, if they're still
counted as a 10, a 20, or a
60, then your system that
you're using right now that
you presented these numbers is
counting that.  And I
understand because you're
still going to be paying
Medicare -- Medicaid claims --
Medi-Cal claims and so you
can't change your codes, but
CMS has determined, per the
Federal Register, that they
can't count those payments
because they did not get a
check.  And so they would be
some of the patients that
we're talking about here, so
anybody who went into a
nursing home from being in the
hospital, or vice-versa, and
didn't get a benefit check
that month would be showing up

395

still as a 10, 20, or 60, but
they would not be counted in
the SSI fraction based on the
methodology that CMS explained
in the Federal Register.  And
that's -- which I think that
really goes to your point.
MR. ROSENSTEIN:
    And certainly, the 14 percent
is not a precise number in
terms of all those factors,
but I don't know if that also
accounts for...
MS. BENSON:
    Well, they...
MR. ROSENSTEIN:
    ...you know, a 20 percent
differential.
MS. BENSON:
    Well, those people may not get
an SSP payment either.  I'm --
I certainly don't know that.
But it's clear here that if
they don't get an SSI payment
then -- because of this $30

396

limit, and they have $30, that
they are not being counted for
SSI, however, the code that
you're getting...
MR. ROSENSTEIN:
    Yeah.
MS. BENSON:
    ...returned from the state,
the 10, 20, or 60, is not
changing because...
MR. ROSENSTEIN:
    Um-hum.
MS. BENSON:
    ...you still have to make the
Medicare -- I mean Medi-Cal
claim payment.
MR. ROSENSTEIN:
    Yeah, I mean...
THE CHAIRMAN:
    And that's...
MR. ROSENSTEIN:
    ...there are less than 65,000
Medicare enrollees in nursing
homes statewide.  So I don't
know if that would account for

00437

1      this big difference.  I mean
2      it might be some, but...
3 THE CHAIRMAN:
4      And that's where some further
5      information on that 14 percent
6      from a macro level may be
7      helpful to get a better
8      picture of, you know, what's
9      included in that in terms of
10     the payment type of
11     situations.
12 MS. BENSON:
13     And maybe looking at the
14     information that SSA is giving
15     you and seeing if they're
16     giving you codes E1 or E2,
17     because then you could
18     identify these patients and
19     then you could pull them out
20     of the data that you pull
21     together, if you are, in fact,
22     getting those codes.
23 MR. ROSENSTEIN:
24     The Department of Healthcare
25     Services might be able to.

1     They cannot share it with the
2     hospital because it's not for
3     the administration of the
4     Medicaid program.  And their
5     contract and federal law
6     limits them...
7 MS. BENSON:
8     I...
9 MR. ROSENSTEIN:
10     ...from sharing.  There's a
11     beneficiary...
12 MS. BENSON:
13     No, I understand...
14 MR. ROSENSTEIN:
15     ...way, you know...
16 MS. BENSON:
17     ...it's -- yeah.
18 MR. ROSENSTEIN:
19     It has -- I'm sorry, it has to
20     come from...
21 MS. BENSON:
22     I feel for you...
23 MR. ROSENSTEIN:
24     ...CMS.
25 MS. BENSON:

1     ...in trying to get the data.
2 MR. ROSENSTEIN:
3     Yeah.
4 MS. BENSON:
5     I truly do.
6 MR. ROSENSTEIN:
7     That's why we asked CMS.
8 MS. BENSON:
9     Yeah.  No, I understand that.
10 MR. GETZOFF:
11     I mean I can represent on
12     behalf of the hospital, we've
13     tried every way to crack the
14     nut of getting the SSA data,
15     it's...
16 MS. BENSON:
17     Right.  I...
18 MR. GETZOFF:
19     ...seemingly impossible.
20 MS. BENSON:
21     I totally understand that.
22 MR. GETZOFF:
23     Yeah.
24 THE CHAIRMAN:
25     And so from a macro level, it

1     might be helpful to get a
2     better picture of the story
3     behind the SSP payments, which
4     the payment codes on the SSP
5     side of things very well --
6     and how they break out, can be
7     very well reflective of, and I
8     would expect it to be, of the
9     information that they receive
10     from SSA.  So the -- all the
11     SSP codes and payments are
12     reactive to the information
13     they're getting from SSA.  And
14     so to the extent we have, you
15     know, that 14 percent breaking
16     out, that creates a -- sort of
17     a better picture potentially
18     of what is being received from
19     SSA.  And...
20 MR. ZIEGLER:
21     Yeah.  Yeah, and I agree with
22     that.  So, you know, what I
23     would like to see is what's
24     being send over from SSA, and
25     then how it's being translated

401

```
 1        over.  If there is...
 2   MR. GETZOFF:
 3        We can't...
 4   MR. ZIEGLER:
 5        ...a translation.
 6   MR. GETZOFF:
 7        We can't access that
 8        information.
 9   MR. ZIEGLER:
10        But it does come over.
11   THE CHAIRMAN:
12        On a claim-by-claim level.
13   MR. ZIEGLER:
14        It does come over and it's
15        translated as 10, 20, or 60.
16        A file is coming over.
17   MR. GETZOFF:
18        Yes, but we can't access it
19        because Mr. Rosenstein is no
20        longer a -- even if he was, he
21        couldn't share it, but he's no
22        longer an...
23   MR. ZIEGLER:
24        But...
25   MR. GETZOFF:
```

402

```
 1        ...employee...
 2   MR. ZIEGLER:
 3        But it is coming over to
 4        Pomona, right?
 5   MS. LETRAN:
 6        No.
 7   MR. ZIEGLER:
 8        No.
 9   MR. GETZOFF:
10        No.
11   MR. ZIEGLER:
12        To Medi-Cal.  Okay.
13   MR. GETZOFF:
14        Believe me, if we had that
15        information...
16   MR. ZIEGLER:
17        I got you.
18   MR. GETZOFF:
19        ...we would have shared it.
20   MR. ZIEGLER:
21        I got you.  I got you.
22   MS. LETRAN:
23        Wave the magical wand.
24   MR. GETZOFF:
25        Yeah.
```

403

```
 1   MR. ZIEGLER:
 2        So that's state.
 3   MR. ROSENSTEIN:
 4        Yeah, and that's the
 5        government, CMS.
 6   MR. ZIEGLER:
 7        And the state can't give you
 8        that?  They won't give you
 9        anything?  I know SSA won't,
10        but will the state?
11   MR. GETZOFF:
12        The state can't.
13   MR. ZIEGLER:
14        ...help you understand what's
15        sent and how they're
16        translating?
17   MS. LETRAN:
18        No.  I've asked.
19   MR. GETZOFF:
20        They can't legally.  They
21        are...
22   MR. ZIEGLER:
23        But on a patient level, but
24        can they tell us what's on
25        that SSA file, high-level,
```

404

```
 1        like C01, we translate this to
 2        10, M01, 20.
 3   MR. ROSENSTEIN:
 4        If the question is how do they
 5        get the aid code definition, I
 6        can get that.  That's...
 7   MR. ZIEGLER:
 8        Okay.
 9   MR. ROSENSTEIN:
10        But I can't get information on
11        which of their patients...
12   MR. ZIEGLER:
13        Right.
14   MR. ROSENSTEIN:
15        ...were in a nursing home and,
16        therefore, were not entitled
17        to disproportionate care when
18        they went to the hospital.  I
19        can't get that kind of data
20        because it's not involved in
21        the administration of the
22        Medicaid program, and that's
23        all that they -- you know,
24        they -- it would be such a
25        federal violation if they were
```

00439

405

```
 1          to provide, you know, use
 2       Social Security
 3       Administration...
 4   MR. ZIEGLER:
 5          Right.
 6   MR. ROSENSTEIN:
 7          ...for anything but the
 8       administration of the program
 9       that Social Security, because
10       -- I just -- you know, from
11       experience, we were challenged
12       once when I worked for the
13       state by the Social Security
14       Administration that we
15       violated our agreement.  And
16       we didn't, by the way.  But
17       they were not happy in
18       challenging it.  So I could
19       just guarantee you they're
20       going to do nothing to violate
21       the Social Security...
22   MR. ZIEGLER:
23          Right.
24   MR. ROSENSTEIN:
25          ...Administration agreement.
```

406

```
 1   MR. ZIEGLER:
 2          Okay.
 3   THE CHAIRMAN:
 4          Okay.  And on MEDS, MEDS is a
 5       system that's used by multiple
 6       agencies within the state of
 7       California?
 8   MR. ROSENSTEIN:
 9          It is a system that's operated
10       by the State Department of
11       Health Services, but is the
12       central data used by multiple
13       agencies; counties, State
14       Department of Social Services,
15       Department of Environmental
16       Services.  So yes, but it's
17       operated by the Department of
18       Healthcare Services.
19   THE CHAIRMAN:
20          Okay.  And Medi-Cal primarily
21       was involved with pulling
22       information from it, or what
23       types of information was Medi-
24       Cal, I guess, involved in
25       terms of entering into the
```

407

```
 1          MEDS?
 2   MR. ROSENSTEIN:
 3          The Medi-Cal -- I'm not sure
 4       -- you know, it's a source of
 5       all eligibility for Medi-Cal,
 6       so...
 7   THE CHAIRMAN:
 8          Okay.
 9   MR. ROSENSTEIN:
10          ...various entities who enter
11       Medi-Cal eligibility
12       information, that data gets
13       posted to MEDS.
14   THE CHAIRMAN:
15          Okay.  Medi-Cal though wasn't
16       involved with the aid codes
17       being entered in, that was
18       being done by a sister agency?
19   MR. ROSENSTEIN:
20          Well, Medi-Cal defines what
21       the aid codes are.  So they
22       will say -- they will -- any
23       time there's a new federal
24       program that Medi-Cal covers,
25       they will create one or more
```

408

```
 1       aid codes that says this
 2       person is covered for breast
 3       and cervical cancer treatment,
 4       and it'll post it.  And then
 5       when somebody, county or
 6       state, makes the person
 7       eligible for that program,
 8       that aid code gets posted.
 9   THE CHAIRMAN:
10          Okay.  Well, there's Medi-Cal
11       aid codes and then there were
12       the SSP aid codes.
13   MR. ROSENSTEIN:
14          Well, SSP aid codes are three
15       Medi-Cal aid codes of about
16       200.  So Medi-Cal created 10,
17       20, 60, you know, 40 years ago
18       for the -- for SSI, SSP
19       eligibility.
20   THE CHAIRMAN:
21          It's a -- they essentially
22       opted to incorporate the aid
23       codes of the sister agency,
24       meaning the SSP is
25       administered by a sister
```

409

```
 1        agency.
 2   MR. ROSENSTEIN:
 3        SSP is administered by Social
 4        Services.  The contract to do
 5        the eligibility determination
 6        -- or -- let me say -- the
 7        contract to make someone SSI,
 8        SSP automatically Medi-Cal-
 9        eligible is held by the
10        Department of Healthcare
11        Services.  Sorry for all the
12        bureaucracy here.  So...
13   THE CHAIRMAN:
14        Right.  So Medi-Cal itself
15        doesn't have the direct
16        interface with SSA, it's the
17        Department of Healthcare
18        Services that has the
19        interface with SSA, and uses
20        that information to then
21        assign the aid codes, that
22        then the Department of
23        Healthcare Services would dump
24        that data as relevant and as
25        truncated as needed into the
```

410

```
 1        MEDS, and then...
 2   MR. ROSENSTEIN:
 3        Yeah, Medi-Cal, Department of
 4        Healthcare Services gets the
 5        data directly from Social
 6        Security Administration.
 7        Their relationship with Social
 8        Security Administration is one
 9        of people who are on SSI, SSP
10        are made eligible and posted
11        to MEDS.  So that's all
12        Healthcare Services.  The SSP
13        program, which is a grant
14        program...
15   THE CHAIRMAN:
16        Um-hum.
17   MR. ROSENSTEIN:
18        ...is a Social Services
19        program.  It gives people
20        additional cash for living
21        expenses.  That grant program
22        is run by the Department of
23        Social Services.
24   THE CHAIRMAN:
25        Okay.
```

411

```
 1   MR. ROSENSTEIN:
 2        Sorry to -- this is confusing,
 3        but -- so they don't get the
 4        SDX file, Medi-Cal does.  But
 5        if you were to -- the grant
 6        amount is determined by Social
 7        Services.
 8   MR. AHERN:
 9        Speaking of confusing, would
10        it be asking too much for you
11        to, post-hearing, just present
12        a diagram to...
13   MR. ROSENSTEIN:
14        Yeah, okay.  Yeah.
15   MR. AHERN:
16        As you're an IT person, so
17        you're...
18   MR. ROSENSTEIN:
19        Yeah.  Yeah.
20   MR. AHERN:
21        ...probably used to a flow
22        diagram.
23   MR. ROSENSTEIN:
24        Um-hum.
25   MR. AHERN:
```

412

```
 1        Maybe that would put it in
 2        visual form.
 3   MR. ROSENSTEIN:
 4        Yeah.  It is very confusing.
 5   MR. AHERN:
 6        Who's connected to who and
 7        what information is going
 8        back-and-forth.
 9   MR. ROSENSTEIN:
10        Yeah.  Yeah, multiple state
11        agencies, multiple federal
12        agencies.
13   MR. AHERN:
14        And you can patent that and
15        maybe make that a consulting
16        product.
17   THE CHAIRMAN:
18        Let me see if there were any
19        other questions I had.  So to
20        your knowledge, SSP payments
21        and Medi-Cal coverage do not
22        begin mid-month, they always
23        begin the first of month?
24   MR. ROSENSTEIN:
25        Yes.  Medi-Cal, the
```

413

eligibility file only has
month segments.  So you can
only be eligible for the full
month.

THE CHAIRMAN:
And the same for SSP?

MR. ROSENSTEIN:
Yeah, same.  And, you know,
Medi-Cal treats SSI and SSP
exactly the same.

THE CHAIRMAN:
Okay.

MS. BENSON:
Do you know if a beneficiary
who applies in the middle of
August and gets qualified so
they have August 1 through
August 31 would be -- they
would have that for their
Medi-Cal insurance, do they
get a payment -- an SSP
payment for August, or do they
not get it until September?

MR. ROSENSTEIN:
My understanding of the

414

payments for SSP follow the
same process that the payments
for SSI follow.

MS. BENSON:
Okay, so if the SSI payment
doesn't come until September,
the SSP payment would not come
until September.

MR. ROSENSTEIN:
That's my understanding.

MS. BENSON:
Okay, thank you very much.

MR. ROSENSTEIN:
The Social Security
Administration writes the
checks for both.

MS. BENSON:
That makes sense.

THE CHAIRMAN:
Okay.  And -- actually, that's
all the questions I had.  And
are there any other Board
questions?  With that, then
we'll turn to redirect...

MR. GETZOFF:

415

Just a few.

THE CHAIRMAN:
...based on the Board
questions.
***

REDIRECT EXAMINATION

BY MR. GETZOFF:
Q. You mentioned in response
to Ms. Benson's questions that you
thought there were about 65,000
nursing home patients that are on
Medi-Cal in California.

A. Yeah, less than that, but
yes.

Q. And was that true in the
2006 to 2008 period?

A. It's been true for 15
years.

Q. Okay.  How many Medi-Cal
participating hospitals are there in
California?  Ballpark estimate is
fine.  I know it's a big state.

A. Well, every hospital
participates.  I think there's in
excess of 300 participating

416

hospitals.

Q. So presumably, would that
65,000 nursing home patients -- my
goodness, would that 65,000 nursing
home patients be distributed around
the state?

A. Yes.  It's a geographical
distribution that wouldn't really
vary by county.

Q. Okay.  Can I ask you to
look at, it's Provider Exhibit P27,
page 502?
***

THE CHAIRMAN:
What was the page again?

MR. GETZOFF:
502.

THE CHAIRMAN:
Okay.

MR. GETZOFF:
502.
***

BY MR. GETZOFF:
Q. Okay?  Are you familiar
with the aid code 14 on this page?

417

A. Yes, that's the Medi-Cal Medically Needy program. And that basically are people who would otherwise qualify for SSI, but chose not to get the cash grant.

***

MR. GETZOFF:

I think that's all I have.

THE CHAIRMAN:

Okay. Mr. Olszewski?

MR. OLSZEWSKI:

I do not have any questions, thank you.

THE CHAIRMAN:

Okay. With that, your testimony is complete. And do you have any other witnesses, Mr. Getzoff?

MR. GETZOFF:

Excuse me?

THE CHAIRMAN:

Do you have any other witnesses?

MR. GETZOFF:

No. No, there are no other

418

witnesses.

THE CHAIRMAN:

Okay. And, Mr. Olszewski, do you have witnesses?

MR. OLSZEWSKI:

No. No witnesses.

THE CHAIRMAN:

Okay. Then at this point we can move to Board questions.

MS. BENSON:

So I guess my question here would concern expedited judicial review. If you take a look at the proposed -- I'm sorry, the final rule that proposes the methodology and then finalized it, and talks about the dates of the various runs that are going to be used, what systems they're going to come from, what codes CMS is going to pick up, what cost report years are involved, do you believe that the Board has the ability to

419

make a determination that we should use Pomona's information as opposed to following the methodology set out in the final rule?

MR. GETZOFF:

I do. I think that the Board certainly has authority to order additional payment where an issue of -- appears on a cost report and is, you know, raised to a level of uncertainty such as this. So I think the Board has a general power to do that. I also would say that we are not claiming that any of the plain language of the regulation or the statute are a problem here. We are not attacking CMS' process, per se, we are simply arguing that the data is correct and we have, I believe, shown, you know, to a fairly good degree that there

420

are serious problems that are not being picked up, for whatever reason. And it may be human error, it may be system error, it could be anything, that are not being picked up and that is creating this huge discrepancy in the data. So I do believe that the Board has the power to make a ruling on that basis. I also believe that if the Board, after deliberation, reached findings but could not -- felt that it was somehow constrained by a CMS regulation or ruling, which I don't believe applies to this here, but it -- if it did, the findings could be issued and at that point either the Board could seek on its own motion expedited judicial review based on those findings, or you can ask the Provider and

421

1    we can make a decision at that
2    point as to whether to seek
3    EJR.  But I think this case is
4    so heavily factual that
5    without findings of fact,
6    there really is not a legal
7    conflict that overrides
8    everything and that would
9    force us to go to court.
10  MS. BENSON:
11       Okay, thank you.  Mr.
12       Olszewski, do you have any
13       comments?
14  MR. OLSZEWSKI:
15       Yes.  The MAC disagrees and
16       believes the Board does not
17       have the power, given the
18       final rule, and should not be
19       able to use Pomona's data in
20       place of CMS'.
21  MS. BENSON:
22       Okay.  I only have one other
23       question.  And I didn't see in
24       the record the proposed rule.
25       I don't know if either of you

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

422

1    believe it's there, but if
2    not, Mr. Olszewski, if you
3    could add that as an exhibit,
4    I would appreciate it.
5    MR. OLSZEWSKI:
6        I will.
7    THE CHAIRMAN:
8        That's to the fiscal year 2011
9        final rule published in 2010.
10  MR. OLSZEWSKI:
11       I was just checking if there
12       was a binder.  Okay, that's
13       okay.  Is that the one I gave?
14  MR. GETZOFF:
15       Must be.
16  MR. OLSZEWSKI:
17       If it's not, I'll certainly
18       supplement the record.
19  MS. BENSON:
20       Okay, thank you.
21  MR. OLSZEWSKI:
22       Um-hum.
23  MS. BENSON:
24       That's all I have.
25  THE CHAIRMAN:

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

423

1        Mr. Ahern?
2    MR. AHERN:
3        Yeah, I just wanted to revisit
4        this concept of CMS' process
5        versus an error in the actual
6        application of the process,
7        because that's central to the
8        idea of whether we have
9        authority or not.  And so I
10       understand you're arguing that
11       if there is an error, a
12       technical error, and I
13       remember Mr. Hefter put
14       forward the hypothetical
15       scenario where the people with
16       the letter S are not being
17       picked up...
18  MR. GETZOFF:
19       Yes.
20  MR. AHERN:
21       ...just a technical error...
22  MR. GETZOFF:
23       Right.
24  MR. AHERN:
25       ...there was no question if

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

424

1    people understood it, they
2    would fix it, things would
3    change.  No debate, nothing,
4    it was just a matter of fixing
5    a computer programming line of
6    code.  If that were the case,
7    you would say we have the
8    authority to provide a remedy
9    and adjust the reimbursement.
10   Is that where you're coming
11   from?
12  MR. AHERN:
13       Yes, if there was an error of
14       that type, I would say
15       unquestionably you have the
16       authority to correct it.  I am
17       also saying that -- I will
18       compare this case to another
19       case that you recently
20       decided, the Hall Render, it's
21       a long name, that was in
22       April, the -- that case the
23       Provider was arguing that the
24       codes were not broad enough
25       that SSA was giving to CMS.

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

425

They were only giving them the C whatever, C01 or MO -- you know, those codes, which -- and they were only using three of them.  And in that case they were arguing, well, there's these other eligible patients out there and they should be using more codes, they should really be allowing more.  We don't see evidence in this case that suggests that, as a general matter, incorrect codes are being used, because we haven't seen the data.  We asked for it, but we can't get it.  All we see is a discrepancy in the data from what we see as -- or what the Provider sees as a population of claims and patients where every indication is that they were getting SSI benefits.  Now, there may be a few on the

426

margins who were, you know, either in a nursing home situation that somehow wasn't picked up, or there was someone who -- you know, a nursing home that then went to the hospital, which is, you know, admittedly a somewhat small population.  And there may be a couple of other -- you know, a few days here, a few days there, but again, there appears to be some discrepancy and no one seems to know what it's being caused by, and the only way to get at it is through the SSA database itself, which we can't get at either through the Federal Government, because it doesn't want to cooperate in that way, or the state, which Mr. Rosenstein explained that, you know, they simply can't because they have a contract

427

with the SSA and they can't share it.  So I think the Provider is left with, you know, the legislative, the Members of Congress, the people from -- the acting commissioner of the SSA, the then-administrator of CMS all said, well, you have to go to the PRRB.  So we've come to the PRRB.  There are actions that the PRRB can take that would be very helpful to the Provider, and we do believe that we're certainly, at a minimum, entitled to the benefit of your findings.  Now, whether you agree with us or not, that's up to you, I mean all four of you today, and five of you in total, but in terms of resolving this matter, and if you ultimately conclude that you cannot order payment because of language in

428

a final rule, which I might add, again, is interpretation of a regulation, not a regulation itself, you -- then at that point EJR may be appropriate, and I would hope we'd have that opportunity.  But to just EJR this case without findings, we have no factual record, it's not a specific legal issue, and a court might, frankly, turn around and remand it back and say, wait a minute, where's the record.

MR. AHERN:

Well, that said, if I were to try to identify an error, first, I have to admit Mr. Rosenstein couldn't find it because he didn't have the data, which would make it very unlikely that I'm going to find it if I -- because I don't have the data and I

429

1  don't have Mr. Rosenstein's
2  background in the technical
3  aspects of how this is done,
4  so how would a Board find that
5  -- with any confidence that --
6  other than simply a
7  statistical deviation, which
8  could be a basis, but is there
9  any other basis to conclude
10 that there's an error, as
11 opposed to the process simply
12 working the way it should, but
13 we get a strange and
14 improbable but nonetheless
15 accurate outcome?  How can we
16 come to a technical conclusion
17 error versus non-error other
18 than simply seeing two
19 different norms and say, well,
20 this does look like it's
21 deviating from the norm, but
22 beyond that...
23 MR. GETZOFF:
24      Well...
25 MR. AHERN:

430

1       ...how -- because we don't
2  have the data either, and
3  we're not intimately familiar
4  with the process...
5  MR. GETZOFF:
6       The deviation is...
7  MR. AHERN:
8       ...on that level.
9  MR. GETZOFF:
10      ...is so large...
11 MR. AHERN:
12      Okay.
13 MR. GETZOFF:
14      ...first of all. I think, you
15 know, at least most people in
16 this room would agree that
17 it's a very large discrepancy
18 from the norm.  And there's no
19 evidence in this hospital's
20 background or location or --
21 it's a large hospital, it's
22 not a hospital that would be
23 susceptible to, you know, wild
24 swings of data in any given
25 year.  And if one looks at the

431

1       -- you know, in terms of how
2  you can have confidence, the
3  confidence would derive from
4  the level of scrutiny that
5  this hospital has given these
6  data sets.
7  MR. AHERN:
8       And that would be our sole
9  basis that we can actually
10 knuckle onto, as opposed...
11 MR. GETZOFF:
12      We...
13 MR. AHERN:
14      ...to...
15 MR. GETZOFF:
16      The number of sources that
17 have been looked at, the
18 number of repositories of data
19 that have been scrubbed for
20 each one of these patients,
21 each one of these admissions,
22 each one of these, you know,
23 days within the admission, it
24 -- I think there was one
25 statistic, I'm not a witness

432

1       and this is not...
2  MR. AHERN:
3       Um-hum.
4  MR. GETZOFF:
5       ...meant to be a
6  representation of a fact, but
7  there was one that Ms. LeTran
8  had showed me at one point
9  where they look at, you know,
10 something like 1.8 million
11 pieces of data per year to get
12 at this result and this study.
13 And, you know, maybe the
14 Social Security Administration
15 and CMS do the same thing, I
16 tend to doubt it, although I'm
17 not there, I don't know, but,
18 you know, this was a very,
19 very thorough undertaking, and
20 to come out with results
21 showing, I'll just compare
22 apples to apples, 35 percent,
23 37 percent, 39 percent of
24 patients looking like SSP-only
25 in a given year, versus a

433

statewide average of 14
percent, that is a monstrously
large discrepancy, and it's
not easily explained by any
logical factor that has been
looked at in this scrubbing
process.  And Mr. Hefter
himself, you know, looked at
this and said this just -- I
don't want to put words in his
mouth, but this doesn't look
right to me.  Something is not
right.  It really needs to be
looked into.  So that's why I
say that with that record, for
us the conclusion would be
that there is a problem here.
I think the only way to
conclusively answer the
question, I think everyone
would agree that the only way
to 100 percent conclusively --
is to get into the Social
Security data...
MR. AHERN:

434

And...
MR. GETZOFF:
...which no one can do.
MR. AHERN:
Which we cannot do either.
MR. GETZOFF:
Yes.  So I think short of
that, one has to look at the
-- again, go back to if you
cannot -- if you don't feel
you have the authority to make
a final judgment on the matter
in terms of assigning a
specific amount of payment,
then I think at that point,
with your findings, going to a
court with an expedited
judicial review at that point
would potentially give the
court a foundation on which to
order SSA to release the
information.  So that would be
the fallback position if we
can't have a, you know,
completely positive result,

435

which, of course, is what we
would ask for in the...
MR. AHERN:
Well, I think you can see
where I'm coming from...
MR. GETZOFF:
Yes.
MR. AHERN:
...that this is -- we have had
cases where CMS has
stipulated, and I'm not saying
this particular issue, but
analogous issues where CMS has
said we made an error.  We've
had cases where you could see
that CMS made an error.  But
this is a case where we have
to kind of deduce, and it gets
rather foggy to come to that
conclusion.  It's not as
clear-cut as other cases we've
had.  So -- and that's why,
you know, you want to make it
very clear where you're coming
from in terms of us looking at

436

this case.
MR. GETZOFF:
Um-hum.
MR. AHERN:
Other than that, I have no
other questions.
THE CHAIRMAN:
Mr. Ziegler?
MR. ZIEGLER:
Yeah, I have no questions.
THE CHAIRMAN:
Okay.  I guess sort of
following up on Ms. Benson and
Ms. -- Mr. Ahern, it'd be
helpful if you did include
with your post-hearing Brief,
you know, specific findings of
fact that you are looking for
the Board to make.  And
certainly, regardless of
whether it takes the form of
an EJR or a published
decision, one of the things
that the Board, I think, will
be looking at will be, you

437

1     know, what authority it has to
2     grant the Provider relief.
3     And so that sort of also
4     raises the question of what
5     relief you're asking of the
6     Board, and I think one of the
7     things that you've stated or
8     implied is that you're asking
9     the Board, in essence, to
10    accept Pomona's numbers rather
11    than, I think, remand back to
12    CMS, assuming the Board had
13    authority to do either.
14 MR. GETZOFF:
15     In terms of a remand back to
16    CMS, if -- and again, we go
17    back to the sample, I mean if
18    they were willing to look at a
19    sample of unmatched patients
20    and run those back through
21    SSA, as from the start, I want
22    to check, but we have agreed
23    that that is something that we
24    would have abided by the
25    result.  And we've said that

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

438

1     from day one, and, frankly, we
2     would have asked the MAC to do
3     it but they don't have
4     authority to go to SSA either,
5     so it's -- yes, if...
6 THE CHAIRMAN:
7     Sure.
8 MR. GETZOFF:
9     ...that is all this Provider
10    wants is some type of
11    verification, and whether it
12    is done voluntarily, which
13    we've tried to do and we've...
14 THE CHAIRMAN:
15    Sure.
16 MR. GETZOFF:
17    ...really tried to avoid this
18    whole hearing, I mean to be
19    perfectly honest, not that we
20    didn't want to come here, but,
21    you know, in terms of time,
22    money, and expense and
23    everything.  So...
24 THE CHAIRMAN:
25    And...

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

439

1 MR. GETZOFF:
2     ...I think that if that could
3    happen, that would be
4    wonderful.  If it can't
5    happen, then, you know,
6    findings from this Board based
7    on this hearing, and if it
8    turned out that you felt you
9    had authority as a Board only
10    to do an EJR at that point
11    with findings, then that would
12    be, you know, a result that we
13    could also live with.  It
14    would be the more circuitous
15    route to the information, but
16    I'm sure we could live with
17    it.
18 THE CHAIRMAN:
19    Sure.  And certainly, you
20    have, you know, made clear
21    throughout your, I think,
22    appeal, as well as final
23    position paper of the desire
24    of the Provider to develop the
25    record, and to have a hearing

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

440

1     for that purpose.
2 MR. GETZOFF:
3     Yes.
4 THE CHAIRMAN:
5     And I know with -- in looking
6     at the Board's authority, it's
7     important to note that the
8     hospital is in a -- sort of a
9     -- I guess potentially unique
10    bucket, but it's important to
11    note what bucket the hospital
12    is in, and that's sort of laid
13    out in our jurisdiction
14    decision. It's the situation
15    where the hospital wasn't
16    subject to at 1498-R remand,
17    but nonetheless, because it
18    had an open unsettled cost
19    report prior to the date given
20    -- for a fiscal year prior to
21    the date given in 1498-R, it
22    is still subject to 1498-R.
23    And the -- there's an
24    interplay there between the
25    ruling and the final rule, the

York Stenographic Services, Inc.
34 North George St., York, PA 17401 - (717) 854-0077

441

final rule on its own is
subject to -- or effective for
fiscal years 2011 forward.
There's another section of
that final rule dealing with
1498-R and its applicability
to 1498-R.  And so that would
be what we would be looking at
in looking at, you know, to
what extent we have authority
versus having our hands tied.
The Hall Render decision was
dealing with where the
hospitals were subject to
remand underneath...

MR. GETZOFF:
    Yes.

THE CHAIRMAN:
    ...1498-R.  So it's a slightly
    different bucket, but
    nonetheless, still a part of
    1498-R.  And I know CMS in
    its, I think, responses back
    to the Providers, or requests
    through Senators and

442

Representatives, gave a
response back about suggesting
why, I think, its position --
what its position may be
regarding the Board authority,
sort of laying out we have a
set process, and I'm sort of
paraphrasing, but it seems to
be reading between the lines
saying we have a set process,
we pull the data once, we only
pull the data once, and we go
from there.  We don't have the
authority to pull -- request
information from SSA more than
once.  And so it'd be helpful
in terms of looking at -- or
addressing what CMS' position
is outlined there.  Also, just
as a side point, I wanted to
for the record find out or get
clarification on Provider's
statement in its final
position paper, and that was
on page 9.  I'm looking at

443

2006, because there is a
reference to the Board and the
Board's knowledge, without a
footnote, and just wanted to
get clarification of what it
actually meant.  On page 9 of
the 2006 final position paper,
the second sentence in the
last paragraph reads, after a
nationwide effort, CMS, with
the PRRB's, and presumably the
MAC's knowledge, established a
process for reviewing Provider
requests for SSI-factor-
related information, which
also processes -- which
process also seeks to remove
any obstacle passed by
privacy-related provisions in
federal law.

MR. GETZOFF:
    That was really just a general
    statement regarding their new
    process for obtaining
    information.

444

THE CHAIRMAN:
    Okay.  So it's -- so the
    Board's knowledge is just
    through what's been
    published...

MR. GETZOFF:
    The cases and...

THE CHAIRMAN:
    Okay.

MR. GETZOFF:
    I wasn't citing -- I mean I --
    if it was in a specific case,
    I would have cited it.  It was
    just -- it's in, you know, it
    trails its way all through the
    cases that Providers are
    seeking the information.  CMS,
    after initially not sharing
    the information, then started
    sharing some information, and
    that was that new process that
    followed Bay State.  And yeah
    -- so...

THE CHAIRMAN:
    Okay, I just wanted to make

445

1    sure it wasn't implying that
2    the Board somehow is involved
3    on the front end with setting
4    policy or involved in policy,
5    or...
6  MR. GETZOFF:
7      I am not making that...
8  THE CHAIRMAN:
9      Okay.
10 MR. GETZOFF:
11     ...assumption or
12     representation...
13 THE CHAIRMAN:
14     Okay.
15 MR. GETZOFF:
16     ...for the record.
17 THE CHAIRMAN:
18     Just -- it was just to clarify
19     that.  And that's all the
20     questions I had.  I don't know
21     if there was any other
22     additional questions?  Let's
23     go off the record.
24          ***
25 [Off the record]

446

1  [On the record]
2          ***
3  THE CHAIRMAN:
4      Okay, we'll go back on the
5      record.  Post-hearing Briefs
6      are due to the Board 60 days
7      from today's date.  The Board
8      expects post-hearing Briefs
9      from both parties.  The Board
10     understands that the parties
11     will exchange information
12     based on the Board's request
13     within 30 days of today's
14     date.  Post-hearing Briefs are
15     intended to give the parties
16     an opportunity to summarize
17     the evidence and arguments,
18     and to propose conclusions
19     based on the evidence.  Post-
20     hearing Briefs are not to be
21     utilized to submit new
22     evidence or to make new
23     arguments.  The Board will
24     only accept new or supporting
25     evidence that is requested by

447

1    Board Members during the
2    hearing.  And as previously
3    noted, there have been a
4    number of Board requests, and
5    ask you to carefully review
6    the transcript to make note of
7    those requests and invitations
8    from the Board.  And
9    certainly, those are
10   invitations, and it's at your
11   discretion whether you
12   respond.  Please make certain
13   that any additional cites
14   and/or materials referenced
15   today are included in your
16   Brief, and that you respond to
17   any Board questions or
18   requests.  Thank you for
19   appearing at this consolidated
20   hearing today.  The hearing is
21   now adjourned.
22        ***
23 [End of Proceedings]
24 nad/seh

# C E R T I F I C A T I O N

I, CYNTHIA KUHNS, hereby certify that the examination of the witnesses in the within case was reduced to writing by me or under my supervision, and that the transcript is a true record of the testimony given by the witnesses.

I further certify that I am neither attorney, nor counsel for, nor related to or employed by any of the parties in which this action is taken, and further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

IN WITNESS WHEREOF, I here unto set my hand this 29th day of August, 2017.


*Cynthia Kuhns*

CYNTHIA KUHNS

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

## #

#3 [1] 209:24

## $

● [1] 91:23
$100 [1] 194:20
$100,000 [1] 199:1
$17 [1] 145:17
$18 [1] 50:19
$2,000 [1] 254:1
$250,000 [1] 181:11
$30 [4] 393:18,20 395:25 396:1
$4 [1] 145:20
$600 [1] 194:8
$700 [1] 194:18
$800 [2] 194:12,16
$800,000 [1] 147:23

## *

*** [59] 3:15 45:6,8,14,19 46:3,10
58:15 60:5 73:16,21 115:12,21,24
116:20 117:24 118:6,18 203:11
204:6,23 205:1,8,10,16,21 207:23
209:4,7,14 210:24 211:9 242:16
243:1 244:20 268:21,24 269:11,
13,19,24 282:6 284:17 286:19
294:14,17 295:19 328:19 329:14,
24 330:7 334:8 415:5 416:13,22
417:6 445:24 446:2 447:22

## 0

0503 [1] 183:15
06 ●8 224:5 326:19
07 ●8 74:3 224:5 274:12 326:
20
08 [5] 18:8 74:3 228:19 274:13 326:
20

## 1

1 [6] 341:23 342:8 354:19 384:7,7
413:17
1,000 [2] 238:25 253:25
1,129 [1] 82:24
1,146 [1] 138:15
1,204 [1] 138:12
1.8 [1] 432:10
1/2 [1] 91:20
10 [63] 25:10 70:16 71:4 72:25 73:1
5 74:17 75:13,22 81:11 82:3,5 87:
22 89:6 98:20,22 99:3,8 141:14,
19 147:17 171:23 176:14 188:11
191:14 203:17 220:5 222:21 225:
25 226:18,24 227:7 243:8 261:15
262:1,7,13 311:6 316:11,19 319:
22 320:4,22 322:2,2,2,2,2,2,3,3,
3 331:16 334:24 338:22 340:6,19,
22 341:12,18,22,24 342:14 343:17
345:22 350:5 351:5,7 373:13 377:
23 378:7 384:8 385:14 387:21
388:21 392:15 394:4 395:1 396:9
401:15 404:2 408:16
10,000 [1] 151:12
10●ute [1] 115:19
10●:28 192:9 307:15 309:22

317:13 318:7 320:19 433:22
107 [2] 75:1,3
108 [2] 75:2,3
109 [1] 75:3
10s [2] 226:12,22
11 [2] 122:1,6
117 [1] 3:6
119 [1] 3:6
11a [1] 75:1
11b [1] 71:23
12 [4] 147:17 251:15,16,19
12/31 [1] 118:7
12:30 [1] 312:20
13 [2] 274:2 277:5
13-0430 [7] 1:12 3:20 4:1,8 5:5 9:4
16:6
13-0628 [7] 1:13 3:23 4:1,11 5:5 9:
8 16:11
13-0680 [7] 1:14 3:26 4:1,14 5:6 9:
14 16:16
1395ww(d)(5)(f [1] 210:1
14 [34] 95:9 96:15 118:15,16
178:2 179:8 187:21 188:10,24
232:19 253:8 254:14 255:14 265:
12 266:21 267:5 268:10 300:21,
24 301:19,23 303:9 323:24 324:8,
14 325:2 332:7 379:14 395:9 397:
5 400:15 416:25 433:1
14.7 [1] 91:16
14.74 [2] 89:20 91:6
1498 [1] 119:19
1498-r [11] 120:14,16 122:8 123:19
440:16,21,22 441:6,7,19,22
1498-r2 [3] 119:25 120:9 180:24
14s [1] 226:5
15 [12] 3:21,24,27 4:2,9,12,15 36:
18 42:20 195:17 232:19 415:17
15.09 [1] 191:5
1508 [1] 1:27
15th [1] 195:9
16 [3] 4:9,12,15 41:8 145:17
1611(c)(7 [1] 362:11
1634 [2] 304:17,19
1638 [1] 171:9
17 [4] 1:25 5:2 23:3 91:19
176 [1] 78:9
179 [1] 79:15
18 [2] 147:20 148:4
184 [4] 57:22,22,24 60:15
187 [2] 59:6 60:24
1878 [1] 5:17
1889 [1] 5:21
19 [3] 61:2 83:2 222:11
191 [1] 57:25
192 [1] 221:17
193 [1] 221:17
195 [1] 237:8
197 [1] 237:8
1977 [2] 270:15 279:2
1979 [1] 307:8
1980s [2] 307:17 310:8
1983 [1] 271:4
1986 [2] 271:4 272:4
1987 [1] 180:18

1990 [1] 181:9
1993 [2] 272:4 273:1
1996 [2] 273:1,20
1e [4] 82:9 185:4 186:9 188:24
1st [1] 195:11

## 2

2 [1] 384:8
2,000 [2] 222:22 238:25
2,200 [1] 196:11
2,400 [1] 224:1
20 [6] 25:12 70:16 71:4 72:25 73:1,
5 75:14,22 81:12 82:3,5 87:22 99:
5 141:14,19 171:23 176:14 188:
15 191:14 203:17 220:5 222:21
226:18,25 227:7 243:8 261:15
262:1,7,15 311:6 316:11,19 320:5
22 331:16 334:24 338:22 340:7,
19,22 341:22 342:14 343:17 345:
22 350:6 351:5,7 352:15 377:23
378:7 385:14 387:22 392:15 394:
4 395:1,17 396:9 401:15 404:2
408:17
200 [1] 408:16
2005 [1] 120:12
2006 [52] 9:6 16:8 21:21 25:14 35:
19 53:15,18,20 54:16,17 63:15 71:
22 73:8 74:1,3,24 77:25 80:10 83:
13 85:20 88:5,9 89:19 90:6 91:23
93:12 95:2,14 97:22 99:2,8 100:6
131:6 209:23 217:17 222:3,8,10
228:18,20 275:4 281:25 302:1
306:17 311:9 321:22 323:9,12
330:24 415:16 443:1,7
2007 [18] 9:10 16:12 21:21 53:15
73:9 77:25 83:21 84:3 85:20,23
86:6 92:6 93:12 95:24 99:9 228:
19 273:21 317:20
2008 [29] 9:16 16:18 21:21 35:19
53:15,18 73:9 78:11 83:22 84:15
85:21 86:20 87:2 88:5 92:6 93:13
95:2 96:7 99:9 217:17 222:3 275:
5 282:1 302:2 306:17 311:9 317:
21 415:16
2010 [5] 41:9 120:20 122:4 249:8
422:9
2011 [4] 122:3 249:8 422:8 441:3
2013 [1] 123:10
2014 [2] 51:20 206:16
2015 [3] 75:10 120:11 123:16
2016 [12] 51:17 100:18 101:22 103:
6 104:9,10 106:10 111:1,20 217:
19 227:14 328:3
2017 [4] 1:25 5:2 112:9 113:6
205 [1] 3:7
20s [3] 225:25 226:13,22
21 [3] 91:14 227:13 328:3
21.57 [1] 91:15
22 [1] 206:15
23 [5] 26:21 113:6 147:18,21 148:3
235 [1] 318:14
237 [4] 319:8,9,14,16
24 [2] 237:8 354:18
241 [1] 319:6

243 [1] 3:7
245 [1] 3:7
25 [2] 10:7 11:16
250 [3] 35:14 37:8 326:10
26 [2] 10:7 11:17
27 [7] 10:7 11:25 82:23 116:25 117:
1 321:19 330:13
270 [1] 3:8
28 [7] 11:25 47:2,17 132:6,7,8 192:
3
285 [1] 3:8
29 [2] 10:7 12:4

## 3

3 [2] 112:8 145:20
30 [24] 10:7 26:20 48:14,17 98:2 99:
8,23 100:12 107:13 108:22 109:
21 110:1 112:14 113:9 114:16
115:5,7 132:1,10 241:25 289:9
316:19 319:22 446:13
30,000 [1] 63:20
300 [3] 35:15 37:9 415:25
31 [6] 10:8 12:11,15 139:10 270:16
413:18
32 [4] 10:8 12:15 13:7 184:1
32,371 [7] 189:25 91:3,13 128:16
129:25 130:9 132:24
33 [2] 12:15 13:3
33,149 [4] 89:18 90:3,13 128:14
330 [1] 3:9
334 [1] 3:8
34 [1] 330:19
35 [11] 22:4 37:5 323:16 324:11,11,
13,23 325:7 330:25 331:9 432:22
36 [1] 319:18
37 [4] 10:8 13:7 324:24 432:23
380-some [1] 83:6
381 [1] 323:16
39 [3] 324:24 325:7 432:23

## 4

4,000 [3] 151:14,18 223:25
4,153 [1] 84:12
4,231 [1] 84:19
4,821 [1] 222:14
4,886 [5] 83:19 89:14,22 95:20 117:
14
4,886 [1] 89:16
40 [11] 95:21 96:4,18 117:21,21
218:23 223:16 232:8 300:25 385:
1 408:17
405.1801 [1] 15:20
412.106 [1] 50:1
42 [3] 5:19 49:25 209:25
45 [6] 3:6 22:5 37:6 96:4,12,18
496 [1] 105:1
497 [1] 107:17
498 [1] 107:17
499 [1] 111:5

## 5

5 [1] 36:20
50 [9] 100:12 109:21 218:23 224:2
232:8 304:5,8 310:23 324:7
500 [1] 111:5

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

**501** [10] 80:13 88:19,22,22 89:2,2
222:8,9 223:19 331:13
**502** [6] 71:6,10 188:18 416:12,17,
21
[15] 88:8,24 89:7 93:15 95:12
16:25 117:1 128:5,6,10,11 330:
13,14 331:7,11
**504** [3] 85:20 321:21,24
**517** [4] 85:20 137:25 138:4 321:21
**518** [5] 84:2 223:22,23,23,24
**519** [3] 92:1,5 95:23
**521** [1] 85:20
**522** [1] 85:24
**5280** [2] 358:11,23
**5281** [2] 362:5 392:23
**534** [3] 85:21 86:7,11
**535** [1] 84:16
**536** [3] 92:1,5 96:9
**538** [2] 85:21 86:19
**54** [1] 272:16
**541** [4] 319:3,5,6,11
**547** [1] 87:15
**553** [1] 85:21
**558** [1] 108:11
**574** [1] 108:12
**575** [1] 112:1
**576** [1] 112:1
**577** [2] 112:2,23
**581** [1] 270:11
**584** [1] 323:5
**589** [3] 323:7 330:19,19
**59** [1] 301:2
**59** ⬤ 8:2

**6**

**6,595** [1] 84:18
**6,665** [2] 84:11 86:10
**6,982** [5] 83:17 88:23 91:11 95:20
117:10
**6.8** [1] 191:17
**60** [6] 148:12 61:4 70:16 71:4 72:25
73:2,5 75:14,22 81:12 82:3,5,9 87:
23 141:15,19 171:24 176:14 188:
15 191:15 203:17 220:5 222:22
226:18,25 227:7 243:8 261:15
262:1,7,16 311:6 316:12 319:19,
22 320:4,22 331:16 334:24 338:
23 340:7,19,22 341:22 342:14
343:17 345:22 350:6 351:6,7 377:
23 378:7 385:14 387:22 392:15
394:5 395:1 396:9 401:15 408:17
446:6
**60s** [3] 225:25 226:13,22
**612** [1] 297:16
**614** [1] 299:11
**619** [1] 23:11
**620** [1] 23:11
**64** [1] 82:9
**64s** [1] 226:5
**65** [1] 262:14
**65,000** [5] 340:17 396:22 415:10
416:3,4
**68** ⬤ 1:2
**66** ⬤ 5:4 188:24

**7**

**70** [1] 279:2
**716** [1] 323:15
**748** [1] 83:3
**7980** [1] 370:2

**8**

**8** [7] 3:21,24,27 4:2 73:18 93:15
106:10
**8:50** [1] 1:26
**80** [1] 164:9

**9**

**9** [6] 88:24 96:4 147:17 301:3 442:
25 443:6
**95** [1] 310:25

**A**

**a.m** [1] 1:26
**abbreviation** [2] 61:24 62:1
**abide** [3] 102:7,12,19
**abided** [1] 437:24
**ability** [2] 25:1 418:25
**able** [28] 10:15,19 47:25 65:17 67:
21 76:19,20 81:23 83:1,5 84:24
87:22 94:8 95:3 164:2 174:19 177:
14 193:15 202:19 229:8 234:15
291:15 314:10 317:25 331:8 381:
1 397:25 421:19
**above** [2] 297:14 325:12
**absolutely** [2] 31:17 32:14
**abstracted** [1] 371:2
**accept** [5] 282:10 288:5 294:22
437:10 446:24
**accepted** [2] 282:13 287:3
**accepting** [2] 70:25 252:17
**access** [5] 281:14 311:21,23 316:
24 373:18 374:4,8 381:2,11 401:7,
18
**accessed** [1] 382:4
**accesses** [1] 313:18
**accommodate** [1] 317:25
**according** [3] 173:5 228:12 343:6
**account** [14] 19:20 34:8 35:21 73:
8 76:23 86:3 99:5,6 107:13 115:3
131:22 252:21 326:13 396:25
**accountable** [2] 38:12 304:9
**accountant** [1] 49:12
**accounting** [2] 49:17 216:1
**accounts** [20] 68:6 70:16 73:24
74:17 76:18,24 77:7,8,18,25 80:
22 85:2 98:20,22 99:4,8,9,24 115:
5 395:13
**accuracy** [7] 233:20,25 308:2 310:
11 317:14 326:17 385:3
**accurate** [25] 23:20 38:14 43:19
143:21 213:6 215:8,25 249:5 252:
18 307:24,25 309:18,23 315:1
316:15 318:6,8 321:16 322:9 324:
9,18 326:8 355:22 385:20 429:15
**accurately** [4] 41:17 213:20 316:
17 317:17
**across** [3] 76:21 224:16 265:4
**act** [6] 5:18 23:1 28:20 329:16 362:

**11** 393:10
**acted** [2] 328:16 329:5
**acting** [6] 2:4 15:5 240:16 241:11
273:22 427:6
**actions** [4] 285:5,13 357:9 427:11
**active** [1] 29:15
**actual** [11] 21:8 89:12 96:2 124:25
131:22 159:7,8 195:6 349:2 375:6
423:5
**actually** [53] 11:18 14:11 26:2 28:
17 31:24 32:21 34:3 36:5 37:1 51:
24 69:17 90:4,13 101:13 125:10
154:19 156:11,12 168:9 173:22
174:1 180:17 193:19 195:9 208:
21 209:24 212:2 226:4 245:12
248:8 262:3 266:12 271:25 278:
25 285:6,9,14 286:4 316:10 322:
10 331:20 343:19 344:2 348:20
354:14 356:13 358:13 386:20 391:
4 393:15 414:20 431:9 443:6
**acute** [5] 26:19,23 30:2 100:23
206:17
**add** [5] 160:25 319:4 350:1 422:3
428:2
**add-on** [1] 50:14
**added** [1] 24:5
**addition** [5] 81:10 125:4 257:19,
23 306:13
**additional** [16] 25:12 81:14,17 88:
15 99:6 106:11,23 113:25 203:2
204:10 241:24 257:10 268:5 389:
13 410:20 419:9 445:22 447:13
**address** [9] 13:11 34:23 193:15
202:22 210:3 211:12 216:3 246:
23 249:22
**addressed** [2] 216:11 250:4
**addressing** [3] 249:23 268:16
442:18
**adds** [2] 306:1 312:16
**adjourned** [1] 447:21
**adjust** [1] 424:9
**adjusted** [3] 52:5,7,11
**adjustment** [12] 18:6 19:5 22:21,
24 23:22 24:5 38:9,23 52:14,19
53:2 210:8
**adjustments** [2] 44:13 52:20
**administer** [4] 44:1 217:7 278:19
298:5
**administered** [6] 258:20,25 259:5
296:13 408:25 409:3
**administering** [1] 270:21
**administers** [1] 298:19
**administration** [74] 14:25 15:23
21:9 24:24 25:4 27:18 31:21 32:
18 40:25 71:20 108:24 110:7 212:
11 214:1 217:5 219:20 236:7 257:
5,15 274:7 278:3,11,15,19 279:5
280:15 283:2 290:10,17 296:14
303:24 304:22 305:3,6,15 306:3,
15,22 307:4 312:25 313:6,9 314:8
320:18,21 329:21 344:11 346:9
351:14,20 355:24 356:21 360:15,
21,25 361:1,3,8,13,23 363:6 380:3
381:12 389:24 398:3 404:21 405:

**3,8,14,25** 410:6,8 414:15 432:14
**administration's** [2] 105:2 313:8
**administrative** [10] 5:10 6:25 37:
18,24 38:6 41:24 42:6 43:5 173:
10 257:10
**administratively** [2] 44:3 239:20
**administrator** [3] 15:5,6 293:12
**administrators** [1] 1:19
**admissibility** [1] 6:17
**admission** [6] 66:7,12 78:25 165:
20 182:24 431:23
**admissions** [3] 87:16 161:23 431:
21
**admit** [2] 87:4 428:19
**admitted** [4] 3:17 4:5 87:5 215:21
**admittedly** [1] 426:8
**admitting** [4] 47:24 162:20 163:4,
6
**adopted** [2] 23:5 303:15
**ads** [1] 382:4
**advance** [3] 28:14 288:17,18
**advantage** [1] 47:12
**adversary** [1] 6:9
**advice** [1] 277:20
**advisor** [2] 2:9 277:18
**advisory** [3] 47:7 48:7 371:22
**aevs** [11] 281:2,3,13,24 311:17 312:
1,11,14 313:16,19 368:6
**afar** [1] 206:1
**affect** [2] 218:18 358:6
**affected** [1] 18:15
**affecting** [1] 207:8
**affects** [2] 357:17 387:14
**affirms** [1] 44:13
**afraid** [1] 361:24
**afternoon** [3] 270:2,5 363:23
**age** [1] 58:13
**aged** [12] 73:4 75:14 229:1 320:23
321:7 335:10 351:4 356:3 378:13,
23 379:1 383:3
**agencies** [5] 28:7 406:6,13 412:11,
12
**agency** [15] 121:3,11 239:23 241:
14 242:7 270:20,24 307:21,22
309:12,15 360:2 407:18 408:23
409:1
**agency's** [1] 213:3
**agent** [3] 272:12 281:15 373:25
**ago** [8] 18:21 25:9 35:3 51:18 256:
10 314:19 332:12 408:17
**agree** [12] 93:7 101:5 108:24 201:
20 215:22 238:2 329:19 340:11
400:21 427:18 430:16 433:21
**agreed** [17] 7:22 8:16 28:13,17 34:
4 38:11 89:23 101:10,11 105:21
107:8 109:3 110:24 218:5 244:4
351:18 437:22
**agreement** [19] 76:22 85:6,9 123:
7 171:9 243:16,20,21,25 244:3,10,
17 247:8 278:14 304:18 332:15
334:5 405:15,25
**agreements** [2] 28:24 39:25
**ahead** [6] 60:4 156:19 162:18 174:
9 289:9 336:15

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

ahern [84] 2:6 142:21,22 143:2,7,
12 144:3,9 146:16 147:9 148:8,17
149:11 150:6 151:11,15,20,24
152:5,16 153:1,5,11,20,25 154:7
12 255:17 363:19,20 364:3,13
365:11 366:3,12,22 368:14 369:5
370:9,14,20 371:8,23 372:17 373:
2,9 374:22 375:7,17 376:2,10,15
377:8,14 411:8,15,20,25 412:5,13
423:1,2,20,24 424:12 428:16 429:
25 430:7,11 431:7,13 432:2 433:
25 434:4 435:3,8 436:4,14
aid [155] 29:13 60:8 61:3,6,21 64:
10,12,16,22 65:1,4,6,9,13,16,18,
20 66:11,14,17,20,22 67:9,13,17,
18 68:3,5,13 70:5,6,9,10 71:3,9,11,
18 72:17,25 73:2 75:12,21 77:21
79:11 81:13,14,17,20,24 82:2,8
84:20 87:22 100:1,8 125:25 126:4,
7 130:25 141:14 148:25 149:5
155:10,11 159:25 160:11,13 161:
24 162:9 163:12 165:6 187:2 188:
23 203:25 220:9 221:2,19 225:17
226:18 227:15,25 229:15,21 230:
21,25 231:7 243:7 275:18 281:20
283:3 290:18 306:1 307:5 308:5,8
309:3,5,13,19,25 310:2,4,5,5,11,
16,21 311:1,2,6 312:5 314:2,3,5,8,
12 316:6,20 318:5 319:19,24 320:
4,7,10,16 321:3,25 322:3,11,13,16
332:4 334:22 335:8 336:17 337:7
33       :9,6,7 357:10 358:7 360:
16       25 404:5 407:16,21 408:1,
8,11,12,14,15,22 409:21 416:25
algorithm [1] 368:18
allow [4] 6:13 281:4 284:5,12
allowed [1] 361:11
allowing [1] 425:10
allows [1] 43:25
almost [5] 35:3 89:11 91:23 164:6
211:20
already [1] 151:4
although [6] 6:7 31:7 215:20 238:
7 285:5 432:16
amanda [6] 105:9 108:5,6 109:2
111:12 112:20
among [3] 271:18 278:13
amount [9] 97:3 256:24 257:7,8
304:14 339:9 340:20 411:6 434:
14
amy [8] 72:2,10,12 75:9,11 76:4 93:
24 176:8
analogous [1] 435:13
analyses [1] 74:9
analysis [23] 20:23 25:22 29:18
55:2 56:17 63:9 66:14 77:3,22 80:
19 81:25 83:8 91:10 96:15 140:13
164:3 233:12,13 315:18 327:23
352:14 359:13 361:24
analysts [1] 240:21
analytics [2] 29:11 46:23
an       4 [4] 67:1,2 300:6 361:7
an       ed [1] 300:17

and/or [4] 38:25 229:1 311:4 447:
14
angeles [3] 24:1 61:3 179:16
announced [1] 215:16
annual [1] 51:6
annually [4] 63:3 78:23 207:4,5
anomaly [1] 90:18
another [24] 12:6 59:14 62:24 71:
1 90:18 123:15,15 146:8 156:15
168:12 184:24 195:1 202:18 223:
22 242:13 261:12 300:23 341:2
342:20 343:14 344:6 375:8 424:
18 441:4
answer [14] 136:9 141:22 174:20
193:23 195:24 219:6 234:6 235:6,
6,12 239:10 258:13 261:24 433:
19
answered [2] 115:11 381:8
answers [2] 209:21 353:17
anticipate [1] 145:25
anticipated [1] 91:22
anybody [10] 218:14 241:21 244:
16 278:17 297:9 299:4 303:17
334:2 394:1,21
anybody's [1] 172:4
apologies [2] 319:13,15
apparent [2] 33:12 35:12
appeal [20] 19:18 49:21 52:20,22,
23 53:2,12 102:15 173:6 196:8
197:25 199:9,19 200:18 201:8,13
239:12,15 361:9 439:22
appealing [1] 68:25
appeals [8] 18:25 19:11,13 20:12
38:22 217:16 275:4 314:16
appear [5] 22:25 33:12 96:1 301:4
322:8
appearances [1] 2:1
appeared [3] 27:9,13 292:6
appearing [2] 273:22 447:19
appears [9] 108:13 237:7 297:20
419:10 426:13
apple-to-apple [1] 324:2
apples [6] 134:19,19,21,21 432:22,
22
apples-to [1] 324:9
apples-to-apples [2] 137:21 332:
15
applicability [1] 441:6
application [18] 165:18 166:1,2,3,
4,9,12,18 167:13 171:18 342:5
343:20 345:25 362:13,17,22 393:
11 423:6
applications [2] 168:5 355:15
applied [4] 20:8 345:14 349:8 354:
23
applies [4] 165:20 324:10 413:15
420:18
apply [11] 5:24 20:7 134:6 168:12,
22 169:15,19 347:12 355:7,23
356:4
applying [1] 134:8
appreciate [5] 138:22 143:6 154:
14 250:23 422:4
approach [2] 225:23 226:12

approached [2] 27:16 104:6
approaches [1] 27:23
approaching [1] 146:9
appropriate [8] 14:21 18:13,22 42:
5 227:25 254:19 284:5 428:6
approval [3] 65:18,21 364:6
approve [1] 369:13
approved [2] 6:6 86:2
approximately [9] 48:9 49:19 78:
22 95:14 100:15 101:16 217:13
314:13 326:10
april [4] 120:11 271:4 272:4 424:
22
area [11] 26:11 47:9 49:1,10 146:4
241:6 254:4 255:13 277:21 303:7
367:2
areas [3] 290:19 295:8,10
aren't [3] 11:8 125:5 225:7
argued [1] 215:8
arguing [4] 419:22 423:10 424:23
425:6
argument [7] 6:16 35:20 218:13,
15 239:17 292:1,20
arguments [4] 31:10 32:7 446:17,
23
arise [1] 193:18
arm [1] 276:14
around [12] 75:10 96:12 103:5 107:
1 120:10 123:10 145:24 271:16
292:23 370:7 416:5 428:13
arranged [1] 14:9
arrive [1] 301:5
aside [2] 92:12 211:24
aspects [3] 56:7 276:7 429:3
assert [1] 40:7
asserted [1] 37:19
asserts [2] 40:12,18
assessing [1] 29:18
assign [4] 64:22 314:11 387:1 409:
21
assigned [8] 64:13,23 228:1 320:
25 321:2,3 345:23 349:6
assigning [3] 172:7 316:6 434:13
assignment [2] 372:6 381:22
assigns [3] 307:5 309:12,17
assist [4] 63:8 103:20 219:18 315:
3
assistance [1] 106:24
assistant [1] 273:23
associated [1] 225:20
associates [5] 332:19,20 333:2,6,
9
association [2] 276:11,13
assume [6] 161:22 220:18 232:21
233:14 341:2 377:22
assuming [7] 234:12,12 258:4
359:6 379:19 384:6 437:12
assumption [2] 39:24 445:11
assure [2] 126:9 227:24
assured [1] 109:11
attached [1] 298:12
attaching [3] 173:4,7 258:17
attachment [2] 228:4 298:15
attacking [1] 419:20

attempt [5] 74:4 97:19 100:10,13
101:17
attempted [1] 96:24
attempting [1] 14:23
attempts [1] 111:23
attention [4] 83:25 116:24 137:24
213:3
attracted [1] 144:17
audited [2] 63:2 86:1
auditing [3] 48:24 49:4,8
auditor [1] 49:2
augmentation [1] 194:4
august [16] 1:25 5:2 41:8 145:24
341:11,18,23,24 342:8 343:4 354:
18,19 413:16,17,18,22
authenticity [1] 14:2 237:16
authority [16] 5:16 241:1 275:22
419:8 423:9 424:8,16 434:11 437:
1,13 438:4 439:9 440:6 441:10
442:5,14
authorized [1] 116:5
automated [2] 272:20 281:1
automatic [3] 278:16 303:15 304:
25
automatically [2] 194:14 409:8
available [22] 35:24 36:10 37:2,17,
23 38:15,18 39:3 42:12,24 51:13,
19 55:7 63:13 66:15 145:6,7 161:
6 168:11 249:17 313:2 365:14
avenue [1] 239:12
average [17] 95:7 177:16 178:1,2
179:9,14 232:25 252:20 254:6
300:21 302:20 303:9 325:2 326:6,
11 327:2 433:1
averages [3] 35:16 302:10 325:21
avoid [3] 97:6 113:17 438:17
avoided [1] 28:12
awaiting [1] 19:14
awake [1] 363:24
aware [18] 19:2 51:2 66:2 92:22
103:24 104:16,18 162:8,21 168:
10 173:17 200:9 214:6 264:20
316:22 317:5 325:4 329:23
away [4] 104:8 144:17 238:6 354:
13

**B**

bachelor [1] 49:16
bachelor's [1] 278:5
back [55] 50:19 60:16 61:8 73:12,
13 76:8 95:12 100:7 105:22 106:4,
18 111:24 116:1 136:14 138:18
145:5,20 147:20 157:13 174:17
181:10 183:16 189:12 201:12,13
205:3 208:17,24 209:9 215:23
227:10 228:6 279:1 286:10,18
294:19 295:21 313:23 323:4 331:
7 332:10 353:15 369:12 370:7
376:1 377:19 428:13 434:9 437:
11,15,17,20 441:23 442:2 446:4
back-and-forth [1] 412:8
back-out [2] 93:16 94:4
backdrop [1] 152:21
background [8] 252:16 277:8,24

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

278:2 366:25 370:23 429:2 430:
20
**backing** [1] 80:21
**backlog** [1] 355:11
**nce** [1] 142:5
**ballpark** [1] 415:21
**baltimore** [1] 1:29
**base** [1] 52:25
**based** [60] 16:4 34:2 43:12,16 44:6
50:25 51:24 52:23 67:4 75:25 90:
9 91:10 96:1,14 98:14 102:15 109:
1 114:19 118:4 119:13 122:18,24,
25 130:24 137:10 160:14 177:19
198:10 203:3 212:12 215:23 218:
7 225:15 226:14,24 227:19 228:
24 229:16 244:12 265:15 267:23
268:6,8 297:7 306:1 311:23 321:3
331:17 333:18,20,21 338:14 362:
21 379:15 395:3 415:3 420:24
439:6 446:12,19
**basic** [5] 119:5 281:10 295:23 296:
10 313:24
**basically** [16] 54:25 56:12 113:7
144:19 155:9 158:15 161:21 167:
16 168:1 176:13 238:21 248:17
275:18 313:22 322:13 417:3
**basing** [1] 132:22
**basis** [16] 42:18 125:19 202:23
217:10 234:11 237:3 291:7 293:
14 299:20 301:20 305:19 365:5
420:11 429:8,9 431:9
**batch** [1] 373:21
**ba** [3] 3:3 38:3 119:17 120:9
120:2,4,18 122:25 123:18 179:
20 180:1 182:23 215:11 218:10
225:10 230:17 241:4 262:21 444:
22
**became** [5] 48:3 224:17 245:18
292:3 309:7
**becky** [1] 2:10
**become** [3] 195:5,8 304:3
**becomes** [6] 23:17 132:20 279:14,
15 304:3 362:20
**becoming** [2] 173:16,17
**begged** [1] 33:21
**begin** [6] 11:10 124:19 195:7,10
412:22,23
**beginning** [7] 77:10 85:24 113:16
143:9 147:16 284:3 341:23
**begins** [2] 64:3 349:11
**begs** [2] 234:6 235:11
**behalf** [6] 61:22 101:6 167:21 203:
19 217:15 399:12
**behind** [2] 51:16 400:3
**believe** [41] 14:15 41:15,24 42:3,
16 57:17 67:23 128:15,16 153:15
179:13 212:24 217:18 219:22 227:
17 237:11,23 243:6,8,22 245:11
246:15,19 263:21,25 316:14 327:
9 328:17 329:6 330:22 331:1 374:
19,23 402:14 418:24 419:24 420:
9,12,18 422:1 427:14
**be** [3] 92:14 127:1 222:4
**be** [3] 40:10 236:4 421:16

**below** [9] 87:15 231:25 296:7,21
297:9,11,15 303:10 325:12
**beneficiaries** [8] 92:19 95:5,6
216:17 229:3 236:13 302:8 303:
19
**beneficiary** [3] 344:24 398:11 413:
14
**beneficiary's** [1] 309:21
**benefit** [14] 23:19 65:25 133:7 190:
1 213:6 232:4 343:25 344:23 345:
5,11 352:5 363:13 394:24 427:17
**benefits** [29] 22:17 25:18 26:1,3,6
28:25 29:16 31:3 34:1,11,10 36:6
41:21 93:5 221:22 222:6 223:12
225:21 226:19 236:12 308:24 309:
9 311:11 312:3 314:1 340:5 343:
21 362:13 425:24
**benson** [149] 2:5 46:4 118:23,24
119:3,4,18,22 120:1,5,13,17,24
121:8,16,25 122:5,11 123:11,20
124:3,10,16 125:15 126:1,14,23
127:7,24 128:9,25 129:4,11 130:3,
10,15,21 131:3 132:12,18 133:8,
17,22 134:2,17,22 135:1,7,11,16,
21 136:4,12,21 137:9,14 138:7,21
139:4 140:3,7,11,18,25 141:7,24
142:4,9,14 245:5,6 248:1 250:6
334:17,18 335:15,21 336:1,5,9,14
337:23 338:3 339:10 340:23 341:
15 342:6,12,18 344:13,21 346:4,
10,14,19 347:3,22 348:17,24 349:
14 352:1,16,20,24 353:4,8,23 354:
3,8 355:1,18 356:10,17 358:3,8,20
359:15,20 361:19,25 363:9 386:
13 392:8,14,20 395:14,19 396:7,
13 397:12 398:7,12,16,21,25 399:
4,8,16,20 413:13 414:4,11,17 418:
10 421:10,21 422:19,23 436:13
**benson's** [3] 183:16 377:19 415:9
**besides** [1] 207:14
**best** [15] 36:10 37:2,17,22 38:18
39:3 42:11,23 107:3 209:22 211:6
229:10 240:6 249:16 298:16
**better** [11] 38:14 148:10 208:5,16,
18,20 241:8 327:19 397:7 400:2,
17
**between** [31] 5:6,14 21:11 27:1 42:
5 75:9 96:19 97:25 117:18 128:17
141:19 195:5 218:23 223:11 224:
5,7 229:14,16 232:19 233:23 238:
12 253:22 254:1 285:24 335:23
344:17 351:5 352:3 388:12 440:
24 442:9
**beyond** [1] 429:22
**big** [10] 65:3 74:12 133:14 136:24
145:15,21 147:7,10 155:3,3 182:
16 192:5 219:5 235:11 281:20
377:3 397:1 415:22
**bigger** [1] 143:14
**bill** [3] 64:6 132:2 148:25
**billed** [3] 132:4,5 137:2
**billing** [6] 47:24 64:18,19 131:18
132:3 148:23
**billions** [1] 308:1

**binder** [1] 422:12
**bit** [13] 66:3 98:6 125:13 133:11
143:14 168:17 176:7 208:21 211:
2 218:18 222:23 238:1,2
**bits** [1] 368:9
**black** [1] 145:12
**blank** [1] 9:13
**blind** [14] 73:5 75:15 229:1 262:15
320:23 321:7 335:10 351:4 356:3
378:13,23 379:2 382:24 383:3
**blue** [6] 55:14 63:23 65:12 68:18
69:19,25
**board** [82] 1:5 2:3,9 3:3 5:24 6:7,7,
11,21,23 9:1 18:14,21 19:1 29:2
38:4,20 39:13 44:13 46:1 50:11
52:22 58:18 63:10 74:5 92:4 118:
22 199:12 200:7 203:14 239:13
240:3 245:4 265:6 268:6 282:10
283:12 284:25 285:4,12,16 286:5,
6,9 287:22 288:15,18 291:14 294:
12,21 295:2,5 334:16 414:22 415:
3 418:9,25 419:7,14 420:10,13,21
421:16 429:4 436:19,24 437:6,9,
12 439:6,9 442:5 443:2 445:2 446:
6,7,9,23 447:1,4,8,17
**board's** [8] 20:9 85:19 203:4 267:
23 440:6 443:3 444:3 446:12
**boards** [1] 285:19
**boiled** [1] 220:4
**book** [2] 54:7 209:23
**booklet** [1] 74:24
**books** [2] 147:24 148:7
**boss** [1] 150:19
**both** [25] 17:17 19:15 25:25 27:5
85:3 114:1 198:15 210:23 213:12
221:13 226:8 240:22 242:7 257:6
259:2,3 263:19 271:15 279:4 297:
12 303:25 304:10 392:1 414:16
446:9
**bothered** [1] 219:4
**bottom** [13] 27:25 35:11 77:4 82:
16 105:23 236:8 237:5 239:21
315:11 330:23 353:18 354:7 364:
17
**box** [12] 56:5 65:11 70:13,14 73:14,
23 77:5,6 125:12 127:18 128:1
145:12
**boxer** [1] 103:15
**branches** [1] 150:15
**break** [2] 115:19 400:6
**breakdown** [1] 111:2
**breaking** [2] 202:15 400:15
**breakout** [1] 131:21
**breaks** [1] 388:21
**breast** [2] 308:18 408:2
**brief** [5] 39:15 138:20 242:23 436:
16 447:16
**briefly** [7] 9:3 50:10 83:25 86:21
295:22,25 296:9
**briefs** [4] 446:5,8,14,20
**bring** [10] 65:6,8 125:7 137:24 153:
2 201:23 283:25 286:11 309:24
333:11
**broad** [1] 424:24

**brought** [5] 213:2,10 367:12,14
385:13
**bubble** [1] 124:13
**bucket** [4] 388:20 440:10,11 441:
20
**build** [1] 10:15
**building** [1] 56:11
**bullet** [3] 290:25 291:3 294:13
**bureaucracy** [1] 409:12
**bureaucratic** [1] 154:2
**bush** [1] 112:15
**bytes** [1] 368:10

**C**

**c.f.r** [2] 5:20 49:25
**c01** [12] 41:16 141:17,20 335:1 336:
2 350:10 356:24 359:24 378:5,25
404:1 425:2
**c02** [2] 338:7 386:15
**cahaba** [1] 1:19
**cal** [14] 274:9 275:11 276:17 281:
15 283:3 290:3 292:11 294:25
319:18 327:5 337:10 377:24 389:
25 406:24
**calculate** [5] 40:11 51:9 91:7 212:
2 332:2
**calculated** [11] 7:1 19:19 23:9 44:
15 50:24 119:13 207:2 211:14
248:4 265:14 344:4
**calculating** [4] 22:23 42:17 53:25
215:9
**calculation** [18] 3 19:25 40:5
42:1 43:21 50:12 88:16,20 92:10,
16 95:16 226:16 254:15 256:1
343:13 344:5 345:2 393:24
**calculations** [4] 36:8 92:6 93:12
139:8
**calendar** [2] 139:16 184:4
**california** [58] 21:5 31:3 39:18 40:
13,19 60:12 62:2 71:14 79:20 94:
11,15 95:1 150:22 172:12 177:13
194:3,10 216:15 220:19 227:24
256:21 270:13,18,25 271:10,23
274:5,8 278:5,12 279:8 280:17
282:24 290:14 298:2,17,25 302:
15,16,19,20,21 303:14 304:7 308:
7 317:6 325:22,23,24,25 326:2,3,
25 355:13,25 406:7 415:12,21
**california's** [3] 30:15 41:3 270:21
**call** [17] 5:4 31:8 44:18 100:11 145:
10 185:25 186:24 204:21 208:17,
23 235:25 269:2 275:22 350:17
356:23 370:22 382:20
**called** [23] 10:13 11:22 14:20 45:
17 150:23 156:15 158:17 159:9
168:20 205:19 269:22 270:25 271:
10,19 272:20 276:10 280:8 292:
21 305:7 308:8 311:17 318:16
332:18
**calls** [3] 44:20 269:5 329:10
**calworks** [1] 308:17
**came** [28] 56:14 57:17 71:13 72:19,
23 75:18 89:5,25 95:8 100:7 105:
14 112:21 129:25 132:1 134:13

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

144:15 175:21 185:1 226:25 234:
3 238:6 239:17 264:14 266:8 267:
5 307:7 350:12 373:15
cancer [2] 308:19 408:3
candice [8] 3:6 14:9 15:13 29:7
33:8 44:21 45:15 221:16 227:13
cannot [17] 37:16,19 44:10 68:12
75:16 79:5 96:22 107:11 109:19
112:11 127:20 309:24 325:9 398:
1 427:24 434:5,10
capacities [1] 47:3
capture [7] 55:10 63:12 69:12 125:
18,20 161:23 164:13
captures [1] 41:17
capturing [1] 62:20
card [7] 281:7,9 306:7,8 311:13
374:20 375:1
care [10] 26:19,23 30:2 100:23 190:
3 206:18 240:14 273:24 304:3
404:17
career [2] 206:14 377:5
carefully [2] 50:18 447:5
carriers [1] 280:16
case [54] 1:12 5:4 16:10,16 18:1,
12 22:1 33:4 34:19 39:20 58:7 66:
2 84:10 90:10 101:10 121:12 211:
17 215:12 218:10 222:23 225:11
226:21 227:8 229:23 232:20 234:
10 244:13 248:24 256:21 257:2
262:21 272:18 273:18 274:25 286:
14,22 287:23 298:8 333:22 339:8
342:7 379:6 380:23 421:3 424:6,
18,20,21 425:5,12 428:8 435:17
437:24,25 442:12
caseload [4] 298:10,11 299:19
300:12
cases [21] 9:18 18:20 38:13 221:8
225:7 226:3 256:23 285:8,15,16,
23,25 288:1 343:8 369:18 375:6
435:10,15,21 444:7,16
cash [12] 73:3 175:15,21 189:3
194:7,19 296:2 297:8 298:7 357:
15 410:20 417:5
categories [2] 275:19 296:4
categorizes [1] 351:9
category [3] 81:7,18 85:1
cause [1] 37:13
caused [1] 426:15
causes [1] 325:10
ceiling [1] 194:12
center [9] 1:10 5:7 33:4 46:20 63:
23 76:9 97:23 215:11 325:5
center's [2] 7:3 18:1
central [3] 150:25 406:12 423:7
certain [11] 19:1 59:2 137:22 189:
19 224:16 225:4 230:7 263:22
282:14 371:20 447:12
certainly [28] 36:22 207:19 211:15
212:19,21 218:8 219:25 231:1
233:2 236:23 237:3 238:9,13 250:
23 258:24 259:4 284:9 352:17
374:13 375:13 395:9,22 419:8
421:18 427:15 436:20 439:19 447:
9

certainty [2] 43:6,25
certificates [1] 49:15
certified [4] 49:11 165:22 167:11
307:23
cervical [2] 308:19 408:3
cetera [3] 152:18 226:5 265:8
chair [3] 45:24 276:13 372:5
chairman [189] 2:4 5:3 7:18,25 8:5,
10,15,19,24 9:25 11:1,23 12:3,10,
14,19 13:4,8,12 15:25 16:24 17:5,
15 39:5,10 44:16,22 45:1,19 46:6
58:24 59:10,15,19,23 60:3 115:16,
25 116:6,10,16 118:2,21 120:19
121:23 122:2 142:20 154:9 193:
10,25 194:25 195:15,21 196:1,5,
23 197:6,10,20 198:12 199:2,6
200:10,14 201:1,9 202:2,8,13 203:
7 204:9,13,19 205:2,11 207:24
208:8,19 209:1,8 210:25 211:7
242:19,24 244:23 245:3 250:10
256:1 264:25 265:23 266:10,17
267:9,16,20 268:3,14,25 269:7,14
282:9,16 283:6,14 284:11 288:10,
25 289:5,11,20 290:4,23 291:6,22
292:13,17,24 293:5,22 294:1,9,18
329:1,9 330:3 334:11,15 336:16
337:4 344:19 347:19 349:17 360:
4 363:18 377:11 386:9 387:9,18
388:8 389:6,17 390:9,14,21 391:1,
9,19 396:19 397:3 399:24 401:11
406:3,19 407:7,14 408:9,20 409:
13 410:15,24 412:17 413:5,11
414:19 415:2 416:14,18 417:9,14,
21 418:2,7 422:7,25 436:7,11 438:
6,14,24 439:18 440:4 441:18 444:
1,8,24 445:8,13,17 446:3
challenge [3] 19:4,7 360:11
challenged [1] 405:11
challenging [2] 196:7 405:18
change [14] 36:22 41:14 162:16
246:4 310:4 338:22 339:7,8 340:7
374:17 375:2 392:24 394:13 424:
3
changed [6] 47:16,18 180:25 240:
7 274:20 338:6
changes [11] 66:6,11 207:11,13
211:25 218:18 252:5 310:3,4 321:
10,11
changing [2] 313:22 396:10
charge [4] 100:22 108:9 255:12
271:25
charged [2] 151:8 360:20
charlotte [1] 62:5
chart [9] 69:21 81:3 82:20 180:17
223:6 298:13 299:10,12 388:14
charts [3] 197:12 236:16 301:15
chasing [1] 251:13
check [15] 78:23 80:2 194:16 257:
4,4 269:7,10 338:17,21 344:23
345:5,11 394:18,24 437:22
checked [1] 293:4
checking [1] 422:11
checks [1] 414:16
chfp [1] 2:6

chief [4] 271:3 273:2 274:13 277:
15
chose [2] 241:2 417:4
churns [1] 327:5
circle [7] 55:14 61:11 63:23 65:12
68:18 69:19,25
circles [5] 54:22,25 106:17,18 154:
3
circuitous [1] 439:14
circumstances [1] 325:4
cirp [1] 20:11
cited [2] 112:15 444:13
cites [1] 447:13
citing [1] 444:11
city [1] 302:10
claim [28] 6:5 61:25 62:6 68:15 69:
15 70:11 79:12 82:25 106:6,12
108:25 109:22 125:4 126:7,25
127:8,12,16,22,23 169:18 309:10
310:16,19 317:20 346:23 367:23
396:16
claim-by-claim [1] 401:12
claimed [5] 52:4 83:13 199:21 236:
11 385:4
claiming [5] 87:23 126:10 310:25
331:22 419:17
claims [34] 25:2,10,13 33:5 42:20
61:15,17 98:10 99:10,15,16,21
100:12 101:14 110:13 124:22,25
125:7,23 187:10 225:19 271:17
272:12 273:11 279:13 324:5,5,7
329:22 367:13,21 394:11,12 425:
21
clarification [4] 143:16 261:13
442:22 443:5
clarify [5] 58:17 75:18 98:13 117:5
445:18
clarity [1] 330:1
classic [1] 36:17
clayton [1] 2:4
clear [10] 13:24 17:8 123:22 248:
20 300:12 323:13 366:20 395:23
435:24 439:20
clear-cut [1] 435:21
clearing [1] 356:12
clearly [3] 105:5 225:22 247:19
close [1] 36:19
closely [4] 47:23 150:21 277:1
279:4
closer [2] 66:3 222:25
clue [2] 224:21,23
cms [254] 7:15 15:4,24 20:7 22:7
24:23,25 25:16 26:19,21 27:7,11,
16,23 28:18,24 29:23 30:2,6,11
31:5 32:3,25 33:5,22,24 34:5 37:1,
6,12,17 38:11,17 41:1,5,10,21 42:
15,22 44:15 51:25 52:17 55:13,15
68:20,23 69:4,5,7 70:15,22 73:8,
10 76:14,19,22 81:7,8,18,20 82:
2,10 83:2,18 84:12,18,20,25 85:5,
7 87:8,24 89:3,8,12 90:6 91:4 95:
20 96:20 97:12,17,25 100:21 101:
2,11,12,14,18,20 105:18 107:4,10
108:21 109:7,13,16,18,22 110:2,

13 112:16 113:6,11 114:1 117:13,
20 119:12 123:8,15 130:1 132:16
138:14 141:16 156:13 157:17 159:
9 181:10 184:17 185:4 190:10,10
198:8 203:17,24 204:1 206:15,18
207:5 212:2,8,13,25 213:1,19,25
214:8,15 215:14,18,20,21,21,22
216:8,11 218:3 219:19 221:8 222:
7,12,16 223:14 224:9 226:4 229:
15,17,18,20,23,24 230:19,23 233:
21 234:1 235:2,14,17,20 236:5,12
237:17,21 238:13,17 239:2,14,17,
19 240:11 241:25 242:8 243:10
245:10,20 246:5,10,23 247:7,9,15,
21 248:4,15,25 249:1,5,11,23 250:
5 262:20,24 276:15,22 277:20
279:4 304:6,12 310:18 322:19,23
323:1 324:16 326:7 327:9,23,24
328:4,11,12,16,17,22 329:5,6,16,
19 339:17 343:23 345:2 347:4
353:13,22 358:11 361:22 371:22
394:14 395:4 398:24 399:7 403:5
418:22 420:16 424:25 427:8 432:
15 435:10,13,16 437:12,16 441:22
443:10 444:17
cms' [36] 21:16,22 22:6 25:6 27:3
30:9 31:21 32:18 35:12,19 36:7
40:1,4,16 43:3,17,23 95:17,25 97:
8 122:23 213:11 218:13 223:2,25
224:1 232:9 235:7 236:5 263:18
326:18 393:23 419:21 421:20 423:
4 442:18
co [1] 359:24
code [98] 60:8 61:4,7,21 64:12,16
65:18,20 67:17,18 68:3,5,13 71:3
73:2 75:12 77:21 79:11 81:20,24
82:2,9 125:25 126:4,8 148:25 149:
5 160:11,14 161:24 162:10 163:
12 164:7 165:6 187:3,19 221:2,20
229:15 262:1,5 281:20 283:3 290:
18 306:1 309:3,6 310:1,2,4,16
311:1 312:5 314:2,3,5,9,12 316:
20 319:18,19,24 320:4 321:3,25
322:4,11 336:17 338:2,22 339:7
341:21 342:13 343:17 349:6 354:
12 357:10,12,24 358:7 360:5 362:
6,10 369:17 378:14 382:25 386:
15,25 387:12 388:24 389:9 392:
15 393:8 396:3 404:5 408:8 416:
25 424:6
coded [1] 394:1
codes [130] 29:13 41:16 64:10,22
65:1,4,6,9,14,16 66:1,15,15,17,20,
22 67:10,13 70:6,6,9,10 71:9,11,
19 72:17,25 75:22 81:11,13,14,17
84:20 87:22 100:1,8 130:25 141:
14,17 155:10,11 159:25 171:24
172:6 185:2 188:23 191:3 203:17,
25 220:4,10 222:21 225:17 226:
18 227:15,25 229:21 230:21,25
231:7 243:8,10 261:14,15,19 275:
18 307:5 308:5,8 309:13,19 310:5,
6,11,21 311:2,6 316:7 318:5 320:
7,10,16 322:13,16 332:5 334:22

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

335:1,8 336:24 337:2,8 338:9 339:6,16 350:11,13 356:24,25 358:24 359:4,8,17 360:6 377:24 379:8 381:22 386:15,18,19,23 388:10 ⬤:24 394:13 397:16,22 400:4,4,7 407:16,21 408:1,11,12,14,15,23 409:21 418:21 424:24 425:3,9,14

**coding** [4] 33:17 39:19 142:3 229:2

**coinsurance** [1] 58:10

**collected** [2] 67:20 315:23

**color** [3] 54:10 61:9,12

**colored** [1] 54:10

**column** [14] 71:1 81:6 83:15,15 84:12 88:22 90:1 124:12 202:6 299:17,18,23 322:1 358:23

**columns** [4] 82:17 87:13 198:16 300:16

**combination** [1] 266:3

**come** [36] 55:23 89:1,4 105:8 107:10 134:11 154:19 157:16 164:4 179:5 224:16 227:21 239:4 241:7 245:24 248:18 263:16,24 265:4 303:25 341:3 353:15 363:16 369:11 381:17 398:20 401:10,14 414:6,7 418:21 427:10 429:16 432:20 435:19 438:20

**comes** [11] 52:8 124:18,20 137:16 145:4 157:13 220:21 258:12 306:6 320:19 358:1

**comfortable** [2] 100:25 226:7

**co⬤** [18] 110:15 134:9 156:22 16⬤,72:20 248:8 261:16,18 314:3 378:4,5 379:4 380:19 401:16 402:3 424:10 435:5,24

**commend** [1] 185:14

**commented** [1] 42:16

**comments** [4] 41:11,22 358:25 421:13

**commercial** [1] 77:14

**commissioner** [2] 15:7 427:7

**common** [1] 302:13

**communicated** [2] 52:12 109:6

**communication** [7] 72:9 75:6,8 76:3 108:19 109:10 110:23

**communications** [2] 108:15 297:22

**community** [2] 145:11 325:16

**company** [3] 57:12 220:15 332:18

**compare** [2] 69:10 76:19 324:8 424:18 432:21

**compared** [5] 83:10 137:15 225:13 302:9 325:1

**compares** [1] 212:9

**comparing** [2] 134:19 214:20

**comparison** [5] 21:10 70:21 324:3,10 332:7

**compilation** [1] 316:25

**compiled** [4] 21:7 63:24 316:15 322:8

**complaining** [1] 218:12

**co⬤te** [5] 67:8 76:22 78:21 2⬤417:16

**completed** [1] 116:2

**completely** [4] 181:16 214:9 287:5 434:25

**complex** [1] 308:13

**complicated** [2] 66:24 316:12

**component** [5] 51:3,4 63:1 145:19 272:2

**components** [2] 51:2 271:8

**comprised** [1] 85:14

**computer** [13] 33:17 136:7 212:6 228:5 231:4 271:15 277:21,25 279:10 305:10 310:14 366:21 424:5

**computerized** [2] 280:22 311:22

**computers** [1] 279:25

**concept** [4] 226:23 229:22 373:15 423:4

**concern** [5] 136:13 137:18 139:1 293:19 418:12

**concerned** [4] 133:12 148:24 169:17 193:16

**concerning** [1] 324:16

**concerns** [1] 318:1

**conclude** [4] 94:25 326:17 427:24 429:9

**concluded** [1] 27:9

**concludes** [2] 204:15 268:18

**conclusion** [8] 21:15 43:13 96:6 227:1 234:3 429:16 433:16 435:20

**conclusions** [5] 30:7,19 233:19, 24 446:18

**conclusively** [2] 433:19,22

**conditions** [2] 281:13,19

**conduct** [1] 6:19

**conducted** [1] 212:22

**conduit** [1] 28:20

**confer** [1] 294:11

**conference** [1] 294:21

**confidence** [3] 429:5 431:2,3

**confidentiality** [2] 6:6 360:23

**confirm** [8] 8:7 72:16 75:11 84:5 92:4 199:8 202:19 331:9

**confirmed** [3] 76:4 228:15 322:24

**confirming** [1] 52:16

**conflict** [1] 421:7

**conflicting** [1] 93:19

**confused** [2] 106:16 159:17

**confusing** [3] 411:2,9 412:4

**confusion** [2] 196:12 258:12

**congress** [7] 11:6 12:8 14:16,18 24:6 276:16 427:5

**congressional** [5] 28:2 103:9 150:18 242:4,10

**congressperson** [2] 242:13

**congresswoman** [1] 103:15

**connected** [2] 152:17 412:6

**connection** [2] 101:2 372:22

**conservative** [2] 225:23 226:11

**consider** [1] 302:17

**considerably** [1] 40:14

**considered** [2] 37:16 375:9

**considering** [1] 6:23

**consist** [2] 61:19 98:17

**consistency** [1] 139:7

**consistent** [12] 100:7 139:2 146:6 200:4 217:2 301:19 302:5,18 303:2 327:3,7,7

**consistently** [7] 89:11 95:9 98:22 201:6 300:24 301:22 302:24

**consists** [1] 219:22

**consolidated** [5] 4:2 5:12 9:20 38:21 447:19

**constant** [1] 109:9

**constitute** [1] 279:12

**constrained** [1] 420:16

**construct** [1] 22:25

**consultant** [7] 94:16 97:20 151:4 206:6,13 270:6 292:4

**consultants** [3] 146:9 152:2 206:8

**consulting** [4] 49:7 206:9 332:21 412:15

**contact** [7] 72:13 100:16 103:3 170:18 219:19 256:7 334:2

**contacted** [9] 100:17 103:10 149:18 152:19 177:12 217:14,19 314:14 332:12

**contacts** [1] 75:20

**contended** [1] 92:13

**contends** [4] 31:12 32:9 34:7 36:7

**contention** [1] 192:23

**contents** [1] 3:1

**contesting** [2] 18:2 20:13

**context** [3] 38:8 87:19

**contingency** [2] 244:12 333:23

**contingent** [2] 333:20,21

**continue** [4] 42:3 87:17 106:21 284:6

**continued** [1] 390:17

**continues** [1] 75:2

**contract** [14] 278:14 303:13,15 304:20,21 332:21,23 333:12,16 356:2 398:5 409:4,7 426:25

**contracted** [1] 166:14

**contractor** [7] 5:11 7:1,13 52:6,8, 13 92:13

**contractor's** [2] 19:16 52:19

**contravene** [1] 28:11

**contributes** [1] 256:22

**control** [1] 307:21

**conversation** [1] 93:23

**conversations** [1] 101:8

**converts** [1] 262:7

**convince** [5] 29:23 30:10 31:4 33:24 101:18

**cooperate** [2] 28:7 426:21

**cooperation** [1] 16:22

**coordinate** [1] 97:25

**coordination** [1] 108:9

**copies** [1] 46:14

**copy** [4] 237:12 244:17 333:12 334:4

**corporate** [1] 375:11

**correct** [53] 8:18 9:22,24 16:21 17:10,14 25:7,8 26:12 38:9 62:20 74:19 81:1 82:1 85:16 117:15 137:23 143:19,25 153:24 155:15,17,22

**consistency** column continued at right:

**156:**7,9 157:10 162:3 170:20 172:7 180:15 235:8,9 237:19 239:16 259:22 260:9 266:6 267:15 270:16 285:17 304:10 310:1 331:3,4 333:7 342:11,17 350:15 382:18 392:17,19 419:23 424:16

**corrected** [1] 44:7

**correctional** [3] 389:8 390:2,6

**correctly** [2] 214:3 218:11

**correlate** [1] 334:25

**correlation** [3] 141:18 335:12,23

**correspondence** [1] 265:7

**corroborate** [1] 26:12

**cost** [37] 18:7,19 42:14 43:2 47:22 48:6,9,13,14,17,23 49:6 51:6,17, 21,23 52:3,10 53:19 121:2,9,13 122:14,23 140:20 144:18,20 150:8,8,11 194:11 222:3 314:17 326:19 418:23 419:11 440:18

**costly** [2] 245:22 246:10

**couldn't** [12] 68:5 72:22 82:10 83:6 175:24 184:5 239:8 241:15 324:4 361:17 401:21 428:20

**council** [1] 372:4

**counsel** [8] 55:6 108:16 114:7,7 199:7 201:21 254:17 268:9

**count** [20] 31:25 32:22 35:13 62:15 82:14 84:21 95:17 98:19 143:21 213:15 223:11 232:9,10 233:21 234:1 331:13,15,17 393:25 394:16

**countable** [1] 393:20

**counted** [10] 19:9 223:14 343:12 345:9,15 347:15,16 394:4 395:2 396:2

**counties** [2] 306:24 406:13

**counting** [2] 347:5 394:8

**country** [2] 238:24 287:8

**counts** [1] 143:18

**county** [8] 24:1 61:2 179:16 302:11 319:18 356:4 408:5 416:9

**couple** [6] 35:3 51:16,18 52:9 218:19 227:11 238:5 279:19 426:10

**course** [5] 77:13 240:20 274:2 313:7 435:1

**court** [22] 38:3,5 237:1 240:3 248:23 284:25 285:5,7,8,9,15 287:19, 24 288:2 292:7,23 293:3,8 421:9 428:12 434:17,20

**courts** [2] 38:10,16

**cover** [3] 57:13,16 390:5

**coverage** [6] 57:20 58:9 347:24 349:19 390:4 412:21

**coverages** [2] 57:10 60:21

**covered** [16] 58:6 90:1,23 91:1,13 128:24 129:1,3,6,22 132:8,16 183:18 198:11 366:16 408:2

**covers** [3] 279:24 304:15 407:24

**cpa** [1] 2:5

**crack** [1] 399:13

**create** [4] 98:9 229:13 320:16 407:25

**created** [2] 98:13 408:16

**creates** [1] 400:16

codes - creates

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

creating [1] 420:7
creation [2] 275:16 276:19
credibility [2] 30:8,20
credible [5] 21:3 22:10 33:25 35:
●28:25
criteria [2] 275:15 296:5
criticize [1] 19:24
cross [15] 3:3 10:20 115:17 116:
12,21 242:21 243:2 283:12,16
284:9,13,18 287:16 330:4,8
crossmatch [1] 230:4
crunching [1] 231:5
curiosity [2] 114:14 180:3
curious [2] 102:11 345:21
current [5] 46:19,21 206:4 270:3
369:25
currently [2] 206:6 270:6
curriculum [1] 12:24
cut [2] 259:7 390:4
cut-and [1] 211:20
cuts [1] 259:10
cv [3] 271:1 272:3,25

## D

d.c [5] 103:12 104:22 107:5 114:2,
9
dash [1] 119:21
data [285] 10:11 11:2,4 20:24,25
21:2,9,12,13,16,22 22:4,6 25:6,7,8,
21 26:13 27:2,3,4,11 28:18,21,23,
25 30:9,20 31:13,16,18,22,23 32:4,
10,13,15,19,20 33:1,13,18 34:2 35:
24,●● 37:2,7,13,16,23 38:1,13,
14,●,●39:3,24 40:1,16,21 41:2,
7,23 42:13,19,23 43:13,17,17 44:7,
8 53:4,8 55:1,7,9,10 56:3,5,8,12
61:17,20 64:2,6 65:1,2,6 70:1 74:
4 76:21 79:3 81:21,23 85:5,6,9 86:
21 88:17,21 89:3,13 90:19,20 91:
4 95:10 96:15 97:4,19 98:11,14,
15 107:9,10,11 109:18,19 123:7,
17,19 124:18,21 125:10,11,22,24
139:13 140:13 158:23,24 164:14
180:13 186:5 191:2 201:25 207:
21 212:7,8,9,9,11,13,13 214:7,8,
16 215:7 216:8 217:7 218:2,4,21
220:6,8 221:9 222:2,7 223:3 225:
16 229:15,17 230:19 231:3,5 232:
15 233:11 235:14 236:5 239:5,6
247:8 248:7,19,25 249:2,3,4,10,17
18,25 263:19 266:8 278:10 280:5,
8 282:22 290:1,9 298:9 300:6 303:
1 305:8,23,25 306:2 312:24 313:
10,10,13,21 314:9,11 315:24 316:
3,14,22,24 318:25 319:1,2,3 321:5,
8,9,11,12 322:19 324:16 326:18,
22 327:10,14,15,20,21 328:7,18
329:8 331:12,18,19 335:6,13,20
336:12 337:16 353:14 358:1 360:
14,24 361:7,14 363:4 366:8 367:
11,21 368:19 370:24 373:20 374:
7,12,13 378:10 382:22 383:8,8,21,
25,●,23 386:2,5 397:20 399:1,
14,●,19 406:12 407:12 409:24

deadlines [1] 42:25
deal [7] 90:20 201:24 239:8 241:15
247:6 264:12 332:8
dealing [6] 206:21 240:10 386:23
387:23 441:5,13
deals [1] 210:7
dealt [3] 240:12,17 332:9
debate [1] 424:3
decades [1] 282:4
deceased [2] 214:13 230:16
december [2] 139:10 274:12
decide [1] 29:3
decided [4] 34:5 107:2 294:22
424:20
decision [13] 20:9 53:1 121:17
215:15,19,23 241:5 371:18 374:5

410:5 419:22 420:9 421:19 425:
16,19 428:22,25 430:2,24 431:6,
18 432:11 433:24 442:11,12
data's [1] 315:12
data-matching [1] 43:23
database [34] 21:4 30:5,23 54:3
56:19,21,23 57:7,13,20 58:2 62:
23,24 63:5,6,8 65:10 67:14 97:1
124:24 126:17 131:14,20 132:9
133:13 164:13,16,24 187:4 229:
16 280:9 305:13 306:5 426:17
databases [1] 40:24
date [24] 87:4,4 285:6 341:19 342:
9 344:10,18 345:23 346:8 348:16
349:5,22 351:11 352:3,4 354:16,
18 362:16,19 363:7 440:19,21
446:7,14
dated [3] 112:8 113:6 227:13
dates [3] 114:17 351:10 418:18
daubert [1] 292:21
day [32] 29:17,17,20,20 67:1 89:1
97:8,10 224:18 341:5 342:4 347:
23,24 348:2,4 349:18,20 354:16
362:15,18 438:1
day-to-day [1] 47:21
days [16] 19:8 20:14,15 21:23 22:
6,15,19 25:24 26:3 27:5 29:14 34:
12 35:20 36:2,3 37:4,7 40:4,9,23
53:24 55:25 58:11 63:5 66:4 67:6,
22,23 70:21,24 75:21 76:12,14,16
81:2 83:11,16,17,19 84:11,12,18
86:11 87:1,6 87,8,9 88:12,23 89:9,
18,23,25 90:1,23,24 91:1,11,13 93:
1,2,3,9,11,17,22 95:17,17 96:11,
12,17,18,20,25 98:18 117:8,9,12,
18,19 118:10,12 125:1,22 128:22
129:1,3,21,22,23 130:17,23 131:6,
12,23,25 132:2,6,7,8,8,10,16,24
133:3 134:4,5 136:16 137:1,4,6
138:10,15 181:21 183:18 190:11
192:3,9 193:18 195:17 198:11
199:22 200:1 210:22 213:5,6,16,
16,21 214:9 218:24 220:24 222:
13,17,23 223:1 224:10 230:4 289:
9 323:14 324:7,17 331:2,21 332:2,
8 343:9 344:1,7 345:6,7,14,19
347:6,18 426:11,12 431:23 446:6,
13
deadlines [1] 42:25

421:1 436:23 440:14 441:12
decision-making [1] 365:12
decisions [1] 374:10
declines [1] 295:2
deduce [1] 435:18
deductible [1] 58:10
deemed [3] 25:15,20 93:2
deep [1] 368:13
defend [1] 63:5
deferring [1] 112:16
deficiency [1] 33:18
defies [1] 233:1
define [2] 320:23 369:9
defines [1] 407:20
defining [1] 367:3
definitely [3] 102:12,17 211:20
215:17 232:13 236:1 240:7 244:2,
2 246:17 251:8 262:13 355:8
definition [7] 37:15 297:11 299:4
346:21 349:9 352:6 404:5
degree [3] 49:16 371:14 419:25
degrees [1] 49:14
deliberate [2] 21:1 209:20
deliberation [1] 420:13
demographic [4] 56:12 57:6 281:
10 313:24
demonstrating [1] 316:16
denial [1] 131:17
denials [1] 136:25
denied [1] 127:8
denominator [20] 89:17,24 90:8,
24 91:2,12 128:3,12 131:4 132:21
134:7,8 137:16 139:3 145:8 181:
20 197:15,23 200:2,4
denoted [1] 197:14
department [55] 1:1 60:12 79:20
94:15 99:21,24 163:13 168:19
177:12,13 270:13,19 274:18,19
286:2 298:2,3,15,18,22,25 299:13
300:7,15 303:20 305:17 307:20
309:16 313:11,12 315:22,24,25
317:9,21,24 324:1 356:5 360:12,
19 361:5 381:13,23 382:8 383:6
397:24 406:10,14,15,17 409:10,17,
22 410:3,22
department's [1] 162:22
dependent [1] 308:2
depending [1] 22:7
depositions [1] 292:6
deprives [1] 24:12
deputy [7] 104:21 241:11 273:22,
23,23 274:3,13
derivation [1] 266:16
derive [3] 212:17 320:17 431:3
derived [1] 210:13
describe [7] 50:10 271:5 272:7
273:4,25 275:25 297:21
described [3] 99:13 317:4 386:16
describing [1] 328:4
description [4] 70:8 71:11 75:13
226:24
descriptions [3] 71:13 188:22
221:20
design [6] 271:8 272:1 367:2,12,

17 368:7,16 370:2 374:10
designate [1] 335:9
designated [1] 289:2
desire [1] 439:23
despite [2] 27:22 28:22
detail [11] 57:2 84:1 86:5 101:9
125:14 144:21 145:9 147:6 149:
15 157:14,15
detailed [7] 43:19 78:15 85:25 86:
25 156:6,14 185:15
details [2] 48:1 210:8
determination [8] 280:19 283:13
300:10 332:14 337:14 380:4 409:
5 419:1
determinations [1] 42:9
determine [17] 40:9,22 54:4 66:3
78:24 83:10 219:17 221:12 280:
12,17,20 284:13 300:17 305:9
311:18 314:24 351:25
determined [6] 76:12 230:12 267:
6 313:5 394:14 411:6
determines [1] 280:15
determining [17] 54:15 213:19 217:
10 282:23 290:2,12 379:20
develop [1] 439:24
developed [5] 34:17 54:2 121:18
148:10 367:7
developing [1] 375:12
development [1] 277:17
deviating [1] 429:21
deviation [2] 429:7 430:6
diagnosis [1] 57:3
diagram [3] 155:4 411:12,22
diagrammatic [1] 365:8
diagrams [4] 368:17,18 369:13,16
dictionary [4] 335:6,14 336:13
383:25
die [1] 337:20
died [3] 230:13,14 357:19
difference [24] 69:17 84:14 96:10,
19 117:17 128:17 129:8 180:12
218:24 219:5 224:21 232:8 254:1
301:25 340:10 341:1 342:20 343:
14 344:17 346:21 351:5 352:2,15
397:1
differences [4] 218:16 339:13
352:11 363:16
different [39] 11:13 38:15 63:4 89:
8 95:21 124:21 126:12 131:11
133:23 134:13 156:4 157:22 164:
15 191:3 197:15 213:9 216:2 219:
17 247:3,20 248:7,9 265:5,6 274:
15,17 289:14 296:17 308:23 309:
2 320:9 336:23 347:4 349:9 358:1
365:7 375:24 429:19 441:20
differential [2] 91:17 395:18
difficult [5] 148:22 149:10 245:15,
19 247:1
dilemma [1] 178:22
diligence [1] 234:10
direct [18] 3:3 45:20 54:6 83:25
116:3,24 141:18 205:13,22 229:8
255:21 269:17,25 284:7 374:4,8
383:9 409:15

Sheet 7

creating - direct

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

directly [13] 14:12 15:11 31:19 32:
16 97:19 107:11 109:19 208:2,7
312:10 314:3 356:9 410:5
director [42] 13:22 26:7,10,18,22
29:10,11 30:1,14 46:22 48:3
17 97:23 104:21,21 174:15
177:11 206:17 240:10,14,16 241:
11,12 272:5 273:22,23,24 274:4,5,
6,10,14,16,21 275:1,3 276:5 286:
24 372:2,4,10
directors [2] 276:12,15
disabled [15] 61:6 73:6 75:14 229:
2 262:16 296:3 320:24 321:8 335:
10 351:4 356:3 378:13,23 379:2
383:4
disagree [2] 20:2 52:18
disagrees [4] 31:14 32:11 39:23
421:15
disallowance [1] 385:10
disburse [2] 386:24,25
disc [1] 55:23
discharged [1] 87:6
disclosable [1] 6:3
disclosure [1] 5:23
discrepancies [1] 229:14
discrepancy [16] 22:11 27:1 28:1
69:10 74:12 223:10 224:7 233:23
347:13 349:16 355:9 420:8 425:
18 426:14 430:17 433:3
discretion [2] 6:20 447:11
discuss [5] 29:12 101:11 232:13
241:24 283:22
discussed [1] 106:19
discussion [2] 379:13 383:6
discussions [2] 227:20 235:3
diskette [1] 157:17
disposition [1] 19:14
disproportionate [3] 7:3 18:5
404:17
dispute [1] 5:14
disputes [2] 6:14 285:23
distil [1] 188:17
distinction [1] 73:6
distributed [1] 416:5
distribution [1] 416:8
district [2] 103:15 104:13
divided [1] 22:17
division [17] 26:19,22 30:1 72:14
100:23 157:22,23 206:17,18 240:
17 273:2,3,7 275:11 277:15,16
317:11
divisions [1] 273:8
doctor [2] 57:3 367:24
doctor's [1] 312:20
document [7] 108:2 111:8,11 113:
1,4 319:14 331:8
documentation [9] 1 94:21 219:
16 235:16,19
documented [1] 255:3
documents [10] 10:3,17 11:4,5,12
112:4 243:17 315:14 330:11 332:
13
documented [5] 74:21 75:25 76:3 90:6
15 140:14 188:9 231:5 246:9

250:1 257:11 318:11 369:24 370:
2 375:21
dollars [3] 24:13 148:6 308:1
done [29] 33:8 65:5 69:2,25 70:2
74:1,2,8 77:16 80:21 141:4 149:
16 154:15 167:6,16 192:18 212:
25 216:3 234:8,9 292:5 304:16
305:18 315:18 328:23 370:6 407:
18 429:3 438:12
doubt [1] 432:16
down [25] 52:9 68:17 69:21 70:14
88:19 111:3 117:13 133:19 144:
21,23 145:12 146:2,7 148:4 179:3
182:2 220:4 304:5 312:19 322:1
330:23 338:20 368:8 389:2,10
download [1] 64:25
drafted [1] 152:9
dramatic [1] 375:1
dramatically [1] 374:18
drawn [2] 287:4,4
draws [1] 304:5
drg [1] 207:16
drive [1] 1:27
driven [1] 346:17
drives [3] 309:4 310:15,16
driving [1] 171:22
drop [4] 148:4 230:20 339:2 357:
15
dropped [3] 127:17,25 225:5
dropping [1] 225:2
drugs [1] 279:23
dsh [37] 18:6 19:5 20:11 22:12,21
23:21 24:4 38:9 44:5 49:21 50:3,5,
6,12,13,17,23 62:22,25 63:5 68:11
83:17 100:25 124:24 145:18 151:
2 152:12 206:22 207:1,20 210:7
238:22,25 240:21 252:6 344:4
345:2
dss [2] 56:18,21
dua [3] 158:17,22 185:24
dual [1] 20:11
due [8] 16:4 18:17 96:17 234:9
253:14 317:25 337:10 446:6
duly [6] 4:1 61:1 45:16 205:18 269:
21 292:14
dump [1] 409:23
duplicate [1] 182:25
during [2] 41:18 50:19 95:1 196:
14 213:1 227:5 262:23 271:6 272:
8 273:5 274:1,9 275:3 278:7 279:
5 281:24 282:5 295:15 306:16
311:8 327:12 447:1
duties [5] 271:5 272:8 273:4 274:1,
16
dynamics [1] 325:22

**E**

e-mail [14] 10:10 13:21 55:23 72:1,
2,5,19 109:8 123:8,9 297:20,24,25
298:12
e-mails [9] 13:18 75:9 108:13,
14,18 109:1 110:9 174:1
e01 [4] 359:4 393:4,14 394:1
e02 [1] 359:4 393:5,14

e1 [1] 397:16
e2 [2] 362:6 397:16
each [54] 15:18 21:20 23:2 24:21
25:2,11,14 27:7 28:23 29:19 53:
14 55:4 56:1 69:4 74:18 80:7 82:
16 83:21 86:3,15 88:4 96:21 98:
19,20 99:9,10,14 140:23 212:2,15,
17 216:4 218:17 219:25 222:2,21
223:6,9 225:11,11 228:14,14 233:
7 238:6 290:22 308:21,22 309:1
327:12 372:2,3 431:20,21,22
earlier [6] 36:12 55:6 80:24 86:9
245:20 349:2
early [3] 97:21 100:18 101:21
easily [4] 157:12 174:24 322:5 433:
4
east [1] 23:25
easy [2] 26:25 337:7
educational [2] 277:8 278:2
effect [3] 14:14 23:6 36:9
effective [6] 351:11,17 352:3 362:
14 363:7 441:2
effectively [1] 242:9
effort [11] 27:22 97:3,25 100:3 108:
19,20 111:22 239:24 276:22 283:
25 443:10
efforts [12] 14:22 15:20 29:22 30:
10 31:4 102:2,23 103:1 106:12
113:25 219:18 241:25
eight [1] 161:8
eighteen [1] 25:8
either [27] 28:9,11 64:14,15 73:4
167:6 187:4 221:7 241:10 274:3,9
316:19 319:21 320:4 337:19 341:
23 342:14 358:16 395:21 420:21
421:25 426:2,19 430:2 434:5 437:
13 438:4
ejr [5] 421:3 428:5,8 436:22 439:10
electronic [1] 305:10
electronically [3] 304:1 305:7
382:6
element [7] 126:5 146:18 314:11
321:5 382:22 383:8,21
elements [1] 314:9
eligibility [113] 26:11 39:22 41:7
42:8,13,19 67:4 72:13,15 79:21,
24 80:2 168:20 215:4 272:21 273:
12,13,16 275:9,11,16,19,23 278:
16,20 280:2,3,5,7,10,13,19,21 281:
1,19 282:20,23 289:24 290:3,13
291:9 294:25 295:24 296:5,10
301:7,8,10 303:11,12,16,17 304:
23 305:1,4,9,13 306:5,18,21,24,25
308:11,16 309:8,21,25 311:19
312:1,16,21 317:3,10 318:16 320:
1,14 322:12 336:19 337:10,13,19
338:5 342:1,3,19 344:20,22 348:6
349:21 351:7,12,16,25 352:4 354:
19,22 357:18,23 367:14 372:13
373:4,7 374:17 387:24 390:8,13,
17 393:14 407:5,11 408:19 409:5
413:1
eligible [59] 20:11,13 149:3 195:6,
8 196:9 221:14 223:2,4 224:18

272:24 275:14 279:14,18 280:13
281:6,12,17,18 296:8,16,20,24,25
300:1 306:10 309:7 310:23 311:
10,14,16 312:2,4,19 313:5,17,19
314:1 320:8,11 321:7 323:19,22
339:5 347:7,8 362:7,20 368:1,1
383:2 384:25 392:5,6 408:7 409:9
410:10 413:3 425:7
eligibles [3] 323:13,14,15
eliminate [1] 93:11
emily [3] 105:22,25 106:3
emphasis [1] 366:13
employee [1] 402:1
employer-employee [1] 285:22
employment [1] 286:9
end [14] 42:21 59:18 67:25 70:20
82:24 111:1 113:19 127:17 140:1
143:9 238:16 390:8 445:3 447:23
ended [5] 139:9 206:16 276:12
337:20 353:13
ending [1] 18:7
engaged [1] 26:17
enhancement [1] 272:17
enhancements [1] 272:16
enlisted [1] 13:22
enough [5] 36:23 138:17 216:6
299:9 424:24
enrolled [3] 271:22 303:23
enrollee [2] 279:16 311:3
enrollees [2] 323:21 396:23
enrollment [2] 363:8,10
ensure [2] 62:13 64:7
ensures [1] 43:9
enter [4] 16:2 243:15 356:7 407:10
entered [4] 10:25 332:15,21 407:
17
entering [1] 406:25
entire [7] 43:7 44:1 206:14 232:7
274:7 286:3 377:5
entities [4] 280:12,20 308:9 407:
10
entitled [17] 20:15 22:13 23:18 24:
14 41:18,20 90:9,11,25 220:12
258:3,5 362:8 393:6,22 404:16
427:16
entitlement [1] 41:13
entity [4] 299:3 375:11
entries [2] 87:15 88:2
environmental [1] 406:15
episode [1] 77:2
equal [2] 348:1,4
equals [4] 347:24 349:20 384:8,8
equate [1] 324:13
equivalent [1] 372:20
era [1] 216:12
error [14] 33:16 327:15 420:4,5
423:5,11,12,21 424:13 428:18
429:10,17 435:14,16
errors [2] 33:13,15
especially [4] 167:9 250:25 283:9
371:4
esquire [2] 2:13,16
essence [3] 148:18 159:4 437:9
essentially [2] 143:18 408:21

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

established [4] 53:5 278:24 308:8 443:12

establishing [2] 275:13 276:16

establishment [2] 275:17 298:7

estimate [2] 331:9 415:21

even [24] 21:24 33:11 90:14 91:6 103:18 145:9 201:12 213:16 218:10 223:16,24 224:5 226:1 235:1 242:14 246:18 250:18 360:16 361:5,11,16 372:9 376:19 401:20

event [1] 36:25

everybody [9] 154:25 225:3 239:22,22,23 271:21 281:8 296:16 297:1

everybody's [1] 240:6

everyone [1] 433:20

everything [10] 94:1 127:20 145:3 202:7 210:8 273:14 320:3 351:19 421:8 438:23

evidence [15] 6:11,15,18 28:4 31:15 32:12 33:20 105:20 334:6 425:11 430:19 446:17,19,22,25

evidently [3] 164:5 258:19 260:13

ex-senator [1] 103:14

exact [2] 129:15 346:24

exactly [13] 127:6 134:1 152:25 160:17 165:8 168:6 172:23 182:19 188:8 220:22 379:7 386:1 413:10

examination [18] 45:20 115:18 116:3,13,21 118:7 203:12 205:22 241:24,43:2 269:17,25 283:17 287:5 287:17 330:4,8 415:6

examine [4] 10:20 283:12 284:9,13

examined [3] 45:18 205:20 269:23

examining [1] 287:17

example [30] 51:17 58:1,7 60:17,20,23 85:23 87:3 131:17,25 138:2 194:6,9 195:1,18 202:11 230:7 248:23 264:1 276:25 279:23 319:3 337:9 338:25 341:10 343:2 357:11 388:23 390:1,11

examples [1] 236:16

exceeded [1] 231:22

excellent [1] 114:5

exception [1] 7:11

excess [1] 415:25

exchange [3] 305:8 313:10 446:11

exchanges [1] 370:5

excited [1] 175:23

exclude [2] 76:2 77:17

excluded [2] 59:5 331:15

excuse [7] 37:25 231:18,21 234:8 315:8 358:18 417:20

executive [1] 272:5

exhaustive [1] 29:22

exhibit [66] 11:16 23:10 50:1 54:7,17 57:21,24 60:14 61:9 63:24 65:12,13 71:5,10,23 73:13 75:1 76:7,24 78:8,13 79:14 80:12,

fact [25] 92:5,17 127:3 149:20 163:19 213:7 215:6 216:3,22 225:10 228:16 234:21,21 235:7 241:4 242:2,11 257:2,9 261:23 292:5 397:21 421:5 432:6 436:18

factor [3] 155:5,9 433:5

factors [1] 395:11

facts [1] 6:14

factual [4] 20:3 152:21 421:4 428:10

fail [1] 286:21

failed [1] 214:9

fair [2] 256:12,13

fairly [3] 305:18 385:4 419:25

fall [1] 253:16

fallback [1] 434:23

falls [4] 253:22 297:9,11,14

familiar [25] 18:9 49:3,9,24 50:8 107:20 111:7 112:3,25 142:2,7 166:17 168:6,14,17 169:24 209:22 212:1 215:10 216:13 231:9 237:6 308:4 416:24 430:3

far [14] 148:23 166:12 169:16 201:12 213:15,21 215:8 225:24 230:21 232:16 248:20 259:10 287:20 291:11 325:23

fault [1] 20:5

february [3] 101:21 106:1 273:1

federal [7] 38:10 41:9,10 42:22 75:23 76:1,5 94:2 139:11,19,22 140:15,17 171:2,4,14 175:23 176:17 184:6 194:5,24 231:15,22,24 253:23 256:25 257:6 258:7,8 261:10 276:7 285:25 292:23 293:2 304:6,7,12,13,19 307:22 308:10,18 309:2,10 310:10,13,15,23 338:10 339:14,20 340:3 342:21,21 343:7 345:16 360:18 376:23 385:9,11 386:17 392:22 394:2,15 395:5 398:5 404:25 407:23 412:11 426:19 443:20

federally [2] 271:13 307:23

fee [4] 47:11 151:8 173:10 257:10

feel [7] 169:9 217:24 240:24 249:20 295:11 398:22 434:10

feeling [2] 238:7,14

feels [3] 249:11,11 295:5

feinstein [11] 11:21 103:14,25 105:3 107:23 111:20 112:10,13 113:18 150:3 152:18

feinstein's [16] 14:13 15:10,12 104:7 105:9 106:10,19,23 107:6,12 108:4 110:21 111:14 112:21 113:8 242:12

fell [6] 81:18 82:2 189:5 190:9 231:25 241:6

felt [8] 100:25 213:24 217:24 226:6 238:22 239:6,19 420:15 439:8

few [11] 21:23 70:6 237:23,24 273:17 286:9 300:22 415:1 425:25 426:11,12

field [3] 64:18 331:18 378:11

field-by-field [1] 365:4

fields [5] 64:4 161:6,8 214:24 216:

6

fifth [3] 99:5,6 236:20

figure [7] 155:1 179:2 225:24 245:16 246:7 377:17,18

figured [1] 178:9

file [107] 40:18 55:13,17,22 56:1 61:23 62:4,8,10,12 68:24,24 69:5 70:23 73:11 76:20,23,25 81:19,21 83:2,19 84:25 87:24 89:5,21 90:16 91:14 123:9,15 124:23,23 125:4,5,6 126:16,18 127:13 128:4 129:15,17,17,19,24 130:1 131:6 132:17 155:25 156:6,12,14,15,23 157:18 158:7 159:10,24 161:1,2,7,15 166:11 175:8 183:22 185:25 186:24 187:21,23 198:17 212:13 227:3 241:8 263:21 305:10,20 306:3,4 350:3,7,12,25 351:10 359:9 364:21 374:1 377:21 378:4,11,15 379:5,16 380:11,19 381:5,7,12,20 382:5,10,23 383:12,17 384:6 401:16 403:25 411:4 413:1

filed [9] 36:1 51:17 52:22 171:19 341:16,19 343:19 345:25 362:17

files [10] 40:17 52:3 213:24 279:22 280:22 313:8 316:9,10 351:2 373:21

filing [4] 51:21,22 94:7 168:4

fill [1] 189:10

filled [1] 158:21

final [47] 3:21,24,27 4:9,12,15 9:6,10,16 16:8,13,18 23:17 43:1 70:3 80:19,23 87:13 88:10 89:19 92:13 112:7,9 113:5 122:13,21 133:5 141:16 207:6,7,18 249:13 344:25 358:11,14 418:15 419:5 421:18 422:9 428:1 434:12 439:22 440:25 441:1,5 442:23 443:7

finality [7] 37:19,24 38:7 41:25 42:6 43:5,24

finalized [6] 122:20 207:14,22 241:5 249:7 418:17

finally [6] 16:15 21:10 30:13 36:6 114:13 154:3

finance [1] 49:18

financial [9] 47:20 56:11,23 57:3 163:7 169:8 252:10 365:5 375:12

find [35] 21:6 42:14 51:8 58:2,6 65:16 67:10 68:5,12 69:9 74:12,22 77:1 79:5,10,11 82:10 87:22,25 94:9 101:2,3 110:18 122:18,22 138:2 233:4 234:22 281:5 327:16,19 428:20,24 429:4 442:21

finding [4] 38:25 67:9 246:18,21

findings [10] 20:14,20,24 421:5 427:17 428:9 434:16 436:17 439:6,11

fine [10] 8:3 166:24 174:13,13,22 175:1,2 235:10 336:10 415:22

finer [1] 20:2

finish [1] 277:10

firm [3] 49:5 103:11 149:25

first [82] 11:3,5,16 14:8 20:21 26:4 31:11 32:8 44:18 45:16 53:19 64:

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

24 65:24 79:2 80:10,13 87:3 100:
9,13 104:6 144:15 150:16 205:18
216:23 217:14,18,22 219:14 227:
11 237:24,25 238:8,8 240:12 246:
349:2 269:21 290:25 291:3
305:7,16,17 297:19 306:5 314:14
318:19,24 321:21 324:22 334:21
342:4,23,25 343:10,18,22,24 344:
2,23 345:12,24 346:7 347:10,23,
24 348:2,4 349:6,18,20,22 352:5,8
354:22 355:6 362:15,18 363:21
366:19 412:23 428:19 430:14
**first-level** [1] 369:22
**fiscal** [33] 9:5,9,15 16:7,12,17 36:
20 40:2 42:22 87:2 120:12 121:21
122:3,6 139:9,12,15,19,22 140:15,
17 184:6 272:12 275:3 281:15,25
323:9 330:24 373:25 422:8 440:
20 441:3
**five** [9] 10:9 21:25 49:5 66:23 115:
2,4 151:12 289:16 427:21
**five-year** [1] 35:18
**fix** [2] 23:15 424:2
**fixing** [1] 424:4
**flaw** [1] 74:13
**flawed** [3] 21:18 37:14 38:12
**flow** [8] 220:13 368:18 369:12,15
373:19 389:2,9 411:21
**flowchart** [3] 54:11 61:10 76:10
**flowcharting** [1] 124:7
**flows** [1] 369:2
**fluctuate** [1] 146:3
**fluctuating** [2] 147:1,5
**fluctuation** [2] 146:21,22
**fluctuations** [1] 147:11
**flying** [1] 114:8
**focus** [2] 47:9 53:19
**focusing** [1] 53:17
**foggy** [1] 435:19
**folks** [4] 223:3 235:4 253:9 257:18
**follow** [8] 53:22 86:14 193:13 241:
18 351:19 389:20 414:1,3
**follow-up** [3] 107:22 111:19 265:
11
**follow-ups** [1] 101:23
**followed** [3] 53:14 110:18 444:22
**following** [14] 20:22 25:22 110:12
195:11 233:21 234:1 343:1,22
347:11 352:9 362:16,19 419:4
436:13
**follows** [5] 6:24 45:18 205:20 269:
23 389:22
**footnote** [1] 443:4
**force** [1] 421:9
**forever** [3] 192:24 250:2 370:8
**forget** [8] 171:23 176:8 220:14
228:10 236:21 241:10
**forgetting** [1] 182:25
**forgot** [1] 277:13
**forgotten** [1] 132:4
**form** [4] 6:8 78:13 412:2 436:21
**formal** [1] 6:10
**formality** [1] 17:15
**former** [4] 84:7,17 161:2 220:2

**former** [13] 13:21 26:7,17 27:5,7
29:25 30:14 94:17 97:22 100:21
174:15 177:10 286:24
**formula** [7] 22:22 51:1,1 88:14 91:
18,21 210:10
**fortunately** [1] 255:18
**forums** [1] 284:24
**forward** [3] 148:14 423:14 441:3
**forwarded** [1] 108:3
**found** [9] 5:17 67:12 82:8 105:20
312:18 316:18 317:13 323:14 328:
5
**foundation** [6] 10:16 13:24 125:
19 295:7,13 434:20
**four** [10] 79:1 273:8 276:8 279:18
289:13,14 293:21,23 369:24 427:
20
**four-to** [1] 35:17
**fourth** [1] 290:22
**fraction** [26] 18:4 19:6,9,19 20:17
21:20 22:12,23 23:8,16,21 24:10
34:14 35:22 36:16 42:2 51:4 63:2,
3 210:5 212:4 248:5,9 343:12 393:
25 395:3
**fractional** [1] 301:21
**fractions** [5] 42:17 121:1,4 211:13
300:22
**francisco** [3] 105:24 107:4 108:21
**frankly** [4] 33:9 292:9 428:12 438:
1
**frequently** [2] 305:14 312:13
**fringes** [2] 225:8,9
**front** [3] 286:8,11 445:3
**full** [10] 6:13 23:19 99:11 149:4
294:4,7 305:20 308:24 368:2 413:
3
**fully** [2] 22:24 33:10
**function** [1] 212:7
**functional** [1] 367:3
**functionality** [3] 367:19 368:4,12
**funding** [1] 50:14
**funds** [1] 304:6
**furnished** [2] 21:13 218:3
**further** [10] 20:8 40:12 42:15 43:
22 103:1 118:1 242:18 250:8 330:
1 397:4

---

## G

**gap** [2] 96:23 195:4
**gave** [2] 68:6 70:22 82:10 91:14
105:7 107:13 190:11 230:9 235:
19 343:2 422:13 442:1
**gee** [1] 238:10
**general** [7] 18:14 177:16 200:19
309:18 419:15 425:13 443:22
**generally** [3] 167:7 200:19 226:15
**generated** [2] 318:23 338:1
**generates** [2] 220:7 221:4
**generating** [1] 230:15
**generically** [1] 51:7
**genre** [1] 364:23
**geographical** [1] 416:7
**george** [447] 1:34 2:34 3:34 4:34 5:
34 6:34 7:34 8:34 9:34 10:34 11:

34 12:34 13:34 14:34 15:34 16:34
17:34 18:34 19:34 20:34 21:34 22:
34 23:34 24:34 25:34 26:34 27:34
28:34 29:34 30:34 31:34 32:34 33:
34 34:34 35:34 36:34 37:34 38:34
39:34 40:34 41:34 42:34 43:34 44:
50:34 51:34 52:34 53:34 54:34 55:
34 56:34 57:34 58:34 59:34 60:34
61:34 62:34 63:34 64:34 65:34 66:
34 67:34 68:34 69:34 70:34 71:34
72:34 73:34 74:34 75:34 76:34 77:
34 78:34 79:34 80:34 81:34 82:34
83:34 84:34 85:34 86:34 87:34 88:
34 89:34 90:34 91:34 92:34 93:34
94:34 95:34 96:34 97:34 98:34 99:
34 100:34 101:34 102:34 103:34
104:34 105:34 106:34 107:34 108:
34 109:34 110:34 111:34 112:34
113:34 114:34 115:34 116:34 117:
34 118:34 119:34 120:34 121:34
122:34 123:34 124:34 125:34 126:
34 127:34 128:34 129:34 130:34
131:34 132:34 133:34 134:34 135:
34 136:34 137:34 138:34 139:34
140:34 141:34 142:34 143:34 144:
34 145:34 146:34 147:34 148:34
149:34 150:34 151:34 152:34 153:
34 154:34 155:34 156:34 157:34
158:34 159:34 160:34 161:34 162:
34 163:34 164:34 165:34 166:34
167:34 168:34 169:34 170:34 171:
34 172:34 173:34 174:34 175:34
176:34 177:34 178:34 179:34 180:
34 181:34 182:34 183:34 184:34
185:34 186:34 187:34 188:34 189:
34 190:34 191:34 192:34 193:34
194:34 195:34 196:34 197:34 198:
34 199:34 200:34 201:34 202:34
203:34 204:34 205:34 206:34 207:
34 208:34 209:34 210:34 211:34
212:34 213:34 214:34 215:34 216:
34 217:34 218:34 219:34 220:34
221:34 222:34 223:34 224:34 225:
34 226:34 227:34 228:34 229:34
230:34 231:34 232:34 233:34 234:
34 235:34 236:34 237:34 238:34
239:34 240:34 241:34 242:34 243:
34 244:34 245:34 246:34 247:34
248:34 249:34 250:34 251:34 252:
34 253:34 254:34 255:34 256:34
257:34 258:34 259:34 260:34 261:
34 262:34 263:34 264:34 265:34
266:34 267:34 268:34 269:34 270:
34 271:34 272:34 273:34 274:34
275:34 276:34 277:34 278:34 279:
34 280:34 281:34 282:34 283:34
284:34 285:34 286:34 287:34 288:
34 289:34 290:34 291:34 292:34
293:34 294:34 295:34 296:34 297:
34 298:34 299:34 300:34 301:34
302:34 303:34 304:34 305:34 306:
34 307:34 308:34 309:34 310:34
311:34 312:34 313:34 314:34 315:

34 316:34 317:34 318:34 319:34
320:34 321:34 322:34 323:34 324:
34 325:34 326:34 327:34 328:34
329:34 330:34 331:34 332:34 333:
34 334:34 335:34 336:34 337:34
338:34 339:34 340:34 341:34 342:
34 343:34 344:34 345:34 346:34
347:34 348:34 349:34 350:34 351:
34 352:34 353:34 354:34 355:34
356:34 357:34 358:34 359:34 360:
34 361:34 362:34 363:34 364:34
365:34 366:34 367:34 368:34 369:
34 370:34 371:34 372:34 373:34
374:34 375:34 376:34 377:34 378:
34 379:34 380:34 381:34 382:34
383:34 384:34 385:34 386:34 387:
34 388:34 389:34 390:34 391:34
392:34 393:34 394:34 395:34 396:
34 397:34 398:34 399:34 400:34
401:34 402:34 403:34 404:34 405:
34 406:34 407:34 408:34 409:34
410:34 411:34 412:34 413:34 414:
34 415:34 416:34 417:34 418:34
419:34 420:34 421:34 422:34 423:
34 424:34 425:34 426:34 427:34
428:34 429:34 430:34 431:34 432:
34 433:34 434:34 435:34 436:34
437:34 438:34 439:34 440:34 441:
34 442:34 443:34 444:34 445:34
446:34 447:34
**gets** [27] 60:10 66:24 86:1 152:23
212:10 220:9 221:10 243:9 257:3
297:1,12 306:9,23 338:5 357:8,13
360:13 369:7 381:24 382:4 385:
25 393:2 407:12 408:8 410:4 413:
16 435:18
**getting** [63] 18:24 28:15 93:19 103:
7 145:17 150:2 154:3 155:12 156:
14 163:7,12 164:7 165:5 167:4
187:19 194:19 213:23 214:4 217:
1,8,8,12 226:8 228:13,16 231:16
232:2,18 233:8,9 235:23 241:21
244:7 248:25 253:10,23,24 257:
18 258:1 259:1,3,16,18,20,21 260:
1,2,3,4,7 263:19 264:7 273:15,16
332:25 333:5 362:23 366:15 396:
4 397:22 399:14 400:13 425:24
**getzoff** [140] 2:13 7:7,9,23 8:2,8,13,
17 9:21,23 12:23 13:10,14 16:25
17:3,13,20,22 44:17,19 45:11,12,
21 46:11 58:16 59:8,12,17 60:1,6
73:22 115:13 116:2,4,8 117:3 118:
8,19 174:6,10,14,23 199:20 200:
12,22 201:3,11,17 203:1,5 204:10,
11,20 205:12,14,23 209:11,12,15
211:10 242:17 244:25 245:1 266:
23 267:2,12,18,25 268:1 269:2,4,
18 270:1 282:7,18 283:15,18 286:
20 288:23 289:3,7,15,22 290:7
291:19,24 293:1 295:13,17,20
328:24 329:4,12,15,25 334:13
358:17 399:10,18,22 401:2,6,17,
25 402:9,13,18,24 403:11,19 414:
25 415:7 416:16,20,23 417:7,18,

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

19,24 419:6 422:14 423:18,22
429:23 430:5,9,13 431:11,15 432:
4 434:2,6 435:6 436:2 437:14 438:
2,16 439:1 440:2 441:16 443:21
446:6,10 445:6,10,15
give [2] 16:3 23:6 57:1 61:20 75:7
106:2 115:3,6 148:9 158:13 246:3
255:4 324:9 332:6 351:15 358:22
365:18 372:19 403:7,8 434:19
446:15
given [20] 20:6 23:22 36:8 42:24
63:14 66:7,12 67:10 216:20 221:5
232:15 253:1 281:21 326:15 421:
17 430:24 431:5 432:25 440:19,
21
gives [6] 203:24 320:21 344:11
346:13 387:2 410:19
giving [10] 117:20 123:8 191:2
230:1,2,19 397:14,16 424:25 425:
1
gme [1] 250:25
goalsetting [1] 376:6
goodness [1] 416:4
gosh [1] 228:21
got [41] 89:20 93:23 94:14 123:3
144:4 146:9,11 147:12 150:1 152:
20 164:22 179:11 185:14,23,23
186:23 187:14,14 188:4 194:17
219:13 224:5 237:12 238:18 242:
11 246:20 251:13 271:14 281:9
299:20 316:10 341:16,17 354:12
357:1 367:23 368:8 372:10 402:
17
gotta [3] 158:23 353:18 354:6
governing [1] 24:16
government [21] 103:11 149:24
150:14 151:3 152:1 171:3 231:15
257:1 261:17 276:8 279:1 286:1
292:2 304:12 307:22 308:10 309:
11 376:23 385:12 403:5 426:20
grabs [1] 313:20
grand [4] 82:23 86:5,7,12
grant [6] 73:3 175:16,21 189:3
194:7,19 296:2,15,18 297:8 298:7
303:15 339:9 340:20 357:15 410:
13,21 411:5 417:5 437:2
grants [1] 304:25
great [7] 114:4 136:1 149:14 150:
12 192:18 204:14 267:21
greater [3] 287:6 302:22 326:2
greatly [1] 302:9
green [1] 61:12
greenish-yellow [1] 124:13
gregory [1] 2:7
grossly [2] 21:18 38:1
grounds [1] 364:5
group [15] 47:14 70:5,9 130:17
241:6,11,12 277:18,19 318:15
344:6 371:22 372:7,8,8
grouped [1] 76:11
groups [2] 19:13 202:17
guarantee [1] 405:19
guess [19] 124:17 126:17 132:19
135:6 141:8 162:8 167:3 172:3

199:11 202:22 209:19 215:13 222:
15 228:8 240:15 241:17 247:13
248:21 256:16 262:18,22 267:10,
22 268:17 289:13,16 315:7 329:
10 334:21 344:14 347:20 359:1
386:10,22 388:16 406:24 418:11
436:12 440:9
guessing [2] 247:10,11
guy [1] 219:4

## H

half [5] 19:4 222:24,25 314:18 332:
11
hall [3] 20:10 424:20 441:12
hand [5] 45:5 124:12 201:4 205:5
269:10
handful [1] 82:8
handling [1] 19:25
handpick [2] 98:15 99:17
hands [2] 366:7 441:11
hands-on [1] 371:4
hang [1] 208:23
happen [6] 233:11 286:13 333:11
339:3 439:3,5
happened [5] 104:2 110:11 224:
16 232:22,22
happening [3] 104:9 107:25 110:
20
happens [2] 254:3 338:4
happily [1] 284:1
happy [3] 76:6 147:24 405:17
hard [3] 219:10 376:11,11
harder [1] 241:20
hardstein [1] 237:9
harrold [1] 298:1
hcfa [1] 206:15
hdx [10] 57:7,11,20 58:2,5 60:7,9,
15 65:6 79:3 164:13,23 187:4 204:
3 220:15 228:3 243:12,13
headed [1] 276:21
header [2] 129:18,20
health [14] 1:1 23:4 47:14 206:7
285:24 298:18 304:2 317:10 332:
18,20 333:1,5,9 406:11
healthcare [35] 1:18 5:9 49:5 60:
13 79:20 99:22,25 270:6,13,19
274:14,23 298:23 303:21 305:17
307:20 309:17 313:11,12 315:22
317:22,24 360:13,19 361:6 381:
13,23 382:9 397:24 406:18 409:
10,17,23 410:4,12
healthy [1] 24:3
hear [8] 75:24 143:3 198:7 199:17
213:8 251:2,21 293:8
heard [16] 111:23 113:13 150:17,
24 203:16 250:16 251:5,8,12,23
253:5 254:13,21 291:25 330:22
343:9
hearing [28] 5:11,12,16,25 6:2,19
7:12 9:2 14:19 28:13 36:24 58:20
97:6 121:5 146:17 208:10 255:20
283:24 288:19 291:15 295:16 438:
18 439:7,25 446:20 447:2,20,20
hearings [5] 6:8 265:6 285:1,4

286:5
heavily [3] 21:11 276:6 421:4
hefter [64] 3:7 27:16,21 29:25 97:
23 100:14,16 101:5,9,17,25 103:7
106:1 205:4,6,17,24 207:25 208:4,
12,15,22 209:16 211:1,5 243:4
245:8 246:14 248:12 250:20 251:
4,22 252:23 253:3 255:6,24 256:4,
11,18 257:22 258:23 259:19,25
260:8,16,20,25 261:4,20 262:11
263:3,7,15 265:2,21 266:5,14,19,
25 267:4,14 268:19 423:13 433:7
hefter's [2] 27:14 102:23
held [3] 38:11 273:21 409:9
help [23] 24:6 28:3 63:8 103:9,22
106:21 112:11,14 113:20 114:5
150:18 151:7 165:16 173:24 175:
24 185:10 211:3 328:6,14 361:6
377:6 389:12 403:14
helped [1] 151:1
helpful [11] 384:18,19 386:12 387:
20 388:9,17 397:7 400:1 427:13
436:15 442:16
helping [1] 113:9
herein [3] 45:17 205:19 269:22
herring [1] 36:17
hesitated [1] 38:17
hic [1] 114:23
high [8] 78:14 98:19 162:23,25
263:9 315:6,7,9
high-level [2] 54:18 403:25
higher [22] 35:15 40:15 50:15 164:
4 194:11,23 201:7 223:17,24 232:
1 260:17,17,21,21,24 297:8
302:14,19 325:14 326:5 374:11
highly [1] 325:17
himself [2] 102:1 433:8
history [1] 288:13
hit [1] 148:5
hmo [1] 47:12
hold [3] 38:17 49:15 357:16
holidays [1] 110:15
home [20] 338:15 339:1,18 340:9,
14,15 357:13 390:11 391:24 392:
3,12,25 393:2 394:22 404:15 415:
11 416:3,5 426:2,6
home-cooked [1] 74:14
homes [1] 396:24
honest [2] 200:25 438:19
honestly [1] 291:25
hope [3] 256:12,12 428:6
hopeful [2] 110:25 111:1
hopefully [1] 363:23
hoping [7] 97:5,24 99:7 101:1 136:
9 148:1 179:5
horrible [1] 238:13
hospital [78] 1:10 5:7 7:2,4 17:25
21:17 22:20 23:25 24:19 27:12 29:
9 33:14 46:20 47:1,8 48:8 52:2 53:
7 56:15 57:15 63:18 67:7 77:12
78:7 96:20 125:11 147:3 168:18
169:17 180:10 189:9 192:23 206:
19 207:21 210:20 212:15 216:21
217:25 219:3 220:7,8,17,19,21

221:4,6,10,11 232:14 234:9 238:
10 240:2 253:17 256:9 315:16,19
325:5 331:12 341:4,9,11 349:4
367:24 381:10 392:7,13 394:23
398:2 399:12 404:18 415:23 426:
7 430:21,22 431:5 440:8,11,15
hospital's [28] 20:23 21:2,11 22:3,
18 27:2 42:1 44:5 51:9,23 52:4,21
53:25 56:3,8 76:13 84:21 92:15
95:16 96:16 100:11 125:21 182:
21 212:3,18 213:5 220:8 430:19
hospitals [14] 24:7 35:16 50:15
80:1 89:15 206:9 207:9 213:10,24
238:23,25 415:20 416:1 441:14
hospitals' [2] 207:1 211:12
hour [1] 144:25
hourly [2] 333:24,25
hours [1] 115:7
house [3] 12:8 14:7 242:6
however [5] 40:6 82:7 89:20 394:
3 396:3
huge [9] 84:13 200:23 201:22 218:
16 224:14,15,20 225:6 420:8
human [5] 1:2 23:4 33:16 292:12
420:4
hundred [1] 148:6
hurt [1] 90:13
husband's [1] 264:5
hypothetical [1] 423:14

## I

i1 [3] 16:9,14,19
i1-i10 [2] 4:10,16
i1-i9 [1] 4:13
i10 [2] 16:9,19
i9 [2] 16:14 358:10
id [2] 59:7 183:1
idea [3] 188:9 246:13 423:8
ideally [2] 353:7,12
ideas [2] 188:17 314:24
identifiable [1] 59:4
identification [5] 78:21 96:25 97:
10 114:17 288:20
identified [7] 71:2 137:6 167:15
224:9,10 308:22 311:5
identifies [1] 262:13
identify [10] 66:6 67:18,22 225:18
264:15 311:3 362:6 380:17 393:5
397:18 428:18
identifying [4] 229:1 309:20 318:5
321:15
ignores [1] 92:17
imagine [3] 143:8 292:12 357:1
immaterial [1] 383:5
impact [9] 19:21 24:18 88:15 92:
15 152:13 197:22 198:23 219:2
252:10
impacts [1] 88:11
imperative [1] 43:6
implement [1] 211:16
implementation [5] 271:9 272:15,
19 276:24 376:25
implemented [1] 207:12
implied [1] 437:8

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

**implying** [1] 445:1
**importance** [1] 162:9
**important** [15] 23:23 38:7 42:2,4 43:22 56:16 68:23 149:6 163:14 :20 316:21 320:10 384:11 440: :10
**importantly** [2] 23:12 297:25
**impossible** [6] 44:4 233:2 253:12 254:8,10 399:19
**impressed** [1] 235:5
**impression** [4] 238:18 246:20 247:19 266:7
**improbable** [1] 429:14
**improved** [1] 33:6
**in-depth** [1] 365:18
**inaccurate** [3] 37:25 38:1 385:15
**inappropriate** [1] 41:2
**include** [8] 34:19 75:17 98:23 206: 24 226:9,10 310:20 436:15
**included** [17] 20:16 23:1 31:18 32: 15 35:4 68:7 94:21 108:17 128:19, 21 200:18 226:12 270:10 300:5 388:19 397:9 447:15
**includes** [5] 73:23 199:22 257:6 288:19 313:24
**including** [12] 35:18 40:17 41:15 57:2 99:15 206:20 207:10 210:9 263:22 280:2 281:8 367:5
**inclusion** [4] 36:1,3 42:7 68:8
**income** [29] 7:6 189:7,18 194:18, 22,23 231:23 253:22 258:7 296:6, 17,19,21 297:5,8,10,11,14 302:19 32 :4,14,19,20 338:14,19 348: 3,5 :20
**incorporate** [1] 408:22
**incorrect** [3] 33:16 94:3 425:14
**incorrectly** [1] 132:5
**increase** [3] 91:8,22 224:2
**increased** [2] 83:12 181:20
**indeed** [2] 32:5 33:2
**independent** [1] 337:13
**independently** [1] 332:1
**index** [1] 161:5
**indicate** [1] 270:11
**indicated** [3] 70:19 265:16 290:20
**indicates** [3] 129:25 271:2 272:3
**indication** [2] 106:6 425:23
**indicator** [6] 39:20 64:13 114:22 149:7 309:3 378:9
**indicators** [3] 350:24 364:23 380: 16
**indifferent** [1] 249:16
**individual** [11] 26:20 64:22 76:18 98:21 173:12 212:3 309:13 323: 21 362:20 393:16,21
**individualized** [1] 53:23
**individuals** [11] 10:12,18 11:9 41: 18 225:20 226:17 296:23 297:4 307:11 321:1 322:6
**industries** [1] 49:9
**ineligible** [1] 338:13
**inescapable** [1] 21:15
**int** [1] 56:6
**information** [129] 5:24 13:25 14:3,

24 35:5 51:8 54:23 55:24 56:24 58:22 59:4,25 60:8,11,17 63:7,12 67:20 71:16 74:6,20 75:18 79:18 93:20,21 97:9,12,17 98:4 105:18 114:18 131:9 136:2 138:17 157: 12 163:11 167:18,20 174:3 179:2 198:9 214:3 216:16,20 217:1,3,23 219:23 220:2,25 221:5,7,20 235: 23 245:14 246:3 254:24 257:14 271:11,12,21,24 272:14,23 273:14 277:22 279:9,16 280:10,24 281: 10,16 282:25 290:15 298:16,20 299:8 305:4,16 306:14,18 307:10, 13 309:4 311:24 312:2,9 313:1,23, 25 314:7 315:21 320:15 322:9,11 326:7,15 337:21 354:14 356:19 357:7,14 359:23 362:23 365:14 369:2 389:13 397:5,14 400:9,12 401:8 402:15 404:10 406:22,23 407:12 409:20 412:7 419:3 434: 22 439:15 442:15 443:15,25 444: 17,19,20 446:11
**initial** [7] 56:4 69:3 93:11 112:13 171:18 195:17 355:13
**initially** [5] 109:3 128:13 217:21 245:12 444:18
**inpatient** [6] 63:14 77:11 126:17 206:19 213:5 345:8
**inpatients** [1] 207:9
**input** [6] 20:24 64:16 97:9 221:9 229:9 250:24
**inputs** [2] 134:11,12
**inquiries** [1] 228:3
**inquiry** [3] 60:19 62:11 80:7
**insignificant** [1] 180:5
**instance** [7] 39:4 128:4 165:19 195:4 336:20 388:13,21
**instances** [1] 391:10
**instead** [3] 107:4 231:13,14
**institution** [5] 388:22,25 389:8 390:3,6
**instructive** [1] 15:19
**insurance** [5] 57:10 60:21 77:15 169:7 413:20
**insured** [1] 57:18
**intake** [1] 126:25
**intended** [2] 6:12 446:15
**intentionally** [1] 9:13
**interaction** [2] 387:11 388:12
**interacts** [1] 365:25
**interest** [6] 49:1 145:21 146:8 216: 25 240:6 242:10
**interested** [3] 206:11 363:24 364: 6
**interesting** [1] 226:1
**interface** [5] 282:21 289:25 290:8 409:16,19
**intermediary** [4] 2:15 3:11 4:7 5: 15
**intermediary's** [1] 51:12
**internal** [17] 53:4,8 54:4 56:22 64: 25 65:2 79:2 81:23 83:7 99:12 125:11,22 131:13,13,20 160:15 187:3

**internet** [1] 51:14
**interplay** [1] 440:24
**interpret** [1] 383:7
**interpretation** [3] 312:11 313:21 428:2
**interpreted** [1] 315:2
**interrupt** [1] 174:11
**intimately** [1] 430:3
**intrigued** [2] 216:23 252:2
**intrigues** [1] 224:22
**introduce** [1] 15:1
**invalidated** [1] 153:22
**invested** [1] 216:25
**invitations** [2] 447:7,10
**invoices** [1] 145:1
**involve** [2] 93:3 109:16
**involved** [30] 48:4 49:20 103:16 150:21 152:23 214:12 242:12,13 244:4,7 247:4,21 276:6 277:3 278: 8,23 279:3 366:7 369:19 370:4 374:9 376:22 377:4 404:20 406: 21,24 407:16 418:24 445:2,4
**involvement** [5] 242:4,14 276:4, 18 356:1
**iowa** [1] 278:6
**ipps** [1] 100:24
**isn't** [4] 167:8 250:4 335:17 360:11
**isolating** [1] 153:24
**issue** [51] 6:22 7:8,11,17,19,20 8: 21 18:10,15 23:23 24:18 29:2 36: 25 38:4 40:2 80:8 101:12 152:11 154:24,25 155:3 197:23 200:16, 23 201:22 217:16 218:15 238:21, 23 239:7,21,25 244:5,8 246:24 247:16,25 249:22 253:2 275:4 277:2,4 281:25 311:13 314:16 · 328:14 371:14 385:11 419:10 428: 11 435:12
**issued** [5] 122:7 225:12 306:7 344: 24 420:20
**issues** [24] 19:10,23 48:24 49:21 90:21 131:16,18 202:16 207:20 213:10 216:4,10 229:12 230:7 238:22 239:1 263:11 264:13 270: 8 277:20 281:7 283:23 287:1 435: 13
**issuing** [2] 38:8 207:17
**it'd** [4] 199:7 388:17 436:14 442:16
**it'll** [1] 408:4
**it-involved** [1] 376:21
**item** [2] 73:23 144:19
**items** [6] 15:1,18 67:1 70:15 221:1 318:15
**itself** [7] 221:4,9 293:10 364:4 409: 14 426:18 428:4

**J**

**jack** [1] 2:6
**january** [5] 97:21 100:18 217:19 227:13 328:3
**jerrod** [1] 2:16
**job** [2] 274:20 375:22
**joining** [1] 205:25
**judged** [1] 18:20

**judgment** [2] 38:21 434:12
**judicial** [3] 418:13 420:23 434:18
**july** [3] 145:24 272:4 274:12
**jump** [2] 147:18,21
**june** [3] 113:6 114:10 273:21
**jurisdiction** [4] 199:17 200:8,21 440:13
**justice** [1] 286:2

**K**

**keep** [1] 330:17
**keeping** [3] 82:13 85:1 331:6
**keeps** [1] 359:5
**key** [11] 146:18 155:5,9 165:5,14 167:3 190:24 379:5,11 380:18 384:20
**kind** [12] 58:13 124:12 219:3 220: 25 224:13 262:4,5 263:23 299:9 364:5 404:19 435:18
**kinds** [1] 254:7
**knowledge** [7] 30:24 104:24 253: 1 412:20 443:3,12 444:3
**knowledgeable** [1] 292:10
**known** [4] 74:11 277:17 370:12 372:15
**knows** [4] 299:3 328:25 337:18 357:14
**knuckle** [1] 431:10
**kristin** [1] 112:23

**L**

**label** [1] 287:14
**labeled** [3] 81:6 87:17 140:23
**labels** [1] 374:21
**laid** [3] 295:7 373:16 440:12
**language** [6] 36:13 43:14 77:6 129:15 419:18 427:25
**large** [14] 23:24 24:7 27:1 53:7 54: 7 263:1 272:16 302:10 318:14 387:23 430:10,17,21 433:3
**largely** [4] 85:14 318:23 328:18 329:7
**larger** [3] 63:22 69:19 128:19
**last** [17] 83:14,15 84:11 86:6 88:22 138:5,5 206:15 224:18 225:4 238: 16 247:18 276:8 277:5 290:17 293:3 443:9
**late** [2] 110:14 363:22
**later** [8] 43:12,17 44:6 94:18 240: 14 295:15 318:25 349:23
**latest** [3] 42:12 51:13,19
**latter** [3] 246:16 362:15 391:8
**laurence** [1] 2:13
**law** [4] 304:19 360:18 398:5 443: 20
**lawfully** [1] 24:14
**lawyers** [1] 206:10
**lay** [1] 288:8
**laying** [1] 442:6
**lead** [2] 288:1 377:1
**leadership** [4] 47:6 48:4 276:1 372:3
**learned** [1] 229:22
**least** [13] 33:14 59:6 207:4 212:5

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

220:1 223:16 225:23 232:16 234:
5 238:4,8 345:1 430:15
leave [3] 94:6 233:24 325:16
leavitt [1] 33:4 215:12 277:2
●10] 9:12 29:2 54:20,25 56:6 61:
1 112:20 124:11 220:24 427:3
left-hand [1] 81:5
legal [2] 421:6 428:11
legally [3] 361:18 381:14 403:20
legislative [5] 103:4,19 150:15
154:2 427:4
legitimate [2] 218:1 254:23
length [7] 90:4,12 128:20 131:15
132:11 138:13 198:10
lengthy [3] 85:11,11 101:7
leon [2] 105:23 107:7
less [14] 38:7 115:6 133:1 192:9
198:25 222:24 247:12 252:18 292:
8,8 325:20 366:16 396:22 415:13
letran [260] 3:6 14:9 15:13 29:7,20
35:8 44:21,24 45:15,22 59:21 73:
19 92:3 116:23 119:2,16,20,24
120:3,7,15,21 121:6,14 122:9 123:
2,13 124:1,8,14 125:8,17 126:3,21
127:5,15 128:7,23 129:2,9,13 130:
6,13,19 131:1,7 132:14,25 133:15,
20,25 134:15,20,24 135:3,9,14,19,
24 136:6,19 137:7,12,19 138:9,24
139:17 140:5,9,16,21 141:5,21
142:1,6,11,18,25 143:5,10 144:1,7,
12 147:4,14 148:15,19 150:4,10
151:13,17,22 152:3,7,24 153:3,9,
18,●4:5,16,21 155:14,18 156:
1,8,●4:0 157:1,5,11 158:1,5,10,
18,25 159:5,13,21 160:2,6,10,16,
20,24 161:12,17,25 162:4,11,15,
19 163:3,10,18,24 164:8,19 165:1,
7,11 166:5,16,21,25 167:23 168:
16,25 169:6,14,22 170:3,7,12,16,
25 171:8,13,25 172:9,14,18 173:
20 175:5,10,20 176:3,10,16,23
177:2,7,24 178:6,12,16,20 179:1,
12,22 180:6,14,22 181:4,8,14,19,
25 182:5,9,13,18,22 183:6,12,21
184:2,10,15,20 185:3,7,16 186:2,6,
11,15,19 187:1,9,16 188:1,5,12,16,
21 189:2,16,22 190:8,14,21 191:4,
8,16,20,25 192:7,12,20 193:1,8,22
194:2 195:13,19,23 196:3,16,25
197:8,18 198:1,14 199:4 201:15,
19 202:4,10 203:14 204:16,17
221:17 227:13,21 316:23 402:5,
22 403:17 432:7
letran's [4] 251:2 316:1,6 318:4
letter [46] 11:19 12:7 103:24 104:3,
5,17,19,19 105:4,6,7,8,11 106:11,
15 107:21,23,24 108:3 111:16,19
112:8,9,13,17,19 113:5,10,19 152:
12 201:13 221:16 225:4,11 227:
12,14,19 237:7,15 327:25 328:4,
17 329:5,17 354:2 423:16
letters [9] 10:10 11:6 14:6,8,10,11
11●:0
lev●]] 78:15 144:22 179:4 189:

19 194:24 231:23 240:9 242:5,6
246:25 247:22 276:2 277:6 296:
18,20 297:15,16 302:19 308:18
325:12 326:1 364:7 365:12 366:4
368:10,20 369:1 370:18 371:2
372:23,23 374:11 397:6 399:25
401:12 403:23 419:12 430:8 431:
4
levels [1] 296:6
life [3] 163:19 292:3 365:2
lifetime [3] 58:11 281:7 306:8
lifting [1] 42:10
light [1] 360:7
likelihood [1] 232:6
likely [5] 225:19 254:10,11 325:7
391:3
likewise [1] 19:23
limit [3] 36:15 393:19 396:1
limitation [1] 214:24
limited [2] 149:4 308:25
limits [1] 398:6
line [13] 35:11 82:23 83:2 88:24 89:
6 93:15,16 94:6 96:4 138:5 157:
16 222:11 424:5
lines [3] 86:4 386:11 442:9
linked [1] 68:19
lipkin [3] 105:22,25 106:3
lisa [2] 105:23 107:7
list [23] 63:25 73:8 214:5,8,15,18
215:25 227:6 228:7 230:2,3,11,15,
17 235:24 236:21 263:17 288:16
289:2 301:2 317:8 318:3 358:24
listed [3] 81:13,17 289:14
listen [1] 353:5
listening [1] 354:11
listing [9] 69:22 76:14 82:15 86:25
177:15,16,20,25 388:14
listings [1] 85:25
lists [3] 85:15 95:5 322:8
literal [1] 325:14
literally [5] 29:16 308:1 312:18
369:22 373:14
litigation [2] 213:17 214:12
little [13] 66:3 125:13 133:11 143:
14 176:7 180:25 181:3 208:21
211:2 218:16 222:23 238:1,1
live [5] 28:14 145:13 235:9 439:13,
16
living [3] 194:11 292:12 410:20
llc [2] 1:18,19
located [2] 104:14 254:4
location [1] 430:20
logic [1] 233:1
logical [1] 433:5
logics [2] 54:3 64:6
long [6] 46:24 57:4 101:16 114:14
275:21 286:25 303:3 424:21
long-time [1] 29:25
longer [7] 214:17 230:16 231:24
241:14 391:24 401:20,22
longtime [1] 26:18
look [100] 28:18 50:17 53:4,8 55:3,
11 56:2,9,10,18 63:21 64:5 65:5,7
66:2,14 67:13,14 69:3 70:3 71:6

74:17 79:9 81:4 82:22 85:23 86:
11 87:14 88:14 95:10 98:2 99:7
107:8,16 108:22 109:3 110:24
114:25,25 115:7 125:24 131:10
135:5 138:4 139:23 143:13 144:
22 145:23 148:10 161:4 169:8
170:10 175:16 188:18,24 196:20
209:23 217:23 218:5,6 219:8 220:
13 223:18,20 228:5 230:1 238:3,4
239:11 248:17 249:5 309:5 318:
13 319:4,17 321:23 322:1 323:6
324:3,4,5,10 328:1 330:12,18 331:
13,14 332:13 352:25 358:9,16
365:16 368:17 416:11 418:14 429:
20 432:9 433:11 434:8 437:18
looked [17] 77:11 86:9 109:12 218:
7 223:19 225:25 226:3 263:17
300:9 316:9 319:15 323:12 354:
20 431:17 433:6,8,14
looking [64] 57:21 60:14 61:10 66:
19 70:12 73:13 78:8 79:14 80:12
82:24 84:13 85:10 86:19 89:6 91:
21 95:11,23 103:23 104:11,25
108:10 111:4,25 112:24 114:21
130:18,22 133:2,5,10 139:11,12,
14,18 140:14 175:3 192:2,5,8 220:
3 222:9 223:21,23 239:5 248:7
250:3 271:1 299:10 300:4 331:5
340:6 354:13 365:13 368:15 397:
13 432:24 435:25 436:18,25 440:
5 441:8,9 442:17,25
looks [7] 53:9 57:25 128:11 219:
24 220:1 343:24 430:25
los [3] 24:1 61:2 179:16
lose [3] 65:25 189:25 337:11
lot [17] 56:15 59:20,24 152:9 155:
24 166:9 202:15 213:9 218:6 239:
24 264:17 303:7 340:16 351:2
356:19 357:25 376:4
lots [3] 137:3 357:7 370:4
love [3] 198:5 377:20 380:18
low [1] 98:19
low-income [2] 50:16 169:1
lower [9] 90:15 95:15,22,25 143:
23 200:3 260:15 302:16
lower-income [2] 24:3,8
lowest [1] 368:20

## M

m01 [11] 41:16 141:17,20 335:1
336:2 338:7 350:10 356:24 359:
24 378:5 404:2
m02 [11] 41:16 141:17,20 335:1
336:2 338:7 350:10 356:25 359:
25 378:5,25
mac [21] 10:6,19,23 16:6,10,15 20:
4,5 31:7,8,11 32:8 34:7,14 36:7
39:22 44:11 283:5 287:11 421:15
438:2
mac's [4] 19:25 40:20 43:3 443:12
macro [2] 397:6 399:25
made [20] 10:3 104:16 111:22,22
189:6 224:12 235:1 243:6 252:3
283:24 300:10 323:16 352:6 355:

4 365:22 371:17 410:10 435:14,
16 439:20
maevs [1] 372:19
magical [1] 402:23
magnitude [1] 225:13
main [2] 72:12 79:13
maintain [4] 164:11 174:2 360:22
374:1
maintained [4] 21:4 40:24 164:15
176:4
maintaining [2] 163:22 271:21
maintains [1] 280:23
maintenance [1] 280:3
major [2] 277:3 374:9
majority [1] 67:25 70:1 82:1
manage [5] 171:4,15 279:12,14
304:22
managed [2] 272:11
management [13] 271:11,12 272:
14 277:22 279:8,20,21,25 332:18,
20 333:1,6,9
manager [8] 47:19 240:9 271:25
272:18 273:7 368:7 373:12 375:
18
managerial [1] 376:5
manner [1] 23:9
manpower [2] 239:9 247:24
manual [4] 68:4 79:8 271:16 279:
11
many [31] 18:24 19:14 34:21 48:9
49:19 65:25 63:6,6 65:1 74:10 77:
15,16 78:22 87:6,7,8,9 88:12 111:
22 133:23 181:1 207:19 214:25
220:24 222:4 253:16 290:21 323:
10,11 345:6 415:19
margins [1] 426:1
mark [1] 237:9
marked [3] 3:17 4:5 9:20
maryland [1] 1:29
massive [1] 351:1
master [3] 63:25 65:9 278:3
match [19] 41:23 69:3 76:20 77:2
81:7 83:2,5,7 84:24 87:15 187:23
212:24 214:9,23 222:12,15 223:
25 226:4 310:25
matched [21] 25:25 76:15,17,25
80:25 81:8,8,18 82:2,17 98:10
127:14 215:2 216:7 226:2,5 227:
15 322:18,22 323:10,15
matches [1] 231:6
matching [19] 29:14 33:6 41:6 43:
18 81:22 112:12 136:18 185:1,21
187:14 212:16,23 213:4 229:16
304:7 309:2 310:17,24 365:5
materials [2] 333:24 447:14
math [1] 74:14
matter [7] 1:8 20:1 101:4 424:4
425:13 427:23 434:12
max [4] 253:23,24 258:7,7
mba [2] 2:6 49:17
mean [52] 8:3,4,6 25:16 70:17 71:8
77:8 84:22 87:18 136:13 153:13
156:21 214:11 225:2 229:4 233:1
234:8 239:16,22 243:24 245:17

by ETS Inc.

least - mean

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

255:15 259:6 266:15 286:17 291:
21 310:14 318:7 320:5 322:10,17
324:19,22 326:12 331:23 337:3,8
351:6 368:19,21 379:1 385:3 389:
●92:12 396:15,18 397:1 399:
7 427:20 437:17 438:18 444:11
**meaning** [14] 200:16 210:10 212:8
218:9 229:6,25 234:7 238:21,23
246:16 248:22 262:1 263:12 408:
24
**meaningful** [1] 60:18
**means** [6] 65:21 207:15 253:19
378:6,25 388:18
**meant** [4] 76:15 227:8 432:5 443:6
**measure** [1] 23:20
**measured** [3] 23:17 36:18 210:13
**measures** [1] 22:13
**measuring** [1] 36:15
**medi** [14] 274:8 275:10 276:16 281:
14 283:2 290:2 292:10 294:24
319:17 327:4 337:9 377:23 389:
24 406:23
**medi-cal** [150] 13:22 26:8,9,16 27:
6 30:16,23 41:3 48:17 58:12 59:7
60:25 61:6,22 64:12,13,14,15 65:
8 67:3,16 68:2 72:13,15 79:6,23
80:3 94:17 149:1 151:2 168:20,22
169:15,19 172:6,8,10,15 174:16
177:11 187:5 216:15,19 221:19
225:17 261:19 270:21,25 271:23
272:6,24 273:11 275:9,14,20 278:
8 280:5,7,11,11,14,25 281:6,6 282:
19 ●● 289:23,24 290:2,11,12,
18 ●●,9 293:13 294:24 298:19,
23 303:12,16,19 304:15 305:4,13,
22 306:4,7,10,11 308:5 310:12
311:3,10,25 313:2 314:25 315:3,
12 316:11 317:2,18 318:3 319:2,3
320:7 337:12,15 339:5 340:17
341:5 342:1 344:9 346:13,23 347:
23 349:1,19 350:14 356:6 357:17
364:15 367:1 390:3,5 392:5 394:
12 396:15 402:12 406:20 407:3,5,
11,15,20,24 408:10,15,16 409:8,
14 410:3 411:4 412:21,25 413:9,
20 415:12,19 417:1
**medicaid** [71] 19:6 30:15 47:12 51:
4 61:17 63:1,3 165:22,25 166:11
167:11 172:12,15,17 210:11 211:
22 213:13,15 229:14 270:8,24
271:10,12,22 272:13 273:8 274:4,
4,5,8,10,16,21,24 275:1,3 276:2,4,
5,11,14,17,17,20 277:4,22 278:1,
16 279:8 286:3 287:1 304:25 308:
12 347:14 354:21 360:21 361:2,4,
16 372:1,2,3,9,13 373:3 377:1,2
392:5 394:11 398:4 404:22
**medical** [12] 1:10 5:7 7:2 17:25 33:
4 46:20 47:13 215:11 273:24 325:
5 349:3 393:17
**medically** [1] 417:2
**medicare** [85] 5:10 6:25 7:13 18:2
19:●●,14 22:14,19 24:6,15,17
39●●:6 43:1,7 44:1 47:11,12 48:

13,14,23 49:2,6,25 50:22 52:5,8,
13 58:8 62:5,13,16,21 67:16 68:2,
2 69:12,14 77:14 82:6 87:7,23 89:
9,18 90:1,9,11 92:12 126:10,20,24
127:2,9,22 128:13 133:6 134:10,
12 138:15 206:11 207:8 210:5,15,
16,18 211:11 212:14 214:19,21
220:23 221:13 222:5 223:4 226:
15 227:4 264:4 276:24 318:25
322:23 340:2 361:9,14 394:11
396:15,23
**medicare's** [2] 37:21 234:25
**medicare-covered** [2] 129:21
133:3
**medication** [1] 86:13
**medpar** [43] 40:1,17 42:19 55:13,
17,22 68:20,23 70:23 73:11 76:20,
22,25 81:19 83:18 89:5,21 90:15
91:14 129:17 130:1 155:25 156:
12,15,21,23 157:18 158:16 159:4,
9 161:7 183:20,22 185:25 186:23,
25 197:16 198:17 212:9 223:2
227:3 230:4 263:21
**meds** [30] 280:6,8,24 281:16,24
305:12 306:4,18 307:4,13 309:19
310:8 312:10 313:13,15,20 314:4
365:17 367:5,6,11,16 374:4 381:
25 406:4,4 407:1,13 410:1,11
**meet** [4] 64:7 77:18 114:2,9 237:
21 250:18
**meeting** [1] 114:7
**meetings** [1] 369:21
**meets** [1] 369:14
**member** [2] 14:15 203:15
**members** [9] 2:3 14:17 39:13 46:2
63:10 261:8 294:12 427:5 447:1
**memorize** [1] 251:25
**memory** [1] 333:18
**mention** [2] 266:20 277:13
**mentioned** [12] 36:11 55:6 60:9
73:1 77:24 145:16 252:19 281:2
301:18 323:18 376:22 415:8
**mentions** [1] 36:14
**mere** [1] 36:1
**merely** [2] 7:14 20:7
**messes** [1] 202:6
**met** [8] 77:22 101:20 103:18 104:
20 106:1,18 152:10 238:5
**method** [1] 92:9
**methodology** [27] 26:5 27:13 29:
13 30:4,18 40:8 53:23 54:14,16
80:5 119:14 121:19 122:19,25
123:25 137:11 212:1 219:15 227:
22 228:25 233:22 234:2 248:10
316:2 395:4 418:16 419:4
**methods** [3] 316:6 318:4 321:14
**mid-month** [1] 412:22
**middle** [6] 61:1,10 105:16 299:17,
18 413:15
**might** [25] 146:18 193:18 221:21
226:10 243:6 246:1 250:17 255:1
260:2 267:7 288:1 308:24,25 309:
1 319:4 320:8,11 354:17 360:7
389:11 397:2,25 400:1 428:1,12

**miller** [1] 113:24
**million** [8] 50:20 91:23 145:18,20
301:2,3,3 432:10
**millions** [1] 24:13
**mimic** [1] 211:19
**mind** [1] 129:12
**mindboggling** [1] 308:13
**minds** [1] 246:5
**minimum** [2] 66:20 427:16
**miniscule** [1] 391:6
**minute** [3] 75:7 230:8 428:14
**minutes** [2] 115:2,4
**minutiae** [1] 143:17
**miscellaneous** [1] 188:23
**misquote** [1] 243:5
**missed** [2] 164:22 251:7
**missing** [4] 65:4,9 74:16 126:5
**misstatement** [2] 203:18 243:7
**mistake** [2] 203:20 204:5
**misunderstanding** [1] 202:1
**misunderstood** [1] 155:23
**mix** [1] 252:13
**mixture** [1] 388:16
**mmis** [4] 279:9 281:24 367:5 370:
1
**mo** [1] 425:2
**moment** [2] 23:13 92:12
**money** [10] 217:4 247:14 256:22,
25 257:16 261:1,5 309:9 310:17
438:22
**monstrously** [1] 433:2
**month** [67] 41:19 65:21,24 66:1,17
67:3,4,7 95:9,9 110:17 189:7,23
194:8,16 195:9,12 281:12,17,22
283:21 300:20,20,23 301:23 302:
5,6 311:15,16,20,20 338:17,21
340:5 342:4,24 343:1,4,5,10,11,18,
22 344:1 345:4,4,7,13,24 347:9,11,
15 348:21 349:7,7 352:9 354:23
355:6 362:9,16,18 374:20 393:7
394:25 412:23 413:2,4
**month-specific** [1] 342:2
**month-to-month** [1] 301:20
**monthly** [6] 95:4,5 110:18 178:2
299:19 305:19
**months** [11] 25:8 36:19 41:19 42:
21 51:18 65:23 66:19 301:7,8,10
323:22
**moreover** [2] 31:24 32:21
**morning** [14] 39:13 45:22,23,24
46:1,5,7,9 118:25 119:3 205:24
206:2,2 251:1
**most** [9] 35:21 43:22 219:22 226:
17 256:23 280:17 311:22 368:21
430:15
**motion** [2] 209:18 420:22
**mouth** [1] 433:11
**move** [7] 69:17 118:22 245:4 334:
16 367:21 372:18 418:9
**moved** [1] 376:20
**movement** [2] 104:4 209:18
**moving** [5] 44:11 63:22 69:21 76:
8 149:12
**ms** [412] 29:20 44:20,24 45:22 46:4

59:21 72:16 73:19 92:3 109:5,15
113:24 116:23 118:23,24 119:2,3,
4,16,18,20,22,24 120:1,3,5,7,13,
15,17,21,24 121:6,8,14,16,25 122:
5,9,11 123:2,11,13,20 124:1,3,8,
10,14,16 125:8,15,17 126:1,3,14,
21,23 127:5,7,15,24 128:7,9,23,25
129:2,4,9,11,13 130:3,6,10,13,15,
19,21 131:1,3,7 132:12,14,18,25
133:8,15,17,20,22,25 134:2,15,17,
20,22,24 135:1,3,7,9,11,14,16,19,
21,24 136:4,6,12,19,21 137:7,9,12,
14,19 138:7,9,21,24 139:4,17 140:
3,5,7,9,11,16,18,21,25 141:5,7,21,
24 142:1,4,6,9,11,14,18,25 143:5,
10 144:1,7,12 147:4,14 148:15,19
150:4,10 151:13,17,22 152:3,7,24
153:3,9,18,23 154:5,16,21 155:14,
18 156:1,8,16,20 157:1,5,11 158:1,
5,10,18,25 159:5,13,21 160:2,6,10,
16,20,24 161:12,17,25 162:4,11,
15,19 163:3,10,18,24 164:8,19
165:1,7,11 166:5,15,25 167:23
168:16,25 169:6,14,22 170:3,7,12,
16,25 171:8,13,25 172:9,14,18
173:20 175:5,10,20 176:3,10,16,
23 177:2,7,24 178:6,12,16,20 179:
1,12,22 180:6,14,22 181:4,8,14,19,
25 182:5,9,13,18,22 183:6,12,16,
21 184:2,10,15,20 185:3,7,16 186:
2,6,11,15,19 187:1,9,16 188:1,5,
12,16,21 189:2,16,22 190:8,14,21
191:4,8,16,20,25 192:7,12,20 193:
1,8,22 194:2 195:13,19,23 196:3,
16,25 197:8,18 198:1,14 199:4
201:15,19 202:4,10 203:14 204:
15,17 227:20 245:5,6 248:1 250:6
251:2 316:1,5,23 318:4 334:17,18
335:15,21 336:1,5,9,14 337:23
338:3 339:10 340:23 341:15 342:
6,12,18 344:13,21 346:4,10,14,19
347:3,21 348:17,24 349:14 352:1,
16,20,24 353:4,8,23 354:3,8 355:1,
18 356:10,17 358:3,8,20 359:15,
20 361:19,25 363:9 377:19 386:
13 392:8,14,20 395:14,19 396:7,
13 397:12 398:7,12,16,21,25 399:
4,8,16,20 402:5,22 403:17 413:13
414:4,11,17 415:9 418:10 421:10,
21 422:19,23 432:7 436:13,14
**much** [36] 36:22 37:15 38:13 43:
18 93:21 108:17 110:19 143:3
144:25 146:5 151:10 161:10 164:
6 180:2,11 189:25 228:22 241:20
242:8 250:7 251:5,7 259:13 261:9
264:11 309:9 310:17 326:5 327:1,
4 332:24 333:1 377:9 388:2 411:
10 414:12
**multiple** [11] 66:17,22 308:15,20
311:21 320:13 350:24 406:5,12
412:10,11
**must** [6] 34:12 36:8 44:7 163:22
360:22 422:15
**myself** [2] 173:23 365:3

00465

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

mysterious [1] 33:9
mystery [1] 145:14

## N

[1] 359:5
[1] 359:5
n11 [1] 359:5
nad/seh [1] 447:24
name [14] 114;16 127:11 153:7 159:7,7,8,14 220:15 225:4 265:4 286:6 287:22 319:18 424:21
names [2] 109:14 286:10
narrowly [1] 287:3
nation [1] 89:15
national [3] 276:2,10 277:6
nationwide [1] 443:10
nature [4] 284:14 294:5,7 336:18
nearly [1] 206:14
necessarily [7] 214:23 338:18 363:11 387:25 388:5 389:11 390:15
need [11] 55:10 64:5 94:4 139:1 148:24 149:1 150:20 207:11,13 249:21 391:25
needed [6] 51:8 103:8 109:16 150:17 152:14 409:25
needs [10] 162:22,23 219:1,6 234:14,15 291:11,16 311:15 433:13
needy [1] 417:2
negotiator [1] 241:13
neither [3] 23:13 35:23 36:12
nervous [2] 102:5 103:8
net [2] 79:7 187:10
net [1] 33:10 47:17 139:20 203:24 283:22 287:18 291:13,25 328:10 353:20 385:10,12
new [14] 112:22 121:19 123:24 226:23 229:22 275:16 310:2,4 407:23 443:23 444:21 446:21,22,24
newly [3] 119:11 122:16 123:23
news [1] 176:6
next [10] 26:16 64:1 67:11 69:22 87:17 148:2 177:9 263:2 269:3 362:4
nice [2] 124:6 151:7
nicely [1] 149:16
nix [2] 2:4 204:18
nobody [2] 190:3 385:2
nominal [4] 151:8,16 152:4 339:22
non [2] 77:13,15
non-error [1] 429:17
non-matched [1] 233:16
non-ssi [2] 70:10 76:12
non-use [1] 39:2
none [2] 3:12 285:6
nonetheless [4] 18:11 429:14 440:17 441:21
nonpayment [2] 386:22 387:14
nonprofit [1] 23:25
noon [1] 312:19
no [1] 3:14 35:23 36:13
no [2] 1:18 5:8

norm [2] 429:21 430:18
norma [1] 103:16
normal [1] 194:7
normally [1] 257:1
norms [1] 429:19
north [447] 1:34 2:34 3:34 4:34 5:34 6:34 7:34 8:34 9:34 10:34 11:34 12:34 13:34 14:34 15:34 16:34 17:34 18:34 19:34 20:34 21:34 22:34 23:34 24:34 25:34 26:34 27:34 28:34 29:34 30:34 31:34 32:34 33:34 34:34 35:34 36:34 37:34 38:34 39:34 40:34 41:34 42:34 43:34 44:34 45:34 46:34 47:34 48:34 49:34 50:34 51:34 52:34 53:34 54:34 55:34 56:34 57:34 58:34 59:34 60:34 61:34 62:34 63:34 64:34 65:34 66:34 67:34 68:34 69:34 70:34 71:34 72:34 73:34 74:34 75:34 76:34 77:34 78:34 79:34 80:34 81:34 82:34 83:34 84:34 85:34 86:34 87:34 88:34 89:34 90:34 91:34 92:34 93:34 94:34 95:34 96:34 97:34 98:34 99:34 100:34 101:34 102:34 103:34 104:34 105:34 106:34 107:34 108:34 109:34 110:34 111:34 112:34 113:34 114:34 115:34 116:34 117:34 118:34 119:34 120:34 121:34 122:34 123:34 124:34 125:34 126:34 127:34 128:34 129:34 130:34 131:34 132:34 133:34 134:34 135:34 136:34 137:34 138:34 139:34 140:34 141:34 142:34 143:34 144:34 145:34 146:34 147:34 148:34 149:34 150:34 151:34 152:34 153:34 154:34 155:34 156:34 157:34 158:34 159:34 160:34 161:34 162:34 163:34 164:34 165:34 166:34 167:34 168:34 169:34 170:34 171:34 172:34 173:34 174:34 175:34 176:34 177:34 178:34 179:34 180:34 181:34 182:34 183:34 184:34 185:34 186:34 187:34 188:34 189:34 190:34 191:34 192:34 193:34 194:34 195:34 196:34 197:34 198:34 199:34 200:34 201:34 202:34 203:34 204:34 205:34 206:34 207:34 208:34 209:34 210:34 211:34 212:34 213:34 214:34 215:34 216:34 217:34 218:34 219:34 220:34 221:34 222:34 223:34 224:34 225:34 226:34 227:34 228:34 229:34 230:34 231:34 232:34 233:34 234:34 235:34 236:34 237:34 238:34 239:34 240:34 241:34 242:34 243:34 244:34 245:34 246:34 247:34 248:34 249:34 250:34 251:34 252:34 253:34 254:34 255:34 256:34 257:34 258:34 259:34 260:34 261:34 262:34 263:34 264:34 265:34 266:34 267:34 268:34 269:34 270:34 271:34 272:34 273:34 274:34 275:34 276:34 277:34 278:34 279:34 280:34 281:34 282:34 283:34
northern [6] 302:15,18,21 325:23 326:3
note [4] 58:25 440:7,11 447:6
noted [3] 16:1 292:18 447:3
notes [1] 93:25
nothing [14] 75:2 104:9 107:24 113:10 145:5 151:25 152:2,6 225:13 226:21 229:21 325:15 405:20 424:3
noticed [1] 90:3
november [1] 271:4
nowadays [1] 157:7
npr [1] 52:24
nprs [2] 18:18 119:8
number [102] 7:14 16:11,16 20:6,24 22:18 40:3,15,22 51:24 53:7 54:4 67:6 69:1 73:5 89:17,22 114:23,24,25 117:7,9,12,18,19 118:10,12 127:9 128:19,21 130:2,5,7,8 131:5 134:3,5 136:24 137:23 144:16,16 145:15 146:23 147:8 181:15 194:12 201:7 210:18 213:22 214:24 215:5,7 218:24 222:12,12,13 223:13 224:8,10,17 225:6 230:10 236:21 245:23 251:25 253:5,9 254:14,20 255:5,7,16 262:2,6 264:8 265:5,14,25 266:12 272:16

284:34 285:34 286:34 287:34 288:23 285:8 299:25 314:22 319:10,16 321:10 327:10 331:15 347:6,18 357:9 379:15 395:10 431:16,18 447:4
numbers [42] 5:5 14:5 19:17 24:8 36:21 92:2 128:18 180:25 183:7 192:6 193:5 197:15 213:19 214:20,22 215:1 216:6 218:8,20 219:7 226:22 228:8 235:8,25 236:3,17,24 239:2 262:3 263:12 264:12,21 286:14,22 287:23 299:16,23 301:1,3,5 394:7 437:10
numerator [6] 20:16 34:13 68:9 132:22 145:8 182:1
numerous [5] 27:23 127:4 134:13 392:3,12,25 393:2 394:22 396:23 404:15 415:11 416:3,4 426:2,6
nut [1] 399:14

## O

object [2] 287:12 328:21
objecting [1] 291:1
objection [7] 11:11 283:16 287:15 293:9,15,19 294:8
objections [8] 10:2 11:3 12:16 16:1 17:1 20:4 284:14 294:5
objectives [1] 376:7
objects [3] 10:6,24 283:5
obstacle [1] 443:16
obtain [17] 14:23 15:21 31:13 32:10 55:12 60:8 73:7 74:7 81:23 85:5 95:4 97:19 108:2 111:11 113:4 177:15 318:20
obtained [10] 15:11 31:18,22 32:15,19 40:1 44:10 72:17 76:13 225:16
obtaining [3] 278:9 316:3 443:24
obtains [2] 282:24 290:14
obviously [4] 219:2 229:7 257:12 347:13
occupation [2] 206:5 270:4
occur [1] 326:14
occurring [1] 196:14
occurs [3] 168:7 350:5 382:13
october [10] 75:10 101:22 102:5 104:10 107:2,25 110:15 140:1 273:1,20
offer [3] 103:20 244:18 334:5
offered [4] 103:21 114:6 283:22 287:13
offering [1] 283:9
office [27] 14:13 15:12 47:24,25 71:20 72:20 104:7 105:15,24 106:23 107:4,5,6,13,14 108:5,21 111:24 112:10,21 115:6 148:23 169:11 174:2 242:12 286:18 312:20
officer [1] 276:9
offices [1] 103:20
official [3] 27:7 100:22 159:8
officials [1] 240:25
often [1] 189:11

00466

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

okay [332] 8:20 13:9 46:25 48:16, 19 50:21 52:2 53:13,17,21 54:6, 13,20 55:16 56:7 57:21,23 58:17 59:13 60:2 61:8,18 62:3,9,18 66:5, 17:8,19 68:17 69:16,20 70:12 71:7,12,15,21,24,25 72:10,24 73:7, 12 74:23,25 75:7 76:8 78:8 79:14, 23 80:4,11,15 81:10 82:4,12 83: 24 84:9,15 85:13 86:17,19 87:11 88:25 89:6 91:7,24 92:11 95:11, 13,23 96:14 98:8 104:11 106:5,22 107:16 108:6,10,23 110:11 111:4, 6,13,25 112:7,24 113:23 115:17 116:11 117:3 118:3,22 123:12,21 125:16 126:2,15 127:25 128:1 129:5 130:4 131:8 140:4 141:8,25 142:5,12 148:1 154:8,12 155:17 156:11,19 158:4,15 159:12,20,20 160:9,19 161:18,20 162:7 163:2 164:18,18 165:4,10 166:6,20,20 168:24 171:7,12,21 174:22 175:1 176:2,6,13 177:1,23 178:5,9,15,19, 25 184:14,19,23 187:8,13 188:4 192:11 193:23 194:1 195:1,14,22 196:2 197:3 199:3 201:10 203:22 204:2,14 205:3 206:12,23 208:13, 25 209:2,9,13 210:12,21 211:6,8, 24 214:6 215:10 216:13 217:20 219:8,10,13,14 221:15 222:1 223: 5,9,18 224:3 225:15 227:10 229: 12 231:9 232:5,12 233:9 236:9 237:6,13 240:8 241:23 243:23 24:... 247:5 248:2 249:24 250:7 25... 56:4 257:21 258:11 259: 24 260:6,11,12,24 261:3,12 262: 10,18 263:6,14 264:23 265:1 266: 11,18 267:10,17 268:15 269:5 272:25 275:2,25 278:7 279:7 280: 4,25 281:23 282:8 283:15 284:12 285:11,18 288:11 289:6,12,23 290:24 291:20 292:25 295:18 296: 23 297:17,18 298:14,17 299:18,22 300:4 301:12,17 302:7 304:17 311:7 312:13 317:5,15 318:12 319:12,25 320:15 321:18 323:3, 23 329:13 330:1,21 334:16 336:6 340:24 342:7,19 356:11 359:16 361:20 364:14 365:17 366:11,23 380:21 382:2 386:10 402:12 404: 8 406:2,4,20 407:8,15 408:10 410: 25 411:14 413:12 414:5,12,20 415:19 416:10,19,24 417:10,15 418:3,8 421:11,22 422:12,13,20 430:12 436:12 444:2,9,25 445:9, 14 446:4
old [1] 310:5
olszewski [65] 2:16 8:20,22 10:1, 5 11:15 12:1,5,12,17,21 13:1,6 16: 20,22 17:11 39:6,8,12 58:18 116: 12,14,18,22 117:25 203:8,9,13 204:7 242:20,22 243:2 244:21 268:4,7 283:4,8,20 284:8,15,19 28... 290:24 291:4,10 292:15, 19... 20,24 294:6 328:20 330:5,

9 334:9 417:10,11 418:3,5 421:12, 14 422:2,5,10,16,21
olszewski's [1] 118:5
onboard [2] 28:16 152:15
once [19] 15:7 25:5 27:20 29:1 52: 2 63:24 76:11 78:20 91:24 102:22 180:12 227:19 305:19 387:4,5 405:12 442:11,12,16
one [108] 17:21 21:17,23 28:17 32: 5 33:2 34:4 58:2 59:6 64:23 66:17 69:8 70:19 75:11,19 100:5 105:25 111:19 114:15 117:5 118:9 119:5 123:4 127:4 140:8 147:18,19 149: 17 161:4 165:25 168:3 173:25 184:16 193:12 197:16,16 199:11 203:10 216:4 218:17 221:1 222: 21 225:11,14 228:14,14 232:14 233:7 242:3 247:4 255:8 257:3,4 263:2 272:11 273:8 277:10 285: 20 286:8 287:21 290:5,13,18,22 291:14 300:22 301:7 303:14 307: 5 308:14 317:13 318:8 321:10 322:16 325:16 334:22 339:5,12, 15 346:22,25 347:5,14 351:2 356: 18 358:16 370:25 371:1 377:15 382:22 386:11 407:25 410:8 421: 22 422:13 426:14 430:25 431:20, 21,22,24 432:7,8 434:3,8 436:23 437:6 438:1
one-to-one [2] 335:22 378:19
onehanded [1] 219:11
ones [2] 167:19 233:7
online [3] 114:22,25 157:7
only [75] 36:3 62:15 65:17,23 69: 11 70:6,10 89:25 93:17 96:18 100: 5 120:12 126:10 132:5,6 133:2 141:9 142:7 143:8 145:6 160:13 169:16 177:19 194:19,21 222:17 225:24 226:12,23 228:18 229:6 230:6 231:3,17 232:18 233:9 245: 25 247:6 249:1 258:1 287:19 297: 16 298:19,24 299:6,7 300:14 301: 11 302:23 306:22 307:1,3 315:10 318:18 324:14,24 325:1,8,10 326: 9 356:6 360:23 361:15,22 413:1,3 421:22 425:1,4 426:16 433:18,21 439:9 442:11 446:24
open [1] 440:18
opening [3] 17:18 39:7,15
operated [3] 332:17 406:9,17
operates [2] 271:15 272:12
operation [4] 271:9 281:24 282:3, 5
operational [6] 47:7 48:5 157:23 275:22 372:23 376:6
operations [3] 47:8,22 273:10
opinion [6] 232:5 288:5 316:5 318: 2 321:13 322:7
opportunity [4] 27:24 283:11 428: 7 446:16
opposed [7] 129:7 193:19 223:13 331:2 419:3 429:11 431:10
opposition [2] 31:11 32:8
opted [1] 408:22

optional [1] 20:10
orange [1] 77:5,6 127:18 128:1
order [13] 5:4 6:15 13:15 55:9 97:4 155:7 167:4,14 184:6 291:17 419: 9 427:24 434:21
orderly [1] 149:16
ordinary [1] 248:6
organization [2] 150:22 151:1
organized [1] 225:16
original [4] 18:18 94:8 125:10 243: 25
originally [2] 214:25 239:16
other [79] 12:16 14:4 18:16 19:4, 23 20:14 33:23 37:20 38:10 48:22 81:13 92:1 93:2 98:24 114:18 127: 11 137:3 141:8,9 153:13 159:16 166:3 185:2 197:11 201:4 202:17 218:17 222:25 223:6 226:2 228: 10 229:9,11 241:16 248:3 262:4,5 268:8 273:17 274:22 277:9 279: 18 292:11 294:2,11,13 301:9 306: 16,25 318:10 320:12 337:16 338: 9 343:8 347:16 351:10 364:9 366: 18 357:7 359:3 368:21 379:11 380:16 386:15 412:19 414:22 417: 17,22,25 421:22 425:7 426:10 429:6,9,17 435:21 436:5,6 445:21
others [1] 11:14
otherwise [1] 417:4
ourselves [1] 126:9
out [74] 19:12 21:6 47:19 49:2 52:9 58:6 63:16 69:9 74:13,22 79:10 80:21 86:24 89:14 95:8 97:16,22 103:9,12,13 107:3 110:18 114:12, 13 122:18,22 134:3,9,11,13 140:1 143:20 150:18 151:5 155:1 157: 21 158:21 165:16 171:17 178:10 179:3 180:3 189:10 190:1 198:19 201:24 202:16 234:22 245:16 246: 7 281:5 327:16,20 342:20 343:15 345:20 355:10 362:1 363:1 373: 17 377:17,18 379:14 388:21 397: 19 400:6,16 419:5 425:8 432:20 439:8 440:13 442:6,21
outcome [4] 244:13 333:21 374: 14 429:15
outlined [1] 442:19
outside [1] 248:5,10
ovals [1] 54:22
over [43] 35:17 47:16 96:11 114:8 148:11 171:3,15 210:17 222:22 224:2 238:24,24,25 240:7 247:2 250:24 258:6 262:14 274:2 275:8, 23 277:15 303:25 310:11 350:12 358:2 369:23 377:22 378:4 379:4 380:11,19 381:17,20 385:25 387: 3,15 400:24 401:1,10,14,16 402: 3
over-capturing [1] 66:4
overall [7] 23:21 31:1 273:7 276: 18 326:25 387:3,23
overreaching [1] 165:24
overrides [1] 421:7
oversaw [1] 375:4

overseeing [2] 47:10 372:6
oversight [3] 304:14 307:21 310: 10
overstated [1] 37:8
overview [1] 372:20
own [18] 25:21 30:10 31:4 40:8,8 53:22 54:2 65:2 83:7 97:9 160:14 174:4 187:3 264:7 297:6 333:8 420:22 441:1

P

p1 [3] 9:7,11,17
p1-p19 [3] 3:22,25,28
p11 [1] 171:23
p19 [4] 9:7,12,12,17
p20 [15] 9:21 54:7,17 61:9 63:24 65:12 68:19 73:13 76:10 77:5 78: 13 124:4 136:15 155:4 185:12
p20-p39 [1] 4:3
p21 [1] 78:9
p22 [1] 79:15
p23 [2] 57:22,24
p24 [4] 219:9,21 227:11 318:13
p25 [2] 103:23 104:25
p26 [4] 11:4 107:18 111:5,6
p27 [12] 11:5 71:5 80:12 86:10 88: 7 95:12 128:8 138:1 183:11 197: 13 221:25 416:11
p29 [1] 104:12
p3 [1] 23:2
p30 [3] 108:11 110:10 297:18
p31 [1] 112:1
p32 [1] 112:25
p33 [1] 270:10
p34 [3] 94:22 282:12 300:6
p35 [2] 177:21 328:2
p36 [1] 177:21
p37 [3] 267:13 268:9 299:11
p39 [3] 9:21 23:11 50:1
packet [1] 106:2
page [84] 23:1 54:21 57:22 60:23 61:1 70:15 71:6 75:1 78:9 79:24 80:13,13 84:2,15 86:6,7,11,19,22 87:14,17 88:8,24 89:2,7 92:1,3 93: 15 95:12,23 96:9 105:1 107:17 108:11 112:23 116:25 123:6 128: 5 137:25 138:4 166:1 188:18 219: 25 221:17 222:8 223:22 237:8 270:11 297:18 299:11 318:14 319: 2,5,8,14,16,16,23,23,23 321:24 322:4,4,15,15 323:7 330:12,14,17, 18,19,24 331:7,11,13 358:10,23 362:4 392:22 416:12,15,25 442: 25 443:6
pages [12] 23:11 57:24 79:10 88: 18 92:5 108:12 111:5 115:1 227: 12 297:19 319:1 321:20
paid [41] 20:15 36:6 61:14,17,22, 25 62:5 65:8 79:12 91:1 124:22 125:4 126:7,11,19 127:2,22 128: 22 129:7,23 131:19,22,25 132:7 133:3,6 136:22 169:18 187:10 199:22,25 259:6 273:15 332:25 333:2,5 343:21,25 348:20,25 363:

okay - paid

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

13
painful [1] 143:3
paper [22] 3:21,24,27 4:9,12,15 9:
7,11,17 16:9,13,19 35:1 92:14
●:6,6 198:3 341:20 374:19 439:
18 442:24 443:7
papers [1] 34:20
paperwork [4] 189:10,13 190:5
341:17
paragraph [2] 105:16 443:9
paraphrasing [1] 442:8
parse [1] 133:18
part [55] 10:3 17:2 19:7 22:14,19
24:1 25:19 26:1 29:14 36:4,24 51:
11 62:16 67:16 72:8 82:6 90:10,
11,24 97:13 99:18 133:6 196:7,12
197:24 198:5 199:9,19 200:1 213:
5 214:8 222:5 223:11 224:8 232:9
250:4 272:14 276:24 277:12,13
278:17 281:20 288:15 304:24 317:
7 333:8 349:15 359:13 367:17
371:11 376:11,11,24,24 441:21
partial [7] 65:18,20,21 81:8 87:15
222:15
partially [1] 370:17
participate [4] 29:23 30:11 31:5
34:6
participated [1] 57:11
participates [1] 415:24
participating [3] 6:1 415:20,25
particular [13] 23:15 58:4 60:23
63:19 66:21 76:23 77:12 100:20
12● ● 39:24 287:9 302:10 435:
12
particularly [1] 293:10
parties [10] 6:21 7:21 8:12,25 17:9,
17 202:21 446:9,10,15
parts [4] 210:9 251:6,8 318:24
partway [1] 246:5
pass [2] 107:15 337:2
passed [1] 443:18
passes [1] 337:16
past [4] 30:5 149:21 214:10 248:3
paste [1] 211:21
patent [1] 412:14
path [3] 144:4,6,11
patient [119] 22:15,16 25:2,10,17,
24 29:14,17,17,19 39:19 48:1 55:
13,21,21,24 56:1,3,8,13,16,23 57:
2,4,5 58:4,5,7,12,13 59:3 60:22,24
61:1,4,5,21 62:13,14,16,17 63:20,
25 64:14 65:22 66:16,16,18,22 67:
6 68:14 69:4,13,15 70:23,24 71:2
76:18 77:1,25 84:25 85:15,18,25
86:3,4,12,25 87:5,5,21 90:5 93:1
94:10 98:10,24 125:1 127:1,21
132:1 145:9 149:2,3 163:6 168:9
169:1,2 175:15 178:11 179:3 190:
15 194:21 210:22 220:10,20 229:
17 230:8,13,14 259:1,2 263:23
264:2 281:18 311:10,24,25 313:
16,19,316:24 317:8,20 322:18
33● ● 5 340:1 345:8 387:4 403:
23

patient's [3] 66:7,12 78:24
patients [118] 24:4,9,20 25:20 27:
4 29:15 30:25 31:2 34:9,10,22,25
35:13 36:4 50:16 57:14,17 62:21
63:13,17 64:10 67:15 68:1,16,20
69:6,12,23 70:5,11 77:11,14,20,21
78:6 81:2 82:8,11,25 83:1,3,6 93:
4 114:16 125:2 126:11,19 167:11
173:13,17 190:20 210:17,18 213:
22 214:5,13,21 217:11 220:11,23
221:13,21 222:5,13 223:2,12,14
224:9,17 225:18 227:1,16 228:9,
13 229:2 230:3,20 231:10,12,16,
21 232:7,10,11,23 233:16 234:13,
14,19 236:3,11 253:21 254:7 262:
14 263:18 264:17 265:18,19 309:
13 318:6 321:15 323:10,11 324:
20 325:8 327:11 331:16 394:19
397:18 404:11 415:11 416:3,5
425:8,22 431:20 432:24 437:19
patients' [3] 30:22 39:21 53:24
pause [1] 288:12
pay [8] 173:12 181:10 271:17 279:
13,13 304:2 333:21 391:25
paycheck [1] 144:24
payer [1] 252:13
payers [1] 57:11
paying [9] 167:9 173:9 217:3 231:
12 244:8 304:6 346:23 349:3 394:
10
payment [69] 38:23 42:10 43:12
92:18 173:3,8,19 193:20,21 196:
11 206:20 231:25 253:7 258:9,17,
18 259:17,18 273:3 277:15 278:
21 339:22,23,24 342:23 343:3,11
344:3 347:7 348:18 349:1,10,22,
23 352:5 355:5 356:23 360:6,8
362:9 386:18,19 387:13 388:1,4
389:21 390:23,25 391:4,5,12,14,
17,21,25 393:3,19 395:21,24 396:
16 397:10 400:4 413:21,22 414:5,
7 419:9 427:25 434:14
payments [91] 92:20 195:7,10 207:
8 217:6 304:10 336:21 348:1,3,9
386:21 393:7,23 394:16 400:3,11
412:20 414:1,2
payroll [1] 144:23
pays [5] 231:15 257:1,9,16 304:4
pcl [2] 61:23 124:22
peach [1] 150:23
pended [1] 337:19
pension [1] 194:18
people [71] 33:23 55:18 73:2 82:5
109:13 149:22 158:11 162:21 163:
5 167:10,21 177:17,18 206:10
231:1,4 241:16 245:10 247:3,20
263:16 277:19 280:16,18 281:8
296:2,5,7,19 298:20 299:5,20 300:
1,13 303:8,22,23 308:15 315:7,9
316:18 317:17 322:22,25 324:2,3,
4,6,11,12,23 325:18 331:2 332:8,9
337:8 341:3 356:2 367:8 368:23
372:11 375:21 390:5 395:20 410:
9,19 417:3 423:15 424:1 427:6

430:15
per [10] 37:6,9 90:7 115:2 178:10
199:1 394:1,14 419:21 432:11
percent [101] 22:5,5 35:14,15 37:5,
6,8,9 53:11 89:20 91:5,6,15,15,20
93:18 95:8,21 96:4,13,16,19 117:
21,22 118:15,16 143:22 146:25
147:17,19,20,22 148:3 164:9 178:
3 179:8 198:24 211:22 218:19,23
223:16 224:2 232:8,20 251:14,15,
17,17,19,19 252:12,19 253:8 254:
14 255:14 265:12 268:10 300:22,
24,25 301:19,23 303:9 304:5,8
307:15 309:22 310:23,25 317:14
318:8 320:19 323:17,24 324:7,8,
11,12,13,15,23,24,25 325:2,7 326:
10 330:25 331:10 332:7 352:15
379:14 388:22 395:9,17 397:5
400:15 432:22,23,23 433:2,22
percentage [69] 7:7 19:10 21:19,
24,25 22:13,14 30:5,25 34:24 40:
6,11 44:6,9,14 50:24 51:10,24 52:
4,12,21 54:1,15 55:20 68:11,25
83:12 95:1,15,25 96:3 117:17 147:
1,6 155:8,13 164:5 165:15 179:21
199:21 210:4,10,11,13,16 211:13,
23 212:3,18 213:14 215:9 217:16
226:16 232:17 252:6 265:18,19
300:11,18 302:8,17,23 303:5 314:
16 315:7,9 324:19 326:19 379:18
percentages [6] 211:18,21 212:
15 213:11 301:18 324:17
perfectly [2] 254:23 438:19
performed [1] 26:15
perhaps [5] 189:6 190:2 195:24
254:18 348:10
period [9] 35:18 195:4 227:5 282:
5 298:9 302:4 306:17 311:9 415:
16
permanent [1] 306:8
permit [1] 17:17
permitting [1] 39:14
perpetuating [1] 250:2
perplexed [1] 106:15
person [48] 101:3 112:22 114:15
141:11,13,22 238:17 240:13,15,18
241:13,17 255:12 274:6,11 281:
12,21 306:6,6,9,10 309:6,7 313:25
321:7 323:22 335:9 338:13 339:
18 340:8 341:21 349:8 351:9 357:
19,20,22 362:7 365:16 367:25
375:9 382:24 392:24 393:1,6,12
408:2,6 411:16
person's [2] 337:18 351:16
personal [3] 104:23 364:25 365:
19
personally [4] 14:4 28:6 103:10
353:21
persons [1] 6:1
perspective [5] 233:13,14 239:9
315:12 317:2
pertaining [7] 9:5,9,15 16:7,11,17
86:20
pfc [2] 62:22 124:23

ph [6] 105:10,23,24 112:23 237:10
298:1
phone [3] 208:6,24 250:17
pick [5] 198:19 202:5 339:17,25
418:22
picked [11] 98:20 99:4,5 127:13
141:14 236:20 274:21 420:2,7
423:17 426:4
picking [1] 236:24
pickup [1] 147:23
picture [7] 143:15 171:17 387:2,24
397:8 400:2,17
piece [1] 164:22
pieces [1] 432:11
place [5] 216:24 307:6,7,17 421:20
plain [3] 36:12 43:14 419:17
plan [3] 28:19 31:7 65:8
planning [2] 47:20 114:8
plans [1] 285:24
plastic [4] 281:7 306:7 311:13 374:
25
pleaded [1] 33:22
please [19] 13:13 45:4,10,11 50:10
66:10 86:21 116:17 205:5 207:25
209:10 242:25 269:15,16 289:21
290:6 329:3 330:13 447:12
pleases [1] 87:14
pleasure [4] 250:21 255:20 265:3,
8
plus [4] 224:8 232:9 333:25 334:1
point [51] 28:17 33:20 34:4 35:2,8
44:8 59:2 67:20 79:7 117:6 121:
10 146:21 149:17 150:1 167:3
187:5 190:18,25 191:11 201:23
212:5 214:17 225:6 228:20 232:
15,15 235:1 242:3 247:4 261:8
268:17 282:8 295:11,15 342:19
343:15 345:20 355:10 362:1 363:
1 371:21 395:7 418:8 420:21 421:
2 428:5 432:8 434:15,18 439:10
442:20
pointed [1] 86:24
pointing [1] 224:24
points [17] 20:3 21:24,25 282:14,
17 289:12 290:25 291:3 293:16,
18,21,23 294:3,13 295:1,4 373:18
polices [1] 207:21
policies [4] 206:20 207:7 275:8,13
policy [9] 206:8 207:12 219:3 231:
1 233:13 276:17 277:4 445:4,4
pomona [105] 1:10 5:6 7:2 17:24
18:19 19:16 20:1,12 23:24 24:2,
12 25:9,21 26:4,17 28:13,23 29:5,
12 31:12,14,16 32:9,11,13 33:21
34:7,16 35:4,11,17 36:2 37:3 46:
19,25 48:11,21 49:23 63:14 65:17
83:11,12 88:25 93:10 96:24 97:8,
18 98:9 100:9 101:6 102:7,14,18,
25 103:3,20 104:14 107:10 114:6
117:8,13,19 118:11 144:15 146:4
179:15 217:15 219:18 222:4 224:
11 225:17,18,22 226:2,6 227:22
228:6,17,25 229:5 232:21 234:24
235:13,19,22 236:11 237:17 241:

00468

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

24 254:3 303:6 311:8 313:1 314:
15 317:19 318:20 325:5,15,19
327:11,22 331:21 332:12,16,22
402:4
[black mark]ona's [41] 7:5 18:6 21:19 23:
24:10,25 25:6 27:12,19 28:8,10
29:22 30:21 31:6 35:9 36:24 51:5
54:15 102:25 106:6 108:25 219:
15 223:11 227:15 232:10 233:22
234:2 235:4 253:17 303:5 316:2
317:7 321:14 324:19 326:8,18
328:18 329:8 419:2 421:19 437:
10
poor [2] 303:6,7
population [12] 133:4,5 146:5 297:
14 300:18 302:14 326:9 327:3,4,6
425:21 426:9
populations [2] 31:1 94:10
portion [1] 65:3
portions [1] 283:7
position [33] 3:21,24,27 4:9,12,15
9:6,10,16 16:8,13,18 29:5 34:20
35:1 39:17 40:21 43:3 46:19,21
92:14 197:24 198:3 247:21 272:7
273:4 434:23 439:23 442:3,4,18,
24 443:7
positions [3] 47:4 271:5 273:25
positive [1] 434:25
possibility [1] 196:18
possible [6] 19:21 127:11 148:13
209:21 215:25 253:11
possibly [2] 303:9 377:17
po[black mark]82:24 408:4 446:19
po[black mark]y [1] 216:11
post-hearing [8] 135:23 138:19,
20 202:23 411:11 436:16 446:5,8,
14
posted [6] 313:6 360:16 381:24
407:13 408:8 410:10
posts [5] 305:12 306:3 307:4 313:
13 321:12
potential [4] 199:15 229:3 340:25
352:10
potentially [7] 344:6,16 379:17
380:24 400:17 434:19 440:9
poverty [2] 326:1,1
power [4] 419:15 420:10 421:17
ppo [1] 47:13
practiced [1] 292:22
precise [1] 395:10
precisely [3] 32:3,25 34:21
precluded [1] 24:25
predecessor [1] 270:14
predictability [1] 43:9
predominant [2] 81:11 272:10
predominantly [3] 270:7 271:17
274:25
prejudiced [1] 10:23
premise [1] 82:4
preparation [2] 48:6 49:7
prepare [3] 51:5 55:2 330:11
prepared [3] 48:10 83:21 88:4
pre[black mark]ng [1] 47:22
pro[black mark]t [5] 13:20 17:24 29:6 180:

23 411:11
presentation [1] 6:13
presented [4] 6:17 16:5 78:12
394:7
preserved [1] 200:16
president [1] 206:7
presumably [3] 11:8 416:2 443:
11
pretty [14] 108:17 137:22 146:5
164:6 174:24 255:16 259:13 300:
24 302:18,24 327:6 351:1 368:13
385:16
prevent [1] 29:5
preventing [1] 43:10
previous [4] 26:9 75:20 88:17 179:
21
previously [2] 189:4 447:2
primarily [2] 24:24 406:20
primary [7] 47:5 61:3 319:19,24
320:10
principle [3] 20:20 31:10 32:7
printout [6] 58:3 79:19 220:14,22
221:1,2
printouts [2] 220:17 228:6
prior [10] 47:18 48:21 206:12 248:
23 274:15 283:23 344:1 347:15
440:19,20
privacy-related [1] 443:19
private [3] 20:25 49:8 150:25
privilege [1] 6:5
probably [23] 201:14 204:3 209:17
213:8 219:22 233:16 247:8,14
256:6 262:19 279:1 287:6 335:12
343:8 346:24 358:16 363:14 373:
13 381:7 383:4,9 385:1 411:21
problem [17] 27:10 37:10,11 224:4,
14,23,25 225:1 233:15 234:4 236:
8 246:18,21 249:25 264:19 327:
17,21 419:19 433:17
problems [5] 30:6 208:10 213:2
276:23 420:1
procedures [2] 6:12 288:15
proceed [10] 45:11 74:5 116:17
198:21 205:13 209:10 239:15 241:
1 242:25 269:16
proceedings [4] 1:22 6:9 334:4
447:23
process [85] 5:25 6:2 21:1 25:23
30:12 41:6,12 43:8,10,18,24 44:2
49:4 53:5,13 54:19 63:11 65:10
67:9,21 70:18 74:14 76:13 78:16,
21 86:15 97:10,13 99:12,17,19
101:21 103:6,17 106:20 113:11
124:20 125:9 126:13 132:3 136:
18 146:15 148:11,22 149:10,12
153:15 161:21,23 166:18 168:14
170:4,21 172:24 175:3,9 185:12,
13,19,20 207:3 216:14 239:15
246:6,12 248:6 278:9,23 284:2
315:1 317:3 353:1 414:2 419:21
423:4,6 429:11 430:4 433:7 442:7,
10 443:13,17,24 444:21
processed [1] 44:9
processes [6] 43:4 271:16 279:11

305:12 314:24 443:16
processing [4] 272:13 273:12
367:13,22
procurement [1] 272:6
produced [1] 68:24
product [1] 412:16
professional [2] 114:20 365:2
program [74] 13:23 21:14 26:8 30:
15 60:10 173:14 174:16 206:11
211:11 216:15 229:15 270:22 271:
22 273:9,11 274:8 275:20 276:20,
25 278:17,21,22,24 279:3,13,15,
23 280:1,11 282:19 286:3 287:1
289:23 290:11 295:23 296:1,2,10,
12,13,22 298:5,21,23 299:2 304:
24 306:12 307:16 308:13,14 310:
3,12 316:11 318:3 320:12 327:1
360:22 361:2,4 365:17 367:1 368:
8 374:16 375:5 398:4 404:22 405:
8 407:24 408:7 410:13,14,19,21
417:2
program's [2] 18:3 39:2
programmatic [2] 369:10,14
programmer [3] 212:6 366:21
368:11,23 371:1
programming [3] 225:1 231:4
424:5
programs [16] 271:15 273:17 274:
14,23 275:17 279:11 280:1 297:
13 303:2,25 307:1,2 308:20,21,22
320:9
progress [1] 101:24
project [7] 108:9 272:5,6 367:6
373:12 375:18,19
promised [1] 113:20
promoted [2] 48:2 240:16
proper [7] 92:25 93:6 155:8 239:
12 310:20 332:4 382:25
properly [6] 7:1,8,10 8:21 199:19
200:15
proportion [1] 50:16
propose [2] 249:6 446:18
proposed [15] 43:21 121:20,21
122:19 207:5,7,10,13,18 249:12
288:21 358:13 359:1 418:14 421:
24
proposes [1] 418:16
prove [3] 11:18 189:18 236:25
proved [2] 241:20 245:14
proven [3] 307:25 310:9 385:16
proves [2] 81:25 235:6
provide [11] 22:9 43:15 106:23
173:18 278:15 296:18 299:9 306:
17 327:23 405:1 424:8
provided [17] 105:17,19 109:22
110:2,5,8 114:18 152:20 198:16
277:19,23 298:8 299:12 300:7
305:23 306:14 307:13
provider [55] 1:5 2:12 3:5,19 5:8,
14 9:4,8,14,19 10:14 15:20 17:24
20:19 23:18 28:1 33:19 37:3 38:
24 39:25 40:7,12,18 44:20 62:7
109:20 139:10 145:11 201:5 239:
23 240:1 243:9,16 244:8,11 245:

305:12 314:24 443:16
25 269:5 311:7,15 312:7,25 313:
15,17,23 318:20 416:11 420:25
424:23 425:20 427:3,14 437:2
438:9 439:24 443:13
provider's [13] 14:22 30:4,8,18 39:
17 43:20 50:23 116:24 139:14
154:20 200:18 210:4 442:22
providers [21] 18:17 33:11 80:1
218:11 230:6 245:23 271:24 272:
23 273:15,15 279:13,17,21 281:4,
14 285:24 307:9 308:10 367:15
441:24 444:16
provides [9] 43:24 206:8 272:22
279:16 296:15 304:20 307:9 362:
12 393:10
providing [6] 47:6 173:2 271:23
273:13 368:6 379:8
proving [1] 246:25
provision [1] 304:24
provisions [5] 5:22 211:17 443:19
prrb [7] 5:4 113:12,17,21 427:10,
11,12
prrb's [1] 443:11
ps&r [13] 62:3,10,12 124:23 125:5,
6 126:9 156:5,13,21 157:6 183:25
184:3
public [3] 6:3 49:11 278:3
published [19] 41:8,21 51:13 55:
19 89:13,23 91:16 119:12 121:3
122:4,16 123:23 146:1,24 197:17
248:16 422:9 436:22 444:5
publishes [1] 51:25 207:5
pull [9] 86:2 129:16 134:3 234:16
397:19,20 442:11,12,14
pulled [1] 233:6
pulling [3] 164:25 239:5 406:21
purely [1] 91:4
purportedly [2] 10:11 12:7
purporting [1] 172:1
purpose [1] 440:1
purposes [6] 7:16 19:17 109:23
110:4 316:15 334:3
pursuant [6] 21:13 24:15 210:14
270:9 362:10 393:9
pursue [3] 236:6 238:19 245:21
put [15] 46:14 63:4 68:15 93:17,24
97:2 111:21 121:20 135:12 143:4
200:24 369:18 412:1 423:13 433:
10
puts [1] 212:13
putting [3] 92:11 130:8 153:7
pvhmc [2] 70:16 83:16

Q

quagmire [1] 238:12
qualification [1] 29:19
qualified [8] 60:25 61:5 175:15
222:6 231:24 341:8,18 413:16
qualifies [1] 379:20
qualify [15] 65:23 70:7 80:21,22
82:7 92:20 93:4 167:22 173:13
190:20 194:6,13,14 221:21 226:
19 260:19 261:6 297:4 342:24
387:5 417:4

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

qualifying [2] 264:4 327:11
quality [1] 169:10
quantify [1] 66:6
quarter [3] 198:24 310:18 385:5
queried [1] 214:16
question [49] 95:7 117:16 118:9
119:6 124:24 135:2,4 136:10 141:
9 144:14 146:12 153:13 172:3
182:8 183:17 184:25 193:24 197:
11 203:16 214:19 215:4 217:22
218:1 234:5,6 235:11 239:18 254:
16 256:15 262:22 265:12 298:10
315:5 329:2 341:2 350:10 356:18
364:8 377:20 380:15 381:9 383:
11 385:13 404:4 418:11 421:23
423:25 433:20 437:4
questioned [1] 385:2
questioning [4] 213:11 378:3 385:
22,24
questions [51] 46:13 72:14 117:4
118:1,5,23 140:8 142:16 173:22
174:20 192:16 202:24 203:2,4
213:12,18 218:4 242:18 245:4
250:9 255:23 262:25 263:9 264:
24 267:22,24 268:5,6,13 287:20
288:3 318:18 330:2 334:17,21
363:17 364:24 377:10,13 412:19
414:21,23 415:4,9 417:12 418:9
436:6,10 445:20,22 447:17
quick [3] 102:24 183:11 265:11
quickly [2] 163:6 242:8
quite [4] 120:18 144:5 256:10 365:6
qu... 339:20

## R

r2 [1] 120:14
raise [4] 45:4,23 205:5 269:9
raised [6] 20:3 31:9 32:6 216:10
230:6 419:12
raises [2] 182:8 437:4
ran [4] 58:5 88:13 186:19 322:13
random [6] 25:13 99:3 236:1,17,
24 237:1
randomly [2] 99:4 236:19
rare [1] 238:23
rate [5] 207:16 309:2 310:17,24
333:25
rates [3] 43:12 207:15 304:7
rather [6] 11:7 37:10 259:9 328:14
435:19 437:10
ratio [7] 51:20 53:10 90:14 91:4
119:12 122:24 210:16
ratios [2] 122:17 123:24
raw [2] 55:1 265:25
re-coordinate [1] 108:20
re-review [1] 59:1
reach [9] 38:20 96:5 103:9,12 107:
3 150:17 157:21 233:20,25
reached [4] 103:13 151:5 345:12
420:14
reaching [1] 97:22
react [1] 291:20
rea... [1] 400:12
re... 7:21 94:19 105:12 173:5

250:14 333:15 339:14 343:6 352:
7 382:23 384:6
readily [1] 55:7
reading [3] 68:17 393:13 442:9
reads [1] 443:9
real [6] 24:18 36:25 183:11 219:2
224:25 373:19
real-time [2] 157:13 312:15
realignment [1] 139:21
realized [1] 143:22
really [64] 36:21 59:9 75:2 98:6
149:6 164:23 165:4,17 207:4 213:
13,20,23 214:4 215:24 218:14
219:21 224:15 225:12 228:13,22
230:22,24 233:5,15 235:3,22,24
238:11,19 239:10 240:5,13 241:5,
8 245:20 247:22 248:13,14,14,24
249:4,15 251:24 253:19 261:21
264:3 273:18 274:24 281:10 312:
11 318:9 335:16 359:16 371:9
372:14 379:6 385:22 395:7 416:8
421:6 425:10 433:13 438:17 443:
22
reason [22] 22:10 24:22 189:5 191:
23 202:18 214:7 222:17 231:19
241:3 254:3 258:3,4 264:1 318:9
338:18,21 340:10,25 345:10,18
357:24 420:3
reasonably [1] 20:18
reasons [7] 20:21 127:4,12 137:3
215:6,7 339:13
rebid [1] 272:11
recalculate [1] 44:4
recalculation [1] 43:16
recalibrating [1] 207:16
recall [7] 105:1,4 147:10 186:22
244:19 291:16 315:13
recap [1] 54:19
receive [5] 23:19 34:10 41:20 72:
4 73:3 109:19 232:3 337:9 350:3
360:24 364:22 388:2,4 393:22
400:9
received [14] 14:3,10 15:15,16,17
26:1 109:2 123:14 203:16 216:15
219:23 297:25 328:11 400:18
receives [4] 32:4 33:1 280:9 306:
20
receiving [11] 25:19 26:2 36:5 195:
10 196:10 210:17 213:25 227:4
266:2 343:17 344:2
recent [2] 20:9 216:8
recently [2] 292:4 424:19
recess [2] 294:4,10
recipient [8] 13:20 79:24 230:15
257:3 271:19 272:1 372:8 387:5
recipients [9] 40:16 231:22 232:
18 257:25 265:22,24 266:1,2 388:
15
reciprocal [1] 279:15
recognition [1] 96:17
recognize [1] 295:3
recommend [1] 370:1
recommendations [1] 277:24
recommended [3] 149:22 239:14

242:3
record [58] 6:2 10:4,25 16:3 17:2
58:4 79:9 87:25 110:2 112:12 115:
20,22,23 116:1 123:22 175:17
182:25 196:21 202:20 204:22,24,
25 205:4 209:3,5,6,10 242:1 266:
13,21 267:7 268:12,20,22,23 269:
1 294:15,16,20 313:20 321:4,6
334:5 354:15 364:10 371:13 421:
24 422:18 428:10,15 433:15 439:
25 442:21 445:16,23,25 446:1,5
records [29] 26:16 34:3 39:18 40:
14,19 58:20 59:2 63:20 98:2,24
108:22 112:14 113:9 114:21,21
160:15 228:11,12 233:5,6 234:17,
20,23 237:16 316:18 321:14 326:
16 331:25 332:1
recross [1] 203:12
rectangle [2] 69:18 76:9
red [6] 36:17 56:5 69:18 70:13 76:
9 125:12
redacted [4] 58:19 85:15,17 319:
18
redirect [8] 118:4,7 203:3 244:24
267:25 334:12 414:24 415:6
reduce [3] 91:19 118:16 179:7
reduced [6] 340:20 390:25 391:2,
17 392:2
reduction [1] 96:16
refer [3] 105:22 323:19,20
reference [5] 85:19 155:24 165:5
279:22 443:2
referenced [2] 183:19 447:14
referred [2] 155:21 158:16
referring [5] 46:15 106:4 159:3
227:18 302:1
reflected [2] 213:20 317:17
reflective [1] 400:7
refuse [1] 246:3
refused [2] 27:24 28:19
regarding [20] 5:23 19:18 30:7,17,
19 39:1 41:12 73:24 94:9 213:3
214:7 216:16 224:6 233:20,25
243:7 294:12 326:17 442:5 443:
23
regardless [2] 36:16 436:20
register [14] 41:9,10 338:11 339:
15,20 340:3 342:22 343:7 345:17
386:17 392:22 394:2,15 395:5
registered [2] 22:20 56:14
regretfully [1] 188:20
regular [1] 208:24
regulation [18] 23:14 36:14 43:15
49:25 50:6,11,22 62:15 64:8 75:
16 90:22 91:19 112:15 200:5 419:
18 420:17 428:3,4
regulations [10] 5:19 23:6 24:17
90:8 199:25 206:25 211:12,15,19,
25
regulatory [3] 5:22 46:22 206:25
reimbursable [1] 147:8
reimbursement [15] 1:5 7:4 29:9
43:8 44:2 46:22 47:9,10 49:1 50:
14,17 83:18 88:11,15 91:9,22 92:

15 145:18 152:13 163:13 197:22
198:22 333:25 334:1 424:9
reimbursements [1] 207:2
reissuance [1] 180:24
reiterate [1] 35:25
rejected [2] 28:19 38:2
relate [1] 303:12
related [7] 207:20 262:25 273:11,
14 289:17 357:10 443:15
relating [1] 207:1
relations [4] 103:11 149:24 151:3
286:9
relationship [1] 410:7
relative [6] 11:12,24 293:15,17
294:2,24
relatively [4] 252:15 325:13
release [1] 434:21
released [2] 157:20,21
relevance [1] 286:23
relevant [4] 62:10 272:17 273:18
409:24
reliable [6] 34:17 39:20 40:20 93:
21 94:9 217:10 307:12,15
relied [2] 31:16 32:13
relief [2] 437:2,5
rely [2] 131:23 363:4
relying [1] 171:22
remain [2] 339:4 392:16
remained [1] 274:20
remaining [2] 99:15 295:1
remains [1] 37:11
remand [7] 18:14,22 428:13 437:
11,15 440:16 441:15
remedy [1] 424:8
remember [9] 161:3 186:14 218:
11 252:1 256:6 263:4 264:20 333:
19 423:13
remove [3] 77:19 93:7 443:17
removed [2] 34:12 357:21
removing [4] 77:7,8 136:16,17
render [4] 20:10 307:10 424:20
441:12
rent [1] 392:1
reorganized [1] 274:18
replaced [1] 240:13
reply [1] 16:9
report [31] 42:14 47:23 48:6 49:7
51:6,18,21,23 62:3,10,15 58:1 94:
20,25 95:4 122:14 140:20 144:18,
20 282:12 283:21 289:9 300:5
301:4 323:5 330:12,18,22 418:23
419:11 440:19
reported [2] 273:16 275:11
reporting [3] 48:23 62:7 279:19
reports [15] 43:2 48:10,13,15,18
121:3,10,13 122:23 315:16 318:
16,21,22,24 320:1
repositories [1] 431:18
represent [8] 36:9 82:21 235:13
251:10 299:17,24 325:18 399:11
representation [2] 432:6 445:12
representations [1] 237:14
representative [9] 14:7 104:12,13,
17,20 179:15 217:14 236:10 314:

00470

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

14

representatives [8] 12:9 31:9
103:4 114:1 149:19 237:22 241:
23 442:1
representing [1] 268:9
represents [2] 268:10 393:15
republished [2] 120:10 123:19
request [9] 68:8 111:2 113:8 157:
8,15 159:15 329:20 442:14 446:
12
requested [5] 28:21 55:22 91:8
105:17 446:25
requests [6] 44:12 441:24 443:14
447:4,7,18
require [2] 38:22 90:22
required [5] 64:17 212:17 215:18
271:13 289:10
requirement [6] 23:7 37:22 38:19
51:12 64:8 77:19
requirements [5] 295:24 296:11
367:4 369:11,15
reran [1] 180:12
research [2] 68:4 79:8
resident [1] 393:16
resides [1] 313:14
resolution [3] 19:22 97:7 328:10
resolve [10] 5:13 101:4 102:15
239:20,25 315:4,10 327:19 328:6,
14
resolved [3] 113:22 114:10 219:1
resolving [1] 427:22
resources [1] 100:5
res [7] 17:5 41:25 50:23 217:
15,20 314:15 326:18
respectfully [2] 44:12 92:7
respond [4] 254:17 261:14 447:12,
16
responded [2] 41:11 354:1
responds [1] 242:8
response [9] 105:2 106:9 113:7
287:11 318:16 328:11 389:18 415:
8 442:2
responses [1] 441:23
responsibilities [3] 47:15 206:24
272:10
responsibility [8] 47:5,21 274:22
275:8 277:14 298:6 299:1 367:10
responsible [14] 206:19 207:17
231:2 270:20,24 271:7,20 272:19
273:9,19 274:6 275:12 298:4 304:
4
responsive [1] 158:12
restate [1] 329:2
restricted [1] 16:10
restrictions [1] 312:5
result [12] 28:12 33:15 87:13 100:
2,7 102:13 179:19 180:1 432:12
434:25 437:25 439:12
resulting [1] 102:23
results [11] 28:10,15 31:17 32:14
70:4 80:6,19 102:8,19 324:18 432:
20
res [1] 270:9
retu [2] 194:17,23

retroactive [2] 42:7 215:4
return [2] 187:24 244:6
returned [3] 186:1 312:6 396:8
returns [1] 311:25
reverse [1] 113:15
review [51] 1:5 9:3 26:23 29:3,24
30:3,12,17 31:6 33:25 38:24 49:
20 52:10 61:14,19 100:10 102:8,
20,24 108:25 109:24 113:9 199:
13 219:15,16 221:15,19 223:5
225:15 233:21 234:2 237:18 242:
1 243:17 244:4,7 315:14,15 316:1
319:25 329:21 330:11 331:20,24
355:14 369:21 385:12 418:13 420:
23 434:18 447:5
reviewed [17] 25:3 26:6,13 27:20
28:9 61:16 80:5 106:7,13 307:19
315:19,20 320:2 326:16 331:25
353:14 374:14
reviewing [2] 114:20 443:13
reviews [2] 310:14,18
revised [4] 41:5,12 119:14 122:24
180:1 230:18
revision [2] 183:2,3
revisit [3] 149:13 295:14 423:3
right-hand [1] 321:25
rightly [1] 361:10
rigorous [1] 25:22
risk [1] 153:21
road [1] 52:9
role [4] 48:7,7 375:14 377:3
roles [2] 375:10,25
room [2] 367:8 430:16
rosenkrantz [1] 176:9
rosenkranz [1] 71:2,11,12,16 75:9
93:24 176:11
rosenstein [173] 3:8 30:13 35:10
95:3 177:10 195:25 237:9,13 255:
10,19 262:19 267:11 268:16 269:
6,20 270:3 282:11 284:6,20 286:
23 294:23 295:22 330:10 335:2,
18,24 336:3,7,11 337:1,6,25 338:
24 340:12 341:13,25 342:10,15
344:8 346:2,6,12,16 347:1 348:7,
14,22 349:12 350:16,22 351:23
352:12,18,22 353:2,6,11,25 354:5,
24 355:16,20 356:15 357:5 358:5
359:11,18 360:10 361:21 363:2
364:1,11,16,18 365:9 366:11,18
24 369:3,8 370:11,16 371:6,19,25
372:25 373:6,11 374:24 375:15,
20 376:8,13,17 377:25 378:8,18
379:22 380:1,7,12,20,25 381:6
382:1,7,15,19 383:14,19,24 384:4,
14,21 385:8,19 386:3 387:7,16
388:6 389:4,15,19 390:12,19,24
391:7,16,22 392:10,18 395:8,16
396:5,11,17,21 397:23 398:9,14,
18,23 399:2,6 401:19 403:3 404:3,
9,14 405:6,24 406:8 407:2,9,19
408:13 409:2 410:2,17 411:1,13,
18,23 412:3,9,24 413:7,24 414:9,
13 426:23 428:20
rosenstein's [1] 94:20 284:3 429:

1
rough [1] 147:13
roughly [3] 25:10 96:6 147:10
route [1] 439:15
routine [1] 305:19
routinely [2] 220:18,20
rule [21] 14 119:15 121:21 122:
13,21 141:16 207:6,7 248:16 249:
7,13 343:23 344:25 358:12,13,14
359:1 418:15 419:5 421:18,24
422:9 428:1 440:25 441:1,5
rulemaking [1] 120:20
rules [7] 6:11 206:25 207:18 276:
18 343:20 352:7 389:20
ruling [9] 100:24 119:15,17 120:10
122:7,12 420:11,17 440:25
rulings [1] 265:7
run [7] 21:16 91:18 301:14 302:24
373:24 410:22 437:20
running [5] 96:3 212:12 277:16
298:4 373:23
runs [4] 247:15 248:25 305:25 418:
19

## S

safeguard [1] 1:19
sagra [6] 105:10 108:5,7 109:2,5,5,
15 111:12 112:20
same [53] 25:1,9 26:24 27:19 28:
8 29:24 30:12 31:6 34:1 78:4 98:2,
5,9,13,16 99:1,3,11,18,20 100:11
101:14,19 102:9,16,20,25 106:2,6,
12 108:25 109:4,22 110:1,2,13
235:14 236:1,2,2,10 237:2 242:1
315:23 317:7,11,14,16 328:7,12
329:22 437:17,19
samples [3] 115:7 315:20 317:20
san [3] 105:24 107:4 108:21
satisfied [2] 85:3 236:9
saves [1] 239:21
saw [9] 83:19 89:22,25 102:22 106:
14 141:1 180:4 252:4 320:3
saying [17] 74:15 75:24 82:4 86:10
112:10 113:21 238:10 239:3 247:
2 252:1 253:20 344:15 368:25
379:17 424:17 435:11 442:10
says [16] 68:19 105:19 113:10 190:
19 248:17 249:13 300:2 321:6,25
351:3 352:7 357:22 378:12 382:
23 384:7 408:1
scenario [1] 423:15
schedule [1] 118:17
scheduled [1] 5:13
schedules [1] 135:10
schematic [1] 368:16
scheme [1] 162:24

scope [8] 149:4,5 308:23,25 309:1
312:3 314:1 368:2
scrubbed [2] 21:12 431:19
scrubbing [3] 54:3 70:2 433:6
scrutiny [1] 431:4
sdx [3] 305:24 306:15 411:4
se [1] 419:21
search [1] 55:8
seat [1] 45:2
seated [3] 45:10 269:8,15
second [12] 24:21 34:6 66:1 70:14
249:3,4 264:5 277:13 288:12 321:
24 358:23 443:8
second-from-the-top [1] 73:14
secondary [2] 41:4 320:7
secretary [2] 23:4 277:1
section [8] 171:9 210:1,3,6 271:2
362:11 393:9 441:4
sections [2] 5:20 271:3
security [97] 5:18 7:6 14:25 15:7,
23 21:8 24:23 25:4 27:18 31:20
32:17 40:25 71:19 105:2 108:24
110:7 114:24 212:10 214:1,20,22
215:1 216:5 217:4 219:20 228:8
230:9 235:25 236:3,7 257:5,15
264:6,8 278:10,15,19 279:5 280:
14 283:1 290:10,16 296:14 303:
24 304:22 305:3,5,15 306:2,15,21
307:3 312:24 313:6,7,9 314:6,7,
11 320:18,20 321:4,5 323:25 329:
20 344:11 346:8,18 348:3,5 350:
25 351:14,20 355:24 359:10 360:
360:15,25 361:8,12,23 363:5 364:
21 380:2 381:12,20 389:23 405:2,
9,13,21 410:6,8 414:14 432:14
433:24
see [65] 26:24 53:9 60:24 65:1,3
70:3,19 74:18 81:6,16 88:23 89:
14,21 90:19 93:14 115:8 130:23
138:1,10 139:25 144:24 153:14
164:18 183:10 184:9,23 193:17
196:17,17 222:10 223:24 228:4,
11 229:13 234:19 238:15 239:24
263:8 268:12 286:21 303:7 319:5,
14,17,19,24 321:24 322:2,5,15
331:14 354:15 372:11 377:20 380:
19 383:23 384:17 400:23 412:18
421:23 425:11,18,19 435:4,15
seeing [7] 146:25 147:12 187:20
237:4 265:4 397:15 429:18
seek [7] 64:21 66:5 227:23 316:23
317:19 420:22 421:2
seeking [6] 35:25 36:2 117:9 118:
11,11 444:17
seeks [1] 443:17
seem [3] 242:15 293:13
seemed [4] 224:20 240:3,4 284:5
seemingly [1] 399:19
seems [13] 168:8 216:21 217:9
218:8 220:13 234:7,9,11 238:11
255:1 355:2 426:14 442:8
seen [6] 32:2,24 89:10 180:8,16
425:15
sees [2] 313:16 425:20

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

segment [1] 297:13
segments [1] 413:2
select [1] 100:19
selected [3] 25:9,13 332:4
uninsured [1] 47:13
senate [2] 11:20 242:5
senator [29] 11:20 14:12 15:9,12
28:5 103:13,14,25 104:7 105:3
106:10,18,22 107:6,12,23 108:4
110:21 111:14,20 112:10,13,20
113:8,18 150:2 152:18,22 242:11
senator's [2] 14:6 105:9
senators [2] 103:12 441:25
send [9] 59:14 101:18 175:8 280:
21 305:3,10 327:24 380:11 400:
24
sending [3] 73:24 109:23 385:25
sends [3] 305:6 313:10 381:20
sense [5] 200:6 253:18 255:4 388:
11 414:18
sent [10] 15:8 104:3 112:17 158:22
328:4 363:6 377:21 382:6,12 403:
15
sentence [1] 443:8
separate [3] 81:3 85:1 274:19
separately [3] 25:12 225:12 228:7
september [6] 140:2 343:5 347:9
413:23 414:6,8
series [3] 321:20 338:9
serious [2] 33:13 420:1
seriously [1] 21:17
serve [2] 50:15 275:2
served [4] 26:9 285:7 286:1 293:
12
service [6] 47:11 79:7 114:17 169:
11 187:6 354:17
services [55] 1:2 23:5 25:19 60:13
79:21 94:16 99:22,25 177:14 206:
9 227:4 270:14,19 273:24 298:3,
15,18,23 299:1,14 300:8 303:21
305:17 307:11,20 309:17 313:11,
12 315:22,25 317:22,24 324:1
349:4 356:5 360:13,20 361:6 381:
14,24 382:9 397:25 406:11,14,16,
18 409:4,11,18,23 410:4,12,18,23
411:7
services' [1] 317:10
set [13] 114:6 143:20 279:10 281:3
318:19 320:1,2 321:9,12,21 419:4
442:7,10
sets [2] 212:12 431:6
setting [1] 445:3
settled [2] 119:11 122:15
settlement [4] 42:15 43:1 179:6
198:6
settling [1] 121:9,13
several [12] 18:21 24:12 55:11 81:
12 87:16 101:7,23 108:12 111:22
124:21 148:5 181:21
shall [3] 6:16,19 362:14
shape [1] 69:7
share [8] 7:4 18:5 24:3 304:5 381:
14 401:21 427:2
share [2] 235:20 402:19

sharing [5] 28:25 29:1 398:10 444:
18,20
she's [7] 11:21 108:8 110:22,22
153:6,7 316:17
shed [1] 360:7
sheet [1] 58:23
shifts [1] 43:11
ships [1] 313:22
shirey [1] 2:10
short [3] 196:8 297:20 434:7
shorter [1] 167:13
shortly [1] 102:1
show [9] 7:13 14:21 23:10 27:15
28:4 31:15 32:12 33:21 35:12 40:
14 55:25 56:25 60:17 65:13 70:21
80:17 83:16 87:4 90:11 100:8 132:
10 138:3,11,12 222:2 223:3 227:3
236:5 340:21
showed [11] 71:2 84:12,19 87:8
88:12 90:12 169:2 235:21,22 264:
17 432:8
showing [21] 22:4 32:2,24 70:24
95:20 215:3 220:9 222:16 223:25
225:7 230:11,17 234:20,24 263:
20 264:2,9 315:8,9 394:25 432:21
shown [5] 54:17 81:14 96:20 222:
7 236:13 291:12 419:24
shows [11] 160:20 88:23 177:25
212:14 218:22 220:11 222:11,11,
15 319:20 322:23
shut [1] 111:2
sic [2] 233:10 316:19
sick [1] 190:2
side [11] 181:5 154:20 159:16 182:
21 192:23 213:13 321:25 336:25
389:1 400:5 442:20
signed [1] 185:9
significant [7] 72:24 251:20 252:4,
9,11 301:24 347:18
signify [1] 165:19
silly [2] 292:1,20
similar [7] 18:16 83:20 86:23 219:
24 220:1 223:6 360:5
simple [3] 265:25 316:8 322:11
simplistic [1] 92:16
simply [8] 157:15 419:22 426:24
429:6,11,18
since [11] 10:22 46:15 49:22 53:6
98:6 109:18 230:13 241:17 270:
14 307:17 310:8
single [1] 270:23
singular [1] 309:3
sir [1] 204:12
sister [3] 407:18 408:23,25
sit [1] 44:25
site [3] 79:24,25 151:4
sits [1] 313:14
sitting [2] 174:17 182:17
situation [4] 246:2 248:15 426:3
440:14
situations [3] 216:1 360:9 397:11
six [3] 53:11 66:23 271:14
sixty [1] 172:1
size [5] 24:11 224:7 228:3,3 297:7

skeptical [1] 238:2
skilled [1] 391:13
slide [1] 186:8
slight [1] 301:21
slightly [6] 200:3 201:7 274:17
300:20 302:22 441:19
sloopier [1] 233:10
slowly [1] 211:3
small [10] 25:1 29:24 30:11 33:25
54:22,24 61:11 192:2 329:21 426:
9
smaller [1] 128:21
smith [2] 298:1,8
social [13] 5:18 14:24 15:6,22 21:
8 24:23 25:3 27:18 31:20 32:17
40:25 71:19 94:15 105:1 108:23
110:7 114:24 169:11 177:14 212:
10 214:1,20,21 215:1 216:5 217:4
219:19 228:8 230:9 235:24 236:2,
6 257:4,15 264:5,8 278:10,14,18
279:4 280:14 288:1 290:10,16
296:14 298:2,15,25 299:13 300:8
303:24 304:21 305:2,5,15 306:2,
14,21 307:3 312:24 313:5,7,8 314:
5,6,7,10 315:25 320:17,20 321:4,5
323:25 324:1 329:20 344:10 346:
8,17 348:2,5 350:25 351:13,19
355:23 356:4,9,14,20 360:14,25
361:8,12,22 363:5 364:21 380:2
381:11,19 389:23 405:2,9,13,21
406:14 409:3 410:5,7,18,23 411:6
414:14 432:14 433:23
sole [3] 6:20 293:18 431:8
solid [4] 153:6 219:2 254:20 255:2
solutions [2] 1:18 5:9
somebody [10] 107:7 126:15 234:
15 246:18,21 309:24 312:17 313:
4 366:15 408:5
somebody's [1] 310:22
someday [1] 250:17
somehow [10] 132:3 167:16 168:
12 190:9 225:1 258:21 383:7 420:
15 425:3 445:2
someone [8] 165:20 167:5 325:10
340:14 355:21 390:10 409:7 426:
5
sometimes [8] 209:19 218:9 223:
16 308:12 339:21,22
somewhat [2] 292:4 426:8
somewhere [5] 79:11 161:2 232:
1 266:21 327:15
sophisticated [1] 29:8
sorry [23] 13:5 27:3 66:8 97:11
109:25 162:16 174:11 201:20 230:
22 239:11 277:10,11 286:12 288:
7 309:14 319:7 383:15 386:4 393:
13 398:19 409:11 411:2 418:15
sort [30] 131:18 171:21 193:13,20
196:8 199:18 202:5,21 265:11,15,
17 288:12 328:9 336:22 347:20
377:15 378:9 379:11 386:10,21
387:1 389:2,9 400:16 436:12 437:
3 440:8,12 442:6,7
sorted [1] 98:18

sorts [2] 201:25 360:14
sought [2] 28:2 327:16
sound [2] 27:13 316:7
sounds [7] 245:17 347:21 355:12
356:21 370:10,21 376:3
source [24] 31:23 32:20 40:21 41:
5 79:2 94:13 131:24 184:17 221:7
254:20 255:2,3,5,7 298:16 299:7
306:23 308:11 309:8,8,21 316:22
331:18 407:4
sources [13] 20:25 55:1,4,9 65:13
78:22 79:1,13 124:22 306:16 308:
15 320:13 431:16
southern [5] 278:4 302:15,20 325:
24 326:2
spd [1] 241:10
speaker [3] 73:17 208:1,5
speaking [8] 51:6 200:20 208:2
229:18 234:10 240:25 351:13 411:
9
specialize [1] 49:6
specializing [1] 270:7
specific [15] 34:24 39:19 43:20 52:
20 228:9 234:17,18 239:6 257:14
359:8 383:21 428:11 434:14 436:
17 444:12
specifically [6] 53:18 124:11 226:
16 323:6 335:4 362:2
specified [2] 107:9 331:1
specify [2] 109:14 198:2
speculating [1] 328:22
speculation [1] 329:11
split [2] 202:16 274:18
spoke [5] 80:24 107:6 208:6 235:2
238:17
spot [1] 135:13
squarely [1] 38:2
ssa [116] 27:3 28:16,22,23 31:13
32:4,10 33:1,24 72:20,23 74:17
97:1 98:1,1,11 99:7 100:10 101:
19 102:20,24 103:25 105:15,17,21
106:3,7,13 107:7,15 108:22 109:
13,18,23 110:23 111:24 112:9
114:1 115:5 142:2 172:20 173:1,
11 174:2 176:4 196:20 214:7,15,
16,17 215:7,24,24 217:2,9 229:9,
24 230:14 233:4 234:16,16 236:2
237:4,17 238:12 239:4 241:7,8,13,
19,22 242:1,7 245:13 246:2,8,19,
22 247:5,9 249:1 258:20 259:7
261:18,25 335:7 336:20,25 350:4,
7,12 377:21 378:11 379:7,9,16
382:6 385:24 397:14 399:14 400:
10,13,19,24 403:9,25 409:16,19
424:25 426:17 427:1,7 434:21
437:21 438:4 442:15
ssa's [7] 106:9 234:20
ssdi [4] 166:4 167:5,15 355:14
ssi [406] 18:4 19:9,18 20:11,14,17
21:19 22:5,12,16,23 23:1,8,20 24:
10 25:17 26:2,5 27:2 28:25 29:15,
20 30:5,22 34:1,3,11,13 35:22 36:
6,16 37:4 39:21 40:4,5,9,11,15,23
41:7,13,16,17,20 42:2,8,10,12,17,

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

18 44:5,14 51:3,9,14,19 52:4,12,
21 53:6,24,25 54:4,15 55:2,6,13,
17,19,25 60:18 61:6 62:11,16 65:
●,67:17,18,23 68:9,9,14,20,25 69:
●,3 70:7,9,11,16,16,22,24 71:3
●,3,8,11 75:15,23 76:1,5,11,14,
16,25 77:20 78:20,24 81:19 82:7,
11,15,25 83:11,12,16,17 87:1,8,9,
24 88:12 89:1,3,19,22 90:14 91:4,
11,15,16 92:20 93:5,8 94:2 95:5,
16,17 96:17,19,25 97:8,9,19 98:18
117:9,12 119:12 121:1,4 122:16,
23 123:24 130:1 133:7 137:6 139:
23 141:4 143:22 144:16 145:4,19
146:7,24 154:24 155:8,12 157:18
159:9 164:5 165:15 166:3 167:5,
14 169:23,25 170:18 171:4 173:4,
9,13 176:15 177:18 179:21 183:
22,24 186:5 187:25 189:17 190:
15,19,19 191:12 193:21 194:5,7,
13 195:5,18 196:10 198:17 210:4,
10,12,15,17 211:13,23 212:3,11,
14,18 213:6,16,23 214:5,8,21 215:
5,9 216:16 217:6,12,16 220:12
221:13,22 226:6 223:1,3,4,12 224:
8 225:21 226:8,15,19 228:13,16
229:3,17 230:2,10,15 231:16,24
232:9,17 233:8 234:13,25 236:12,
13 248:4,9 251:13,17,18 252:12
253:10,23,25 257:2,6,19 258:8,15,
18 259:3,15,16,20 260:2,3,7 262:
13 263:1,20 264:7 266:3 278:9,17
28●,●81:9 282:22,24 290:1,9,
14●,●3 296:1,16,19,24 297:1,5,
6,10,15 298:10,21 299:3,4,5,21
300:3,14 301:9 303:11,17,18 304:
23 305:23 306:23 307:2 308:16
310:6 311:3 314:15,25 315:8 316:
16,20 317:1,8,18 319:20 320:11
321:15 322:3,6,19,23,24 323:1,2
324:17 325:12 326:19,25 327:2,5,
10 334:25 336:21 337:10,11,18
339:2,6 340:4 341:6 342:16,25
343:3,12,20 344:3,25 347:7 348:8,
25 349:10,21,22 352:5,7 355:5,14,
22 356:8 362:8,13,21 370:6 379:
10,18 383:2 384:24 386:18 387:6,
12 388:13,16,25 389:22,25 390:18,
22 391:12 392:1,23 393:7,11,22,
24 395:3,24 396:3 408:18 409:7
410:9 413:9 414:3,5 417:4 425:24

**ssi's** [1] 389:20

**ssi-eligible** [5] 36:1 130:24 227:2
236:4 299:21

**ssi-factor** [1] 443:14

**ssi-only** [1] 252:19

**ssi/ssp** [2] 31:2 318:5

**ssp** [150] 22:6 30:25 34:10 37:7 61:
6 65:24 68:14 73:4 75:15,17 76:2
92:19 93:8,17,22 96:17 176:6,19,
22 177:19 178:7 193:16 194:4,15,
20 195:16 226:8 232:3,4,18 233:9
25●,●56:17,20 258:14,17 259:3,
15●,●1 260:1,4,7,14 261:7 266:4

278:10,21 280:16 282:22,25 290:
1,9,15 296:10,12,21,25 297:2,4,8,
12,15,16 298:4,21,24 299:2,5,6
300:2,14 301:9,11 302:23 303:5,
11,17,18 304:23 305:23 306:23
307:2 308:16 310:6 311:4 315:10
316:16,20 317:2,8,18 319:20 320:
11 321:15 322:3,6,23 323:1 324:
13,24 325:1,8,13 326:8 327:1,3,5
342:16 348:9,19 349:20,23 356:8
370:6 379:13,21 383:2 384:24
387:10,15 388:2,12,17 389:3,20,
22,25 391:14,17,20 392:1 395:21
400:3,4,11 408:12,14,18,24 409:3,
8 410:9,12 412:20 413:6,9,21 414:
1,7

**ssp-only** [28] 34:9,12,22,25 35:13,
20 93:2 94:10,25 95:6 118:12 193:
18 196:13,13 231:10 232:6,25
233:17 259:11 300:1,19 302:8,14
324:20 325:11 388:15,18 432:24

**ssp-specific** [1] 298:11

**st** [447] 1:34 2:34 3:34 4:34 5:34 6:
34 7:34 8:34 9:34 10:34 11:34 12:
34 13:34 14:34 15:34 16:34 17:34
18:34 19:34 20:34 21:34 22:34 23:
34 24:34 25:34 26:34 27:34 28:34
29:34 30:34 31:34 32:34 33:34 34:
34 35:34 36:34 37:34 38:34 39:34
40:34 41:34 42:34 43:34 44:34 45:
34 46:34 47:34 48:34 49:34 50:34
51:34 52:34 53:34 54:34 55:34 56:
34 57:34 58:34 59:34 60:34 61:34
62:34 63:34 64:34 65:34 66:34 67:
34 68:34 69:34 70:34 71:34 72:34
73:34 74:34 75:34 76:34 77:34 78:
34 79:34 80:34 81:34 82:34 83:34
84:34 85:34 86:34 87:34 88:34 89:
34 90:34 91:34 92:34 93:34 94:34
95:34 96:34 97:34 98:34 99:34
100:34 101:34 102:34 103:34 104:
34 105:34 106:34 107:34 108:34
109:34 110:34 111:34 112:34 113:
34 114:34 115:34 116:34 117:34
118:34 119:34 120:34 121:34 122:
34 123:34 124:34 125:34 126:34
127:34 128:34 129:34 130:34 131:
34 132:34 133:34 134:34 135:34
136:34 137:34 138:34 139:34 140:
34 141:34 142:34 143:34 144:34
145:34 146:34 147:34 148:34 149:
34 150:34 151:34 152:34 153:34
154:34 155:34 156:34 157:34 158:
34 159:34 160:34 161:34 162:34
163:34 164:34 165:34 166:34 167:
34 168:34 169:34 170:34 171:34
172:34 173:34 174:34 175:34 176:
34 177:34 178:34 179:34 180:34
181:34 182:34 183:34 184:34 185:
34 186:34 187:34 188:34 189:34
190:34 191:34 192:34 193:34 194:
34 195:34 196:34 197:34 198:34
199:34 200:34 201:34 202:34 203:
34 204:34 205:34 206:34 207:34

208:34 209:34 210:34 211:34 212:
34 213:34 214:34 215:34 216:34
217:34 218:34 219:34 220:34 221:
34 222:34 223:34 224:34 225:34
226:34 227:34 228:34 229:34 230:
34 231:34 232:34 233:34 234:34
235:34 236:34 237:34 238:34 239:
34 240:34 241:34 242:34 243:34
244:34 245:34 246:34 247:34 248:
34 249:34 250:34 251:34 252:34
253:34 254:34 255:34 256:34 257:
34 258:34 259:34 260:34 261:34
262:34 263:34 264:34 265:34 266:
34 267:34 268:34 269:34 270:34
271:34 272:34 273:34 274:34 275:
34 276:34 277:34 278:34 279:34
280:34 281:34 282:34 283:34 284:
34 285:34 286:34 287:34 288:34
289:34 290:34 291:34 292:34 293:
34 294:34 295:34 296:34 297:34
298:34 299:34 300:34 301:34 302:
34 303:34 304:34 305:34 306:34
307:34 308:34 309:34 310:34 311:
34 312:34 313:34 314:34 315:34
316:34 317:34 318:34 319:34 320:
34 321:34 322:34 323:34 324:34
325:34 326:34 327:34 328:34 329:
34 330:34 331:34 332:34 333:34
334:34 335:34 336:34 337:34 338:
34 339:34 340:34 341:34 342:34
343:34 344:34 345:34 346:34 347:
34 348:34 349:34 350:34 351:34
352:34 353:34 354:34 355:34 356:
34 357:34 358:34 359:34 360:34
361:34 362:34 363:34 364:34 365:
34 366:34 367:34 368:34 369:34
370:34 371:34 372:34 373:34 374:
34 375:34 376:34 377:34 378:34
379:34 380:34 381:34 382:34 383:
34 384:34 385:34 386:34 387:34
388:34 389:34 390:34 391:34 392:
34 393:34 394:34 395:34 396:34
397:34 398:34 399:34 400:34 401:
34 402:34 403:34 404:34 405:34
406:34 407:34 408:34 409:34 410:
34 411:34 412:34 413:34 414:34
415:34 416:34 417:34 418:34 419:
34 420:34 421:34 422:34 423:34
424:34 425:34 426:34 427:34 428:
34 429:34 430:34 431:34 432:34
433:34 434:34 435:34 436:34 437:
34 438:34 439:34 440:34 441:34
442:34 443:34 444:34 445:34 446:
34 447:34

**stable** [1] 252:15

**staff** [48] 28:5 103:18 105:9 106:19
108:8 110:21 111:15 123:8 162:8
166:14 212:25 235:2,20 246:25
369:24 373:13 374:12 375:22

**staffer** [1] 123:16

**staffers** [1] 152:19

**staffing** [1] 318:1

**stan** [7] 3:8 30:13 35:10 177:9 237:
9 269:5,20

**stand** [1] 269:6

**standard** [6] 292:22 296:21 297:7,
9,10,12

**standpoint** [2] 368:12 385:23

**stands** [1] 62:6

**start** [20] 13:15 17:19 46:12 54:23
64:5 65:10 70:4 136:23 139:25
170:21 222:7 239:2,5 321:19 344:
10,17 346:7 348:9,16 437:21

**started** [19] 34:18 47:19 49:2,23
58:9 63:16 85:8 97:16,21 102:4
144:10 246:11 278:25 284:2 307:
7,8 366:25 370:17 444:19

**starting** [13] 54:20 56:5 60:15 78:
9 79:15 190:18,25 191:11 270:11
299:11 318:13 323:5 328:2

**starts** [2] 57:22 297:23

**state** [183] 7:8 8:21 21:5 26:16 27:
2 30:20,23 31:15,19,23 32:12,16,
20 33:3 34:3 35:16 38:3 39:18 50:
22 60:11 62:1 71:14,16,18 73:25
74:7 75:17 76:2 92:18 93:16 94:5
99:21 111:17 119:17 120:9 121:5,
12,18 123:1,19 125:3 126:6 142:8
149:21 164:24 167:17,17,22 168:
3,13 170:19,22 171:16 173:16,23
175:13,16,22 177:16 179:9,14,20
180:2 182:23 187:22 191:1 215:
11 216:12,24 217:8 218:10 221:8
225:10 227:23 228:7,9,15,20 229:
14 230:18 231:12,14 232:1,2 234:
7,23 241:4 243:10 252:20 253:6,
24 255:11 256:20 257:7,9,13,25
258:1 262:6,21 265:13 270:20,23
276:11,14 277:5 278:9,20,22,25
279:6 280:19,21,22 290:5 296:13
298:14 299:1,8,20 302:11 304:1,2,
3,8,11 305:8,11,11,16 306:20,25
307:19,21,21 308:9 309:10 313:
10 314:4,10 315:24 316:11 317:6,
9 320:21 321:9 323:1 326:24 332:
24 337:3,17,17 343:16 346:22
347:25 351:15,17,18 355:12,25
357:8,13 360:6,18 363:3 367:4
370:19 377:1 396:8 403:2,7,10,12
405:13 406:6,10,13 408:6 412:10
415:22 416:6 426:22 444:22

**state's** [8] 40:13 70:8 71:3 261:7
276:21 304:4 310:19,24

**state-approved** [3] 57:8 60:10 79:
4

**state-only** [6] 93:8,8,22 178:7 179:
4 253:7 266:1 360:8

**state-paid** [1] 125:23

**stated** [5] 6:22 38:6 41:13 245:9
437:7

**statement** [9] 7:19,20 17:18 39:7,
16 120:6 357:4 442:23 443:23

**states** [7] 1:1 7:10,16 11:19 278:
13 303:14 304:21

**statewide** [15] 232:17,25 253:6
254:6 255:14 280:9 302:9 324:14
325:1,21 326:5,11 340:17 396:24
433:1

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

**stating** [2] 41:23 359:2
**statistic** [2] 62:7 431:25
**statistical** [1] 429:7
**statistically** [2] 236:25 237:1
**...istician** [1] 236:14
**...isticians** [1] 236:15
**statistics** [3] 34:18 94:9
**status** [16] 30:22 39:21 69:23 78:24 114:16 216:16 220:22 303:19 311:19 316:16 319:21 322:20 337:11 357:16,19,21
**statute** [9] 23:14 24:16 36:13 199:24 200:6 209:25 210:7,14 419:19
**statutory** [5] 5:21 22:25 23:7 207:11 211:16
**stay** [13] 66:21 90:4,12 128:20 131:15 132:11 138:11,13 148:2 184:16 198:10 224:19 345:9
**stayed** [6] 67:5 65:22 87:7 132:1 376:19 377:3
**staying** [1] 66:18
**step** [7] 64:1,24 67:11 68:23 69:9 103:17 370:25
**steps** [3] 77:23 78:2 80:20
**sticky** [1] 374:20
**still** [27] 68:1,4 102:18 110:25,25 182:14 190:11 231:25 249:11 261:6,7 275:1 296:20 339:4 340:18,21 363:24 371:2 392:4,4,6 394:3,10 395:1 396:14 440:22 441:21
**stipulated** [1] 435:11
**stipulations** [1] 17:9
**sto...** [2] 121:12 389:21
**sto...** 354:9 400:2
**straight** [1] 322:1
**strange** [1] 429:13
**stream** [1] 356:7
**strictly** [1] 333:24
**strike** [1] 244:16
**string** [4] 75:8 108:13 288:2 297:20
**strings** [2] 72:18 110:9
**struck** [2] 218:25 224:6
**stuck** [1] 238:11
**study** [1] 432:12
**stuff** [4] 186:9 218:6 228:10 370:6
**subcontract** [1] 332:19
**subject** [7] 206:21 213:17 393:18 440:16,22 441:2,14
**submission** [2] 42:25 110:12
**submit** [6] 99:20 101:13 189:12 235:17 317:20 446:21
**submits** [1] 37:3
**submitted** [7] 8:25 99:23 218:2 288:17 289:8 329:25 344:13
**submitter** [1] 359:2
**submitting** [3] 167:20 235:14
**subsequent** [3] 94:7 324:25 347:17
**subsequently** [3] 27:14 238:5 370:3
**substance** [1] 18:24
**su...tantially** [1] 143:23
**su...tiate** [1] 68:13

**subsystem** [2] 271:19 272:2
**subsystems** [4] 271:14,18 279:19, 20
**subtotal** [1] 138:6
**subtracted** [1] 118:13
**successful** [3] 102:2,6 327:18
**successfully** [1] 37:20
**suddenly** [1] 189:24
**sufficient** [3] 293:14 295:6,12
**suggest** [3] 303:4 325:6 359:21
**suggesting** [2] 347:22 442:2
**suggests** [1] 425:12
**suite** [1] 11:28
**sum** [1] 347:20
**summaries** [1] 320:3
**summarize** [6] 78:12 105:13 155:6 312:23 377:16 446:16
**summary** [3] 10:10 61:25 62:6 65:8 78:15 79:13 80:18 81:24 86:8 88:10,18 126:7 187:11
**supervised** [1] 290:21
**supervising** [1] 148:5
**supervisor** [1] 369:23
**supervisory** [1] 275:7
**supplement** [7] 217:5 231:17 256:23,24 257:8 258:2 422:18
**supplemental** [11] 7:6 35:6 92:18 173:3,8,19 193:20 194:22 278:22 296:15 347:25
**supplementing** [1] 231:14
**supplies** [1] 351:24
**support** [4] 29:3,4 40:3 147:7
**supportable** [1] 145:3
**supported** [4] 13:16 15:2 35:23 237:15
**supporting** [1] 446:24
**supposed** [1] 288:16
**surprised** [2] 18:12 320:6
**susceptible** [1] 430:23
**suspect** [2] 174:19 261:23
**suspend** [1] 336:21
**suspension** [1] 386:20
**suspensions** [1] 142:11
**suspicious** [1] 193:4
**swear** [1] 45:3
**swings** [1] 430:24
**sworn** [6] 45:7,16 205:9,18 269:12, 21
**sympathetic** [2] 238:9 240:4
**sympathize** [1] 238:14
**sync** [1] 326:23
**synonymous** [3] 258:16 259:14 260:12
**system** [82] 33:7,8 41:3 57:9 64:17,19 79:4 83:4 134:10,12 138:14 142:3,8 149:8 271:11,13,13 272:13,14,21,22 275:9,23 276:22 277:17,23 279:12 280:5,8,23,24 281:2,13,14 283:3 290:19 292:11 306:19 307:14,16,23 308:3,5 309:19 310:8 311:18,21,23 312:1,12,14,22 313:14,15,18,19 322:24 350:15 364:15 365:23 367:2,11,13,22 368:4,25 371:10 372:19,24 373:1,

5,8 375:12 376:24,25 377:4 381:25 382:14 394:5 406:5,9 420:5
**systemic** [1] 224:13
**systems** [21] 26:11 134:14 273:3,10 277:15,21,25,25 279:9 281:4,23 282:20 284:25 289:25 313:3 360:17 364:20 365:6 368:16 373:24 418:20

---

**T**

**tab** [1] 86:20
**tabbed** [1] 73:18
**table** [12] 10:11 78:11 80:16 81:12,15 83:20 84:6 88:3,9 89:7 117:7 118:11 121:2,4 85:18
**tables** [4] 11:7 12:2,4 85:18
**tag** [1] 277:17
**talked** [11] 104:22 128:5 141:16 152:11 176:6 182:23 216:2 244:1 254:22 334:23 360:17
**talks** [4] 77:6 124:17 342:22 418:17
**tanf** [1] 308:17
**target** [1] 44:11
**taxpayers** [2] 304:11,13
**team** [1] 370:1
**technical** [14] 47:7 78:13 277:18 295:9 365:20 366:4 369:23 371:3,15,21 372:7,7,22 423:12,21 429:2,16
**telephone** [2] 208:3 265:10
**tells** [4] 55:18 255:13 281:16 351:3
**tend** [2] 253:16 432:16
**tenets** [1] 37:21
**tenth** [1] 236:20
**tenure** [5] 213:1 276:9 277:5 278:7 279:6
**term** [1] 323:18
**terminated** [1] 357:23
**terms** [28] 14:5 15:3 50:11 60:17 76:15 96:11 118:10 146:24 147:13 199:18 200:20 251:1 322:19 324:19 363:7 364:22 366:7 370:25 395:11 397:9 406:25 427:22 431:1 434:13 435:25 437:15 438:21 442:17
**test** [9] 310:3,9 369:18,18 371:10 374:11,13,14 375:6
**tested** [2] 307:18 310:2
**testified** [16] 13:18 45:18 88:18 205:20 243:9 269:23 284:21 285:9,15 286:23 287:18,21,24 291:13, 14 332:11
**testify** [14] 10:19 11:10 14:1,14 15:14 27:8 29:21 30:3,16 94:18 243:18 286:4 291:18 330:22
**testifying** [4] 14:19 102:1 174:18 265:9
**testimony** [26] 16:5 27:15 35:7 119:1 142:24 154:13 193:7 204:15 208:11 243:5 244:1 245:8 250:14 251:3,21 255:21 256:5 265:2 268:18 284:4,7 293:7 334:20 353:9 363:22 417:16
**testing** [4] 369:20,21 371:5 375:4

**thanks** [1] 356:11
**that'll** [1] 96:9
**themselves** [2] 240:22 264:14
**then-administrator** [1] 427:8
**theory** [2] 191:13 258:15
**there's** [60] 13:23 59:6 79:10 113:10 136:25 137:1,2 146:22 195:4 199:14 222:14,19 224:13 234:4 247:7 249:21 254:5 268:2 280:18 295:12 304:13 308:20 310:13 311:13,20 320:12 321:4,20 325:15 327:13 333:20 335:22 336:22 338:8 344:16 347:12,12 350:23,23 351:10 355:11 357:24,25 358:24 378:10,10,14 381:18,21 387:12 388:23 398:10 407:23 408:10 415:24 425:7 429:10 430:18 440:23 441:4
**therefore** [12] 10:24 24:2 83:11 174:4 212:17 214:15 227:2 231:23 232:3 249:20 264:9 404:16
**they'll** [5] 166:10,11 167:12 235:9 388:1
**they've** [3] 282:3 309:23 310:8
**thinking** [4] 132:19 139:6 161:15 389:10
**thirteen** [1] 275:24
**thirty-one** [1] 12:13
**thirty-seven** [2] 13:9,16
**thirty-three** [1] 12:24
**thorough** [1] 432:19
**though** [4] 216:1 376:20 391:15 407:15
**thousand** [2] 148:6 181:21
**thousands** [2] 24:20 88:2
**three** [38] 9:18 29:6 31:10 32:7 53:11 54:21,24 55:4 65:22 66:19,20 74:10 80:7 88:4 96:21 115:2,6 119:9 121:2 122:22 220:4 232:24 254:5 294:2,13 295:1,4 307:2,5 310:5 311:6 314:17 317:12 318:17 322:16 327:12 408:14 425:4
**threshold** [5] 232:1,2 260:14,15 261:10
**threw** [1] 379:14
**throughout** [3] 78:25 300:25 439:21
**thumb** [2] 330:17 331:6
**tie** [2] 86:8 183:24
**tied** [3] 33:17 263:11 441:11
**ties** [1] 183:15
**timely** [1] 137:2
**timing** [4] 18:18 37:9 41:22 157:19
**title** [1] 5:17
**titles** [2] 273:21 274:20
**tma** [1] 206:7
**today** [15] 6:24 10:13 27:8 38:5 80:8 206:21 243:18 244:18 255:9 333:13 357:3 375:22 427:20 447:15,20
**today's** [2] 446:7,13
**together** [5] 63:4 212:13 240:23 300:16 397:21
**took** [5] 88:21 218:15 225:22 251:

by ETS Inc.

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

16 255:15 331:11

**top** [13] 54:21 63:23 68:18 98:20,
22 99:3 100:21 109:13 193:21
**318:**15 319:11,17 364:14

⬤ **cs** [1] 287:9

**torres** [3] 103:16 104:12,17

**torres'** [1] 104:21

**total** [27] 22:18 82:23 83:16 84:21,
21 86:6,8,12 90:4,12 95:16,17,25
96:19 118:13 128:19 131:5,11,14
132:11 137:5 138:13 198:10,11
210:18 223:25 224:1 253:9 300:
11,13,18,25 301:6,8,10,14 427:21

**totaled** [1] 301:6

**totally** [3] 222:20 253:13 399:21

**totals** [7] 181:11 82:18,21 83:9 89:1,
4,8

**touch** [1] 193:12

**touched** [1] 98:7

**town** [1] 303:7

**trace** [2] 144:23 145:2

**traceable** [1] 144:21

**tracing** [1] 90:2

**track** [8] 74:19 115:8,9 131:21 147:
2,13 179:23 252:13

**tracked** [4] 149:8 179:19 180:16,
18

**traditional** [1] 306:11

**trails** [1] 444:15

**transcript** [2] 1:22 447:6

**transcriptionist** [2] 208:9 211:4

**transfer** [2] 370:24 383:9

tra⬤⬤red [5] 19:12 350:18,21
36⬤⬤⬤

**translate** [5] 67:5 374:3,7 379:3
404:1

**translated** [5] 350:14 383:18 386:
1 400:25 401:15

**translates** [1] 378:19

**translating** [4] 350:9,19 383:13
403:16

**translation** [5] 350:4 381:18 382:
13,21 384:22 401:5

**transmit** [2] 109:17 241:25

**transmittal** [2] 13:17 112:2

**transmitting** [1] 110:6

**travels** [1] 312:24

**treat** [1] 24:7

**treated** [4] 57:4,14 210:19 327:11

**treating** [1] 232:23

**treatment** [4] 93:1,6 393:17 408:3

**treats** [3] 24:21 389:25 413:9

**tremendous** [3] 97:3 304:14 325:
25

**trend** [1] 145:23

**triangle** [1] 170:13

**tried** [7] 28:5 228:18 245:12,18
399:13 438:13,17

**trigger** [2] 357:8 390:7

**true** [10] 34:15 120:6 233:11 259:9
355:3,5 357:3 379:25 415:15,17

**truly** [4] 127:22 217:11 234:13 399:
5 ⬤

tru⬤⬤ted [1] 409:25

---

**try** [12] 27:16 54:3 66:25 74:6 108:
19 208:13 209:20 211:6 219:11
228:17 315:10 428:18

**trying** [24] 63:5 113:16 114:5 120:
25 122:17,21 138:2 148:12 155:1
165:21 168:1 172:25 192:24 245:
16 246:7 315:4 328:7 345:20 352:
25 354:10 360:2 377:16,16 399:1

**turn** [4] 71:21 74:23 124:4 155:4
297:17 321:19 323:4 333:4 362:4
414:24 428:12

**turned** [2] 374:16 439:8

**turning** [3] 71:5 88:7 219:14

**twenty-eight** [1] 49:22

**twenty-nine** [1] 112:6

**two** [31] 11:5 20:20 21:23 28:7 51:
2 89:8 92:1 112:3 128:18 193:11
197:14 210:9 212:12 218:9 223:7
248:24 254:2 272:9 274:11 287:
20 289:17 290:25 291:3 293:16,
18 297:19 300:16 318:10 320:9
362:17 429:18

**two-measure** [1] 176:3

**two-page** [2] 166:2 298:13

**type** [18] 58:1 84:6 88:3 91:25 92:9
212:16 220:2 230:20 246:1 284:
24 285:18 366:5 372:13 378:12
388:1 397:10 424:14 438:10

**types** [3] 229:12 336:23 406:23

**typical** [2] 30:24 87:12

**typically** [2] 229:13 339:3

**tzvi** [6] 3:7 27:14 29:24 97:23 106:
1 205:17

---

# U

**u.s** [2] 28:4 286:2

**u.s.c** [1] 209:25

**ultimately** [11] 83:9 157:4 167:18
168:3 219:19 234:14 237:21 247:
17,18 320:17 427:23

**um-hum** [28] 130:14 133:21 137:8
158:9 181:7 182:4 183:5 188:20
189:1 341:14 347:2 354:25 364:
12 365:10 366:2 371:7 378:1 387:
8,17 388:7 389:5 390:20 396:12
410:16 411:24 422:22 432:3 436:
3

**unable** [4] 22:8 296:3

**unbiased** [1] 236:23

**uncertainty** [1] 419:13

**unchanged** [1] 314:4

**under** [17] 37:15 61:6 62:14 69:18
81:18 82:1,2 89:13 215:19 261:6
264:4,7 266:7 275:19 281:12 332:
17 356:1

**underlie** [1] 6:14

**underneath** [1] 441:15

**understand** [38] 48:1 63:11 117:6
149:20 172:5 173:1 175:11 185:
10 192:17 216:18 221:6 227:21
231:11 240:5 256:19 259:15 268:
15 364:9,25 365:23 371:10 384:
12 387:21 391:3,11 394:9 398:13

---

399:9,21 403:14 423:10

**understandable** [1] 197:7

**understanding** [14] 94:2 119:7
171:2 173:11 199:23 256:17 258:
22 322:21 338:7 365:7,19 381:4
413:25 414:10

**understands** [1] 446:10

**understated** [3] 35:22 37:5 53:10

**understatement** [1] 24:9

**understates** [2] 21:18 327:10

**understood** [6] 228:2 231:18,19
259:4 348:8 424:1

**undertaking** [1] 432:19

**undoubtedly** [1] 18:9

**unexpected** [1] 43:11

**unexplained** [2] 27:10 37:12 251:
14

**unfortunate** [1] 328:15

**unfortunately** [1] 381:9

**unidentified** [1] 73:17

**uninsured** [2] 57:19 169:2

**unique** [3] 248:14,14 440:9

**united** [2] 1:1 11:19

**universe** [1] 300:11

**university** [2] 278:4,6

**unless** [3] 6:4 200:8 233:4

**unlike** [1] 20:8

**unlikely** [5] 233:17,18 253:15 254:
2 428:23

**unmatched** [22] 25:15,16 76:16,
24 80:25 81:9 82:18 87:18,20 222:
20,20 224:1 322:18,25 323:11,16,
17 324:12 330:25 331:1,21 437:
19

**unpaid** [1] 195:18

**unquestionably** [1] 424:15

**unrelated** [2] 134:6 274:24

**unsettled** [1] 440:18

**until** [9] 101:22 104:9 107:25 121:
4 195:11 347:9 413:23 414:6,8

**untimely** [1] 131:17

**unwilling** [1] 22:9

**up** [68] 45:24 46:14 60:16 68:6 77:
2 79:9 81:22 84:24 86:2 110:18
114:6,25 121:4 127:14 129:16
131:10 141:14 146:2,7 147:21
164:4 165:15 169:2 185:1 193:14
201:23 202:5,7 208:23 213:10
215:3 225:3,7 227:3 230:11 241:7,
18 248:8,18 251:15 263:20 264:
10,17 274:22 276:12,21 284:1
288:1 309:24 338:19 339:17,25
347:20 353:13 356:12 358:19 370:
19,25 373:15 376:21 394:25 418:
22 420:2,7 423:17 426:4 427:19
436:13

**up-to-speed** [1] 153:2

**update** [1] 305:15

**updated** [4] 42:20 312:14,15,17

**updates** [1] 305:21

**updating** [1] 207:15

**upfront** [1] 161:22

**upper** [1] 61:11

**upset** [1] 106:16

---

**uses** [7] 62:2 261:25 308:6 346:22
347:4 360:7 409:19

**using** [36] 19:17 21:7 26:15 29:16
37:6,25 38:12 42:11,23 57:19 68:
19 71:3 81:21 83:7 91:4,12 123:
24 125:1,6,23 126:11 129:10,14
132:15 216:9 234:24 249:2 254:
25 322:8 332:4 344:9 345:3 390:1
394:6 425:4,9

**utilized** [1] 446:21

---

# V

**valid** [3] 153:16 237:1,3

**validate** [11] 52:15 53:6 62:19 98:
3 99:25 127:21 136:8 146:13,14
176:22 315:1

**validated** [5] 148:13 153:17 328:
18 329:7 332:3

**validates** [2] 32:3,25

**validating** [1] 74:4

**validation** [7] 72:21 126:12

**valley** [12] 1:10 5:6 7:2 17:25 46:
20 117:8 311:8 325:5 331:21 332:
12,16,22

**valuable** [1] 63:7

**variance** [4] 251:18 252:11,22 253:
13

**variances** [4] 251:15,20 263:1,9

**variations** [1] 301:22

**varied** [2] 285:21 300:19

**varies** [1] 389:24

**variety** [2] 296:4,6

**various** [16] 38:10 46:18 55:9 65:
13 271:3,8 273:21 277:20 279:22
308:9 315:16 353:9 364:20 370:5
407:10 418:18

**vary** [3] 180:3 302:9 416:9

**vendor** [2] 318:23 373:23

**venues** [1] 284:25

**verification** [22] 25:23 26:14 34:2
57:9 73:25 79:22 99:12,22 100:3
101:19 227:23 272:21 273:13 280:
2 281:1 312:21 317:3 322:12 367:
15 373:4,7 438:11

**verified** [4] 21:12 22:4 317:7,12

**verify** [16] 25:5 28:9 30:21 31:17
32:14 57:9,20 65:18 96:25 97:4
114:15 311:9 314:23 317:11 318:
3 321:14

**verifying** [2] 21:2 26:5

**versus** [11] 30:9 70:9 96:20 224:9
266:1 383:1 388:15 423:5 429:17
432:25 441:11

**vetted** [2] 31:25 32:22

**via** [1] 306:15

**vice** [2] 276:12 372:5

**vice-versa** [1] 394:23

**view** [2] 107:11 146:22

**violate** [1] 405:20

**violated** [2] 37:23 405:15

**violation** [1] 404:25

**virtually** [3] 151:21 152:6 277:3

**visual** [1] 412:2

**vitae** [1] 12:25

---

by ETS Inc.

took - vitae

POMONA VALLEY HOSPITAL MEDICAL CENTER VS. NORIDIAN HEALTHCARE SOLUTIONS, LLC.

**volume** [1] 71:22
**voluntarily** [1] 438:12
**volunteered** [1] 106:20
**vouch** [1] 26:14
[1] 1:16

**W**

**wait** [3] 157:19 230:8 428:14
**waited** [1] 110:17
**walk** [2] 312:19 341:5
**wand** [1] 402:23
**wanted** [26] 63:7 74:12,21 75:10,
17 77:17 117:5 123:21 140:12
141:1 146:12 184:16 193:12,17
201:22 202:19 229:7 288:11 355:
9 361:20 362:1,25 423:3 442:20
443:4 444:25
**wants** [4] 117:19 257:17 288:4
438:10
**warrant** [1] 36:23
**washington** [1] 114:2
**wave** [1] 402:23
**way** [33] 11:17 33:19 103:18 141:3
155:11 160:13 167:8 176:20 177:
8 178:10 181:5,16 183:8 200:24
207:3 230:14,18 236:23 238:19
300:22 327:19 370:19 374:5 377:
17 398:15 399:13 405:16 426:16,
21 429:12 433:18,21 444:15
**ways** [5] 97:18 254:24 281:5 311:
21 389:10
**wealthy** [1] 325:24
**well** [1] 321:14
**well** [7] 52:16,17 55:20 79:6
89:12,14,24
**weeds** [5] 368:13 370:13 372:12,
14,16
**weight** [1] 16:4
**weird** [1] 252:4
**welcome** [2] 284:10 295:21
**well-connected** [1] 33:23
**well-tested** [1] 309:23
**whatever** [24] 37:13 74:20 75:21
149:5 173:14 176:9 179:7 187:21
189:4 191:23 209:18 218:13 220:
16,16 229:5 230:5 232:24 236:17
241:12 260:13 262:12 393:9 420:
3 425:2
**whatsoever** [1] 283:25
**where's** [1] 428:14
**whereas** [3] 24:4 128:20 324:14
**whether** [48] 6:24 19:7 20:13 25:6
26:24 36:18 37:1 53:1 199:8,13
200:11,17 207:10,12 213:18 214:
13,14,18 216:4,7 217:11,24 218:1,
3 219:17 220:11 221:12 228:11
236:24 242:4 259:9 261:23,25
262:2 264:16 310:3 317:6 320:23
335:25 379:10 383:3 384:24 421:
2 423:8 427:18 436:21 438:11
447:11
**white** [4] 65:11 70:12,14 73:14
**white** [1] 238:10
**white** [1] 280:13 299:3 372:4 373:

23 412:6
**whole** [16] 67:14 149:10 162:24
171:16 185:12 197:4 292:3 336:
23 338:8 340:16 354:4 357:25
374:15 379:6 380:23 438:18
**whom** [2] 15:16 27:8
**wide** [3] 96:23 296:4,6
**wild** [1] 430:23
**will** [80] 6:23 7:12 13:18 14:1 17:
17 21:6 23:12 27:8,15,21 28:4 29:
5,12,21 30:2,16 31:15 32:12 33:
21 35:7,12 45:3 54:5 58:8,11 60:
24 64:3,6 67:5 70:19 78:17 81:6
87:4 88:23 94:17 101:25 115:18
127:23 139:25,25 140:1 144:19
148:2 157:16 161:5 163:15 171:3,
15,17 174:18,19 177:8 179:6 211:
3,6 219:11 253:12 255:19,22 257:
13 262:19 267:11 268:16 304:2
305:8,9 351:14 356:6,7 389:20
403:10 407:22,22,25 422:6 424:
17 436:24,25 446:11,23
**willing** [10] 98:1 102:7,12,15,19
153:21 196:20 246:22 328:13 437:
18
**window** [2] 196:9,15
**wiped** [1] 214:14
**wish** [2] 34:6 296:14
**wishes** [1] 284:8
**within** [11] 31:1 66:6,11 137:25
167:22 251:18 287:5 382:13 406:
6 431:23 446:13
**without** [6] 19:20 155:10 309:25
421:5 428:9 443:3
**witness** [29] 11:22 12:25 13:19 14:
8 15:3 35:10 44:18 45:7,17 115:
15 116:7 177:9 205:9,19 269:3,12,
22 282:13 283:10 284:23 287:13,
14 288:6,7,8,9,16 289:2 431:25
**witnesses** [11] 14:1,21 21:7 29:6
31:8 255:9 288:20,22 417:17,23
418:1,4,6
**wonderful** [1] 439:4
**wondering** [4] 134:18 149:25 203:
18 358:4
**woodlawn** [1] 1:27
**woodruff** [2] 112:23 113:24
**words** [5] 93:3 218:17 226:2 368:
21 433:10
**work** [43] 26:15 27:17 33:24 49:20
63:17 96:1 101:17 108:21 114:12
143:4 152:9 154:14 169:10 172:
24 192:18 206:12,13 208:16,18
215:24 228:22 234:15 241:7,22
242:15 245:13 246:23 255:10 276:
15,15,22 278:1 280:1 296:3 315:
19 332:25 333:2 361:18 367:6
369:25 370:3 376:16,19
**worked** [17] 46:25 49:4 107:12
149:23 180:10 240:21 256:8 270:
12 276:20,25 279:3 287:25 290:
20 365:3 367:9 370:19 405:12
**worker** [1] 312:16
**working** [15] 47:23 48:21,22 83:4

**109**:12 **110**:22 150:14 206:24 241:
19 245:9 278:25 368:22 370:18
373:13 429:12
**workload** [3] 238:21 239:9 247:24
**works** [2] 114:11 207:4
**world** [4] 151:25 250:25 374:6 375:
8
**worry** [1] 163:5
**worse** [2] 208:21 224:5
**writes** [1] 414:15
**written** [6] 104:6,20 243:21 250:15
333:12,16
**wrote** [1] 111:20

**X**

**xviii** [1] 5:17

**Y**

**year** [85] 9:5,9,15 16:7,12,17 22:7,
21 23:3,22 24:21 25:3,11 36:20
37:6,9 42:22 50:20 53:2 54:1 63:
14,19 67:11 74:18 77:13 86:7,20
87:2 88:19 95:18 98:19,21 100:6
120:12 121:22 122:3,6,15 125:20
139:9,12,15,16,19,22,24 140:15,
17 145:23 147:18,19 148:2 184:5,
7 199:1 207:14 222:22,22 252:5,5,
15,16,22,22 263:2 301:25,25 302:
6,6 303:3,3 314:18 317:13 318:8
323:9 324:22 327:7,8 330:24 332:
11 422:8 430:25 432:11,25 440:
20
**years** [66] 18:7,16,19,21 20:22 21:
20 35:3,19 36:20 40:2 47:2,18 49:
5,20,22 50:19 51:16 52:9 53:14,
19 74:10,11 80:7 83:21 86:15 88:
4 89:12 92:1 95:2,7 96:21 114:19
119:9 146:13 148:11 181:1 206:
15 207:19 217:17 222:3,25 223:7,
10 250:24 270:17 274:3 275:4,24
276:9 277:5 278:24 281:25 286:
10 290:21 314:17 317:12 318:10,
17 324:25 326:19 327:12 385:1
408:17 415:18 418:23 441:3
**years'** [1] 26:20

**Z**

**zero** [1] 193:17
**ziegler** [207] 2:7 46:8 154:10,11,18,
23 155:16,20 156:3,10,18,24 157:
3,9,24 158:3,8,14,20 159:2,11,19,
23 160:4,8,12,18,22 161:9,14,19
162:2,6,13,17 163:1,8,16,21 164:1,
17,21 165:3,9,13 166:7,19,23 167:
2,25 168:23 169:4,12,20 170:1,5,9,
14,23 171:6,11,20 172:2,11,16,21
174:8,12,21,25 175:7,18 176:1,5,
12,18,25 177:4,22 178:4,8,14,18,
24 179:10,17,24 180:9,20 181:2,6,
12,17,23 182:3,7,11,15,20 183:4,9,
14,23 184:8,13,18,22 185:5,9,18
186:4,8,13,17,21 187:7,12,18 188:
3,7,14,19,25 189:14,20 190:6,12,
16,23 191:6,10,18,22 192:4,10,14,
22 193:3,14 203:15 256:2,3,14

**257**:20 258:10 259:12,23 260:5,
10,18,23 261:2,11 262:9,17 263:5,
13 264:22 348:12 349:25 350:20
351:21 377:12 378:2,16,21 379:
24 380:5,9,14,22 381:3,16 382:3,
11,17 383:10,16,22 384:2,9,16
385:6,17,21 386:6 400:20 401:4,9,
13,23 402:2,7,11,16,20 403:1,6,13,
22 404:7,12 405:4,22 406:1 436:8,
22

by ETS Inc.

P-20

01036

POMONA VALLEY HOSPITAL MEDICAL CENTER'S (PVHMC) PROCESS OF CAPTURING SSI DAYS FOR MEDICARE DSH REIMBURSEMENT
Refer to I-1 Process Summary, I-2 Legend for further explanations, and I-3 for summary of logics/queries



7/10/2017  5:40 PM

C:\Users\getzoff\AppData\Local\Microsoft\Windows\Temporary Internet
Files\Content.IE5\ZJKLON03\PVHMC%20SSI%20Identification%20Process_2006%20to%202008_PRRB[1]  Flow-Chart

0175

01037

P-24

01057



POMONA VALLEY HOSPITAL
M E D I C A L   C E N T E R
*Expert care with a personal touch*

January 21, 2016

Mr. Tzvi Hefter
TMH Health Policy Consultants, LLC
3110 Shelburne Road
Pikesville, MD 21208

RE:    Medi-Cal SSI aid code verification process and supporting documentation
       Provider No. 05-0231
       FYEs: 2006, 2007, and 2008

Dear Tzvi:

Thank you for assisting our hospital in contacting CMS and we hope, through CMS, the Social Security Administration with respect to our attempt to demonstrate that the hospital's DSH SSI percentage was understated during specified years. This letter describes the method utilized by Pomona Valley Hospital Medical Center (PVHMC) in capturing the Medi-Cal SSI aid codes, specifically 10, 20, and 60, to determine the SSI/SSP recipients for purposes of the DSH SSI numerator calculation.

As background information, we prepared our internal Medicare/Medi-Cal patients with SSI benefits through the usage of the California Medi-Cal SSI aid codes. We then compared our internal SSI file with the patient listing obtained from the CMS SSI Medpar file, and determined the Matched accounts (where CMS and PVHMC both agreed on the SSI days), and the Unmatched accounts (where PVHMC showed more SSI days than CMS). Of the SSI accounts that we matched with the CMS SSI file for the above three years, approximately 97% of the accounts from CMS had the State aid code of 10, 20 or 60. Please see below for the general description of the SSI aid codes:

| Codes | Program/Description per the State of California DHCS Aid Codes Master Chart |
|---|---|
| Aid Codes Captured by PVHMC (& CMS) as SSI per Medi-Cal Program Description | |
| | SSI/SSP Aid to the Aged |
| 10 | (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| | SSI/SSP Aid to the Blind (FFP). |
| 20 | A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| | SSI/SSP Aid to the Disabled |
| 60 | (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |

The Medi-Cal aid codes were obtained from PVHMC billing records. The aid codes are obtained through the Point of Service (POS) Network. The POS Network is used to verify title XIX eligibility and related aid codes for the current month of service and up to 12 previous months. Within the POS Network, the eligibility verification could be accessed through the Automated Eligibility verification system (AEVS), the Internet or State-approved vendor software, such as Health Data Exchange (HDX). Please refer to Exhibit A from the Medi-Cal website www. medi-cal.ca.gov garding the eligibility checking and the POS Network reference. PVHMC uses the HDX to verify di-Cal eligibility, as per our HDX Inquiry policy in Exhibit B. Please see Exhibit C for the HDX site at www.hdx.com

pvhmc.org                                    1798 North Garey Avenue | Pomona, CA 91767 | 909.865.9500

0192

01058

The Medi-Cal aid codes can also be requested in writing through the Medi-Cal Eligibility Division of the Department of Healthcare Services (DHCS). However, due to DHCS' limited resources, we were informed that only 10 accounts could be verified directly by DHCS in this manner (though using the HDX website method also taps into DHCS data).

To demonstrate the validity of the SSI aid codes that we claimed as additional SSI days (labeled as CMS Unmatched in our Medicare/Medi-Cal SSI schedule), we selected sample records and provided the aid code documentation from DHCS and the HDX Eligibility Response printout:

1) We sorted the Unmatched accounts by patient days, from high to low
2) We selected the top 10 Unmatched accounts with the highest patient days, in calendar year 2006, 2007, and 2008. We sent these accounts to DHCS on 12/30/2015 for aid code verification. We have received back 2006, and DHCS informed us that 2007 and 2008 would not be verified, due to the limit of 10 accounts. Please see Exhibit D for the information that we sent to DHCS, the responded DHCS 2006 letter, and subsequent follow-ups for 2007 and 2008. Please note that for 2006, we selected the top 10 accounts with services in 2006, and did not choose any accounts with services in 2005.
3) For 2006, we selected another 20 accounts, randomly choosing every 5th account after the top 10 accounts sent to DHCS. Please see Exhibit E for our sample selections and the related Eligibility Response printout showing the supports for aid codes 10, 20, or 60.
4) For 2007 and 2008, we selected the top 10 accounts that we sent to DHCS and printed out the Eligibility Response as DHCS will not be verifying these. Please Exhibit F and G, respectively.
5) For each of the above year, we included a summary schedule (in Exhibit E, F, and G) of all the SSI days that we identified through the usage of aid codes, separated between CMS Matched and Unmatched. The percentage of the Unmatched is between 34% to 38%.

We strongly believe that the usage of the Medi-Cal aid codes 10, 20 or 60 represent the SSI/SSP status of our Medicare/Medi-Cal patients. We greatly appreciate your advice and assistance in moving this important issue forward. If you have any questions or will need any additional information with which to approach CMS,, please contact me at (909) 865-9844.

Sincerely,

Candice Le-Tran

Candice Le-Tran
Director of Reimbursement & Capitated Systems

Encl.

cc: Laurence Getzoff
    Keith Fontenot
    Stan Rosenstein

N:\REIMB\Appeals\SSI Appeals_Medi-Cal Aid Code process ltrdocx

# HEALTH MANAGEMENT ASSOCIATES

VIA U.S. MAIL & E-MAIL

January 21, 2016

Mr. Marc Hartstein
Hospital and Ambulatory Policy Group
Centers for Medicare and Medicaid Services
7500 Security Blvd.
Windsor Mill, MD  21244-1849

Dear Mr. Hartstein:

I have been retained by Pomona Valley Hospital Medical Center (Pomona) to assist it in connection with PRRB appeals filed by Pomona relating to the calculation of Pomona's "SSI Percentage" and DSH calculation for a series of years, including but not limited to Pomona's fiscal years ending December 31, 2006, 2007 and 2008.  In the course of this engagement, I am being asked by Pomona, among other tasks, to review data relating to the verification of Supplemental Security Income (SSI) and/or State Supplemental Payment (SSP) status of patients treated at Pomona during the 2006 to 2008 period, in order to assist in the identification and verification of the SSI status of hundreds of patients.  It is my understanding that Pomona is contesting the calculation of the SSI Percentage in these years based on the fact, among others, that State records may show a higher percentage of SSI eligible individuals than do the records obtained by Pomona from CMS.

Prior to serving as a consultant with  Healthcare Management Associates (HMA), I worked for approximately 31 years in various administrative positions with the State of California Medicaid program known as "Medi-Cal."  Most pertinently, the Eligibility Division of the Medi-Cal program reported to me for 13 years.  In addition, I worked on the development, implementation and operation of the Medi-Cal eligibility and verification system that was in use during the 2006-2008 timeframe (and is still in use today) and am familiar with that system.  Finally, I served as the Medicaid Director or Assistant Medicaid Director for 13 years, including during the 2006 to 2008 period.

As a result of my experience with and knowledge of the Medi-Cal program and its verification and eligibility systems, I am quite familiar with the types of Medi-Cal verification records being submitted for CMS and SSA review, and believe them to accurately reflect information that was received by the Medi-Cal program directly from the Social Security Administration with regard to program eligibility.  (As you may know, the State of California contracts with SSA to administer benefits both for SSI and SSP recipients, so that benefits are

1215 K STREET, SUITE 1050, SACRAMENTO, CALIFORNIA 95814
TELEPHONE: 916.792.3740 | FAX: 916.446.4220
WWW.HEALTHMANAGEMENT.COM

ATLANTA, GEORGIA • AUSTIN, TEXAS • BOSTON, MASSACHUSETTS • CHICAGO, ILLINOIS • COLUMBUS, OHIO
DENVER, COLORADO • HARRISBURG, PENNSYLVANIA • INDIANAPOLIS, INDIANA • LANSING, MICHIGAN • NEW YORK, NEW YORK
OLYMPIA, WASHINGTON • PORTLAND, OREGON • SACRAMENTO, CALIFORNIA • SAN FRANCISCO, CALIFORNIA
SEATTLE, WASHINGTON • SOUTHERN CALIFORNIA • TALLAHASSEE, FLORIDA • WASHINGTON, DC

1/21/2016
Page 2

combined into one check on a monthly basis for SSI/SSP recipients.) SSA sends the State of California a computer tape of beneficiaries on SSI called the SDX file. This file is processed by DHCS and interfaced with the Medi-Cal Eligibility Data System (MEDS) through the assignment of one of the three aid codes, 10, 20 or 60. MEDS data is the basis for providers to verify Medi-Cal eligibility.

Pomona is submitting to CMS (for ultimate submission to the SSA) two types of Medi-Cal records at this time, as a sample group, to determine whether, in fact, CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years omitted a significant number of days that Pomona believes, based on State Medi-Cal records, constitute days associated with patients who were, at the time of their services, receiving SSI benefits:

First, Pomona is submitting one list verified by Amy Rosenkranz and Manuel Urbina of the Medi-Cal program's Medi-Cal Eligibility Division, "Program Integrity Unit" of the State Department of Health Care Services. These lists are in response to Pomona specifically requesting that Medi-Cal verify the SSI status of ten specific patients from each of the 2006, 2007, and 2008 fiscal years. (Pomona would have preferred to have more patients verified by Medi-Cal, but due to time limitations, the 2006 list was the maximum that Medi-Cal agreed to verify SSI status on.) I am familiar with the work of the Program Integrity Unit -- it is within the Division of Eligibility – and I can verify that the SSI/SSP status information that would have been checked by Program Integrity in response to Pomona's inquiry is information that would have been received by the Medi-Cal program directly from the SSA.

Second, Pomona is submitting three sets (totaling 40 records) of the Medi-Cal on-line Eligibility Response printouts from Medi-Cal Point of Service (POS) Network from its 2006, 2007, and 2008 cost reporting years, to demonstrate that a significant additional percentage of patients from these years were SSI eligible at the time of services. Pomona is submitting 20 Eligibility Response printouts for 2006, 10 printouts for 2007, and 10 printouts for 2008. From my service with Medi-Cal, I know that these reports are the product of an online verification system that was established by the Medi-Cal program to assist providers in determining eligibility of patients and/or prospective patients for Medi-Cal program benefits. These reports also include an indicator regarding each patient's SSI/SSP status through the usage of aid code assignment, specifically 10, 20 or 60. The information regarding SSI/SSP status is obtained by the Medi-Cal program directly from the SSA, for purposes of compiling information regarding Medi-Cal beneficiaries' eligibility. Pomona indicates that it routinely obtains these reports for all Medi-Cal eligible patients at the time of service, which is consistent with my understanding of how the online verification system was designed to function (information is available on a beneficiary month of eligibility basis, based on the month of service, but only for one year). Pomona has asked me to review the SSI patient lists for 2006, 2007, and 2008, DHCS letter verifying the 10 SSI patients from 2006, and sample online Eligibility Reponses printouts reports. Based on my review of the records being submitted to CMS and SSA, I believe that each of the individual patient reports was obtained from the Medi-Cal online verification system, and that each report contains verification of patient SSI/SSP status that was obtained by the Medi-Cal program within roughly 30 days of services date from the Social Security Administration.

0196

01062

1/21/2016
Page 3

      If I can be of any further assistance for purposes of verifying the information being submitted by Pomona at this time, I would be pleased to assist.  Please contact me at (916) 792-3740, e-mail srosenstein@healthmanagement.com.

                  Sincerely,

                  Stan Rosenstein

cc: Tzvi Hefter
    Candice Le-Tran
    Laurence D Getzoff
    Keith Fontenot

P-25

01359

DIANNE FEINSTEIN
CALIFORNIA

SELECT COMMITTEE ON
   INTELLIGENCE – VICE CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND
   ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510–0504
http://feinstein.senate.gov

May 20, 2016

Ms. Christina Walters
Senior Public Affairs Specialist
San Francisco Regional Public Affairs Office
Social Security Administration
1221 Nevin Ave
Richmond, California 94801

Dear Ms. Walters:

    I am writing to bring to your attention a letter from Pomona Valley Hospital regarding their request to have 30 records of SSI patients from 2006-2008 reviewed. Please look into the issues raised, as quickly as possible, so I can appropriately respond to them.

    Attached you will find the enclosures from my constituent to assist you with your review. After you have completed your review, please send your written response to Abby Ellis of my San Francisco office. Ms. Ellis may be contacted by phone at (415) 393-0707, or by fax at (415) 393-0710, if you have any questions.

        Sincerely,

        Dianne Feinstein
        United States Senator

DF:ae

FRESNO OFFICE:
2500 TULARE STREET
SUITE 4290
FRESNO, CA 93721
(559) 485-7430

LOS ANGELES OFFICE:
11111 SANTA MONICA BOULEVARD
SUITE 915
LOS ANGELES, CA 90025
(310) 914-7300

SAN DIEGO OFFICE:
880 FRONT STREET
SUITE 4236
SAN DIEGO, CA 92101
(619) 231-9712

SAN FRANCISCO OFFICE:
ONE POST STREET
SUITE 2450
SAN FRANCISCO, CA 94104
(415) 393-0707

0493

01360

**Please Help Pomona Valley Hospital Medical Center With a Medicare Challenge**
**May 2016**

### Background

The Pomona Valley Hospital Medical Center believes a discrepancy in data used by the Centers for Medicare & Medicaid Services (CMS) led its Medicare disproportionate share hospital payments (Medicare DSH) to be $6 million less than they should have been from 2006 to 2008. Although CMS has agreed to look into this matter, it has not been able to secure the assistance it needs from the Social Security Administration to do so.

### About Pomona Valley Hospital Medical Center

Founded in 1903, the Pomona Valley Hospital Medical Center is a 437-bed acute-care hospital that serves Pomona, Claremont, Chino, Chino Hills, La Verne, Montclair, Ontario, Rancho Cucamonga, Alta Loma, San Dimas, and beyond. Those communities have a large population of low-income residents: 25 percent of the households in the communities the hospital serves have incomes of less than $25,000 a year. In more than half of those households, languages other than English are spoken at home. In 2013, 57 percent of the hospital's patients were insured by Medicaid, 22 percent by Medicare, and four percent were uninsured while only 16 percent had private health insurance.

The hospital and more than 2500 employees respond to the challenges this community poses with a broad range of services, including a busy emergency room (more than 85,000 visits in 2013); Centers of Excellence in cancer and cardiac care; a Primary Stroke Center; a maternity unit that welcomes 7500 babies into the world every year and includes a Level III Neonatal Intensive Care Unit; and an on-site outpatient care pavilion and four satellite outpatient facilities.

### The Challenge

Medicare DSH payments are made only to hospitals like the Pomona Valley Hospital Medical Center that care for especially large numbers of low-income and uninsured inpatients. Without the additional DSH payments, these hospitals would suffer significant losses caring for such patients; Medicare DSH is intended to help lessen those losses. Pomona Valley qualifies for Medicare DSH based on the many Medicaid and Supplemental Security Income (SSI) patients it serves: in 2013, more than half of its patients – 57 percent – were insured by California's Medi-Cal program and another four percent were uninsured.

One of the components in the Medicare DSH formula is the number of days SSI patients spend as inpatients in the hospital. The SSI days figures that CMS used for its 2006-2008 Medicare DSH calculations are based on data furnished to CMS by the Social Security Administration. The hospital has reviewed the SSI data CMS used and compared it to SSI data it received from California's state government and observed discrepancies that suggest the federal data may be incomplete. Pomona Valley is in the process of appealing its 2006, 2007, and 2008 Medicare DSH payments to CMS's Provider Reimbursement Review Board, but final resolution of that appeals process, including appealing the decision to District Court, could take years.

DF - 5/20/16

CMS has agreed to look into this discrepancy since it understands that an administrative resolution of this issue instead of a judicial resolution would be in both the hospital's and the federal government's best interest, saving significant time and resources. CMS has asked the Social Security Administration to examine a sample of just 30 records – ten records for each of the three years in question – to help determine the accuracy of the data provided by the Social Security Administration. Although CMS has made a number of attempts to obtain the Social Security Administration's assistance to resolve this issue, that agency has not yet responded to this request.

**Our Request**

Medicare DSH is an important part of the Pomona Valley Hospital Medical Center's financial foundation, helping the hospital offer an extensive range of high-quality services to a community with significant numbers of low-income and government-insured patients. The hospital's leaders believe that a discrepancy in data between the state and the federal government has led to a $6 million shortfall in its Medicare DSH payments between 2006 and 2008. CMS has graciously agreed to look into this issue – other discrepancies affecting many DSH hospitals have been identified and addressed in the past – and CMS has asked the Social Security Administration to verify a sample of just 30 records to determine whether its database, and that of the state of California, record the same SSI status for these 30 individuals. To date, the Social Security Administration has not responded to this request. Now, Pomona Valley asks the members of its congressional delegation to convey to the Social Security Administration their desire that it comply expeditiously with the CMS request. Resolving this matter quickly and administratively will save the hospital and the federal government the significant time and resources that would be necessary to resolve a lengthy legal appeal.

DF – 5/20/16



## SOCIAL SECURITY

OCT 2 6 2016

Social Security Administration
San Francisco Regional Public Affairs
P.O. Box 4201
Richmond CA  94804

The Honorable Dianne Feinstein
United States Senator
One Post Street, Suite 2450
San Francisco, California 94104

Dear Senator Feinstein:

Thank you for your May 20, 2016, letter on behalf of Pomona Valley Hospital Medical Center
concerning their request to have 30 records of Supplemental Security Income (SSI) patients from
2006-2008 reviewed.

The San Francisco Regional Office investigated Pomona Valley Hospital Medical Center's
concerns and discovered the Centers for Medicare & Medicaid Services (CMS) Headquarters
contacted our Central Office regarding how certain data is populated from Social Security's
(SSA) data sharing agreement (State Exchange Agreement) to the State of California's database.
We reached out to the components involved and determined SSA provided the requested
information to CMS in the spring of this year.   We found no evidence that SSA agreed to review
any Supplemental Security Income (SSI) records related to Pomona Valley Hospital Medical
Center.

The matter that you wrote about is under the jurisdiction of CMS, therefore, it is our
recommendation that Pomona Valley Hospital Medical Center direct their questions to CMS so
that the inquiry can be resolved. Below we are providing you with the contact information for
the individual at CMS who would be best equipped to assist Pomona Valley Hospital Medical
Center with this inquiry.

Emily Lipkin Emily.Lipkin@cms.hhs.gov      Lisa Leong Lisa.Leong@cms.hhs.gov
(410) 786-3633                             (415) 744-3658
7500 Security Blvd                         90 Seventh Street, Suite 5-300 (5W)
Woodlawn MD  21244                         San Francisco CA 94103

Please let us know if we can be of further assistance.

Sincerely,

Patricia Raymond
Regional Communications Director

0496

01363

P-26

01364

DIANNE FEINSTEIN
CALIFORNIA

SELECT COMMITTEE ON INTELLIGENCE - VICE CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION



## United States Senate
WASHINGTON, DC 20510-0504
http://feinstein.senate.gov

October 26, 2016

Carolyn W. Colvin
Acting Commissioner
Social Security Administration
6401 Security Boulevard
Baltimore, MD 21235

Dear Commissioner Colvin:

I write today to request that your agency respond to a request for assistance from Pomona Valley Health Hospital Medical Center based in Pomona, California. It has come to my attention that the Pomona Valley Health Hospital may have been underpaid approximately $6 million under the Medicare Disproportionate Share Hospital Payment formula. In order to verify its concerns, the hospital requested that the Social Security Administration assist with its case in January of this year. The hospital has not received a response from your agency and I would like to request your assistance in resolving this issue.

Pomona Valley Health Hospital Medical Center is a non-profit health care provider that serves thousands of East Los Angeles and San Bernardino County residents each year. The majority of the hospital's patients are low-income and are medically underserved. More than 57 percent of patients are insured by Medicaid, while an additional four percent have no health insurance at all. The hospital assists a diverse socioeconomic and ethnic population, and it is crucial that it receive the appropriate reimbursement level to provide quality healthcare to the communities it serves.

Under the Medicare Disproportionate Share Hospital payment formula, a hospital is paid for the number of days that Supplemental Security Insurance (SSI) patients are treated in its facilities. Pomona Valley Hospital reviewed the number of SSI days it was paid for from 2006 to 2008 and found that the State of California's Social Security records indicate that the hospital served a much higher proportion of SSI patients than it was paid for. This discrepancy indicates that the State of California's Social Security records and the Centers for Medicare and Medicaid's Social Security records are different. Due this potential discrepancy, the hospital's administrators believe that it was

underpaid $6 million under the Medicare Disproportionate Share Hospital Payment formula and are appealing the reimbursement amount at a hearing in January 2017.

Recognizing that the State's data may not be up to date, in January 2016 the hospital reached out to you to verify the accuracy of its findings by reviewing a sample of ten patient cases from each of the years in question. The hospital has since followed up with your department and the Centers for Medicare and Medicaid Services numerous times to no avail.

In addition, staff in my San Francisco and Los Angeles offices have attempted repeatedly to gain information about the request but have not been able to learn anything of use. I encourage your administration to make every effort to thoroughly review the hospital's request and reply as soon as possible in writing.

Ensuring that the underserved in California have access to quality healthcare is one of my top priorities and it is imperative that we support local efforts to serve communities in need.

I look forward to hearing your response because this is an issue of great importance to me. Thank you for giving this request every consideration.

Sincerely,

Dianne Feinstein
United States Senator

DF/as

DF - 10\26\16

0498

01366

DIANNE FEINSTEIN
CALIFORNIA

COMMITTEE ON THE JUDICIARY
– RANKING MEMBER
SELECT COMMITTEE ON
INTELLIGENCE
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON RULES AND
ADMINISTRATION

## United States Senate

WASHINGTON, DC 20510–0504
http://feinstein.senate.gov

May 19, 2017

Seema Verma
Administrator
Centers for Medicare and Medicaid Services
Hubert H. Humphrey Building
200 Independence Avenue, SW, Room 445-G
Washington, D.C. 20201

Nancy Berryhill
Acting Commissioner
Social Security Administration
2100 M Street, NW
Washington, DC 20037

Dear Administrator Verma and Acting Commissioner Berryhill:

Since May of 2016, my office has been working with staff in both of your
departments to resolve an issue concerning Pomona Valley Health Hospital
Medical Center in Southern California.  For context, officials from Pomona Valley
Health Hospital believe that the hospital was underpaid approximately $6 million
under the Medicare Disproportionate Share Hospital Payment formula.  In order to
address this issue, the hospital requested that the Social Security Administration
(SSA) and the Centers for Medicare and Medicaid (CMS) verify the hospital's
payment discrepancy in January of 2016. To date, neither the hospital nor my
office has received a satisfactory response to this request.

Staff in my Washington D.C., San Francisco, and Los Angeles offices have had
numerous communications with both Social Security Administration and Centers
for Medicare and Medicaid Services staff. Over the course of e-mails and phone
calls, I understand that your departments have provided, at times, conflicting
reasons as to why the agencies could not assist Pomona hospital. In December of
2016, staff from my office, SSA, and CMS held a conference call to determine
why there was a significant delay in the agencies' response time. While no
resolution was reached, both departments agreed to put in writing their response to

the hospital's request; an official explanation of their response; and a history of the issue for my office's records. To date, my office has not received any of the promised documents despite numerous assurances from SSA and CMS.

Based on conversations my staff has had with SSA and CMS, it is my understanding that neither department is legally restricted from working together to provide the hospital with the information it needs. The departments' reluctance to provide an explanation in writing is highly concerning and irregular.

I ask that you carefully examine this issue and provide a prompt response. I am deeply frustrated by the lack of a clear and effective response from both the Social Security Administration and the Centers for Medicare and Medicaid Services. Please take urgent action to resolve this issue quickly.

I look forward to receiving your responses in writing.

Sincerely,

Dianne Feinstein
United States Senator

DF - 5|19|17

0500

01368

P-27

**PVHMC**

**Summary of SSI Days by aid code for Position Paper**

**PVHMC FYE: 12/31/2006**

**Federal Fiscal Year:  10/1/2005 - 9/30/2006 SSI data**

For EXHIBIT E  (T. Hefter package)

Values

| Matched | Aid Cd | Patient count | Pt Count Mix | Total PVHMC Days (LOS) | CMS Medicare Days | CMS SSI Days | Total PVHMC SSI Days |
|---|---|---|---|---|---|---|---|
| **CMS Matched** | 10 | 313 | 27.72% | 1,978 | 1,965 | 1,978 | 1,978 |
| | 14 | 3 | 0.27% | 8 | 8 | 8 | 8 |
| | 1E | 2 | 0.18% | 20 | 20 | 20 | 20 |
| | 20 | 21 | 1.86% | 340 | 293 | 340 | 340 |
| | 60 | 382 | 33.84% | 2,245 | 2,171 | 2,245 | 2,245 |
| | 64 | 5 | 0.44% | 24 | 24 | 24 | 24 |
| | 6E | 3 | 0.27% | 40 | 40 | 40 | 40 |
| | (blank) | 19 | 1.68% | 166 | 135 | 147 | 147 |
| **CMS Matched Total** | | 748 | 66.25% | 4,821 | 4,656 | 4,802 | 4,802 |
| **CMS Partial Matched** | 10 | 2 | 0.18% | 23 | 23 | 6 | 23 |
| | 60 | 6 | 0.53% | 103 | 100 | 78 | 103 |
| **CMS Partial Matched Total** | | 8 | 0.71% | 126 | 123 | 84 | 126 |
| **CMS Unmatched** | 10 | 133 | 11.78% | 727 | 646 | 0 | 727 |
| | 20 | 15 | 1.33% | 123 | 123 | 0 | 123 |
| | 60 | 225 | 19.93% | 1,204 | 1,146 | 0 | 1,204 |
| **CMS Unmatched Total** | | 373 | 33.04% | 2,054 | 1,915 | 0 | 2,054 |
| **Grand Total** | | 1,129 | 100.00% | 7,001 | 6,694 | 4,886 | 6,982 |

PVHMC   \

Legend of California Aid Codes captured as SSI

| Code | Program/Description per the State of California DHCS Aid Codes Master Chart |
|------|---------------------------------------------------------------------------|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Medi-Cal Program Description** | |
| 10 | SSI/SSP Aid to the Aged (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| 20 | SSI/SSP Aid to the Blind (FFP). A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| 60 | SSI/SSP Aid to the Disabled (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | |
| 14 | Aid to the Aged - Medically Needy (FFP). Covers persons 65 years of age or older who do not wish or are not eligible for a cash grant, but are eligible for Medi-Cal only. |
| 1E, 6E | Continued eligibility for the Aged (1E) (FFP) or Disabled (6E), Covers former SSI beneficiaries who are Aged (with exception of persons who are deceased or incarcerated in a correctional facility) until the county predetermines their eligibility. |
| 64 | Aid to the Disabled û Medically Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| Blank | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

01371

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2006 | | | | | |
| 3 | | | | | | |
| 4 | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published Data |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,803 | 4,886 | 4,886 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 179 | | |
| 8 | Less: Estimate of State SSP only days & Note B below | | | 0% | | |
| 9 | Total Federal Medicare SSI days | | | 6,982 | 4,886 | 4,886 |
| 10 | Total Medicare Days Part A & C per CMS MedPar data (2) | | | 32,371 | 32,371 | 33,149 |
| 11 | SSI Percentage per PVHMC | | | 21.57% | 15.09% | 14.740% |
| 12 | Published SSI % per CMS | | | 14.740% | | |
| 13 | SSI Percent Difference | | | 6.83% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 5.63% | | |
| 16 | PVHMC 2006 Federal specific Payment per Audited PS&R dated 11/29/2010 | | | 28,271,966 | | |
| 17 | Increase in SSI Reimbursement | | | $    1,592,863 | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C | | | | | |
| 21 | in SSI factor is already in a separate appeal Issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI. Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

01372

PVHMC
Summary of SSI Days by Aid Code for Position Paper
FFY 2007

Filter for Aid Code with SSI Days & tie to summary SSI Days on S-1, from linked main data

| Submission | TRUE |
|---|---|

| Matched | Aid Cd | Count of PT_NO_WSCD | Sum of DAYS_STAY | Mix of Days | Sum of CMS MCare Days | Sum of CMS SSI Days | Sum of SSI MCare per PVHMC | Sum of SSI MCareHMO per PVHMC | Sum of SSI Total per PVHMC |
|---|---|---|---|---|---|---|---|---|---|
| CMS Matched | 10 | 336 | 1,903 | 28.51% | 1,890 | 1,903 | 1,821 | 82 | 1,903 |
| | 14 | 1 | 4 | 0.06% | 4 | 4 | 4 | 0 | 4 |
| | 20 | 19 | 123 | 1.84% | 123 | 123 | 122 | 1 | 123 |
| | 60 | 382 | 1,977 | 29.62% | 1,889 | 1,967 | 1,905 | 62 | 1,967 |
| | 64 | 4 | 20 | 0.30% | 20 | 20 | 20 | 0 | 20 |
| | (blank) | 1 | 7 | 0.10% | 7 | 7 | 7 | 0 | 7 |
| | | 14 | 94 | 1.41% | 74 | 94 | 94 | 0 | 94 |
| CMS Matched Total | | 757 | 4,128 | 61.84% | 4,007 | 4,118 | 3,973 | 145 | 4,118 |
| CMS Unmatched | 10 | 171 | 965 | 14.46% | 954 | 0 | 808 | 157 | 965 |
| | 20 | 10 | 32 | 0.48% | 30 | 0 | 30 | 2 | 32 |
| | 60 | 256 | 1,505 | 22.55% | 1,461 | 0 | 1,464 | 41 | 1,505 |
| CMS Unmatched Total | | 437 | 2,502 | 37.48% | 2,445 | 0 | 2,302 | 200 | 2,502 |
| CMS Partial Ma | 10 | 1 | 20 | 0.30% | 19 | 19 | 20 | 0 | 20 |
| | 60 | 2 | 25 | 0.37% | 25 | 16 | 25 | 0 | 25 |
| CMS Partial Match Total | | 3 | 45 | 0.67% | 44 | 35 | 45 | 0 | 45 |
| Grand Total | | 1,197 | 6,675 | 100.00% | 6,496 | 4,153 | 6,320 | 345 | 6,665 |

01387

|   | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2007 (SSI = FFY 2007) | | | | | |
| 3 | | | | | | |
| 4 | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare Part A & C | CMS Published (3/19/2012) Data - FFY 2007 |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,320 | 4,153 | 4,153 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 345 | | |
| 8 | Less: Estimate of State SSP only days & Note B below | | | 0% | | |
| 9 | Total Federal Medicare SSI days | | | 6,665 | 4,153 | 4153 |
| 10 | Total Medicare Days Part A & C per CMS MedPar data (2) | | | 27,538 | 27,538 | 28,188 |
| 11 | SSI Percentage per PVHMC | | | 24.20% | 15.08% | 14.733% |
| 12 | Published SSI % per CMS | | | 14.733% | | |
| 13 | SSI Percent Difference | | | 9.47% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 7.81% | | |
| 16 | PVHMC Federal specific Payment per Audited PS&R dated 7/28/11 for FYE 2007 | | | 28,828,953 | | |
| 17 | Increase in SSI Reimbursement | | | $ 2,252,263 | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C | | | | | |
| 21 | in SSI factor is already in a separate appeal issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI. Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

01388

PVHMC                       FYE: 2007 (SSI = FFY 2007)

Legend of Aid Codes captured as SSI

| Code | Benefits | SOC | Program/Description |
|------|----------|-----|---------------------|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Program Description** | | | |
| | | | SSI/SSP Aid to the Aged |
| 10 | Full | No | (FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| | | | SSI/SSP Aid to the Blind (FFP). |
| 20 | Full | No | A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| | | | SSI/SSP Aid to the Disabled |
| 60 | Full | No | (FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | | | |
| | | | Aid to the Aged - Medically Needy (FFP). Covers persons |
| 14 | Full | No | 65 years of age or older who do not wish or are not eligible for a cash grant, but are eligible for Medi-Cal only. |
| | | | Aid to the Disabled û Medically |
| 64 | Full | No | Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| Blank | | | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

0520

01389

PVHMC
**Summary of SSI Days by Aid Code for Position Paper**
FFY 2008

| Submission | TRUE |
|---|---|

| Matched | Aid Cd | Values Count of PT_NO_WSCD | Sum of DAYS_STAY | Mix of Days | Sum of CMS MCare Days | Sum of CMS SSI Days | Sum of SSI MCare per PVHMC | Sum of SSI Mcare HMO per PVHMC | Sum of SSI Total per PVHMC |
|---|---|---|---|---|---|---|---|---|---|
| CMS Matched | 10 | 338 | 1,818 | 27.20% | 1,805 | 1,805 | 1,672 | 133 | 1,805 |
| | 13 | 1 | 8 | 0.12% | 8 | 8 | 8 | 0 | 8 |
| | 1E | 1 | 5 | 0.07% | 5 | 5 | 5 | 0 | 5 |
| | 20 | 17 | 136 | 2.04% | 136 | 136 | 131 | 5 | 136 |
| | 3N | 1 | 4 | 0.06% | 4 | 4 | 4 | 0 | 4 |
| | 60 | 357 | 2,220 | 33.22% | 2,148 | 2,148 | 2,055 | 93 | 2,148 |
| | 63 | 1 | 4 | 0.06% | 4 | 1 | 1 | 0 | 1 |
| | 64 | 1 | 9 | 0.13% | 9 | 9 | 9 | 0 | 9 |
| | 80 | 1 | 3 | 0.04% | 3 | 3 | 3 | 0 | 3 |
| | | 11 | 55 | 0.82% | 55 | 55 | 50 | 5 | 55 |
| CMS Matched Total | | 729 | 4,262 | 63.77% | 4,177 | 4,174 | 3,938 | 236 | 4,174 |
| CMS Unmatched | 10 | 147 | 849 | 12.70% | 821 | 0 | 718 | 131 | 849 |
| | 20 | 15 | 65 | 0.97% | 63 | 0 | 61 | 4 | 65 |
| | 60 | 247 | 1,416 | 21.19% | 1,396 | 0 | 1,359 | 57 | 1,416 |
| CMS Unmatched Total | | 409 | 2,330 | 34.86% | 2,280 | 0 | 2,138 | 192 | 2,330 |
| CMS Partial Ma | 10 | 5 | 36 | 0.54% | 31 | 31 | 36 | 0 | 36 |
| | 60 | 5 | 55 | 0.82% | 52 | 33 | 55 | 0 | 55 |
| CMS Partial Match Total | | 10 | 91 | 1.36% | 83 | 64 | 91 | 0 | 91 |
| Grand Total | | 1,148 | 6,683 | 100.00% | 6,540 | 4,238 | 6,167 | 428 | 6,595 |

N:\SSI Data\2008\FFY 2008 PVHMC SSI[S-4_SSI By AC]
7/10/2017 12:18 PM

01404

| | A | B | C | D | E | F |
|---|---|---|---|---|---|---|
| 1 | PVHMC | | | | | |
| 2 | FYE: 2008 (SSI = FFY 2008) | | | | | |
| 3 | | | | | | |
| 4 | | Summary SSI Data Integrity Impact Calculation SSI data - Appeal Issue One | | | | |
| 5 | | | | SSI Per PVHMC Analysis with Medicare Part A & C | Per CMS DSH MedPar Patient Detail with Medicare | CMS Published (3/19/2012) Data - FFY 2008 |
| 6 | SSI and Medicare Days per PVHMC Listing - Part A (1) | | | 6,167 | 4,238 | 4,235 |
| 7 | SSI and Medicare Days per PVHMC Listing - Part C (1) | | | 428 | | |
| 8 | Less: Estimate of State SSP only days  & Note B below | | | 0% | | |
| 9 | Total Federal Medicare SSI days | | | 6,595 | 4,238 | 4,235 |
| 10 | Total Medicare Days Part A & C per CMS MedPar data (2) | | | 28,768 | 28,768 | 29,404 |
| 11 | SSI Percentage per PVHMC | | | 22.92% | 14.73% | 14.403% |
| 12 | Published SSI % per CMS | | | 14.403% | | |
| 13 | SSI Percent Difference | | | 8.52% | | |
| 14 | DSH Formula's Multiplier | | | 82.50% | | |
| 15 | SSI Incremental Difference | | | 7.03% | | |
| 16 | PVHMC Federal specific Payment per Audited PS&R dated 2/23/12 (FYE 2008) | | | 31,693,675 | | |
| 17 | Increase in SSI Reimbursement | | | $ 2,228,264.87 | | |
| 18 | | | | | | |
| 19 | (1) Mainly based on Aid Codes 10, 20, 60 which are consistent with CMS Medpar SSI patient details | | | | | |
| 20 | (2) For purposes of SSI data integrity impact calculation, we will use the denominator with both Part A & C days, as Part C in | | | | | |
| 21 | SSI factor is already in a separate appeal issue | | | | | |
| 22 | | | | | | |
| 23 | Note B: Per various research and DHCS' email confirmation from Medi-Cal Eligibility Branch on 10/27/15 , Aid Codes 10,20, and 60 are all Federal SSI.  Therefore, we do not need to estimate for State only SSP. | | | | | |
| 24 | | | | | | |
| 25 | | | | | | |

01405

PVHMC                        FYE: 2008 (SSI = FFY 2008)

Legend of Aid Codes captured as SSI

| Code | Benefits | SOC | Program/Description |
|------|----------|-----|---------------------|
| **Aid Codes Captured by PVHMC (& CMS) as SSI per Program Description** | | | |
| 10 | Full | No | SSI/SSP Aid to the Aged<br>(FFP). A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older. |
| 20 | Full | No | SSI/SSP Aid to the Blind (FFP).<br>A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age. |
| 60 | Full | No | SSI/SSP Aid to the Disabled<br>(FFP). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability. |
| **Aid Codes Assigned to CMS SSI Beneficiaries Days in CMS SSI DUA Data File (Claimed by PVHMC):** | | | |
| 13 | Full | Y/N | Aid to the Aged - LTC (FFP)<br>Covers persons 65 years of age or older who are medically needy and in LTC status |
| 1E | Full | No | Continued eligibility for the<br>Aged (FFP). Covers former SSI beneficiaries who are Aged (with exception of persons who are deceased or incarcerated in a correctional facility) until the county predetermines their eligibility. |
| 3N | Full | No | Aid to Families with Dependent<br>Children (AFDC) - 1931(b) Non-CalWORKs |
| 63 | Full | Y/N | Aid to the Disabled - LTC Status (FFP). Covers persons<br>who meet the federal definition<br>of disability who are medically needy and in LTC status. |
| 64 | Full | No | Aid to the Disabled - Medically<br>Needy (FFP). Covers persons who meet the federal definition of disability and do not wish or are not eligible for cash grant, but are eligible for Medi-Cal only. |
| 80 | Restricted to Medicare expenses | No | Qualified Medicare Beneficiary<br>(QMB). Provides payment of Medicare Part A premium and Part A and B coinsurance and deductibles for eligible low income aged, blind, or disabled individuals. |
| Blank | | | Accounts identified as SSI by CMS MedPar file where PVHMC internal aid code is not available. |

Source: DHCS Aid Codes Master Chart

0537

01406

P-30

| From: | Laurence D. Getzoff |
|---|---|
| To: | "lisa.leong@cms.hhs.gov" |
| Cc: | "amanda_sadra@feinstein.senate.gov"; Candice LeTran |
| Subject: | SSA-Pomona Valley Hospital |
| Date: | Friday, October 28, 2016 3:32:20 PM |
| Attachments: | SSA-Pomona Valley Hospital.pdf |

Ms. Leong:

Attached is a letter from Senator Feinstein's office to the Social Security Administration, that will provide further background.  We appreciate your help on this.

*Laurence Getzoff*
lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

| | |
|---|---|
| **From:** | Sadra, Amanda (Feinstein) |
| **To:** | Candice LeTran |
| **Subject:** | RE: PVHMC 2006-2008 SSI Data verification with SSA |
| **Date:** | Tuesday, October 11, 2016 4:34:38 PM |

Hey Candice,

I had a chance to speak with the folks at SSA and they were not able to give me an answer, as we had hoped. I just received the all clear to draft a letter on behalf of the Senator and I will let you know once it is sent out.

Thanks for checking in! Hopefully we will have a response ASAP.

-Amanda

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Tuesday, October 11, 2016 9:45 AM
**To:** Sadra, Amanda (Feinstein) <Amanda_Sadra@feinstein.senate.gov>
**Subject:** RE: PVHMC 2006-2008 SSI Data verification with SSA

Hi Amanda,
I am checking in to see the progress from your offices in getting a response from SSA to review our 30 records. If Sen. Feinstein had sent out a letter to SSA on our behalf, please give me a copy as this is a valuable document for our January hearing with the PRRB in Baltimore. Please advise and let me know if you need additional information. Thank you.


Candice Le-Tran
Director of Regulatory Reimbursement & Analytics
Pomona Valley Hospital Medical Center
Office: 909-865-9844


**From:** Candice LeTran
**Sent:** Friday, September 30, 2016 3:18 PM
**To:** Sadra, Amanda (Feinstein)
**Subject:** PVHMC 2006-2008 SSI Data verification with SSA

Hi Amanda,
Thank you so much for meeting with me in person in regards to the above issue. The full name for the PRRB is Provider Review Reimbursement Board, and we are scheduled for a hearing with the Board in January 2017 to present and defend our case. We greatly appreciate your and Sen. Feinstein's assistance in asking SSA to review the 30 records. Please let me know if there is anything else that you need on this issue.

Have a great weekend & thank you.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics
Pomona Valley Hospital Medical Center
Office: 909-865-9844

The information contained in this transmission may contain privileged and confidential
information, including patient information protected by federal and state privacy laws. It is
intended only for the use of the person(s) named above. If you are not the intended recipient, you
are hereby notified that any review, dissemination, distribution, or duplication of this
communication is strictly prohibited. If you are not the intended recipient, please contact the
sender by reply email and destroy all copies of the original message.

01432

| From: | Laurence D. Getzoff |
|---|---|
| To: | "lisa.leong@cms.hhs.gov" |
| Cc: | "amanda_sadra@feinstein.senate.gov"; Candice LeTran |
| Subject: | 102616- Letter from Senator Feinstein to Acting Commissioner Carolyn Col... |
| Date: | Friday, October 28, 2016 3:34:03 PM |
| Attachments: | 102616- Letter from Senator Feinstein to Acting Commissioner Carolyn Col....pdf |

Ms. Leong:

Attached is one final document, a letter from Senator Feinstein to the Acting Director of the Social
Security Administration.

> *Laurence Getzoff*
> lgetzoff@health-law.com
> **HOOPER, LUNDY & BOOKMAN, P.C.**
> 1875 Century Park East
> Suite 1600
> Los Angeles, CA 90067
> Tel 310.551.8190
> Fax 310.551.8181
> The contents of this e-mail message, including any attachments, are intended solely for the
> use of the person or entity to whom the e-mail was addressed. It contains information that may
> be protected by the attorney-client privilege, work-product doctrine, or other privileges, and
> may be restricted from disclosure by applicable state and federal law. If you are not the
> intended recipient of this message, be advised that any dissemination, distribution, or use of
> the contents of this message is strictly prohibited. If you have received this message in error,
> or are not the named recipient(s), please notify the sender immediately by reply e-mail or by
> phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

| From: | Candice LeTran |
|---|---|
| To: | Sadra, Amanda (Feinstein) |
| Subject: | 30 SSI records with SSA |
| Date: | Wednesday, November 02, 2016 9:21:00 AM |

Hi Amanda,
I am checking in to ensure that you received the email the Larry Getzoff sent on Friday to Lisa
Leong on the 30 SSI records. It went secured, and I have re-attached the body below in blue.

Please keep me posted with your progress with SSA, and they offered a turn-around time for this
review, as we still need to prepare for our Board hearing in January if this can't be settled with
CMS soon.

Please let me know if I can do anything, and we greatly appreciate the attention that you put in on
this matter.

Candice Le-Tran
Office: 909-865-9844


From: Laurence D. Getzoff
To: 'lisa.leong@cms.hhs.gov'
Cc: 'amanda_sadra@feinstein.senate.gov', 'Candice LeTran'
Sent: Friday, October 28, 2016 3:28:44 PM

   Attachments: PVHMC SSI 30 samples_for SSA Verification_06 to 08.pdf

Ms. Leong:
Our Firm is counsel to Pomona Valley Hospital Medical Center. On behalf of the
hospital, I am forwarding securely to you a list of thirty (30) patients, their
accounts and claims. If she has not already done so, Amanda Sadra, of Senator
Dianne Feinstein's Office, will contact you to explain why we are involving you
in this process, and to discuss some of the background supporting this request.
I am also available to discuss the circumstances of our request with you.

In brief summary, we have been attempting, with the blessing of CMS, to resolve
a reimbursement matter involving the "SSI Percentage" of the Disproportionate
Share Hospital ("DSH") calculation for three of Pomona's fiscal years. Because
California State generated data and CMS generated data do not necessarily agree
on the SSI status of individual patients at the times they received hospital
services, the hospital has been trying to find a way to have the Social Security
Administration verify, one way or the other, the SSI status of a small sample of
patient accounts.

Ten patient accounts from each of the years at issue, 2006, 2007 and 2008, were
selected, and are included on the attached list. With the extremely diligent

assistance of Senator Feinstein's office, after several months, the Social
Security Administration has agreed to review these 30 accounts, to verify
whether these patients had or did not have SSI benefits covering the time they
received services, and to advise the parties regarding the findings. The SSA,
however, has advised Senator Feinstein's office that it will review and report
on these 30 accounts only if it can receive the listing from CMS, and to return
the results to CMS (for discussion with the hospital). The SSA representative
who has been corresponding with Senator Feinstein's office identified you as a
CMS representative with whom to discuss this matter; therefore, we are
requesting, along with Senator Feinstein's office, that you assist us in
providing the information to the SSA, and then agree to receive the results of
the SSA review.

For your convenience, I will also send you (by separate email outside of the
"secure" environment) two letters from Senator Feinstein to the SSA, which will
provide you additional background, should you want and/or need it.

We very much appreciate your talking to Amanda Sadra of the Senator's office, as
well as your sending the attached listing to the SSA for review.

If you have any questions of me, please do not hesitate to call me at
310-551-8190. Thank you, once again, for your help.

Laurence Getzoff
lgetzoff@health-law.com
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181

0563

01435

| From: | Laurence D. Getzoff |
| To: | Candice LeTran |
| Subject: | FW: Pomona Valley Hospital Medical Center |
| Date: | Thursday, November 03, 2016 3:02:11 PM |

FYI.

## Laurence Getzoff

lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

**From:** Leong, Lisa (CMS/CFMFFSO) [mailto:Lisa.Leong@cms.hhs.gov]
**Sent:** Thursday, November 03, 2016 2:36 PM
**To:** Laurence D. Getzoff
**Cc:** 'amanda_sadra@feinstein.senate.gov'
**Subject:** RE: Pomona Valley Hospital Medical Center

Mr. Getzoff,

I've been sick and have been out of the office. I am confirming receipt of your email.

Thank you,

Lisa

Lisa Leong
Division of Medicare Financial Management & Fee for Service Operations
Centers for Medicare and Medicaid Services
90 7th Street, Suite 5-300 (5W)
San Francisco, CA 94103-6707
Telephone: 415-744-3669
Fax: 415-744-2706
email: lisa.leong@cms.hhs.gov

**From:** Laurence D. Getzoff [mailto:LGETZOFF@HEALTH-LAW.COM]
**Sent:** Thursday, November 3, 2016 12:01 PM
**To:** Leong, Lisa (CMS/CFMFFSO) <Lisa.Leong@cms.hhs.gov>

**Cc:** 'amanda_sadra@feinstein.senate.gov' <amanda_sadra@feinstein.senate.gov>
**Subject:** Pomona Valley Hospital Medical Center

Ms. Leong:

Last Friday afternoon, I sent you a short explanation of an issue involving some data that Senator Feinstein's office had arranged to be reviewed by the Social Security Administration, but which the SSA had asked us to have CMS send directly to them. Amanda Sadra of Senator Feinstein's California Field Office was coordinating this process on behalf of the Senator. Ms. Sadra was going to coordinate with you further.

As I did not receive a bounce back to any of the three emails I sent to you (or Ms. Sadra), I am assuming the emails were received and that the data will be forwarded to the SSA. However, I have received no confirmation from you or acknowledgment of receipt. Given the nature of the data (involving a limited number of patient names), and even though the data was sent through our secure system, I would like to at least receive a confirmation that you received the emails and data, and that you have been in touch with Ms. Sadra. The SSA's review of the 30 patient accounts also is time sensitive, so we want to make certain at this time that everyone has what they need, and that the review by SSA is being facilitated. There is no "work" on this that CMS has to do at this point to my knowledge, other than facilitating the SSA's review of the small number of patient accounts for determination of SSI status.

Thank you for your assistance in this matter. We appreciate it.

*Laurence Getzoff*
lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

Filtered by 3BClean from http://www.microsystems.com

0565

01437

**From:** Laurence D. Getzoff
**To:** Candice LeTran
**Subject:** FW: Pomona Valley Hospital Medical Center
**Date:** Thursday, November 03, 2016 3:02:31 PM

FYI

### *Laurence Getzoff*

lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

**From:** Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
**Sent:** Thursday, November 03, 2016 2:49 PM
**To:** Laurence D. Getzoff
**Subject:** Re: Pomona Valley Hospital Medical Center

Laurence,

Talking to CMS tomorrow at 8.

Will update soon.

-Amanda

Sent from my iPhone

On Nov 3, 2016, at 12:01 PM, Laurence D. Getzoff <LGETZOFF@HEALTH-LAW.COM> wrote:

> Ms. Leong:
>
> Last Friday afternoon, I sent you a short explanation of an issue involving some data that Senator Feinstein's office had arranged to be reviewed by the Social Security Administration, but which the SSA had asked us to have CMS send directly to them. Amanda Sadra of Senator Feinstein's California Field Office was coordinating this process on behalf of the Senator. Ms. Sadra was going to coordinate with you further.

As I did not receive a bounce back to any of the three emails I sent to you (or Ms. Sadra), I am assuming the emails were received and that the data will be forwarded to the SSA. However, I have received no confirmation from you or acknowledgment of receipt. Given the nature of the data (involving a limited number of patient names), and even though the data was sent through our secure system, I would like to at least receive a confirmation that you received the emails and data, and that you have been in touch with Ms. Sadra. The SSA's review of the 30 patient accounts also is time sensitive, so we want to make certain at this time that everyone has what they need, and that the review by SSA is being facilitated. There is no "work" on this that CMS has to do at this point to my knowledge, other than facilitating the SSA's review of the small number of patient accounts for determination of SSI status.

Thank you for your assistance in this matter. We appreciate it.

*Laurence Getzoff*
lgetzoff@health-law.com
**HOOPER, LUNDY & BOOKMAN, P.C.**
1875 Century Park East
Suite 1600
Los Angeles, CA 90067
Tel 310.551.8190
Fax 310.551.8181
The contents of this e-mail message, including any attachments, are intended solely for the use of the person or entity to whom the e-mail was addressed. It contains information that may be protected by the attorney-client privilege, work-product doctrine, or other privileges, and may be restricted from disclosure by applicable state and federal law. If you are not the intended recipient of this message, be advised that any dissemination, distribution, or use of the contents of this message is strictly prohibited. If you have received this message in error, or are not the named recipient(s), please notify the sender immediately by reply e-mail or by phone at (310) 551-8190 and delete this message from your computer. Thank you.

Filtered by 3BClean from http://www.microsystems.com

Filtered by 3BClean from http://www.microsystems.com

0567

01439

**From:**    Laurence D. Getzoff
**To:**    "lisa.leong@cms.hhs.gov"
**Cc:**    "amanda_sadra@feinstein.senate.gov"; Candice LeTran
**Subject:**    PVHMC SSI 30 samples_for SSA Verification_06 to 08
**Date:**    Friday, October 28, 2016 3:28:53 PM
**Attachments:**    SecureMessageAtt.html

 

This is a secure, encrypted message.
To read it, open the attachment contained with this email
Or alternatively you can used this provided link to "pick up" your email & attachment(s).
Please be aware this "pickup" will expire.... but the attachement will remain within this email

Click here within 4 days of receiving the message for web "pickup"

More Info

0568

01440

| From: | Candice LeTran |
|---|---|
| To: | "Sadra, Amanda (Feinstein)" |
| Cc: | lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us) |
| Subject: | RE: Pomona Valley Hospital SSI data - Status (30 records)? |
| Date: | Tuesday, December 06, 2016 4:06:00 PM |

Hi Amanda,
I am checking in again.  Please give us an update on what SSA said from your call with them last week
- did they give you an estimate of when they would have the results?  Thank you.

Candice Le-Tran
Office: 909-865-9844

-----Original Message-----
From: Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
Sent: Wednesday, November 30, 2016 12:04 PM
To: Candice LeTran
Cc: lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us)
Subject: RE: Pomona Valley Hospital SSI data - Status?

Hi Candice,

I have a call scheduled with SSA tomorrow at 1pm. I'll let you know what they tell me.


Amanda Sadra
Field Representative | U.S. Senator Dianne Feinstein
11111 Santa Monica Boulevard, Suite 915
Los Angeles, CA 90025 | (310) 914-7300


-----Original Message-----
From: Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
Sent: Wednesday, November 30, 2016 11:54 AM
To: Sadra, Amanda (Feinstein) <Amanda_Sadra@feinstein.senate.gov>
Cc: lgetzoff@health-law.com; Kate Finkelstein (kate@debrunner.us) <kate@debrunner.us>
Subject: RE: Pomona Valley Hospital SSI data - Status?

Hi Amanda,
I am checking in for an update, as you are aware time is of the essence to us.  Quick recap, we sent
the 30 sample SSI records to CMS San Francisco office on 10/28/16, and CMS did confirm receipt of
these records.  CMS and SSA were going to coordinate to review these records .  My estimate is each
record should not take more than 1-2 minutes to look up as SSA simply needs to validate if the
reported aid code is Federal or not.

We greatly appreciate your assistance on this issue, and look forward to hearing back with some SSA
updates.  Thank you.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics Pomona Valley Hospital Medical Center
Office: 909-865-9844

-----Original Message-----
From: Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
Sent: Monday, November 21, 2016 9:26 AM
To: Candice LeTran

Cc: lgetzoff@health-law.com
Subject: Re: Pomona Valley Hospital SSI data - Update

I asked for an update last week but have not heard back. I will follow-up again today.

Sent from my IPhone

> On Nov 21, 2016, at 8:58 AM, Candice LeTran <Candice.LeTran@pvhmc.org> wrote:
>
> Hi Amanda,
> I am checking in to see if SSA had received our 30 records from CMS, and if an estimated turnaround time was given, so that we can plan for our January hearing in Baltimore.  Thank you for your help.
>
> Candice Le-Tran
> Office: 909-865-9844
>
> -----Original Message-----
> From: Sadra, Amanda (Feinstein)
> [mailto:Amanda_Sadra@feinstein.senate.gov]
> Sent: Tuesday, November 08, 2016 2:32 PM
> To: Candice LeTran
> Subject: Update
>
> Candice,
>
> Please share this with the team:
>
> We have elevated this issue to the highest levels of CMS and SSA. We seem to have two willing agencies, who aren't speaking to each other. I have been assured that talks are in progress between the two agencies to figure out the best foot forward. My impression is that there's been one miscommunication after another. That should be over now.
>
> I'm continuing to work and will update you with new information as it comes in.
>
> Thank you,
>
> Amanda Sadra
>
> Sent from my iPhone
> The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.
>
>
The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:**      Sadra, Amanda (Feinstein)
**To:**        Candice LeTran
**Subject:**   Update (CMS_SSA 30 records)
**Date:**      Tuesday, November 08, 2016 2:32:30 PM

Candice,

Please share this with the team:

We have elevated this issue to the highest levels of CMS and SSA. We seem to have two willing agencies, who aren't speaking to each other. I have been assured that talks are in progress between the two agencies to figure out the best foot forward. My impression is that there's been one miscommunication after another. That should be over now.

I'm continuing to work and will update you with new information as it comes in.

Thank you,

Amanda Sadra

Sent from my iPhone

0571

01443

| From: | Sadra, Amanda (Feinstein) |
| --- | --- |
| To: | Candice LeTran |
| Cc: | lgetzoff@health-law.com |
| Subject: | RE: PVHMC's CMS-SSA update |
| Date: | Thursday, March 02, 2017 10:53:00 AM |

Sorry Candice/Larry,

Can we re-schedule for Tuesday morning? Just spoke to SSA/CMS and they aren't going to have the update for me until Monday evening now.

Thanks!

-Amanda

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Tuesday, February 28, 2017 10:39 AM
**To:** Sadra, Amanda (Feinstein) <Amanda_Sadra@feinstein.senate.gov>
**Cc:** lgetzoff@health-law.com
**Subject:** RE: PVHMC's CMS-SSA update

Thanks Amanda. How about Fri 3/3 9:30am?

Candice Le-Tran
Office: 909-865-9844

**From:** Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
**Sent:** Tuesday, February 28, 2017 9:24 AM
**To:** Candice LeTran
**Cc:** lgetzoff@health-law.com
**Subject:** Re: PVHMC's CMS-SSA update

Hi Candice,

I should have an update for you by Friday. What time can we jump on the phone that day?

Thanks,

-Amanda

Sent from my iPhone

On Feb 24, 2017, at 12:14 PM, Candice LeTran <Candice.LeTran@pvhmc.org> wrote:

> Hi Amanda,
> I am checking in to see if you have any updates.  Thank you.

Candice Le-Tran
Office: 909-865-9844

**From:** Candice LeTran
**Sent:** Tuesday, February 14, 2017 3:30 PM
**To:** 'Sadra, Amanda (Feinstein)'
**Cc:** 'lgetzoff@health-law.com'
**Subject:** RE: CMS-SSA update

Hi Amanda,
I am checking in on the CMS & SSA progress of our 30 SSI records.  I understand that
with the President's transition, there are delays.  As you are aware, this has gone on
for too long (Sen. Feinstein wrote in May 2016 and again in Oct 2016 to SSA) and we
are shooting to have the SSI results by 2/28/17.  Please let us know the status and/or
have a phone conference with certain parties to clarify any issues.  Thank you for
helping us  with this frustrated matter.

Candice Le-Tran
Office: 909-865-9844

**From:** Candice LeTran
**Sent:** Friday, January 13, 2017 5:31 PM
**To:** 'Sadra, Amanda (Feinstein)'
**Cc:** lgetzoff@health-law.com
**Subject:** RE: CMS-SSA update & PRRB Hearing extension

Thanks Amanda and please continue to push CMS & SSA to collaborate and expedite
on this issue.  Our strategy is to have the SSI results by 2/28/17 so that we can
properly prepare for our hearing.

Thanks for indicating that you are not going to mention the date change, as that is our
desire, however, I think CMS already knew!  I informed Grant Kerr (Rep. Torres) of the
extension and he wrote back and said CMS just told him the same thing!!

Candice Le-Tran
Office: 909-865-9844

**From:** Sadra, Amanda (Feinstein) [mailto:Amanda_Sadra@feinstein.senate.gov]
**Sent:** Friday, January 13, 2017 12:14 PM
**To:** Candice LeTran
**Subject:** RE: CMS-SSA update & PRRB Hearing extension

Candice,

That's great news. I wish I had some positive news to share, but we're still playing the
waiting game here. As soon as I know something, you and your team will.

Also, we're not going to mention the change of date to CMS/SSA folks. It does not

11111 Santa Monica Boulevard, Suite 915
Los Angeles, CA 90025 | (310) 914-7300

Website | Twitter | Facebook | YouTube

**From:** Candice LeTran [mailto:Candice.LeTran@pvhmc.org]
**Sent:** Wednesday, May 17, 2017 10:53 AM
**To:** Sadra, Amanda (Feinstein) <Amanda_Sadra@feinstein.senate.gov>
**Cc:** lgetzoff@health-law.com
**Subject:** RE: PVHMC CMS-SSA Status

Hi Amanda,
Are you available for a conference call next week for us to check in on the statuts & discuss the
next steps? Our hearing in Baltimore is on 8/17/17 so it's coming up soon. Larry and I are available
anytime next week at 10am or please let us know of another time slot. Thank you.

Candice Le-Tran
Office: 909-865-9844

**From:** Candice LeTran
**Sent:** Wednesday, May 03, 2017 11:06 AM
**To:** Sadra, Amanda (Feinstein)
**Cc:** lgetzoff@health-law.com
**Subject:** PVHMC CMS-SSA Status

Hi Amanda,
I am checking in to see if your office has some progress for us with SSA or CMS in response to our
request of reviewing 30 records. Quick recap, Larry and I had a conference call with you in early
March, and you indicated that you had elevated to the "top of the top" for both CMS and SSA,
with no results from either offices. SSA promised to issue a document to your office summarizing
what has transpired since around May 2016. We were all hoping that this document would arrive
by late March, and if not, then Senator Feinstein will be writing to CMS or SSA follow-up.

Please advise us of the status, and if possible, please forward any letters/documents for our file as
our hearing is coming up in August. We greatly appreciate your help in moving this matter along.

Candice Le-Tran
Director of Regulatory Reimbursement & Analytics
Pomona Valley Hospital Medical Center
Office: 909-865-9844

The information contained in this transmission may contain privileged and confidential

0574

01446

P-3

01447



# SOCIAL SECURITY
### The Commissioner

May 30, 2017

The Honorable Dianne Feinstein
United States Senate
Washington, DC 20510

Dear Senator Feinstein:

Thank you for your May 19, 2017 letter regarding Pomona Valley Health Hospital payments under the Medicare Disproportionate Share Hospital Payment Formula (DSH). I agree that this issue has been complex, with both the Centers for Medicare and Medicaid Services (CMS) and the Social Security Administration (SSA) playing a role in determining the correct payments. I apologize for any confusion, and am glad to provide you with additional information.

As you describe, the Pomona Valley Hospital alleges that it was underpaid approximately $6 million under the DSH payment formula. Under this formula, a hospital is paid for the number of days that a Supplemental Security Income (SSI) recipient is a patient in its facility. Pomona Valley reviewed the days it was paid from 2006 to 2008 for SSI patients, and, using social security records California receives to administer Medicaid, is alleging there was a discrepancy between the social security data that California Medicaid agency maintains and the data CMS maintains that led to the underpayment. Pomona Valley is appealing the payment amount through an administrative process. To my understanding, the administrative appeal is still pending.

On a separate track, the Hospital asked SSA if we could provide SSI eligibility data based on a 30 case sample for the period in question. Pomona Valley was hopeful that such a double-check would allow the hospital to determine whether the DSH amounts for this period had been correctly paid.

Unfortunately, we are unable to perform such a separate match of records, because the process by which these payments are determined is already articulated in law and regulation. Section 1886(d)(5)(F) of the Social Security Act (Act) describes DSH formula and authorizes CMS to incorporate SSI eligibility data from SSA to calculate the DSH formula. CMS regulations implementing the DSH calculation (75 FR 50275 to 50286) state further that the SSI eligibility file produced by SSA at a certain point in time serves as the authoritative source for whether SSA made an SSI payment to an individual. Consequently, CMS defers to SSA's determination about SSI eligibility at the time SSA produces the data exchange file.

Page 2 – The Honorable Dianne Feinstein

In addition, we determined that we do not have legal authority under the Privacy Act to disclose the specific detailed information about affected SSI recipients. SSA cannot provide personally identifiable data to hospitals. Under the authorities in the Privacy Act, the Social Security Act and CMS regulations, and as required by Information Exchange Agreement (IEA) Match 10038 (see enclosure), SSA already provides CMS the exact data it needs to administer the DSH.

Again, I apologize for any confusion over what is admittedly a very complicated process.  If you have questions or if I may be of further assistance, please do not hesitate to contact me.  Staff may contact Mr. Royce Min, our Acting Deputy Commissioner for Legislation and Congressional Affairs, at (202) 358-6030.

Sincerely,

Nancy A. Berryhill
Acting Commissioner

Enclosure

0576

01449

P-32

01451



DEPARTMENT OF HEALTH & HUMAN SERVICES                    Centers for Medicare & Medicaid Services

7500 Security Boulevard
Baltimore, MD  21244-1850

June 23, 2017

The Honorable Dianne Feinstein
United States Senate
Washington DC 20510

Dear Senator Feinstein:

Thank you for your May 19, 2017 letter regarding payments to Pomona Valley Health Hospital under the Medicare Disproportionate Share Hospital (DSH) payment formula.  Your office first reached out to CMS regarding this issue in late October, 2016, and I regret any confusion that may have occurred during the course of our subsequent conversations.

Medicare DSH payments are authorized and described in the Social Security Act at Section 1886(d)(5)(F). This provision directs CMS to make additional Medicare payments to subsection (d) hospitals that serve a significantly disproportionate number of low-income patients. Most subsection (d) hospitals qualify for Medicare DSH payments based on a methodology that, among other factors, takes into account the number of a hospital's inpatient days that are furnished to patients who were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits. Title XVI of the Social Security Act authorizes the Social Security Administration to make SSI eligibility determinations.

Section 1886(d)(5)(F)(vi)(I) of the Act specifies the methodology by which CMS calculates each hospital's DSH payment. CMS has implemented 1886(d)(5)(F)(vi)(I) through its FY 2011 rulemaking, in which CMS addresses the issue of source data for determining the number of inpatients who were entitled to both Medicare Part A and SSI. This CMS rule (75 Fed. Reg. 50275 to 50286) finalizes CMS policy that the SSI eligibility file produced at a certain point in time serves as the system of record for whether or not an individual is entitled to SSI benefits for individuals who applied for SSI benefits for a specified time period.  This means that CMS defers to SSA's determination as to whether an individual is entitled to SSI benefits, as reflected in that specific eligibility file, at the time that file is produced.

CMS does not have access to any additional SSI information beyond what is transmitted in that SSI eligibility file, and in light of the relevant privacy rules and existing CMS regulations, the agency does not have authority to ask for additional information that SSA may have created at other points in time or shared with other outside parties.  CMS relies on the eligibility file created by SSA as the source of information to match, on an annual basis, the many millions of beneficiary records on behalf of thousands of Medicare DSH hospitals nationwide. This is a policy that went through notice and comment rulemaking, and CMS does not make exceptions for individual hospitals.

Furthermore, disputes regarding Medicare payment determinations are handled through the appeals process for all providers.

Pomona is currently awaiting a hearing at the Provider Review Reimbursement Board (PRRB). The PRRB is the administrative forum for appeals from Medicare providers dissatisfied with Medicare payment determinations. The PRRB has five board members who are appointed by the Secretary of HHS and serve three-year terms. The PRRB appeals process is a relatively formal one. For additional information, see https://www.cms.gov/Regulations-and-Guidance/Review-Boards/PRRBReview/Downloads/PRRBRULES_07_01_2015.pdf

By statute, the CMS Administrator (pursuant to a delegation from the Secretary) may review final PRRB decisions. See 42 USC 1395oo(f)(1); 42 CFR 405.1875. A decision of the Board may be affirmed, modified, reversed, or vacated and remanded by the CMS Administrator within 60 days of notification to the provider of that decision. If a provider is not happy with the final decision of the CMS Administrator, it may pursue its case in federal court.

I hope this response clarifies CMS policy with respect to the DSH payment formula. Please do not hesitate to contact CMS if you have further questions.

Respectfully,

Carol L. Blackford
Director
Hospital Ambulatory and Payment Group
Center for Medicare, CMS

0579

01453

**Laurence D. Getzoff**

| | |
|---|---|
| **From:** | Woodruff, Kristen (Feinstein) <Kristen_Woodruff@feinstein.senate.gov> |
| **Sent:** | Thursday, June 29, 2017 10:19 AM |
| **To:** | Candice LeTran; Laurence D. Getzoff |
| **Cc:** | Muller, Peter (Feinstein) |
| **Subject:** | CMS Response Letter and Meeting Request |
| **Attachments:** | CMS Response letter.pdf |

Candice and Larry,

Please find attached CMS's response to Senator Feinstein's most recent letter. Unfortunately CMS and SSA also said that they would not be able to attend a meeting with the hospital present because of the review process underway, which is disappointing for all of us. Peter and I will be speaking shortly about what our next step should be. Please let us know if you would like to discuss further.

Best,
Kristen

**Kristen Woodruff** | Field Representative
Office of U.S. Senator Dianne Feinstein
Los Angeles, CA | (310) 914-7300

**Website | Twitter | Facebook | YouTube**

1

0580

01454

P-34

01459

# HEALTH MANAGEMENT ASSOCIATES

July 12, 2017

Re:     Case Number: 13-0430, Pomona Valley Hospital Medical Center, Provider No. 05-0231.

## I.      SCOPE OF ENGAGEMENT

I was engaged by Pomona Valley Hospital Medical Center to provide information and my opinion on how California's Medicaid program (Medi-Cal) provides providers with information pertaining to Medi-Cal enrollees' enrollment in the Supplemental Security Income (SSI) program. This includes a description of how Medi-Cal obtains SSI eligibility information from the Social Security Administration (SSA), places that information on its eligibility files and provides this information to Medi-Cal providers. Further, I was engaged to provide information on enrollment numbers between people on Medi-Cal who are enrolled in SSI and the State Supplemental Payment (SSP) program.

## QUALIFICATIONS

Attached is a copy of my Résumé.

I am currently a consultant specializing in health care, primarily relating to state programs such as Medicaid. I provide consultation to a wide range of clients on many issues and as a result I have continued to stay knowledgeable on Medicaid Program requirements, both current and historical. I have been a consultant since January 2009.

Prior to becoming a consultant, I worked as a California state employee in the Medi-Cal for 32 years. I served as an executive appointee with the State of California for 21 years of this time with over 13 years as the Medicaid Director or Deputy Medicaid Director in California. When I retired from the State of California at the end of 2008, I was the Chief Deputy Director of Health Care Programs for the Department of Health Care Services ("DHCS").

During the last 13 years of my employment (while I was the Medicaid Director or Deputy Medicaid Director), I had responsibility for setting policy for the California Medicaid Program ("Medi-Cal"), operation of the Medi-Cal eligibility system, operation of the Medi-Cal payment systems (provider enrollment and claims processing), operation of the state's prior authorization system, operation of the Medi-Cal drug program, oversight of the Medi-Cal Managed Care program, development and implementation of various federal waivers, and numerous other parts of the Program.

During my tenure working for the state, I had extensive involvement, responsibility and leadership in the state processes that obtained SSI and SSP data from the Social Security Administration and provided that information to Medi-Cal providers. This included:

1

0584

01460

- Beginning in 1977, work on developing the California Medicaid Management Information Systems ("MMIS"). This work included design of the recipient subsystem which was used to store information on people who were eligible for Medi-Cal for use in claims processing. During this time I worked closely with the state employees who were designing, developing and implementing the Medi-Cal Eligibility Data System (MEDS), which is used to collect eligibility data from various sources including the SSA, into a central data depository for use in maintaining people's Medi-Cal eligibility, providing this information for claims processing, and providing this information to providers. My work with these systems continued until I retired from the state at the end of 2008.
- In the late 1980s I was the manager in charge of designing and implementing Medi-Cal's Automated Eligibility Verification System (AEVS). This system provides real time eligibility information to providers who use this information to verify a person's Medi-Cal eligibility and to obtain necessary demographic information.

All of the systems cited above are still in operation and were in operation and were in operation during the 2006-2008 time period.

During my tenure working for California, I also had considerable involvement in Medicaid on a national level. This included serving as an officer of the National Association of State Medicaid Directors, including serving as its Vice-Chair for several years. In my earlier work, I was a member of the federal Systems Development Technical Advisory Group, which worked with the federal government on developing requirements for the operation of state MMISs. The federal government establishes requirements for state MMISs that consist of six subsystems. One of the six subsystems in the MMIS is the Recipient Subsystem, which includes both the computer systems and processes that obtain and retain enrollee eligibility information for state Medicaid Programs.

I have a Master's Degree in Public Administration from the University of Southern California and a Bachelor's Degree from the University of Iowa.

## II.   FINDINGS

### SSI/SSP Processing

California is one of the thirty-two states that grant automatic Medicaid (Medi-Cal) eligibility to anyone enrolled in either the SSI or SSP programs. Under this arrangement states enter into a "1634 agreement" with SSA. These agreements are named for the implementing provision in the Act. These 1634 agreement specifies the State and SSA's responsibilities and requires the state to provide Medicaid coverage to recipients of federally-administered SSI and State Supplementary Payments (SSP's). California is a signatory to a 1634 agreement with the SSA.

2

Under this agreement, the SSA is responsible for processing applications for SSI /SSP eligibility and determining eligibility for these programs.  After this determination, SSA provides Medi-Cal with information on SSI/SSP recipients by the way of the State Data Exchange (SDX) file. Medi-Cal then utilizes this information to establish and maintain Medi-Cal eligibility.

Upon receipt of SSI/SSP data from the SSA via the SDX, the Department of Health Care Services (DHCS) processes this data and posts it to its MEDS file.  The MEDS file is the central depository of all Medi-Cal eligibility data including data from the SSA, California counties, and from DHCS and other state departments.  MEDS posts demographic information about each person, assigns each person with a unique Client Identification Number, and assigns each person with the appropriate Aid Code that identifies the source of that person's eligibility.  For new enrollees, MEDS will also cause the Medi-Cal's fiscal agent to issue a plastic Medi-Cal eligibility card known as the Benefits Identification Card (BIC).  All Medi-Cal enrollees, including those on SSI/SSP, receive a BIC.

The MEDS computer system including the process to accept and post SDX data was implemented in the early 1980s and it was in operation through the entire 2006-2008 time period (it remains in operation today).  The system is highly reliable as demonstrated by its ability to function well for over 30 years.  MEDS has been shown to be accurate in providing the eligibility information provided to it by various sources including the SSA.

**Aid Codes**

Medi-Cal eligibility is extremely complex with multiple categories of eligibility.  Each category of eligibility may grant the enrollee a different set of benefits (full scope or limited) and may have one of several federal matching rates (ranging from zero percent federal funds up to 100 percent federally funded).  Further, there are various state and federal reporting requirements that require the state to track and report on various eligibility groups including the number of people enrolled and expenditures on their behalf.

In order to meet these requirements, Medi-Cal uses a series of "Aid Codes" that MEDS assigns to each enrollee so that the state, the federal government, and providers know the source of the person's eligibility, the scope of services the person can get, and the federal funding level. There are now well over 100 Aid Codes in use in Medi-Cal.

Medi-Cal uses three long established Aid Codes for Medi-Cal enrollees on SSI/SSP.  These are:

> 10, SSI/SSP Aid to the Aged (full scope). "A cash assistance program administered by the SSA which pays a cash grant to needy persons 65 years of age or older."

0586

01462

20, SSI/SSP Aid to the Blind (full scope).  "A cash assistance program administered by the SSA, which pays a cash grant to needy blind persons of any age."

60. SSI/SSP Aid to the Disabled (full scope). A cash assistance program administered by the SSA that pays a cash grant to needy persons who meet the federal definition of disability."[1]

The three Aid Codes used for SSI/SSP have been in use for over 30 years.  Assignment of these codes by Medi-Cal has been well established and has withstood the test of time including federal oversight throughout this period.  There is no question that an enrollee assigned this code has gotten their Medi-Cal eligibility through enrollment in the SSI/SSP program.

**Medi-Cal Provider Eligibility Verification**

When a person is first enrolled in Medi-Cal, including people with Medi-Cal eligibility due to being on SSI/SSP, MEDS causes the Medi-Cal fiscal agent to issue a lifetime plastic BIC card.  As a lifetime card, the BIC contains a limited amount of information.  This information includes the enrollee's:

- Name
- Client Identification Number
- Gender
- Birthdate

And the card issuance date.

Medi-Cal grants eligibility status on a monthly basis and a person's status may change from month to month.  As the BIC is a lifetime card, it does not include eligibility information.  The BIC by itself is not "Proof of Eligibility".

Providers need to know if a person is eligible at the time of service and if so what service limits exist (does the person have full scope benefits or limited scope benefits) and they need "Proof of Eligibility".  To provide providers this information and "Proof of Eligibility", Medi-Cal uses the Automated Eligibility Verification System to allow providers to access necessary eligibility information on their patients.  This system is also known as the "Medi-Cal Point of Service (POS) Network".  This system operates like a retail credit card system where a provider enters in, by a swipe or manually, the information on the BIC and Medi-Cal returns to the provider critical eligibility information on the patient.  This includes the patient's Aid Code.

---

[1] Aid Code Master Chart, November 24, 2015,
http://www.dhcs.ca.gov/services/MH/Documents/MedCCC/Library/SDMCAidCodeChart11-24-15.pdf

4

0587

01463

While Medi-Cal eligibility is granted on a monthly basis, the granting of this status can occur anytime in the month.  Once a person is granted Medi-Cal eligibility that person may immediately go to a provider for medical care.  To meet this real time requirement no eligibility information is maintained by the Automated Eligibility Verification System.  Rather for each transaction that system accesses MEDS to obtain the most current information.  In the case of the three long existent Aid Codes for SSI/SSP, the codes that are on MEDS are provided to the provider.

As the Medi-Cal is providing "Proof of Eligibility" a guarantee that the provider can rely on this information and receive payment based on this information, Medi-Cal has ensured that it is accurate.  Since the Automated Eligibility Verification System has been in operation for over 20 years it has been well tested and withstood the test of time.

**The Information a Provider Receives from Medi-Cal is Information from the SSA**

As stated above, California receives SSI/SSP information directly from the SSA.  Medi-Cal posts this information on its MEDS system and uses three Aid Codes that identify each individual as enrolled in the SSI/SSP program.  When a provider accesses enrollee information via the Automated Eligibility Verification System they receive the Aid Code created by MEDS using the data from the SSA.  The SSI/SSP Aid Codes have been in place for more than 30 years, the MEDS system has been assigning these codes for over 30 years, and the Automated Eligibility Verification System has been in place for over 20 years.  There is no question as to the accuracy of these systems and processes and they have been providing Proof of Eligibility and meeting federal and state reporting requirements for decades.

**SSI and SSP**

The SSI Program is a federally funded program which provides income support to eligible individuals who are aged 65 or older, blind or disabled and qualified blind or disabled children. The SSP Program is the state program which augments SSI.  Both SSI and SSP benefits are administered by the Social Security Administration (SSA).  If an eligible individual qualifies for SSI, they qualify for SSP.

The standards to qualify for SSI and SSP are complex and vary by a number of factors including what category of eligibility a person has, the person's living arrangements, and the person's income.  For each eligibility group there is a maximum income standard for receipt of an SSI grant and a higher maximum income standard for receipt of an SSP grant.  A person whose income falls below the SSI level will get both a cash grant from SSI and a supplemental SSP cash grant.  However, there are people whose income falls above the income standard for SSI but below the SSP income level.  These people would only receive a SSP cash grant.

5

0588

01464

As mentioned above, after making its decision on whether a person is eligible for SSI/SSP the SSA sends Medi-Cal a computer record that says whether the person is eligible for SSI/SSP. This record does not distinguish between people who are eligible for SSI/SSP and those people who are only eligible for SSP. Thus the response a provider receives from Medi-Cal includes both people on SSI as well as those people whose income is too high for SSI but still receive SSP.

In order to enable me to ascertain what percentage of SSI/SSP records were SSP only, on December 23, 2016 Aron Smith a manager in the Cash Assistance, Special Projects and Coordinated Care Initiative Unit of the California Department of Social Services provided me with enrollment totals for California for the period of July 2005 through June 2009 for people enrolled in SSI (which would include SSP) and those enrolled only in SSP with no SSI enrollment. This information is shown in Exhibit A to this report and Exhibit P-37.

This information shows that for this period there are 68,636,595 enrollment months (people enrolled in a specific month) or which 58,936,800 are in SSI and 9,699,795 are only in SSP. This means the average enrollment of people with a SSI/SSP designation by SSA in California and only have SSP averages approximately 14 percent. In reviewing this data on a monthly basis, it consistently averages about 14 percent enrolled only in SSP. Consistently, 86 percent of the people with an SSI/SSP designation had SSI.

Therefore one can assume in reviewing a provider's data one would expect that about 14 percent of the individuals the provider is told by Medi-Cal to have SSI/SSP status would have only SSP enrollment and the remaining 86 percent would be enrolled in SSI.

**Pomona Valley Hospital Medical Center Analysis**

I have reviewed the analysis done by Candice Le-Tran, Director of Reimbursement & Capitated Systems, Pomona Valley Hospital Medical Center, and have found her analysis to be correct. In her analysis she identified patients on Medi-Cal who had SSI/SSP as designated by either having Aid Code 10, 20 or 60 and then their associated claims. She has properly identified the Aid Codes that are SSI/SSP. These Aid Codes have then been matched with Center for Medicare and Medicaid (CMS) data which provides a very large number of people who are unmatched.

I have found the following data for these 3 Aid Codes:

| Year | Matched | Unmatched | Percent Unmatched |
|---|---|---|---|
| FY 2006 | 716 | 381 | 35% |
| FY 2007 | 737 | 440 | 37% |
| FY 2008 | 695 | 436 | 39% |

6

Based on this analysis that between 35 and 39 percent of the patients with Aid Codes showing them as having SSI/SSP were not found to have SSI status when matched with CMS data. This conclusion is inconsistent with the data that the State receives from SSA, which shows during this time period 86 percent of the people with SSI/SSP have SSI and only 14 percent are enrolled in only SSP.

On January 21, 2016 I sent a letter to Marc Hartstein, Hospital and Ambulatory Policy Group, Centers for Medicare and Medicaid Services regarding CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years. This letter is Exhibit Number P-35. The purpose of this letter was in part to "…to determine whether, in fact, CMS's published SSI percentages respectively for Pomona's 2006, 2007 and 2008 cost reporting years omitted a significant number of days that Pomona believes, based on State Medi-Cal records, constitute days associated with patients who were, at the time of their services, receiving SSI benefits".

My letter included ten specific patients from each of the 2006, 2007, and 2008 fiscal years where staff from the Medi-Cal Eligibility Division, "Program Integrity Unit" of the State DHCS verified that these enrollees had an eligibility status of SSI/SSP. This verification by the State further demonstrates that Pomona has correctly determined SSI/SSP status based on the information provided to it through verification of eligibility. The Program Integrity Unit performs state and federally required quality reviews of Medi-Cal eligibility determinations and are experts in ensuring accuracy in the Medi-Cal eligibility process.

Further this letter indicated that Pomona was submitting three sets (totaling 40 records) of the Medi-Cal on-line Eligibility Response printouts from Medi-Cal Point of Service (POS) Network from its 2006, 2007, and 2008 cost reporting years, to demonstrate that a significant additional percentage of patients from these years were SSI/SSP eligible at the time of services (SSI/SSP status with Aid Codes 10, 20 or 60). This information was "…the product of an online verification system that was established by the Medi-Cal program to assist providers in determining eligibility of patients and/or prospective patients for Medi-Cal program benefits." This information was further verification that Pomona had accurately received eligibility information from the State, properly determined these individuals had SSI/SSP status, and that there was an underreporting of information by CMS.

Had my letter been acted on, there would have been further validation of this information by CMS. Regretfully, my letter was not acted on by CMS.

7

01466

### III.    CONCLUSION

Based on my analysis and experience the Medi-Cal data is accurate in giving providers SSI/SSP status, Ms. Le-Tran did a proper, complete and accurate analysis of her patient records and how they show SSI/SSP status, and the analysis shows that the percentage of people shown on Medi-Cal as having SSI/SSP status who do not have SSI benefits pursuant to the CMS database (and who therefore were  "SSP" only) is much larger (by between 200% and 300%) than the data the State has on how many people during this time period had SSP only.  Based on the data available to me, there appears to be a problem with the CMS data.  As noted earlier, it has been my desire to have this data discrepancy resolved by having CMS and SSA do a sample of Pomona's cases so that greater clarity could be obtained so as to resolve this issue.  Regretfully the federal government has not been willing to do this analysis, leaving their data in question.

Sincerely,

Stan Rosenstein
Principal Consultant

8

0591

01467

**Attachment A**

**Information from California Department of Social Services**

**December 23, 2016**

| Month - Year | Total SSI Caseload | Caseload – SSP Only (No SSI) |
|---|---|---|
| | | |
| July 2005 | 1,196,567 | 196,567 |
| August 2005 | 1,201,958 | 197,436 |
| September 2005 | 1,203,998 | 197,896 |
| October 2005 | 1,203,912 | 199,399 |
| November 2005 | 1,209,061 | 200,163 |
| December 2005 | 1,203,954 | 200,535 |
| January 2006 | 1,180,468 | 187,387 |
| February 2006 | 1,182,214 | 187,571 |
| March 2006 | 1,196,088 | 190,377 |
| April 2006 | 1,207,087 | 198,651 |
| May 2006 | 1,209,340 | 199,120 |
| June 2006 | 1,209,410 | 199,936 |
| | | |
| July 2006 | 1,163,141 | 190,204 |
| August 2006 | 1,173,146 | 192,004 |
| September 2006 | 1,175,737 | 193,470 |
| October 2006 | 1,222,746 | 203,814 |
| November 2006 | 1,223,216 | 204,693 |
| December 2006 | 1,221,100 | 205,347 |
| January 2007 | 1,224,647 | 202,549 |
| February 2007 | 1,225,847 | 202,881 |
| March 2007 | 1,226,262 | 203,062 |
| April 2007 | 1,230,427 | 203,978 |
| May 2007 | 1,230,532 | 204,176 |
| June 2007 | 1,232,539 | 204,942 |
| | | |
| July 2007 | 1,214,181 | 204,939 |
| August 2007 | 1,216,117 | 205,349 |
| September 2007 | 1,220,536 | 206,286 |
| October 2007 | 1,244,689 | 207,203 |
| November 2007 | 1,244,211 | 207,894 |
| December 2007 | 1,225,029 | 203,512 |
| January 2008 | 1,226,334 | 202,092 |
| February 2008 | 1,244,310 | 206,091 |
| March 2008 | 1,245,627 | 206,777 |
| April 2008 | 1,248,737 | 206,969 |
| May 2008 | 1,247,780 | 206,956 |
| June 2008 | 1,253,629 | 208,221 |

9

0592

01468

| | | |
|---|---|---|
| July 2008 | 1,254,039 | 208,359 |
| August 2008 | 1,257,422 | 209,052 |
| September 2008 | 1,262,530 | 210,177 |
| October 2008 | 1,262,985 | 210,174 |
| November 2008 | 1,267,145 | 212,100 |
| December 2008 | 1,266,221 | 211,238 |
| January 2009 | 1,263,666 | 205,594 |
| February 2009 | 1,268,020 | 205,956 |
| March 2009 | 1,268,371 | 205,983 |
| April 2009 | 1,270,831 | 206,306 |
| May 2009 | 1,253,793 | 188,190 |
| June 2009 | 1,257,200 | 188,219 |

10

0593

01469

P-37

01490

**Laurence D. Getzoff**

| | |
|---|---|
| **Subject:** | FW: SSI/SSP Data 2005-2009 |
| **Attachments:** | SSI-SSP Caseload Info 2005-2009.docx |

**From:** Stan Rosenstein [mailto:srosenstein@healthmanagement.com]
**Sent:** Friday, December 23, 2016 3:33 PM
**To:** Laurence D. Getzoff; Danette Polchowski; Candice.LeTran@pvhmc.org
**Subject:** FW: SSI/SSP Data 2005-2009

**From:** Smith, Aron@DSS [mailto:Aron.Smith@dss.ca.gov]
**Sent:** Friday, December 23, 2016 1:39 PM
**To:** Stan Rosenstein <srosenstein@healthmanagement.com>
**Cc:** Carroll, Eileen@DSS <Eileen.Carroll@dss.ca.gov>; Thomson, Debbi@dss.ca.gov <Debbi.Thomson@dss.ca.gov>; Cervinka, Pete@DSS <Pete.Cervinka@DSS.ca.gov>; Rutledge, Kim@DSS <Kim.Rutledge@dss.ca.gov>; Bandaccari, Lisa@DSS <Lisa.Bandaccari@dss.ca.gov>
**Subject:** SSI/SSP Data 2005-2009

Good afternoon,

Thank you for your inquiry.  Attached please find monthly statewide breakouts of SSI/SSP and SSP-only caseloads for fiscal years 2005 through 2009 in response to Questions #1 and 2.  Unfortunately, we are unable to provide this data for specific counties.

We hope you find this information helpful.

Aron Smith
Staff Services Manager I
Cash Assistance, Special Projects and Coordinated Care Initiative Unit
Program Integrity, Cash Assistance and Coordinated Care Initiative Bureau
Policy & Quality Assurance Branch
Adult Programs Division
California Department of Social Services
(916) 651-1174



CONFIDENTIALITY NOTICE: This Communication, with its contents, may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws, including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** Stan Rosenstein <srosenstein@healthmanagement.com>
**Date:** December 21, 2016 at 12:43:41 PM PST
**To:** "Cervinka, Pete@DSS (Pete.Cervinka@DSS.ca.gov)" <Pete.Cervinka@DSS.ca.gov>, "Carroll, Eileen@DSS

1

(Eileen.Carroll@dss.ca.gov)" <Eileen.Carroll@dss.ca.gov>
**Subject: SSP Only Caseload**

Hello, I hope you both are doing well.

I am doing work for a client and they are trying to get information on the caseload counts in CA for people who are enrolled in SSI/SSP and of that group, how many get SSP only. The SSP only group are those people who have income too high to qualify for SSI but low enough to get a SSP only cash grant. SSA sends enrollment information on SSI/SSP to DHCS and DHCS is not able to breakdown how many people in the files they get are SSP only. We know there is a subset of SSI/SSP enrollees who only get SSP, but we have been unable to get a count or percent of how many people there are.

I am hoping that CDSS knows this breakdown. I am not able to find this breakdown on your Web Site.

My client is specially interested in the fiscal years 2005 through 2009 but would take other years if that information is not available.

I was hoping you could direct me to the right place or person to get this information.

They are specifically looking for (but would take what you have if it gives a comparison of caseload in SSP/SSP to SSP only):

1. For each of the fiscal years 2005 through 2009, a statewide count of the number of people receiving SSI benefits.
2. For each of the fiscal years 2005 through 2009, a statewide count of the number of people receiving only SSP benefits (no SSI).
3. For each of the fiscal years 2005 through 2009, the same two data sets for Los Angeles County, Riverside County and San Bernardino County.

I appreciate any assistance you can provide in getting me to the right person or place to get this information.

Take care and thank you.

Stan Rosenstein
Phone: 916.792-3740

srosenstein@healthmanagement.com

---

The information contained in this e-mail, including any attachments, is confidential and intended solely for the named recipient(s) and may be subject to protection under federal and state laws. If you are not the intended recipient, please inform the sender immediately by reply e-mail that the message was sent in error and delete the message. Thank you.

0613

01492

Hello,

Please find the attached SSI/SSP information for FY 2005-2009.

| Month - Year | Total SSI Caseload | Caseload – SSP Only (No SSI) |
|---|---|---|
| | | |
| July 2005 | 1,196,567 | 196,567 |
| August 2005 | 1,201,958 | 197,436 |
| September 2005 | 1,203,998 | 197,896 |
| October 2005 | 1,203,912 | 199,399 |
| November 2005 | 1,209,061 | 200,163 |
| December 2005 | 1,203,954 | 200,535 |
| January 2006 | 1,180,468 | 187,387 |
| February 2006 | 1,182,214 | 187,571 |
| March 2006 | 1,196,088 | 190,377 |
| April 2006 | 1,207,087 | 198,651 |
| May 2006 | 1,209,340 | 199,120 |
| June 2006 | 1,209,410 | 199,936 |
| | | |
| July 2006 | 1,163,141 | 190,204 |
| August 2006 | 1,173,146 | 192,004 |
| September 2006 | 1,175,737 | 193,470 |
| October 2006 | 1,222,746 | 203,814 |
| November 2006 | 1,223,216 | 204,693 |
| December 2006 | 1,221,100 | 205,347 |
| January 2007 | 1,224,647 | 202,549 |
| February 2007 | 1,225,847 | 202,881 |
| March 2007 | 1,226,262 | 203,062 |
| April 2007 | 1,230,427 | 203,978 |
| May 2007 | 1,230,532 | 204,176 |
| June 2007 | 1,232,539 | 204,942 |
| | | |
| July 2007 | 1,214,181 | 204,939 |
| August 2007 | 1,216,117 | 205,349 |
| September 2007 | 1,220,536 | 206,286 |
| October 2007 | 1,244,689 | 207,203 |
| November 2007 | 1,244,211 | 207,894 |
| December 2007 | 1,225,029 | 203,512 |
| January 2008 | 1,226,334 | 202,092 |
| February 2008 | 1,244,310 | 206,091 |
| March 2008 | 1,245,627 | 206,777 |
| April 2008 | 1,248,737 | 206,969 |
| May 2008 | 1,247,780 | 206,956 |
| June 2008 | 1,253,629 | 208,221 |
| | | |
| July 2008 | 1,254,039 | 208,359 |
| August 2008 | 1,257,422 | 209,052 |
| September 2008 | 1,262,530 | 210,177 |
| October 2008 | 1,262,985 | 210,174 |
| November 2008 | 1,267,145 | 212,100 |

01493

| December 2008 | 1,266,221 | 211,238 |
| January 2009 | 1,263,666 | 205,594 |
| February 2009 | 1,268,020 | 205,956 |
| March 2009 | 1,268,371 | 205,983 |
| April 2009 | 1,270,831 | 206,306 |
| May 2009 | 1,253,793 | 188,190 |
| June 2009 | 1,257,200 | 188,219 |

0615

01494

# FSS FEDERAL SPECIALIZED SERVICES™

1701 SOUTH RACINE AVENUE
CHICAGO, IL 60608

312.988.0473

Via FedEx:  779804320401

August 3, 2017

RECEIVED

AUG 0 7 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

Becky Shirey, Board Advisor
Division of Hearings and Decisions
CMS Office of Hearings
1508 Woodlawn Dr., Suite 100
Baltimore, MD 21207

Re:   Medicare Administrative Contractor Final Position Paper – Hearing Copies
      Pomona Valley Hospital Medical Center
      Provider No. 05-0231
      FYE  12/31/2006
      PRRB Case No. 13-0430

Dear Ms. Shirey:

Enclosed are six additional copies of the Medicare Administrative Contractor's final position
paper for the above referenced case.  This case is scheduled for hearing on August 17, 2017.

If you have any questions, please contact me at 312.988.0621, or donna.kalafut@fedspecserv.com.

Sincerely,

Donna Kalafut
Appeals Supervisor

Enclosure

cc: Noridian Healthcare Solutions (via email: JEPRRBAppeals@noridian.com)
    Laurence Getzoff – Hooper, Lundy & Bookman, P.C. (via email: lgetzoff@health-law.com)
    prrb@fssappeals.com

01600

# FSS FEDERAL SPECIALIZED SERVICES™

1701 SOUTH RACINE AVENUE
CHICAGO, IL 60608

February 24, 2016

**VIA FEDERAL EXPRESS**

Lisa Ogilvie, Director
Division of Jurisdiction and Case Management
Provider Reimbursement Review Board
2520 Lord Baltimore Dr., Suite L Baltimore,
MD 21244-2670

RECEIVED

AUG 0 7 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

Re:   Medicare Administrative Contractor Final Position Paper
      Pomona Valley Hospital Medical Center
      Provider No. 05-0231
      FYE: 12/31/2006
      PRRB Case No. 13-0430

Dear Ms. Ogilvie:

Enclosed, for the above referenced case, is a copy of the final position paper.  A copy was sent to the provider.

If you have any questions, please contact me at 630.746.0508 or Anthony.whelan@fedspecserv.com.

Sincerely,

Anthony J. Whelan
Appeals Consultant

Enclosure

cc: Noridian Healthcare Solutions (via email: jeprrbappeals@noridian.com)
    Laurence D. Getzoff, Esq. Hooper, Lundy & Bookman, P.C (via email: lgetzoff@health-law.com)

01601

# BEFORE THE PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| Pomona Valley Hospital Medical Center | ) |
| | ) |
| | ) |
| Provider No. 05-0231 | ) |
| | ) **PRRB CASE NO. 13-0430** |
| (PROVIDER) | ) |
| | ) |
| vs. | ) **FYE  December 31, 2006** |
| | ) |
| | ) |
| Medicare Administrative Contractor: | ) |
| **NORIDIAN HEALTHCARE SOLUTIONS, LLC** | ) |
| (MAC JE) | ) |
| | ) |
| and | ) |
| | ) |
| Appeals Support Contractor: | ) |
| **FEDERAL SPECIALIZED SERVICES, LLC** | ) |

RECEIVED

AUG 0 7 2017

PROVIDER REIMBURSEMENT
REVIEW BOARD

## MAC'S FINAL POSITION PAPER

Submitted By:
Peggy Sharpe
Noridian Healthcare Solutions, LLC
Noridian JE Part A
P.O. Box 6782
Fargo, ND 58108-6782

515-697-4045

and

Anthony Whelan
Federal Specialized Services, LLC
1701 S. Racine Avenue
Chicago, IL 60608-4058

630-746-0508

**TABLE OF CONTENTS**

PAGE

I.      INTRODUCTION                                          1

II.     ISSUES AND ADJUSTMENTS IN DISPUTE                     2

III.    MAC'S POSITION

        Issue 1:        Whether the MAC's calculation of the Provider's DSH reimbursement
        with respect to the Provider's SSI Percentage was proper.

        A.      Facts                                         4

        B.      Argument                                      7

        C.      Conclusion                                    12

IV.   CITATION OF PROGRAM LAWS, REGULATIONS,
        INSTRUCTIONS AND CASES                                13

V.    EXHIBITS                                                14

# I. INTRODUCTION

Pomona Valley Hospital Medical Center (Provider) is a short-term acute care hospital located in Pomona, California.

Relevant statistical information for FYE December 31, 2006 is as follows:

| | |
|---|---|
| Date Certified for Program Participation | 7/1/1966 |
| Number of Beds | 386 |
| Medicare Discharges | 3,386 |
| Total Discharges | 22,226 |
| Medicare Percentage of Total Discharges | 15.2% |
| Date of Notice of Amount of Program Reimbursement (Exhibit 1-1) | 8/20/2012 |
| Date of Appeal Request | 1/15/2013 |

The Provider's servicing Medicare Administrative Contractor (MAC), Noridian Healthcare Solutions, LLC (MAC JE), and Federal Specialized Services, LLC are together referred to herein as the "MAC" or "Intermediary".  The Provider and the MAC are referred to collectively as the "Parties".

1

01604

## II.    ISSUES AND ADJUSTMENTS IN DISPUTE

Issue 1:  Whether the MAC's calculation of the Provider's Disproportionate Share Hospital (DSH) reimbursement with respect to the Provider's Supplemental Security Income (SSI) Percentage was proper.

Adjustment Number(s)                                                      22, 23, 39

Reimbursement Effect per Provider's Calculation                    $1,580,614

Issue 2:  Whether the MAC's inclusion of Medicare Part C days in the SSI Percentage was proper.

Adjustment Number(s)                                                      22, 23, 39

Based on the Provider's Final Position Paper, this issue is being transferred to the group appeal

HLB Independent Hospitals 2006 DSH SSI Part C Days Group Case No. 13-3870G. (See Exhibit

I-3.) Therefore, the MAC will not address this issue in its position paper

Issue 3:  Whether the MAC's inclusion of Medicare Part C days in the DSH Medicaid Percentage was proper.

Adjustment Number(s)                                                      22, 23, 39

Based on the Provider's Final Position Paper, this issue is being transferred to the group appeal

HLB Independent Hospitals 2006 DSH Medicaid Dual Eligible Part C Days Group Case No. 13-

3874G. (See Exhibit I-4.) Therefore, the MAC will not address this issue in its position paper.

01605

Issue 4:  Whether the MAC's exclusion of unbilled deductibles and copayments to Medi-Cal in determining Medicare crossover bad debt was proper.

Adjustment Number(s)                                             20, 25

Based on the Provider's Final Position Paper, this issue is being transferred to the group appeal

HRS 2006 Crossover Bad Debt Billed/Unbilled Group Case No. 14-0069G. (See Exhibit I-5.)

Therefore, the MAC will not address this issue in its position paper.

3

01606

## III. MAC'S POSITION

**Issue 1: Whether the MAC's calculation of the Provider's Disproportionate Share Hospital (DSH) reimbursement with respect to the Provider's Supplemental Security Income (SSI) Percentage was proper.**

### A. Facts

Pursuant to audit adjustment numbers 22 and 39 (Exhibit I-2), the MAC adjusted the Provider's SSI Ratio to 14.74 percent. The Provider claims in its Final Position Paper that the rate should be 20.33 percent (page 4 of Provider's Final Position Paper).

Section 1886(d)(5)(F) of the Medicare Act provides for a DSH payment to hospitals that serve a significantly disproportionate number of low-income patients.  42 U.S.C. § 1395ww(d)(5)(F).  A hospital typically qualifies for a DSH payment adjustment through a complex statutory formula under which the DSH payment adjustment is based on the hospital's geographic designation, the number of beds in the hospital, and the level of the hospital's disproportionate patient percentage ("DPP").  A hospital's DPP is the sum of two fractions:  The "Supplemental Security Income ("SSI") fraction" and the "Medicaid fraction."  The SSI fraction (also known as the "SSI ratio" or the "Medicare fraction") is computed by dividing the number of the hospital's inpatient days that are furnished to patients who were entitled to both Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan) and SSI benefits by the hospital's total number of patients entitled to benefits under Medicare Part A (including patients who are enrolled in a Medicare Advantage (Part C) plan).  The Medicaid fraction is computed by dividing the hospital's number of inpatient days furnished to patients who, for such days, were

4

01607

eligible for Medicaid, but were not entitled to benefits under Medicare Part A, by the hospital's total number of inpatient days in the same period.

The regulation for the calculation of the SSI fraction is found at 42 C.F.R. § 412.106(b) (Exhibit I-6):

> (b) *Determination of a hospital's disproportionate patient percentage* — (1) *General rule.* A hospital's disproportionate patient percentage is determined by adding the results of two computations and expressing that sum as a percentage.
>
> (2) *First computation: Federal fiscal year.* For each month of the Federal fiscal year in which the hospital's cost reporting period begins, CMS —
>
> (i) Determines the number of patient days that —
>
> (A) Are associated with discharges occurring during each month; and
>
> (B) Are furnished to patients who during that month were entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI, excluding those patients who received only State supplementation;
>
> (ii) Adds the results for the whole period; and
>
> (iii) Divides the number determined under paragraph (b)(2)(ii) of this section by the total number of days that —
>
> (A) Are associated with discharges that occur during that period; and
>
> (B) Are furnished to patients entitled to Medicare Part A (including Medicare Advantage (Part C)).

In the August 12, 2005 Federal Register (70 FR 47,438-47,439) (Exhibit I-7), the Centers for Medicare and Medicaid Services ("CMS") explained how the Medicare Fraction would be calculated and the matching process used to arrive at the SSI ratio. The provider community believed there were errors in the matching process. In Baystate Medical Center v. Leavitt, 545 F. Supp. 2d 20 (D.D.C. 2008), as amended by 587 F.

01608

Supp. 2d 37 (D.D.C. 2008) (Exhibit I-8), the District Court for the District of Columbia found that, in certain aspects, CMS's current matching process did not use the "best available data." Based on the decision in Baystate, CMS revised its process for matching Medicare and SSI eligibility data. The Secretary published the revised process in the August 16, 2010 Federal Register. See 75 FR 50,275-50,286 (Aug. 16, 2010) (Exhibit I-9).

This appeal stems from CMS Ruling 1498-R (Exhibit I-10), which relates to this matching process. CMS Ruling 1498-R provides that for qualifying appeals of the data matching issue and for cost reports not yet final settled by an initial NPR, CMS will apply any new data matching process that is adopted in the forthcoming FY 2011 IPPS final rule for each appeal that is subject to the Ruling. See CMS Ruling 1498-R, pp. 4-7. CMS specified that "[t]he data matching process provisions of the Ruling would apply to properly pending appeals and open cost reports for cost reporting periods beginning prior to October 1, 2010 (that is, those preceding the effective date of the FY 2011 IPPS final rule)." Id., at p. 28. The Ruling further states that if a new data matching process was not adopted in the FY 2011 IPPS final rule, CMS would apply the same data matching process as the agency used to implement the Baystate decision to claims subject to the Ruling by recalculating that provider's SSI Fractions. Id. In the Ruling, CMS also adopted the proposed data matching process for FY 2011 as final.

The Provider's appeal is based on the claim that CMS incorrectly computed the SSI ratio for the fiscal year at issue because it failed to include all patients that were entitled to SSI

01609

benefits in its calculation.  The Provider believes that the SSI ratio issued by CMS and

the resulting audit adjustments made by the MAC are both flawed. It is the Provider's

position that the State records and coding of specific patient cases are a reliable indicator

of patients' SSI status and eligibility (or lack of it). The MAC disagrees with this

assumption.

## B.  Argument

### 1.  CMS Has Produced the Data That It Is Required to Produce to the Providers

The statutory basis for the Provider to obtain the data relating to the SSI data is the

Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Pub. L. 108-

173) (the "MMA").  Section 951 of the MMA directed the Secretary to begin providing

hospitals the information necessary to "compute the number of patient days used in

computing the disproportionate patient percentage no later than December 8, 2004".

The Secretary published her method for complying with the MMA in the August 12,

2005 Federal Register.  See 70 FR 47,438-47,439 (Aug. 12, 2005) (Exhibit I-7).  CMS

explained that:

> We interpret section 951 to require the Secretary to arrange to furnish to hospitals
> the data necessary to calculate both the Medicare and Medicaid fractions.  With
> respect to both the Medicare and Medicaid fractions, we interpret section 951 to
> require CMS to arrange to furnish the personally identifiable information that
> would enable a hospital to compare and verify its records, in the case of the
> Medicare fraction, against the [sic] CMS' records, and in the case of the Medicaid
> fraction, against the State Medicaid agency's records.

Id., at 47,438.

7

Specifically, CMS stated that it calculated the Medicare Fraction using data from the "MedPAR LDS," which was established in a notice published in the August 18, 2000 Federal Register (65 FR 50,548). Id., at 47,439. The notice explained that "MedPAR LDS contains a summary of all services furnished to a Medicare beneficiary, from the time of admission through discharge, for a stay in an inpatient hospital or skilled nursing facility, or both; SSI eligibility information; and enrollment data on Medicare beneficiaries." Id.

In the case at issue, the Provider has obtained, through data use agreements, CMS' MedPAR data for Federal Fiscal Years 2006 and 2007, supporting the number of SSI days used in CMS' calculation of the SSI percentage.

### 2. The Provider's Calculation Methodology

In the Provider's Final Position Paper, the Provider describes its methodology in determining the SSI days it believes should be used to calculate the SSI percentage. On page 5 of its Final Position Paper it states in part:

> The Provider then sought to match CMS's MedPAR data files and other CMS supplied data with the Provider's own patient records denoting SSI eligibility, and with State of California records showing specific benefit "aid codes" assigned to specific patients....It should be noted that these "aid codes," while captured for purposes of documentation for this appeal in Provider documents, actually are assigned by the Social Security Administration and then tabulated and published by State of California Department of Social Services, for use by the State Department of Health Care Services (DHCS). ...the Provider has asked a former Director of California's Medi-Cal program to validate the data provided for purposes of matching "SSI" designating Medi-Cal aid codes to specific patients' SSI status.

01611

The Provider goes on to describe how it has identified the Medi-Cal program designated aid codes that correspond to SSI benefit eligibility and aggregated those days.  The Provider found "the State's records show a considerably higher number of SSI recipients than do the CMS data file, including the MedPAR file." The Provider contends that the State's records are reliable, as it relates to how the State benefits programs are structured.

The MAC appreciates the Provider's attempt to be specific in identifying additional days it asserts should be included in the SSI percentage.  However, the MAC contends that the source data should be from the databases maintained by the Social Security Administration (SSA) and CMS. It is not appropriate to use data from California's Medi-Cal system.  It appears the Provider has over-simplified the matching process utilized by CMS.

The regulation at 42 C.F.R. § 412.106(b)(2)(i), identifies the days used in the computation of the SSI ratio (Exhibit I-6).

> (i) Determines the number of patient days that —
>
> > (A) Are associated with discharges occurring during each month; and
> >
> > (B) Are furnished to patients who during that month were entitled to both Medicare Part A (including Medicare Advantage (Part C)) and SSI, <u>excluding those patients who received only State supplementation;</u> (Emphasis added.)

The MAC maintains that the Provider has not documented that it has excluded those patients who received only State supplementation, from the days it is claiming should be counted in the SSI ratio.

9

01612

The Provider states in its position paper that it is requesting CMS and the SSA furnish more information to demonstrate that it has identified the correct number of days in its calculation.  The MAC contends that CMS has provided the detail that supports the number of SSI days utilized in its calculation of the SSI percentage included on the Provider's final cost report.

### 3. The Calculation Methodology Utilized by CMS

As explained above, CMS revised its process for matching Medicare and SSI eligibility data.  The Secretary published the revised process in the August 16, 2010 Federal Register. See 75 FR 50,275-50,286 (Aug. 16, 2010) (Exhibit I-9). In the Federal Register, CMS responded to comments regarding the revised process.

CMS addresses SSI entitlement as follows:

> The authorizing DSH statute at section 1886(d)(5)(F)(vi)(I) of the Act limits the numerator to individuals entitled to Medicare benefits who are also *"entitled* to supplemental security income benefits (excluding any State supplementation)" (emphasis added). Consistent with this requirement, we have requested, and are using in the data matching process, those SSA codes that reflect "entitlement to" receive SSI benefits. Section 1602 of the Act provides that "[e]very aged, blind, or disabled individual who is determined under Part A to be eligible on the basis of his income and resources shall, in accordance with and subject to the provisions of this title, be *paid* benefits by the Commissioner of the Social Security" (emphasis added). However, eligibility for SSI benefits does not automatically mean that an individual will receive SSI benefits for a particular month. For example, section 1611(c)(7) of the Act provides that an application for SSI benefits becomes effective on the later of either the month following the filing of an application for SSI benefits or the month following eligibility for SSI benefits.
>
> (75 FR page 50280)

10

01613

CMS goes on to explain that "SSI entitlement can change from time to time, and we believe that including SSI codes of C01, M01, and M02 accurately captures all SSI-entitled individuals during the month(s) that they are entitled to receive SSI benefits." (Id, at 50281)

CMS also comments on the timing of the data match.

> As we stated in the FY 2006 IPPS final rule, we believe that administrative finality with respect to the calculation of a hospital's SSI fraction is important (70 FR 47440). We continue to believe that it is important to find an appropriate balance between administrative finality (that is, the final settlement of a hospital's cost report) and the inclusion of retroactive SSI eligibility determinations and the lifting of SSI payment suspensions by using the best and latest available SSI eligibility data at the time of cost report settlement. Further, we believe it is important to account for the time period in which hospitals are allowed to submit timely Medicare claims in order to ensure that the point in time that we perform the match process includes as many timely submitted inpatient hospital claims as are administratively practicable.
>
> .....
>
> Therefore, we believe that using the version of MedPAR that is updated 15 months after the end of the fiscal year would contain more accurate and complete inpatient claims information, as we would be using claims data from 3 months after the filing deadline for claims with a date of service occurring on the last day of the second preceding fiscal year. Furthermore, a later update of the SSI eligibility file would contain more accurate eligibility information and would account for all retroactive changes in SSI eligibility and the lifting of SSI payment suspensions through that date.
>
> .....
>
> We believe that, by calculating SSI fractions on the basis of SSI eligibility data and MedPAR claims data that are updated 15 months after the end of the Federal fiscal year, we would be using the best data available to us, given the deadlines for the submission and final settlement of Medicare cost reports.
>
> (Id, at 50282)

CMS stated that the timing of the data match described above achieves "an appropriate balance between accounting for additional retroactive SSI eligibility determinations and the lifting of SSI payment suspensions using all timely submitted Part A inpatient claims, and

11

01614

facilitating administrative finality through the timely final settlement of Medicare cost reports." (Id, at 50283)

The Provider's SSI ratio, as adjusted by the MAC, was properly determined based on the revised process as published in the August 16, 2010 Federal Register.  CMS has properly calculated the Provider's SSI ratio in accordance with 42 C.F.R § 412.106(b).

## C.  Conclusion

It is the MAC's position that the methodology proposed by the Provider in its Final Position Paper is not appropriate for use in calculating the SSI Percentage. The Provider's method uses data from a secondary source, instead of the primary databases maintained by the SSA and CMS.  In addition, the matching process described in the August 16, 2010 Federal Register is much more detailed, accurate and specific than the method proposed by the Provider.

The Provider has failed to demonstrate that the SSI ratio is not accurate. The SSI ratio has been properly determined based on CMS' process for matching Medicare and SSI eligibility data as published in the August 16, 2010 Federal Register. The MAC respectfully requests the Board affirm its adjustment to the SSI Percentage as calculated by CMS.

01615

## IV. CITATION OF PROGRAM LAWS, REGULATIONS, AND INSTRUCTIONS

**Title XVIII of the Social Security Act**

SSA § 1886(d)(5)(F)

**United States Statutes**

5 U.S.C. § 552a

42 U.S.C. § 1395ww(d)(5)(F)

Health Insurance Portability and Accountability Act of 1996 (Pub. L. 104-191)

Medicare Prescription Drug, Improvement and Modernization Act of 2003 (Pub. L. 108-173, § 951)

**Code of Federal Regulations**

42 C.F.R. § 412.106

**Federal Register Notices**

65 FR 50,548 (Aug. 18, 2000)

70 FR 47,438-47,440 (Aug. 12, 2005)

75 FR 50,277-50,286 (Aug. 16, 2010)

**Judicial Decisions**

*Baystate Medical Center v. Leavitt,* 545 F. Supp. 2d 20 (D.D.C. 2008), *as amended by* 587 F. Supp. 2d 37 (D.D.C. 2008)

**Agency Instructions**

CMS Ruling 1498-R (April 28, 2010)

01616

## V. EXHIBITS

I-1.    August 20, 2012 Notice of Program Reimbursement

I-2.    Audit Adjustment Report, applicable pages

I-3.    Issue 2 transferred to CN 13-3870G

I-4.    Issue 3 transferred to CN 13-3874G

I-5.    Issue 4 transferred to CN 14-0069G

I-6.    42 C.F.R. §412.106

I-7.    70 FR 47,438-47,439 (August 12, 2005)

I-8.    Baystate Medical Center v. Leavitt, 545 F. Supp. 2d 20 (D.D.C. 2008), as amended by 587 F. Supp. 2d 37 (D.D.C. 2008)

I-9.    75 FR 50,275-50,286 (August 16, 2010)

I-10.   CMS Ruling 1498-R (April 28, 2010)

01617

**Doc Type: 10**



Final Position Paper



01822

RECEIVED

JAN 2 7 2016

PROVIDER REIMBURSEMENT
REVIEW BOARD

BEFORE THE

PROVIDER REIMBURSEMENT REVIEW BOARD

| | |
|---|---|
| In the Matter of: ) | |
| ) | |
| POMONA VALLEY HOSPITAL ) | CASE NO.: 13-0430 |
| MEDICAL CENTER ) | |
| ) | |
| Fiscal Year Ended ) | |
| December 31, 2006 ) | |
| ) | |
| Provider No.: 05-0231 ) | |
| ) | |

PROVIDER'S FINAL POSITION PAPER RE:

I.      DSH Adjustment – Data Integrity in SSI Percentage Calculation

II.     DSH Adjustment – Inclusion of Medicare Part C Days in SSI Percentage
        (Transferred)

III.    DSH Adjustment – Inclusion of Medicare Part C Days in DSH Medicaid
        Percentage (Transferred)

IV.     Medicare Unbilled Crossover Bad Debt (Transferred)

*Attorneys for Provider:*
POMONA VALLEY HOSPITAL
MEDICAL CENTER

LAURENCE D. GETZOFF
HOOPER, LUNDY & BOOKMAN, P.C.
1875 Century Park East, Suite 1600
Los Angeles, CA 90067
Tel.: (310) 551-8111
Fax: (310) 551-8181

# TABLE OF CONTENTS

**Page**

I.  DISPROPORTIONATE SHARE HOSPITAL (DSH) ADJUSTMENT – DATA
    INTEGRITY IN SSI PERCENTAGE CALCULATION.................................................1

    A.  ISSUE PRESENTED...........................................................................1

    B.  STATEMENT OF FACTS .................................................................1

    C.  PARTIES' CONTENTIONS ..............................................................3

        1.  MAC Contentions. ...........................................................3

        2.  Provider's Contentions..................................................3

    D.  ARGUMENT ......................................................................................3

        1.  SSI Percentage – Inaccurate Count Of Medicare/SSI Patient Days. ...........3

        2.  The Provider's Calculation Methodology. ....................................5

        3.  The Continued Need for Additional SSA Data..............................9

        4.  CMS Ruling 1498-R Supports the Provider's Position............................11

        5.  The Provider Is Using the Data Set Approved by CMS, and
            Following the Methodology Requested by CMS.......................................11

II.  DSH ADJUSTMENT -- INCLUSION OF MEDICARE PART C DAYS IN SSI
     PERCENTAGE.........................................................................................12

III. DSH ADJUSTMENT -- INCLUSION OF MEDICARE PART C DAYS IN DSH
     MEDICAID PERCENTAGE. .....................................................................12

IV.  UNBILLED MEDICARE CROSSOVER BAD DEBTS. ................................................13

01824

## <u>TABLE OF CITATIONS</u>

**Page(s)**

**Federal Cases**

*Baystate Medical Center v. Leavitt,*
 545 F. Supp. 2d 20, *as amended,* 587 F. Supp. 2d 37 (D.D.C. 2008)......................................10

*Loma Linda Community Hosp. v. Shalala,*
 907 F. Supp. 1399 (C.D. Cal. 1995) (Exhibit P-13) ................................................................9

**Federal Statutes**

42 U.S.C. § 1395ww(d)(5)(F)(vi) (Exhibit P-3) ...........................................................................2, 4

**Other Authorities**

CMS Ruling 1498-R ...............................................................................................4, 10, 11

S.F. Rep. No. 23, 98th Congress,1st Sess. 54 (1983), reprinted in 1983 U.S.C.C.A.N. 143............1

H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1356 (1984), reprinted in 1984 U.S.C.C.A.N.
 1445..............................................................................................................................1

Pub. L. No. 98-21, 601(e) ...........................................................................................................1

Social Security Administration Publication No. 05-11125 – January 2015 ...................................7

01825

I.   **DISPROPORTIONATE SHARE HOSPITAL (DSH) ADJUSTMENT – DATA INTEGRITY IN SSI PERCENTAGE CALCULATION.**

A.   **ISSUE PRESENTED**

Whether the Medicare Administrative Contractor ("MAC") properly calculated Pomona Valley Hospital Medical Center's ("Provider" or "Pomona" or "Hospital") disproportionate share hospital ("DSH") reimbursement with respect to the Provider's Supplemental Security Income ("SSI") percentage.

Adjustment Numbers: 22, 23 and 39

Estimated reimbursement impact (as revised) for SSI percentage issue: $1,580,614.

B.   **STATEMENT OF FACTS**

When Congress enacted the Prospective Payment System ("PPS") it recognized that providers that were paid a set amount per diagnostic related group would be unfairly penalized if they treated a disproportionate share of low income patients.  Congress recognized that low income patients frequently are in poorer health and are more costly to treat than are higher income patients. See S.F. Rep. No. 23, 98th Cong., 1st Sess. 54 (1983), reprinted in 1983 U.S.C.C.A.N. 143, 194; H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. 1356 (1984), reprinted in 1984 U.S.C.C.A.N. 1445, 2044 (Exhibit P-1).  To compensate for this detriment to PPS hospitals, Congress authorized the Secretary of Health and Human Services ("Secretary") to disburse extra Medicare funds, called DSH payments, to PPS hospitals that treat a disproportionate share of low income patients.  See Social Security Amendments of 1983, Pub. L. No. 98-21, S 601(e) (Exhibit P-2).

A provider's DSH percentage, the primary calculation used to take into account a hospital's treatment of a disproportionate share of low income patients, consists of the sum of two fractions: (1) a provider's patient days associated with treating Medicare patients eligible for SSI, divided by the provider's total Medicare patient days (hereinafter "the SSI percentage"), and (2) a provider's Medicaid eligible patient days divided by total patient days (hereinafter "the Medicaid proxy" – the

Medicaid eligible days issues are treated separately below).  See 42 U.S.C. § 1395ww(d)(5)(F)(vi) (Exhibit P-3).

The Provider herein disputes the MAC's calculation of the numerator of the Provider's SSI percentage as set forth below, on the basis that due to flawed data matching, a full set of the Provider's qualifying "SSI" Medicare patient days were not included by CMS in the numerator of the Provider's "SSI Percentage," which has resulted in the Provider's SSI percentage being understated. The Provider timely appealed this issue by letter to the Provider Reimbursement Review Board ("Board" or "PRRB") dated January 15, 2013.  (See Exhibit P-4).

In calculating the Provider's DSH adjustment percentage, the MAC used an SSI percentage generated by Centers for Medicare and Medicaid Services' ("CMS"), of 14.74%.  However, that percentage includes counting Medicare Part C days in the SSI percentage.  Omission of such Part C days from the SSI percentage is the subject of a separate group appeal involving Pomona for this fiscal year.  The Provider, however, to assure an accurate comparison with the MAC's applied percentage accepts (but only for purposes of this appeal) that the 21.52% is the starting point for the analysis of the "data matching" issue addressed in this position paper.  The Provider disputes the accuracy of the 14.74% SSI percentage used by the MAC and CMS.  Indeed, CMS's own "MedPAR" file shows an SSI percentage for Pomona of 15.09%.  But, the Provider, after a thorough review of the data, has determined, as discussed below, that the correct SSI percentage (again, without respect to the Part C days SSI issue and without taking into account other relief in this appeal, and adjustments to be discussed below in this section, should be 21.52%.

Further, the Provider seeks to analyze and challenge based on CMS's own approved data sets the underlying data used by CMS in generating the SSI percentage used for the Provider's fiscal year ending ("FYE") 12/31/2006.

01827

The Provider contends that the "raw" SSI percentage computed by CMS was 6.78% too low, based on the Provider's analysis and matching of days. The estimated reimbursement impact for this portion of the MAC's DSH adjustment is $1,580,614. (See Calculation attached as Exhibit P-5.)

## C.   PARTIES' CONTENTIONS

### 1.   MAC Contentions.

The MAC contends that it was required by law to use CMS' SSI percentage. The MAC further contends that CMS' SSI percentage is now based on a methodology that results in a more accurate calculation.

### 2.   Provider's Contentions.

The Provider contends that the CMS methodology used to generate the SSI percentage, though somewhat improved, still understates the number of the Provider's Medicare/SSI patient days for purposes of the FYE 12/31/06 DSH calculation, due to inaccurate matching of SSI and Medicare data and the incomplete matching with data produced by the State of California. Further, the Provider contends that the MAC should not be permitted to rely on CMS' SSI percentage in the DSH calculation unless the Provider is afforded an opportunity to analyze and challenge the information and data used by CMS in arriving at its SSI percentage, and/or to analyze in greater detail the methodology used in any revised matching process approved by CMS. Also, contrary to the MAC's statement in a prior year's appeal, the Provider contends that it is basing its calculation on a data set that it appropriately obtained, and on one that has been approved by CMS.

## D.   ARGUMENT

### 1.   SSI Percentage – Inaccurate Count Of Medicare/SSI Patient Days.

As set forth above, the SSI percentage is one of two percentages used to calculate a provider's DSH reimbursement. The SSI percentage consists of the number of patient days associated with treating patients who are entitled to Medicare Part A benefits and SSI, divided by the

01828

number of patient days associated with the treatment of all patients entitled to Medicare Part A benefits. See 42 U.S.C. § 1395ww(d)(5)(F)(vi) (Exhibit P-3). In calculating the Provider's DSH adjustment, the MAC used an SSI percentage of 14.74%.[1] However, despite improvements in CMS' matching methodology, the Provider has calculated that CMS' imputed SSI percentage is still understated by at least 5.59%[2], due to inaccurate and/or incomplete data; therefore, the MAC should revise the DSH adjustment using the appropriate and accurate SSI percentage.[3]

According to the relevant data, the Provider's final, actual SSI percentage should be revised to approximately 20.33%. Using this data and based on the Provider's calculations, the Provider is due approximately an additional $1,580,614 of Medicare reimbursement. See Exhibit P-5. The Provider also seeks to analyze the underlying data used by CMS. Although the Provider acknowledges that CMS has instructed MAC's to use a revised methodology for verifying Providers' SSI days, and that such methodology is producing somewhat better matching between Social Security Administration and Medicare program data, flaws in the matching process still exist, and the Provider's SSI percentage continues to be significantly understated.

Based on the Provider's own analysis, which included a review of CMS supplied data, and various records produced by the State of California Department of Health Care Services ("CDHCS"), it is clear that CMS simply missed, did not count or was completely unaware of approximately 2,079 days for which reliable records show that patients were both entitled to Part A

---

[1] Omitting Part C days from the SSI percentage (the subject of a separate appeal filed by the Provider) yields an imputed CMS-derived SSI percentage of 28.84%.

[2] The actual difference between the CMS derived percentage, 14.74%, and the Provider's derived rate of 21.52%, is 6.78%; however, the 6.78% difference is then reduced using a DSH formula multiplier (0.825) to yield a final SSI incremental difference of 5.59% (see Exhibit P-5).

[3] CMS and the MAC claim to use CMS "MedPAR" data in performing the SSI matching. See CMS Ruling 1498-R (Exhibit P-6). Yet, CMS's own MedPAR data file lists the Provider's SSI percentage as 15.09%. The MAC has applied an SSI percentage even lower than what is shown in CMS's own data file. Clearly, inaccuracy and inconsistency remain in the SSI data matching process.

benefits and eligible for SSI benefits. The Provider continues to believe that the State records and coding of specific patient cases are a reliable indicator of patients' SSI status and eligibility (or lack of it).

## 2.   The Provider's Calculation Methodology.

As a starting point for determining its SSI percentage for cost reporting year ending 12/31/2006, the Provider obtained, through data use agreements, CMS's basic data for Federal Fiscal Years 2006 and 2007 (the last three months of the Provider's 2006 cost year is in Federal Fiscal Year 2007) supporting the CMS-issued SSI percentage of 14.74%. (Data Use Agreement with CMS attached as Exhibit P-7). The Provider then sought to match CMS's MedPAR data files and other CMS supplied data with the Provider's own patient records denoting SSI eligibility, and with State of California records showing specific benefit "aid codes" assigned to specific patients. See List of Patients attached as Exhibit P-8. It should be noted that these "aid codes," while captured for purposes of documentation for this appeal in Provider documents, actually are assigned by the Social Security Administration and then tabulated and published by State of California Department of Social Services, for use by the State Department of Health Care Services (DHCS). The aid codes are not assigned or produced by the Provider. Indeed, the Provider has asked a former Director of California's Medi-Cal program to validate the data provided for purposes of matching "SSI" designating Medi-Cal aid codes to specific patients' SSI status.

The Provider then isolated the State aid codes that correspond to SSI benefit eligibility and aggregated those days. See Workpaper S-1/2 "SSI Days based on Aid Codes" Exhibit P-9. The MAC should note, in addition, that the relevant aid codes are also described in narrative form on the "Legend of Aid Codes" (derived from the State DHCS Aid Codes Master Chart) that is attached as Exhibit P-10. In comparing the days by State aid code on Exhibit P-9 with CMS's data file, one can see that for several aid codes, there is full agreement between the CMS data and the Provider's

01830

accounting. However, for aid codes "10" ("SSI/SSP"), "20" (SSI/SSP Aid to the Blind) and "60" (SSI/SSP Aid to the Disabled), in particular, the State's records show a considerably higher number of SSI recipients than do the CMS data file, including the MedPAR file. The Provider can demonstrate, either before or at hearing that the aid code assignment system is accurate, and that specific aid codes 10, 20, and 60, unambiguously reflect and correspond to a patient's SSI status, since the Medi-Cal program obtains patients' SSI status in real time directly from the Social Security Administration.

Specifically, Pomona has focused only on Medi-Cal program designated aid codes 10, 20 and 60 for purposes of this appeal, since these three aid codes unambiguously indicate that a patient is an SSI/SSP benefits recipient at a given time. These aid codes, which correspond to "aged" (10), "blind" (20) and "disabled" (60), respectively, are assigned to patients with these conditions only if such patients have been verified by the SSA as being eligible for SSI/SSP benefits. This is confirmed by the current Medi-Cal program's Program Integrity Unit of the Medi-Cal Eligibility Division (see email from Amy Rosenkranz, October 27, 2015 at Exhibit P-11A), and is (and will be) confirmed as well by a former Director of the Medi-Cal program (who prior to that post served as the Director of the Eligibility Branch of Medi-Cal). Each of these individuals state unequivocally that SSA provided (and still provides) the State Medi-Cal program with monthly verification of Medi-Cal beneficiaries' SSI/SSP status, and that such status is verified prior to use of the aid codes at the State level.

The State's records regarding the SSI status of patients is especially reliable for a number of reasons related to how the State benefits programs are structured. Unlike some other states, California provides a "State supplementation amount" or "SSP" that is in addition to benefits these patients receive from the SSA. However, and again, unlike many other states, California has these payments added to SSI beneficiaries' checks prepared by the SSA, so that the SSI beneficiaries

01831

receive one check monthly from SSA, which includes both the SSI benefit, and the State's SSP benefit. The State actually pays the SSA an administrative fee to have SSA prepare the unified check and to manage the State benefit. The State has no interest whatsoever in overstating the number of eligible individuals assigned aid codes 10, 20 and 60. The single payment an SSI beneficiary receives monthly from SSA includes both the federal SSI payment and the California supplement. See Exhibit P-12 (Social Security Administration Publication No. 05-11125 – January 2015).

State Medi-Cal aid codes 10, 20 and 60 refer to categories of patients who are eligible for SSI benefits, and who also may be eligible for SSP benefits. In fact, the aid codes, themselves, are assigned by the SSA. (See Exhibit P-11B, E-mail from Amy Rosenkranz, 12/10/2015, of the Medi-Cal Program Integrity Unit.)

Aid codes 10, 20 and 60, to which Pomona has decided to limit its challenge to the SSI percentage assigned by CMS, further are not used where a patient's SSI/SSP status has not been verified on a monthly basis. Since the Medi-Cal program was utilizing these aid codes based directly on data from SSA that was and is updated on a monthly basis, the aid codes may provide a more reliable basis for verifying SSI days for purposes of calculating a provider's SSI percentage than do the CMS percentages, which are apparently based more on a "snapshot" at a particular date and time, and which may further not be based on the best available SSA data that has been updated over time. Moreover, the Medi-Cal aid code system is known, is verifiable and has been set up specifically to capture SSA data specifying SSI status of beneficiaries. Aid codes and the system for assigning them are transparent and verifiable. In contrast, the Medicare program has never actually explained precisely which data are being reviewed by CMS to calculate providers' SSI percentages for DSH purposes, nor has CMS ever delineated exactly what the process and methodology for determining the SSI percentages it uses for DSH purposes. Further, the MACs state only (and the

1199052.1                                    -7-

Provider does not dispute this) that they simply accept and apply the SSI percentages that are published annually by CMS for each provider. In other words, the Provider's methodology is not only more reliable and accurate, but it is more transparent and verifiable.

Prior cases before the PRRB did not fully present this argument, nor have any of such cases presented in any detail the derivation of these aid codes (10, 20 and 60), explained which agency (the SSA) assigned them, what they stand for, or even why a patient receiving SSP with an aid code of 10, 20 or 60 must also be counted as a patient receiving SSI benefits. Pomona has satisfied each of the prerequisites of proving that SSA data completely supports the Provider's position in this appeal. Moreover, unlike in previous cases before the Board, Pomona has obtained the counsel of, and will present testimony from, the former Director of the Medi-Cal program and former Director of the Medi-Cal Eligibility Division. In this case, the Provider can and will demonstrate conclusively the meaning and reliability of the State generated data. In addition, the Provider will be submitting a randomly selected sample set of data to CMS for verification by the SSA prior to the hearing.

The end result of these discrepancies between CMS data files and the Provider's process (starting with CMS data, but then using State records to complete the matching in lieu of SSA records that the Provider does not have, as yet anyway) is that the Provider identified a total of 6,965 SSI Medicare days, whereas CMS identified only 4,886 such days. The Provider's calculation appears to be more accurate than CMS's data at this point, owing to the inclusion of State-generated data, data based directly on SSA records, in addition to the CMS data.

The total of 6,965 SSI days translates to a Medicare SSI percentage of 20.33%, not 14.74%, and an increase in reimbursement of $1,580,614. See Exhibit P-5. The Provider's calculation methodology, though, further highlights the need for improved data from the SSA and CMS.

01833

### 3.    The Continued Need for Additional SSA Data.

The Provider also is requesting for CMS and the Social Security Administration ("SSA") to furnish more complete information in a reliable and accurate form, which, to date, has not been provided generally.

A federal District Court for the Central District of California, in overturning a prior CMS decision, held that a provider has a right to access the data used by CMS's predecessor in making its SSI percentage calculation. *See Loma Linda Community Hosp. v. Shalala*, 907 F. Supp. 1399, 1404-1405 (C.D. Cal. 1995) (Exhibit P-13). The Court directly addressed the SSI percentage calculation at issue herein and specifically noted that the PRRB "hearing procedure would be rendered meaningless if the MAC's calculations must be accepted as conclusively correct and the health provider is not allowed to contest it by presenting its own calculations and by challenging the data underlying the MAC's calculation." Id. at 1405 (Exhibit P-13).

But now having received data from CMS pursuant to a data use agreement for both Federal fiscal years 2006 and 2007, the Provider remains convinced of the inaccuracy of the data matching process used by CMS. The Provider clearly would be aided by improved data from either CMS or from the Social Security program to fully demonstrate these inaccuracies.

In accordance with its desire to effectively challenge the CMS-generated SSI percentage, the Provider seeks to work with CMS and the Social Security Administration to obtain a clearer explanation of the revised methodology used by the MAC and CMS for matching SSI days. After a nationwide effort, CMS, with the PRRB's (and presumably the MAC's) knowledge, established a process for reviewing provider requests for "SSI factor" related information, which process also seeks to remove any obstacle passed by "privacy" related provisions in federal law. The Provider pursued and has obtained whatever information has been made available by CMS through this process. Yet, the data still appears to be incomplete.

01834

The Provider's position is supported further by the decision in *Baystate Medical Center v. Leavitt,* 545 F. Supp. 2d 20, *as amended,* 587 F. Supp. 2d 37, 44 (D.D.C. 2008). See Exhibit P-14. Therein, the district court concluded that CMS had not used the "best available data" in matching Medicare and SSI eligibility data, and then ordered CMS to recalculate a provider's SSI fractions and DSH adjustments. *Baystate,* at 587 F. Supp. 2d 43.

Rather than appeal the court's decision in *Baystate,* CMS instead issued CMS Ruling 1498-R, which addressed, among other issues, how to implement aspects of the court's decision. See Exhibit P-6. CMS has instructed MACs to use a revised data matching process, intended, the Provider presumes, to improve the accuracy of matching Medicare and SSI data. However, the revised methodology has neither been explained fully, including why it is supposedly more accurate; nor has the methodology been objectively verified and tested.

The Provider, therefore, in appealing this issue, also seeks to obtain further relevant information that will conclusively demonstrate the correct number of SSI days for fiscal year ending 12/31/2006, and/or to receive a clear explanation regarding how and why CMS's "revised" matching methodology, alluded to in CMS Ruling 1498-R, has assured an accurate calculation of the Provider's SSI percentage that accurately matches the Provider's Medicare and SSI days. Absent such information and/or assurance, the Provider contends that the *Baystate* court's decision has not been afforded sufficient effect, and the Provider requests the PRRB to review and determine the Provider's SSI percentage based on such new information that the Provider can submit. Based on the discrepancies in data matching shown by the Provider, it appears that no fully reliable methodology has yet been established and explained by CMS, at least for the Provider's fiscal year end 12/31/2006.

01835

### 4.    CMS Ruling 1498-R Supports the Provider's Position.

CMS determined that in order to comply with the Baystate decision, the agency would revise its matching methodology to assure that the matching process is more consistent and more accurate. CMS Ruling 1498-R, pages 5, 6. There is some evidence that CMS's matching process has improved modestly; however, providers, such as the Provider (Pomona Valley) herein, still notice that days which appear obviously to qualify as SSI patient Medicare days are not being included in the SSI percentage for purposes of calculating the DSH adjustment. As such, these providers, including Pomona herein, are still being shortchanged on their appropriate Medicare reimbursement for services rendered Medicare beneficiaries. As shown by CMS's acknowledgement in its Ruling 1498-R, the SSI data matching process has been plagued by inconsistency in the past, and some of these problems apparently are now continuing.

The Provider posits that the continued inaccuracy of the CMS's matching may be due to a lack of careful study of state by state records, or it may simply reflect continued inaccuracy in data provided by other agencies (such as the SSA). But whatever the cause, the Provider is entitled to demonstrate before the PRRB that days attributable to SSI patients who were entitled to Medicare benefits incurred days of service that were not accounted for in the CMS revised data matching process, and Pomona Valley is prepared to make that showing. The Provider has spent considerable time and effort in matching its days, and firmly believes that its calculations are correct, based on all of the data available to date.

### 5.    The Provider Is Using the Data Set Approved by CMS, and Following the Methodology Requested by CMS.

In preparing its appeal and this preliminary position paper, the Provider entered into a data use agreement as prescribed by CMS, obtained the data in a form offered and approved by CMS, and then used this approved data set to support its position.

01836

First, Pomona followed the directions on the "CMS.gov" website page and requested a set of "DUA – DSH" data from CMS for Pomona's 2006 through 2008 fiscal years (portions of FFY 2006 and FFY 2007 combine to cover this provider fiscal year). See Exhibit P-15. The DSH-DUA file is referenced in CMS instructions and is an appropriate file to use (and rely on) as it is prepared under CMS's auspices. Importantly, this particular data file has three fields for SSI identification (pre-CMS Ruling 1498-R SSI, post-ruling SSI, and then showing SSI identified days under the CMS Ruling new "matching" process.)

A Data Use Agreement was signed and submitted to CMS, dated 7/17/2013. See Exhibit P-7. Thereafter, CMS provided the requested DSH data set on July 25, 2013 with a start date of 1/1/06 and an end date of 12/31/09. (See E-mail from Faye Johndrow of CMS dated July 25, 2013 re "DSH Data Request Provider Number 05-0231, Exhibit P-16, including Appendix A showing file layout.) In addition, in past years, CMS and/or MACs have advised the Provider to use this data set for SSI calculations. The Provider contends, therefore, that it has obtained and reviewed an appropriate date set, but that the data set is inaccurate with respect to Pomona's SSI percentage.

## II.   DSH ADJUSTMENT -- INCLUSION OF MEDICARE PART C DAYS IN SSI PERCENTAGE.

Adjustment Numbers: 22, 23, 39.

This issue has been transferred to Group Appeal Case No. 13-3870G. See Exhibit P-17.

## III.   DSH ADJUSTMENT -- INCLUSION OF MEDICARE PART C DAYS IN DSH MEDICAID PERCENTAGE.

Adjustment Numbers: 22, 23, 39.

This issue has been transferred to Group Appeal Case No. 13-3874G. See Exhibit P-18.

01837

IV.    **UNBILLED MEDICARE CROSSOVER BAD DEBTS.**

This issue has been transferred to Group Appeal HRS 2006 Crossover Bad Debt Billed/Unbilled Group on October 7, 2013.  See Exhibit P-19.


DATED: January 2<u>l</u>, 2016                          Respectfully submitted,

                                                        LAURENCE D. GETZOFF
                                                        HOOPER, LUNDY & BOOKMAN, P.C.

                                                  By: _____
                                                        Laurence D. Getzoff
                                                        Attorneys for Provider

01838

**P7**

P-7

01908

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB No. 0938-0734

## DSH DATA USE AGREEMENT FOR COST REPORTING PERIODS THAT INCLUDE DECEMBER 8, 2004 AND THEREAFTER

DUA #   *05- 0231*

### AGREEMENT FOR USE OF CENTERS FOR MEDICARE & MEDICAID SERVICES (CMS) DATA CONTAINING INDIVIDUAL-SPECIFIC INFORMATION

In order to secure data that resides in a CMS Privacy Act System of Records, and in order to ensure the integrity, security, and confidentiality of information maintained by the CMS, and to permit appropriate disclosure and use of such data as permitted by law, CMS and *Pomona Valley Hospital Medical Center, 05-0231* enter into this agreement to comply with the following specific paragraphs.

*(Provider Name and Number)*

1. This Agreement is by and between the Centers for Medicare & Medicaid Services (CMS), a component of the U.S. Department of Health and Human Services (DHHS), and *Pomona Valley Hospital Medical Center, 05-0231* , hereinafter termed "User."

   *(Provider Name and Number)*

2. This Agreement addresses the conditions under which CMS will disclose and User will obtain and use the CMS data file(s) specified in paragraph 5. This Agreement supersedes any and all agreements between the parties with respect to the use of data from the files specified in paragraph 5 and preempts and overrides any instructions, directions, agreements, or other understanding in or pertaining to any grant award or other prior communication from the Department of Health and Human Services or any of its components with respect to the data specified herein. Further, the terms of this Agreement can be changed only by a written modification to this Agreement or by the parties adopting a new agreement. The parties agree further that instructions or interpretations issued to User concerning this Agreement or the data specified herein, shall not be valid unless issued in writing by the CMS point-of-contact specified in paragraph 16 or the CMS signatory to this Agreement shown in paragraph 17.

3. The parties mutually agree that CMS retains all ownership rights to the data file(s) referred to in this Agreement, and that User does not obtain any right, title, or interest in any of the data furnished by CMS.

4. User represents, and in furnishing the data file(s) specified in paragraph 5. CMS relies upon such representation, that such data file(s) will be used solely for the purpose of calculating User's Medicare fraction of the disproportionate patient percentage. User represents further that User shall not disclose, release, reveal, show, sell, rent, lease, loan, or otherwise grant access to the data covered by this Agreement to any person. Exception: User may disclose, release, reveal or show individually identifiable data to the following entities (including individuals employed by or under contract with such entities) and individuals, to the extent necessary to calculate User's Medicare fraction of the disproportionate patient percentage: (1) CMS; (2) a fiscal intermediary under contract with CMS; (3) The PRRB; (4) a consultant or attorney or other representative under contract with User to prosecute, or assist in the prosecution of, an administrative and/or judicial appeal of CMS's calculation of its disproportionate patient percentage; (5) the Department of Justice (6) a Federal court. Any such grant of access by User to individually identifiable data under the foregoing Exception shall be strictly limited to the extent necessary for User to calculate its Medicare fraction of the disproportionate patient percentage – User is expected to redact individually identifiable data and/or use code identifiers wherever possible. User further agrees that, within the User organization, access to the data covered by this Agreement shall be limited to the minimum number of individuals necessary to achieve the purpose stated in this section paragraph and to those individuals on a need-to-know basis only.

01909

5. The following CMS data file(s) is/are covered under this Agreement:
MEDPAR File Extract

| Provider Number | Provider Cost Reporting Period |
|---|---|
| 05- 0231 | 1/1/2006 ～ 12/31/2006 |
| 05- 0231 | 1/1/2007 ～ 12/31/2007 |
| 05- 0231 | 1/1/2008 ～ 12/31/2008 |
| 05- 0231 | 1/1/2009 ～ 12/31/2009 |
|  |  |
|  |  |
|  |  |

The above file(s) are being disclosed to User under routine use 3 of the 'Medicare Provider Analysis and Review (MEDPAR), HHS/CMS/OIS, 09-70-0514' Privacy Act system of records, published at 71 Fed. Reg. 17470 (April 06, 2006).

6. The parties mutually agree that the aforesaid file(s) (and/or any derivative file(s) (which includes any file that maintains or continues identification of individuals)) may be retained by User no more than 90 days after the date of termination of User's appeal of CMS's calculation of its disproportionate patient percentage. For purposes of this paragraph, "date of termination of User's appeal" shall be the date upon which any of the following events occur: (1) the User abandons its appeal; (2) an order rendered by the PRRB, the CMS Administrator or court upholding CMS's calculation of User's disproportionate patient percentage has become final and non-appealable; (3) an order rendered by the PRRB, the CMS Administrator or court awarding additional payment to User with respect to the disproportionate patient percentage (including an order approving a settlement) has become final and non-appealable and such payment has been made to User; (4) an administrative resolution satisfactory to User and to the fiscal intermediary is reached on the appeal, and any additional payment provided for by such resolution, with respect to the disproportionate patient percentage, has been made to User. User agrees to destroy the files(and/or any derivative file(s) (which includes any file that maintains or continues identification of individuals)) after the date of termination of User's appeal. User agrees that no data from CMS records, or any parts thereof, shall be retained when the aforementioned file(s) are destroyed unless authorization in writing for the retention of such file(s) has been received from the appropriate Systems Manager or the person designated in paragraph 17 of this Agreement. User acknowledges that strict adherence to the aforementioned retention date is required.

The Agreement may be terminated by either party at any time for any reason upon 30 days written notice. Upon such notice, CMS will cease releasing data to User under this Agreement and will notify User to destroy all previously released data files. Sections 3, 4, 6, 9, 10, 12, 13 and 14 shall survive termination of this Agreement.

01910

7. User agrees to establish appropriate administrative, technical, and physical safeguards to protect the confidentiality of the data and to prevent unauthorized use or access to it. The safeguards shall provide a level and scope of security that is not less than the level and scope of security established by the Office of Management and Budget (OMB) in OMB Circular No. A-130, Appendix III—Security of Federal Automated Information Systems (http://www.whitehouse.gov/omb/circulars/a130/a130.html), which sets forth guidelines for security plans for automated information systems in Federal agencies. User acknowledges that the use of unsecured telecommunications, including the Internet, to transmit individually identifiable or deducible information derived from the file(s) specified in paragraph 5 is prohibited. Further, User agrees that the data must not be physically moved or transmitted in any way from the site(s) indicated in paragraph 16, except as provided in paragraph 4, without written approval from CMS.

8. User agrees that the authorized representatives of CMS or DHHS Office of the Inspector General will be granted access to premises where the aforesaid file(s) are kept for the purpose of inspecting security arrangements confirming whether the User is in compliance with the security requirements specified in paragraph 7.

9. The User agrees not to disclose direct findings, listings, or information derived from the file(s) specified in section 5, with or without direct identifiers, if such findings, listings, or information can, by themselves or in combination with other data, be used to deduce an individual's identity. Examples of such data elements include, but are not limited to geographic location, age if > 89, sex, diagnosis and procedure, admission/discharge date(s), or date of death.

   The User agrees that any use of CMS data in the creation of any document (manuscript, table, chart, study, report, etc.) concerning the purpose specified in section 4 (regardless of whether the report or other writing expressly refers to such purpose, to CMS, or to the files specified in section 5 or any data derived from such files) must adhere to CMS' current cell size suppression policy. This policy stipulates that no cell (eg. admittances, discharges, patients) less than 11 may be displayed. Also, no use of percentages or other mathematical formulas may be used if they result in the display of a cell less than 11. By signing this Agreement you hereby agree to abide by these rules and, therefore, will not be required to submit any written documents for CMS review. If you are unsure if you meet the above criteria, you may submit your written products for CMS review. CMS agrees to make a determination about approval and to notify the user within 4 to 6 weeks after receipt of findings. CMS may withhold approval for publication only if it determines that the format in which data are presented may result in identification of individual beneficiaries.

10. User understands and agrees that it may not reuse original or derivative data file(s) without prior written approval from the appropriate System Manager or the person designated in paragraph 17 of this Agreement.

11. The parties mutually agree that the following specified Attachments are part of this Agreement:

    ☒ NO ATTACHMENTS

    _____
    _____
    _____

12. User agrees that in the event CMS determines or has a reasonable belief that User has made or may have made disclosure of the aforesaid file(s) that is not authorized by this Agreement or other written authorization from the appropriate System Manager or the person designated in paragraph 17 of this Agreement, CMS in its sole discretion may require User to: (a) promptly investigate and report to CMS User's determinations regarding any alleged or actual unauthorized disclosure, (b) promptly resolve any problems identified by the investigation; (c) if requested by CMS, submit a formal response to an allegation of unauthorized disclosure; (d) if requested by CMS, submit a corrective action plan with steps designed to prevent any future unauthorized disclosures; and (e) if requested by CMS, return data files to CMS. User understands that as a result of CMS's determination or reasonable belief that unauthorized disclosures have taken place, CMS may refuse to release further CMS data to User for a period of time to be determined by CMS.

01911

13. User hereby acknowledges that criminal penalties under § 1106(a) of the Social Security Act (42 U.S.C. § 1306(a)), including a fine not exceeding $5,000 or imprisonment not exceeding 5 years, or both, may apply to disclosures of information that are covered by § 1106 and that are not authorized by regulation or by Federal law. User further acknowledges that criminal penalties under the Privacy Act (5 U.S.C. § 552a(i) (3)) may apply if it is determined that the Requestor, User or Custodian, or any individual employed or affiliated therewith, knowingly and willfully obtained the file(s) under false pretenses. Any person found guilty under the Privacy Act shall be guilty of a misdemeanor and fined not more than $5,000. Finally, User acknowledges that criminal penalties may be imposed under 18 U.S.C. § 641 if it is determined that the User, or any individual employed or affiliated therewith, has taken or converted to his own use data file(s), or received the file(s) knowing that they were stolen or converted. Persons convicted under § 641 shall be fined under Title 18 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $1,000, they shall be fined under Title 18 or imprisoned not more than one year, or both.

14. By signing this Agreement, User agrees to abide by all provisions set out in this Agreement for protection of the data file(s) specified in paragraph 5, and acknowledges having received notice of potential criminal or administrative penalties for violation of the terms of the Agreement.

15. On behalf of User the undersigned individual hereby attests that he or she is authorized to enter into this Agreement and agrees to all the terms specified herein.

| | | |
|---|---|---|
| **Name and Title of User** *(Representative for Provider) (typed or printed)*<br>*VALLEN H. Kuo , Senior Financial & Reimbursement Analyst* | | |
| **Provider Name**<br>*Pomona Valley Hospital Medical Center* | | |
| **Street Address**<br>*1798 N. Garey Ave.* | | |
| **City**<br>*Pomona* | **State**<br>*CA* | **ZIP Code**<br>*91767* |
| **Office Telephone** *(Include Area Code)*<br>*(909) 865-9880* | **E-Mail Address** *(If applicable)*<br>*VALLEN.Kuo@PVHMC.ORG* | |
| **Signature** | | **Date**<br>*7/17/2013* |

01912

16. The parties mutually agree that the following named individual(s) and/or entities is or are designated as Custodian(s) of the file(s) on behalf of User and each person or entity so designated will be responsible for the observance of all conditions of use and for establishment and maintenance of security arrangements as specified in this Agreement to prevent unauthorized use. User is responsible for any non-observance of the conditions of use, and/or failure to establish or maintain security arrangements, on the part of any Custodian. User agrees to notify CMS within fifteen (15) days of any change of custodianship. The parties mutually agree that CMS may disapprove the appointment of a custodian or may require the appointment of a new custodian at any time.

Each Custodian agrees and in his or her capacity as an employee or contractor (including consultant, attorney or other representative) of the User to comply with all of the provisions of this Agreement on behalf of User.

| Name of Custodian *(typed or printed)* |||
| VALLEN H. KUO , Senior Financial & Reimbursement Analyst |||
| Company/Organization |||
| Pomona Valley Hospital Medical Center |||
| Street Address |||
| 1798 N. Grasey Ave. |||
| City | State | ZIP Code |
| Pomona | CA | 91767 |
| Office Telephone *(Include Area Code)* | E-Mail Address *(If applicable)* ||
| (909) 865-9880 | VALLEN.KUO @ PVHMC.ORG ||
| Signature | Date ||
| | 7/17/2013 ||

17. The parties mutually agree that the following named individual will be designated as point-of-contact for the Agreement on behalf of CMS.

On behalf of CMS the undersigned individual hereby attests that he or she is authorized to enter into this Agreement and agrees to all the terms specified herein.

| Name of CMS Representative |||
| JoAnn Cerne |||
| Title/Component |||
| Health Insurance Specialist, CMM, Division of Acute Care |||
| Street Address | | Mail Stop |
| 7500 Security Boulevard | | C4-08-06 |
| City | State | ZIP Code |
| Baltimore | MD | 21244-1850 |
| Office Telephone *(Include Area Code)* | E-Mail Address *(If applicable)* ||
| 410-786-4530 | Joann.Cerne@cms.hhs.gov ||
| Signature | Date ||
| | ||

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0734. The time required to complete this information collection is estimated to average 30 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have any comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, N2-14-26, Baltimore, Maryland 21244-1850 and to the Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D.C. 20503.

01913

P8

P-8

01914

**PLEASE NOTE:**

**EXHIBIT 8** IS THE LISTING OF ALL OF THE SSI ELIGIBLE PATIENTS POMONA VALLEY HOSPITAL MEDICAL CENTER CONTENDS SHOULD BE INCLUDED IN THE PROVIDER'S SSI PERCENTAGE.  THE LISTING HAS BEEN REMOVED FROM THE PRRB's INITIAL VERSION OF THE FINAL POSITION PAPER, SINCE THE LISTING INCLUDES PHI, AND THE PRRB's FILES ARE "PUBLIC."  THE INFORMATION HAS BEEN PROVIDED TO THE MAC REPRESENTATIVES, SINCE THE PROVIDER AND MAC WILL BE DISCUSSING HOW TO RESOLVE THE PERCENTAGE BETWEEN THEM, AND WITH CMS, PRIOR TO THE HEARING DATE.  IN THE EVENT A HEARING IS HELD IN THIS CASE, THE LISTING WILL BE PROVIDED TO THE PRRB UNDER APPROPRIATE PROTECTION, PRIOR TO THE HEARING.

01915

on providers.  Continuing with regular updates to ICD-9-CM and ICD-1-CM/PCS would make the implementation of these new code sets more costly and complex, requiring repeated changes to systems and the development of educational training materials.

## WAGE INDEX

Acumen's recommendation on wage index data: While CMS is not proposing any additional changes regarding reforming the wage index in FY 2011, the health care reform law mandates that the Secretary recommend comprehensive reform of the Medicare wage index system to Congress by December 31, 2011.  The plan is required to take into account the 2007 MedPAC wage index report, including the proposed use of BLS data and the recommended redefinition of wage areas.  IHA is concerned about using BLS data for several reasons including, because BLS wage data for a particular occupation are collected from all employers, not just short-term, acute-care hospitals participating in Medicare.  Consequently, the BLS data may not be an accurate reflection of labor costs experienced by hospitals in some communities.  **IHA continues to have significant concerns about using BLS data and urges CMS to move forward cautiously.**

## PAYMENT ADJUSTMENT FOR MEDICARE DSH

For FY 2011, CMS is proposing a new data match approach for determining SSI eligibility.  In *Baystate Medical Center* v. *Leavitt*, the district court concluded that CMS' current matching process did not use the "best available data" to match Medicare patient day information with SSI eligibility data.  In implementing the *Baystate* decision, CMS recalculated the plaintiffs' SSI fractions and DSH payments using a revised data matching process that comports with the district court's decision.  CMS is proposing to adopt the same revised data matching process for calculating hospitals' DSH SSI fractions for FY 2011 and subsequent fiscal years.

**IHA supports CMS' proposal to implement the *Baystate* decision.**  The changes flowing from the *Baystate* case will apply prospectively to all and retrospectively to those hospitals that appealed the applicable issues.  In Iowa, several hospitals participated in the appeal and will benefit from this corrected and improved policy.

Thank you for your review and consideration of these comments.  If you have any questions, please contact me at the Iowa Hospital Association at 515/288-1955.

Sincerely,

Abigail Stork
Director, Federal Relations

CMS provide hospitals with an electronic receipt for each electronically submitted agreement, so that hospitals may have documentation that they completed the submission requirements.


### PAYMENT ADJUSTMENT FOR MEDICARE DSH

For FY 2011, CMS is proposing a new data match approach for determining SSI eligibility.  In *Baystate Medical Center* v. *Leavitt*, the district court concluded that CMS' current matching process did not use the "best available data" to match Medicare patient day information with SSI eligibility data.  In implementing the *Baystate* decision, CMS recalculated the plaintiffs' SSI fractions and DSH payments using a revised data matching process that comports with the district court's decision.  CMS is proposing to adopt the same revised data matching process for calculating hospitals' DSH SSI fractions for FY 2011 and subsequent fiscal years.


**IH-DM supports CMS' proposal to implement the *Baystate* decision.**  The changes flowing from the *Baystate* case will apply prospectively to all and retrospectively to those hospitals that appealed the applicable issues.  IH-DM participated in the appeal and will benefit from this corrected and improved policy.


Thank you for your review and consideration of these comments.  If you have any questions, please contact me at (515) 362-5103.


Sincerely,



Crystal Estabrook
Reimbursement Manager

These days should be included in the Medicaid fraction. Both courts ruled that CMS has violated federal statute by not including these days in the Medicaid fraction.

**C.      Timing of the SSI Match:**

Due to the proposed timing of publication of the SSI percentages, many hospitals will have their desk reviews and audits completed prior to the release of the SSI data. Providers who typically receive desk audits have their 2007 and 2008 cost reports NPR'd quickly. Subsequent appeal of the SSI issue is dismissed due to lack of data necessary to issue a position paper. Hospitals should not be penalized for being a provider that requires minimal audit or cannot obtain accurate information from CMS. CMS should instruct the MACs to hold the NPR's for the SSI data or require all settled cost report years be reopened.

Mercy firmly believes any revisions to SSI should be applied to all hospitals not just those with open appeals or whose cost reports have not been settled. Absent this, providers would be encouraged to appeal or protest every cost report going forward to ensure any future rights that may be granted.

Finally, Mercy applauds CMS's proposal to use SSA and MedPAR data updated 15 months after the close of each Federal fiscal year rather than the current 6 months subsequent to each Federal fiscal year. We definitely agree that this is a big step towards finding an appropriate balance between administrative finality and cost report settlement.

**D.      Labor & Delivery Room Days:**

Mercy proposes CMS publish instructions to the MACs to process L&D appeals by simply reversing the initial audit adjustment offsetting L&D. We do not believe it is necessary to redo SSI fractions to determine if L&D days were removed from the SSI fraction. CMS has indicated in *Northeast* that its programs do not offset L&D in the SSI fraction. For audits in process, CMS should instruct MACs to not make an audit adjustment for L&D.

**E.      SSI Fraction:**

CMS should re-run the SSI fractions for all years, including those under appeal and re-publish the fractions. The SSI fractions should be re-run using covered days, which is consistent with the Court decision in *Baystate*, and reimburse hospitals what is due. CMS should not include